# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**'09 CIV 00777**

| | |
|---|---|
| JOHN CACOULIDIS and PHYLLIS CACOULIDIS, as Trustees of GRAND METRO BUILDERS OF NY CORP. DEFINED BENEFIT PLAN, on Behalf of Themselves and all Others Similarly Situated, and Derivatively on behalf of BEACON ASSOCIATES LLC I, | CIVIL ACTION NO. |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| BEACON ASSOCIATES MANAGEMENT CORP.; JOEL DANZIGER, ESQ.; HARRIS MARKHOFF, ESQ.; IVY ASSET MANAGEMENT CORP.; THE BANK OF NEW YORK MELLON CORPORATION; FRIEDBERG SMITH & CO. P.C.; and JOHN DOES 1-100, | |
| Defendants, | |
| and BEACON ASSOCIATES LLC I, | |
| Nominal Defendant. | |

Plaintiffs John Cacoulidis and Phyllis Cacoulidis, as Trustees of Grand Metro Builders of NY Corp. Defined Benefit Plan (together, "Plaintiffs") and a Class (defined below), and on behalf of the Nominal Defendant (defined below), allege upon the investigation made by and through their counsel, complaints filed by the United States government and Securities and Exchange Commission (the "SEC"), and reports and interviews published in the financial press, as follows:

## I.    SUMMARY OF ACTION

1.    This is both a derivative action brought by investors in Beacon Associates LLC 1 (the "Fund"), on behalf of the Fund, and a class action on behalf of all persons, other than defendants, who invested in the Fund from August 9, 2004 until the present (the "Class Period"), to recover damages caused by defendants' violations of the federal securities laws and common law (the "Class").

2.    This case arises from a massive, fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and others, and which was facilitated by the defendants named herein, who recklessly or with gross negligence and/or in breach of fiduciary duties owed to Plaintiffs and other Class members, caused and permitted the Fund's assets to be invested with Madoff.

3.    On December 10, 2008, Madoff informed his sons that his investment advisory business, BMIS, was a complete fraud. Madoff stated that he was "finished," that he had "absolutely nothing," and that "it's all just one big lie." He confessed he had been running "basically, a giant Ponzi scheme." Madoff admitted that the business was insolvent and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion. Published reports now indicate that Madoff's estimate may be conservative and the losses will not be fully known until the full effect of the fraud is understood.

4.    On December 11, 2008, Madoff's fraud was exposed and the SEC charged both Madoff and BMIS with securities fraud. Criminal charges were also filed against Madoff individually. When he was arrested, Madoff was quoted as saying "there is no innocent explanation" for what had happened and that he "paid investors with money that wasn't there." In short, Madoff and his cohorts operated a massive Ponzi scheme the likes of which are unparalleled.

5.     Madoff was unable to perpetrate this fraud on his own.  Numerous funds of funds ("FOF"), investment advisors, and affiliates, including the defendants, facilitated Madoff's fraud by investing and allowing to be invested, billions of dollars of their clients' money with Madoff and his related entities without performing adequate due diligence despite the existence of obvious "red flags."  These red flags included, among others, the abnormally high and stable positive investment results reportedly obtained by Madoff regardless of market conditions; inconsistencies between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients; and the fact that BMIS was audited by a small, obscure accounting firm with no experience auditing entities of the apparent size and complexity of BMIS.  Despite having failed to perform the most basic due diligence, these FOFs, investment advisors and affiliates were paid large management and advisory fees by their clients, often for doing little other than blindly handing over their clients' funds to Madoff or his related entities, without telling their clients.

6.     Defendant Beacon Associates Management Corp. ("Beacon Associates" or the "Managing Member"), which is wholly owned by defendants Joel Danziger, Esq., Harris Markhoff Esq. and their immediate families, was the "Managing Member" of the Fund.  The Fund's "Investment Consultant" was defendant Ivy Asset Management Corp. ("Ivy Asset Management"), which is a wholly owned subsidiary of defendant The Bank of New York Mellon Corporation. Plaintiffs' investment in the Fund was decimated as a direct result of Beacon Associates' and Ivy Asset Management's reckless and/or grossly negligent dereliction of their fiduciary duties, and the complete failure of Friedberg Smith & Co. ("Friedberg Smith"), the Fund's auditor, to perform adequate due diligence despite the existence of myriad

red flags indicating that a high concentration of the Fund's assets were invested in Madoff related investments.

7.    In fact, as a result of the defendants' conduct, the Fund has been forced into liquidation, and most of Plaintiffs' and the other Class members' investments have been lost.

8.    Plaintiffs seek to recover damages caused to the Class by defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for common law fraud, negligent misrepresentation and breach of fiduciary duty under New York law. Plaintiffs also seek to recover derivatively for breach of fiduciary duty, gross negligence and mismanagement, and common law fraud.

## II.    JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.P.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.P.R. § 240.10b.5, as well as under the laws of the State of New York. This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and the supplemental jurisdiction of this Court. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77u, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.    Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.    Additionally, defendants maintain their headquarters or conduct substantial business in this District.

11. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.   PARTIES

12. Plaintiffs John Cacoulidis and Phyllis Cacoulidis are Trustees of Grand Metro Builders of NY Corp. Defined Benefit Plan ("Grand Metro Plan," or the "Plan"). The sponsor of the Plan is Grand Metro Builders of NY Corp. located in Jericho, New York. Plaintiffs invested approximately $2.01 million on behalf of the Plan in the Fund and have suffered damages as a result.

13. Nominal Defendant, Beacon Associates LLC I, is a New York limited liability company formed under the laws of the State of New York on April 1, 2004 and managed by Beacon Associates Management Corp. Its principal office is located at 123 Main Street, Suite 900, White Plains, NY 10601. Beginning on or about August 9, 2004, memberships in the Fund were offered via an Offering Memorandum ("Memberships"). The minimum capital contribution entitling an investor to access to the Fund was $500,000, subject to the right of Beacon Associates to modify the requirement. Prior to the revelation of Madoff's fraud, as of October 20, 2008, the Net Asset Value of the Fund was approximately $560 million.

