UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

09 OCT -1  PM 8: 25

U.S. DISTRICT COURT
S.D.N.Y.

| | |
|---|---|
| IN RE: BEACON ASSOCIATES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MASTER FILE<br>NO. 09-CV-0777-LBS<br><br>Demand for Jury Trial |

## CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

Lead Plaintiff the Pipe Trades Group, comprised of the Plumbers & Steamfitters Local

267 Pension Fund and Plumbers & Steamfitters Local 267 Insurance Fund (collectively "Local

267"), Plumbers Local 112 Health Fund ("Local 112"), Local 73 Retirement Fund and U.A. of

Journeymen & Apprentices Local 73 Fund (collectively "Local 73"), brings this action on behalf

of itself and all similarly situated persons who purchased interests in Beacon Associates LLC I

and Beacon Associates LLC II (collectively, the "Beacon Fund," defined below), the assets of

which were substantially invested directly or indirectly with Bernard L. Madoff ("Madoff")

and/or Bernard L. Madoff Investment Securities ("BMIS"), and who sustained losses thereby

(the "Investor Class")., "ERISA Plaintiffs," which include the Trustees of Local 267 (comprised

of Gregory Lancette, Bradley Ward, Bryan Allen, David Waby, Donald A. Little, Jr., James

Fredenburg, Peter Lauze, Donald Beckley, Patrick Bonnell, Dominic Mancini, and James Rood);

the Trustees of Local 112 (comprised of James Rounds and Lyle D. Fassett); the Trustees of

Local 73 (comprised of Patrick Carroll, Timothy Donovan, Timothy Rice, Frederick J.

Volkomer, Frederick J. Volkomer II, Daniel Hickey, Eric Saunders, L. James Culeton, Jason

Lozier, James Donovan, Marc Stevens, Tom Metcalf, Jr., Thomas Culeton, and Mark Maniccia);

the Trustees of the I.B.E.W. Local 43 and Electrical Contractors Welfare Fund (comprised of

William C. Towsley, Dennis J. McDermott, Kevin J. Crawford, Donald H. Morgan, John S.

Kogut, Carl Hibbard, Jr., and Marilyn M. Oppedisano); and the Trustees of the Oswego County

Laborers' Local 214 Pension Fund (comprised of David Henderson, Jr., Michael Blasczienski,

William F. Shannon, Earl N. Hall, Paul A. Castaldo, and Earl R. Hall), bring this action on

behalf of themselves and all fiduciaries, participants and beneficiaries of any employee benefit

plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA") who invested

in the Beacon Fund at any time through the present, the assets of which were substantially

invested directly or indirectly with Madoff and/or BMIS, and who sustained losses thereby (the

"ERISA Class").  Derivative Plaintiff Jay Raubvogel IRA, brings this action derivatively in the

right and for the benefit of the Beacon Fund to seek redress of the injuries suffered by the

Beacon Fund as a direct result of the breaches of fiduciary duties, breached contract, gross

mismanagement, negligence, and fraud alleged herein, that caused its assets to be invested

directly or indirectly with Madoff and/or BMIS.  Additional plaintiffs include Jay Raubvogel for

himself and as Trustee of the M. Raubvogel Co. Trust, and Grand Metro Builders of NY Corp.

Defined Benefit Plan, John and Phyllis Cacoulidis, as Trustees of,the Grand Metro Builders of

NY Corp. Defined Benefit Plan.  The allegations contained herein are based on personal

knowledge as to Plaintiffs' own acts, and on information and belief as to all other matters based

on the investigations and interviews conducted by and through Lead Counsel, which included the

review of complaints filed by the United States Government, the New York Attorney General,

and the Securities and Exchange Commission (the "SEC"), plea allocutions, papers and

pleadings filed in actions commenced by state municipalities and administrative agencies, the

SEC Inspector General's Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi

Scheme ("SEC OIG Report"), offering memoranda and quarterly and periodic reports issued to

potential investors and Beacon Fund members, news reports published in the financial press, auditor reports, and other available information.

## NATURE OF THE ACTION

1.       On December 11, 2008, Madoff was arrested by federal authorities for operating a $50 billion Ponzi scheme, in which Madoff used the principal investments of new clients to pay the fictitious "returns" of other clients.  Madoff and BMIS were charged with securities fraud and other federal offenses by the SEC.  Madoff and BMIS were also criminally charged with securities fraud by the United States Attorney's Office for the Southern District of New York. On March 12, 2009, Madoff pleaded guilty to all eleven criminal charges, admitting in court that he operated a Ponzi scheme.  On June 29, 2009, Madoff was given a sentence of 150 years in prison.

2.       Madoff did not perpetrate this fraud by himself.  Defendants facilitated Madoff's fraud and committed their own violations of law by investing and allowing to be invested their clients' money with Madoff while knowing that they would be unable to carry out their duties given their inability to obtain independent verification of the facts being represented to them by Madoff and/or BMIS.  They did so by, among other things, (a) employing a scheme to defraud potential investors by (i) issuing Offering Memoranda that contained false statements regarding their due diligence; and the investment strategies and objectives of the Beacon Fund, (ii) failing to disclose relevant facts to investors, and (iii) issuing account statements, financial reports and other devices to perpetuate their scheme to defraud Beacon investors; (b) engaging in a course of business which operated as a fraud or deceit upon investors in the Beacon Fund; and (c) breaching their fiduciary duties imposed by ERISA (as to ERISA covered plans) and state law with regard to candor, undivided loyalty and good faith and fair dealing.  These breaches

arose from false and misleading statements and omissions regarding (a) Ivy's role in the scheme and (b) all the Defendants' due diligence and  monitoring of Madoff and BMIS (*e.g.*, the performance of Madoff's trading strategy).

3.       As a result of Defendants' wrongful conduct, including making false and misleading statements (and failing to disclose material information) in the Offering Memoranda, audit reports, and other documents about, *inter alia*, Ivy's role, due diligence performed and by failing to conduct due diligence into Madoff and/or BMIS, the Beacon Fund's investments in Madoff and/or BMIS have been decimated, thereby damaging the Class and the Beacon Fund.

4.       During the Class Period, defendant Beacon Associates Management Corp. ("BAMC"), the Managing Member of the Beacon Fund, issued false statements from or omitted certain facts it was duty bound to disclose in its Offering Memoranda and Subscription Agreements, regarding its initial and ongoing due diligence over the investment manager, Madoff, to whom the Fund's assets were allocated.

5.       To bolster its credibility, BAMC leveraged the pedigree of Defendant Ivy Asset Management Corp., (and its successor in interest, Ivy Asset Management, LLC, hereinafter "Ivy")[1] a registered investment adviser that offered high net-worth individuals and institutional clients alternative investment vehicles.  The retention of Ivy as the Beacon Fund's Investment Consultant and representations regarding its expertise as an investment advisor in the Offering Memoranda and on Ivy's website, created an appearance of financial sophistication and exclusivity that the BAMC and Ivy Defendants purported to offer potential investors.  This image was cultivated by Defendants with the purpose and effect of inducing investors to invest

---

[1] Ivy was acquired by and became a wholly owned subsidiary of Defendant Bank of New York Mellon Corp. ("BONY").

in the Beacon Fund in reliance on, *inter alia*, the purportedly sound investment strategy and high standard of due diligence exercised by BAMC and Ivy Defendants.

6.       In fact, Ivy was at the heart of the scheme to collect substantial management fees from Plaintiffs and Class members by acting as the portal through which the Beacon Fund and other feeder funds placed assets under Madoff's management.  Ivy's founder, Larry Simon, was a close friend of Madoff.  Larry Simon described Madoff as a genius, as someone who was well respected in the financial community, and trumpeted his reputation for consistently high returns.

7.       Upon information and belief, when Madoff, citing a minimum net worth requirement, stopped accepting direct investments from individuals, he permitted his friend Larry Simon, along with Defendants Joel Danziger and Harris Markhoff, individuals with whom Simon shared a personal relationship, to establish the Beacon Fund to serve as a conduit to Madoff's "investment services."

8.       Ivy, through the actions of Larry Simon and other individuals, abandoned its duties because investing with Madoff (as opposed to other outside managers) was uniquely lucrative in that his consistent profits and inflated returns were structured to provide inflated fees to feeders such as Ivy.  Because Madoff did not receive a "cut" of the advisory fees, foregoing them purportedly to make the fee on the supposed ongoing, but in fact, non-existent trades, he was able to reflect higher net returns, which in turn, allowed BAMC and Ivy to collect greater amounts in management fees based on the inflated assets under management.  Over more than a decade, Ivy orchestrated this scheme by omitting to disclose to Plaintiffs and the Class that it was not able to perform its oversight function in breach of its duties as investment adviser and was not conducting the represented and paid for due diligence.  BAMC was enticed to invest specifically with Madoff by the prospect of millions of dollars in management and incentive fees

that it would not have to share with Madoff so long as it likewise abandoned its fiduciary obligations to Plaintiffs and other Class members.

9.      After Bank of New York Mellon (BONY) acquired Ivy, BONY caused Ivy to maintain Beacon's investment with Madoff despite the absence of due diligence.  BONY caused the Beacon/Madoff exposure to continue, despite glaring "red flags," including the fact that Madoff was limiting and eliminating Ivy fund-of-funds investment in Madoff (e.g., the Rosewood and Birchwood funds) as a result of Ivy's acquisition by BONY.  Madoff's refusal to continue the fund-of-funds investments at the time of the acquisition put BONY under a heightened duty to protect its other investors, specifically Plaintiffs and the Class, because Madoff's refusal to accept the money was manifestly in order to avoid questions and any semblance of due diligence.

10.     Jeanneret Associates ("Jeanneret") was the Investment Manager for members of the ERISA and Investor Classes (the "Jeanneret Subclass").  As Investment Manager, Jeanneret executed Discretionary Investment Management Agreements with members of the Jeanneret Subclass and undertook obligations of oversight and due diligence, and in the case of the ERISA Class, covenanted to invest employee benefit plan assets in accordance with the heightened standard of prudence required of an ERISA fiduciary.  However, Jeanneret knew that it could not live up to these standards as to assets placed in the Beacon Fund; assets that it intended to go to Madoff.

11.     During the Class Period, BAMC and Jeanneret Associates represented to Plaintiffs and the Class that they would fulfill their professional and fiduciary duties to manage the capital that Plaintiffs and other Class members entrusted to their discretion while knowing, or recklessly disregarding the fact, that they could not fulfill these obligations with respect to the

Beacon Fund's assets invested with Madoff.  Nevertheless, BAMC and Jeanneret Associates continued to mislead Plaintiffs and the Class members and blindly entrusted their capital to funds that fed into Madoff and BMIS, who misappropriated that capital in a massive Ponzi-scheme. BAMC and Jeanneret Associates failed to perform proper due diligence, failed to exercise due care in managing investments, and/or concealed from Plaintiffs and the Class the fact that it was not actively managing or safeguarding investments made by Plaintiffs and the Class.

12.     The Beacon, Ivy and Jeanneret Defendants had an affirmative duty to disclose and did omit to disclose to investors the facts that (a) they had not conducted, and could not conduct, the appropriate and required level of due diligence on Madoff's operations, due to the inability of investment managers to independently verify Madoff's operations, and the multiple roles (which included inherent conflicts of interest) that Madoff served, including broker/dealer, custodian, and investment manager; (b) they had no reasonable basis to believe that Madoff was in fact utilizing the strategy that was being represented would be utilized in the management of the Beacon Fund; (c) they had no reasonable basis to understand the strategy Madoff was in fact utilizing to achieve the reported results, which were both remarkably high and remarkably consistent, regardless of market conditions.

13.     In justifiable reliance on Defendants' representations and conduct, Plaintiffs and other members of the Class remitted investment adviser fees to BAMC, Jeanneret and Ivy so that BAMC, Jeanneret Associates and Ivy would vet suitable investment managers, assemble a diversified group of investments, follow a sound investment strategy, and conduct ongoing due diligence in accordance with the representations made to Plaintiffs and the Class members. BAMC, Jeanneret Associates and Ivy utterly ignored their contractual, statutory, and common

law duties.  Additionally, defendants BAMC and Ivy, pursuant to a consulting agreement, shared

in undisclosed and prohibited fees that unjustly enriched those defendants.

14.     As detailed herein, the Beacon, Jeanneret, Bank of New York and Ivy Defendants,

among others, unfairly, unlawfully and deceptively represented their due diligence and ongoing

oversight of Madoff in order to enrich themselves with lucrative fees from their relationship to

Madoff.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337, §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j

and 78t(a), and Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well

as the common law, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C.

§ 1367.

16.     This Court also had jurisdiction over the subject matter of this action pursuant to

§§ 409, 502(a)(2) & (3), and 502(e) of the Employee Retirement Income Security Act

("ERISA"), as amended, 29 U.S.C. §§ 1109, 1132(a)(2) & (3), 1132(e).

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, 28 U.S.C. § 1391(b), and 29 U.S.C. § 1132(e)(2).  Substantial acts in furtherance

of the alleged fraud and other wrongdoing and/or their effects occurred within this District, and

many of the Defendants reside in and/or maintain principal executive offices in this District.

18.     In connection with the acts and omissions alleged in this Complaint, Defendants,

directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## PARTIES

**Plaintiffs:**

19.     Plaintiff Plumbers & Steamfitters Local 267 Pension Fund  invested $5,738,000.00 in Beacon I interests during the Class Period.  Plaintiff Plumbers & Steamfitters Local 267 Insurance Fund, a fund maintained for the benefit of members of Local 267, invested $3,000,000.00 in Beacon II interests during the Class Period.  Local 267 is a local union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical areas of Onondaga, Cortland, Chemung, Schuyler and Tompkins counties in New York.  Local 267's membership includes over 1,000 skilled tradesmen and tradeswomen.

20.     Plaintiff Plumbers Local 112 Health Fund invested $1,400,000 in Beacon II interests during the Class Period.  Local 112 is a union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical area comprised of Broome, Chenango, Cortland, Delaware, Hamilton, Herkimer, Lewis, Madison, Oneida, Otsego and Tioga counties in New York.

21.     Plaintiff Local 73 Retirement Fund invested $8,270,337 in Beacon I interests during the Class Period.  U.A. of Journeymen & Apprentices Local 73 Fund, a fund maintained for the benefit of the Journeymen and Apprentices of Local 73, invested $1,380,000.00 in Beacon II interests during the Class Period.  Local 73 is a union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical area comprised of Oswego and Cayuga counties, and the Townships of Savannah, Butler, Wolcott, Jefferson, St. Lawrence, the Village of Hogansburg, the St. Regis Indian Reservation in Franklin County, and the Islands in Lake Ontario and the St. Lawrence River in New York.

22.     Plaintiff Gregory Lancette serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Greg Lancette is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Gregory Lancette's address is 150 Midler Park Drive, Syracuse, New York 13206.

23.     Plaintiff Bradley Ward serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Brad Ward is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Bradley Ward's address is 150 Midler Park Drive, Syracuse, New York 13206.

24.     Plaintiff Bryan Allen serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Bryan Allen is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Bryan Allen's address is 701 West State Street, Ithaca, NY 14850.

25.     Plaintiff David Waby serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff David Waby is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff David Waby's address is 8 Fairway Drive, Auburn, NY 13021.

26.     Plaintiff Donald A. Little, Jr. serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Donald A. Little, Jr. is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C.

§ 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Donald A. Little, Jr.'s address is 109 Belshire Lane, Syracuse, NY 13208.

27.     Plaintiff James Fredenburg serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff James Fredenburg is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Fredenburg's address is 1680 Berry Road, Lafayette, NY 13084.

28.     Plaintiff Peter Lauze serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Peter Lauze is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Peter Lauze's address is 900 Old Liverpool Road, Suite 17, Liverpool, 13088.

29.     Plaintiff Donald Beckley serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Donald Beckley is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Donald Beckley's address is 1525 Lake Street, PO Box 205, Elmira, NY 14902.

30.     Plaintiff Patrick Bonnell serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Patrick Bonnell is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Patrick Bonnell's address is 1004 Sullivan Street, Elmira, NY 14902.

31.     Plaintiff Dominic Mancini serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff Dominic Mancini is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Dominic Mancini's address is 615 South Avenue, Rochester, NY 14620.

32.     Plaintiff James Rood serves as a Trustee of the Board of Trustees of the Local 267 Funds.  As a Trustee of the Local 267 Funds, Plaintiff James Rood is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff James Rood's address is 400 Leavenworth Avenue, Syracuse, NY 13204.

33.     Plaintiff James Rounds serves as a Trustee of the Board of Trustees of the Plumbers Local 112 Health Fund, and participates in the Plumbers Local 112 Health Fund.  As a Trustee of the Plumbers Local 112 Health Fund, Plaintiff James Rounds is a fiduciary with respect to the Plumbers Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff James Rounds' address is 11 Griswold St., Binghamton, New York 13904.

34.     Plaintiff Lyle D. Fassett serves as a Trustee of the Board of Trustees of the Plumbers Local 112 Health Fund, and participates in the Plumbers Local 112 Health Fund.  As a Trustee of the Plumbers Local 112 Health Fund, Plaintiff Lyle D. Fassett is a fiduciary with respect to the Plumbers Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Lyle D. Fassett's address is 11 Griswold St., Binghamton, New York 13904.

35.     Plaintiff Patrick Carroll serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Patrick Carroll is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Patrick Carroll's address is 65 Baitsell Drive, Oswego, New York 13126.

36.     Plaintiff Timothy Donovan serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Timothy Donovan is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Timothy Donovan's address is 336 S.W. Eighth Street, Oswego, New York 13126.

37.     Plaintiff Timothy Rice serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Timothy Rice is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Timothy Rice's address is 205 East Sixth Street, Oswego, New York 13126.

38.     Plaintiff Frederick J. Volkomer serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Frederick J. Volkomer is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the

meaning of 29 U.S.C. § 1002(7).  Plaintiff Frederick J. Volkomer's address is 205 W. Albany Street, Oswego, New York 13126.

39.     Plaintiff Frederick J. Volkomer II serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Frederick J. Volkomer II is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Frederick J. Volkomer II's address is 1380 County Rt. 1, Oswego, New York 13126.

40.     Plaintiff Daniel Hickey serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Daniel Hickey is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Daniel Hickey's address is 705 East Seneca Street, Oswego, New York 13126.

41.     Plaintiff Eric Saunders serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Eric Saunders is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Eric Saunders' address is 705 East Seneca Street, Oswego, New York 13126.

42.     Plaintiff L. James Culeton serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff L. James Culeton is a fiduciary with respect to the Local

73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff L. James Culeton's address is 705 East Seneca Street, Oswego, New York 13126.

43.     Plaintiff Jason Lozier serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Jason Lozier is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Jason Lozier's address is 705 East Seneca Street, Oswego, New York 13126.

44.     Plaintiff James Donovan serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff James Donovan is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff James Donovan's address is 705 East Seneca Street, Oswego, New York 13126.

45.     Plaintiff Marc Stevens serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a Trustee of the Local 73 Funds, Plaintiff Marc Stevens is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Marc Stevens' address is 705 East Seneca Street, Oswego, New York 13126.

46.     Plaintiff Tom Metcalf Jr. serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a

Trustee of the Local 73 Funds, Plaintiff Tom Metcalf Jr. is a fiduciary with respect to the Local

73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73

Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Tom Metcalf Jr.'s address is 705

East Seneca Street, Oswego, New York 13126.

47.     Plaintiff Thomas Culeton serves as a Trustee of the Board of Trustees of the U.A.

of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a

Trustee of the Local 73 Funds, Plaintiff Thomas Culeton is a fiduciary with respect to the Local

73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73

Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Thomas Culeton's address is 705

East Seneca Street, Oswego, New York 13126.

48.     Plaintiff Mark Maniccia serves as a Trustee of the Board of Trustees of the U.A.

of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds.  As a

Trustee of the Local 73 Funds, Plaintiff Mark Maniccia is a fiduciary with respect to the Local

73 Funds within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 73

Funds within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Mark Maniccia's address is 705 East

Seneca Street, Oswego, New York 13126.

49.     Plaintiff William C. Towsley serves as a Trustee and the Secretary of the Board of

Trustees of the I.B.E.W. Local 43 and Electrical Contractors Welfare Fund ("I.B.E.W. 43

Welfare Fund") and participates in the I.B.E.W. 43 Welfare Fund.  The I.B.E.W. 43 Welfare

Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. §

1002(3).  As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff William C. Towsley is a

fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA,

29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of

ERISA, 29 U.S.C. § 1002(7). Plaintiff William C. Towsley's address is I.B.E.W. Local 43 and

Electrical Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

50. Plaintiff Dennis J. McDermott serves as a Trustee of the Board of Trustees of the

I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the

I.B.E.W. 43 Welfare Fund, Plaintiff Dennis J. McDermott is a fiduciary with respect to the

I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is

also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. §

1002(7). Plaintiff Dennis J. McDermott's address is I.B.E.W. Local 43 and Electrical

Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

51. Plaintiff Kevin J. Crawford serves as a Trustee of the Board of Trustees of the

I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the

I.B.E.W. 43 Welfare Fund, Plaintiff Kevin J. Crawford is a fiduciary with respect to the I.B.E.W.

43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a

participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7).

Plaintiff Kevin J. Crawford's address is I.B.E.W. Local 43 and Electrical Contractors Welfare

Fund, P.O. Box 2218, Clay, New York 13041.

52. Plaintiff Donald H. Morgan serves as a Trustee of the Board of Trustees of the

I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the

I.B.E.W. 43 Welfare Fund, Plaintiff Donald H. Morgan is a fiduciary with respect to the

I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is

also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. §

1002(7). Plaintiff Donald H. Morgan's address is I.B.E.W. Local 43 and Electrical Contractors

Welfare Fund, P.O. Box 2218, Clay, New York 13041.

53.     Plaintiff John S. Kogut serves as a Trustee and the Chairman of the Board of Trustees of the I.B.E.W. 43 Welfare Fund.  As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff John S. Kogut is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21).  Plaintiff John S. Kogut's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, c/o Kogut Electric, Inc., 1025 Erie St, P.O. Box 1735, Utica, New York 13503-1735.

54.     Plaintiff Carl Hibbard, Jr. serves as a Trustee of the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Carl Hibbard, Jr. is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21).  Plaintiff Carl Hibbard, Jr.'s address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, c/o Patricia Electric, 407 Brown Ave, Syracuse, New York 13208.

55.     Plaintiff Marilyn M. Oppedisano serves as a Trustee of the I.B.E.W. 43 Welfare Fund.  As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Marilyn M. Oppedisano is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21).  Plaintiff Marilyn M. Oppedisano's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, 23 Mitchell Street, Oswego, New York 13126.

56.     Plaintiff David Henderson, Jr. serves as a Trustee of the Board of Trustees of the Oswego County Laborers' Local 214 Pension Fund ("Oswego Laborers' Fund") and participates in the Oswego Laborers' Fund.  The Oswego Laborers' Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. § 1002(3).  As a Trustee of the Oswego Laborers' Fund, Plaintiff David Henderson is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7).

Plaintiff David Henderson's address is Oswego County Laborers' Local  214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

57.     Plaintiff Michael Blasczienski serves as a Trustee of the Board of Trustees of the Oswego Laborers' Fund and participates in the Oswego Laborers' Fund.  As a Trustee of the Oswego Laborers' Fund, he is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7).  Plaintiff Michael Blasczienski's address is Oswego County Laborers' Local 214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

58.     Plaintiff William F. Shannon serves as a Trustee of the Board of Trustees of the Oswego Laborers' Fund and participates in the Oswego Laborers' Fund.  As a Trustee of the Oswego Laborers' Fund, he is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7).  Plaintiff William F. Shannon's address is Oswego County Laborers' Local 214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

59.     Plaintiff Earl N. Hall serves as a Trustee of the Oswego Laborers' Fund.  The Oswego Laborers' Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. § 1002(3).  As a Trustee of the Oswego Laborers' Fund, Plaintiff Earl N. Hall is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21).  Plaintiff Earl N. Hall's address is Construction Employers Association of Central New York, Inc., 6563 Ridings Road, Syracuse, New York 13206.

60.     Plaintiff Paul A. Castaldo serves as a Trustee of the Oswego Laborers' Fund.  As a Trustee of the Oswego Laborers' Fund, Plaintiff Paul A. Castaldo is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Paul A. Castaldo's address is Paul A. Castaldo, Inc., 9 Fourth Avenue, Oswego, New York 13126.

61.     Plaintiff Earl R. Hall serves as a Trustee of the Oswego Laborers' Fund.  As a Trustee of the Oswego Laborers' Fund, Plaintiff Earl R. Hall is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Earl R. Hall's address is Construction Employers Association of Central New York, Inc., 6563 Ridings Road, Syracuse, New York 13206.

62.     Plaintiffs Jay Raubvogel and M. Raubvogel Co. Trust, by Jay Raubvogel as trustee, (collectively "Raubvogel") invested millions of dollars in the Beacon Fund, and have suffered damages as a result of the wrongful conduct alleged herein.

63.     Additional Plaintiffs Grand Metro Builders of NY Corp. Defined Benefit Plan and John and Phyllis Cacoulidis, as Trustees of Grand Metro Builders of NY Corp. Defined Benefit Plan (collectively, "Cacoulidis").  The sponsor of the Plan is Grand Metro Builders of NY Corp. located in Jericho, New York.  Cacoulidis invested approximately $2.01 million on behalf of the Plan in the Beacon Fund and have suffered damages as a result.

64.     Derivative Plaintiff Jay Raubvogel IRA is and at relevant times was a member of the Beacon Fund.

**<u>Defendants</u>:**

65.     Defendant Beacon Associates Management Corp. is a New York corporation, located at 123 Main Street, Suite 900, White Plains, New York 10601.  Beacon Associates is the

Managing Member of the Beacon Fund.  Based on the documents governing Beacon I and

Beacon II, BAMC, as Investment Manager of the Beacon Fund, is responsible for directing the

business operations and affairs of the Beacon Fund, including making all investment, allocation

and reallocation decisions.  Defendants Joel Danziger and Harris Markhoff own (beneficially and

of record) 100% of the issued and outstanding voting shares of the BAMC (constituting 1% of

the outstanding stock of the Beacon Fund).  All of the non-voting common stock of BAMC

(consisting of 99% of the total outstanding stock) is held by the immediate families of defendants

Danziger and Markhoff.   Because BAMC was assigned authority or control over the

management and disposition of the ERISA covered employee benefit plan assets held by the

Beacon Fund by the documents and instruments governing those entities, including those assets

which were in turn entrusted by the Beacon Fund to the discretion and control of Madoff, BAMC

has at all relevant times been a fiduciary with respect to the ERISA covered plan investors in the

Beacon Fund within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

66.     Defendant Joel Danziger, Esq. ("Danziger") is the President and a Director of

BAMC and by virtue of the control he exercised over the management and disposition of ERISA

covered employee benefit plan assets invested in the Beacon Fund, has at all relevant times been

an ERISA fiduciary with respect to these employee benefit plan assets held by the Beacon Fund,

and has at all relevant times had a responsibility to manage such assets in accordance with the

provisions of ERISA.   Danziger is a licensed attorney and a partner of the law firm of Danziger

& Markhoff LLP located at 123 Main Street, Suite 900, White Plains, New York 10601.