14. Defendant Beacon Associates Management Corp. is a New York corporation, located at 123 Main Street, Suite 900, White Plains, NY 10601. Beacon Associates is the Managing Member of the Fund. Beacon Associates directs the business operations and affairs of the Fund, and makes all allocation and reallocation decisions concerning the Fund's assets. Defendants Joel Danziger and Harris Markhoff own (beneficially and of record) 100% of the issued and outstanding voting shares of Beacon Associates (constituting 1% of the outstanding

stock of Beacon Associates). All of the non-voting common stock of Beacon Associates (consisting 99% of the total outstanding stock of Beacon Associates) is held by the immediate families of defendants Danziger and Markhoff. Beacon Associates has a responsibility to the Fund's investors to exercise good faith and fair dealing in all dealings affecting the fund.

15. Defendant Joel Danziger, Esq. ("Danziger") is the President and a Director of Beacon Associates. Mr. Danziger is a licensed attorney and a partner of the law firm of Danziger & Markhoff LLP located at 123 Main Street, Suite 900, White Plains, NY 10601. Mr. Danziger resides in Bedford, NY.

16. Defendant Harris Markhoff, Esq. ("Markhoff") is the Vice President, Secretary, Treasurer and Director of Beacon Associates. Mr. Markhoff is a licensed attorney and a partner of the law firm of Danziger & Markhoff LLP located at 123 Main Street, Suite 900, White Plains, NY 10601. Mr. Danziger resides in Pound Ridge, NY.

17. Defendants Beacon Associates, Danziger and Markhoff are sometimes referenced collectively as the "Beacon Defendants."

18. Defendant Ivy Asset Management Corporation ("Ivy Asset Management"), a Delaware corporation located at One Jericho Plaza, Jericho, New York 11753, is a wholly owned subsidiary of The Bank of New York Mellon Corporation. Ivy Asset Management is a registered Investment Advisor under the Investment Advisors Act of 1940 and a commodity trading advisor under the Commodity Exchange Act. Beacon Associates engaged Ivy Asset Management to provide it with advice regarding the selection and allocation of the Fund's assets among various investment managers and investment pools.

19. Defendant The Bank of New York Mellon Corporation ("BONY") is a Delaware corporation headquartered at One Wall Street, New York, NY 10286. According to its Form

10-K for the year ending December 31, 2007, BONY "is a global financial services company headquartered in New York, New York, with approximately $1.121 trillion in assets under management and $23.1 trillion in assets under custody and administration." BONY is the parent company of Ivy Asset Management.

20.     Defendant Friedberg Smith & Co., P.C., located at 855 Main Street, Bridgeport, CT 06604, is the Fund's independent auditor.

21.     Defendants Beacon Associates, Danziger, Markhoff, Ivy Asset Management, BONY and Friedberg Smith are sometimes referenced collectively as the "Defendants."

22.     Defendant John Does 1-100.  The true identities, roles and capacities of John Does 1-100 have yet to be ascertained.  Included in John Does 1-100 are the immediate family members of defendants Danziger and Markhoff, the control persons of the Fund, the members of the Managing Member's Advisory Board, hedge funds, hedge fund managers, brokerage firms and fiduciaries to the Fund who participated, exploited and perpetrated the wrongdoing alleged herein, and knowingly violated the policies established, though not enforced because of the breaches of fiduciary duties alleged herein. The identities of John Does 1-100 will be disclosed in amendments to this complaint when the true identities are discovered.

23.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Fund investors by their actions.

## IV.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons who were investors in the Fund during the Class Period and who suffered damages thereby.  Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families

and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

25.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there may be approximately 100 members in the proposed Class. Members of the Class may be identified from records maintained by the Fund or Beacon Associates and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal and state laws described herein.

27.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

28.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants during the Class Period misrepresented material facts about the business, operations, investments, and financial condition of the Fund;

c.    whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

d.    whether Defendants' conduct alleged herein was intentional, reckless, and/or grossly negligent and/or in violation of fiduciary duties owed to Plaintiffs and other Class members and therefore violated the statutory and common law of New York; and

e.    to what extent the members of the Class have sustained damages and the proper measure of damages.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    PLAINTIFFS' DERIVATIVE ALLEGATIONS

30.    Plaintiffs bring this action derivatively in the right and for the benefit of the Fund to seek redress for the injuries suffered, and to be suffered, by the Fund as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, negligence, and fraud alleged herein. The Fund is named as a Nominal Defendant solely in a derivative capacity.

31.    Plaintiffs will adequately and fairly represent the interests of the Fund and its investors in enforcing and prosecuting its rights.

32.    Plaintiffs are investors in the Fund and were investors of the Fund at all times relevant to Defendants' wrongful course of conduct alleged herein.

33.    Plaintiffs have not made any demand upon the Managing Member to bring an action on behalf of the Fund asserting the claims herein to recover damages for the injuries

suffered by Fund, since such demand would have been a futile, wasteful and useless act, and therefore is excused for the following reasons.

34. Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Managing Member, and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of the Fund to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims.

35. Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Managing Member to the Members and the Fund. The Managing Member is subject to liability for breaching its fiduciary duties to the Fund by, *inter alia*, causing the Fund's assets to be invested with Madoff or Madoff-related entities without any oversight or supervision, causing or permitting the reckless investing practices alleged herein, failing to adequately monitor the investment vehicles in which it placed the Fund's assets, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

36. Demand is excused because the Managing Member exercised and continues to exercise ultimate authority over the Fund and profited at the expense of the Fund by receiving monthly management and administrative fees and other fees from the Fund while in possession of material, adverse, non-public information.

37. Demand is excused because the Managing Member faces a substantial likelihood of liability in this action because of its acts and omissions alleged herein. The dramatic breakdowns and gaps in the Managing Member's internal controls were so widespread and systematic that the Managing Member faces substantial exposure to liability under the "Caremark" or similar doctrine for total abrogation of its duty of oversight. The Managing

Member either knew or should have known that the Fund's assets were invested in a fund of funds that were actually part of a massive Ponzi scheme, or otherwise generated purported results that would have been impossible to achieve under Madoff's investment strategy, and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses.

38.   In addition, demand is also excused because the Managing Member has ratified the egregious actions outlined herein, and the Managing Member cannot be expected to prosecute claims against itself and persons or entities with whom it has extensive inter-related business, professional and personal entanglements, if Plaintiffs demanded that it do so.   The Managing Member, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund.