Danziger resides in Bedford, New York.

67.     Defendant Harris Markhoff, Esq. ("Markhoff") is the Vice President, Secretary,

Treasurer and a Director of BAMC and by virtue of the control he exercised over the

management and disposition of ERISA covered employee benefit plan assets invested in the

Beacon Fund, has at all relevant times been an ERISA fiduciary with respect to these employee

benefit plan assets held by the Beacon Fund, and has at all relevant times had a responsibility to

manage such assets in accordance with the provisions of ERISA.   Markhoff is a licensed

attorney and a partner of the law firm of Danziger & Markhoff LLP located at 123 Main Street,

Suite 900, White Plains, New York 10601.   Danziger resides in Pound Ridge, New York.

68.     Defendants Danziger and Markhoff together with members of their immediate

families beneficially own 100% of the issued and outstanding voting shares of BAMC.

69.     Nominal Defendants Beacon Associates LLC I ("Beacon I") and Beacon

Associates LLC II ("Beacon II") are each a New York limited liability company with principal

office at 123 Main Street, Suite 900, White Plains, New York 10601.  At all relevant times,

BAMC served as the Managing Member of the Beacon Fund.  In its capacity as Managing

Member, BAMC was responsible for making all investment, allocation and reallocation

decisions on behalf of the Beacon Fund, as well as administering the business and affairs of the

Beacon Fund.  By virtue of its authority with regards to the Beacon Fund, BAMC has at all

relevant times been a fiduciary with respect to the ERISA covered employee benefit plan assets

held by the Beacon Fund, and has at all relevant times had a responsibility to manage such assets

in accordance with the provisions of ERISA.  Membership in the Beacon Fund was offered to

investors via confidential Offering Memoranda.  The minimum capital contribution for an

investor to access the Beacon Fund was $500,000, subject to the right of BAMC to modify this

requirement.  According to the Beacon Fund's Offering Memoranda, all of Beacon II's assets

were invested in Beacon I for investment and trading activities.  The Beacon Fund holds

employee benefit plan assets subject to ERISA because at all relevant times more than 25% of the Beacon Fund's assets represented investments of employee benefit plan assets.

70.    Defendant BAMC, together with individual defendants, Danziger and Markhoff, are referred to collectively as the "Beacon Defendants."

71.    Defendant J.P. Jeanneret Associates, Inc. ("Jeanneret Associates") is a New York corporation established in 1988 with its principal place of business in Syracuse, New York. Jeanneret Associates is a registered investment advisor under the Investment Advisors Act of 1940 and a corporation engaged in the business of rendering investment advice for a fee to ERISA covered employee benefit plans organized as Taft-Hartley funds and other institutional investors and acted as an investment manager to those ERISA-covered employee benefit plans pursuant to ERISA § 3(38.   Jeanneret Associates used the authority, control and influence it exercised as a fiduciary to such investors to direct investor monies into the Beacon Fund.

72.    Defendant John P. Jeanneret, Ph.D., ("Jeanneret") is the founder, president, chief executive officer and chief compliance officer of Jeanneret Associates.  Jeanneret holds a Bachelor of Arts degree in Economics and Accounting, a Master of Arts in Economics and Business, and a doctorate in Philosophy, Economics and Finance, all from the State University of New York at Binghamton.  Jeanneret has been a Registered Investment Advisor, registered with the SEC from 1973 to the present.  Together with Defendant Perry, Jeanneret determined and delivered  the investment advice for a fee to Taft-Hartley funds and other institutional investors provided by Jeanneret Associates, acting on behalf of Jeanneret Associates exercised the authority and control over plan assets possessed by Jeanneret Associates and invested the assets of Jeanneret Associates' clients into the aforementioned Beacon Fund.

73.     Defendant Paul L. Perry ("Perry") is the director and owner of Jeanneret Associates.  Perry holds a Bachelor of Science in Finance and Quantitative Analysis from New York University.  Prior to his position at Jeanneret Associates, Perry was a Financial Consultant for Shearson Lehman Hutton and Gruntal and Company, Inc.  Together with Defendant Jeanneret, Perry determined and delivered the  investment advice for a fee to Taft-Hartley funds and other institutional investors provided by Jeanneret Associates, acting on behalf of Jeanneret Associates exercised the authority and control over plan assets possessed by Jeanneret Associates and invested the assets of Jeanneret Associates'  clients into the aforementioned Beacon Fund. Defendants John P. Jeanneret, J.P. Jeanneret Associates, and Paul L. Perry are hereinafter, collectively referred to as the "Jeanneret Defendants."

74.     At all relevant times, Jeanneret Associates served as an investment manager to certain ERISA covered employee benefit plans whose participants, beneficiaries and fiduciaries are members of the ERISA Class (defined infra ¶ 107) within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38), and, by virtue of the Jeanneret Defendants' authority and control respecting management and disposition of these ERISA covered employee benefit plans' assets, the Jeanneret Defendants were fiduciaries to certain members of the ERISA Class pursuant to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).   To the extent that Jeanneret Associates  also provided investment advice for a fee to the ERISA covered employee benefit plans it served, it is also a fiduciary to these class members pursuant to ERISA § 3(21)(A)(ii),  29 U.S.C. § 1002(21)(A)(ii).   Defendants Jeanneret and Perry by virtue of their control over the decisions and advice of provided by Jeanneret in connection with each of their ERISA covered employee benefit plan clients'  investments in the Beacon Funds are each themselves fiduciaries with pursuant to   ERISA § 3(21)(A)(i) and (ii), 29 U.S.C. § 1002(21)(A)(i) and (ii).

75.     Defendant Ivy Asset Management LLC was formerly a Delaware corporation that reorganized as a Delaware limited liability company on January 1, 2009.  Ivy is located at One Jericho Plaza, Jericho, New York, 11753, and is a wholly owned subsidiary of The Bank of New York Mellon Corporation.  Ivy is a registered Investment Adviser under the Investment Advisers Act of 1940 and a commodity trading advisor under the Commodity Exchange Act.  The Beacon Defendants were introduced to BMIS and Madoff through Ivy Asset Management and developed a long-term relationship with Defendant Ivy during which the two shared investment advisor and referral fees.

76.      Defendant Lawrence Simon ("Larry Simon") was a co-founder of Ivy and served as Chief Executive Officer and President of Defendant Ivy from approximately January 1984 to January 2006 when he became Vice Chairman of Ivy, a position he held until at least February 2007.  He also served on Ivy's Board of Directors from October 2000 to November 2006. During the Class Period, Larry Simon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.  When Ivy was sold to BONY in 2000, Defendant Simon received a significant percentage of the approximately $300 million sale.

77.     Defendant Howard Wohl ("Wohl") was a co-founder of Ivy and served as Chairman of Defendant Ivy from approximately January 1984 to October 2000, after which point when he assumed the post as Ivy's Vice Chairman.  Wohl also served as Chief Investment Officer from approximately October 1996 to October 2000.  He served on Defendant Ivy's Board of Directors from October of 2000 until November of 2006.  During the Class Period,

Wohl, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.  When Ivy was sold to BONY in 2000, Defendant Wohl received a significant percentage of the approximately $300 million sale.

78.     Defendant Adam L. Geiger ("Geiger") joined Ivy in 1997 as the Head of Research and then served as Director of Investments of Defendant Ivy from approximately 1999 to April 2002, and Managing Director and Head of Investments from April 2002 to January 2006.  He also served on Ivy's Strategic Operating Committee from approximately March 2005 until December 2005.   Geiger also was Chief Investment Officer and a member Manager Approval Committee until at least May 2006.  The Manager Approval Committee was responsible for overseeing manager research and selection, portfolio management, operational due diligence and risk management.  During the Class Period, Geiger, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

79.     Defendant Jeffrey R. Lindenbaum ("Lindenbaum") served as Chief Financial Officer of Defendant Ivy from before 2000 until March of 2001.  During the Class Period, Lindenbaum, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy

provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

80.     Defendant John D. Rogers ("Rogers") served as Director, Products and Markets of Defendant Ivy from July of 2000 to April of 2002; Managing Director, Products and Markets, from April of 2002 until March of 2003; and Managing Director, Investment Products Group from March of 2003 until on or after the end of March 2004.  During the Class Period, Rogers, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

81.     Defendant Sean C. Simon ("Sean Simon") served from April of 2002 to January of 2006 as Managing Director and Head of Global Client Development and Global Client Services of Defendant Ivy, and as co-President from January of 2006 until January of 2009, when he was named CEO of Defendant Ivy.  During that time he also served as a member of Defendant Ivy's Board of Directors.  From approximately March of 2005 until approximately December of 2005, Sean Simon also served as a member of Ivy's Strategic Operating Committee and co-chaired Defendant Ivy's Executive Committee.  From approximately May of 2006 to the present he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the Investment Committee).  He was an advisory member with veto power of the Investment Committee (together with Defendant Singer) from approximately April of 2007 through the end of 2008.   Simon is Defendant Lawrence Simon's son and was promoted to co-President after his father stepped down to Vice Chairman in January 2006.  During the Class Period, Sean Simon, together with other key officers and board members of Ivy, exercised control of and discretion

over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

82.     Defendant Kevin J. Bannon ("Bannon") served as a member of the Board of Directors of Defendant Ivy from sometime prior to March 31, 2004 until approximately April of 2007, during which time he also served as Chief Investment and Member of the Investment Committee of Ivy's parent, the Bank of New York.  During the Class Period, Bannon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

83.     Defendant Steven Pisarkiewicz ("Pisarkiewicz") served as Chairman of the Board Directors of Defendant Ivy from July of 2003 until approximately April of 2007.  During this time, Pisarkiewicz also served as Executive Vice President of the Bank of New York.  During the Class Period, Pisarkiewicz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

84.     Defendant Robert Meschi ("Meschi") served as Manager of Research of Defendant Ivy from January of 2000 until April of 2002, Assistant Vice President from October of 2000 until April of 2002, Director, Investments from April of 2002 until approximately May of 2006, and a member of Ivy's Manager Approval Committee from approximately December 7,

2005 until approximately May of 2006.  During the Class Period, Meschi, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

85.     Defendant Susan Rabinowitz ("Rabinowitz") served as Vice President of Investments of Defendant Ivy from about 2003 until approximately the end of March 2004. During the Class Period, Rabinowitz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

86.     Defendant Michael Singer ("Singer") served from before March of 2005 until approximately December of 2005 as Managing Director and Chief Administrative Officer if Defendant Ivy, a member of its Strategic Operating Committee, and a member of its Manager Approval Committee (subsequently renamed the Investment Committee).  He was an advisory member with veto power of the Investment Committee (together with Defendant Sean Simon) from approximately April of 2007 through the end of 2008.  From approximately January of 2006 until approximately December of 2008, he served as co-President of Defendant Ivy with responsibilities that included, *inter alia*, legal and compliance, risk management, and hedge fund manager operational due diligence.  During that time he also served on the Board of Directors of Defendant Ivy.  During the Class Period, Singer, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and

administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

87.     Defendant Alan Chuang ("Chuang") served as Director of Investments and Head of Portfolio Management of Defendant Ivy from approximately January of 2006 until approximately May of 2006 and during that time was a member of Ivy's Manager Approval Committee.  During the Class Period, Chuang, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

88.     Defendant Gregory van Inwegen ("van Inwegen") served as Director, Investments Quantitative Research and Risk Management and a Member of the Management Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from approximately January 2, 2007 until approximately March 18, 2008 when he became Managing Director and Chief Investment Risk Officer of Defendant Ivy.  He continued to serve in that capacity, as a member of Defendant Ivy's Investment Committee and as the chair of Ivy's Risk Management Committee and the leader of its Risk Management and Quantitative Research Team beyond the end of 2008.  During the Class Period, van Inwegen, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

89.     Defendant Sean Cumiskey ("Cumiskey") served as Managing Director, head of the Investment Strategies Group and the Capital Markets Coverage Team, as well as serving as a member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from January of 2006 until after December of 2008.  He was a member of Defendant Ivy's Executive Committee from approximately March of 2008 through the end of 2008.  During the Class Period, Cumiskey, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

90.     Defendant Stuart Davies ("Davies") served as Managing Director, Investments, Head of Investments in Europe and Asia and Member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from about January of 2006, and member of the Investment Risk Committee (from May of 2006) until about January of 2007 when he became Global Head of Investments with responsibility for Ivy's investment philosophy, portfolio strategy and asset allocation.  He served in this capacity and continued to serve as a member of Ivy's Manager Approval Committee (subsequently renamed the Investment Committee) and a Member of Defendant Ivy's Executive Committee from about March of 2008 until sometime before January 9, 2009.  During the Class Period, Davies, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

91.     Defendant Peter Rose ("Rose") served as Director of Investments and Head of Investment Research for Europe and Asia and member of the Manager Approval Committee of Defendant Ivy from about January of 2006 until approximately February of 2007.  During the Class Period, Rose, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

92.     Defendant Joseph Burns ("Burns") served as Director of Investments and Head of Long/Short Equity of Defendant Ivy from approximately January of 2006 until December of 2006.  In December 2006, he became Managing Director, Investments and Head of Investments, Europe and Asia where he served until after December 2008.  Throughout that time period he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the Investment Committee).  During the Class Period, Burns, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

93.     Defendant Mark Santero ("Santero") served as Managing Director, Investments responsible for coordinating Research, Risk Management, and Portfolio Management of Defendant Ivy from approximately January of 2006 until approximately February of 2007.  During that period he also served as a member of Defendant Ivy's Manager Approval Committee.  During the Class Period, Santero, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and

administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

94.     Defendant Peter D. Noris ("Noris") served as Chief Investment Officer of Defendant Ivy from approximately February 20, 2007 until sometime after March 18, 2008. Beginning about April 2007 and for the balance of his tenure, he chaired Defendant Ivy's Investment Committee.  Beginning approximately March 18, 2008 until the end of his tenure, Noris also served as a member of the Defendant Ivy's Executive Committee and its Investment Risk Management Committee.  During the Class Period, Noris, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

95.     Defendant Farzine Hachemian ("Hachemian") served as Director, Investments and a member of its Investment Committee of Defendant Ivy from approximately May 2007 until approximately December 2008.  Beginning approximately March 2008, he headed Defendant Ivy's Portfolio Management Group and became a member of the Investment Risk Management Committee of Defendant Ivy and held those positions until at least sometime after December of 2008.  During the Class Period, Hachemian, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

96.     Defendant Scott E. Wennerholm ("Wennerholm"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors.  Since September 2005, he has also served as the Chief Operating Officer of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York.  During the Class Period, Wennerholm, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

97.     Defendant Jonathan Little ("Little"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors.  He also serves as the Vice Chairman of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York.  During the Class Period, Little, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS.

98.     Defendant Ronald P. O'Hanley ("O'Hanley"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors.  He also serves as the President and Chief Executive Officer of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York.  During the Class Period, O'Hanley, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally

and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund' assets with Madoff and BMIS.

99.     Defendant Ivy, together with the individual defendants, Larry Simon, Howard Wohl, Adam Geiger, Jeffrey R. Lindenbaum, John D. Rogers, Sean C. Simon, Kevin J. Bannon, Steven Pisarkiewicz, Robert Meschi, Susan Rabinowitz, Michael Singer, Alan Chuang, Gregory van Inwegen, Sean Cumiskey, Stuart Davies, Peter Rose, Joseph Burns, Mark Santero, Peter D. Noris, Farzine Hachemian, Scott E. Wennerholm, Jonathan Little, and Ronald P. O'Hanley (the "Individual Ivy Defendants") are referred to collectively as the "Ivy Defendants."

100.     The advice of Defendant Ivy and the Individual Ivy Defendants who determined investment advice given by Ivy was provided to the Beacon Defendants and the Jeanneret Defendants under such circumstances that both Ivy and the Individual Ivy Defendants were fiduciaries within the meaning of  ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) and 29 CFR §2510.3-21(c).  Due to Ivy's expertise and the reliance placed on them by the Jeanneret Defendants, as a practical matter these decisions were controlled by Ivy Asset Management and the Individual Defendants who determined the investment advice given by Ivy such that these Defendants were also *de facto* fiduciaries within the meaning of  ERISA § 3(2l)(A)(i), 29 U.S.C. § 1002(3)(21)(A)(i), because they exercised authority or control over the management and disposition of plan assets.

101.     Hereinafter, the Beacon Defendants and Ivy Defendants will be known collectively as the "Investment Manager Defendants."

102.     Defendant The Bank of New York Mellon Corporation ("BONY") is a Delaware corporation headquartered at One Wall Street, New York, New York 10286.  According to its Form 10-K for the year ending December 31, 2008, BONY "is a global financial services

company headquartered in New York, New York, with approximately $928 billion in assets

under management and $20.2 trillion in assets under custody and administration."  BONY is the

parent company of Ivy Asset Management, having acquired Ivy in 2000.  According to Ivy's

website, BONY and Ivy have a "synergistic" relationship:

> Given the size of our infrastructure, we believe we have the resources
> to deliver the best quality work and produce the highest quality
> products.  This is further enhanced by the relationship with our parent
> company, The Bank of New York Mellon Corporation.  As a leading
> financial institution with the resources to support our institutional
> enterprise, the bank is equally committed to maintaining our
> entrepreneurial and performance-driven culture.  The result has been a
> mutually beneficial, synergistic affiliation.

103.    Defendant BONY had the power to exercise, and did exercise, a controlling

influence over Ivy's investment management policies and acted in concert with Ivy, through its

ownership of Ivy and through the service of BONY executives on Ivy's Board of Directors.

Thus, BONY was at some or all relevant times a fiduciary of the employee benefit plan members

of the ERISA Class, and/or exercised discretionary authority or discretionary control respecting

management of the employee benefit plans, and/or exercised authority or control respecting

management or disposition of the employee benefit plans' assets, and/or rendered investment

advice for a fee or other compensation, direct or indirect, with respect to moneys or other

property of each employee benefit plan, or had authority or responsibility to do so and/or had

discretionary authority or discretionary responsibility in the administration of the employee

benefit plans.

104.    Defendant Friedberg, Smith & Co., P.C., ("Friedberg") is a Connecticut

Professional Corporation authorized to do business in New York, with its registered offices in

Westchester County, and was at all relevant times an independent auditor of the Beacon Fund.

105.    Defendants BAMC, Danziger, Markhoff, J.P. Jeanneret Associates, Inc., Dr.

Jeanneret, Perry, Ivy, the Individual Ivy Defendants and BONY, are collectively referred to

herein as "Defendants."

## CLASS ACTION ALLEGATIONS

106.    This action is brought as a class action pursuant to Rules 23(a) and (b)(3) of the

Federal Rules of Civil Procedure on behalf of the Class, consisting of all investors in the Beacon

Fund who had not redeemed their interests in the Fund as of December 11, 2008 (the "Investor

Class").  Excluded from the Class are the Defendants, members of the immediate families of

individual Defendants, executive officers and/or any affiliate of the corporate Defendants, and

any entity in which any excluded person has a controlling interest, and the legal representatives,

heirs, successors and assigns of any excluded person.

107.    This action is also brought pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (2) on

behalf of  all fiduciaries, participants and beneficiaries of any employee benefit plan covered by

ERISA who invested in Beacon I or Beacon II at any time through the present (the "ERISA

Class").  Excluded from the ERISA Class are defendants, their officers, employees, directors,

partners, and members of the immediate families of any of the foregoing, or any of their heirs,

successors or assigns.  At various times since the inception of the Beacon Fund, employee

benefit plans covered by ERISA invested their assets in these entities, some plans invested in

only one, others in both.  At all relevant times the Beacon Fund has been comprised of sufficient

employee benefit plan assets or (after the effective date of the Pension Protection Act) ERISA

covered employee benefit plan assets that each such Fund has held ERISA covered employee

benefit plan assets, making the investment of those assets subject to the provisions of ERISA.

108.    Pursuant to Fed. R. Civ. P. 23(c)(5), defined as a subclass of the Investor Class, are all persons and entities who obtained the investment management services of J.P. Jeanneret Associates, Inc., John P. Jeanneret, or Paul L. Perry, and who, as a result of such services, invested in Beacon I or Beacon II at any time through the present (the "Jeanneret Investor Subclass").

109.    Pursuant to Fed. R. Civ. P. 23(c)(5), defined as a sub-class of the ERISA Class, are all fiduciaries, participants and beneficiaries of any employee benefit plan covered by ERISA who obtained the investment management services of J. P. Jeanneret Associates, Inc., John P. Jeanneret, or Paul L. Perry, and who, as a result of such services, invested in Beacon I or Beacon II at any time through the present (the "Jeanneret ERISA Subclass").

110.    At times throughout this complaint the "Jeanneret Investor Subclass and the "Jeanneret ERISA Subclass will be collectively referred to as the "Jeanneret Subclass." Excluded from the Jeanneret Subclass are the Defendants, members of the immediate families of individual Defendants, executive officers and/or any affiliate of the corporate Defendants, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

111.    At times throughout this Complaint, the ERISA Class and the Investor Class, inclusive of the Jeanneret Subclass, together with other persons and entities who invested in LLC interests of the Beacon Fund, are collectively referred to as "the Class."  Where allegations concern only the Investor Class, ERISA Class, or a Jeanneret Subclass, they will be identified as pertaining to either the "Investor Class," "ERISA Class" or the relevant "Jeanneret Subclass."

112.    This action is properly maintainable as a class action because:

a.      The members of the proposed Class are dispersed geographically and are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that Class members number in the hundreds, if not thousands;

b.      Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of the federal securities laws, ERISA and New York state and common law as alleged herein.  Moreover, ERISA Plaintiffs' claims are typical of those of the ERISA Class because (1) to the extent that Plaintiffs seek relief on behalf of the employee benefit plans covered by ERISA that invested in the Beacon Fund pursuant to § 502(a)(2) of ERISA their claims are not only typical of, but the same as a claim under this section brought by any other ERISA Class member; (2) to the extent that Plaintiffs seek relief under ERISA § 502(a)(3) for equitable relief, that relief would affect all class members equally; all of the ERISA Class members were injured and continue to be injured in the same manner by Defendants' breaches of fiduciary duty.

c.      Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action securities and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent;

d.      The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.      whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

ii.      whether Defendants' conduct alleged herein violated the Investment Advisors Act;

iii.      whether Defendants' representations to Plaintiffs and the other Class members misrepresented and/or omitted material facts;

iv.      whether the governing documents of the Beacon Fund require that the assets be allocated to, and invested in accordance with, the Large Cap strategy as detailed in the Offering Memoranda;

v.      whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

vi.      whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary and other duties owed to Plaintiffs and the Class; and

vii.      to what extent the members of the Class have sustained damages and the proper measure of damages.

e.      With respect to the ERISA Class, the case presents numerous common questions of law and fact, including:

i.      Did the Beacon Fund, at all or any relevant time hold employee benefit plan assets covered by ERISA;

ii.      Were the Beacon Defendants, the Ivy Defendants or any of them, fiduciaries within the meaning of ERISA as a result of their roles with respect to the investments made by the Beacon Fund;

iii.     Did the Beacon Defendants, the Ivy Defendants or any of them, breach their fiduciary duties under ERISA by causing or allowing the Beacon Fund to invest and maintain a portion of their assets in accounts under the control of Madoff or Madoff Securities;

iv.     Did the Beacon Defendants, the Ivy Defendants or any of them, breach their fiduciary duties under ERISA by, *inter alia*, (a) causing or allowing monies to be invested and with Madoff; or (b) failing to adequately investigate the soundness and suitability of investing with Madoff;

v.     Were ERISA Class members harmed by the breaches of fiduciary duty, committed by the Beacon Defendants, the Ivy Defendants or any of them as described herein;

vi.     Are ERISA Plaintiffs and the ERISA Class entitled to equitable relief through appointment of an independent fiduciary to take control of the Beacon Fund so as to protect the interests of the ERISA Class;

vii.     Are ERISA Plaintiffs and the ERISA Class entitled to recover losses from Beacon Defendants, the Ivy Defendants or any of them caused by their breaches of fiduciary duty, in order to recover lost assets on behalf of the employee benefit plans they serve or in which they participate;

f.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote; and

g.      Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

113.    Class action status in the this action is warranted and appropriate under Rule 23(b)(1)(B) for the ERISA Class because prosecution of separate actions by the members of the ERISA Class would create a risk of adjudications with respect to individual members of the ERISA Class that would, as a practical matter, be dispositive of the interests of the other members not parties to these actions, or substantially impede their ability to protect their interests.

114.    Class action status is also warranted under the other subsections of Rule 23(b) because (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

115.    In the alternative, under Fed. R. Civ. P. 23(b)(3), questions of law or fact common to ERISA Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

116.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained competent counsel, experienced in class actions, securities and ERISA litigation.

## PLAINTIFFS' DERIVATIVE ALLEGATIONS

117.    Derivative Plaintiff Jay Raubvogel IRA ("Raubvogel IRA") bring this action derivatively in the right and for the benefit of the Beacon Fund to seek redress of the injuries suffered by the Beacon Fund as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, negligence, and fraud alleged herein.

118.    Plaintiff Raubvogel IRA will adequately and fairly represent the interests of the Beacon Fund and its investors in enforcing and prosecuting its rights.

119.    Plaintiff Raubvogel IRA is an investor in the Beacon Fund and was an investor in the Beacon Fund at all times relevant to Defendants' wrongful course of conduct alleged herein. As such, Raubvogel IRA is a  Member of the Beacon Fund under the terms of the Beacon Fund Operating Agreement.

120.    The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

121.    Pursuant to the Beacon Fund's Operating Agreement, BAMC, as the Beacon Fund's Managing Member, owes a fiduciary duty to the Beacon Fund and its Members.

122.    The Beacon Fund is in the process of liquidating and is therefore named as a Nominal Defendant solely in a derivative capacity so that investors may obtain a more meaningful recovery in the event that the Beacon Fund secures a recovery against one or more of the Defendants.

123.    Plaintiff Raubvogel IRA  has not made any demand upon the Beacon Defendants to bring an action on behalf of the Beacon Fund asserting the claims herein to recover damages for the injuries suffered by the Beacon Fund, since such demand would have been futile.