39.   Demand is also excused because the Managing Member participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and therefore is not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

40.   Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, the Managing Member either knew of the financial risks to the Fund's assets or recklessly turned a blind eye to them.   Such conduct is not protected by the business judgment rule and exposes the Managing Member to a substantial threat of liability in this action.

41.   The Managing Member lacks sufficient independence to make a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants.

42.   In addition, demand would be a futile and useless for the additional following reasons:

a.  The Managing Member, because of its inter-related business, professional and personal relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund as requested herein;

b.  The Managing Member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Fund's Members or recklessly and/or negligently disregarded the wrongs complained of herein, and is therefore not a disinterested party. The Managing Member exhibited a sustained and systemic failure to fulfill its fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.  In order to bring this suit, the Managing Member would be forced to sue itself and persons with whom it has extensive business and personal entanglements, which it will not do, thereby excusing demand;

d.  The acts complained of constitute violations of the fiduciary duties owed by the Managing Member and these acts are incapable of ratification; and

e.  The Fund has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Managing Member has not filed any lawsuits against itself, its principals, or others who were responsible for that wrongful conduct to attempt to recover for the Fund any part of the damages the Fund has suffered and will continue to suffer.

43.   Finally, Plaintiffs have not made any demand on the Members of the Fund to institute this action since such demand would be a futile and useless act for the following reasons:

    a.    The Fund has numerous Members;

    b.    Making demand on a number of Members would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of the Members; and

    c.    Making demand on all the Members would force Plaintiffs to incur huge expenses, even assuming all the Members could be individually identified.

44.   The Fund has been directly and substantially injured by reason of the Managing Member's intentional breach and/or reckless disregard of its fiduciary duties to the Fund. Plaintiffs, as Members and representatives of the Fund, seek damages and other relief for the Fund, in an amount to be proven at trial.

45.   Beacon Associates, as Managing Member of the Fund, violated its fiduciary duties to the Fund by failing to act with due care, loyalty and good faith when it failed to conduct any due diligence on the hedge funds in which it invested the Fund.   Beacon Associates caused the Fund to invest with Madoff-related entities, or in conscious abrogation of its fiduciary duties, permitted it to occur.

## VI.   SUBSTANTIVE ALLEGATIONS

46.   During the Class Period, Defendant Beacon Associates offered Memberships in the Fund to qualified investors such as Plaintiffs.

47.   Participation in the Fund was offered primarily through an offering memorandum dated on or about August 9, 2004 ("Offering Memorandum").   According to the Offering

Memorandum, Defendant Beacon Associates, with the assistance of Ivy Asset Management, made all investment allocation and reallocation decisions on behalf of the Fund.

48.   Neither the Offering Memorandum nor any other offering materials used to solicit investments in the Fund disclosed that the vast majority of the Fund's assets were blindly entrusted to Madoff, BMIS, or other Madoff-controlled entities.

49.   In fact, the Offering Memorandum falsely stated that:

> *A significant portion of the Company's assets are allocated to a strategy adopted by the Managing Member involving a portfolio of Large Cap Stocks hedged with options ("Large Cap Strategy").* The balance of the Company's assets are allocated among independent investment managers ("Managers") indirectly through investment in other investment funds ("Investment Pools") which the Managers manage…. The Company's assets are allocated and reallocated among strategies and to and from Managers by the Managing Member, following consultation with Ivy Asset Management Corp. (the "Investment Consultant") and the Managing Member's Advisory Board. (Emphasis added).

50.   The Offering Memorandum also described the investment strategy of each of the Managers of the remainder of the Fund's assets, as follows:

> The strategies employed by the Manager trading one Investment Pool in which a minority of the Company's assets currently is invested include:
>
> - Hedge/arbitrage activities, consisting of related securities arbitrage, closed-end fund arbitrage, convertible arbitrage, merger arbitrage, Reg D custom convertibles, and fixed income arbitrage. This group of activities is designed to be unaffected by stock and bond market fluctuations and to provide an extra measure of profitability in times of market adversity;
>
> - Long-term equity-oriented situations, including private equity, venture capital, energy, and special situations;
>
> - Distressed securities, emphasizing process-driven and activist situations which are expected to be uncorrelated with the stock and bond markets; and

- Short stocks and other portfolio protection trades, such as index put options or volatility swaps.

The strategies currently employed by the Manager trading another Investment Pool with a minority of the Company's assets involves the use of a long/short strategy of investing in securities of publicly traded companies believed to be under valued (long positions) or overvalued (short positions), with an emphasis on the small-cap sector (defined as companies with a capitalization of at least $400,000,000) with the rest of the portfolio invested in larger cap stocks. The median capitalization of stocks in this Manager's portfolio is $2.5 billion. This Investment Pool seeks to manage risk and to enhance portfolio returns through the flexible use of hedging, including selling stocks short. The Investment Pool's portfolio is concentrated in a relatively small number of equity positions and therefore this Investment Pool is not diversified. Moreover, this Manager has historically utilized a greater percentage of long positions than short positions.

The Strategies currently employed by the Manager trading another Investment Pool with a minority of the Company's assets involved investment in a portfolio of securities of distressed and out-of-favor companies, including corporate bonds, convertible bonds, high-yield bonds, bank debt, trade claims, and equities. To minimize risk, the Investment Pool diversifies its portfolio across a broad spectrum of securities, companies and industries. Distressed securities are found among companies that are currently in a reorganization under applicable bankruptcy laws, companies that are restructuring debt obligations outside of court, companies that are liquidating assets to pay creditors, and companies that have recently been restructured. Securities of out-of-favor companies are found among companies in out-of-favor industries, and situations where the market has overreacted to an event or series of events, such as the potential for (or initiation of) significant litigation. An important part of the strategy involves shorting the securities of companies that the Manager believes may become distressed in the future.

The strategies currently employed by the Manager trading another Investment Pool with a minority of the Company's assets include "event driven investing." Event driving investing involves the purchase or sale of securities of companies which are undergoing substantial changes. Among other opportunities, the Company invests in securities of companies that are selling assets, leaving or entering new businesses, changing their capital

structures or that are the subject of a publicly announced acquisition, merger, tender offer, exchange offer, liquidation or other corporate reorganization.