124.    Demand is excused as futile because:

(a)     the unlawful acts and practices alleged herein cannot be defended by the Beacon Defendants, and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of the Beacon Fund to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims.

(b)     the wrongs alleged herein constitute violations of the fiduciary and contractual duties owed by the Beacon Defendants to the Beacon Fund.  The Beacon Defendants are subject to liability for breaching their fiduciary and contractual duties to the Beacon Fund, *inter alia,* causing the Beacon Fund's assets to be invested with Madoff or Madoff-related entities without any oversight or supervision, causing or permitting the reckless investing practices alleged herein, failing to adequately monitor the investment vehicles in which it placed the Fund's assets, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

(c)     the Beacon Defendants exercised and continue to exercise ultimate authority over the Beacon Fund and profited and continued to profit at the expense of the Beacon Fund by receiving monthly management and administrative fees and other fees from the Beacon Fund while in possession of information that would have disclosed that Madoff's operations were not legitimate.

(d)     the Beacon Defendants face substantial liability in this action because of their acts and omissions alleged herein.  The Beacon Defendants face substantial exposure to liability for abrogation of their duty of oversight.  The Beacon Defendants either knew or should have known that the Beacon Fund's assets were actually part of a massive Ponzi scheme, or otherwise generated purported results that would have been impossible to achieve under Madoff's alleged investment strategy, and took no steps in a good faith effort to prevent or remedy that situation, proximately causing million of dollars of losses.

(e)     the Beacon Defendants have committed the egregious actions outlined herein, and the Beacon Defendants cannot be expected to prosecute claims against themselves and persons or entities with whom they have extensive inter-related business, professional and personal, including familial, entanglements, if Plaintiffs demanded that they do so.  The Beacon Defendants, because of these relationships, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Beacon Fund.

(f)     the Beacon Defendants participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and therefore they are not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein.

(g)     the Beacon Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Beacon Fund as requested herein;

(h)     the Beacon Defendants exhibited a sustained and systemic failure to fulfill their obligations, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

(i)     the Beacon Defendants would be forced to sue themselves and persons with whom have extensive business and personal entanglements, which it will not do, thereby excusing demand;

(j)     the acts complained of constitute violations of the fiduciary and contractual duties owed by the Beacon Defendants and these acts are incapable of ratification; and

(k)     The Beacon Fund has been exposed to significant losses due to the wrongdoing complained of herein, yet the Beacon Defendants have not filed any lawsuits against themselves, or others who were responsible for that wrongful conduct to attempt to recover for the Beacon Fund any part of the damages the Beacon Fund has suffered.

(l)     the Beacon Defendants lack sufficient independence to make a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants.

(m)     Notwithstanding Beacon Defendants' appointment of an outside law firm as the Beacon Fund's attorneys, the outside law firm lacks sufficient independence to make a disinterested decision on whether to pursue the claims alleged herein against Defendants. Without impugning their integrity, attorneys retained by the Beacon Defendants cannot possibly evaluate in a disinterested, independent and objective manner whether it is in the best interest of the Beacon Fund to sue the very persons who retained those attorneys and have agreed to pay their legal fees.

125.     Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, the Beacon Defendants either knew of the financial risks to the Beacon Fund's assets or recklessly turned a blind eye to them.  Such conduct is not protected by the business judgment rule and exposes the Beacon Defendants to substantial liability in this action and excuses demand.

126.     Demand upon other Members of the Beacon Fund is excused because they are so numerous and widespread that such demand would be impracticable and unfeasible.

## SUBSTANTIVE ALLEGATIONS

### A.     Summary of Allegations

127.     On March 12, 2009, Madoff pled guilty to eleven counts in the criminal information filed by the United States Attorney's Office, including one count of securities fraud in violation of Title 17, C.F.R. § 240.10b-5, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s).  In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the "split-strike conversion" strategy he touted, and that he never had custody of the securities he purportedly held for his investment advisory clients.

128.     Madoff also admitted that he caused to be created and sent to his clients, false trading confirmations and client account statements that reflected bogus transactions and positions.  Prosecutors charged that Madoff hired numerous employees with little or no prior pertinent training or experience in the securities industry to perform these and other "back office" functions.  Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading.  On June 29, 2009, Madoff was given a sentence of 150 years in prison.

129.    On March 18, 2009 the United States Attorney's Office charged Madoff's accountant David Friehling ("Friehling") of Friehling & Horowitz, CPAs, P.C., with securities fraud, aiding & abetting investment-adviser fraud, and four counts of filing false audit reports with the Securities & Exchange Commission.  The criminal information alleges that Friehling did not conduct a meaningful audit of BMIS under the required Generally Accepted Auditing Standards ("GAAS") or in conformity with Generally Accepted Accounting Principles ("GAAP"), that he falsely certified audited financial statements for BMIS, including balance sheets, statements of income, statements of cash flows and reports of internal control, and that he lacked the requisite independence to audit BMIS in a manner consistent with the industry's professional standards.

130.    On August 11, 2009 BMIS' Chief Financial Officer, Frank DiPascali, Jr., pleaded guilty to ten counts in the criminal information filed by the United States Attorney's Office, including conspiracy to commit securities fraud, investment adviser fraud, falsify book and records of a broker-dealer, falsify books and records of an investment adviser, mail fraud, wire fraud, and international money laundering.   In his plea allocution, Di Pascali said that, "there was one simple fact that Bernie Madoff knew, that I knew . . . [i]t was all fake.  It was all fictitious.  It was wrong and I knew it was wrong at the time . . ."

131.    In order to keep the Ponzi scheme running, Madoff needed money from new investors.  Madoff limited the investors he would deal with directly to those who would accept the lucrative fees but not perform due diligence.  Consequently, Madoff accepted investments from funds managed by, among others, the Beacon Defendants.

132.    The Beacon, Ivy and Jeanneret Defendants, through the use of Offering Memoranda, financial statements, investment management agreements and other devices

defrauded investors by representing their ability to perform supervisory and due diligence functions over the assets that they placed with Madoff while knowing that secrecy was a cardinal rule of Madoff and he would not allow scrutiny of, nor even access to, his operations. Defendants induced Plaintiffs and Class Members into investing with them while concealing their failure to carry out the due diligence they promised.

**B.     The Beacon Offering**

133.     The Beacon Defendants solicited investments into the Beacon Fund pursuant to offering memoranda and other materials from individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds.  BAMC served as the Managing Member of the Beacon Fund and, as Managing Member, invested Beacon Fund assets with Madoff.  Prior to the revelation of the Madoff fraud, the reported net asset value of Beacon I was $560,000,000, approximately 72% of which was invested with Madoff.

134.     Participation in the Beacon Fund was offered primarily through substantially identical offering memoranda for each of the two LLCs, as amended and revised from time to time.  The first Offering Memorandum issued on behalf of Beacon I (then known as Beacon Associates LLC) was issued on or about June 15, 2000 ("the June 15, 2000 Offering Memorandum").  On information and belief, a similar Offering Memorandum was subsequently issued on behalf of Beacon II, and subsequently revised by identical Offering Memoranda for Beacon I and Beacon II, which were issued on August 9, 2004 ("the August 9, 2004 Offering Memoranda").  Collectively, these Offering Memoranda are referred to as "the Offering Memoranda."  According to the Offering Memoranda, Defendant BAMC, with the advice of Defendant Ivy, made all investment allocation and reallocation decisions and management selections on behalf of the Beacon Fund.

135.    The Offering Memoranda stated that BAMC would conduct thorough due diligence with respect to the investments of the Beacon Fund.  As stated in the August 9, 2004 iteration of the Offering Memoranda, BAMC's role was explained as follows:

The Managing Member (after consultation with the Investment Consultant [Defendant Ivy] and the Managing Member's Advisory Board) allocates and reallocates the company's assets.  The Managing Member also reviews the Company's portfolio of investments on a regular basis.

The Managing Member is responsible for selecting the Company's strategies and for selecting the Managers and the Investment Pools they manage, and for monitoring the Company's performance and for monitoring the Managers' adherence to their stated investment strategies and objectives. . .

Both quantitative and qualitative criteria are factored into the evaluation of Managers, including analyses of type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation with traditional investments such as stocks and bonds.

Analysis of the performance records of existing and prospective managers is combined with evaluation of a number of less tangible qualitative factors in an effort to identity Managers whose (i) collective trading results have historically demonstrated substantial returns, while making use of various hedging techniques in an attempt to limit risk and, (ii) strategies and/or investments which have a low degree of cross-correlation with each other and with the Managing Member's Large Cap Strategy. . .

The Managing Member (after consulting with the Investment Consultant and the Managing Member's Advisory Board), selects strategies and Managers that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable), and in the case of Managers, which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; the rise of hedging strategies as part of the Manager's investment approach; diversification benefits relative to other Managers; a quality and stable organization; a market independent (market neutral) investment approach; and an ability to consistently and effectively apply its investment approach.  Certain criteria may be emphasized above others in the selection and retention of particular Managers and strategies.

Prior versions of the Offering Memoranda contained substantially similar language assuring due diligence in the selection of managers. (Beacon Offering Memorandum dated June 15, 2000

("Beacon Offering Mem.") at 9-10; Beacon I Offering Memorandum dated August 9, 2004

("Beacon I Offering Mem.") at 10-11; Beacon II Offering Memorandum dated August 9, 2004

("Beacon II Offering Mem.") at 11-12).

136.    Neither the Offering Memoranda nor any other offering materials used to solicit

investments in the Beacon Fund, and pursuant to which employee benefit plan assets were

invested in these entities, provided that the Fund's assets were or would be blindly entrusted to

Madoff, BMIS, or other Madoff-controlled entities.  Rather, the June 15, 2000 Offering

Memorandum indicated that an unnamed manager controlling "a substantial majority of the

Company's assets" would employ the Split-Conversion Hedged Option Transaction ("split strike

conversion") strategy described in ¶ 137, *infra*.  The Manager referred to was Madoff or BMIS,

and due diligence would have revealed that he was not and could not achieve the returns he was

reporting using the purported "split-strike conversion" strategy.  On or before the issuance of the

August 9, 2004 Offering Memoranda, the reference to this Manager was excised from the

Offering Memoranda.  As revised, the Offering Memoranda stated:

> A significant portion of the Company's assets are allocated to a strategy adopted
> by the Managing Member involving a portfolio of Large Cap Stocks hedged with
> options ("Large Cap Strategy").  The balance of the Company's assets are
> allocated among independent investment managers ("Managers") indirectly
> through investment in other investment funds ("Investment. Pools") which the
> Managers manage . . .  The Company's assets are allocated and reallocated among
> strategies and to and from Managers by the Managing Member, following
> consultation with Ivy Asset Management Corp. (the "Investment Consultant") and
> the Managing Member's Advisory Board.

Notwithstanding these provisions of the Offering Memoranda indicating that the "Large Cap

Strategy" would be used to invest a significant portion of the Company's assets, no one,

including the Beacon Defendants, the Ivy Defendants, or Madoff in fact employed such a

strategy.  In fact, the Beacon and Ivy Defendants entrusted the bulk of the Beacon Fund's assets

to Madoff and BMIS to manage.  Once these assets were entrusted to Madoff and BMIS, the

Beacon Defendants and the Ivy Defendants abdicated their duties of due diligence, inquiry and

prudence and knowingly or recklessly accepted at face value whatever records Madoff, BMIS or

entities associated with them chose to provide despite many red flags that indicated that Madoff

could not be actually using his stated investment strategy.  Other Beacon Fund assets were

assigned by BAMC and Ivy to outside managers to manage, but the August 9, 2004 Offering

Memoranda clearly provided for the outside management only of assets not allocated to the so-

called "Large Cap Strategy," in contradistinction to the assets allocated to the Large Cap

Strategy "adopted by the Managing Member," which should have been under the BAMC's direct

control.

137.     In marketing the Beacon Fund to investors, the Beacon, Ivy and Jeanneret

Defendants represented that one of their outside investment managers, *i.e.*, Madoff, had for years

achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with

positive monthly returns in virtually every month) on the monies he was managing through the

use of a hedging strategy using equities, options trading, and short selling or so-called "split-

strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 100

stocks and the simultaneous sale of out-of-the-money call options ("calls") on the S&P 100

Index and the purchase of out-of-the-money put options ("puts") on the S&P 100 Index.  Madoff

claimed that under the right market conditions, he could achieve steady returns of over ten

percent per year regardless of whether the market as a whole had advanced or declined.  The

Beacon, Ivy and Jeanneret Defendants, knowingly or recklessly represented that, (i) this strategy

was being employed and, (ii) was producing the extraordinary results reported even though they

had no independent basis for those representations and reasonable inquiry would have revealed

that the results purportedly achieved through this strategy were at best implausible.  However, they failed to disclose to investors that they had not obtained any independent verification of Madoff's strategy as mandated by their duties of due diligence and monitoring.

**C.    Defendants, Through the Use of Offering Memoranda and
Other Devices, Engaged in a Scheme To Defraud Investors**

      **1.    The Beacon and Ivy Defendants**

138.    During the Class Period, Defendant BAMC offered Memberships in the Beacon Fund to qualified investors such as Lead Plaintiff.

139.    As discussed *supra* at ¶¶ 132-136 , participation in the Beacon Fund was offered primarily through Offering Memoranda that were virtually identical to one another and represented that, Defendant BAMC, in consultation with Defendant Ivy, made all investment allocation and reallocation decisions on behalf of the Beacon Fund.

140.    According to the Offering Memoranda, BAMC retained Ivy to provide investment advice regarding the selection of fund managers and the allocation of the Beacon Fund's assets. Ivy was also to provide "administrative services" that in fact concealed, through legitimate looking paperwork, the nature of the fraud, and "accounting services" that were offered to further induce reliance but if actually performed (which they manifestly were not) would have revealed the fraud.  Specifically, the Offering Memoranda state:

> Pursuant to an agreement between the Managing Member and [Ivy], the Investment Consultant provides advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and also provides certain administrative and accounting services to the Managing Member.

(Beacon I Offering Mem. at 2-3; Beacon II Offering Mem. at 3.)

141.    The Offering Memoranda also tout Defendant Ivy's pre-eminence as a "global leader in alternative investment fund-of-funds portfolio management."  The Beacon Defendants

leveraged Ivy's reputation, and that of Ivy's parent, BONY, to bolster the appearance that the

Beacon Fund was a sound investment:

> The Managing Member has engaged the Investment Consultant, Ivy Asset Management Corp., a wholly owned subsidiary of The Bank of New York Company Inc., to provide advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and to provide certain administrative services to the Managing Member.  The Investment Consultant is a registered Investment Adviser under the Advisers Act, with approximately $13 billion of assets under management.  The Investment Consultant is a global leader in alternative investment fund-of-funds portfolio management.  Since 1984, the Investment Consultant's clients have participated in niche styles and sophisticated strategies of investing.  The Investment Consultant's clientele includes Fortune 500 companies, defined benefit plans, multi-national insurance corporations, high net worth investors, global investment banking firms, foundations and endowments, Taft-Hartley pension plans, private family businesses, offshore investors and corporate entities, professional money managers, registered investment companies, and the Investment Consultant's principals and employees.

(Beacon I Offering Mem. at 27; Beacon II Offering Mem. at 28)

142.    As the above-quoted language indicates, the Beacon and Ivy Defendants

specifically targeted Taft-Hartley pension plans due to Ivy's reputation as a "global leader in

alternative investment fund-of-funds portfolio management."

143.    Although the Beacon and Ivy Defendants fostered the appearance that BAMC

retained Ivy for its investment management expertise in helping to allocate assets of the Beacon

Fund, in reality, Ivy, through its principal, Larry Simon was the catalyst for the very formation of

the Beacon Fund itself.

144.    Larry Simon was a close friend of Madoff's and described Madoff as someone

who was well respected in the financial community.  Simon described Madoff as a genius who

was capable of significant returns on investment (10%-12%), year-after-year.  Upon information

and belief, Simon privately conceded that he did not understand how Madoff was able to achieve

such results; an admission against interest that was inconsistent with Ivy's obligations of due diligence and evidence of Ivy's participation in the scheme.

145.    Simon also shared a personal relationship with Beacon Defendants Danziger and Markhoff.  Sometime in the mid-to-late 1990s, Madoff stopped accepting direct investments from individuals and imposed a minimum net worth requirement for investing directly with BMIS.  In order for Simon and Ivy to continue enjoying the lucrative management fees that flowed from investing their clients' assets with Madoff, Simon, Danziger and Markhoff founded the Beacon Fund to serve as a pass-through to BMIS' investment services.  In fact, Simon characterized this as a favor that Madoff extended to Simon by virtue of their close friendship.  Simon further represented to potential investors that he was effectively in control of the Beacon Fund and vouched for the Fund's successful and steady performance of 12% returns.

146.    Pursuant to an agreement between BAMC and Ivy, dated February 17, 1995, Ivy was specifically compensated for introducing the Principals of BAMC, Danziger and Markhoff to Madoff and BMIS:

> WHEREAS, Ivy has introduced the Principals [of BAMC] to [BMIS], an entity that generally invests in securities following convertible bond hedging and option hedging strategies.
>
> WHEREAS, the Principals understand the MADOFF strategies and the risks associated therewith; and
>
> WHEREAS, the Principals [of BAMC] intend to form an investment limited liability company named Beacon Associates LLC for the purpose of pooling investment funds to be managed by Madoff.

(Consultant Agreement at 1.)

147.    Notwithstanding the representations made to investors that they would be conducting appropriate due diligence, the Beacon and Ivy Defendants did not, nor could they,

understand or conduct appropriate due diligence on the Madoff strategies or risks associated
therewith because of their inability to independently verify Madoff's purported investment
strategy.   Nevertheless, the Beacon and Ivy Defendants were intent on creating a Madoff feeder-
fund.  Through representations made in the Beacon Fund Offering Memoranda, they conveyed to
investors that they understood the strategy and were able to oversee and verify its results.   In
reality, they did not verify the strategy or results, and knowingly or recklessly accepted at face
value the fictitious returns that Madoff reported.  Confronted with a multitude of red flags, they
ignored their fiduciary duty to further investigate Madoff's strategy and simply turned a blind
eye to the ongoing fraud, thereby causing devastating losses to the Beacon Fund's investors.

148.    BAMC's consultant agreement with Ivy states:

> IVY covenants and agrees to use reasonable care in
> providing its services hereunder and shall not be responsible or
> held accountable for any act of failure to act by any party
> whatsoever, ***including without limitation, MADOFF***, the
> Principals or the Managing Member. [. . .] The Managing
> Member and Principals understand that MADOFF may not
> achieve acceptable results and it is possible that losses may be
> incurred with respect to the LLC funds invested with MADOFF.
> [. . .] Neither IVY nor anyone on its behalf makes any express or
> implied warranty relating to the performance or ability of
> MADOFF.

(Consultant Agreement at 10).  This clause survived every amendment of the Consultant
Agreement and remained in effect even after BONY acquired Ivy in 2000 (discussed *infra* at ¶¶
184-204.)

149.    Despite having knowledge of Madoff's *modus operandi* of, *inter alia*,
withholding reliable confirmatory information regarding his trading activity and operating in an
inherently conflicted manner as a self-clearing broker/dealer and custodian, Ivy held itself out to
Plaintiffs and the Class as an expert investment adviser of global prominence that would

"provide advice to the Managing Member with respect to Manager selection and allocation of the Company's assets," and consult BAMC in "select[ing] strategies and Managers that are generally not available to the investing public […], and which satisfy one or more criteria including, extensive management experience; consistent and/or superior historical performance […]; diversification benefits relative to other Managers; a quality and stable organization; and an ability to consistently and effectively apply its investment approach . . ." (Beacon I Offering Mem. at 10; Beacon II Offering Mem. at 12).  In reality, and unbeknownst to investors, Ivy introduced the Beacon Defendants to Madoff and BMIS in exchange for 50% of the management fees collected by BAMC.  As will be described below, Ivy, through Defendant Larry Simon, functioned as one of a handful of Madoff's gatekeepers that brought in new money to the fraudulent enterprise and reaped substantial consulting fees for its pass-through role.

150.    BAMC also retained Ivy to provide administrative services to help manage the Funds' business.  Its administrative services under the Consultant Agreement included but were not limited to:

> (a)    Reconcile all MADOFF statements against trade tickets received and dividends and interest accrued;
>
> (b)    Maintain original books of entry for all MADOFF activity. This including posting the following: (i) cash contributions to and withdrawals from the brokerage account(s); (ii) purchase and sales activity; (iii) interest and dividends collected;
>
> (c)    Calculate changes in monthly value of the MADOFF account(s) based on posting of the above activity.

(Consultant Agreement at 3-4).  In carrying out its reconciliation of Madoff's statements, Ivy could not have believed that it was performing adequate due diligence in its capacity as an investment consultant to the Beacon Fund.  Ivy knew or should have known of the inherent

conflicts of interest in Madoff's operation as a self-clearing broker-dealer.  Ivy had access to

enough dubious, if not obviously false information that its failure to investigate the veracity of

Madoff's representations while continuing to recommend Madoff to the Beacon Fund,

constituted a reckless disregard for the truth.  Because Ivy was in possession of Madoff's

falsified trading tickets, Ivy either (i) had a number of trading tickets that did not reflect the

actual prices at which the alleged securities traded, in which case Ivy would be on notice of fraud

(*i.e.*, either a Ponzi scheme or "front-running" scheme).  In either case, Ivy had an affirmative

duty to investigate further.  Both the Ivy and Beacon Defendants willfully ignored the fraud,

despite the myriad red flags, because of the financial benefits inuring to them.

151.    The financial statements and audit reports that Defendants disseminated to

Plaintiffs and Class members contained material misrepresentations and omissions.

152.    The Beacon and Ivy Defendants knew, or should have known, that the financial

statements and audit reports were not the product of adequate due diligence and therefore, highly

suspect as to the veracity of the representations they contained.  Ivy, as a result of its monitoring

and recordkeeping duties under the 1995 Ivy Agreement with BAMC directed the making and

dissemination of these misleading statements by producing inherently unreliable data on the

Beacon Fund that was not the product of adequate confirmation of Madoff's reported trading and

investment activities.  In making their decision to invest and retain interests in the Beacon Fund,

Plaintiffs and other Class members relied on the periodic financial statements and audit reports

that were a product of Ivy's knowing, or reckless misconduct as Beacon Fund's bookkeeper.

153.    The Offering Memoranda were part of an ongoing scheme to defraud investors

because, during the Class Period, the Beacon Defendants failed to disclose that the Beacon and

Ivy Defendants would, with little or no due diligence or oversight, abdicate their fiduciary and

contractual duties to the investors in the Beacon Fund by entrusting the assets of the Beacon

Fund to Madoff and BMIS, while simultaneously collecting management fees they had not truly

earned.  Plaintiffs relied on the misrepresentations contained in the Offering Memoranda

regarding the oversight and due diligence roles that the Beacon and Ivy Defendants would

assume in allocating the Beacon Fund's assets, as well as on the Beacon and Ivy Defendants'

conduct which consisted of issuing periodic financial statements and audited financial reports of

the Beacon Fund.

154.    Further, while Ivy, at all relevant times, served as an investment consultant for the

Beacon Fund and therefore had fiduciary obligations to the Beacon Fund and its members, its

services went beyond what a traditional investment consultant would provide.  Ivy also provided

administrative and bookkeeping services to BAMC, and received substantial fees for such

services.  As such, it knew or should have known that its performance of these services would be

relied upon by Plaintiffs and other Class members in making their investment decisions, and had

a duty to disclose to investors the fact that it was unable to perform its duties in a manner

consistent with the representations made to investors.  In furtherance of the scheme, Ivy ignored

this duty to disclose and caused Plaintiffs and the Class substantial damages..

155.    The Beacon and Ivy Defendants owed fiduciary duties to the investors in the

Beacon Fund.  The Beacon Fund's assets were entrusted to their care and they owed fiduciary

duties of good faith, fair dealing and due care to the Beacon Fund's investors.  They knew, or, in

the exercise of due care in discharging their fiduciary duties, were reckless in not realizing that

Madoff was engaged in a massive Ponzi scheme, or, at a minimum, was reporting results that

could neither be verified nor explained.  Despite having access to substantial information that

should have prompted the Beacon and Ivy Defendants to further scrutinize Madoff's operations

in a manner consistent with their contractual and fiduciary obligations, they turned a blind eye to the fraud and failed to disclose material facts to investors.  They had fiduciary obligations to oversee, monitor and protect the investments of the Beacon Fund, which they utterly failed to fulfill.

### 2.     The Jeanneret Defendants

156.    At all relevant times Jeanneret Associates served as Plaintiffs' Investment Manager and did so for other similarly situated Jeanneret Subclass members.

157.    In the late 1980's, Defendant J.P. Jeanneret met Defendant Lawrence Simon of Ivy Asset Management in a restaurant in upstate New York.  The Jeanneret Defendants and the Ivy Defendants at that time began discussing placement of clients' assets with Madoff's investment management services.

158.    Defendant Simon, the former President and CEO of Ivy Asset Management introduced Defendant Jeanneret Associates in 1989 to Madoff.  Defendant Simon introduced many other investors who comprise the Class to Madoff.

159.    By that time, Defendant J.P. Jeanneret had established J.P. Jeanneret Associates and was providing investment management services to, *inter alia,* union clients such as members of the Jeanneret ERISA Subclass, *i.e.*, employee benefit plan clients.

### 3.     The Jeanneret-Ivy Agreement

160.    On May 15, 1991, Jeanneret Associates and Ivy entered into an investment consulting agreement ("Ivy Agreement").  Jeanneret Associates and Ivy agreed to the following terms:

-       Ivy agreed to make available to Jeanneret, its "sources of information and contacts with investment managers" (*i.e.* Madoff).

- Jeanneret agreed to provide Ivy with a list of its clients whose assets would be placed with investment managers recommended by Ivy.  Jeanneret agreed to update this list periodically and Ivy agreed to keep the list confidential.  Jeanneret also agreed to provide Ivy with copies of the investment management agreements that Jeanneret executed with its clients.

- Ivy agreed to (a) research, identify, monitor, evaluate and meet with potential investment managers; (b) recommend investment managers to Jeanneret; (c) advise Jeanneret as to the availability of opportunities to invest Client funds with particular investment managers; (d) monitor, evaluate and meet with investment managers that are managing Client funds invested through Jeanneret; (e) assess the performance of investment managers managing Client funds invested through Jeanneret and make periodic recommendations with respect to such performance; (f) maintain such records as are mutually deemed appropriate by Ivy and Jeanneret relating to the recommendation, retention, performance and services of investment managers recommended to Ivy and selected by Jeanneret to manage the Client funds invested through Jeanneret; and (g) provide Jeanneret with such documentation as it reasonably requires with respect to investments of Client funds with investment managers such that Jeanneret may maintain compliance with the record-keeping requirements of the Advisers Act.