The Manager seeks to achieve absolute returns from event driven investing which are not dependent on overall stock market advances or declines or fluctuations in interest rates or currencies. Generally, the Manager will seek to reduce or eliminate such market or other risks inherent in its portfolio by employing a variety of hedging techniques including the purchase or sale of, among other things, options on market or sector indices, futures contracts, or structured derivative products.

51.    In other words, while the Offering Memorandum sought to lull potential investors into believing the assets of the Fund would be invested in a number of different vehicles including the "Large Cap Strategy" adopted by Beacon Associates itself; in reality, the vast majority of the assets in the Fund were invested in Madoff, BMIS or other Madoff-controlled entities unbeknownst to investors.

52.    The Offering Memorandum also falsely stated that Beacon Associates would conduct thorough due diligence with respect to the Fund's investments:

> The Managing Member (after consultation with the Investment Consultant and the Managing Member's Advisory Board) allocates and reallocates the company's assets. The Managing Member also reviews the Company's portfolio of investments on a regular basis.
>
> The Managing Member is responsible for selecting the Company's strategies and for selecting the Managers and the Investment Pools they manage, and for monitoring the Company's performance and for monitoring the Managers' adherence to their stated investment strategies and objectives.
>
> \*                \*                \*
>
> *Both quantitative and qualitative criteria are factored into the evaluation of Managers, including analyses of: type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation with traditional investments such as stocks*

*and bonds.*

Analysis of the performance records of existing and prospective Managers is combined with evaluation of a number of less tangible qualitative factors in an effort to identify Managers whose (i) collective trading results have historically demonstrated substantial returns, while making use of various hedging techniques in an attempt to limit risk and, (ii) strategies and/or investments which have a low degree of cross-correlation with each other and with the Managing Member's Large Cap Strategy.

*     *     *

The Managing Member (after consulting with the Investment Consultant and the Managing Member's Advisory Board), selects strategies and Managers that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable), and in the case of Managers, which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; the use of hedging strategies as part of the Manager's investment approach; diversification benefits relative to other Managers; *a quality and stable organization;* a market independent (market neutral) investment approach; and an ability to consistently and effectively apply its investment approach. Certain criteria may be emphasized above others in the selection and retention of particular Managers and strategies. (Emphasis added).

53.    In addition, Beacon Associates retained Ivy Asset Management to provide investment advice regarding the selection of Fund Managers and the allocation of the Fund's assets. Specifically, the Offering Memorandum provides in relevant part:

Pursuant to an agreement between the Managing Member and [Ivy Asset Management] the Investment Consultant provides advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and also provides certain administrative and accounting services to the Managing Member.

54.    The Offering Memorandum was false and misleading because it contained a material omission in that it failed to disclose that the Beacon Defendants and Ivy Asset

Management, with no or inadequate due diligence or oversight, abdicated their responsibilities and entrusted the assets of the Fund to investment vehicles that were connected with Madoff.

55.   Further, while Ivy Asset Management is an Investment Consultant for the Fund and therefore has fiduciary obligations to the Fund and its members, its services go beyond what a traditional investment consultant would provide. In fact, Ivy Asset Management also provided administrative and accounting services to the Managing Member, and split the fees generated.

56.   The Beacon Defendants' investing of the Fund's assets gave rise to duties owed them to the Fund. The Beacon Defendants knew that the Fund's assets were entrusted to their care and owed fiduciary duties of good faith, fair dealing and due care to the Fund and its Members. They knew, or, in the exercise of due care in discharging their fiduciary duties, were reckless in not knowing that Madoff was engaged in a massive Ponzi scheme, or, at a minimum, was reporting results that could neither be verified nor explained. Nonetheless, they knowingly and willfully invested the Fund's assets in BMIS or other Madoff-managed investment vehicles. They had a fiduciary obligation to protect the assets of the Fund, which they utterly failed to fulfill.

57.   Further, the Beacon Defendants and Ivy Asset Management, as the Fund's Investment Consultant, violated their fiduciary duties to the Fund and its Members by failing to disclose that a majority of the Fund's assets were invested with Madoff, as opposed to being largely invested in a  "Large Cap Strategy" adopted by Beacon Associates itself, as set forth in the Offering Memorandum. These material misrepresentations and omissions caused the Fund to lose over 74% of its value.

58.   Despite Beacon Associates' egregious conduct in failing to properly conduct due diligence and failing to ensure that the Fund's assets were invested in accord with the Offering Memorandum instead of in a Ponzi scheme orchestrated by Madoff, Beacon Associates nevertheless has been collecting a Managing Member fee from the value of each Member's Capital Account at an annual rate of 1.5%.

59.   In addition, despite the fact that it conducted virtually no due diligence on the Fund's investments, Ivy Asset Management received a fee for its services as the Fund's Investment Consultant.  In addition, beginning January 1, 2006, the Fund was also responsible for paying the fee for "administrative services" performed by Ivy Asset Management.

60.   The Fund was also required to pay a fee to each of the Managers who traded the Fund's assets.

61.   The Beacon Defendants and Ivy Asset Management, in breach of their respective fiduciary duties, failed to conduct even the most rudimentary due diligence in the vehicles in which they were investing the proceeds of the subscriptions of Plaintiffs and the Fund's other investors.   The Beacon Defendants and Ivy Asset Management instead relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high even during adverse market conditions.

62.   As reported in the financial press, unlike the Beacon Defendants and Ivy Asset Management, other investment advisors who conducted due diligence on Madoff and ran even the most simplistic models testing the validity of Madoff's results recognized the fraudulent irregularities with Madoff's investments with ease.  For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net worth

individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme. Mr. Rosenkranz reached this conclusion based, *inter alia*, on the abnormally stable and high investment returns claimed by Madoff and the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

63.    The financial press also reported that, prior to the disclosure of the massive fraud committed by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. Mr. Fludgate's conclusion is supported by the determination of the investigators who examined the materials in Madoff's offices that Madoff was operating a secret, unregistered investment vehicle from his office.

64.    Similarly, as *The New York Times* reported on December 17, 2008, routine due diligence on Madoff conducted by Société Générale revealed serious irregularities:

> What [Société Générale] found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraged wealthy clients at its private bank from his investments.
>
> The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

Schwartz, N., "European Banks Tally Losses Linked to Fraud," *The New York Times*, Dec. 17, 2008.