- As compensation for its services, Ivy received 50% of management fees collected by Jeanneret in connection with the funds invested with investment managers introduced to Jeanneret by Ivy.

- Jeanneret agreed to maintain at least two clients who invest with investment managers introduced to them by Ivy, and a minimum total investment of $4,000,000.

- Ivy agreed to use reasonable care in providing its services but disclaimed liability to Jeanneret for acts and omissions by any investment manager that it recommended, and any matter arising out of or in connection with the agreement, except for matters arising out of Ivy's gross negligence or willful misconduct.

(1991 Ivy Agreement, at pp. 1-3).  The impetus behind Jeanneret Associates' engagement of Ivy

for these services was primarily, if not exclusively, based upon Ivy's relationship with Madoff.

Although both Jeanneret Associates and Ivy knew, or should have known, that they would be unable to perform their duties of monitoring and due diligence with respect to assets placed with Madoff, Ivy functioned as the gateway through which Jeanneret blindly entrusted Plaintiffs' and other Class members' assets under Madoff's management.  As a result, both Jeanneret Associates and Ivy collected millions of dollars in management fees while representing to Plaintiffs and other Class members that they were carrying out their duties as investment managers and fiduciaries.  Moreover, the terms of the 1991 Ivy Agreement, in particular, the fee-sharing provision and Ivy's disclaimer of liability for acts and omissions of its recommended investment managers, were not disclosed to Plaintiffs or other Class members.  Upon information and belief, Ivy earned 50% of management fees from other investment managers that it placed with Madoff.

161.    By virtue of its fee sharing provision with Jeanneret, and a similar fee sharing provision with BAMC (described *supra* at ¶ 148), Ivy was apparently collecting investment advisor fees twice for essentially the same underlying investments by Jeanneret Subclass members; first, a fee based on the amount of assets Ivy managed for clients of Jeanneret Associates and, second, a fee based on its consulting services provided to the Beacon Fund.

162.    As described below in Section G *infra*, when investing with Madoff investment managers and investment advisers were precluded from meaningful oversight or control over Madoff's activities.  As such, the Jeanneret Defendants had a duty to (a) follow through with their duties of oversight and demand transparency of Madoff, and (b) in the event they were denied access to this necessary information, withdraw the Beacon Fund's from BMIS entirely. The Jeanneret Defendants did nothing.  Instead, they continued to receive investment management and incentive fees, thereby conducting themselves in a self-interested manner and

inconsistent with their ERISA and common law duties as fiduciaries.  The Beacon, Jeanneret and

Ivy Defendants abrogated their duties as ERISA fiduciaries to the ERISA Class members, and

their common law fiduciary duty to all Class members.

### 4.    Jeanneret Associates' Investment Management Agreements

163.    Defendant Jeanneret, through the means of, *inter alia*, the Discretionary

Investment Management Agreements executed with the various union pension funds, repeatedly

misrepresented its investment strategy to investors.  Under the Discretionary Investment

Management Agreements between J.P. Jeanneret Associates, Inc., and various members of the

Jeanneret ERISA Subclass, the Jeanneret Defendants' duties are defined as follows:

> [J.P. Jeanneret Associates, Inc. is] the [Local 267] Board's
> attorney-in-fact to invest and reinvest the assets received and
> deposited with the custodian . . .for investment by the Investment
> Manager, and/or to appoint other investment advisors **subject to
> the Investment Manager's oversight** to invest and reinvest such
> assets, as fully as the Board itself could do.  The Investment
> Manager hereby accepts this appointment, hereby acknowledges
> that it is a fiduciary with respect to the Plan, and **agrees to
> supervise and direct the investment of the assets** of the Plan in
> accordance with (i) the written investment guidelines [. . .] and, (ii)
> the current funding policy and method that have been established
> to carry out the objectives of the Plan as communicated to the
> Investment Manager.
>
> Subject to the attached Investment Guidelines, the Investment
> Manager and/or any investment advisors appointed by the
> Investment Manager and subject to its supervision may, in its full
> discretion and without obligation on its part to give prior notice to
> the Board, (a) buy, sell, exchange, convert and otherwise trade in
> any stocks, bonds and other securities, and (b) establish and
> execute security transactions, through accounts with such brokers
> or dealers as the Investment manager and/or any appointed
> investment advisor may select, except to the extent otherwise
> directed by the Board; provided however, **that all such activities
> shall be conducted in a manner consistent with the Investment
> Guidelines, the Investment Manager's obligations hereunder,
> and the requirements of the Employee Retirement Income
> Security Act of 1974, as amended (the "Act")** [. . .]

> The Investment Manager further certifies that it is an "Investment manager" as that term is defined in Section 3(38) of the Act.

(July 1, 1996 Discretionary Investment Management Agreement between Local 267 Pension Fund and J.P. Jeanneret Associates, hereinafter the "1996 Agreement", at 1) (emphasis added). Therefore, by the terms of its contract with Local 267, Jeanneret Associates was an ERISA fiduciary.  Upon information and belief, other members of the Jeanneret ERISA Subclass also retained Jeanneret Associates under substantially similar Investment Management Agreements, establishing fiduciary relationships with Jeaneret Associates.

164.    The Investment Management Agreement further stated that Jeanneret:

> shall perform its duties [. . .] with the care, skill, prudence, and diligence, under the circumstances then prevailing, [. . .] and shall diversify the Investment Account Assets so as to avoid the risk of large losses . . .

(*See* 1996 Agreement at 2).

165.    Finally, the Investment Guidelines reiterated Jeanneret Associates' duty to

> [S]atisfy all other provisions as to fiduciary standards and obligations required by the Act and/or the Plan.

(1996 Agreement at 8).

166.    The Jeanneret Defendants lulled their clients into a false sense of security by engendering the false impression that (i) Jeanneret Associates had a factual basis for its representations with respect to the hedging strategy employed by Madoff and, (ii) that indeed, Jeanneret Associates itself exercised control over the portfolio's level of risk exposure. Jeanneret Associates made the following representations regarding its investment philosophy:

> This is a basic hedged equity portfolio strategy.  Stocks are purchased based upon significant weighting in the S&P 100 Stock Index.  This causes our portfolio of stocks to increase and decrease in a fashion almost identical to the Index.  The portfolio is

> maintained at a 90% or greater correlation to the S&P 100 Stock
> Index at all times.  The portfolio is hedged by purchase of S&P
> 100 Index puts approximately 1% under the then current Index
> level.  This portfolio put protection is effective <u>at all times</u>.  In
> addition, index calls are sold against the portfolio, which are fully
> covered, approximately 2% above the existing Index level.  This
> allows for approximately 1.50% per month (18% annualized)
> upside potential for the equity portfolio while simultaneously
> providing excellent downside protection.  The result has been
> returns significantly in excess of the S&P Index, with much less
> volatility.
>
> *       *       *       *       *
>
> We control risk by maintaining put protection on the portfolio at
> all times.  These put assets increase significantly in value if the
> S&P index declines, thus lessening downside risk of the stock
> portfolio.  We have developed risk measurements and adherer to
> those measurements . . .

(Response to Request for Proposal from Local 267 dated August 29, 1995, at 2) (Emphasis in

original.)  Substantially similar representations were made to other Jeanneret Subclass members.

167.    Pursuant to the 1991 Ivy Agreement, Jeanneret provided Ivy with copies of the

Investment Management Agreement with Local 267 and other Jeanneret ERISA Subclass

members.  As such, Ivy, in providing investment advice for a fee to Plaintiff employee benefit

plans and other employee benefit plans with respect to which ERISA Class members are

participants, beneficiaries or fiduciaries, assumed duties of an ERISA fiduciary, pursuant to

ERISA § 3(21)(A)(ii).  Because Jeanneret Associates' investment decisions vis-à-vis Plaintiffs'

and other Class Members' assets were largely, as a practical matter, based on Ivy's investment

recommendations pursuant to its consulting agreement with Jeanneret, Ivy functioned as the *de

facto* fiduciary for Plaintiffs and other ERISA Class members whose employee benefit plans are

governed by ERISA.

168.    Upon information and belief, the financial reports that Jeanneret Associates

disseminated to Plaintiffs and other Jeanneret Subclass members contained material

misrepresentations and omissions that were directed by Ivy as a result of its monitoring and recordkeeping duties under the 1991 Ivy Agreement with Jeanneret.

169.    During the Class Period, in blatant disregard for their contractual, statutory and common law duties, the Beacon, Jeanneret and Ivy Defendants placed millions of dollars of Jeanneret Subclass members' assets into the Beacon Fund, and, ultimately, into the Madoff Ponzi scheme, while falsely representing to the Jeanneret Subclass Members that they were capable of performing, and in fact did perform, ongoing oversight and due diligence.

170.    Relying largely on Madoff's reputation for abnormally strong returns, but disregarding their duty to inquire further in light of the myriad red flags, Jeanneret abandoned its duties of initial and ongoing due diligence of his investment strategies.  In fact, Defendants Jeanneret and Perry of Jeanneret Associates and Defendant Larry Simon made frequent representations to Plaintiffs and the Class regarding the consistent positive performance of Madoff's strategy and that it was less risky with higher returns. (*See, e.g.*, Local 267 Pension Fund Board of Trustees' Meeting Minutes dated Aug. 12, 1999, at 3).  In reality, the Jeanneret Defendants and Ivy Defendants had no reasonable basis to believe that Madoff's investment strategy was capable of such results.

171.    In fact, Larry Simon and the Ivy Defendants had especially compelling reasons to question the results being reported by Madoff.  Ivy performed administrative and book-keeping functions for clients who invested with Madoff and other investment managers recommended by Ivy.  In performance of these functions, Ivy had access to the falsified account statements and fabricated trade confirmation tickets that BMIS generated in furtherance of the Ponzi scheme. Defendant Larry Simon and Ivy knew or should have known (had they exercised reasonable diligence) that Madoff and BMIS were engaged in a fraudulent scheme because had they ever

tried to confirm that Madoff indeed held the positions he claimed to have, they would have immediately known that the trade confirmations were fabricated.

172.    As investment manager to members of the Jeanneret Subclass, Jeanneret had a duty to investigate Madoff's operations, especially in light of the red flags suggesting illegalities. Jeanneret, without disclosing to its clients, abrogated this duty and accepted, at face value, the highly implausible returns being reported as a result of Madoff's strategy, settling instead for the uniquely lucrative management fees that Madoff investments offered.

**D.    Based on the Red Flags, Any Competent Investment Advisor Would Conclude That Madoff Was Engaged in Fraud, But Defendants Ignored This Fact Because Their Relationship With Madoff Benefitted Them Financially**

173.    The Beacon, Jeanneret and Ivy Defendants' selection of Madoff as an outside investment manager and continued investments with him– despite the abundance of red flags regarding Madoff and BMIS leads to only one of three possibilities: (a) the Beacon, Jeanneret and Ivy Defendants conducted no due diligence whatsoever; (b) Beacon, Jeanneret and Ivy Defendants' due diligence was so recklessly deficient that they did not investigate the myriad red flags surrounding Madoff's operations, or (c) their due diligence confirmed the strong likelihood that Madoff was engaged in fraud but these defendants wantonly disregarded it.  Irrespective of which scenario is in fact the case, the reason behind such misconduct is the fact that the Beacon, Jeanneret and Ivy Defendants had the motive and opportunity to perpetuate the fraud and receive the individual and concrete benefit of, *inter alia,* the inflated management fees that Madoff's services permitted.  In their desire to generate substantial fees, the Beacon, Jeanneret and Ivy Defendants breached their fiduciary and contractual duties owed to Plaintiffs and the Class.

174.    The Jeanneret and Ivy Defendants were experienced investment professionals and registered investment advisers. They knew the appropriate level of due diligence required of

them as it was plainly set out in the Offering Memoranda, Discretionary Investment Management

Agreements, the 1991 Ivy Agreement between Jeanneret and Ivy, the 1995 Agreement between

BAMC and Ivy, and provisions under ERISA and the Investment Advisers Act.  Nonetheless,

they intentionally failed to perform the required due diligence and instead remained recklessly, if

not willfully, blind to the Madoff fraud.

      175.    The Beacon and Jeanneret Defendants knew or should have known that they were

unable to verify whether Madoff was in fact employing the above-stated strategy and knew or

should have known that they could exercise no control over the degree of risk Madoff's

purported investment strategy would entail.  In fact, the Beacon and Jeanneret Defendants also

knew or should have known that Ivy also lacked the necessary access to Madoff's operations that

would allow it to perform its duties as the investment consultant pursuant to its contract with

BAMC and Jeanneret Associates.

      176.    The Beacon, Jeanneret and Ivy Defendants chose to (i) keep Ivy's purported

disclaimer of liability concealed from Plaintiffs and Class members, and (ii) lead members of the

Class to believe that they had actually verified the reported results of the hedged equity strategy

and exercised a level of control over the investment strategy so as to avoid undue risk.  In truth,

the Beacon, Jeanneret and Ivy Defendants' decision to invest in Madoff was not informed by an

independent evaluation of the veracity of the strategy and results reported by Madoff, nor did the

Beacon, Jeanneret and Ivy Defendants apprise themselves of the actual risks attending Madoff's

operations.  They simply functioned as a pass-through to Madoff for which they collected

substantial fees as investment advisors.

      177.    The only cogent explanation for the Beacon, Jeanneret and Ivy Defendants'

failure to investigate in light of the myriad red flags identified below is that they were content to

collect substantial fees from Plaintiff and Class members using their long-term relationship with Madoff and BMIS.  Therefore, in reckless disregard for the truth, they did not conduct any meaningful due diligence that would have uncovered the strong likelihood of an ongoing fraud, notwithstanding the many red flags because doing so would have required them to end their lucrative relationship with Madoff and/or the entities he owned and controlled.

178.    As Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy, testified before Congress, because Madoff was only compensated through the commissions he charged from the trades he purportedly executed for his investors, funds-of-funds managers had a strong financial incentive to invest with Madoff:

> [Investment Managers] were paid so much to look the other way. . . .  Mr. Madoff was purporting to only be taking commissions from this product.  Even though he was a fund manager, who usually would take a one percent management fee and 20 percent of the profits, he was so generous as a human being that he was offering those fees to the feeder funds to lure in new victims.

*       *       *

> To deliver 12 percent annual return, he needed to be earning a 16 percent gross, because there were four percent in fees.  And he was passing the four percent in fees along to the feeder funds and keeping only a smidgen for himself.

> And so those feeder funds were incentivized not to ask the questions, to be willfully blind, if you will, and not get too intrusive into the Madoff scheme.

(Markopolos Testimony, Feb. 4, 2009).

179.    The action brought by New York's Attorney General Andrew Cuomo ("NY AG Action") against Ezra Merkin, a fund manager who invested heavily with Madoff, describes the same financial incentive that Merkin responded to in his decision to invest the Ariel and Gabriel funds with Madoff as follows:

> Merkin's incentive to invest Ariel and Gabriel funds with Madoff is clear from the compensation arrangements he had with the other managers: of the outside managers he used, Madoff was the cheapest, since Madoff charged no management fee or incentive fee, and simply took a $0.04 per share brokerage commission already built into the reported stock and option prices for Madoff's trades.  Thus, on the Madoff portion of the portfolio, for doing almost nothing, Merkin could keep his full 20% incentive fee in addition to the 1% management fee – a much better deal for Merkin even than Ascot, where he took only a 1% to 1.5% management fee.  In contrast, Cerberus charged Merkin an annual management fee of 1% for the assets it managed, plus an annual incentive fee of 9% of profits.  Cohanzick received an annual management fee of 1% plus an incentive fee of 10% less the current money market return.  Thus, the assets given to Cerberus yielded Merkin only an 11% incentive fee after paying Cerberus's 9% fee, and Cohanzick even less.

(*Cuomo v. Merkin*, Civ. No. 450879/2009, at ¶ 80.)

180.    The Beacon, Jeanneret and Ivy Defendants were unjustly enriched as a result of their relationship with Madoff.  In addition to collecting the fees foregone by Madoff, the Jeanneret Defendants also collected management and incentive fees set forth in the investment management agreements.

181.    In addition to the management fees that BAMC and Jeanneret Associates shared with Ivy, their consulting agreements with Ivy contained provisions that created unseemly incentives for BAMC and Jeanneret Associates to abandon their fiduciary duties in the interest of sustaining their lucrative fee arrangements.

182.    First, the Beacon and Ivy Defendants shared in undisclosed referral fees pursuant to the February 17, 1995 Investment Consultant Agreement between BAMC and Ivy.  These fees were structured in a manner so as to incentivize the Beacon Defendants to market Madoff's investment services:

> In the event that Managing Member, one or more of the Principals or any Affiliate shall introduce a person or entity to

MADOFF, or should any person or entity previously introduced to MADOFF by the Managing Member, one or more of the Principals or any Affiliate introduce any person or entity to MADOFF, and any such persons or entities open an account or otherwise invests with MADOFF (each an "Investor" and collectively, "Investors"), and as a result thereof, the Managing Member, one or more of the Principals and/or an Affiliate derives Additional Fees arising out of, relating to or in connection with MADOFF, the Principal shall [...] give written notice to IVY, which notice shall indicate the name and address of the Investor and the particulars of all arrangements with the Investor and/or Madoff.

*     *     *

In addition to the compensation referred to in Section 4 above, IVY shall be entitled to receive and the Managing Member and/or Principals shall pay to IVY fifty (50%) percent [. . .] of all fees, compensation, commissions, bonuses, charges and other remuneration of any kind received by the Managing Member, one or more of the Principals and/or by an Affiliate arising out of, relating to or otherwise received in connection with the introduction of Investors to MADOFF and/or the investment of funds by Investors with MADOFF (collectively, "Additional Fees").

183.    Pursuant to Ivy's agreement with Jeanneret Associates, the Jeanneret Defendants also had the incentive to maintain a loyal contingent of clients invested with Madoff because if the number of Jeanneret clients invested with Ivy-recommended managers dropped below 2, Ivy would be entitled to receive 60% of the investment management fees as opposed to 50%.  This perverse incentive articulates itself a breach of a fiduciary's duty of loyalty as it further caused Jeanneret to act in its self-interest and ignore its duties of due diligence and prudence that, if observed, would have avoided the massive losses suffered by the Jeanneret Subclass.

**E.    <u>BONY's Role</u>**

184.    Defendant BONY acquired Ivy Asset Management, a privately-held asset management firm, in part, to market its pool of clientele which included Taft-Hartley pension plans such as Plaintiffs.  *See* Press Release: The Bank of New York Co., Inc. Agrees to Acquire

Ivy Asset Management, Aug. 9, 2000, PRNewswire; Press Release: The Bank of New York Co., Inc. Completes Acquisition of Ivy Asset Management, Oct. 4, 2000, PRNewswire.  In 2000, Ivy touted that it caters to Taft-Harley pension plans on its website.

185.    BONY had actual knowledge of Ivy's relationship with Madoff and knew or should have known of Ivy's inability to effectively oversee and conduct appropriate due diligence of Madoff's operations and performance.  BONY was also undoubtedly aware of the lucrative fees that Ivy was enjoying by being a Madoff conduit at the time BONY completed the acquisition of Ivy on October 4, 2000.

186.    After the acquisition, BONY continued to market Ivy as a primary player in its portfolio of asset managers servicing pension funds.  For example, in a 2006 BONY publication, *Improving Pension Liability Management with Liability Benchmarks,* BONY lists Ivy Asset Management as a member of its asset management team, BNY Mellon Asset Management.

187.    In July 2007, through the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation of Pittsburgh, the Bank of New York Mellon (hereinafter "BNY Mellon") was formed.

188.    According to BNY Mellon's website, BNY Mellon Asset Management is "The 'umbrella organization' for all of the company's affiliated investment management firms and *is responsible* for U.S. and non-U.S. retail, intermediary and institutional distribution of investment management and related services."

189.    BNY Mellon Asset Management, consistent with BONY's initial impetus for acquiring Ivy, specifically identified itself as a provider of investment services to Taft-Hartley pension plans.  Its website describes its service as follows:

> The unique approach of BNY Mellon Asset Management's Taft-Hartley Group brings together the strengths of each of the specialty investment

> management firms and channels them *through a single point of contact*. This approach ensures a sustained level of excellent client service combined with strong, consistent investment performance.  Working with our group offers your benefit funds broader management diversification while saving on administration.

190.    Unlike the opaque wall behind which Madoff operated, BNY Mellon Asset Management represented that its affiliated investment firms "provide asset management service that is responsive to our clients' needs, ***transparent in its processes***, and consistently working to pursue strong performance and results for clients." (BNY Mellon Asset Management website, http://www.bnymellon.com/products/assetmanagement/index.html last visited Sept. 24, 2009).

191.    Ivy was subject to the leadership, supervision and control of Vice Chairman, President and Chief Executive Officer at BNY Mellon Asset Management, Ronald P. O'Hanley III, due to his dual roles at each entity.

192.    Beginning in March 2008, O'Hanley sat on the Board of Directors of Ivy and is currently a manager of Ivy Asset Management LLC.  Straddling the management line between parent BONY and BONY's subsidiary, Ivy, O'Hanley was in a position of direct influence and control over the nature of investment advice and oversight that Ivy provided to its clients such as Taft-Hartley pension plans.  In fact, O'Hanley communicated to the public a unitary vision of BNY Mellon Asset Management under which Ivy was subsumed:

> Founded on the principle of independent thought, research, and entrepreneurship, we believe there is no other asset management business in the world that has BNY Mellon Asset Management's breadth of product offering.  We also recognize the need to bring our clients the right product at the right time, and the importance of supporting our clients and their advisors throughout their relationship with us.  Our structure allows us to bring our capabilities to our clients individually or through strategic combinations.

193.    BNYM's participation in, influence over, and/or control of Ivy is further illustrated by the following examples:

194. At some or all relevant times, high-ranking Bank of New York Mellon Asset Management ("BNYM Asset Management") and BONY executives served in management or policy-making positions at Ivy, including on Ivy's Board of Directors:

1. Defendant Kevin Bannon simultaneously served as Executive Vice President — Chief Investment Officer for The Bank of New York and a member of Ivy's Board of Directors.

2. Defendant Steven Pisarkiewicz served as Executive Vice President of the Bank of New York while also serving as Chairman of Ivy's Board of Directors.

3. Defendant Jonathan Little served simultaneously on BNYM Asset Management's Executive Committee and Ivy's Board of Directors.

4. Defendant Ronald O'Hanley served as Vice Chairman of BNYM Asset Management as well as a member of BNYM Asset Management's Executive Committee. He simultaneously served on Ivy's Board of Directors.

195. At some or all relevant times, BONY participated in and influenced Ivy's decisions. For example, the Ivy Executives and the Ivy Strategic Operating Committee were responsible for meeting consistently with senior management at BONY to discuss strategies and synergies.

196. As Defendant Pisarkiewicz stated in a January 6, 2006 press release, "Ivy is a critical component of our growing investment management business and is strategically important to The Bank of New York."

197. On information and belief, BONY exercised oversight over Ivy, was responsible, at least in part, for Ivy's corporate compliance, audit, and risk management, and subjected Ivy to multiple BONY corporate compliance policies. For example, BONY noted that "[a]s a

subsidiary of BONY, Ivy is subject to multiple corporate compliance policies and benefits from corporate wide training around compliance and ethics matters."  In addition, in public investor relations filings, BNYM stated that in addition to Ivy's management oversight and compliance infrastructure, "[a]ugmenting this are service functions shared with The Bank of New York Mellon Corporation ("BNYM") such as Compliance, Internal Audit, IT Security and Risk Management."

198.    Despite having access to augmented compliance, Internal Audit & Risk Management functions of its parent BONY, Ivy failed to employ any of those faculties in its capacity as a sub-advisor to the Beacon Fund and continued to allow its assets to be placed with Madoff.

199.    Nonetheless, after the acquisition, Ivy's founder, Defendant Larry Simon represented to Ivy's clients that investing through Ivy was beneficial because the assets it managed were "protected" by BONY in the event that any problems should arise.

200.    A further indication of BONY's absolute control over Ivy's operations is the fact that BONY's insignia appears on letters that Ivy sent to several Class members regarding their investments in the Beacon Fund.  Additionally, applicants to Ivy's employment opening were linked to BONY's career opportunities website and placed through BONY's interview process.

201.    BONY exercised its control over Ivy, specifically with respect to Ivy's fund-of-funds investment in Madoff,from the date of the acquisition.  In making the decision to acquire Ivy in 2000, BONY examined and evaluated Ivy's own fund-of-funds investments with Madoff. However, it was Madoff (not Ivy) that forced Ivy  to divest itself of its interests in the Rosewood and Birchwood funds (which were two funds invested in Madoff).  This decision was made by

Madoff to prevent BONY from performing adequate due diligence which would have revealed the fraud.  BONY stated in its 10-K filed for FY 2008:

> On Dec. 11, 2008, Bernard L. Madoff was arrested by the FBI and sued by the SEC for engaging in a massive "Ponzi-scheme" investment fraud through his broker dealer and investment advisory company, [BMIS]. [BONY] has no direct exposure to the Madoff fraud. ***[Ivy], a subsidiary that primarily manages funds-of-hedge-funds has not had any funds-of-funds investments with Madoff since 2000.***  Several investment managers contracted with Ivy as a sub-advisor and one pension fund contracted with Ivy as investment manager; a portion of these funds were invested with Madoff and likely suffered losses as a result of the Madoff fraud.

(Bank of New York, 10-K for FY 2008, at 29) (emphasis added).

202.    BONY had actual or constructive knowledge of Ivy's relationship with Madoff, BAMC and Jeanneret.  BONY's pre-acquisition due diligence of Ivy, if properly conducted, would have raised the same red flags noted by so many investment managers who avoided investing with Madoff.  In the interest of limiting Ivy's exposure to liability as a fiduciary of the fund-of-funds it managed, BONY caused Ivy to divest its Madoff investments.  Nevertheless, BONY continued to allow Ivy to advise other fund managers to place their money with Madoff in its capacity as a sub-advisor.  This way BONY directly benefitted from the millions of dollars in sub-advisory and incentive fees Ivy earned as a result of Madoff's Ponzi-scheme, without having exposure to the fraud in the form of fund-of-funds investments with Madoff.

203.    BONY benefitted from the fees Ivy received as a result of its relationships with BAMC, Madoff and Jeanneret, which were reported as part of BONY's total earnings in their financial statements.  Furthermore, in its financial statements filed with the SEC, BONY specifically referenced earnings from Ivy as an important contributing source to BNYCo's own earnings.  For example:

      1.    In 2000, the Ivy acquisition is mentioned in BONY's "Summary of

Results" in its 10-K filing.  Among other references to Ivy,  BONY stated that its "[p]rivate client services and asset management fees were up 21% to $296 million in 2000, led by strong business flows in the BNY Hamilton Funds, as well as by *the acquisitions of Ivy Asset Management Corp. and Estabrook Capital Management, Inc."* (Emphasis added.)