65.    Further, *BusinessWeek* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after

hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye Fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye. In July, the pension's board voted unanimously to dump its Rye stake."

66.     Indeed, there were warning signs going back as early as 1992 that should have alerted investment professionals such as the Beacon Defendants and Ivy Asset Management that Madoff and/or BMIS were perpetrating a massive fraud on investors.

67.     For example, in 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising them returns of 13.5 to 20 percent, and invested the money entirely with Madoff. As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients. No action was taken against Madoff.

68.     A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry, reported that Madoff had reported positive returns for the last 11-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

69.    Further, the article reported that Madoff's strategy and trading was done by signals from a proprietary 'black box,' and that Madoff would not disclose the specifics of his firm's risk management and how it could move so much capital in and out of positions without having a major effect on the Market. The article quoted Madoff as saying "I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."

70.    On May 27, 2001 *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." As reported in Barron's, Madoff's accounts:

> [H]ave produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

The article reported that some on Wall Street, including three options strategists for major investment banks, were skeptical about how Madoff achieved his double-digit returns using options alone, and told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy."

71.    The article further reported that:

> The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance – even though they don't understand how he does it. "Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told *Barron's*. 'People who have all the trade confirms and statement still can't define it very well; ... This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money.

*        *        *

> ***What Madoff told us was, 'If you invest with me, you must never***

*tell anyone that you're invested with me. It's no one's business what goes on here,'* says an investment manager who took over a pool of assets that included an investment in a Madoff fund. *'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'* (Emphasis added.)

72.    Harry Markopolous, who reported Madoff to the SEC, summed up the peculiarity

of the situation as follows:

The third-party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. ... *"Why the need for such secrecy? If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings."* (Emphasis in original.)

73.    Moreover, Madoff, instead of using an outside prime broker as nearly all hedge

funds do, was his own prime broker and custodian of all the assets he manages. A December 13,

2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives,

which invests in hedge funds for clients, as follows: "There was no independent custodian

involved who could prove the existence of assets.... There's clear and blatant conflict of interest

with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is

not a structure I've seen."

74.    By failing to investigate and blindly ignoring these clear red flags and the

suspicious nature of Madoff's operations and investment results, the Beacon Defendants and Ivy

Asset Management were grossly negligent. If they had made an appropriate inquiry into any of

these red flags, that investigation would have raised questions regarding the true value and

existence of the Fund's assets invested with Madoff.

75.    The Beacon Defendants and Ivy Asset Management acted with gross negligence

and violated their fiduciary duties by failing to perform, or causing to be performed,

appropriate due diligence that would have revealed that the Fund's assets, which they handed over to Madoff were part of a fraudulent scheme.

76.   Moreover, in stark contrast to its representations and undertaking that it had ultimate responsibility for the management, operations and investment decisions made on behalf of the Fund, Beacon Associates abdicated its responsibilities as the Managing Member of the Fund and failed to properly and adequately supervise, monitor and manage the investments of the Fund as it was bound to do.   As a result, Beacon Associates breached its fiduciary duty to the Fund and its Members.

77.   The reality was that the Beacon Defendants gave carte blanche to Madoff to manage the majority of the Fund's assets, and did not have any say in how those assets would be managed.   The Beacon Defendants, in blatant dereliction of their fiduciary duties, exercised no oversight whatsoever over Madoff, despite entrusting more than half of the Fund's assets the Beacon Defendants controlled and were duty-bound to protect.

78.   The Beacon Defendants also breached their fiduciary duties by hiring defendant Friedberg Smith, a small accounting firm consisting of eleven principals, to act as the independent auditor for the Fund.   The Offering Memorandum identified Friedberg Smith as the Fund's auditor, which reasonably led potential investors to believe that the Fund's operations and financial condition would be reviewed and audited by a reputable accounting firm.

79.   Defendant Friedberg Smith utterly failed to perform its work as auditors of the Fund's annual financial statements in a manner consistent with the standards of the auditing profession and as required by Generally Accepted Auditing Standards ("GAAS").

80.    Defendant Friedberg Smith either knew of or recklessly disregarded: (a) the concentration of the Fund's investments in a single third party investment manager, Madoff; (b) the materially heightened risk to Fund's assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (c) the abnormally high and stable positive investment results reportedly obtained by Madoff, (d) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as the Fund; and (e) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

81.    By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, Friedberg Smith's audits of the Fund's financial statements and reports thereon during the Class Period were grossly negligent, in violation of GAAS and constituted an extreme departure from the standards of the accounting and auditing industry. In particular, Friedberg Smith has violated GAAS by failing to use due professional care in the performance of its work, AU §230; failing to properly plan the audits, AU §311; failing to maintain an appropriate degree of skepticism during the audits, AU §316; and failing to obtain sufficient competent evidential matter to support the conclusions of the audit reports, AU §326.

82.    In fact, on January 12, 2009, investors in the Fund received a letter from the Beacon Andover Group, advising them that the Fund's previously issued financial statements and accompanying auditor's reports should not be relied upon.

83.   If Friedberg Smith had made an appropriate inquiry underlying these red flags, that investigation would have raised questions regarding the true value and existence of the Fund's reported investment assets and the serious deficiencies in Beacon Associates' internal controls and adherence to its own policies designed to reduce the risk of loss to the Fund's Members.

84.   The Beacon Defendants also misrepresented the holdings of the Fund in October 2008.   Specifically, in an October 20, 2008 letter to Fund Members, (the "October 2008 Letter"), Beacon Associates stated that "[o]ur fund has been invested approximately 75% in U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month."   However, less than two months later, Beacon Associates revealed that the Fund lost of 74% of is value because it was actually being invested in Madoff entities.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 of the Securities and Exchange Commission**
**(Against All Defendants)**

85.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.   This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

87.   During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material fact and omitted to state material facts in order to make the statements made, in light of the

circumstances under which they were made, not misleading to Plaintiffs and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs and the other members of the Class to purchase Memberships in the Fund.

88.   As a result of the Defendants' conduct, the Fund has been forced into liquidation, and Plaintiffs' investment has been decimated.