2.      In BONY's 10-Q for the period ended June 30, 2002, BONY commented that "Fees were also favorably impacted by continued strong flows into alternative investment funds offered by the Company's Ivy Asset Management subsidiary and demand for the Company's retail investment products.".

3.      In an 8-K filed with the SEC on July 17, 2003, BONY attached a press release singling out Ivy as an important contributor to the rise in BONY's asset management fees, stating that "[t]he sequential quarter increase reflects the continued strong demand for alternative investments from Ivy Asset Management as well as higher fees from the private client services business.  The increase from the second quarter of 2002 and on a year-to-date basis was due to strong performance from Ivy Asset Management and acquisitions."  BONY's 10-Q for the period ended June 30, 2003 makes the same points.

4.      BONY's 10-Q for the period ended September 30, 2003 also references BONY's growth in private client services and asset management fees "reflect higher price levels as well as the continued strong demand for alternative investments from Ivy Asset Management and higher short-term money management fees, partially offset by higher seasonal tax-oriented fees in the second quarter."  Indeed, this 10-Q notes more than a three-fold increase of Ivy's

"grown assets under management from $2.4 billion when it was acquired in 2000 to $8 billion at September 30, 2003."

5.      In BONY's In 10-K for 2003, Ivy was again singled out for mention as a contributor to the growth of private client services and asset management fees. Among other things, the 10-K stated that "Ivy, a fund of funds hedge fund manager, continues to attract new assets at a rapid pace. Ivy ended 2003 with $9.1 billion of assets under management, up 42% for the year."

6.      BONY's 10-K for 2004 noted the significant contribution Ivy made to overall earnings. Specifically, the 10-K identified a 17% increase in private client services and asset management fees that was "primarily due to exceptional growth at the Company's fund of funds manager, Ivy Asset Management." The 10-K also recognized an increase in revenues from Europe reflected "increased revenue from [depositary receipts] and Ivy" and an increase in revenues in Asia was "primarily due to the sale of Wing Hang and higher revenue from Ivy."

7.      BONY's 10-K for 2005 noted that a 9% increase in private client services and asset management fees from the previous year was "driven by another strong performance at Ivy and double-digit growth in fixed income asset management and separate account services." The 2005 Form 10-K also noted that the improvement in income before taxes in the Private Bank and BNY Asset Management Segment between 2003 and 2005, from $175 million to $199 million, "is primarily attributable to strong revenue growth at Ivy Asset Management." In addition, an increase in assets under management during that same time period, from $89 million at December 31, 2003 to $105 million at

December 31, 2005 was attributed to "growth in Ivy, institutional equity products, and liquid assets as well as a rise in equity market values." Finally, the 2005 Form 10-K also noted that increased revenues in Asia reflected "strength in investor services, execution services and Ivy."

8.     BONY's 10-K for 2006 recognized that the increase in income before taxes in the Private Bank and BNY Asset Management Segment of $30 million over the previous year was "primarily attributable to strong revenue growth at Ivy, the acquisitions of Alcentra and Urdang, and higher fee levels in Private Banking."

9.     BONY's Form 10-Q, filed on August 8, 2007, noted an increase in performance fees "reflecting organic growth and strong results at our alternative asset management subsidiaries, Ivy, Alcentra and Urdang." The higher performance fees were also noted as one of the primary reasons for an increase in fees and other revenue during the first six months of 2007.

204.   By reason of the foregoing, at all relevant times, BONY was a fiduciary of the employee benefit plans within the meaning of ERISA.

## F.     Failure to Conduct Adequate Due Diligence

205.   The Beacon, Jeanneret and Ivy Defendants owed fiduciary duties to Plaintiffs and other Class members. Plaintiffs' and other Class members' assets were entrusted to their care and they owed fiduciary duties of good faith, fair dealing and due care to the Fund's beneficiaries. They knew, or, in the exercise of due care in discharging their fiduciary duties, were reckless in not knowing that Madoff was engaged in a massive Ponzi scheme, or, at a minimum, was reporting results that could neither be verified nor explained. Despite being

alerted to the fraud, or having enough information to be put on notice of a probable fraud, they knowingly and willfully invested the Plaintiffs' and other Class members' assets with Madoff through the Beacon Fund.  The Beacon and Ivy Defendants, had fiduciary obligations to oversee, monitor and protect the investments of the Beacon Fund, which they utterly failed to fulfill.

206.    Fiduciaries of ERISA covered employee benefit plans entrusted with the investment of plan assets have a statutory duty to exercise the care, skill and prudence of a person expert in the type of investment under consideration.  As such these fiduciaries are required  to conduct appropriate due diligence not only to assure diversification and appropriate risk adjusted returns, but to protect against fraud and assure that appropriate controls are in place to protect against misappropriation of plan assets and unlawful investment practices by outside managers selected by those fiduciaries.  Moreover, they may only assign assets to outside managers when authorized to do so by governing plan documents.

207.    As the Managing Member of the Beacon Fund, BAMC had fiduciary and contractual obligations to oversee the Beacon Fund and ensure that the Beacon Fund's assets were invested in legitimate investment products.  The Beacon Defendants received millions of dollars in improper fees in connection with the assets invested with Madoff.  In particular, the Beacon Defendants placed over 70% of the Beacon Fund with Madoff and received annual management fees of 1.5% of each investor's investment in addition to a percentage allocation of the profits.  Because investing with Madoff enabled the Beacon Fund to post higher profits than those available with a other investment managers, the Beacon and Ivy Defendants had an incentive to, and did in fact, maintain their relationship with Madoff in order to maximize the percent allocation of the Beacon Fund's profits.  In 2008 alone, the Beacon Defendants received more than $5,000,000 in fees from the management of the Beacon Fund.

208.    Contrary to the provisions of the Offering Memoranda pursuant to which Class members' assets were invested in the Beacon Fund, the Beacon Defendants and the Ivy Defendants, without appropriate due diligence or oversight, entrusted the assets of the Beacon Fund to investment vehicles or brokerage accounts that could be and were, disposed of entirely at the discretion and under the control of Madoff and BMIS.  These assets were not in any sense committed to the investment strategies adopted by BAMC, as provided for in the August 9, 2004 Offering Memoranda; instead these investments were recklessly entrusted to Madoff, without appropriate due diligence and monitoring to assure that the assets continued to be held at all, or, in the alternative, without appropriate disclosure to investors of the complete absence of due diligence.

**G.    Defendants Willfully Ignored Dozens of Warning Signs
That Madoff's Operations Were Not Legitimate**

209.    At the root of Defendants' culpable conduct is the fact that Madoff unabashedly operated behind a shroud of secrecy that Defendants had to necessarily accede to, in order to place the Fund's assets under his management.   As described in § D *supra*, Defendants had a pecuniary interest in accepting Madoff's *modus operandi* in total disregard of their duties as investment managers and fiduciaries because Madoff only collected commissions on the purported trades he executed, thereby leaving a greater portion of the Fund's assets from which Defendants collected their respective percentages of fees.  As a result, Defendants willfully ignored red flags that Madoff was operating a fraud.  By failing to conduct due diligence on Madoff's operations, or if conducted, a proper one, Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class, engaged in a course of business that operated as a fraud upon Plaintiff and Class members, and caused their statements regarding their ongoing due diligence and oversight of outside investment managers to be materially false and misleading.

a.     <u>Madoff Publicly Spoke of Secrecy</u>:  Madoff perpetuated the secrecy in his public statements.  As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry (hereinafter, "*MAR/Hedge* article"): "'[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"  Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

b.     When MAR/Hedge probed into the substance of Madoff's strategy, Madoff deflected the question and invoked his reputation as an industry professional; "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

c.     On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  In that article, author Erin E. Arvedlund wrote: "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance – even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's.  'People who have all the trade confirmations and statements still can't define it very well.'  . . .  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

d. "When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'"  "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manger who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

e. In essence, dealing with Madoff meant that a fund manager was required to willfully abrogate his or her contractual and fiduciary obligations to the fund's investors in exchange for the benefits of highly consistent returns and the lucrative management fees that flowed therefrom.  The Beacon, Ivy, & Jeanneret Defendants were no different in their complicity and fell in line with Madoff's *modus operandi* which dated back to the inception of his practice as an investment manager.  In his interview with Frontline, Michael Bienes recounted the following:

> **Q:** How did you check up on Bernie to make sure that everything was OK on his end?
>
> We did not.
>
> **Q:** Why not?
>
> I was gonna walk in and say, "Bernie, let me see your books"?  He'd show me the door.  He was my income.  He was my life.  How could I do such a thing?
>
> &ast;  &ast;  &ast;
>
> I never used [Madoff's] name.  I never used his name.  **To me, it was like the secret name of God.**  Even when we had the business, I tried not to use his name.
>
> &ast;  &ast;  &ast;
>
> I never brought people to him.  I brought people to me, not him.

\*     \*     \*

[Regarding bringing other funds to Madoff]: "Let me tell you something.  You want to do this?  You don't go to Bernie.  You come to us."  . . .

"Work through us."  Yeah.  "You work through us."  Because Bernie was the well.  If you have a well that's supplying cool, clear water, you don't want everybody to come and feed their cattle there.

(Frontline Program, Michael Bienes (emphasis added).)

      f.     The pressure to remain under the radar was common to all fund managers who dealt with Madoff.  In her interview with Frontline, Sherry Shameer Cohen, a registered sales assistant and secretary for the Fairfield Greenwich Group, fund managers of the Fairfield Sentry Funds that were substantially exposed to Madoff, explained the paradoxical desire to preserve secrecy and inconspicuousness:

I remember talking to Jeff [partner of the Fairfield Greenwich Group] at that time I had started to transition into becoming a writer, and I said to him: "You know, you're doing really great stuff.  Wouldn't it be great to, like, pitch stuff up to *Forbes* or *Fortune* or something like that?"

And he says: "No, no, no.  I don't want too much attention being drawn to us.  I don't want too many people calling."  And that should have tipped me off, because most companies want more customers.

\*     \*     \*

***Don't ask, don't tell***: ***That seems to be their unofficial policy***.  As long as the money comes rolling in, why ask?  Why jeopardize something?

(Frontline Program, Sherry Cohen) (emphasis added).

g.      In her interview with Frontline, Sandra Manzke, CEO of Maxam Capital, another Madoff feeder-fund, corroborated the "don't ask, don't tell" policy that fund managers uniformly followed with respect to their Madoff accounts:

> **Q:**     Did Madoff say to you, "Don't put me on your prospectus"?
>
> Yes.  He did.  [. . .]  That was one of, always, Bernie's conditions of getting an account.
>
> **Q:**     But you've publicly called for transparency.  That's transparency.
>
> Yes.  But many funds and investors were very secretive.  They didn't mention that they had money with Madoff.  It was something you didn't talk about.

(Frontline Program, Sandra Manzke.)  Like the Fairfield fund managers and Ms. Manzke of Maxam Capital, the Beacon, Ivy and Jeanneret Defendants complied with Madoff's "don't ask, don't tell" policy and remained willfully blind to the myriad warning signs that Madoff was a fraud, in complete disregard of the duties they owed to Plaintiff and Class members.

210.    The numerous warnings signs included, but were not limited to, the following:

a.      <u>Suspect Strategy</u>: The description of Madoff's split-strike conversion strategy was inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14-year period.  Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so.  Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them." Between  May 1999 and October 2005, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent several complaints to the SEC describing how Madoff could not have generated the returns he reported

using the split-strike conversion strategy.  As reported in the *MAR/Hedge* article: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

       b.     <u>Impossibly Low Correlation to the market</u>:  As Markopolos explained in "Red Flag #10" of his 2005 memo to the SEC:

> It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market [as measured by the fund's beta[2]] where its returns are supposedly being generated from.  This makes no sense! The strategy depicted retains 100% of the single-stock downside risk since they own only index put options and not single stock put options.

The performance of a fund that actually employs a "split-strike conversion" strategy would track the market's performance.  Markopolos explained in his SEC submission that "In 2000 I ran a regression of BM's hedge fund returns using the performance data from Fairfield Sentry Limited. [BMIS] had a .06 correlation to the equity market's return which confirms the .06 Beta that Fairfield Sentry Limited lists in its return numbers."  This beta, which indicates almost negligible correlation to the market, is impossible to achieve without losing money.  Funds that actually use the split-strike conversion strategy, must sell out-of-the money calls to realize positive returns, but this increases the correlation to the market because this increases the size of the "collar," which makes it less effective at protecting against market moves.  In short, the performance of a truly functional "split-strike conversion" strategy is necessarily correlated with the market because, to try to eliminate the correlation with the market (resulting in a beta close to zero), a manager would have to buy in-the-money puts.  These puts, however, are prohibitively

---

[2] The beta coefficient, is used to measure how sensitive the expected performance of an investment is to the market.  A beta of zero is not correlated to the market.  A positive beta means that the performance will generally follow the market.  The higher the beta the more strongly it follows the market.  A beta of one means indicates that the performance of the investment is completely correlated to the market.

expensive because the monthly premium to maintain in-the-money puts would eclipse any potential positive returns.

        c.    <u>Suspect Market-Timing & Trade Execution Prices</u>: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results.  Additionally, Madoff sent to his clients, paper confirmation tickets reflecting each trade he purportedly made, in addition to the monthly paper account statements, both of which disclosed the price at which each purchase or sale was supposedly made.  According to allegations by, *inter alia*, Irving Picard, trustee for the liquidation of BMIS, several monthly account statements and trade tickets reflected trades purchased or sold on behalf of clients' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question. (*See, e.g., Picard v. Merkin*, No. 08-01789 (BRL) at p. 16, (S.D.N.Y. Bankruptcy, May 6, 2009)).  Customer statements that reflected options being traded, likewise should have put Defendants on notice because Madoff's options trades were always profitable, *i.e.*, there was no incentive for a counterparty to continuously take the other side of those trades since it would always lose money. (*See* Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 31).

        d.    <u>Impossible Options Volumes</u>: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes.  In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume.  A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges.  Testifying before the House Committee

on Financial Services on February 4, 2009, Markopolos explained that *any* hedge fund manager

should have been able to determine that Madoff was a fraud based solely on the basis of

analyzing options volumes:

> Markopolos:    A lot of the victims thought that they were getting a highly diversified portfolio. . . . [Madoff] was purporting to own 30 to 35 of the bluest chip stocks, the largest companies in America.  And they'd see that on their statements.  And they felt very comfortable owning those companies, and they considered it a very diversified basket, because it really was a diversified basket.
>
> Rep. Ackerman:    But there was nothing they could do to check it out, that he didn't actually buy it.
>
> Markopolos:    You could.  As an individual investor you could not.  ***But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price.***  They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers.  And you would have seen that no OEX index options traded at those prices that day.

Testimony of Harry Markopolos before the House Committee on Financial Services, February 4,

2009 (hereinafter, "Markopolos Testimony") (emphasis added).  Indeed, the August 31, 2009,

SEC OIG Madoff Report concluded that, "a simple inquiry to one of several third parties could

have immediately revealed the fact that Madoff was not trading in the volume he was claiming.

(Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 39).

      e.    <u>No Standalone Hedge Fund</u>: Madoff operated through managed accounts,

rather than by setting up a hedge fund of his own, where his fees would have been much higher

than the brokerage commissions he was charging.  This is particularly suspicious because a

hedge fund requires annual audits.  Indeed, the *MAR/Hedge* article highlighted this fact as

particularly suspect because BMIS was willing to earn commissions off the trades rather than

"set up a separate asset management division to offer hedge funds directly to investors and keep

all the incentive fees for itself . . ."  In his November 7, 2005 submission to the SEC

("Markopolos SEC Submission"), Markopolos reiterated this peculiar arrangement:

> **MOST IMPORTANTLY**, why would [Madoff] settle for
> charging only undisclosed commissions when he could earn
> standard hedge fund fees of 1% management fee + 20% of the
> profits?  Doing some simple math on [Madoff]'s 12% average
> annual return stream to investors, the hedge fund, before fees
> would have to be earning average annual returns of 16%.  Subtract
> out the 1% management fee and investors are down to 15% [of
> profits].  20% of the profits would amount to 3% so investors
> would be left with [...] 12% annual returns. . . .  Total fees to the
> third party FOF's would amount to 4% annually.  Now why would
> [Madoff] leave 4% in average annual fee revenue on the table
> unless he were a Ponzi Scheme?

(Markopolos SEC Submission, Nov. 5, 2005, at 3).  Fund managers and Investment Advisers,

including the Beacon, Ivy and Jeanneret Defendants, benefited from this arrangement because

obtaining similar services from another hedge fund would have reduced the amount of fees

received by Defendants.

      f.    <u>Cash Positions</u>: BMIS liquidated its securities positions at the end of each

quarter, presumably to avoid reporting large securities positions.  Indeed, Irving Picard, the

court-appointed trustee charged with sorting out what Madoff assets remain, reported that

Madoff never (at least during the Class Period) engaged in any trades.  Victims' quarter-end and

year-end reports often reflected positions in only United States Treasury Bills.  As Markopolos

explained to the House Committee on Financial Services, this practice was indicative of the

underlying fraud being perpetuated by Madoff and was cause for further investigation:

> Markopolos:     If you're not holding any financial instruments that
> are recordable at year-end marking period or
> quarter-end marking period, especially if you're in
> treasury bills, which are book entry form only –
> there's no physical securities there – there was
> nothing there for the auditors ever to inspect.

(Markopolos Testimony.)

   g. <u>Lack of a Third Party Custodian and Administrator</u>:  The Beacon Fund's

assets with BMIS were not held by a third party custodian but rather by Madoff himself.

Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian

and administrator for the accounts.  Thus, instead of using an outside prime broker as nearly all

hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed.  A

December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall

Alternatives, which analyzes hedge funds for clients, as follows: "There was no independent

custodian involved who could prove the existence of assets . . . There's a clear and blatant

conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously

unusual in that this is not a structure I've seen."  In his interview with the PBS program,

*Frontline: The Madoff Affair* (hereinafter, "Frontline program"), Frank Casey, a colleague of

Markopolos, explained why relying on the trade confirmations and account statements provided

by BMIS was an exercise in futility and did not constitute due diligence:

> Thierry [a French money manager] said: "Well I've been doing
> this due diligence on [Madoff] . . . I get reports every day of which
> positions are bought, which are sold, and which options are
> purchased and which are sold."  And he had, I remember, two or
> three clerks logging everything into a computer, all the
> confirmations that he was receiving from Madoff Securities . . .
>
> I said: "Why are you bothering logging in all these pieces of
> paper?  He can make that up.  There's no check and balance here.
> . . . I wouldn't even bother having two or three clerks log this thing
> in.  ***I would just have one guy, once a week, sit down, look over***

> *the trades at the end of the week and see if any of them were*
> *trading outside of the day's range*."

Frontline: The Madoff Affair, Interview Transcript of Frank Casey, available at PBS.org

(emphasis added).

        h.      <u>Obscure and Ill-Equipped Auditor</u>:  BMIS was audited by Friehling &

Horowitz ("F&H"), which had three employees, of which one was 78-years old and living in

Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in

Rockland County, NY, was 13 feet by 18 feet.  As Representative Sherman of California

remarked during the February 4 testimony of Markopolos before Congress, it was physically

impossible for a three person accounting firm staffed with one active CPA to properly audit a

$17 billion firm:

> Now it is physically impossible for one CPA to audit a $17 billion
> firm. But even if it was possible, you're supposed to be an
> independent auditor. Independence includes not getting more than,
> say, about a fifth of your revenue from any one client.  So unless
> you think that one CPA could audit a $17 billion operation and be
> done in a couple of months, you've got a fraudulent financial
> statement in your hand, not to mention your professional expertise
> focused on the fact that you cannot earn those kinds of
> continuously positive, even returns.

(Representative Sherman, Markopolos Testimony.)  Indeed, managers of feeder funds who dealt

with Madoff early on in his career as an investment adviser harbored reservations about the

apparent inadequacy of Madoff's chosen auditor.  In his interview with the Frontline Program,

Michael Bienes, a money manager who funneled funds into Madoff's operation during its

nascent stages expressed his concern about Madoff's accountant, Jerry Horowitz of Friehling

Horowitz, P.C.:

> Jerry was a nice guy, very quick, very good. [. . .]  And guess
> what?  He was Bernie's accountant.  . . .  Then I was saying to
> myself for a second: "What's with this old man?  He can't be

> Bernie's accountant; he's not independent."  But Jerry was
> Bernie's accountant, and Jerry was a one-man show . . .
>
> **Q:** Wasn't that a red flag [that Madoff used such a small
> accounting firm]?
>
> To me, I was always wondering about it, because . . . [a]uditing is
> a very labor-intensive business.  That's why all the accounting
> firms wanted to get into consulting.  It's just, auditing is so labor-
> intensive, they can't make a profit.  And I was always wondering
> about Jerry doing this.

Frontline Program Transcript, PBS.org.  On March 18, 2009, David G. Friehling ("Friehling")

was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's

Ponzi scheme.  The SEC also filed a civil complaint against Friehling and F&H, alleging that

F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to

confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

      i.    <u>Audit Reports</u>:  Audit reports of BMIS showed no evidence of customer

activity whatsoever, with neither accounts payable nor accounts receivable from customers.

BMIS appeared to be nothing more than a market maker – not a firm with $17 billion in

customer accounts.

      j.    <u>Family Run Operation</u>: Key positions at BMIS were controlled by Madoff

family members (Madoff's brother, two sons, and niece).  As noted by a due diligence team from

Société Générale's investment bank, a European bank that internally blacklisted Madoff and

prohibited the bank from doing business with him, the fact that Madoff's brother, Peter Madoff,

was the chief compliance officer at BMIS was a significant red flag that informed their decision

to avoid Madoff entirely.  Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*,

New York Times, Dec. 17, 2003.

k.    <u>Lack of Electronic Access</u>: BMIS was supposedly technologically advanced but Funds did not have electronic access to their accounts at BMIS.  Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation.  This lack of technological sophistication in Madoff's reporting methods aroused the suspicion of Ms. Cohen at Fairfield Greenwich Group:

> So I looked at [the statements from Madoff], and I said, "Something is very strange."  Every bank statement, every brokerage house statement that I've ever seen, is usually on a very thick paper, and it's got a big logo emblazoned on it, and it's got lots and lots of small print on the front and on the back. . . .  None of that was on there.  It just looked as if it came off a typewriter or [a] dot matrix [printer]. . . . ***I mean, it's so easy these days to perpetuate a fraud with something that looks more impressive, but here it looked so unprofessional. . . . And that's why I don't understand how could they not question any of these things.  It doesn't look like a normal statement***.

(Frontline Program, Sherry Cohen (emphasis added).)

**H.    Investment Professionals Who Did Conduct Due Diligence Concluded
that the Red Flags Were Evidence That Madoff Was Operating a Fraud**

211.    Investment professionals who actually investigated the legitimacy of Madoff's operations concluded, based on the numerous red flags and the absence of any legitimate explanation from Madoff as to how he could generate such consistent results, that his operation must be a fraud.

212.    The SEC OIG Madoff Report acknowledges that several private entities concluded that Madoff's investment services were unsavory given the multitude of red flags:

> The OIG also found that ***numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise***. Specifically, Madoff's description of both his equity and options trading practices immediately led to suspicions about

Madoff's operations. With respect to his purported trading strategy, many
simply did not believe that it was possible for Madoff to achieve his
returns using a strategy described by some industry leaders as common
and unsophisticated. In addition, there was a great deal of suspicion about
Madoff's purported options trading, with several entities not believing that
Madoff could be trading options in such high volumes where there was no
evidence that any counterparties had been trading options with Madoff.
The private entities' conclusions were drawn from the same "red flags" in
Madoff's operations that the SEC considered in its examinations and
investigations, but ultimately dismissed.

(Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 25)

(emphasis added).

213.    For example, the SEC's Investigative Report describes how one CEO of a

company with a fund-of-funds business decided to avoid investing with Madoff:

The CEO was suspicious and obtained copies of an investor's last few
account statements from Madoff Securities, and compared a sample of
trades on the statements with what was actually going on in the markets on
the day Madoff was trading.  The CEO stated he found this "pattern which
really seemed weird where the – where the purchases were all at or close
to the lows of the day and the sales were at or close to the highs of the
day," noting that "of course, nobody can do that."  His "suspicion was that
the fact pattern that [he] had seen seemed consistent with a Ponzi
scheme."  The CEO said he "didn't conclude that that was the case, but
[he] certainly thought there was enough of a risk that that was the case
that, you know, [he] certainly wouldn't touch it with a 10-foot pole."

(*Id*. at 414).  Ivy routinely reviewed the Beacon Fund's account statements and either knew, or

should have known, that Madoff's purported trading activity was impossible.  Instead of

reaching this conclusion, Ivy, in willful and wanton or reckless disregard for its duties to the

Beacon Fund and its investors, failed to take any action to pull the Beacon Fund's assets out of

Madoff.

214.    In his 2005 SEC Submission, Markopolos set forth in over 17 single-spaced pages

and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29

red flags that were signs of highly suspicious activity in BMIS.  Among those already discussed

above and several others, he identified the following red flags:

        a.    "It is mathematically impossible for a strategy using index call options and

index put options to have such a low correlation to the market where its returns are supposedly

being generated from.  This makes no sense!  . . .  However, BM's performance numbers show

only 7 extremely small [monthly] losses during 14 years and these numbers are too good to be

true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one

percent!  And BM never had more than a one month losing streak!"

        b.    "Madoff does not allow outside performance audits."

        c.    "Madoff's returns are not consistent with the one publicly traded option

income fund with a history as long as Madoff's."

        d.    "Why is Bernie Madoff borrowing money at an average rate of 16.00%

per annum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20%

fees bases [sic] upon Bernie Madoff's hard work and brains?  Does this make any sense at all?

Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%."

        215.    As summed up by Markopolos: "If I was the world's largest hedge fund and had

great returns, I'd want all the publicity I could garner and would want to appear as the world's

largest hedge fund in all of the industry rankings.  Name one mutual fund company, Venture

Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under

management.  Then ask yourself, why would the world's largest hedge fund manager be so

secretive that he didn't even want his investors to know that he was investing their money?  Or is

it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he

exists?"

216.     In 2007, investment manager Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.     Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

217.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC.  Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.  The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

218.     In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns.  In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

219.    Similar concerns informed Société Générale's due diligence team to internally blacklist Madoff and advise wealthy clients at its private banks against investing with him. Indeed, as Drago Indjic, a project manager at the Hedge Fund Center of the London Business School noted, many European hedge fund companies saw the tell-tale signs of a Ponzi scheme all along:

> Madoff did not pass due diligence for many European hedge fund companies . . . Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is Ponzi scheme.

Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.

220.    In July 2008, the managers of the Fort Worth Employees' Retirement Fund heeded the advice of Albourne Partners, a London due diligence firm, and liquidated its $10 million stake in the Rye Select Broad Market Fund, a fund that was entirely invested with Madoff.  According to a December 31, 2008 article in BusinessWeek, Albourne Partners had "long-standing concerns about Madoff's trading strategy and consistent returns" and "had urged clients for nearly a decade to avoid affiliate funds such as Rye."  Matthew Goldstein, *The Madoff Case Could Reel in Former Investors*, Dec. 31, 2008, BusinessWeek.

221.    Rogerscasey, a domestic registered investment adviser providing investment consulting services globally, issued several adverse ratings of Madoff-related feeder funds such as Fairfield Greenwich and Tremont dating as far back as 2002, "based largely on concerns about the integrity of the Madoff structure."  A Rogerscasey newsletter published in December 2008 enumerates the several warnings it issued regarding Madoff:

> •    June 4, 2002 – We are exceedingly negative on Madoff as a hedge fund.

- November 21, 2002 – [Tremont's] largest exposure . . . is to Madoff . . . Where Tremont receives limited independent third-party transparency. . . . The only third-party, independent transparency that Madoff provides to its investors is being 100% in cash at the end of each year, so that its auditor can verify with Madoff's banker . . . that the cash is real. Madoff has no prime broker and no plan administrator. It acts as a broker/dealer, self-clears, and sends its own trade confirms to its investors all of whom have "cash" accounts.

- February 27, 2003 – [Fairfield Greenwich] claims its due diligence is based on [employee name] at their firm checking the trade confirms that Madoff's broker dealer sends them. However, our point of view is that, since Madoff is self clearing, it could be making up its statements and tickets.

- February 26, 2004 – Although Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . ***The Madoff exposure is a potential disaster. Even though some products would not be directly affected . . . Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.***

Rogerscasey Flash, December 2008 at 1-2 (Emphasis added).

222.    The Rogerscasey Newsletter reiterates what Markopolos and several other industry professionals had expressed time and again regarding Madoff's investment strategy, that "Madoff's returns [. . .] were too good to be true." To reach this conclusion, Rogerscasey merely examined the returns of a mutual fund known to employ the so-called split-strike conversion strategy and found that, "there are months, and indeed some years, of negative performance." *Id.* at 2.

223.    The Beacon, Ivy and Jeanneret Defendants and BONY willfully ignored what were apparent red flags to many other industry professionals who concluded that investing with Madoff was a mistake because of the high probability that Madoff was either engaged in a

fraudulent course of conduct, by front-running or a Ponzi scheme, or simply did not come

forward with enough confirmatory information to satisfy the standard of adequate due diligence.

By egregiously disregarding the likelihood of fraud, and failing to investigate the doubtful

practices of Madoff, the Beacon, Ivy, and Jeanneret Defendants and BONY abandoned their

fundamental duty to perform due diligence as fiduciaries to investors in the Beacon Fund, but

nevertheless collected their substantial management and incentive fees.  As discussed above,

conducting "due diligence" solely based on the information Madoff provided to feeder fund

managers could not, in any sense of the term, constitute "due diligence" given the anomalous

structure of Madoff's operation.  Rogerscasey described the importance of maintaining a high

standard of due diligence as follows:

> One key factor for effectiveness in this area is the operational due
> diligence resources in place at a hedge fund of funds with
> dedicated, experienced staff that can review the back office and
> operations of their underlying hedge funds.  We consider it best
> practice in this area that the head of operational due diligence at a
> hedge fund of funds should have a reasonable level of seniority
> within the organization and should be in a position to veto
> investment with any hedge fund where there are operational
> concerns.

(Rogerscasey Newsletter, at 2-3.)

224.    Madoff's anomalous operational structure warranted a heightened level of due

diligence.  As noted above, Madoff was his own prime broker and custodian of all the assets he

managed.  Chris Addy told *The Wall Street Journal* on December 13, 2008 that such conduct

was unusual because without an independent custodian, there was no one "involved who could

prove the existence of assets."  According to Addy, "There's a clear and blatant conflict of

interest with a manager using a related-party broker-dealer."

225.    According to Rogerscasey, operational concerns that should prevent an

investment from taking place are:

- An independent custodian.  Madoff appears to have had
  custody of the assets within his firm, making it impossible
  to confirm investors' balances independently.

- An independent administrator to value the portfolio
  independently and strike monthly net asset values.

- An independent auditor with the expertise to audit
  potentially complex investment strategies.

*Id.*  The Beacon, Ivy, and Jeanneret Defendants held such positions of seniority that empowered,

and indeed, obligated them to veto investments which raised serious concerns in terms of

integrity.  In dereliction of their duties, the Beacon, Ivy, and Jeanneret Defendants ignored what

their peers in the industry, after performing the most basic due diligence, found to be

unacceptable signs of impropriety.  Instead of pulling the Beacon Fund out of Madoff, the

Beacon and Ivy Defendants committed over 70% of its assets to his fraudulent scheme while

collecting substantial fees.  The Jeanneret Defendants placed their blind faith in Madoff's

strategy solely based on his reputation in the industry rather than on an independent evaluation

required of a fiduciary, let alone the sound and prudent evaluation required of ERISA covered

employee benefit plans.

226.    Defendants were presented with a litany of anomalous facts and practices of

Madoff and BMIS that made Madoff's representations obviously false, if not dubious to a degree

warranting further inquiry.  Defendants were thus aware of facts which alerted them to the

danger of Madoff's fraud.  Moreover, had Defendants conducted due diligence or, if conducted,

a proper one, into Madoff, BMIS, and/or Madoff-controlled entities, they would have been

alerted to the imminent likelihood of an ongoing fraud in light of the dozens of red flags identified herein.

227.    Instead, Defendants relied on the reputation of Madoff without conducting any reasonable investigation of the bona fides of Madoff and his operations, and/or any real analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high over years, even during adverse market conditions.

228.    Defendants acted with reckless disregard for the truth and violated their duties by failing to perform, or cause to be performed, appropriate due diligence that would have revealed that assets of the Beacon Fund were invested in a suspect manner suggestive of either a Ponzi scheme or unlawful front-running being perpetuated by Madoff and by failing to monitor the Beacon Fund's investments in these Madoff-controlled entities.

I.    **Allegations Regarding Auditor Friedberg**

229.    Friedberg was engaged to perform audits of the Beacon Fund financial statements during the Class Period.  These audits were to be performed in accordance with Generally Accepted Auditing Standards ("GAAS"), established by the Accounting Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA").

230.    The AICPA has set forth its requirements for compliance with GAAS in its Codification of Statements on Auditing Standards (the "AU"), which specify that "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.  In so doing, "the auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of

further audit procedures." AU § 150.02. Once it understands the entity and its environment and designed appropriate audit procedures, "the auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit." *Id.*

231.    One of the principal standards of GAAS is that "the auditor must exercise due professional care in the performance of the audit and the preparation of the report." AU § 150.02. Amplifying on that standard, GAAS specifies that "due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."

      a.    **GAAS Requirements**

232.    GAAS requirements fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards. The General Standards provide guidance to the auditor on the exercise of due professional care. The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of evidential matter sufficient to allow the auditor a reasonable basis for rendering an opinion regarding the financial statements under audit. The Standards of Reporting provide guidance to the auditor on the content of the audit report and the auditor's responsibility contained therein. (AU § 150.02.)

233.    GAAS required Friedberg to exercise due professional care in the performance of its audits and the preparation of its reports. (AU §§ 150.02, 230.02.) Due professional care required Friedberg to exercise professional skepticism, an attitude that includes a questioning mind and a critical assessment of audit evidence. (AU § 230.07.)

234.    An auditor's professional skepticism is particularly critical when assessing the possibility of fraud. GAAS notes that "because of the characteristics of fraud, the auditor's

exercise of professional skepticism is important when considering the risk of material misstatement due to fraud...."  The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred.  In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest."  (AU § 316.13.)

235.    The auditor's responsibility to exercise professional skepticism extends to information obtained from independent third parties like brokers and securities custodians. GAAS notes that "there may be circumstances (such as for significant, unusual year-end transactions that have a material effect on the financial statements or where the [independent third party] respondent is the custodian of a material amount of the audited entity's assets) in which the auditor should exercise a heightened degree of professional skepticism relative to these factors about the respondent.  In these circumstances, the auditor should consider whether there is sufficient basis for concluding that the confirmation request is being sent to a respondent from whom the auditor can expect the response will provide meaningful and appropriate audit evidence." (AU § 330.27).

236.    Under the applicable requirements, Auditors are responsible for using due professional care and judgment to, *inter alia*:

(a)     evaluate and determine the adequacy of arrangements for custody of assets, including receiving adequate assurances that there are proper controls over the custody of assets held by others;

(b)     confirm the existence, custody and value of portfolio securities both at year end and selected interim dates;

(c)     test an appropriate sample of portfolio transactions for proper authorization, extensions, trade dates and reasonableness of transaction pricing;

(d)     test and evaluate calculations of income, gains and losses from securities transactions;

(e)     evaluate compliance with investment strategies; and

(f)     assess additional factors, including non-financial factors, which may have an impact on internal controls and the presentation of financial position and results.

237.    GAAS required Friedberg to obtain a sufficient understanding of the Beacon Fund's Audited Entities and their environment, including their internal controls, in order to assess the risk of material misstatement of the Beacon Fund's financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.  (AU § 150.02.)

238.    As part of the process of obtaining an understanding of the Beacon Fund and its environment, Friedberg was required to obtain an understanding of, among other things, the hedge fund industry in general, and, in particular, the nature of the Beacon Fund and the objectives, strategies, and related business risks that may result in a material misstatement in the financial statements of the Beacon Fund.  This included obtaining an understanding of the

Beacon Fund's operations, ownership, governance, structure, how they were financed, and the types of investments they made.  (AU §§ 314.21, 314.26.)

239.   As part of the process of obtaining an understanding of the Beacon Fund's internal controls, GAAS required Friedberg to evaluate the design of those controls, and determine whether they had been implemented.  (AU § 14.40.)  Additionally, if Friedberg planned to rely on the internal controls of the Beacon Fund, GAAS required it to determine that these controls were operating effectively.  (AU §§ 318.13, 318.23, 318.24, 318.45.)  "Internal control is a process – effected by those charged with governance, management, and other personnel – designed to provide reasonable assurance about the achievement of the entity's objectives with regard to reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations."  (AU § 314.41.)

240.   GAAS recognizes that an understanding of an entity and its environment, including its internal controls, does not provide by itself a sufficient basis for forming an opinion on an entity's financial statements.  Rather, GAAS requires the auditor to perform further audit procedures.  (AU § 150.02.)  Further audit procedures include "tests of controls" and/or "substantive procedures."

241.   Tests of controls are used to "obtain audit evidence that controls operate effectively.  This includes obtaining audit evidence about how controls were applied at relevant times during the period under audit, the consistency with which they were applied, and by whom or by what means they were applied."  (AU § 318.26.)  Substantive procedures are performed to detect material misstatements, and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures.  (AU § 318.50.)

242.     Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures.  (AU § 318.09, 318.51.)  Therefore, GAAS required Friedberg to design and perform substantive procedures for each of the Beacon Fund's material balance sheets and income statement accounts – such as the Beacon Fund's investments and their investment income.  More specifically, Friedberg was required to test (a) the existence and valuation of the Beacon Fund's securities at every balance sheet date; (b) the Beacon Fund's ownership of those securities; (c) the occurrence and accuracy of the Beacon Fund's transactions in US. Treasury obligations, stocks, and options; and (d) the reasonableness of the Beacon Fund's reported investment income.  (AU § 318.09, 318.51, 326.15, 332.21-22, 332.25.)

243.     Friedberg knew or recklessly disregarded that BAMC (as Managing Member of the Beacon Fund) engaged Madoff and/or BMIS to perform the functions of investment advisor, prime broker, and custodian of the Beacon Fund's investments.

244.     This concentration of functions at BMIS created risks requiring special audit consideration – what GAAS calls "significant risks."  (AU § 314.110.)  Because primarily all the Beacon Fund's investment and income information available to Friedberg was based on information from Madoff and/or BMIS, Friedberg needed to do more than rely solely on the procedures it performed with respect to the Beacon Fund.  (AU §§ 314.1 15, 318.53, 332.20.)  In these circumstances, Friedberg should have determined whether an auditor conducted adequate procedures to satisfy itself of the effectiveness of BMIS's internal controls (AU §§ 332.18, 332.20), and the existence of assets and the occurrence of trades reported by BMIS.

245.    Another red flag that, under the prevailing industry standards, should have put Friedberg on inquiry notice and be cause for further investigation into BMIS' operations, was the fact that there was no published SAS 70 audit report available for BMIS.  A SAS 70 audit report is a widely recognized auditing standard developed by the AICPA and represents that a service organization such as an investment adviser has been through an in-depth audit of their control objectives and control activities. . SAS 70 audits are typically performed by reputable and independent accounting firms, and unqualified SAS 70 reports demonstrate that the service organization has established effectively designed control objectives and control activities.  In preparing the financial statements of a hedge fund such as the Beacon Fund (the "user organization"), the independent auditor (the "user auditor") may rely on a SAS 70 audit report to gain an understanding of a service organization's (in this case, BMIS) internal controls sufficient to plan the audit in accordance with standards recognized by the AICPA and set out in GAAS. However, because no such SAS 70 report, either prepared by Freihling & Horowitz, or a truly independent and reputable auditing firm, existed for BMIS, Friedberg was under an obligation to independently gain an understanding of the operational controls at BMIS that would satisfy the principle of professional skepticism and comply with the standards set out in GAAS and recognized by the AICPA.  Friedberg either failed to conduct an independent inquiry into BMIS or, if they did, were unable to carry out such an undertaking given Madoff's impermeable shroud of secrecy.  In any case, Friedberg had no reasonable basis upon which they could responsibly issue unqualified audit opinions of the Beacon Fund given the utter dearth of information regarding Madoff's investment advisory services.

246.    In view of the concentration of functions at BMIS and the lack of a SAS 70 audit report of BMIS, among other red flags, Friedberg should have obtained additional audit evidence

relating to the effectiveness of the functions performed by BMIS relevant to the Beacon Fund's reported investments and investment income.  (AU §§ 332.18, 332.20.)

247.    For example, Friedberg should have obtained additional audit evidence about the operating effectiveness of those controls relating to initiation, recording, processing, and reporting of BMIS's investment advisory clients' transactions (including those of the Beacon Fund), and those relating to the custody of BMIS's investment advisory clients' investments (including those of the Beacon Fund).  (AU §§ 318.25, 332.18, 332.20.)

248.    In addition, an AICPA publication entitled "Alternative Investments – Audit Considerations, A Practice Aid for Auditors," which was intended to assist auditors in their audits of hedge funds and funds of funds, provides that the extent of the audit evidence necessary to conclude on the sufficiency and the appropriateness of audit evidence increases as: (a) the percentage of alternative investments to both the total assets, as well as the total investment portfolio increases; and (b) the nature, complexity and volatility of the underlying investments increases.  Here, because the investments in BMIS accounted for the vast majority of the Beacon Fund's assets and BMIS's operations were opaque, this should have alerted Friedberg that the highest level of audit evidence would be required in order to opine on the Beacon Fund's financial statements.

249.    Additionally, that BMIS was audited by a three-person accounting firm should have been a red flag warranting further inquiry into the bona fides of F & H.  Had Friedberg conducted itself in a manner consistent with GAAS, it would have discovered that F & H had been telling the AICPA for 15 years that it did not conduct audits.  *See* article by Alison Abkowitz, "Madoff's auditor . . . doesn't audit?" in CNN Money.com, December 19, 2008.

250.     Under these circumstances, Friedberg should have taken additional steps to verify the Beacon Fund's investments with BMIS, including, *inter alia*: observing the Beacon Defendants' visits and telephone calls with BMIS; inspecting other documentation showing the Beacon Fund's investments with BMIS; and reviewing periodic statements from BMIS reflecting the investment activity and comparing that activity with amounts recorded by the Beacon Fund.

### b.     Auditor Friedberg Acted Improperly

251.     For the reasons described herein, Friedberg could not have obtained sufficient audit evidence about the operating effectiveness of controls at BMIS, or reasonably have satisfied itself about the existence of the investments and the reasonableness of the reported investment income by performing substantive audit procedures.  Nevertheless, it recklessly issued unqualified audit opinions on the Beacon Fund's financial statements, on which the members of the Class justifiably relied.

252.     In view of the unreliability of the audit evidence, as described above, Friedberg should not have issued unqualified audit opinions on the Beacon Fund's financial statements unless additional audit procedures were performed, the results of which reasonably satisfied Friedberg that the reported securities existed and the reported investments were reasonably stated.  If these required procedures could not be performed, then GAAS required that Friedberg disclaim an opinion on the Beacon Fund's financial statements.  (AU § 508.62.)

253.     Moreover, Friedberg failed to consider in doing its audits that the Beacon Fund did not have sufficient internal controls for evaluating the veracity of the financial returns that Madoff reported to the Beacon Fund.  The Beacon, Jeanneret and Ivy Defendants were unable or unwilling to analyze the financial returns claimed by Madoff, or the data available to the Beacon Fund to conduct such an analysis.  Since the financial returns that Madoff reported were

routinely fabricated, it is apparent that Friedberg failed to determine and consider that no analysis was done by the Beacon Fund.  Nevertheless, Friedberg opined that the financial statements of the Beacon Fund presented fairly in all material respects the financial position and results of operations of the Beacon Fund and thus, concealed from Plaintiffs and the Class, the risk that the Funds' investment returns were fictitious.

254.    Further, in auditing the financial statements for the Beacon Fund, Friedberg knowingly or recklessly disregarded the likelihood of fraud, as evidenced by numerous red flags, including: (a) that the Beacon Fund's investments were heavily concentrated in a single manager, Madoff; (b) that Madoff's purported trading strategy and returns were unable to be replicated by others in the financial industry and were consistently achieved despite the performance of the overall financial market; (c) that Madoff did not employ any third party administrators and custodians; Madoff instead ran his own back office operations – *i.e.*, the calculation of net asset values, and the preparation of account statements, etc.; (d) that the Beacon Fund relied solely on Madoff to provide reports on the performance of the Beacon Fund's investments; (e) that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts; (f) that Madoff lacked transparency and limited access to his books and records; (g) that Madoff later admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance; (h) that no SAS 70 audit report was available for BMIS and (i) that BMIS was audited by a small operation, as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors.

255.    Because of the foregoing red flags and other warnings discussed herein, the need for heightened professional skepticism required that the procedures performed by Friedberg

include seeking corroboration of the existence of the assets and the occurrence of trades from sources independent of BMIS.  (AU §§ 326.08, 326.11.)  Such attempts would have revealed the Madoff fraud.  For example, Madoff and BMIS claimed to hold all of its investment advisory clients' assets – purportedly billions of dollars – in U.S. Treasuries at the end of each reporting period.  An auditor having access to BMIS's books and records could have sought to corroborate the existence of these positions – especially given the large amount reported.   However, no such confirmations were possible.  As Madoff admitted in his plea allocution, Madoff and BMIS held no investment advisory clients' assets in Treasuries, let alone billions of dollars worth.  Rather, according to Madoff, BMIS held only cash in an account at Chase Manhattan Bank, from which he operated his Ponzi scheme.

256.     Friedberg also could have sought to corroborate Madoff's and/or BMIS's purported purchases and sales of equities for the Beacon Funds by (a) instructing Madoff and BMIS to request confirmation of these trades from depository or clearing organizations or counterparties to the trades, and (b) reconciling the trades to settlement reports from these organizations or counterparties.  Such procedures would have revealed either that no such trades had occurred, or that the amounts were wildly inconsistent with the trades that the Beacon Fund reported Madoff and/or BMIS had made.

257.     With respect to the over-the-counter option trades Madoff and/or BMIS claimed to make for their investment advisory clients, Madoff testified to the SEC on or about May 19, 2006 that the counterparties to his purported option contracts were "basically European banks," and that there is "an affirmation that's generated electronically" and an electronic "master option agreement" that is attached to the affirmation that documented these option trades.  Madoff admitted in his plea allocution that these option trades never occurred.  Thus, had an auditor

sought to confirm this documentation with these European bank counterparties (or any other counterparty), the fraud would have been immediately revealed.

258.    Any meaningful attempt at seeking corroboration of the existence of assets and occurrence of trades independent of BMIS would have uncovered the fraud.  Because Friedberg issued unqualified audit opinions on the Beacon Fund's financial statements, it is clear that Friedberg did not attempt to obtain this independent corroboration.

259.    Accordingly, under no circumstances would a reasonable accountant have issued unqualified opinions on the Beacon Fund's financial statements, or claimed that its audits were performed in accordance with GAAS.  By doing so, Friedberg acted, at a minimum, recklessly.

    c.    **Friedberg Disseminated False**
          **Audit Reports to Plaintiffs and the Class**

260.    Although Friedberg failed to perform their audits of the Beacon Fund in accordance with GAAS, it nevertheless sent to Beacon investors unqualified audit opinions with respect to the financial statements of each of the Beacon Fund.

261.    In each of its audit reports, Friedberg stated that it conducted its audits in accordance with GAAS, to the extent that it involved an examination of the "evidence supporting the amounts and disclosures in the financial statements," and an assessment of, "the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation." (*See e.g.*, Certified Consolidated Financial Statements by Friedberg, Smith & Co., P.C., for Beacon Associates LLC I, FY 2007).  However, as discussed above, an examination of the evidence supporting the reported amounts was impossible given the opaque nature of Madoff's trading and operations.

262.    In each audit report, Friedberg expressed its unqualified opinion that the Beacon Fund's financial statements "present fairly, in all material respects, the financial position of [the

fund]. . . and the results of its operations and changes in net assets for the year then ended, in conformity with accounting principles generally accepted in the United States of America." (*Id.*) The grounds supporting this representation of an unqualified opinion were so flimsy that Friedberg could not have possessed a genuine belief in its veracity.

263.    Because Friedberg violated GAAS in the face of known dangers arising from, *inter alia*, the concentration of functions at BMIS and the myriad red flags discussed above, it was reckless, at a minimum, for Friedberg to issue unqualified audit opinions on the Beacon Fund's financial statements.

### d.    Beacon Investors Justifiably Relied on the Auditor Friedberg's Audit Opinions to Their Detriment

264.    Friedberg knew or recklessly disregarded the fact that potential investors and Members would rely on the audit opinions it issued concerning the Beacon Fund's financial statements.  Had Friedberg issued anything other than an unqualified audit opinion with respect to the Beacon Fund, Plaintiffs and the Class would not have invested in the Beacon Fund, and immediately would have redeemed any existing investments.

265.    Friedberg's certification of financial statements without an adequate verification of the reported returns proximately caused Plaintiffs and the Class to retain and purchase membership interests in the Beacon Fund.  Accordingly, Plaintiffs and the Class were damaged by Friedberg's wrongful conduct.

### e.    Friedberg Smith Breached Its Duties to the Beacon Fund

266.    Friedberg Smith breached its duties to the Beacon Fund and the Class in connection with the annual audits of the Beacon Fund by failing to comply with GAAS by reason of, *inter alia*, the following:

(a)      failing to properly assess the controls over the custody of portfolio securities and to determine that there were inadequate controls over the custody of securities purportedly held by Madoff and his firm;

(b)      failing to confirm the existence, custody and value of portfolio securities purportedly held by Madoff and his firm both at year end and at any interim dates;

(c)      failing to test a sample of portfolio transactions purportedly executed by the Madoff firm for proper authorization, extensions, trade dates and reasonableness of transaction pricing;

(d)      failing to properly test and evaluate the reported income, gains and losses from securities transactions;

(e)      failing to assess whether the investments purportedly made by Madoff and his firm were consistent with their purported investment strategies; and

(f)      failing to appropriately assess the multiple "red flags" relating to the Madoff investments discussed above and how those factors may have an impact on internal controls, the presentation of financial position and results, and additional audit testing to mitigate the risks highlighted by these "red flags."

267.    Had Friedberg Smith properly planned and performed its annual audits in accordance with GAAS and with proper consideration of the risks caused by the investment of hundreds of millions of dollars in a discretionary account managed by an outside Manager with multiple "red flag" warning signs, it would have undertaken additional tests relating to the Madoff firm's management and purported custody of Beacon Fund assets including but not limited to: (1) audit tests that did not rely exclusively upon the paper confirmation tickets and account statements sent by the Madoff firm to BAMC; (2) an assessment of Madoff and his

firm's purported strategy of converting investments to US Treasury Bills at year-end, including obtaining a credible explanation of this highly unusual practice; (3) additional confirmation that the Madoff firm actually purchased and held US Treasury Bills for the Beacon Fund's benefit at the end of each audit year; (4) conducting appropriate testing procedures of the Madoff firm's operations and internal control and custody procedures; and (5) assessing and obtaining a credible explanation of why the trading results of Madoff and his firm were significantly different from those which would be expected under the trading strategy they purported to follow.

268.    Had Friedberg Smith complied with its professional duty by conducting GAAS-compliant audits of the Beacon Fund, Friedberg Smith would have determined, *inter alia*, that:

(a)    there were inadequate controls over the custody of portfolio securities purportedly held by the Madoff firm;

(b)    that the portfolio securities purportedly held by the Madoff firm were in fact non-existent and valueless;

(c)    the transactions purportedly executed by the Madoff firm were fictitious in that a substantial portion of the transactions were listed at prices at which were objectively unreasonable as they were outside the securities' trading range for the date of the purported transactions and there was no proper documentary substantiation for the execution of the Beacon Fund's securities transactions purportedly made by the Madoff firm;

(d)    the income, gains and losses from securities transactions were false in that they were based on objectively unreasonable trade prices;

(e)    the investments purportedly made by Madoff and his firm were inconsistent with their purported investment strategy in that the returns claimed to have been

received were wildly divergent from those to be expected from the strategy and that Madoff and his firm always converted the investments to cash or cash equivalents at each year end; and

(f)        the multiple "red flags" relating to the investments made by Madoff and his firm discussed above, were indicators that the investment of hundreds of millions of dollars with Madoff constituted a substantial audit risk, and that had appropriate audit procedures to address that risk been undertaken, Friedberg Smith would have determined that the transactions purportedly undertaken by the Manager and the securities purportedly held by the Madoff firm were wholly fictitious.

269.    Had Friedberg Smith complied with its professional duty and conducted the audits of the Beacon Fund in compliance with GAAS, it would have not issued unqualified audit opinions as to the financial position of the Beacon Fund.