89.   During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiffs and the other Class members as particularized above.

90.   In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiffs and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing Memberships in the Fund. Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

91.   By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class in connection with their acquisitions of Memberships in the Fund.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against Danziger, Markhoff, BONY and John Does 1-100 )**

92.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.   Danziger and Markhoff acted as controlling persons of the Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of the Fund's operations, and/or intimate knowledge of the Fund's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Fund, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Danziger and Markhoff had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.   Danziger and Markhoff had direct and supervisory involvement in the day-to-day operations of the Fund and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

95.   Similarly, John Does 1-100 were in positions of ownership and/or control over the Fund, including the members of the Managing Member's Advisory Board. By virtue of their high level positions, participation in and/or awareness of the Fund's investments, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Fund, including the content and dissemination of some of the statements that Plaintiffs contend are false and misleading, including, without limitation, the described investment strategies of the Fund.

96.   Finally, BONY, as the parent company of Ivy Asset Management, had the power to influence and control and did influence and control the decision making of Ivy Asset Management, including its recommendations regarding the Fund's Managers and the allocation of the Fund's assets.

97.   By virtue of their positions as controlling persons, Danziger, Markhoff, BONY and John Does 1-100, are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their acquisitions of Memberships in the Fund.

**COUNT III**
**Common Law Fraud**
**(Against the Beacon Defendants, Ivy Asset Management and Friedberg Smith )**

98.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.   Plaintiffs and other members of the Class in reasonable and justifiable reliance upon the statements and representations made by the Beacon Defendants, as previously set forth herein, purchased Memberships in the Fund. Plaintiffs and other members of the Class would not have purchased their Memberships in the Fund except for their reliance upon the representations made by the Beacon Defendants in the Offering Memorandum, and would not have purchased them had they been aware of the material omissions and concealment by the Beacon Defendants of the fact that Beacon Associates, the Managing Member, had entrusted a majority of the Fund's assets to Madoff-related entities.

100. At the time the statements and representations were made by the Beacon Defendants in the Offering Memorandum, the Beacon Defendants knew or should have known them to be false and intended to deceive Plaintiffs and other members of the Class by making such statements and representations.

101. Plaintiffs and other members of the Class, also reasonably and justifiably relied upon Ivy Asset Management's representations that it would advise the Managing Member, regarding the selection and allocation of the Fund's assets. In reality, Ivy Asset Management knew or should have known that the majority of the Fund's assets were invested with Madoff-related entities, and that the Offering Memorandum failed to disclose this information.

102. Similarly, as the Fund's auditor, Friedberg Smith knew or should have known that the majority of the Fund's assets were not invested in a "Large Cap Strategy" as stated in the Offering Memorandum but, in fact, were heavily invested in Madoff-related vehicles. Friedberg Smith nevertheless failed to disclose this material information to the Fund's Members.

103. Friedberg Smith falsely certified the Fund's financial statements and reports.

104. At the time of the false statements, misrepresentations and omissions set forth above, each of the Beacon Defendants, Ivy Asset Management and Friedberg Smith intended that Plaintiffs and other members of the Class would act on the basis of the misrepresentations and omissions contained in the Offering Memorandum in determining whether to purchase and/or retain Memberships in the Fund. Plaintiffs and other Class members reasonably relied thereon to their detriment in making such decisions.

105. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Fund was invested "in U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month," when, in fact, less than two months later, it was revealed that the Fund lost over 74% percent of its value as a result of being invested in Madoff entities.

106. Had Plaintiffs and other members of the Class known of the material facts that the Beacon Defendants, Ivy Asset Management and Friedberg Smith wrongfully concealed and misrepresented, and the falsity of the Beacon Defendants', Ivy Asset Management's and Friedberg Smith's representations, Plaintiffs and other Class members would not have purchased and/or retained their Memberships in the Fund.

107. Plaintiffs and other members of the Class, as a result of their purchase of Memberships in the Fund and by reasons of the Beacon Defendants', Ivy Asset Management's and Friedberg Smith's wrongful misrepresentations, have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

108. By reason of the foregoing, the Beacon Defendants, Ivy Asset Management and Friedberg Smith are jointly and severally liable to Plaintiffs and other Class members.

109. The Beacon Defendants', Ivy Asset Management's and Friedberg Smith's fraudulent acts were willful and wanton and Plaintiffs and other Class members are entitled to punitive damages.

### COUNT IV
### Negligent Misrepresentation
### (Against the Beacon Defendants, Ivy Asset Management and Friedberg Smith)

110. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111. The Beacon Defendants, Ivy Asset Management and Friedberg Smith owed to Plaintiffs and other Class members, a duty: (a) to act with reasonable care in preparing and disseminating the Offering Memorandum and other representations relied upon by Plaintiffs and other Class members in deciding to purchase their Membership interests in the Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information

contained in the Offering Memorandum. In addition, Defendant Friedberg Smith knew that its audited financial reports would be provided to the Fund's Members and potential investors in the Fund and would be relied on by them in making investment decisions concerning the Funds.

112. The Beacon Defendants, Ivy Asset Management and Friedberg Smith failed to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memorandum and other representations, including the audited annual financial statements.

113. Neither the Offering Memorandum nor any other offering material used in soliciting investment in the Fund ever disclosed that a majority of the Fund's assets were ultimately invested with Madoff, BMIS or other Madoff-controlled entities. Indeed, to the contrary, the Offering Memorandum explicitly stated that a significant portion of the Fund's assets were invested in a Large Cap Strategy.

114. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Fund was invested "in U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month," when, in fact, less than two months later, it was revealed that the Fund lost over 74% percent of its value as a result of being invested in Madoff entities.

115. As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Class members have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined and to be proven at trial.

116. By reason of the foregoing, the Beacon Defendants, Ivy Asset Management and Friedberg Smith are jointly and severally liable to Plaintiffs and other Class members.

## COUNT V
### Breach of Fiduciary Duty
### (Against the Beacon Defendants, Ivy Asset Management and Friedberg Smith)

117. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

118. The Beacon Defendants owed and continue to owe Plaintiffs and the Class fiduciary obligations. By reason of their fiduciary relationships, the Beacon Defendants owed and continue to owe Plaintiffs and the Class the highest obligation of good faith, fair dealing, loyalty and due care.