## CLAIMS FOR RELIEF

## DIRECT COUNTS

### COUNT I
### By Investor Class for Violation of Section 10(b) of the Exchange Act
### and RULE 10B-5 Promulgated Thereunder
### (Against the Beacon, Jeanneret and Ivy Defendants and Friedberg)

270.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

271.     During the Class Period, Defendants: (i) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Class Period, did deceive the investing public, including Plaintiffs and other Investor Class members; (ii) made various deceptive and untrue statements of material fact as set forth in ¶¶ 133-141, 153, 166, 260-263  necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and other Investor Class members; and (iii) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiff and Investor Class members.

272.     During the Class Period, Defendants, pursuant to said scheme, knowingly and recklessly engaged in employing the following deceptive devices and contrivances:

a.      Materially false and misleading Offering Memoranda designed to market and promote interest in the Beacon Fund, including materially false and misleading statements concerning investment strategies and the level of supervision to be exercised over outside Investment Managers.

b.      Fraudulently certified audit reports, and account statements, that created a false impression of the Beacon Fund's financial condition;

273.   In particular, the scheme, plan and course of conduct, acts, practices and course of business unfolded as follows:

a.      The Ivy Defendants, through Ivy's founder Larry Simon, orchestrated the scheme by introducing the Beacon Defendants to Madoff for the purpose of retaining Ivy's investment services.

b.      The Beacon and Ivy Defendants issued Offering Memoranda containing materially false and misleading statements regarding the level of oversight and due diligence they would provide to the Beacon Fund's investors while knowing, or recklessly disregarding the fact that Madoff's *modus operandi* would not permit them to conduct adequate due diligence.

c.      As part and parcel of the Beacon and Ivy Defendants' scheme, those defendants falsely represented Ivy's role with respect to the Fund.  The Offering Memoranda state that Ivy "does not have any discretion to invest or allocate the Fund's assets."  However, the Beacon Defendants, Ivy and Simon specifically created the Beacon Fund for the purpose of investing the Beacon Fund's assets, through Ivy, with Madoff, so as to generate substantial fees.  The Offering Memoranda also represent that Ivy would perform "certain administrative and accounting services for the Managing Member."  Moreover, the services that Defendants represented that Ivy (a registered investment adviser) would be performing, gave a patina of legitimacy to the scheme.

d.      The Beacon and Ivy Defendants issued or caused to be issued false and misleading financial statements and audit reports that were the product of inadequate due diligence and that Plaintiffs and other Investor Class members relied on.

e.      Plaintiffs and other Investor Class members relied on the oversight and administrative services which were represented in the Offering Memoranda that Ivy would provide, and reasonably expected that Ivy would perform these services consistent with industry standards and its obligations.  Ivy performed its reconciliation and recordkeeping duties with a willful, wanton or reckless disregard for the standards of adequate due diligence.  Also, Ivy directed the scheme, whereby the misstatements and omissions contained in the Offering Memoranda, financial statements, audited financial reports and other statements that were disseminated to Plaintiffs and other Investor Class members. Accordingly, Ivy communicated its deceptive acts to Plaintiffs and other Investor Class members through the Beacon Defendants.  As set forth in the Offering Memoranda, Ivy was an integral part of the marketing of the Beacon Fund to investors, and investors relied on Ivy's oversight of their investments in deciding to invest in the Beacon Fund.

f.      The Jeanneret Defendants executed Investment Management Agreements with members of the Jeanneret Investor Subclass containing false and misleading statements regarding the level of oversight and due diligence they would provide to the assets under their management with the purpose of funneling their clients' money into the Beacon Fund and ultimately, to Madoff.  The Jeanneret Defendants made these representations while knowing, or recklessly disregarding the fact that Madoff's *modus operandi* would not permit them to conduct adequate due diligence by obtaining independent verification of his trading activities.

g.      The purpose and effect of such conduct was, among other things, to create a false appearance of initial and ongoing due diligence in furtherance of the scheme to

defraud the Beacon Fund's investors and induce Plaintiffs and the other members of the

Investor Class to purchase Membership interests in the Beacon Fund, the assets of which

Defendants ultimately funneled to BMIS and Madoff's fraudulent investment services.

h.      The Beacon and Ivy Defendants were motivated to further the scheme due

to the inflated management and incentive fees that were uniquely available by placing the

Beacon Fund's assets under Madoff's management because of his practice of charging

only a commission based on the trades he purportedly executed, rather than charging a

percentage of the alleged investments' return.  This allowed Defendants to report a higher

return on the Beacon Fund's investment which, in turn, added to its portfolio value and

increased the basis upon which Defendants' percentage fees were calculated.  Defendants

had the opportunity to perpetuate the scheme given that they exercised total control over

the Beacon Fund's assets in the case of the Beacon and Ivy Defendants, and over the

assets of the members of the Jeanneret Investor Subclass, in the case of the Jeanneret

Defendants.

274.    Friedberg, as the Beacon Fund's auditor, recklessly engaged in the issuance and

certification of fraudulent financial statements and audit reports that purported to be in

compliance with GAAS.  Friedberg knew, or should have known, that it did not, nor could it,

conduct audits in conformance with GAAS and the accounting principles adopted by the AICPA

because of Madoff's secretive operations.  Nevertheless, year after year, it issued financial

statements purporting to be in conformance with GAAS and containing false and misleading

information regarding the Beacon Fund's investments

275.    In ignorance of the false and misleading nature of the acts described herein and

the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiffs

and the other members of the Investor Class relied, to their detriment, on such deceptive conduct, misleading statements and omissions in purchasing Memberships in the Beacon Fund. Plaintiffs and the other members of the Investor Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

276.    As a result of the Defendants' conduct in furtherance of this scheme, individual investors in the Beacon Fund have suffered substantial losses.

277.    If Defendants had not engaged in the wrongdoing alleged herein, Plaintiffs and the Investor Class would not have invested in the Beacon Fund. Following the revelation of the Madoff Ponzi scheme, the investments of Plaintiffs and the Investor Class in the Beacon Fund were decimated.

278.    As set forth herein, defendants had a duty to disclose to Plaintiffs and the Investor Class their inability to conduct adequate due diligence and omitted to disclose this fact. They also ignored obvious signs of fraud. The danger of fraud was so obvious that defendants must have been aware of the fraud, given that:

    a.    defendants knew that they were unable to perform the due diligence that they were required to do, because of their inability to independently verify Madoff's purported investment strategy or operations;

    b.    defendants knew that they were receiving substantially more compensation with Madoff than with other investment managers;.

    c.    Defendants knew that Madoff purportedly achieved remarkable, and remarkably consistent results, quarter after quarter, year after year, regardless of market conditions, but could not reasonably believe those results were real, and nevertheless ignored the obvious signs of fraud due to the lucrative fees they were receiving.

279.     By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Investor Class in connection with their purchases of Memberships in the Beacon Fund.

280.     By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their investments in the Beacon Fund.

## COUNT II
### By Investor Class for Violation of Section 20(a) of the Exchange Act (<u>Against Danziger and Markhoff</u>)

281.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

282.     Danziger and Markhoff acted as controlling persons of BAMC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and/or awareness of BAMC's operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BAMC, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading, and participation in the scheme and course of conduct alleged herein. Danziger and Markhoff had the ability to prevent the issuance of the allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme and course of conduct.

283.    Danziger and Markhoff had direct and supervisory involvement in the day-to-day operations of BAMC and, therefore, had the power to control or influence the particular allegedly false and misleading statements giving rise to the securities violations  alleged herein.

284.    Danziger and Markhoff were directly involved in the actions of BAMC, and were thus culpable participants in the actions perpetrated by BAMC.

285.    By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by BAMC, Danziger and Markhoff are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Memberships in the Beacon Fund.

**COUNT III**
**By Investor Class and Jeanneret Subclass for**
**Violation of Section 20(a) of the Exchange Act**
**(Against Jeanneret and Perry)**

286.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

287.    Jeanneret and Perry acted as controlling persons of Jeanneret Associates within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and/or awareness of Jeanneret Associates' operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Jeanneret Associates, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading, and participation in the scheme and course of conduct alleged herein.

288.    Jeanneret and Perry had direct and supervisory involvement in the day-to-day operations of Jeanneret Associates and, therefore, had the power to control or influence the

particular allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme or course of conduct.

289.    Jeanneret and Perry oversaw the Discretionary Investment Management Agreements that various Jeanneret Subclass members executed with Jeanneret Associates, within which there were repeated misrepresentations of Jeanneret Associates' investment strategy to investors.  Pursuant to the Discretionary Investment Management Agreements between Jeanneret Associates and the members of the Jeanneret Investor Subclass, Jeanneret Associates agreed to supervise and direct the investment of the assets of the members of the Jeanneret Investor Subclass.  However, Jeanneret and Perry knew that the monies would be invested with Madoff, by virtue of Jeanneret Associates' participation in the Beacon Fund, and thus, they could not be supervised and directed to the degree represented in the investment management agreements.

290.    Jeanneret and Perry were directly involved in the actions of Jeanneret Associates, and were thus culpable participants in the actions perpetrated by Jeanneret Associates.

291.    By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by Jeanneret Associates, Jeanneret and Perry are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Jeanneret Investor Subclass suffered damages in connection with their purchases of Memberships in the Beacon Fund.

**COUNT IV**
**By Investor Class for Violation of Section 20(a) of the Exchange Act**
**(<u>Against Individual Ivy Defendants and BONY</u>)**

292.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

293.     Individual Ivy Defendants acted as controlling persons or entities of the Ivy Asset Management within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and/or awareness of Ivy's operations, and/or intimate knowledge of Ivy Asset Management's contractual agreement with the Beacon Fund and the Beacon Fund's operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ivy Asset Management, and thus, by virtue of such control over Ivy Asset Management, indirect influence and control over the Beacon Fund, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading.  The Individual Ivy Defendants had the ability to prevent the issuance of the allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme and course of conduct.

294.     The Individual Ivy Defendants were directly involved in the actions of Ivy, and were thus culpable participants in the actions perpetrated by Ivy.

295.     BONY, by virtue of its acquisition of Ivy Asset Management in 2000, which was mainly due to Ivy's Taft-Hartley Pension Plan clientele, had the power to influence and control, and did influence and control the decision making of Ivy Asset Management.  This includes BONY's recommendations to Ivy Asset Management regarding the Beacon Fund's managers and the allocation of the Beacon Fund's assets, as Ivy Asset Management was the Investment Consultant to the Beacon Fund.

296.     BONY was directly involved in the actions of Ivy, and was thus a culpable participant in the actions perpetrated by Ivy.

297.     By virtue of their positions as controlling persons or entities, the Individual Ivy

Defendants and BONY are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and

proximate result of their wrongful conduct, Plaintiffs and the other members of the Investor

Class suffered damages in connection with their purchases of Memberships in the Beacon Fund.

**COUNT V**
**By ERISA Class for Breach of Fiduciary Duty of Prudence pursuant to ERISA**
**(<u>Against the Beacon, Ivy and Jeanneret Defendants </u>and BONY)**

298.     ERISA Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

299.     ERISA requires that a fiduciary to an employee benefit plan act "with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a

like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

300.     By virtue of their authority over the assets of the Beacon Fund which include plan

assets, as well as oversight and administrative services provided to the Beacon Fund, and/or

investment advice provided for a fee by Ivy Asset Management to the Beacon Defendants the

Beacon and Ivy Defendants and BONY, as Ivy's parent which controlled the investment advice

dispensed by Ivy, have at all relevant times been fiduciaries with respect to the ERISA covered

employee benefit plan assets held by the Beacon Fund, and have at all relevant times had a

responsibility to manage such assets in accordance with the provisions of ERISA.  As such, they

owed a duty of prudence and loyalty to ERISA Plaintiffs and ERISA Class members, in that they

were required to act solely in the interest of the employee benefit plan participants and

beneficiaries whose plan assets they managed or with respect to which they advised for a fee,

and as part of such fiduciary duties, Defendants owed a duty to prudently manage and invest the

assets of these plans.  The Beacon and Ivy Defendants and BONY breached that duty by, *inter alia*:

a.      Failing to sufficiently investigate the investments controlled by Madoff or Madoff Securities to insure that they were a safe, prudent, honest and suitable investment for employee pension benefit plans and their participants and beneficiaries;

b.      Failing to identify warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or Madoff Securities;

c.      Failing to act on warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or Madoff Securities by:

i.      Entrusting the assets of the Beacon Fund to Madoff and Madoff Securities or advising that they be so entrusted; and

ii.      Failing to withdraw the assets of the Beacon Fund from Madoff and Madoff Securities or failing to advise that they be so removed.

301.    By virtue of their authority over the assets of the Jeanneret ERISA Subclass' members' plan assets, as well as oversight and investment advisory services provided for a fee by Jeanneret Associates to members of the Jeanneret ERISA Subclass, the Jeanneret Defendants have at all relevant times been fiduciaries with respect to the ERISA covered employee benefit plan assets held by the pension plans, and have at al relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.  As such, they owed a duty of prudence and loyalty to Jeanneret ERISA Subclass members, in that they were required to act

solely in the interest of the employee benefit plan participants and beneficiaries whose plan

assets they managed for a fee.  Jeanneret Defendants breached that duty by, *inter alia*:

     a.     Failing to sufficiently investigate the investments controlled by Beacon

Defendants, Madoff or Madoff Securities to insure that they were a safe, prudent, honest and

suitable investment for union pension benefit plans and their participants and beneficiaries;

     b.     Failing to identify warning signs and available information about the

unreliability and suspicious nature of accounts managed or controlled by Madoff or Madoff

Securities;

     c.     Failing to act on warning signs and available information about the

unreliability and suspicious nature of accounts managed or controlled by Madoff or Madoff

Securities by:

     i.     Entrusting the assets of the employee benefit plan clients that it

served as an investment manager to Beacon, and ultimately to Madoff Securities through

Beacon, or advising that they be so entrusted; and

     ii.     Failing to withdraw the assets of the employee benefit plan client

that it served as an investment manager from Beacon or failing to advise that they be so

removed.

     302.     As a result of the above-described conduct, the Beacon, Ivy and Jeanneret

Defendants and BONY have acted in violation of ERISA, 29 U.S.C. § 1104(a)(1)(B). As such,

these Defendants are liable to restore any losses to the employee benefit plans covered by ERISA

that invested and remained invested in the Beacon Fund and as a result suffered losses through

the investment by these Defendants of the Beacon Fund's assets in accounts managed or

controlled by Madoff or Madoff Securities.  Likewise, the Jeanneret Defendants are liable to

restore any losses to the employee benefit plans whose assets they managed to the extent they

caused those assets to be invested in Beacon and those assets were lost through the investment of

the Beacon Fund in accounts managed or controlled by Madoff or BMIS.

**COUNT VI**
**By ERISA Class for Breach of Fiduciary Duty – Failure to Comply with**
**Documents and Instruments Governing the Plan by Entrusting**
**Employee Benefit Plan Assets to Madoff or Madoff Securities**
**Directly by the Beacon Fund or Indirectly by Investing in the Beacon Fund**
**(<u>Against the Beacon, Ivy and Jeanneret Defendants</u> and BONY)**

303.    ERISA Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

304.    ERISA requires that a fiduciary with respect to an employee benefit plan act "in

accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).

305.    The Beacon and Ivy Defendants and BONY caused or allowed the Beacon Fund

to transfer to accounts managed by Madoff all Beacon Fund assets allocated to the so-called

"Large Cap Strategy," despite knowing or recklessly disregarding that, neither the Beacon and

Ivy Defendants and BONY, nor Madoff employed such a strategy.

306.    Had the Beacon and Ivy Defendants and BONY operated the Beacon Fund in

accordance with their governing documents, Madoff would not have been in a position to

misappropriate the assets of the employee benefit plans of Plaintiffs and ERISA Class members

from the date on which the applicable offering memoranda required the Large Cap Strategy to be

adopted by the Managing Members.

307.    Similarly, the Jeanneret Defendants executed Discretionary Investment

Management Agreements with the Jeanneret ERISA Subclass members, within which they

repeatedly misrepresented Jeanneret Associates' investment strategy to investors.  Pursuant to

discretionary investment management agreements between Jeanneret Associates and members of

the Jeanneret Subclass, Jeanneret Associates agreed to supervise and direct the investment of the assets of the union pension funds.  However, Jeanneret and Perry knew that the monies would be invested with Madoff, by virtue of Jeanneret Associates' participation in the Beacon Fund, and thus, could not be supervised and directed to the extend reflected in the investment management agreements.

308.    Had the Jeanneret Defendants operated Jeanneret Associates in accordance with their governing Investment Management Agreements, Beacon Defendants, and ultimately Madoff, would not have been in a position to misappropriate the assets of the Jeanneret ERISA Subclass members from the date on which the applicable offering memoranda required the Large Cap Strategy to be adopted by the Managing Members.

309.    As such, the Beacon and Ivy Defendants and BONY are liable to restore any losses to the employee benefit plans covered by ERISA that invested in the Beacon Fund and as a result suffered losses through the investment of assets allocated, pursuant to the applicable Offering Memoranda, to the Large Cap Strategy by entrusting those assets to Madoff and Madoff Securities in violation of the documents and instruments governing the plan insofar as they were invested in the Beacon Fund.  Likewise, the Jeanneret Defendants are liable to restore any losses to the employee benefit plans whose assets they managed to the extent they caused those assets to be invested in Beacon and those assets were lost through the investment of the Beacon Fund in accounts managed or controlled by Madoff or BMIS.

**COUNT VII**
**By ERISA Class Breach of Fiduciary Duty – Failure to Comply with**
**Documents and Instruments Governing the Plan, Breach of the Duty of Loyalty,**
**and Violation of 29 U.S.C. § 1106(a)(1)(D) Prohibiting Transfer to**
**or Use By or For the Benefit of a Party in Interest of Plan Assets**
**(Against the Beacon and Ivy Defendants and BONY)**

310.    ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

311.    ERISA requires that a fiduciary to an employee benefit plan act "(A) for the exclusive purpose of: (i) providing benefits to participants and beneficiaries; and (ii) defraying the reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).

312.    ERISA requires that a fiduciary with respect to an employee benefit plan act "in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).

313.    ERISA prohibits a fiduciary with respect to an employee benefit plan from directly or indirectly causing the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."  The Beacon, Ivy and Jeanneret Defendants and BONY are each "parties in interest" as that term is used in ERISA, which include fiduciaries and service providers to any employee benefit plan in the definition of party in interest.  29 U.S.C. § 1106(a)(1)(D).

314.    ERISA prohibits a fiduciary with respect to an employee benefit plan from receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b)(3).

315.    The Beacon and Ivy Defendants and BONY caused or allowed the Beacon Fund, which held ERISA covered employee benefit plan assets and was therefore subject to ERISA, to transfer to Beacon Defendants, Jeanneret Defendants and Ivy Defendants and BONY millions of dollars in investment management fees based on ERISA covered employee benefit plan assets

under management entrusted to Madoff or Madoff Securities, when these assets had in fact been

misappropriated by Madoff as part of the Ponzi scheme he operated.  Under the terms of the

documents and instruments governing the Beacon Fund, including the various Beacon Offering

Memoranda pursuant to which employee benefit plans invested, Defendant BAMC received a

monthly fee amounting to 1.5% of assets under management annually, a portion of which was

shared by agreement with Defendant Ivy, and an allocation of the Beacon Fund's profits.  This

fee has been fully paid to the Beacon Fund and a portion of it already shared with Defendant Ivy.

No portion of this fee however, has been refunded, even though the amount of the fee was

calculated based on, in large part, misappropriated or entirely fictional assets and profits falsely

claimed by Madoff or entities controlled by him to be held for investment on behalf of the

Beacon Fund.

316.    By causing or allowing this fee to be paid and subsequently retained without

adjustment, based on purely fictional assets or assets which had been misappropriated, the

Beacon and Ivy Defendants and BONY have violated 29 U.S.C. § 1104(a)(1)(D), insofar as the

documents and instruments governing entitlement to fees calls for fees to be paid on assets

actually managed through the Beacon Fund.  Further, 29 U.S.C. § 1106(a)(1)(D) prohibits direct

or indirect transfers of plan assets to parties in interest, and transfers can only exempt if paid

pursuant to a contract or reasonable arrangement for no more than reasonable consideration.

Because the transfer at issue here was either in violation of the contract that provided for its

payment, not paid pursuant to a reasonable arrangement, or if in compliance with a contract,

amounted to more than reasonable compensation having been paid on misappropriated or

fictional assets and profits, the transfer violated 29 U.S.C. § 1106(a)(1)(D).

317.    The Beacon and Ivy Defendants and BONY further violated 29 U.S.C. §

1106(b)(3) under ERISA by sharing in undisclosed referral fees in connection with transactions

involving ERISA covered plan assets.  The referral fees have been fully paid and a portion of it

already shared with Defendant Ivy.  No portion of this fee however, has been refunded, even

though the fee was in consideration for the Beacon and Ivy Defendants' and BONY's own

personal accounts, and not in consideration for the investment management services that the

Beacon and Ivy Defendants and BONY were bound to perform as ERISA fiduciaries.

318.    As such, the Defendants are liable to restore any losses to the employee benefit

plans covered by ERISA that invested in the Beacon Fund, and as a result, suffered losses

through the payment and retention of investment management fees, referral fees, and profit

allocations bases on assets that had been misappropriated by Madoff or entities associated with

him, or bases on assets which were entirely fictional.

**COUNT VIII**
**By ERISA Class for Co-Fiduciary Liability**
**(Against the Beacon, Ivy and Jeanneret Defendants and BONY)**

319.    ERISA Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

320.    ERISA imposes liability on a fiduciary, in addition to any liability which he may

have had under any other provision of ERISA, if he participates in a breach of fiduciary duty of

another fiduciary, with either actual or constructive knowledge of such a breach.  29 U.S.C.

§ 1105(a)(3).  Additionally, ERISA imposes liability on a fiduciary, in addition to any liability

which he may have had under any other provisions of ERISA, if he knows of a breach by another

fiduciary and fails to remedy it. 29 U.S.C. § 1105(a)(1).

321.     The Beacon, Ivy and Jeanneret Defendants and BONY, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty alleged herein against each of the others, and took no steps to remedy those breaches.  As such, each is liable as a co-fiduciary for breaches of the other fiduciaries, pursuant to 29 U.S.C. § 1105(a)(3).

322.     Ivy Defendants and BONY were assigned the responsibility of assisting and overseeing the Beacon Defendants in the performance of their fiduciary responsibilities, by advising them and by performing administrative responsibilities as set forth previously, and the Individual Defendants and BONY who controlled Defendant Ivy in the performance of its fiduciary duties each knowingly participated in the failure of the Beacon Defendants to prudently invest and allocate plan assets, the failure of the Beacon Defendants to operate the Beacon Fund in accordance with the documents and instruments governing those entities by failing to manage the assets allocated to the Large Cap Strategy themselves rather than transferring those assets to accounts controlled by Madoff or Madoff Securities, and the failure of the Beacon Defendants to charge and retain only reasonable fees calculated based only on actual assets under management by sharing in and retaining improperly calculated fees.  Beacon Defendants participated in the improper charging and retention of inappropriately calculated fees by Defendant Ivy, by splitting those fees with Ivy.  As such, Beacon Defendants and Ivy Defendants and BONY are each liable for the breaches of the others in which they participated pursuant to 29 U.S.C. § 1105(a)(1).

323.     Jeanneret Defendants, who were ERISA fiduciaries by virtue of their Investment Management Agreements with Plaintiffs and other Jeanneret ERISA Subclass members, were assigned the responsibility of supervising and directing the investments of the Jeanneret ERISA Subclass.  In dereliction of its duties under ERISA, the Jeanneret Defendants abdicated control of the Jeanneret ERISA Subclass members' investments when they channeled such investments to

the Beacon Fund without any meaningful oversight.  As such, the Jeanneret Defendants were in violation of duties described by ERISA.

324.    Further, the Jeanneret Defendants were aware of the Beacon Defendants' failure to comply with the investment strategy they purported to follow in their Offering Memorandum, as they knew of the Beacon Defendants involvement with Madoff and decision to relinquish control over Beacon Fund investments to Madoff, which in and of itself was a breach of ERISA fiduciary duties by the Beacon Defendants.

325.    The Jeanneret Defendants therefore participated in the Beacon Defendants' breach of fiduciary duty, as they had actual or constructive knowledge of this breach and failed to remedy it.

## COUNT IX
## By Investor Class for Common Law Fraud
## (<u>Against the Beacon, Ivy and Jeanneret Defendants and Friedberg</u>)

326.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

327.    Plaintiffs and other members of the Investor Class, in reasonable and justifiable reliance upon the statements and representations made by the Beacon Defendants, as previously set forth herein, purchased Memberships in the Beacon Fund.  Plaintiffs and other members of the Investor Class would not have purchased their Memberships in the Beacon Fund except for their reliance upon the representations made by the Beacon Defendants in the Offering Memoranda (as set forth in ¶¶ 133-141, 260-263), and would not have purchased them had they been aware of the false and misleading statements, material omissions and concealment by the Beacon Defendants or the fact that Beacon Associates, the Managing Member, had abdicated its duty of oversight and entrusted a majority of the Beacon Fund's assets to Madoff-related entities.

328.    At the time the statements, representations and omissions were made by the

Beacon Defendants in the Offering Memoranda and the periodic financial statements, the Beacon

Defendants knew or should have known them to be false and intended to deceive Plaintiffs and

other members of the Investor Class by making such statements and representations.

329.    Plaintiffs and other members of the Investor Class also reasonably and justifiably

relied upon Ivy Defendants' actions and omissions (as set forth in ¶¶ 152-154, 166 -168) that Ivy

Defendants would advise the Managing Member regarding the selection and allocation of the

Beacon Fund's assets.  In reality, Ivy Defendants knew or should have known that the majority

of the Beacon Fund's assets were invested with Madoff-related entities without any adequate

due-diligence having been performed, and that the various Beacon Offering Memoranda failed to

disclose this information.

330.    Plaintiffs and other members of the Investor Class also reasonably and justifiably

relied upon Jeanneret Defendants' representations and omissions (as set forth in ¶¶ 163-165) that

they would direct and supervise the investments of the Jeanneret Investor Subclass members.  In

reality, Jeanneret Defendants knew or should have known that the majority of the assets were

invested with the Beacon Fund, and ultimately, with Madoff-related entities. As such, no control

or supervision was possible due to Madoff's policy of nondisclosure.

331.    Similarly, as the Beacon Fund's auditors, Friedberg knew or should have known

that the majority of the Beacon Fund's assets were not invested in a "Large Cap Strategy," as

stated in the Offering Memoranda, but in fact were part of Madoff's Ponzi scheme.  Friedberg

nevertheless issued unqualified audit opinions without a sufficient evidentiary basis for doing so

and failed to disclose to Plaintiffs and Investor Class Members the material risk that the reported

returns of the Beacon Fund could be fictitious.