119. Ivy Asset Management, as the Fund's Investment Consultant, owed and continues to owe Plaintiffs and the Class fiduciary duties.

120. Friedberg Smith, as the Fund's auditor, also owed and continues to owe fiduciary duties to the Plaintiffs and other Class members.

121. As a result of the Beacon Defendants' and Ivy Asset Management's abrogation of their duties to use due care in the management of the assets of the Fund for the benefit of the Fund's Members, as alleged herein, the Beacon Defendants and Ivy Asset Management violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Plaintiffs and the Class. They acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

122. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Fund was invested "in U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month,"

when, in fact, less than two months later, it was revealed that the Fund lost over 74% percent of its value as a result of being invested in Madoff entities.

123.  In addition, as a result of Friedberg Smith's failure to adequately investigate the Fund's investments and failure to discover that its assets were not invested as stated in the Offering Memorandum, including in a Large Cap Strategy, but rather were heavily invested in Madoff-related vehicles, Friedberg Smith has failed to fulfill its fiduciary duty owed to Plaintiffs and other members of the Class.  Friedberg Smith acted in bad faith, with gross negligence and with complete disregard of its obligation to use due care, including without limitation ensuring that the Beacon Defendants were investing the Fund's assets in accordance with the Offering Memorandum and were using reasonable and prudent investment standards.

124.  In addition, Friedberg Smith breached its fiduciary duties by falsely certifying the Fund's financial statements.

125.  As a proximate result of the Beacon Defendants', Ivy Asset Management's and Friedberg Smith's bad faith breaches of their fiduciary duties, Plaintiffs and other Class members have sustained damages, suffered mental and emotional distress and have lost most, if not all, of their respective investments in an amount yet to be determined, and to be proven at trial.

126.  By reason of the foregoing, the Beacon Defendants, Ivy Asset Management and Friedberg Smith are liable to Plaintiffs and other members of the Class.

127.  The Beacon Defendants, Ivy Asset Management and Friedberg Smith's acts were willful and wanton and Plaintiffs and other Class members are entitled to punitive damages.

## COUNT VI
## Gross Negligence and Mismanagement
### (Against the Beacon Defendants and Ivy Asset Management and John Does 1-100)

128. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

129. The Beacon Defendants, Ivy Asset Management and John Does 1-100 were retained by the Fund to invest Plaintiffs' and other Class members' money in a manner consistent with the Fund's investment objectives as set forth in the Offering Memorandum.

130. The Beacon Defendants, Ivy Asset Management and John Does 1-100 owed fiduciary duties to the Plaintiffs and the Class to conduct, manage and supervise their investments in good faith and with due care. As set forth above, the Beacon Defendants, Ivy Asset Management and John Does 1-100 breached their fiduciary duties to Plaintiffs and the Class by acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries.

131. The Beacon Defendants, Ivy Asset Management and John Does 1-50 should have prevented, through the exercise of reasonable diligence, the improper investing of a majority of the Fund's assets solely into Madoff-related vehicles.

132. The Beacon Defendants, Ivy Asset Management and John Does 1-50 authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

133. Plaintiffs and the Class relied to their detriment on the Beacon Defendants, Ivy Asset Management and John Does 1-100 to discharge their duties as fiduciaries in a careful and prudent manner.

134. As a direct and proximate result of result of the gross negligence and misconduct of the Beacon Defendants, Ivy Asset Management and John Does 1-100, Plaintiffs and the Class have been harmed. These Defendants are liable to Plaintiffs and the Class in an amount yet to be determined and to be proven at trial.

## COUNT VII
### Unjust Enrichment
### (Against The Beacon Defendants, Ivy Asset Management, BONY and John Does 1-100)

135. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

136. As a result of the misconduct detailed herein, the Fund has been forced to begin liquidating, and Plaintiffs' and the other Class members' investments have been decimated; yet The Beacon Defendants, Ivy Asset Management, BONY and John Does 1-100 have reaped substantial fees, dividends and other pecuniary benefits at the expense of Plaintiffs and the Class.

137. The Beacon Defendants, Ivy Asset Management, BONY and John Does 1-100 have therefore been unjustly enriched and equity and good conscience require that these Defendants disgorge to the Plaintiffs and the Class, all such unjust enrichment in an amount to be determined at trial.

## COUNT VIII
### Aiding and Abetting Breaches of Fiduciary Duty
### (Against Ivy Asset Management and BONY)

138. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

139. As Beacon Associates' Investment Consultant, Ivy Asset Management had actual knowledge of the investments Beacon Associates was making on behalf of the Fund. With that

knowledge, Ivy Asset Management knew of the fiduciary duty breaches by the Beacon defendants, or was willfully blind to substantial evidence of such breaches.

140. Ivy Asset Management substantially assisted the fiduciary duty breaches of the Beacon Defendants.

141. Similarly, as Ivy Asset Management's parent company, BONY had knowledge of Ivy Asset Management's investment consulting business, including its consulting the Fund regarding its investment strategy. With that knowledge, BONY knew of the fiduciary duty breaches of Ivy Asset Management.

142. Plaintiffs and the Class have suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy Asset Management, in an amount to be proven at trial.

**COUNT IX**
**Derivative Claim for Breach of Fiduciary Duty**
**(Against the Beacon Defendants, Ivy Asset Management and Friedberg Smith)**

143. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

144. The Beacon Defendants owed and continue to owe the Fund fiduciary obligations. By reason of their fiduciary relationships, the Beacon Defendants owed and continue to owe the Fund the highest obligation of good faith, fair dealing, loyalty and due care.

145. Ivy Asset Management, as the Fund's Investment Consultant, owed and continues to owe the Fund similar fiduciary obligations. By reason of its fiduciary relationship, Ivy Asset Management owed and continues to owe the Fund the highest obligation of good faith, fair dealing, loyalty and due care.

146. Friedberg Smith, as the Fund's auditor, also owed and continues to owe fiduciary duties to the Fund.

147. As a result of the Beacon Defendants' abrogation of their duties to use due care in the management of the assets of the Fund, as alleged herein, the Beacon Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to the Fund.  They acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

148. Similarly, as a result of Ivy Asset Management's abrogation of its duties to use due care in advising the Fund with respect to the Manager selection and allocation of the Fund's assets, as alleged herein, Ivy Asset Management violated and breached its fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to the Fund.  Ivy Asset Management acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

149. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Fund was invested "in U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month," when, in fact, less than two months later, it was revealed that the Fund lost over 74% percent of its value as a result of being invested in Madoff entities.