332. At the time of the false statements, misrepresentations and omissions set forth above, each of the Investment Manager Defendants and Friedberg intended that Plaintiffs and other members of the Investor Class would act on the basis of the misrepresentations and omissions contained in the Offering Memoranda in determining whether to purchase and/or retain Memberships in the Beacon Fund. Plaintiffs and other Investor Class members reasonably relied thereon to their detriment in making such decisions.

333. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Beacon Fund was invested in "U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month," when, in fact, less than two months later, it was revealed that the Beacon Fund lost over 74% of its value as a result of being invested in Madoff entities.

334. Had Plaintiffs and other members of the Investor Class known of the material facts that the Beacon, Ivy and Jeanneret Defendants and Friedberg wrongfully concealed and misrepresented, and the falsity of the Beacon, Ivy and Jeanneret Defendants', and Friedberg's representations, Plaintiffs and other Investor Class members would not have purchased and/or retained their Memberships in the Beacon Fund.

335. Plaintiffs and other members of the Investor Class, as a result of their purchase of Memberships in the Beacon Fund and by reason of the Beacon, Ivy and Jeanneret Defendants', and Friedberg's wrongful misrepresentations, have sustained, damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

336. By reason of the foregoing, the Beacon, Ivy and Jeanneret Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Investor Class members.

337.     The Beacon, Ivy and Jeanneret Defendants', and Friedberg's fraudulent acts were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

**COUNT X**
**By Investor Class for Aiding and Abetting Common Law Fraud**
**(Against Ivy, the Individual Ivy Defendants and BONY)**

338.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

339.     As BAMC's investment consultant, Ivy Asset Management had actual knowledge of the misrepresentations BAMC was disseminating to Plaintiffs and other Investor Class members.  With that knowledge, Ivy Asset Management knew of the fraudulent course of conduct being pursued by the Beacon Defendants, or was willfully blind to substantial evidence of such fraudulent conduct.

340.     As Ivy's parent, BONY also had actual knowledge of the misrepresentations being disseminated by the Beacon Defendants and Ivy itself.  With that knowledge, BONY knew of the fraudulent course of conduct being pursued by the Beacon and Ivy Defendants, or was willfully blind to substantial evidence of such fraudulent conduct.

341.     Ivy Asset Management substantially assisted the fraud perpetrated by the Beacon Defendants by (i) failing to disclose the inadequate level of due diligence being performed on Madoff and BMIS while BAMC continued to represent to Plaintiffs that it was living up to its duties of oversight and monitoring; and (ii) providing account reconciliation and bookkeeping services to BAMC and its clients, upon which BAMC relied to create the appearance of due diligence while knowing that the data provided by BMIS was inherently unreliable and cause for further inquiry.

342.    BONY substantially assisted the fraud perpetrated by the Beacon and Ivy Defendants by (i) failing to disclose the inadequate level of due diligence being performed on Madoff and BMIS while BAMC and Ivy continued to represent to Plaintiffs that they were living up to their duties of oversight and monitoring; and (ii) providing Ivy with greater means to market Madoff's fraudulent services through its extensive worldwide network of clients.

343.    Plaintiffs and the Investor Class have suffered damages proximately caused by Ivy Asset Management's and BONY's aiding and abetting of the Beacon Defendants' fraudulent conduct, in an amount to be proven at trial.

### COUNT XI
### By Investor Class for Breach of Fiduciary Duty
### (<u>Against the Beacon, Ivy and Jeanneret Defendants, and Friedberg</u>)

344.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

345.    The Beacon Defendants owed and continue to owe Plaintiffs and the Investor Class fiduciary obligations.  By reason of their fiduciary relationships, the Beacon Defendants owed and continue to owe Plaintiffs and the Investor Class the highest obligations of good faith, fair dealing, loyalty, and due care.  As such, they were duty bound to manage the assets of the Beacon Fund for the benefit of its members.

346.    Ivy owed and continues to owe Plaintiffs and the Investor Class, fiduciary duties as the Beacon Fund's Investment Consultant and as Investor Class Members' Investment Adviser.  As such, Ivy was duty bound to provided services in connection with the management of the assets of the Beacon Fund for the benefit of its members.

347.    Jeanneret Defendants, as Investment Manager to the members of the Jeanneret Subclass, owed and continue to owe Plaintiffs and the Jeanneret Investor Subclass fiduciary duties.  As such, they were duty bound to manage their clients' assets for their clients' benefit.

348.    Friedberg owed and continued to owe fiduciary duties to the Beacon Fund, Plaintiffs and other Class members to certify and confirm that financial statements accurately reflect the true financial condition and position of the Beacon Fund.

349.    As a result of the Beacon Defendants' and Ivy Defendants' abrogation of their duties to use due care in the management of the assets of the Beacon Fund for the benefit of the Beacon Fund's Members, as alleged herein, as well as the Jeanneret Defendants' abrogation of their duties to supervise and direct the Jeanneret Investor Subclass members' investments in any reasonable fashion by investing in the Beacon Fund, which they knew invested monies with Madoff, the Beacon, Ivy and Jeanneret Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Plaintiffs and the Investor Class.  They acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

350.    In addition, as a result of Friedberg's failure to adequately investigate the Beacon Fund's investments and base its audits upon evidentiary grounds that would satisfy GAAS and the AICPA's professional standards, Friedberg failed to fulfill its fiduciary duty owed to the Beacon Fund, Plaintiffs and other members of the Investor Class by concealing the material risk that the Beacon Fund's returns were fictitious.  Friedberg acted in bad faith, with gross negligence and with complete disregard of its obligation to use due care, including without limitation ensuring that the Beacon Defendants were investing the Fund's assets in accordance with the Offering Memoranda and were using reasonable and prudent investment standards.

Further, Friedberg breached its fiduciary duties to investors in the Beacon Fund as Friedberg knew or should have known that the audit reports would be used by investors to assess the Beacon Fund's financial strength, the investors would rely on these audit reports in making their investment decisions, and Friedberg was aware that investors would rely on these reports.

351.     In addition, Friedberg breached its fiduciary duties by falsely certifying the Beacon Fund's financial statements.

352.     As a proximate result of the Beacon, Ivy and Jeanneret Defendants' and Friedberg's bad-faith breaches of their fiduciary duties, Plaintiffs and other Investor Class members have sustained damages, suffered mental and emotional distress, and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

353.     By reason of the foregoing, the Beacon, Ivy and Jeanneret Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Investor Class members.

354.     The Beacon, Ivy and Jeanneret Defendants' and Friedberg's fraudulent acts were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

## COUNT XII
### By Investor Class for Breach of Contract
### (<u>Against the Beacon and Jeanneret Defendants</u>)

355.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

356.     Plaintiffs and Beacon Defendants were parties to the Subscription Agreement with respect to the Beacon Fund, which incorporated the Beacon Fund's Operating Agreement and Offering Memoranda.

357.     Plaintiffs and Jeanneret Defendants were parties to the Discretionary Investment Management Agreement with respect to the union pension funds.

358.     Under those documents and others incorporated therein, Beacon and Jeanneret Defendants were required to perform duties and conditions in accordance with representations made in those documents, including selecting proper investment managers or advisers to whom to delegate the Beacon Fund's investment authority, performing adequate due diligence of the funds of funds with whom the Beacon Defendants invested the Beacon Fund's assets, monitoring performance of the Beacon Fund's investments, and supervising and directing investments made on behalf of the Beacon Fund.

359.     Beacon and Jeanneret Defendants breached their contracts with Plaintiffs and Investor Class members by failing to perform those and other duties owed to Plaintiffs, as set forth in the Subscription Agreements (which incorporated the Operating Agreements and Operating Memoranda) and Discretionary Investment Management Agreements, respectively.

360.     As a result, Plaintiffs suffered damages, including the loss of their investments in the Beacon Fund.

**COUNT XIII**
**By Investor Class for Negligent Misrepresentation**
**(<u>Against the Beacon, Ivy and Jeanneret Defendants and Friedberg</u>)**

361.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

362.     The Beacon, Ivy and Jeanneret Defendants owed to the Beacon Fund, Plaintiffs and other Investor Class members a duty (a) to act with reasonable care in preparing and disseminating the Offering Memoranda, Discretionary Investment Management Agreements and other representations relied upon by Plaintiffs and other Investor Class members in deciding to

purchase their Membership interests in the Beacon Fund or to make investments with Jeanneret Associates, and (b) to use reasonable diligence in determining the accuracy of, and in preparing the information contained in, the Offering Memoranda and Discretionary Investment Management Agreements.

363.    In addition, Friedberg knew that its audited financial reports would be provided to the Beacon Fund's Members and potential investors in the Beacon Fund, and would be relied on by them in making investment decisions concerning the Beacon Fund.

364.    Accordingly, Plaintiffs and Investor Class Members are in privity or at least approaching privity with each of the Defendants named in this Count.  The Beacon, Ivy, and Jeanneret Defendants and Friedberg were aware that the information contained in the Offering Memoranda, Discretionary Investment Management Agreements and audit reports and financial reports would be used by investors to assess the risk of investing in the Beacon Fund.  Further, the Defendants were aware that all statements made in these materials would be relied on by investors, and Defendants prepared and disseminated these materials with the understanding that investors would reasonably rely on all representations made.

365.    The Beacon, Ivy and Jeanneret Defendants and Friedberg failed to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memoranda and Discretionary Investment Management Agreements, as well as other representations, including the audited annual financial statements.

366.    Neither the Offering Memoranda, nor the Discretionary Investment Management Agreements or other offering material used in soliciting investment in the Beacon Fund ever disclosed that a majority of the Beacon Fund's assets would be blindly entrusted to Madoff, BMIS or other Madoff-controlled entities, without the requisite level of due diligence and

oversight being performed.  Indeed, to the contrary, the Offering Memoranda contained several statements that delineated an elaborate structure of oversight, evaluation and supervision of outside Investment Managers that, at the time made, could not have been true given Madoff's secretive operation.

367.    Similarly, the Discretionary Investment Management Agreements never disclosed that full and total control would be abdicated to Madoff.  In fact, such Agreements stated quite the opposite, with representations being made that Jeanneret Defendants would be able to fully supervise the assets invested with them, even though certain investments would be made in the Beacon Fund.

368.    Defendants breached the duty to use reasonable care by failing to disclose the material facts that Defendants were *not*:

      a.     Performing adequate due diligence in connection with Plaintiffs' and Investor Class members' investments;

      b.     Monitoring and overseeing Plaintiffs' and Investor Class members' investments; and/or

      c.     Safeguarding those investments from excessive risks of loss.

369.    Defendants knew that investors would rely on the account statements provided by Jeanneret in selecting between investment management firms.

370.    Plaintiffs reasonably, justifiably, and materially relied upon the expectation that Defendants would vet, monitor, oversee, safeguard, and audit Plaintiff's and Investor Class members' investments.

371.    Plaintiffs and other Investor Class members would not have entrusted their capital to Defendants had they known that Defendants were not conducting due diligence, were not monitoring and overseeing Plaintiffs' and Investor Class members' investments and were not safeguarding those investments.

372.     As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Investor Class members have sustained damages, suffered mental and emotional distress, and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

373.     By reason of the foregoing, the Investment Manager Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Class members.

### COUNT XIV
### By Investor Class for Gross Negligence and Mismanagement
### (<u>Against the Beacon, Ivy and Jeanneret Defendants</u>)

374.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

375.     The Beacon and Ivy Defendants were charged with the responsibility of investing Plaintiffs' and other Investor Class members' money in a manner consistent with the Beacon Fund's investment objectives as set forth in the Offering Memoranda.

376.     The Jeanneret Defendants were retained by the members of the Jeanneret Investor Subclass to invest their money in a manner consistent with the agreed upon investment guidelines and terms of Jeanneret's Discretionary Investment Management Agreement, ERISA and the Beacon Fund's investment objectives as set forth in the Offering Memoranda.

377.     The Beacon, Ivy and Jeanneret Defendants owed fiduciary duties to the Beacon Fund, Plaintiffs and the Investor Class to conduct, manage, and supervise their investments in good faith and with due care.  As set forth above, the Investment Manager Defendants breached their fiduciary duties to the Beacon Fund, Plaintiffs and the Investor Class by acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries.

378.     The Beacon, Ivy and Jeanneret Defendants should have prevented, through the exercise of reasonable diligence, the improper investing of a majority of the Beacon Fund's assets into Madoff-related vehicles.

379.     The Beacon, Ivy and Jeanneret Defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

380.     Plaintiffs and the Investor Class relied to their detriment on the Beacon, Ivy and Jeanneret Defendants to discharge their duties as fiduciaries in a careful and prudent manner.

381.     As a direct and proximate result of the gross negligence and misconduct of the Beacon, Ivy and Jeanneret Defendants, Plaintiffs and the Investor Class have been harmed. These Defendants are liable to Plaintiffs and the Investor Class in an amount to be determined at trial.

382.     The Beacon, Ivy and Jeanneret Defendants' acts were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

**COUNT XV**
**By Investor Class for Unjust Enrichment**
**(<u>Against the Beacon, Ivy and Jeanneret  Defendants, Friedberg and BONY</u>)**

383.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

384.     As a result of the misconduct detailed herein, the Beacon Fund has been forced to begin liquidating, and Plaintiffs' and the other Investor Class members' investments have been decimated; yet the Investment Manager Defendants, Friedberg, and BONY have reaped substantial fees, dividends, and other pecuniary benefits at the expense of Plaintiffs and the Investor Class.

385.     The Beacon, Ivy and Jeanneret Defendants, Friedberg, and BONY have therefore

been unjustly enriched, and equity and good conscience require that these Defendants disgorge to

Plaintiffs and the Investor Class all such unjust enrichment in an amount to be determined at

trial.  As a proximate result of the Investment Manager Defendants', Friedberg's, and BONY's

breaches of their duties, Plaintiffs and other Investor Class members have sustained damages and

lost a substantial part of their respective investments in an amount to be proven at trial.

**COUNT XVI**
**By Investor Class for Aiding and Abetting Breaches of Fiduciary Duty**
**(<u>Against Ivy Defendants and BONY</u>)**

386.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

387.     As BAMC's Investment Consultant, Ivy Asset Management had actual

knowledge of the investments Beacon Associates was making on behalf of the Beacon Fund.

With that knowledge, Ivy Asset Management knew of the fiduciary duty breaches by the Beacon

Defendants, or was willfully blind to substantial evidence of such breaches.

388.     Ivy Asset Management substantially assisted the breaches of fiduciary duty of the

Beacon Defendants by failing to conduct the due diligence and oversight it was retained to

perform.

389.     Similarly, as Ivy Asset Management's parent company, BONY had knowledge of

Ivy Asset Management's investment consulting business, including its consulting the Beacon

Fund regarding its investment strategy.  With that knowledge, BONY knew of the breaches of

fiduciary duty by the Ivy Defendants.

390.     BONY substantially assisted the fiduciary duty breaches of the Ivy Defendants by providing Ivy with access to its global portfolio of clients to which Ivy marketed the fraudulent services of Madoff and BMIS.

391.     Plaintiffs and the Investor Class have suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy Asset Management, in an amount to be proven at trial.

## COUNT XVII
## By Investor Class for Aiding and Abetting a Breach of Fiduciary Duty
## (<u>Against Friedberg</u>)

392.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

393.     The Beacon Defendants owed Plaintiffs and the Investor Class fiduciary duties as alleged herein.

394.     By committing the acts alleged herein, the Beacon Defendants breached their fiduciary duties owed to Plaintiffs and the Investor Class.

395.     Friedberg aided and abetted the Beacon Defendants in breaching their fiduciary duties owed to Plaintiffs and the Investor Class, disseminated false and misleading yearly audit reports and opinions concerning Beacon's financial statements, and was an active and knowing participant in the Beacon Defendants' breaches of fiduciary duties owed to Plaintiffs and the Investor Class.  Among other things, Friedberg knowingly or recklessly ignored information that indicated or should have indicated that (i) there were insufficient controls in place to exercise meaningful oversight over Madoff's operations; and (ii) the money invested by Plaintiffs and the

Class in Beacon was invested with Madoff and/or BMIS and that Madoff and/or BMIS were involved in a Ponzi scheme.

396.    Plaintiffs and the Investor Class have suffered damages proximately caused by Friedberg's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, in an amount to be proven at trial.

**COUNT XIII**
**By Investor Class For Rescission Under the Investment Advisers Act**
**(Against Jeanneret and Ivy)**

397.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

398.    Jeanneret and Ivy acted as "Investment Advisers" to Plaintiffs and other members of the Investor Class pursuant to the Investment Advisers Act.

399.    By executing individual subscriptions, fully incorporating the terms of the Offering Memoranda and Discretionary Investment Management Agreements, Jeanneret and Ivy executed "investment advisory contracts" under the Investment Advisers Act.

400.    Jeanneret executed a contract with Plaintiffs and other members of the Jeanneret Investor Subclass. This contract, which incorporated the Beacon Fund's Confidential Offering Memoranda, designated Jeanneret as Investment Adviser to Plaintiffs and other members of the Class.

401.    Ivy executed a contract with BAMC which designates Ivy as the Investment Consultant to the Beacon Fund, pursuant to the Investment Advisers Act.  Further, Ivy specifically appears in the Beacon Fund's Confidential Offering Memoranda as the Investment Consultant and is bound by representations made therein.

402.     As registered Investment Advisers, Jeanneret and Ivy were responsible for meeting the statutory standards set forth in the Investment Advisers Act, 15 U.S.C. § 80b-6(2). Specifically, Jeanneret and Ivy could not engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

403.     Jeanneret and Ivy breached their duties to Plaintiffs and the other Investor Class members by engaging in a course of conduct which operated as a fraud or deceit on Plaintiffs and the Class.

404.     Jeanneret and Ivy failed to disclose that, they were unable to conduct meaningful oversight into Madoff and BMIS, which would serve the roles of fund advisor, broker/dealer, and custodian of the Beacon Fund's assets.  Such information was material and the Plaintiffs and other members of the Investor Class would not have invested in the Beacon Fund had Jeanneret and Ivy made it known to them.

405.     Ivy was unjustly enriched by the investment management fees that it shared with Jeanneret and BAMC in exchange for Ivy introducing Madoff to BAMC and Jeanneret's clients. Ivy was also unjustly enriched by the referral fees that it shared with BAMC for introducing new investors to Madoff's fraudulent scheme.

406.     The Jeanneret and Ivy Defendants knowingly misrepresented that they had conducted adequate due diligence on Madoff and on the controls in place within his firm to ensure that having Madoff and BMIS fulfill multiple roles would not put the assets of the Beacon Fund at risk.

407.     The Jeanneret and Ivy Defendants knowingly misrepresented the extent of ongoing monitoring they claimed to be providing with respect to the investments entrusted to Madoff.

408.     Plaintiffs and other Investor Class members have been damaged as a result of Jeanneret and Ivy's respective breach of their duties under the Investment Advisers Act.

409.     As a result, Plaintiff and the other Investor Class members are entitled to rescission of their investment adviser contracts with Jeanneret and Ivy,  and to recover, from Jeanneret and Ivy, all fees and commissions paid in connection with Plaintiff's and other Investor Class members' investments in the Beacon Fund.

**DERIVATIVE COUNTS**

**COUNT XIX**
**Breach of Fiduciary Duty**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against the Beacon and Ivy Defendants and Friedberg)**

410.     Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 344-354.

411.     Derivative Plaintiff brings this count for breach of fiduciary duty derivatively on behalf of the Beacon Fund against the Beacon and Ivy Defendants and Friedberg.

412.     As a proximate result of the Beacon, and Ivy Defendants' and Friedberg's breaches of their fiduciary duties, the Beacon Fund has sustained damages, in an amount yet to be determined, and to be proven at trial.

413.     By reason of the foregoing, the Beacon and Ivy Defendants and Friedberg are jointly and severally liable to the Beacon Fund.

414.     The Beacon and Ivy Defendants' and Friedberg's acts were willful and wanton, and the Beacon Fund is entitled to punitive damages.

**COUNT XX**
**Breach of Contract**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against the Beacon and Ivy Defendants)**

415.    Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 315-319.

416.    Derivative Plaintiff brings this count for breach of contract derivatively on behalf of the Beacon Fund against the Beacon and Ivy Defendants and Friedberg.

417.    Beacon and Ivy Defendants breached their contracts with Plaintiffs and Class members by failing to perform those and other duties owed to the Fund, as set forth in the Operating Agreement for the Beacon Fund and the Consulting Agreement between BAMC and Ivy, respectively.

418.    Specifically, under the Beacon Fund's Operating Agreement, BAMC, as the Managing Member owes a fiduciary duty to the Beacon Fund and is prohibited from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law. BAMC and the Beacon Defendants breached this duty by virtue of the conduct described herein.

419.    Under the Consulting Agreement between BAMC and Ivy, Ivy owed the Beacon Fund a duty to use reasonable care in providing its services.  Ivy breached this duty by virtue of the conduct described herein.

420.    As a result, the Beacon and Ivy Defendants are liable for the damages suffered by the Beacon Fund, in an amount to be proven at trial.

## COUNT XXI
### Negligent Misrepresentation
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
<u>Against the Beacon and Ivy Defendants and Friedberg</u>)**

421.     Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 326-335.

422.     Derivative Plaintiff brings this count for negligent misrepresentation derivatively on behalf of the Beacon Fund against the Beacon and Ivy Defendants and Friedberg.

423.     As a direct, foreseeable and proximate result of this negligence, the Beacon Fund sustained damages, in an amount yet to be determined, and to be proven at trial.

424.     By reason of the foregoing, the Beacon and Ivy Defendants and Friedberg are jointly and severally liable to the Beacon Fund.

## COUNT XXII
### Gross Negligence and Mismanagement
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
<u>Against the Beacon and Ivy Defendants</u>)**

425.     Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 338-344.

426.     Derivative Plaintiff brings this count for gross negligence and mismanagement derivatively on behalf of the Beacon Fund against the Beacon and Ivy Defendants.

427.     As a direct and proximate result of the gross negligence and misconduct of the Beacon and Ivy Defendants, the Beacon Fund was harmed.  These Defendants are liable to the Beacon Fund in an amount to be determined at trial.

428.    The Beacon and Ivy Defendants' acts were willful and wanton, and Plaintiffs and other Class members are entitled to punitive damages.

### COUNT XXIII
### Unjust Enrichment
### (Derivatively on behalf of Nominal Defendant, the Beacon Fund,
### Against the Beacon and Ivy Defendants, Friedberg and BONY)

429.    Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeatsand realleges ¶¶ 347-349.

430.    Derivative Plaintiff brings this count for unjust enrichment derivatively on behalf of the Beacon Fund against the Beacon and Ivy Defendants, Friedberg and BONY.

431.    Equity and good conscience require that these Defendants disgorge to the Beacon Fund and all such unjust enrichment in an amount to be determined at trial.

### COUNT XXIV
### Aiding and Abetting Breaches of Fiduciary Duty
### (Derivatively on behalf of Nominal Defendant, the Beacon Fund,
### Against Ivy Defendants and BONY)

432.    Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 350-354.

433.    Derivative Plaintiff brings this count for aiding and abetting breaches of fiduciary duty derivatively on behalf of the Beacon Fund against the Ivy Defendants and BONY.

434.    The Beacon Fund suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy Asset Management, in an amount to be proven at trial.

## COUNT XXV
### Aiding and Abetting a Breach of Fiduciary Duty
### (Derivatively on behalf of Nominal Defendant, the Beacon Fund,
### <u>Against Friedberg</u>)

435.    Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  Specifically, plaintiff repeats and realleges ¶¶ 356-359.

436.    Derivative Plaintiff brings this count for aiding and abetting breaches of fiduciary duty derivatively on behalf of the Beacon Fund against Friedberg.

437.    The Beacon Fund suffered damages proximately caused by Friedberg's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, in an amount to be proven at trial.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    determining that this action may be maintained as a class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    declaring that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission, Section 20(a) of the Exchange Act, Sections 1104 and 1105 of the Employee Retirement Income Security Act, Section 80b-6(2) of the Investment Adviser's Act, and New York common law;

C.    awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

D.      awarding punitive damages in favor of Plaintiffs and the other Class members for Defendants' wrongful conduct, in an amount to be determined at trial;

E.      awarding additional damages in favor of Plaintiffs and the Class consisting of all management fees, incentive fees, commissions and referral fees received by the Defendants, or any of them, from Madoff and/or BMIS during the Class Period;

F.      alternatively rescinding the Discretionary Investment Management Agreements;

G.      awarding Plaintiffs and the Class prejudgment interest on all damages recovered, to the extend allowed by law;

H.      awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

I.      granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper; and

J.      in connection with the derivative claims, awarding damages in favor of the Beacon Fund against all Defendants, jointly and severally, with the proceeds of any such award being used in connection with the liquidation of the Beacon Fund, for the benefit of the members of the Classes.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: October 1, 2009

LOWEY DANNENBERG COHEN
& HART, P.C.

By: _____

Barbara Hart (BH-3231)
Thomas M. Skelton (TS-7908)
One North Broadway
White Plains Plaza, 5th Floor
White Plains, New York 10601
914-997-0500

*Lead Counsel*

COHEN MILSTEIN SELLERS &
  TOLL PLLC

BERNSTEIN LIEBHARD LLP

Catherine A. Torell (CT-0905)
150 East 52nd Street, Thirtieth Floor
New York, NY 10022
212-838-7797

Sandy A. Leibhard
Jeffrey M. Haber
Joseph R. Seidman, Jr.
Jeffrey D. Lerner

Marc I. Machiz (*pro hac vice*)
255 S. 17th Street, Suite 1307
Philadelphia, PA  19103
267-773-4682

*Investor Counsel*

Lisa M. Mezzetti (LM-5105)
Karen L. Handorf (*pro hac vice*)
Anna K. Ryon -Walthall
Michelle C. Yau
1100 New York Avenue, NW,  Suite 500
West
Washington, DC 20005
202-408-4600

*ERISA Counsel*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Daniel W. Krasner
Gregory M. Nespole
Demet Basar
Stacey T. Kelly
270 Madison Avenue
New York, NY 10016

*Additional Plaintiffs' Counsel*

## VERIFICATION

I, Jay Raubvogel c/o Jay Raubvogel IRA, hereby verify that I am familiar with the allegations in the Consolidated Class Action and Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint. Based upon the investigation of my counsel and lead counsel in this action, the allegations in the Complaint are true to the best of my knowledge, information and belief. I declare under the penalty of perjury that the foregoing is true and correct.

October 1, 2009

Jay Raubvogel
c/o Jay Raubuogel IRA

26284v1