150. In addition, as a result of Friedberg Smith's failure to adequately investigate the Fund's investments and failure to discover that its assets were not invested in a "Large Cap Strategy" as stated in the Offering Memorandum, but rather were heavily invested in Madoff-

related vehicles, Friedberg Smith has failed to fulfill its fiduciary duty owed to the Fund. Friedberg Smith acted in bad faith, with gross negligence and with reckless disregard of its obligation to use due care, including without limitation ensuring that the Beacon Defendants and Ivy Asset Management were investing the Fund's assets in accordance with the Offering Memorandum and were using reasonable and prudent investment standards.

151. As a direct and proximate result of result of the Beacon Defendants, Ivy Asset Management's and Friedberg Smith's failure to perform their fiduciary obligations, the Fund has been harmed. As a result of the misconduct alleged herein, the Beacon Defendants, Ivy Asset Management and Friedberg Smith are liable to the Fund in an amount yet to be determined, and to be proven at trial.

152. The Beacon Defendants, Ivy Asset Management and Friedberg Smith's acts were willful and wanton and the Fund is entitled to punitive damages.

## COUNT X
### Derivative Claim for Gross Negligence and Mismanagement
### (Against the Beacon Defendants and Ivy Asset Management and John Does 1-100)

153. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

154. The Beacon Defendants, Ivy Asset Management and John Does 1-100 were retained by and on behalf of the Fund to manage the Fund's assets in a manner consistent with the Fund's investment objectives as set forth in the Offering Memorandum.

155. The Beacon Defendants, Ivy Asset Management and John Does 1-100 owed fiduciary duties to the Fund to conduct, manage and supervise the Fund's investments in good faith and with due care. As set forth above, the Beacon Defendants, Ivy Asset Management and John Does 1-100 breached their fiduciary duties to the Fund by acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries the Fund.

156. The Beacon Defendants, Ivy Asset Management and John Does 1-50 should have prevented, through the exercise of reasonable diligence, the improper investing of a majority of the Fund's assets solely into Madoff-related vehicles.

157. The Beacon Defendants, Ivy Asset Management and John Does 1-50 authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

158. The Fund relied to its detriment on the Beacon Defendants, Ivy Asset Management and John Does 1-100 to discharge their duties as fiduciary of the Fund in a careful and prudent manner, to their detriment.

159. As a direct and proximate result of result of the gross negligence and misconduct of the Beacon Defendants, Ivy Asset Management and John Does 1-100, the Fund has been harmed. These Defendants are liable to the Fund in an amount yet to be determined, and to be proven at trial.

**COUNT XI**
**Derivative Claim Unjust Enrichment**
**(Against The Beacon Defendants, Ivy Asset Management, BONY, and John Does 1-100)**

160. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

161. As a result of the misconduct detailed herein, the vast majority of the Fund's assets have been lost and the Fund has been forced to begin liquidating; yet the Beacon Defendants, Ivy Asset Management, BONY and John Does 1-100 have reaped substantial fees, dividends and other pecuniary benefits at the expense of the Fund.

162. The Beacon Defendants, Ivy Asset Management, BONY and John Does 1-100 have therefore been unjustly enriched and equity and good conscience require that these

Defendants disgorge to the Fund, all such unjust enrichment in an amount to be determined at trial.

**COUNT XII**
**Derivative Claim for Aiding and Abetting Breaches of Fiduciary Duty**
<u>**(Against Ivy Asset Management and BONY)**</u>

163. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs, as though set forth fully herein.

164. As Beacon Associates' Investment Consultant, Ivy Asset Management had actual knowledge of the investments Beacon Associates was making on behalf of the Fund. With that knowledge, Ivy Asset Management knew of the fiduciary duty breaches by the Beacon defendants, or was willfully blind to substantial evidence of such breaches.

165. Ivy Asset Management substantially assisted the fiduciary duty breaches of the Beacon Defendants.

166. Similarly, as Ivy Asset Management's parent company, BONY had knowledge of Ivy Asset Management's investment consulting business, including its consulting the Fund regarding its investment strategy. With that knowledge, BONY knew of the fiduciary duty breaches of Ivy Asset Management.

167. The Fund has suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy Asset Management, in an amount to be proven at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing (including the return of all management fees paid by the limited partners), in an amount to be proven at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

C.      awarding compensatory damages in favor of the Fund against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

D.      awarding punitive damages in favor of Plaintiffs and the other Class members for Defendants' willful and wanton acts, in an amount to be determined at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

E.      awarding punitive damages in favor of the Fund for Defendants' willful and wanton acts, in an amount to be determined at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

F.      awarding Plaintiffs, the Class and the Fund their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 27, 2009

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:_____
    Daniel W. Krasner (DK 6381)
    Gregory M. Nespole (GN 6820)
    Demet Basar (DB 6821)
    Stacey T. Kelly (SK 3339)
    270 Madison Avenue
    New York, NY 10016
    Telephone: (212) 545-4600
    Facsimile:  (212) 545-4653

## VERIFICATION

I, Phyllis Cacoulidis, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief. I declare under the penalty of perjury that the foregoing is true and correct.

January **23**, 2009

_Phyllis Cacoulidis_
Phyllis Cacoulidis
as Trustee of Grand Metro Builders of NY
Corp. Defined Benefit Plan

534361

## VERIFICATION

I, John Cacoulidis, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief. I declare under the penalty of perjury that the foregoing is true and correct.

January **23**, 2009

John Cacoulidis
as Trustee of Grand Metro Builders of NY
Corp. Defined Benefit Plan

534359

Executed this 23rd day of January, 2009.

_Phyllis Cacoulidis_
Phyllis Cacoulidis
as Trustee of Grand Metro Builders of NY
Corp. Defined Benefit Plan


_John C. lidis_
John Cacoulidis
as Trustee of Grand Metro Builders of NY
Corp. Defined Benefit Plan

534368