UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 JUN 21 PM 0:51
U.S. DISTRICT COURT
S.D.N.Y.

| | |
|---|---|
| IN RE: BEACON ASSOCIATES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MASTER FILE<br>NO. 09-CV-0777-LBS<br><br>Demand for Jury Trial |

# SECOND AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ....................6

JURISDICTION AND VENUE ....................12

PARTIES

Plaintiffs ....................13

Defendants....................25

CLASS ACTION ALLEGATIONS ....................67

PLAINTIFFS' DERIVATIVE ALLEGATIONS ....................73

SUBSTANTIVE ALLEGATIONS

A. Summary of Allegations....................76

B. New York Attorney General Action Against Defendant Ivy Asset Management ....................79

C. Defendants, Through the Use of Offering Memoranda and Other Devices, Engaged in a Scheme To Defraud Investors

1. Ivy Meets Defendants Danziger and Markhoff And Encourages Investments In Madoff ....................79

D. Ivy's Scheme to Defraud

1. Ivy Learns Facts that Indicate that Madoff is a Fraud ....................89

E. Ivy Conceals Facts From The Members of the Class While Limiting Its Proprietary Fund Exposure to Madoff....................94

F. Under The Aegis of BONY, Ivy Ranks Madoff As One Of Its Top Risks But Conceals This Fact From Plaintiffs And Members of Each Class While Attempting To Insulate Itself From Madoff Liability....................113

G. The Beacon and Jeanneret Defendants' Scheme to Defraud and Their Fraudulent Misrepresentations....................120

1. BAMC and the Beacon Defendants....................122

2. JPJA ....................126

a. The JPJA-Ivy Agreement ....................126

b. JPJA's Investment Management Agreements ........................................128

H. Facts Bearing on Defendants' Fiduciary Status ............................................................138

1. Jeanneret Defendants' Fiduciary Status ............................................................140

2. Beacon Defendants' Fiduciary Status ..............................................................142

3. Ivy and BONY Defendants' Fiduciary Status ....................................................143

a. Ivy controlled JPJA's and BAMC's access to Madoff ..........................147

b. JPJA and BAMC relied on misleading advice from Ivy in deciding to continue to invest with Madoff ........................149

c. Ivy provided investment advice for a fee pursuant to 29 CFR § 2510.3-21(c) (1)(i) and (ii)(B) ..............................................153

d. Defendant BONY and the BONY Defendants are fiduciaries. ..............163

I. Based on Actual Knowledge And Red Flags, Any Competent Investment Advisor Would Conclude That Madoff Was Engaged in Fraud, But Defendants Ignored These Obvious Signs of Fraud Because Their Relationship With Madoff Benefitted Them Financially ........................173

J. Allegations Regarding Auditor Friedberg ..............................................................176

1. GAAS Requirements ..........................................................................177

2. Auditor Friedberg Acted Improperly ..............................................................184

3. Friedberg Disseminated False Audit Reports to Plaintiffs and the Class ..........................................................187

4. Beacon Investors Justifiably Relied on the Auditor Friedberg's Audit Opinions to Their Detriment ....................................189

5. Friedberg Smith Breached Its Duties to the Beacon Fund ................................189

K. Defendants Willfully Ignored Dozens of Warning Signs That Madoff's Operations Were Not Legitimate ..........................................................192

L. Investment Professionals Who Did Conduct Due Diligence Concluded that the Red Flags Were Evidence That Madoff Was Operating a Fraud .......................204

M. ERISA Plaintiffs are Entitled to the Six-Year Limitations Period from the Time of Discovery of Ivy's Breach of Fiduciary Duty. .......................211

<u>CLAIMS FOR RELIEF</u>

<u>DIRECT COUNTS</u>

COUNT I
Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Brought on Behalf of the Investor Class (including the
Jeanneret Investor Subclass), Against Ivy, Larry Simon and Howard Wohl) ............................213

COUNT II
Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Brought on Behalf of the Investor Class (including the
Jeanneret Investor Subclass), Against BAMC) ..........................................................................228

COUNT III
Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Brought on Behalf of the Jeanneret Investor Subclass, Against JPJA) .....................................234

COUNT IV
Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Brought on Behalf of the Investor Class (including the
Jeanneret Investor Subclass), Against Friedberg)........................................................................239

COUNT V
By Investor Class (including the Jeanneret Investor Subclass)
for Violation of Section 20(a) of the Exchange Act
(Against Danziger and Markhoff)...............................................................................................243

COUNT VI
By Investor Class (including the Jeanneret Investor Subclass) for
Violation of Section 20(a) of the Exchange Act
(Against Jeanneret and Perry).....................................................................................................244

COUNT VII
By Investor Class (including the Jeanneret Investor Subclass) for
Violation of Section 20(a) of the Exchange Act
(Against Individual Ivy Defendants and BONY) ......................................................................245

COUNT VIII
By the ERISA Class and the Jeanneret ERISA Subclass for
Breach of Fiduciary Duty of Prudence and Loyalty Pursuant to ERISA
(Against the Beacon, Ivy, BONY and Jeanneret Defendants)...................................................248

COUNT IX
By the ERISA Class for Breach of Fiduciary Duty –
Failure to Comply with Documents and Instruments Governing the Plan by
Entrusting Employee Benefit Plan Assets to Madoff or BMIS
Directly by the Beacon Fund or Indirectly by Investing in the Beacon Fund
(Against the Beacon, Ivy, BONY and Jeanneret Defendants)....................................................252

COUNT X
By the ERISA Class and Jeanneret ERISA Subclass for Breach of Fiduciary Duty
– Failure to Comply with Documents and Instruments Governing the Plan,
Breach of the Duty of Loyalty, and Violation of 29 U.S.C. § 1106(a)(1)(D) & 1106(b)
Prohibiting Transfer to or Use By or For the Benefit of a Party in
Interest of Plan Assets and Self Dealing by ERISA Fiduciaries
(Against the Jeanneret, Beacon, Ivy and BONY Defendants)....................................................254

COUNT XI
By the ERISA Class and Jeanneret ERISA Subclass Claim for
Misrepresentation, Failure to Disclose Material Facts to BAMC and
JPJA by Ivy and BONY Defendants and Concealment of Breach of
Fiduciary Duty By All Defendants (Against the Ivy, BONY, Beacon
and Jeanneret Defendants) ..........................................................................................257

COUNT XII
By ERISA Class for Co-Fiduciary Liability
(Against the Beacon, Ivy and Jeanneret Defendants and BONY) ..............................................260

COUNT XIII
By ERISA Class and the Jeanneret ERISA Subclass Claim for
Disgorgement of Profits (Against Ivy and the BONY Defendants) ...........................................263

COUNT XIV
By Investor Class (including the Jeanneret Investor Subclass) for
Common Law Fraud (Against the Ivy 10b-5 Defendants, and the
Beacon and Jeanneret Defendants and Friedberg).....................................................................264

COUNT XV
By Investor Class (including the Jeanneret Investor Subclass)
for Aiding and Abetting Common Law Fraud (Against Ivy and BONY) .................................266

COUNT XVI
By Investor Class (including the Jeanneret Investor Subclass) for
Breach of Fiduciary Duty (Against the Ivy 10b-5, Beacon and
Jeanneret Defendants, and Friedberg)..........................................................................................267

COUNT XVII
By Investor Class (including the Jeanneret Investor Subclass)
for Breach of Contract (Against the Beacon and Jeanneret Defendants) ....................................270

COUNT XVIII
By Investor Class (including the Jeanneret Investor Subclass)
for Negligent Misrepresentation (Against the Beacon, Ivy and
Jeanneret Defendants and Friedberg)..........................................................................271

COUNT XIX
By Investor Class (including the Jeanneret Investor Subclass)
for Gross Negligence and Mismanagement (Against the Beacon,
Ivy and Jeanneret Defendants)....................................................................................274

COUNT XX
By Investor Class (including the Jeanneret Investor Subclass)
for Unjust Enrichment (Against the Beacon, Ivy and Jeanneret
Defendants, Friedberg and BONY) ............................................................................275

COUNT XXI
By Investor Class (including the Jeanneret Investor Subclass)
for Aiding and Abetting Breaches of Fiduciary Duty (Against Ivy and BONY) ........................276

COUNT XXII
By Investor Class (including the Jeanneret Investor Subclass)
for Aiding and Abetting a Breach of Fiduciary Duty (Against Friedberg)..................................277

COUNT XXIII
By Investor Class (including the Jeanneret Investor Subclass) for
Rescission Under the Investment Advisers Act (Against JPJA) ................................................278

DERIVATIVE COUNTS

COUNT XXIV
Breach of Fiduciary Duty
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against the Beacon Defendants, Ivy and Friedberg).................................................................279

COUNT XXV
Breach of Contract
(Derivatively on behalf of Nominal Defendant, the
Beacon Fund, Against Ivy) .........................................................................................280

COUNT XXVI
Negligent Misrepresentation
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against the Beacon Defendants, Ivy and Friedberg) ........................................................281

COUNT XXVII
Gross Negligence and Mismanagement
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against the Beacon Defendants and Ivy)..........................................................................281

COUNT XXVIII
Unjust Enrichment
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against the Beacon Defendants, Ivy, Friedberg and BONY)...................................................282

COUNT XXIX
Aiding and Abetting Breaches of Fiduciary Duty
(Derivatively on behalf of Nominal Defendant, the
Beacon Fund, Against Ivy and BONY) ..........................................................................283

COUNT XXX
Aiding and Abetting a Breach of Fiduciary Duty
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against Friedberg) .........................................................................................................283

COUNT XXXI
Malpractice and Professional Negligence
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against Friedberg) ........................................................................................................284

COUNT XXXII
Breach of Contract
(Derivatively on behalf of Nominal Defendant, the Beacon Fund,
Against Friedberg) ........................................................................................................285

PRAYER FOR RELIEF ..................................................................................................286

JURY TRIAL DEMANDED..............................................................................................288

1. Lead Plaintiff the Pipe Trades Group, comprised of the Plumbers & Steamfitters Local 267 Pension Fund and Plumbers & Steamfitters Local 267 Insurance Fund (collectively "Local 267"), Plumbers Local 112 Health Fund ("Local 112"), Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund (collectively "Local 73"), brings this action on behalf of itself and all similarly situated persons who purchased interests in Beacon Associates LLC I and Beacon Associates LLC II and who had not redeemed their interests in the Fund as of December 11, 2008 (collectively, the "Beacon Fund," defined below), the assets of which were substantially invested directly or indirectly with Bernard L. Madoff ("Madoff") and/or Bernard L. Madoff Investment Securities ("BMIS"), and who sustained losses thereby (the "Investor Class").

2. "ERISA Plaintiffs," which include the Trustees of Local 267 (comprised of Gregory Lancette, Bradley Ward, Bryan Allen, David Waby, Donald A. Little, Jr., James Fredenburg, Peter Lauze, Donald Beckley, Patrick Bonnell, Dominic Mancini, and James Rood); the Trustees of Local 112 (comprised of James Rounds and Lyle D. Fassett); the Trustees of Local 73 (comprised of Patrick Carroll, Timothy Donovan, Timothy Rice, Frederick J. Volkomer, Frederick J. Volkomer II, Daniel Hickey, Eric Saunders, L. James Culeton, Jason Lozier, James Donovan, Marc Stevens, Tom Metcalf, Jr., Thomas Culeton, and Mark Maniccia); the Trustees of the I.B.E.W. Local 43 and Electrical Contractors Welfare Fund (comprised of Patrick J. Costello, Dennis J. McDermott, Kevin J. Crawford, Donald H. Morgan, John S. Kogut, Carl Hibbard, Jr., and Marilyn M. Oppedisano); and the Trustees of the Oswego County Laborers' Local 214 Pension Fund (comprised of David Henderson, Jr., Michael Blasczienski, William F. Shannon, Earl N. Hall, Paul A. Castaldo, and Earl R. Hall), bring this action on behalf of themselves and all fiduciaries, participants and beneficiaries of any employee benefit

plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA") who invested in the Beacon Fund at any time through the present, the assets of which were substantially invested directly or indirectly with Madoff and/or BMIS, and who sustained losses thereby (the "ERISA Class").

3. Derivative Plaintiff Jay Raubvogel IRA, brings this action derivatively in the right and for the benefit of the Beacon Fund to seek redress of the injuries suffered by the Beacon Fund as a direct result of the breaches of fiduciary duties, breached contract, gross mismanagement, negligence, and fraud alleged herein, that caused its assets to be invested directly or indirectly with Madoff and/or BMIS. Additional plaintiffs include Grand Metro Builders of NY Corp. Defined Benefit Plan, John and Phyllis Cacoulidis, as Trustees of,the Grand Metro Builders of NY Corp. Defined Benefit Plan.

4. The allegations contained herein are based on personal knowledge as to Plaintiffs' own acts, and on information and belief as to all other matters based on the investigations and interviews conducted by and through Lead Counsel, which included the review of complaints filed by the United States Government, the New York Attorney General, and the Securities and Exchange Commission (the "SEC"), plea allocutions, papers and pleadings filed in actions commenced by state municipalities and administrative agencies, the SEC Inspector General's Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme ("SEC OIG Report"), offering memoranda and quarterly and periodic reports issued to potential investors and Beacon Fund members, news reports published in the financial press, auditor reports, and other available information.

5. Since filing the Consolidated Amended Complaint on October 1, 2009 (Dkt. # 67), Lead Counsel has continued to investigate the claims against the various defendants,

including interviewing persons with knowledge of underlying facts, and reviewing publicly available information, as well as facts disclosed by Defendants in their motions to dismiss. Additional facts learned during this investigation are included herein.

6. Notably, Defendant Ivy Asset Management Corp. (and its successor in interest, Ivy Asset Management, LLC, hereinafter "Ivy") conceded in its filings in this case that it entered into a secret agreement in 2006, as alleged herein, which purported to expressly exclude Madoff from the managers whom Ivy was obligated to monitor, research, evaluate and meet with. This highly suspicious agreement (1) supports a finding of scienter; (2) was not communicated to the Plaintiffs; and (3) makes the representations in the offering documents more misleading.

7. Although Ivy publicly represented great confidence in Madoff, a Confidential Witness who was formerly employed by Ivy has stated that Ivy was precluded from placing institutional investor clients in Madoff due to serious concerns regarding Madoff's operations (together with Ivy's inability to provide to the institutional investor clients detailed information concerning Madoff's operations) and instituted an actual embargo against doing so. As previously alleged, Ivy withdrew all of its Proprietary Funds from Madoff in 2000 when it was acquired by BONY, due to serious concerns that Ivy had regarding Madoff. Prior to that time, Ivy maintained a 3% allocation in Madoff **to intentionally and specifically deceive its Advisory Clients**. As reflected in an email obtained by the New York Attorney General ("NYAG"), Defendant Lawrence Simon ("Larry Simon") articulated this startling aspect of the scheme in a December 1998 e-mail to Defendant Wohl: "**We have said that it is important to maintain at least some level of Ivy fund investments with Madoff in order to send a message to [our] advisor clients that we have confidence in BLM [i.e. Madoff].**"

8. Additional facts learned as part of Lead Counsel's investigation include:

- In 1997, Ivy recognized that there were not enough options to support Madoff's purported trading strategy. Specifically, the volume of Standard and Poor's 100 Index options available would only support half of the amount of assets Ivy believed Madoff had under management. The trades Madoff had been reporting were not actually being made; that trading was impossible.

- Between 1997 and 1998, Madoff gave Ivy three vastly different explanations as to where and with whom he traded OEX options, all of which were inconsistent with Ivy's knowledge and publicly known facts about OEX options. Ivy received information from industry contacts indicating that Madoff was misusing client assets to fund his broker-dealer business instead of investing the money as he claimed he was doing.

9. Other Ivy documents obtained by the NYAG and identified in the Complaint filed by the NYAG against Ivy, as alleged herein, Larry Simon and Howard Wohl reveal that Ivy, Simon, and Wohl knew that investing with Madoff was an unacceptable risk:

- An internal Ivy memorandum from 1997 about Madoff states, "[t]his is a clear example of our inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with the independent information that is available to us."

- When writing to a subordinate in 2002, Wohl wrote "Ah, Madoff, You omitted one possibility - he's a fraud!"

- When listing managers who should be recommended to a prospective client in 2003, Wohl wrote, "Madoff (NOT!)."

- On December 16, 1998, the day after Madoff gave Ivy his third explanation about his option trades, Wohl recommended to Simon that Ivy withdraw all of the funds they managed from Madoff, including some of their own money, writing: "I'm concerned that he [Madoff] now admits that he does not execute all of the index options on the exchange that there are 'unknown' counterparties that if these options are not paid off he'd lose less than 100%. It remains a matter of faith based on great performance - this doesn't justify any investment, let alone 3%."

- In response, Simon argued that Ivy should not withdraw the investment it had placed with Madoff because that could lead Ivy's clients to withdraw their money from Madoff as well, which would significantly impact their total revenue, writing: "Amount we now have with Bernie in Ivy's partnerships is probably less than $5 million. The bigger issue is the 190 mil or so that our relationships have with him which leads to two problems, we are on the legal

> hook in almost all of the relationships and the fees generated are estimated based on 17+% returns …. [to be] $1.275 Million… Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?"

10. Following the filing of the NYAG's complaint, Defendant Larry Simon self-servingly released to the press certain letters sent to Defendant J.P. Jeanneret Associates, Inc. ("JPJA") and other clients which purport to exculpate Ivy from the fraudulent conduct alleged. To the contrary, the letters provide further support to the allegations against Ivy, BAMC and JPJA, because they show contemporaneous concerns that should have prompted Ivy, BAMC and JPJA to undertake additional investigations to obtain necessary information, failing which, Ivy, BAMC and JPJA should have acted promptly to safeguard Plaintiffs' and Class members' assets.

11. Immediately after the Madoff fraud was disclosed, on or about December 16, 2008, Defendant Paul Perry of JPJA specifically conceded, in an admission against interest, to Trustees of several Plaintiffs and Class members that he had tried to replicate Madoff's results numerous times but his calculations and analysis *never* supported Madoff's reported results. Similarly, according to a Confidential Witness, Larry Simon of Ivy also conceded the same inability to replicate Madoff's results. The inability to replicate Madoff's results should have prompted Ivy and JPJA to conduct further investigations and act promptly to safeguard the assets of Plaintiffs and the Classes. Despite this level of specific, repeated fraud alert, neither the Ivy nor Jeanneret Defendants did anything to avoid the Class' losses and did not cause Plaintiffs and the Class to withdraw the investments from Madoff. Moreover, even the watered down "concerns" that Ivy made to BAMC and JPJA (discussed *infra* in § C.1) should have prompted Ivy, JPJA and BAMC to conduct further investigations and act promptly to safeguard the assets of Plaintiffs and the Classes.

12. These facts should have been elicited by Defendant Friedberg Smith & Co. P.C. ("Friedberg"), the independent auditor of the Fund, during its audits but were not.

**NATURE OF THE ACTION**

13. On December 11, 2008, Madoff was arrested by federal authorities for operating a $50 billion Ponzi scheme, in which Madoff used the principal investments of new clients to pay the fictitious "returns" of other clients. Madoff and BMIS were charged with securities fraud and other federal offenses by the SEC. Madoff and BMIS were also criminally charged with securities fraud by the United States Attorney's Office for the Southern District of New York. On March 12, 2009, Madoff pleaded guilty to all eleven criminal charges, admitting in court that he operated a Ponzi scheme. On June 29, 2009, Madoff was given a sentence of 150 years in prison.

14. Madoff did not perpetrate this fraud by himself. Defendants facilitated Madoff's fraud and committed their own violations of law by investing and allowing to be invested their clients' money with Madoff while knowing that they would be unable to carry out their duties given their inability to obtain independent verification of the facts being represented to them by Madoff and/or BMIS. They did so by, among other things, (a) employing a scheme to defraud potential investors by (i) issuing Offering Memoranda that contained false statements regarding their due diligence; and the investment strategies and objectives of the Beacon Fund, (ii) failing to disclose relevant facts to investors, and (iii) issuing account statements, financial reports and other devices to perpetuate their scheme to defraud Beacon investors; (b) engaging in a course of business which operated as a fraud or deceit upon investors in the Beacon Fund; and (c) breaching their fiduciary duties imposed by ERISA (as to ERISA covered plans) and state law with regard to candor, undivided loyalty and good faith and fair dealing. These breaches

arose from false and misleading statements and omissions regarding (a) Ivy's role in the scheme and (b) all the Defendants' due diligence and monitoring of Madoff and BMIS (*e.g.*, the performance and feasibility of Madoff's purported trading strategy).

15. As a result of Defendants' wrongful conduct, including making false and misleading statements (and failing to disclose material information) in the Offering Memoranda, audit reports, and other documents about, *inter alia*, Ivy's actual knowledge and concerns regarding Madoff, Ivy's role, due diligence performed and by failing to conduct due diligence into Madoff and/or BMIS, the Beacon Fund's investments in Madoff and/or BMIS have been decimated, thereby damaging the Class and the Beacon Fund.

16. As the Managing Member of the Beacon Fund, Defendant Beacon Associates Management Corp. ("BAMC") issued false and misleading statements or omitted to disclose certain facts, which in light of the statements made, rendered them misleading through representations it made in the Beacon Fund's OMs. Such statements represented that as the Managing Member, BAMC would conduct initial and ongoing due diligence with respect to the investment strategy and implementation thereof by the various managers to whom Beacon Fund assets were allocated. BAMC was the agent of the investors in the Beacon Fund, and Ivy's misrepresentations and omissions made to BAMC are *de facto* misrepresentations and omissions made to Plaintiffs.

17. To bolster its credibility, BAMC leveraged the pedigree of Ivy, a registered investment adviser that offered high net-worth individuals and institutional clients alternative investment vehicles. The retention of Ivy as the Beacon Fund's Investment Consultant and representations regarding its expertise as an investment advisor in the Offering Memoranda and on Ivy's website, created an appearance of financial sophistication and exclusivity that the

BAMC and Ivy purported to offer potential investors. This image was cultivated by Defendants with the purpose and effect of inducing investors to invest in the Beacon Fund in reliance on, *inter alia*, the purportedly sound investment strategy and high standard of due diligence exercised by BAMC and Ivy.

18. In fact, Ivy was at the heart of the scheme to collect substantial management fees from Plaintiffs and Class members by acting as the portal through which the Beacon Fund and other feeder funds placed assets under Madoff's management. Ivy's founder, Larry Simon, was a close friend of Madoff. Larry Simon described Madoff as a genius, as someone who was well respected in the financial community, and trumpeted his reputation for consistently high returns.

19. Upon information and belief, when Madoff, citing a minimum net worth requirement, stopped accepting direct investments from individuals and an earlier feeder fund, the Income Plus Fund,[1] he permitted his friend Larry Simon, along with Defendants Joel Danziger and Harris Markhoff, individuals with whom Simon shared a personal relationship, to use the Beacon Fund as a conduit to Madoff's "investment services."

20. Ivy, through the actions of Larry Simon and other individuals, abandoned its duties because investing with Madoff (as opposed to other outside managers) was uniquely lucrative in that his consistent profits and inflated returns were structured to provide inflated fees to feeders such as Ivy. Madoff did not receive a "cut" of the advisory fees, foregoing them purportedly to make the fee on the supposed ongoing, but in fact, non-existent trades. He also falsely reported high returns, which in turn, allowed BAMC and Ivy to collect greater amounts in management fees based on the inflated assets under management. Over more than a decade, Ivy orchestrated this scheme by concealing material facts, creating a false impression of confidence

[1] Defendants Ivy and JPJA are also named as defendants in litigation involving the Income Plus Fund. *See In re Jeanneret Associates et al.*, 09-cv-3907 (CM) (S.D.N.Y. 2009).

in the Managers overseeing the assets invested in the Fund, for Plaintiffs and the Class to rely upon, and leading Plaintiffs and the Class to believe that Ivy was undertaking its duties in good faith by, *inter alia*, disseminating false and misleading statements of returns. To the contrary, in intentional breach of its duties as Investment Consultant, Ivy was not conducting (could not conduct or chose not to conduct) the represented and paid for due diligence, but rather concealed those facts that put it on fraud alert concerning Madoff. BAMC was enticed to invest specifically with Madoff by the prospect of millions of dollars in management and incentive fees resulting from its ability to market fictional high and n0n-volatile returns coupled with Madoff's abstention from a customary twenty percent cut of the returns; the *quid pro quo* was that BAMC would have to, and did, misrepresent the fulfillment of its fiduciary obligations to Plaintiffs and members of the Classes.

21. After Bank of New York Mellon ("BONY") acquired Ivy, BONY caused Ivy to maintain Plaintiffs' and the Class' investments with Madoff. This was so despite Ivy's records that reflected Ivy's direct knowledge of Madoff's fraud and its assessment that Madoff was internally considered as one of Ivy's top ten business risks. In light of these concerns Ivy withdrew its fund-of-funds investments from Madoff in 2000. However, in furtherance of the scheme, Larry Simon represented that Madoff demanded that Ivy withdraw its fund-of-funds investments due to BONY's acquisition in an effort to perpetuate Plaintiffs' and the Class' false perception of confidence in Madoff. In actuality, as Defendant Sean Simon succinctly put it, Ivy "fired" Madoff in 2000 but failed to disclose this fact to Plaintiffs and the Classes.

22. JPJA was the Investment Manager for members of the ERISA and Investor Classes (the "Jeanneret Subclass"). As Investment Manager, JPJA executed Discretionary Investment Management Agreements ("DIMAs") with members of the Jeanneret Subclass and

undertook obligations of oversight and due diligence, and in the case of the ERISA Class, covenanted to invest employee benefit plan assets in accordance with the heightened standard of prudence required of an ERISA fiduciary. However, JPJA knew that it could not live up to these standards and that Ivy was not comfortable with Madoff's operations. Yet, JPJA continued to direct assets of the Jeanneret Subclass into the Beacon Fund; assets that it intended to go to Madoff. Also, JPJA was the attorney-in-fact to Plaintiffs and members of the Jeanneret Subclass pursuant to the DIMAs between JPJA and Jeanneret Subclass members, Ivy's misrepresentations and omissions made to JPJA are *de facto* misrepresentations and omissions made to Plaintiffs.

23. Ivy, BAMC and JPJA intentionally breached their duty of candor and duty of loyalty by (a) concealing material facts from investors; (b) misrepresenting that they had conducted due diligence on Madoff's operations; (c) that as investment managers they had independently verified the bona fides of Madoff's operations and evaluated his strategy; and (d) that Madoff was utilizing the strategy represented in the Beacon Fund documents.

24. Friedberg was the accounting firm retained to audit the financial statements and reports of the Beacon Fund. As the Beacon Fund's auditor, Friedberg was required to exercise its duties under the Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP") to ensure that it gained an accurate understanding of the Beacon Fund, as well as where the Fund's assets were allocated, so as to acquire a sufficient basis for forming an opinion on the Fund's financial statements that were sent to Plaintiffs and Class members. Friedberg's audit failure and issuance of unqualified opinions with regards to the Beacon Fund's financial statements, directly caused investment losses suffered by Plaintiffs and members of the Beacon Class, as Beacon Class members relied on Friedberg's professional auditing expertise and opinions. Friedberg knew that Madoff constituted the largest allocation of

the Beacon Fund, it also had access to Ivy's letters sent to BAMC expressing reservations concerning Madoff, and in addition, Friedberg knew that evidence for the underlying investments in Madoff were unavailable as indicated by the notes it appended to its audited financial statements year after year, as alleged herein. Yet, it certified unqualified audit opinions that proximately caused the losses suffered by Plaintiffs and Beacon Class members.

25. Defendants had an affirmative duty to disclose and did omit to disclose to investors the facts that (a) they had not conducted, and could not conduct, the appropriate and required level of due diligence on Madoff's operations, due to the inability of investment managers to independently verify Madoff's operations, and the multiple roles (which included inherent conflicts of interest) that Madoff served, including broker/dealer, custodian, and investment manager; (b) Ivy had serious concerns regarding the legitimacy of Madoff's operations; (c) they had no reasonable basis to believe that Madoff was in fact utilizing the strategy that was being represented would be utilized in the management of the Beacon Fund; and (d) they had no reasonable basis to understand the strategy Madoff was in fact utilizing to achieve the reported results, which were both remarkably high and remarkably consistent, regardless of market conditions.

26. In justifiable reliance on Defendants' representations alleged herein, conduct, and culpable participation, Plaintiffs and members of the Class remitted management fees to BAMC and Ivy so that BAMC and JPJA (both of which shared those fees with Ivy) so that BAMC, JPJA and Ivy would vet suitable investment managers, assemble a diversified group of investments, follow a sound investment strategy, and conduct ongoing due diligence in accordance with the representations made to Plaintiffs and members of the Classes. Indeed, Ivy expressly kept 3% of its own funds invested with Madoff specifically and intentionally to communicate to Plaintiffs

and the Classes Ivy's endorsement of Madoff at a time when Ivy knew Madoff's results and purported trading strategy were a fraud. As detailed herein Defendants pursued a deceptive scheme of concealment, placed their own financial interests ahead of Plaintiffs and the Class, and willfully or recklessly ignored their contractual, statutory, and common law duties. Additionally, defendants BAMC and Ivy, pursuant to a consulting agreement, shared in undisclosed and prohibited fees that unjustly enriched those defendants.

## **JURISDICTION AND VENUE**

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as the common law, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

28. This Court also had jurisdiction over the subject matter of this action pursuant to §§ 409, 502(a)(2) & (3), and 502(e) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1109, 1132(a)(2) & (3), 1132(e).

29. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1391(b), and 29 U.S.C. § 1132(e)(2). Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects occurred within this District, and many of the Defendants reside in and/or maintain principal executive offices in this District.

30. In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

31. The misrepresentations (and omissions) by the Ivy, Beacon and Jeanneret Defendants and Friedberg in the Offering Memoranda, the DIMAs, rfp responses, quarterly and annual financial reports, performance reports, and other documents throughout the relevant period remained part of the total mix of information relied on by the Plaintiffs and the members of the Class in making investment decisions throughout the Class Period.

## PARTIES

**Plaintiffs:**

32. Plaintiff Plumbers & Steamfitters Local 267 Pension Fund invested $5,738,000.00 in Beacon I interests during the Class Period. Plaintiff Plumbers & Steamfitters Local 267 Insurance Fund, a fund maintained for the benefit of members of Local 267, invested $3,000,000.00 in Beacon II interests during the Class Period. Local 267 is a local union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical areas of Onondaga, Cortland, Chemung, Schuyler and Tompkins counties in New York. Local 267's membership includes over 1,000 skilled tradesmen and tradeswomen.

33. Plaintiff Plumbers Local 112 Health Fund invested $1,400,000 in Beacon II interests during the Class Period. Local 112 is a union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical area comprised of Broome, Chenango, Cortland, Delaware, Hamilton, Herkimer, Lewis, Madison, Oneida, Otsego and Tioga counties in New York.

34. Plaintiff Local 73 Retirement Fund invested $8,270,337 in Beacon I interests during the Class Period. U.A. of Journeymen & Apprentices Local 73 Fund, a fund maintained for the benefit of the Journeymen and Apprentices of Local 73, invested $1,380,000.00 in Beacon II interests during the Class Period. Local 73 is a union of workers representing all

aspects of the plumbing and pipefitting industry and covering the geographical area comprised of Oswego and Cayuga counties, and the Townships of Savannah, Butler, Wolcott, Jefferson, St. Lawrence, the Village of Hogansburg, the St. Regis Indian Reservation in Franklin County, and the Islands in Lake Ontario and the St. Lawrence River in New York.

35. Plaintiff Gregory Lancette serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Greg Lancette is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Gregory Lancette's address is 150 Midler Park Drive, Syracuse, New York 13206.

36. Plaintiff Bradley Ward serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Brad Ward is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Bradley Ward's address is 150 Midler Park Drive, Syracuse, New York 13206.

37. Plaintiff Bryan Allen serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Bryan Allen is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Bryan Allen's address is 701 West State Street, Ithaca, NY 14850.

38. Plaintiff David Waby serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff David Waby is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a

participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff David Waby's address is 8 Fairway Drive, Auburn, NY 13021.

39. Plaintiff Donald A. Little, Jr. serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Donald A. Little, Jr. is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Donald A. Little, Jr.'s address is 109 Belshire Lane, Syracuse, NY 13208.

40. Plaintiff James Fredenburg serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff James Fredenburg is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Fredenburg's address is 1680 Berry Road, Lafayette, NY 13084.

41. Plaintiff Peter Lauze serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Peter Lauze is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Peter Lauze's address is 900 Old Liverpool Road, Suite 17, Liverpool, 13088.

42. Plaintiff Donald Beckley serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Donald Beckley is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Donald Beckley's address is 1525 Lake Street, PO Box 205, Elmira, NY 14902.

43. Plaintiff Patrick Bonnell serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Patrick Bonnell is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Patrick Bonnell's address is 1004 Sullivan Street, Elmira, NY 14902.

44. Plaintiff Dominic Mancini serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff Dominic Mancini is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Dominic Mancini's address is 615 South Avenue, Rochester, NY 14620.

45. Plaintiff James Rood serves as a Trustee of the Board of Trustees of the Local 267 Funds. As a Trustee of the Local 267 Funds, Plaintiff James Rood is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Rood's address is 400 Leavenworth Avenue, Syracuse, NY 13204.

46. Plaintiff James Rounds serves as a Trustee of the Board of Trustees of the Plumbers Local 112 Health Fund, and participates in the Plumbers Local 112 Health Fund. As a Trustee of the Plumbers Local 112 Health Fund, Plaintiff James Rounds is a fiduciary with respect to the Plumbers Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Rounds' address is 11 Griswold St., Binghamton, New York 13904.

47. Plaintiff Lyle D. Fassett serves as a Trustee of the Board of Trustees of the Plumbers Local 112 Health Fund, and participates in the Plumbers Local 112 Health Fund. As a

Trustee of the Plumbers Local 112 Health Fund, Plaintiff Lyle D. Fassett is a fiduciary with respect to the Plumbers Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 112 Health Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Lyle D. Fassett's address is 11 Griswold St., Binghamton, New York 13904.

48. Plaintiff Patrick Carroll serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Patrick Carroll is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Patrick Carroll's address is 65 Baitsell Drive, Oswego, New York 13126.

49. Plaintiff Timothy Donovan serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Timothy Donovan is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Timothy Donovan's address is 336 S.W. Eighth Street, Oswego, New York 13126.

50. Plaintiff Timothy Rice serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund and U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Timothy Rice is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Timothy Rice's address is 205 East Sixth Street, Oswego, New York 13126.

51. Plaintiff Frederick J. Volkomer serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Frederick J. Volkomer is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Frederick J. Volkomer's address is 205 W. Albany Street, Oswego, New York 13126.

52. Plaintiff Frederick J. Volkomer II serves as a Trustee of the Board of Trustees of the Local 73 Retirement Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Frederick J. Volkomer II is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Frederick J. Volkomer II's address is 1380 County Rt. 1, Oswego, New York 13126.

53. Plaintiff Daniel Hickey serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Daniel Hickey is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Daniel Hickey's address is 705 East Seneca Street, Oswego, New York 13126.

54. Plaintiff Eric Saunders serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Eric Saunders is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds

within the meaning of 29 U.S.C. § 1002(7). Plaintiff Eric Saunders' address is 705 East Seneca Street, Oswego, New York 13126.

55. Plaintiff L. James Culeton serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff L. James Culeton is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff L. James Culeton's address is 705 East Seneca Street, Oswego, New York 13126.

56. Plaintiff Jason Lozier serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Jason Lozier is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Jason Lozier's address is 705 East Seneca Street, Oswego, New York 13126.

57. Plaintiff James Donovan serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff James Donovan is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Donovan's address is 705 East Seneca Street, Oswego, New York 13126.

58. Plaintiff Marc Stevens serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Marc Stevens is a fiduciary with respect to the Local 73 Funds

within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Marc Stevens' address is 705 East Seneca Street, Oswego, New York 13126.

59. Plaintiff Tom Metcalf Jr. serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Tom Metcalf Jr. is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Tom Metcalf Jr.'s address is 705 East Seneca Street, Oswego, New York 13126.

60. Plaintiff Thomas Culeton serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Thomas Culeton is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Thomas Culeton's address is 705 East Seneca Street, Oswego, New York 13126.

61. Plaintiff Mark Maniccia serves as a Trustee of the Board of Trustees of the U.A. of Journeymen & Apprentices Local 73 Fund, and participates in the Local 73 Funds. As a Trustee of the Local 73 Funds, Plaintiff Mark Maniccia is a fiduciary with respect to the Local 73 Funds within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 73 Funds within the meaning of 29 U.S.C. § 1002(7). Plaintiff Mark Maniccia's address is 705 East Seneca Street, Oswego, New York 13126.

62. Plaintiff Patrick J. Costello serves as a Trustee of the Board of Trustees of the I.B.E.W. Local 43 and Electrical Contractors Welfare Fund ("I.B.E.W. 43 Welfare Fund") and

participates in the I.B.E.W. 43 Welfare Fund. The I.B.E.W. 43 Welfare Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. § 1002(3). As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Patrick J. Costello is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff Patrick J. Costello's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

63. Plaintiff Dennis J. McDermott serves as a Trustee of the Board of Trustees of the I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Dennis J. McDermott is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff Dennis J. McDermott's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

64. Plaintiff Kevin J. Crawford serves as a Trustee of the Board of Trustees of the I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Kevin J. Crawford is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff Kevin J. Crawford's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

65. Plaintiff Donald H. Morgan serves as a Trustee of the Board of Trustees of the I.B.E.W. 43 Welfare Fund and participates in the I.B.E.W. 43 Welfare Fund. As a Trustee of the

I.B.E.W. 43 Welfare Fund, Plaintiff Donald H. Morgan is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff Donald H. Morgan's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, P.O. Box 2218, Clay, New York 13041.

66. Plaintiff James Engler serves as a Trustee of the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff James Engler is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff James Engler s address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, c/o Engler Electric Inc., 609 Columbia Street Utica, New York 13502.

67. Plaintiff John S. Kogut serves as a Trustee and the Chairman of the Board of Trustees of the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff John S. Kogut is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff John S. Kogut's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, c/o Kogut Electric, Inc., 1025 Erie St, P.O. Box 1735, Utica, New York 13503-1735.

68. Plaintiff Carl Hibbard, Jr. serves as a Trustee of the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Carl Hibbard, Jr. is a fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Carl Hibbard, Jr.'s address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, c/o Patricia Electric, 407 Brown Ave, Syracuse, New York 13208.

69. Plaintiff Marilyn M. Oppedisano serves as a Trustee of the I.B.E.W. 43 Welfare Fund. As a Trustee of the I.B.E.W. 43 Welfare Fund, Plaintiff Marilyn M. Oppedisano is a

fiduciary with respect to the I.B.E.W. 43 Welfare Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Marilyn M. Oppedisano's address is I.B.E.W. Local 43 and Electrical Contractors Welfare Fund, 23 Mitchell Street, Oswego, New York 13126.

70. I.B.E.W. Local 43 and Electrical Contractors Welfare Fund ("I.B.E.W. 43 Welfare Fund") invested $1,450,000.00 in Beacon II interests during the Class Period; the $1,450,000.00 represents the Fund's gross and net investment because the Fund did not take any withdrawals. I.B.E.W. 43 is a local union of workers representing several aspects of electrical work including: Inside Construction, Voice-Data-Video, Manufacturing, Security & Alarms, Municipal, Residential Wiring and Telephone. I.B.E.W. Local 43 covers the following counties in New York: Cortland, Herkimer, Madison, Oneida, Onondaga, Oswego and parts of the following counties in New York: Cayuga, Chenango, Otsego, Tompkins and Wayne. The I.B.E.W. 43 Welfare Fund has approximately 1,579 participants.

71. Plaintiff David Henderson, Jr. serves as a Trustee of the Board of Trustees of the Oswego County Laborers' Local 214 Pension Fund ("Oswego Laborers' Fund") and participates in the Oswego Laborers' Fund. The Oswego Laborers' Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. § 1002(3). As a Trustee of the Oswego Laborers' Fund, Plaintiff David Henderson is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff David Henderson's address is Oswego County Laborers' Local 214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

72. Plaintiff Michael Blasczienski serves as a Trustee of the Board of Trustees of the Oswego Laborers' Fund and participates in the Oswego Laborers' Fund. As a Trustee of the

Oswego Laborers' Fund, he is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff Michael Blasczienski's address is Oswego County Laborers' Local 214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

73. Plaintiff William F. Shannon serves as a Trustee of the Board of Trustees of the Oswego Laborers' Fund and participates in the Oswego Laborers' Fund. As a Trustee of the Oswego Laborers' Fund, he is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21); he is also a participant in the Fund within the meaning of ERISA § (7) of ERISA, 29 U.S.C. § 1002(7). Plaintiff William F. Shannon's address is Oswego County Laborers' Local 214 Pension Fund, 23 Mitchell Street, Oswego, New York 13126.

74. Plaintiff Earl N. Hall serves as a Trustee of the Oswego Laborers' Fund. The Oswego Laborers' Fund is an employee benefit plan covered by ERISA as defined in § 3(3) of ERISA, 29 U.S.C. § 1002(3). As a Trustee of the Oswego Laborers' Fund, Plaintiff Earl N. Hall is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Earl N. Hall's address is Construction Employers Association of Central New York, Inc., 6563 Ridings Road, Syracuse, New York 13206.

75. Plaintiff Paul A. Castaldo serves as a Trustee of the Oswego Laborers' Fund. As a Trustee of the Oswego Laborers' Fund, Plaintiff Paul A. Castaldo is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Paul A. Castaldo's address is Paul A. Castaldo, Inc., 9 Fourth Avenue, Oswego, New York 13126.

76. Plaintiff Earl R. Hall serves as a Trustee of the Oswego Laborers' Fund. As a Trustee of the Oswego Laborers' Fund, Plaintiff Earl R. Hall is a fiduciary with respect to the Oswego Laborers' Fund within the meaning of § 3(21) of ERISA, 29 U.S.C. § 1002(21). Plaintiff Earl R. Hall's address is Construction Employers Association of Central New York, Inc., 6563 Ridings Road, Syracuse, New York 13206.

77. Oswego County Laborers' Local 214 Pension Fund ("Oswego Laborers' Fund") invested $7,000,000.00 in Beacon I interests during the Class Period; the $7,000,000.00 represents the Fund's gross and net investment because the Fund did not take any withdrawals. Oswego County Laborers' Local 214 is a local union of workers representing construction workers in upstate New York. The Oswego Laborers' Fund has approximately 504 participants.

78. Plaintiffs Jay Raubvogel and M. Raubvogel Co. Trust, by Jay Raubvogel as trustee, (collectively "Raubvogel") invested millions of dollars in the Beacon Fund, and have suffered damages as a result of the wrongful conduct alleged herein.

79. Additional Plaintiffs Grand Metro Builders of NY Corp. Defined Benefit Plan and John and Phyllis Cacoulidis, as Trustees of Grand Metro Builders of NY Corp. Defined Benefit Plan (collectively, "Cacoulidis"). The sponsor of the Plan is Grand Metro Builders of NY Corp. located in Jericho, New York. Cacoulidis invested approximately $2.01 million on behalf of the Plan in the Beacon Fund and have suffered damages as a result.

80. Derivative Plaintiff Jay Raubvogel IRA is and at relevant times was a member of the Beacon Fund.

**<u>Defendants</u>:**

81. Defendant BAMC is a New York corporation, located at 123 Main Street, Suite 900, White Plains, New York 10601. Beacon Associates is the Managing Member of the Beacon

Fund. Based on the documents governing Beacon I and Beacon II, as Managing Member of the Beacon Fund, BAMC was responsible for making investment, allocation and reallocation decisions on behalf of the Beacon Fund, as well as administering the business and affairs of the Beacon Fund. Defendants Joel Danziger and Harris Markhoff own (beneficially and of record) 100% of the issued and outstanding voting shares of the BAMC (constituting 1% of the outstanding stock of the Beacon Fund). All of the non-voting common stock of BAMC (consisting of 99% of the total outstanding stock) is held by the immediate families of defendants Danziger and Markhoff. Because BAMC was assigned authority or control over the management and disposition of the ERISA covered employee benefit plan assets held by the Beacon Fund by the documents and instruments governing those entities, including those assets which were in turn entrusted by the Beacon Fund to the discretion and control of Madoff, BAMC has at all relevant times been a fiduciary with respect to the ERISA covered plan investors in the Beacon Fund within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

82. Defendant Joel Danziger, Esq. ("Danziger") is the President and a Director of BAMC and by virtue of the control he exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Beacon Fund, through his control of BAMC has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Beacon Fund within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA. Danziger is a licensed attorney and a partner of the law firm of Danziger & Markhoff LLP located at 123 Main Street, Suite 900, White Plains, New York 10601. Danziger resides in Bedford, New York.

83. Defendant Harris Markhoff, Esq. ("Markhoff") is the Vice President, Secretary, Treasurer and a Director of BAMC and by virtue of the control he exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Beacon Fund, has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Beacon Fund within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA. Markhoff is a licensed attorney and a partner of the law firm of Danziger & Markhoff LLP located at 123 Main Street, Suite 900, White Plains, New York 10601. Markhoff resides in Pound Ridge, New York.

84. Defendants Danziger and Markhoff together with members of their immediate families beneficially own 100% of the issued and outstanding voting shares of BAMC.

85. Nominal Defendants Beacon Associates LLC I ("Beacon I") and Beacon Associates LLC II ("Beacon II") are each a New York limited liability company with principal offices at 123 Main Street, Suite 900, White Plains, New York 10601, which together comprise the Beacon Fund. At all relevant times, BAMC served as the Managing Member of the Beacon Fund (consisting of investors in both Beacon I and Beacon II). By virtue of its authority with regards to the Beacon Fund, BAMC has at all relevant times been a fiduciary with respect to the ERISA covered employee benefit plan assets held by the Beacon Fund, and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA. Membership in the Beacon Fund was offered to investors via confidential Offering Memoranda. The minimum capital contribution for an investor to access the Beacon Fund was $500,000, subject to the right of BAMC to modify this requirement. According to the Beacon Fund's Offering Memoranda, all of Beacon II's assets were invested in Beacon I for investment and

trading activities. The Beacon Fund holds employee benefit plan assets subject to ERISA because at all relevant times more than 25% of the Beacon Fund's assets represented investments of employee benefit plan assets.

86. Defendants BAMC, Danziger and Markhoff are referred to collectively as the "Beacon Defendants."

87. Defendant JPJA is a New York corporation established in 1988 with its principal place of business in Syracuse, New York. JPJA is a registered investment advisor under the Investment Advisors Act of 1940 and a corporation engaged in the business of rendering investment advice for a fee to ERISA covered employee benefit plans organized as Taft-Hartley funds and other institutional investors and acted as an investment manager to those ERISA-covered employee benefit plans pursuant to ERISA § 3(38). JPJA used the authority, control and influence it exercised as a fiduciary to such investors (including the plans whose participants and trustees are named in this complaint) to direct investor monies into the Beacon Fund.

88. Defendant John P. Jeanneret, Ph.D., ("Jeanneret") is the founder, president, chief executive officer and chief compliance officer of JPJA. Jeanneret holds a Bachelor of Arts degree in Economics and Accounting, a Master of Arts in Economics and Business, and a doctorate in Philosophy, Economics and Finance, all from the State University of New York at Binghamton. Jeanneret has been a Registered Investment Advisor, registered with the SEC from 1973 to the present. Together with Defendant Perry, Jeanneret determined and delivered the investment advice for a fee to Taft-Hartley funds and other institutional investors provided by JPJA, acting on behalf of JPJA exercised the authority and control over plan assets possessed by JPJA and invested the assets of JPJA's clients into the aforementioned Beacon Fund.

89. Defendant Paul L. Perry ("Perry") is the director and owner of JPJA. Perry holds a Bachelor of Science in Finance and Quantitative Analysis from New York University. Prior to his position at JPJA, Perry was a Financial Consultant for Shearson Lehman Hutton and Gruntal and Company, Inc. Together with Defendant Jeanneret, Perry determined and delivered the investment advice for a fee to Taft-Hartley funds and other institutional investors provided by JPJA, acting on behalf of JPJA exercised the authority and control over plan assets possessed by JPJA and invested the assets of JPJA' clients into the aforementioned Beacon Fund. Defendants JPJA, John P. Jeanneret and Paul L. Perry are collectively referred to as the "Jeanneret Defendants."

90. At all relevant times, JPJA served as an investment manager to certain ERISA covered employee benefit plans whose participants, beneficiaries and fiduciaries are members of the ERISA Class (defined *infra* at ¶ 2) within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38), and, by virtue of the Jeanneret Defendants' authority and control respecting management and disposition of these ERISA covered employee benefit plans' assets, the Jeanneret Defendants were fiduciaries to certain members of the ERISA Class pursuant to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). To the extent that JPJA also provided investment advice for a fee to the ERISA covered employee benefit plans it served, it is also a fiduciary to these class members pursuant to ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii). Defendants Jeanneret and Perry by virtue of their control over the decisions and advice of provided by Jeanneret in connection with each of their ERISA covered employee benefit plan clients' investments in the Beacon Funds are each themselves fiduciaries with pursuant to ERISA § 3(21)(A)(i) and (ii), 29 U.S.C. § 1002(21)(A)(i) and (ii).

91. Defendant Ivy Asset Management LLC was formerly a Delaware corporation that reorganized as a Delaware limited liability company on January 1, 2009. Ivy is located at One Jericho Plaza, Jericho, New York, 11753, and since October 2000 has been a wholly owned subsidiary of BONY or its predecessor BNYCo. Ivy is a registered Investment Adviser under the Investment Advisers Act of 1940 and a commodity trading advisor under the Commodity Exchange Act. The Beacon Defendants were introduced to BMIS and Madoff through Ivy Asset Management and developed a long-term relationship with Defendant Ivy during which the two shared investment advisor and referral fees. As explained in more detail below, Ivy served as as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) both because Ivy exercised authority or control respecting management or disposition of the Plans' assets within the meaning of ERISA § 3(21)(A)(i) and because Ivy rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan within the meaning of ERISA § 3(21)(A)(ii) to each of the Plans whose participants are members of the ERISA class.

92. Defendant Lawrence Simon ("Larry Simon") was a co-founder of Ivy and served as Chief Executive Officer and President of Defendant Ivy from May 1984 to 2005 and Vice Chairman of Ivy from 2006 until 2008. He also served on Ivy's Board of Directors from October 2000 to November 2006. Simon also served on the Manager Approval Committee, and was therefore responsible for approving all new investment managers, entering into investment advisory agreements, establishing investment advisory fees, selecting investment managers, and developing new products and services. Defendant Simon executed documents governing the fiduciary services that Ivy would provide for BAMC and Jeanneret in exchange for a fee, including the fee-sharing agreement. Defendant Simon was also listed in the offering

memoranda for the Beacon Fund with respect to the fiduciary duties Ivy agreed to undertake, as described in more detail below. During some or all of the Class Period, Larry Simon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS. As such, Defendant Simon was a fiduciary of the Plans in the ERISA Class and the Jeanneret subclass pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. When Ivy was sold to BONY in 2000, Defendant Simon received more than $100 million from the sale. Before the sale, Simon owned 46.5% of the common stock of Ivy.

93. Defendant Howard Wohl ("Wohl") was a co-founder of Ivy and served as Vice President from May 1984 to September 1996. From October 1996 to October 2000, Wohl served as the Chairman and Chief Investment Officer of Ivy. He served on Ivy's Board of Directors from October of 2000 until November of 2006. Also from October 2000 until 2006, Whol served as Ivy's Vice Chairman and Chief Investment Officer. In addition, Wohl was also a member of Ivy's Board of Directors, the OCE, and the Manager Approval Committee. Plaintiffs are informed and believe that as an Ivy Executive and member of the Manager Approval Committee, Defendant Wohl was responsible for entering into investment advisory agreements, establishing investment advisory fees, selecting and approving investment managers, and developing new products and services. Additionally, Defendant Wohl executed documents governing the fiduciary services that Ivy would provide for Jeanneret and BAMC in exchange

for a fee, including fee-sharing agreements. Defendant Wohl was also listed in the offering memoranda for the Beacon Fund with respect to the fiduciary duties Ivy agreed to undertake, as described in more detail below. During some or all of the Class Period, Wohl, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Wohl "determined the investment advice to be given to [Ivy's] clients." (*See, e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Wohl was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. When Ivy was sold to BONY in 2000, Defendant Wohl received more than $100 million from the sale. Before the sale, Wohl owned 46.5% of the common stock of Ivy.

94. Defendant Fred P. Sloan ("Sloan") served as Ivy's Chief Financial Officer from November 1990 until April 1992. He then served as Director of Research from 1990 until at least 1994. (*See* part II, Schedule D of Ivy's January 26, 1994 Form ADV.) Upon information and belief, from approximately1996 until at least December 2000, Sloan served as Ivy's Chief of Investment Management. (*See* part II, Schedule F of Ivy's March 20, 2009 Form ADV.)[2] Sloan left Ivy from 2002 until 2009. *Id*. From 1990 until 2001, Defendant Sloan's responsibilities

---

[2] *See* also http://www.iiwealthmanagement.com/Popups/PrintArticle.aspx?ArticleID=1273332; *see also* p. [31-35], Michael Peltz, "Regrowing Ivy" Institutional Investor Alpha Magazine, [March 2008] available at http://www.nxtbook.com/nxtbooks/ii/ alpha0308/index.php?startid=31.

included approving and selecting investment managers; reviewing the risk profile of approved managers; removing managers from the approved list; setting investment parameters for Ivy's portfolios; entering into investment advisory agreements; establishing investment advisory fees; overseeing, managing, and developing Ivy's institutional relationships; hedge fund manager operational due diligence; and fund administration. Sloan, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Sloan "determined the investment advice to be given to [Ivy's] clients." (*See, e.g.*, part II, Schedule D of Ivy's January 26, 1994 Form ADV.) As such, Defendant Sloan was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. In February of 2009, Sloan rejoined Ivy as Chief Investment Officer and serves as a member of Ivy's Management Committee. *Id*; see also "Executive Shake-Up at Ivy Asset Management" *New York Times DealBook* (January 16, 2009).[3] Upon information and belief, through counsel's continuing ongoing independent research and investigation, Fred P. Sloan is the individual identified as the "Chief of Investment Management" from 1996 until 2000 in the New York Attorney General's action against Ivy (*see e.g*, NYAG Ivy Action, ¶¶ 55, 57).

95. Defendant Adam L. Geiger ("Geiger") served as Ivy's Director of Research from July 1997 until October 2000. From October 2000 until September 2001, Geiger served as the

[3] Available at http://dealbook.blogs.nytimes.com/2009/01/16/executive-shake-up-at-ivy-asset-management/

Head of Research and a Vice President. From October 2001 to April 2002, Geiger served as Director of Investments. (*See* part II, Schedule F of Ivy's April 1, 2003 Form ADV) From April 2002 until January 2006, Geiger served as Managing Director and Global Head of Investments. He also served on Ivy's Strategic Operating Committee from approximately March 2005 until December 2005. From January 2006 until approximately December 2006, Geiger served as Chief Investment Officer and served as a member Manager Approval Committee until at least May 2006 and thus Defendant Geiger was responsible for: reviewing portfolios to make sure that they were consistent with investment objectives and guidelines, and/or consistent with the client's advisory contracts and instructions to Ivy; approving, selecting, identifying, or recommending investment managers; entering into investment advisory agreements; establishing investment advisory fees; conducting due diligence on prospective investment managers, including performing in-depth follow-up calls, on-site visits, analysis of portfolio composition, statistical analysis of performance history, and peer comparisons; reviewing documents and financial statements in detail; verifying investment managers' backgrounds; and conducting manager research, due diligence and monitoring, portfolio construction and investment management, and quantitative research and risk management. During some or all of the Class Period, Geiger, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Geiger "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such,

Geiger was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of each Plan. Upon information and belief, through counsel's ongoing independent research and investigation, Adam Geiger is the individual who is referred to in the NYAG Ivy Action as the "Director of Research" in April 2000 (see NYAG Ivy Action, ¶ 102).

96. Defendant Jeffrey R. Lindenbaum ("Lindenbaum") served as Chief Financial Officer of Defendant Ivy from February 1992 until March of 2001. (*See* part II, Schedule F of Ivy's April 1, 2003 Form ADV.) He also served as the Vice President of Finance from October 1996 until October 2000. In October 2000, when BONY acquired Ivy, Lindenbaum was appointed to the Management Committee and appointed as a Director of Ivy. In April 2003, Lindenbaum was appointed as Managing Director of Products and Markets. From April 2003 until approximately 2004, Lindenbaum served as Managing Director and Head of Europe and Asia Client Development. *Id*. Plaintiffs are informed and believe that, as an Ivy Executive, Defendant Lindenbaum was responsible for entering into investment advisory agreements, establishing investment advisory fees, selecting investment managers, and developing new products and services. During some or all of the Class Period, Lindenbaum, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Lindenbaum

"determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's April 1, 2003 Form ADV.) As such, Defendant Lindenbaum was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

97. Defendant Glenn P. Cummins ("Cummins") served as Director of Finance from November 1999 until 2001. Then Cummins became Ivy's Managing Director of Finance and Chief Financial Officer from April 2001 until approximately 2005. (*See* part II, Schedule F of Ivy's March 28, 2005 Form ADV.) Plaintiffs are informed and believe that, as an Ivy Executive, Defendant Cummins was responsible for entering into investment advisory agreements, establishing investment advisory fees, selecting investment managers, and developing new products and services. During some or all of the Class Period, Cummins, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Cummins "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Cummins was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment

advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

98. Defendant Colleen Baldwin ("Baldwin") joined Ivy in 2002 as the Chief Operating Officer and in April 2003, Baldwin was appointed to the Management Committee. Plaintiffs are informed and believe that Defendant Baldwin responsibilities included overseeing the investment process at Ivy; identifying, recommending, and approving new investment managers; conducting due diligence on prospective investment managers, including performing in-depth follow-up calls, on-site visits, analysis of portfolio composition, statistical analysis of performance history, and peer comparisons; reviewing documents and financial statements in detail; verifying investment managers' backgrounds; providing ongoing investment manager monitoring, reviewing the risk profile of approved managers, removing managers from the approved list, and setting investment parameters for Ivy's portfolios. During some or all of the Class Period, Baldwin, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Baldwin "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Baldwin was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

99. Defendant John D. Rogers ("Rogers") served as Director, Products and Markets of Defendant Ivy from July of 2000 to April of 2002; Managing Director, Products and Markets, from April of 2002 until March of 2003; and Managing Director, Investment Products Group from March of 2003 until on or after the end of March 2004. Plaintiffs are informed and believe that, in these roles, Defendant Rogers's responsibilities included creating investment solutions for hedge fund of funds investors and working with selected global investment banks to develop and create investment vehicles which were designed to comply with applicable regulations and guidelines. Plaintiffs are further informed and believe that, as an Ivy Executive, Defendant Rogers was responsible for entering into investment advisory agreements, establishing investment advisory fees, selecting investment managers, and developing new products and services. During some or all of the Class Period, Rogers, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Rogers "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Rogers was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

100. Defendant Sean C. Simon ("Sean Simon") served from April of 2002 to January of 2006 as Managing Director and Head of Global Client Development and Global Client

Services of Defendant Ivy, and as Co-President from January of 2006 until January of 2009, when he was named CEO of Defendant Ivy. During that time he also served as a member of Defendant Ivy's Board of Directors. From approximately March of 2005 until approximately December of 2005, Sean Simon also served as a member of Ivy's Strategic Operating Committee and co-chaired Defendant Ivy's Executive Committee. From approximately May of 2006 to the present he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the Investment Committee). He was an advisory member with veto power of the Investment Committee from approximately April of 2007 through the end of 2008. Simon is Defendant Lawrence Simon's son and was promoted to co-President after his father stepped down to Vice Chairman in January 2006. Plaintiffs are informed and believe that, in these roles, Defendant Sean Simon's responsibilities included approving and selecting investment managers; reviewing the risk profile of approved managers; removing managers from the approved list; setting investment parameters for Ivy's portfolios; entering into investment advisory agreements; establishing investment advisory fees; overseeing, managing, and developing Ivy's institutional relationships; and overseeing the Investments and Global Client Development divisions. During some or all of the Class Period, Sean Simon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Sean Simon "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Sean Simon was a fiduciary of the Plans pursuant to ERISA

§ 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. Upon information and belief, through counsel's independent research and investigation, Sean Simon is the individual who is referred to in the NYAG Ivy Action as the "Ivy's Director of Client Development" in January 2003 (*see* NYAG Ivy Action, ¶ 19).

101. Defendant Kevin J. Bannon ("Bannon") served as a member of the Board of Directors of Defendant Ivy from sometime prior to March 31, 2004 until approximately April of 2007, during which time he also served as Chief Investment, Chairman of the Investment Policy Committee, and Member of the Investment Committee of Ivy's parent, the Bank of New York. During some or all of the Class Period, Bannon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Bannon "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Bannon was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

102. Defendant Steven Pisarkiewicz ("Pisarkiewicz") served as Chairman of the Board Directors of Defendant Ivy from July of 2003 until approximately April of 2007. During this

time, Pisarkiewicz also served as Executive Vice President of the Bank of New York. During some or all of the Class Period, Pisarkiewicz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Pisarkiewicz "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Pisarkiewicz was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

103. Defendant Newton P.S. Merrill ("Merrill") was appointed to Ivy's Management Committee and Board of Directors in October 2000. At the same time he served as a Senior Executive Vice President of the Bank of New York responsible for personal trust and investment, institutional investments management and private banking. He was also a member of the Bank's Senior Policy Committee. During some or all of the Class Period, Merrill, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Merrill "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II,

Schedule D of Ivy's April 1, 2003 Form ADV.) As such, Defendant Merrill was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

104. Defendant Robert Meschi ("Meschi") served as a Research Analyst from 1997 until January 2000 and then as Manager of Research of Defendant Ivy from January of 2000 until April of 2002, Assistant Vice President from October of 2000 until April of 2002, Director, Investments from April of 2002 until approximately May of 2006, and a member of Ivy's Manager Approval Committee from approximately December 7, 2005 until approximately May of 2006. Plaintiffs are informed and believed that, in these roles and as a member of Ivy's Investment Department, Defendant Meschi's responsibilities included overseeing the investment process at Ivy; identifying, recommending, and approving new investment managers; conducting due diligence on prospective investment managers, including performing in-depth follow-up calls, on-site visits, analysis of portfolio composition, statistical analysis of performance history, and peer comparisons; reviewing documents and financial statements in detail; verifying investment managers' backgrounds; providing ongoing investment manager monitoring, reviewing the risk profile of approved managers, removing managers from the approved list, and setting investment parameters for Ivy's portfolios. During some or all of the Class Period, Meschi, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and

BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Meschi "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Meschi was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

105. Defendant Susan Rabinowitz ("Rabinowitz") served as Vice President of Investments of Defendant Ivy from about 2003 until approximately the end of March 2004. On information and belief, at some or all relevant times, Defendant Rabinowitz researched Ivy's hedge fund managers. During some or all of the Class Period, Rabinowitz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Rabinowitz "determined the investment advice to be given to [Ivy's] clients." (*See e.g.,* part II, Schedule D of Ivy's March 31, 2004 Form ADV.) As such, Defendant Rabinowitz was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

106. Defendant Alan Chuang ("Chuang") served as Director of Investments and Head of Portfolio Management of Defendant Ivy from approximately 2005 until approximately May of 2006 and during that time was a member of Ivy's Manager Approval Committee. Plaintiffs are informed and believe, based upon Ivy's website information and Part II, Form ADV filings with the Securities and Exchange Commission, that as a member of Ivy's Investment Department, the Investment Committee, and the Manager Approval Committee, Defendant Chuang had responsibility for identifying, approving, recommending, or selecting Ivy's investment managers; conducting due diligence on prospective investment managers, including performing in-depth follow-up calls, on-site visits, analysis of portfolio composition, statistical analysis of performance history, and peer comparisons, reviewing documents and financial statements in detail, and verifying investment managers' backgrounds; reviewing the risk profile of approved managers; removing managers from the approved list; and setting investment parameters for Ivy's portfolios. During some or all of the Class Period, Chuang, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Lindenbaum "determined the investment advice to be given to [Ivy's] clients." (*See e.g.,* part II, Schedule D of Ivy's December 7, 2005 Form ADV.) As such, Defendant Chuang was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment

advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

107. Defendant Gregory van Inwegen ("van Inwegen") served as Director, Investments Quantitative Research and Risk Management and a Member of the Management Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from approximately January 2, 2007 until approximately March 18, 2008 when he became Managing Director and Chief Investment Risk Officer of Defendant Ivy. He continued to serve in that capacity, as a member of Defendant Ivy's Investment Committee and as the chair of Ivy's Risk Management Committee and the leader of its Risk Management and Quantitative Research Team beyond the end of 2008. Based upon Ivy's website information and Part II, Form ADV filings with the Securities and Exchange Commission, that as a member of Ivy's Investment Department, Defendant van Inwegen had responsibility for identifying and recommending investment managers; conducting due diligence on prospective investment managers, including performing in-depth follow-up calls, on-site visits, analysis of portfolio composition, statistical analysis of performance history, and peer comparisons; reviewing documents and financial statements in detail; and verifying investment managers' backgrounds. On further information and belief, as chair of the Investment Risk Management Committee and a member of the Manager Approval Committee, Investment Committee, and Global Risk Management Committee, Defendant van Inwegen was responsible for developing, implementing, and enforcing investment risk management policies and procedures; reviewing and updating the risk profiles of investment managers; monitoring adherence to the policies; maintaining final accountability for all portfolio allocations; approving all new investment managers; reviewing the risk profile of approved managers; removing managers from the approved list; setting

investment parameters for Ivy's portfolios; and identifying, monitoring, mitigating, and eliminating corporate risk as well as developing policies and procedures for managing corporate risk, including, for example, conflicts of interest, reputation, financial, internal control, compliance and regulatory, and legal and technology. During some or all of the Class Period, van Inwegen, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant van Inwegen "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's April 1, 2003 Form ADV.) As such, Defendant van Inwegen was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

108. Defendant Sean Cumiskey ("Cumiskey") served as Managing Director, head of the Investment Strategies Group and the Capital Markets Coverage Team, as well as serving as a member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from January of 2006 until after December of 2008. He was a member of Defendant Ivy's Executive Committee from approximately March of 2008 through the end of 2008 and served on the Investment Risk Management Committee. Plaintiffs are informed and believe that, in these roles, Defendant Cumiskey was responsible for approving all new investment managers; reviewing the risk profile of approved managers; removing managers

from the approved list; setting investment parameters for Ivy's portfolios; developing, implementing, and enforcing investment risk management policies and procedures; reviewing and updating the manager risk profiles; monitoring adherence to the policies; and maintaining final accountability for all portfolio allocations. During some or all of the Class Period, Cumiskey, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and through the Beacon Fund into Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Cumiskey "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's December 7, 2005 Form ADV.) As such, Defendant Cumiskey was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

109. Defendant Stuart Davies ("Davies") served as Managing Director, Investments, Head of Investments in Europe and Asia and Member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from about January of 2006, and member of the Investment Risk Committee (from May of 2006) until about January of 2007 when he became Global Head of Investments with responsibility for Ivy's investment philosophy, portfolio strategy and asset allocation. He served in this capacity and continued to serve as a member of Ivy's Manager Approval Committee (subsequently renamed the Investment Committee) and a Member of Defendant Ivy's Executive Committee from about March of 2008

until sometime before January 9, 2009. Plaintiffs are informed and believe that, as a member of these committees, Defendant Davies was responsible for approving all new investment managers; reviewing the risk profile of approved managers; removing managers from the approved list; setting investment parameters for Ivy's portfolios; developing, implementing, and enforcing investment risk management policies and procedures; reviewing and updating the risk profiles of investment managers; monitoring adherence to the policies; and maintaining final accountability for all portfolio allocations. During some or all of the Class Period, Davies, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Davies "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, part II, Schedule D of Ivy's December 7, 2005 Form ADV.) As such, Defendant Davies was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

110. Defendant Joseph Burns ("Burns") served as Director of Investments and Head of Long/Short Equity of Defendant Ivy from approximately January of 2006 until December of 2006. In December 2006, he became Managing Director, Investments and Head of Investments, Europe and Asia where he served until after December 2008. Throughout that time period he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the

Investment Committee). During some or all of the Class Period, Burns, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Burns "determined the investment advice to be given to [Ivy's] clients." (See e.g., part II, Schedule D of Ivy's Jan 23, 2006 Form ADV.) As such, Defendant Burns was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

111. Defendant Mark Santero ("Santero") served as Managing Director, Investments responsible for coordinating Research, Risk Management, and Portfolio Management of Defendant Ivy from approximately January of 2006 until approximately February of 2007. During that period he also served as a member of Defendant Ivy's Manager Approval Committee. As such, Defendant Santero was responsible for approving all new investment managers. During some or all of the Class Period, Santero, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Santero "determined the investment advice to be given to [Ivy's] clients." (*See e.g.*, Part II, Schedule D of Ivy's Jan 23, 2006 Form

ADV.) As such, Defendant Santero was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

112. Defendant Peter D. Noris ("Noris") served as Chief Investment Officer of Defendant Ivy from approximately February 20, 2007 until sometime after March 18, 2008. Beginning about April 2007 and for the balance of his tenure, he chaired Defendant Ivy's Investment Committee. Beginning approximately March 18, 2008 until the end of his tenure, Noris also served as a member of the Defendant Ivy's Executive Committee and its Investment Risk Management Committee. On information and belief, at some or all relevant times, Defendant Noris worked with the investment team and was a strategic adviser in four key areas, including research, portfolio management, risk management, and operational due diligence. Moreover, Plaintiffs are informed and believe that as a member of Ivy's Investment Committee, Defendant Noris was responsible for approving all new investment managers, reviewing the risk profile of approved managers, removing managers from the approved list, and setting investment parameters for Ivy's portfolios. During some or all of the Class Period, Noris, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Noris provided investment advice to Ivy's clients. (*See e.g.*, part II, Schedule D of Ivy's July 30, 2007 Form ADV.) As such, Defendant Noris served as a fiduciary of the Plans pursuant to ERISA

§ 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

113. Defendant Farzine Hachemian ("Hachemian") served as Director, Investments and a member of its Investment Committee of Defendant Ivy from approximately May 2007 until approximately December 2008. Beginning approximately March 2008, he headed Defendant Ivy's Portfolio Management Group and became a member of the Investment Risk Management Committee of Defendant Ivy and held those positions until at least sometime after December of 2008. Plaintiffs are informed and believe that, as a member of the Investment Risk Management Committee and the Investment Committee, Defendant Hachemian was responsible for developing, implementing, and enforcing investment risk management policies and procedures; reviewing and updating manager risk profiles; monitoring adherence to the policies; maintaining final accountability for all portfolio allocations; approving all new investment managers; reviewing the risk profile of approved managers; removing managers from the approved list; and setting investment parameters for Ivy's portfolios. During some or all of the Class Period, Hachemian, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Hachemian provided investment advice to Ivy's clients. (*See e.g.*, part II, Schedule D of Ivy's March 18, 2008 Form ADV.) As such, Defendant Hachemian served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in

that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

114. Defendant Scott E. Wennerholm ("Wennerholm"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors. Since September 2005, he has also served as the Chief Operating Officer of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York. Plaintiffs are informed and believe that, as a member of Ivy's Board of Directors, Wennerholm's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. During some or all of the Class Period, Wennerholm, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Wennerholm provided investment advice to Ivy's clients. (*See e.g.*, part II, Schedule D of Ivy's March 18, 2008 Form ADV.) As such, Defendant Wennerholm served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

115. Defendant Jonathan Little ("Little"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors. He also serves as the Vice Chairman of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York. Plaintiffs are informed and believe that, as a member of Ivy's Board of Directors, Little's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. During some or all of the Class Period, Little, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant Little provided investment advice to Ivy's clients. (*See e.g.*, part II, Schedule D of Ivy's March 18, 2008 Form ADV.) As such, Defendant Little served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

116. Defendant Ronald P. O'Hanley ("O'Hanley"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors. He also serves as the President and Chief Executive Officer of BNY Mellon Asset Management, the corporate brand of Ivy's parent, the Bank of New York. Plaintiffs are informed and believe that, as a Vice

Chairman of Ivy's Board of Directors, O'Hanley's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. During some or all of the Class Period, O'Hanley, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally; to BAMC causing it to place the Beacon Fund's assets with Madoff and BMIS; and to JPJA causing it to place plan assets into the Beacon Fund and thus with Madoff and BMIS. Based on Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Defendant O'Hanley provided investment advice to Ivy's clients. (*See e.g.*, part II, Schedule D of Ivy's March 18, 2008 Form ADV.) As such, Defendant O'Hanley served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

117. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Ivy's Manager Approval Committee, at some or all relevant times, approved all new investment managers. On information and belief, at some or all relevant times, Defendants Joseph Burns, Alan Chuang, Sean Cumiskey, Stuart Davies, Adam Geiger, Robert Meschi, Fred Sloan, Mark Santero, Lawrence Simon, Sean Simon, Howard Wohl, and Gregory van Inwegen served on the Manager Approval Committee. As explained in more detail below, the members of the Manager Approval Committee served as fiduciaries to the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised authority

or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the members of the Manager Approval Committee were fiduciaries of each of the Plans as alleged below.

118. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Ivy's Investment Committee, at some or all relevant times, approved all new investment managers, reviewed the risk profile of approved managers, removed managers from the approved list, and set investment parameters for Ivy's portfolios, among other things. On information and belief, at some or all relevant times, Defendants Joseph Burns, Alan Chuang, Sean Cumiskey, Stuart Davies, Farzine Hachemian, Robert Meschi, Peter Noris, and Gregory van Inwegen served on the Investment Committee. Additionally, at some or all relevant times, Defendants Sean Simon served as a non-voting advisory member of the Investment Committee, who had veto power over the committee's decisions in circumstances where they deemed necessary. As explained in more detail below, at some or all relevant times, the members of the Ivy Investment Committee served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the members of the Ivy Investment Committee were fiduciaries of each of the Plans as alleged below.

119. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, at some or all relevant times Ivy's Strategic Operating Committee managed the business operations of Defendant Ivy and was responsible for

entering into investment advisory agreements, establishing investment advisory fees, and selecting investment managers. On information and belief, at some or all relevant times, Defendants Adam Geiger, Sean Simon, and Fred Sloan served on the Strategic Operating Committee. At some or all relevant times, the Ivy Strategic Operating Committee and its members served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the Ivy Strategic Operating Committee and its members were fiduciaries of each of the Plans as alleged below.

120. Defendant Ivy, together with the individual defendants, Larry Simon, Howard Wohl, Fred Sloan, Adam Geiger, Jeffrey R. Lindenbaum, John D. Rogers, Sean C. Simon, Kevin J. Bannon, Steven Pisarkiewicz, Robert Meschi, Collen Baldwin, Newton Merrill, Glenn Cummins, Susan Rabinowitz, Alan Chuang, Gregory van Inwegen, Sean Cumiskey, Stuart Davies, Joseph Burns, Mark Santero, Peter D. Noris, Farzine Hachemian, Scott E. Wennerholm, Jonathan Little, and Ronald P. O'Hanley (the "Individual Ivy Defendants") are referred to collectively as the "Ivy Defendants."

121. The advice of Defendant Ivy and the Individual Ivy Defendants who determined investment advice given by Ivy was provided to the Beacon Defendants and the Jeanneret Defendants under such circumstances that both Ivy and the Individual Ivy Defendants were fiduciaries within the meaning of ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii) and 29 CFR §2510.3-21(c). Due to Ivy's expertise and the reliance placed on them by the Jeanneret Defendants, as a practical matter these decisions were controlled by Ivy Asset Management and the Individual Defendants who determined the investment advice given by Ivy such that these

Defendants were also *de facto* fiduciaries within the meaning of ERISA § 3(2l)(A)(i), 29 U.S.C. § 1002(3)(21)(A)(i), because they exercised authority or control over the management and disposition of plan assets.

122. Defendant The Bank of New York Mellon Corporation ("BONY") is a Delaware corporation headquartered at One Wall Street, New York, New York 10286. BONY, formerly known as as The Bank of New York Company, Inc. ("BNYCo.") became Ivy's parent company on October 3, 2000, when it acquired 100% of Ivy's outstanding stock. BNYCo. merged with Mellon Financial Corporation of Pittsburgh in July 2007 and became BONY. According to its Form 10-K for the year ending December 31, 2008, BONY "is a global financial services company headquartered in New York, New York, with approximately $928 billion in assets under management and $20.2 trillion in assets under custody and administration." According to Ivy's website, BONY and Ivy have a "synergistic" relationship:

> Given the size of our infrastructure, we believe we have the resources to deliver the best quality work and produce the highest quality products. This is further enhanced by the relationship with our parent company, The Bank of New York Mellon Corporation. As a leading financial institution with the resources to support our institutional enterprise, the bank is equally committed to maintaining our entrepreneurial and performance-driven culture. The result has been a mutually beneficial, synergistic affiliation.

123. On information and belief, the structure of BONY's ownership of Ivy changed after Ivy's reorganization as a limited liability company on January 1, 2009. After that date, BONY indirectly owned Ivy via two entities: Alternative Holdings I, LLC, a Delaware limited liability company, and Alternative Holdings II, LLC, also a Delaware limited liability company. Under this structure, BONY owns 100% of Alternative Holdings II, which owns 100% of Alternative Holdings I, which owns 100% of Ivy. BONY thus indirectly owns 100% of Ivy.

124. Defendant BONY had the power to exercise, and did exercise, a controlling influence over Ivy's investment management policies and acted in concert with Ivy, through its ownership of Ivy and through the service of BONY executives on Ivy's Board of Directors. As discussed below, Defendant BONY controlled or otherwise acted in concert with Ivy through its ownership of Ivy, the service of BONY executives on Ivy's Board of Directors, and the activities and oversight exercised by BONY's Risk Committee. As discussed further below, BONY was at some or all relevant times a fiduciary of the employee benefit plan members of the ERISA Class within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as it exercised through Ivy authority or control respecting management or disposition of the employee benefit plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each employee benefit plan.

125. On information and belief, Defendant Frank J. Biondi, Jr., at some or all relevant times, served as a director at BONY and as a member of the Risk Committee (approximately 1995 to 2008). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Biondi's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Biondi served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that through Ivy he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment

advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

126. On information and belief, Defendant Nicholas M. Donofrio, at some or all relevant times, served as a director at BONY, a member of the Risk Committee (approximately 1999 to the present) and the chair of the Risk Committee. Plaintiffs are informed and believe that, as a member of the Risk Committee and as explained in more detail below, Defendant Donofrio's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Donofrio served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that through Ivy he exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

127. On information and belief, Defendant Edmund F. "Ted" Kelly, at some or all relevant times, served as a director at BONY and as a member of the Risk Committee (approximately 2004 to present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Kelly's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy)

concerning fiduciary activities. As such, Defendant Kelly served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

128. On information and belief, Defendant Michael J. Kowalski, at some or all relevant times, served as a director at BONY and as a member of the Risk Committee (approximately 2003 to present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Kowalski's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Kowalski served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

129. On information and belief, Defendant John A. Luke, Jr., at some or all relevant times, served as a director at BONY and as a member of the Risk Committee (approximately 2007 to present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Luke's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at

BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Luke served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

130. On information and belief, Defendant Paul Myners, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 2002 to 2006). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Myners's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Myners served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

131. On information and belief, Defendant Mark A. Nordenberg, at some or all relevant times, served as a director at BONY and as a member of the Risk Committee

(approximately 1998 to the present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Nordenberg's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Nordenberg served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

132. On information and belief, Defendant Catherine A. Rein, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 1981 to the present). Plaintiffs are informed and believe that, as a member of the Risk Committee and as explained in more detail below, Defendant Rein's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Rein served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she through Ivy exercised authority or control respecting management or

disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

133. On information and belief, Defendant William C. Richardson, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 1998 to the present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Richardson's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Richardson served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

134. On information and belief, Defendant Brian L. Roberts, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 1999 to 2007). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Roberts's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other

policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Roberts served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

135. On information and belief, Defendant Samuel C. Scott, III, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 2003 to the present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Scott's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Scott served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

136. On information and belief, Defendant Richard C. Vaughan, at some or all relevant times, served as a director at BNYCo. (now known as BONY) and as a member of the Risk Committee (approximately 2007 to the present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant Vaughan's responsibilities included overseeing the fiduciary activities of BONY's (formerly BNYCo.'s)

subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant Vaughan served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

137. On information and belief, Defendant Wesley W. von Schack, at some or all relevant times, served as a director at BONY and as a member of the Risk Committee (approximately 2007 to the present). As a member of the Risk Committee and as explained in more detail below, Plaintiffs are informed and believe that Defendant von Schack's responsibilities included overseeing the fiduciary activities of BONY's subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. As such, Defendant von Schack served as a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan.

138. On information and belief, based in part upon BONY and BNYCo.'s websites and the companies' filings with the Securities and Exchange Commission, BONY (formerly

BNYCo.)'s Risk Committee (hereinafter "Risk Committee") was responsible for overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. On information and belief, at some or all relevant times Defendants Frank J. Biondi, Jr., Nicholas M. Donofrio, Edmund F. Kelly, Michael J. Kowalski, John A. Luke, Jr., Paul Myners, Mark A. Nordenberg, Catherine A. Rein, William C. Richardson, Brian L. Roberts, Samuel C. Scott, III, Richard C. Vaughan, and Wesley W. von Schack served on the Risk Committee. As explained in more detail below, at some or all relevant times, the members of the Risk Committee served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised through Ivy exercised authority or control respecting management or disposition of the Plans' assets and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, BONY and the BONY executives who were members of the Risk Committee were fiduciaries of each of the Plans as alleged below (collectively referred to as the "BONY Defendants").

139. Defendant Friedberg, Smith & Co., P.C., ("Friedberg") is a Connecticut Professional Corporation authorized to do business in New York, with its registered offices in Westchester County, and was at all relevant times an independent auditor of the Beacon Fund.

140. Defendants BAMC, Danziger, Markhoff, J.P. Jeanneret Associates, Inc., Dr. Jeanneret, Perry, Ivy, the Individual Ivy Defendants, BONY, and the Individual BONY Defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

141. This action is brought as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class, consisting of all investors in the Beacon Fund who had not redeemed their interests in the Fund as of December 11, 2008 (the "Investor Class"). Excluded from the Class are the Defendants, members of the immediate families of individual Defendants, executive officers and/or any affiliate of the corporate Defendants, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

142. This action is also brought pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (2) on behalf of all fiduciaries, participants and beneficiaries of any employee benefit plan covered by ERISA who invested in Beacon I or Beacon II at any time through the present (the "ERISA Class"). Excluded from the ERISA Class are defendants, their officers, employees, directors, partners, and members of the immediate families of any of the foregoing, or any of their heirs, successors or assigns. At various times since the inception of the Beacon Fund, employee benefit plans covered by ERISA invested their assets in these entities, some plans invested in only one, others in both. At all relevant times the Beacon Fund has been comprised of sufficient employee benefit plan assets or (after the effective date of the Pension Protection Act) ERISA covered employee benefit plan assets that each such Fund has held ERISA covered employee benefit plan assets, making the investment of those assets subject to the provisions of ERISA.

143. Pursuant to Fed. R. Civ. P. 23(c)(5), defined as a subclass of the Investor Class, are all persons and entities who obtained the investment management services of JPJA, John P. Jeanneret, or Paul L. Perry, and who, as a result of such services, invested in Beacon I or Beacon II at any time through the present (the "Jeanneret Investor Subclass").

144. Pursuant to Fed. R. Civ. P. 23(c)(5), defined as a sub-class of the ERISA Class, are all fiduciaries, participants and beneficiaries of any employee benefit plan covered by ERISA who obtained the investment management services of JPJA, John P. Jeanneret, or Paul L. Perry, and who, as a result of such services, invested in Beacon I or Beacon II at any time through the present (the "Jeanneret ERISA Subclass").

145. At times throughout this complaint the "Jeanneret Investor Subclass and the "Jeanneret ERISA Subclass will be collectively referred to as the "Jeanneret Subclass." Excluded from the Jeanneret Subclass are the Defendants, members of the immediate families of individual Defendants, executive officers and/or any affiliate of the corporate Defendants, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

146. At times throughout this Complaint, the ERISA Class and the Investor Class, inclusive of the Jeanneret Subclass, together with other persons and entities who invested in LLC interests of the Beacon Fund, are collectively referred to as "the Class." Where allegations concern only the Investor Class, ERISA Class, or a Jeanneret Subclass, they will be identified as pertaining to either the "Investor Class," "ERISA Class" or the relevant "Jeanneret Subclass."

147. This action is properly maintainable as a class action because:

a. The members of the proposed Class are dispersed geographically and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that Class members number in the hundreds, if not thousands;

b. Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of the federal securities laws, ERISA and New York state and common law as alleged herein. Moreover, ERISA Plaintiffs' claims are typical of those of the ERISA Class because (1) to the extent that Plaintiffs seek relief on behalf of the employee benefit plans covered by ERISA that invested in the Beacon Fund pursuant to § 502(a)(2) of ERISA their claims are not only typical of, but the same as a claim under this section brought by any other ERISA Class member; (2) to the extent that Plaintiffs seek relief under ERISA § 502(a)(3) for equitable relief, that relief would affect all class members equally; all of the ERISA Class members were injured and continue to be injured in the same manner by Defendants' breaches of fiduciary duty.

c. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action securities and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent;

d. The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i. whether Defendants' acts, misrepresentations and/or omissions as alleged herein violated the federal securities laws;

ii. whether Defendants' conduct alleged herein violated the Investment Advisors Act;

iii. whether Defendants' representations to Plaintiffs and the other Class members misrepresented and/or omitted material facts;

iv. whether the governing documents of the Beacon Fund require that the assets be allocated to, and invested in accordance with, the Large Cap strategy as detailed in the Offering Memoranda;

v. whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

vi. whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary and other duties owed to Plaintiffs and the Class; and

vii. to what extent the members of the Class have sustained damages and the proper measure of damages.

e. With respect to the ERISA Class, the case presents numerous common questions of law and fact, including:

i. Did the Beacon Fund, at all or any relevant time hold employee benefit plan assets covered by ERISA;

ii. Were the Beacon Defendants, the Ivy Defendants, the BONY Defendants, the Jeanneret Defendants, or any of them, fiduciaries within the meaning of ERISA as a result of their roles with respect to the investments made in or by the Beacon Fund;

iii. Did the Beacon Defendants, the Ivy Defendants, the BONY Defendants, or any of them, breach their fiduciary duties under ERISA by causing or allowing the Beacon Fund to invest and maintain a portion of their assets in accounts under the control of Madoff or BMIS;

iv. Did the Beacon Defendants, the Ivy Defendants, the BONY Defendants, the Jeanneret Defendants, or any of them, breach their fiduciary duties under ERISA

by, *inter alia*, failing to adequately investigate the soundness and suitability of investing with Madoff;

v. Did the Beacon Defendants, the Ivy Defendants, the BONY Defendants, the Jeanneret Defendants, or any of them, breach their fiduciary duties under ERISA by causing the Plains they served as fiduciaries to invest in the Beacon Fund;

vi. Were ERISA Class members harmed by the breaches of fiduciary duty, committed by the Beacon Defendants, the Ivy Defendants, the BONY Defendants or any of them as described herein;

vii. Were Jeanneret ERISA subclass members harmed by the breach of fiduciary duty committed by the Jeanneret Defendants;

viii. Are ERISA Plaintiffs and the ERISA Class entitled to equitable relief through appointment of an independent fiduciary to take control of the Beacon Fund so as to protect the interests of the ERISA Class;

ix. Are the Jeanneret ERISA subclass members entitled to recover losses from the Jeanneret Defendants, the Ivy Defendants, the BONY Defendants, or any of them caused by their breaches of the fiduciary duty on behalf of the employee benefit plans they serve or in which they participate;

x. Are ERISA Plaintiffs and the ERISA Class entitled to recover losses from Beacon Defendants, the Ivy Defendants or the BONY Defendants, or any of them,caused by their breaches of fiduciary duty, in order to recover lost assets on behalf of the employee benefit plans they serve or in which they participate;

f. A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote; and

g. Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

148. Class action status is warranted and appropriate under Rule 23(b)(1)(B) for the ERISA Class and Jeanneret Subclass because prosecution of separate actions by the members of the ERISA Class and Jeanneret Subclass would create a risk of adjudications with respect to individual members of the ERISA Class and Jeanneret Subclass that would, as a practical matter, be dispositive of the interests of the other members not parties to these actions, or substantially impede their ability to protect their interests.

149. Class action status is also warranted for the ERISA Class and Jeanneret Subclass under other subsections of Rule 23(b) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; under 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the ERISA Class and Jeanneret Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the ERISA Class and Jeanneret Subclass as a whole; and (3) questions of law or fact common to members of the ERISA Class and Jeanneret Subclass predominate over any questions affecting only individual members and a

class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

150. In the alternative, class action status is warranted for the ERISA Class and Jeanneret Subclass under Fed. R. Civ. P. 23(b)(3), because questions of law or fact common to ERISA Class and Jeanneret Subclass members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

151. In the alternative, class action status is warranted under Fed. R. Civ. P. 23(b)(3) for the Investor Class and the Jeanneret Investor Subclass because questions of law or fact common to Investor Class and Jeanneret Investor Subclass members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**PLAINTIFFS' DERIVATIVE ALLEGATIONS**

152. Derivative Plaintiff Jay Raubvogel IRA ("Raubvogel IRA") brings this action derivatively in the right and for the benefit of the Beacon Fund to seek redress of the injuries suffered by the Beacon Fund as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, negligence, and fraud alleged herein.

153. Plaintiff Raubvogel IRA will adequately and fairly represent the interests of the Beacon Fund and its investors in enforcing and prosecuting its rights.

154. Plaintiff Raubvogel IRA is an investor in the Beacon Fund and was an investor in the Beacon Fund at all times relevant to Defendants' wrongful course of conduct alleged herein. As such, Raubvogel IRA is a Member of the Beacon Fund under the terms of the Beacon Fund Operating Agreement.

155. The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

156. Pursuant to the Beacon Fund's Operating Agreement, BAMC, as the Beacon Fund's Managing Member, owes a fiduciary duty to the Beacon Fund and its Members.

157. The Beacon Fund is in the process of liquidating and is therefore named as a Nominal Defendant solely in a derivative capacity so that investors may obtain a more meaningful recovery in the event that the Beacon Fund secures a recovery against one or more of the Defendants.

158. Plaintiff Raubvogel IRA has not made any demand upon the Beacon Defendants to bring an action on behalf of the Beacon Fund asserting the claims herein to recover damages for the injuries suffered by the Beacon Fund, since such demand would be futile.

159. Demand is excused as futile because:

(a) the unlawful acts and practices alleged herein cannot be defended by the Beacon Defendants, and are not subject to the protection of any independent business judgment because it would undoubtedly be to the benefit of the Beacon Fund to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims;

(b) the wrongs alleged herein constitute violations of the fiduciary and contractual duties owed by the Beacon Defendants to the Beacon Fund. The Beacon Defendants are subject to liability for breaching their fiduciary and contractual duties to the Beacon Fund, *inter alia,* causing the Beacon Fund's assets to be invested with Madoff or Madoff-related entities without any oversight or supervision, causing or permitting the reckless investing practices alleged herein, failing to adequately monitor the investment vehicles in which it placed the Fund's assets, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein. Therefore, demand is futile given that the Beacon Defendants' wrongful conduct is inextricably linked to Ivy's wrongful conduct;

(c) the Beacon Defendants exercised and continue to exercise ultimate authority over the Beacon Fund and profited and continued to profit at the expense of the Beacon Fund by receiving monthly management and

administrative fees and other fees from the Beacon Fund while in possession of information that would have disclosed that Madoff's operations were not legitimate;

(d) the Beacon Defendants face substantial liability in this action because of their acts and omissions alleged herein. The Beacon Defendants face substantial exposure to liability for abrogation of their duty of oversight. Through its relationship with Ivy, the Beacon Defendants either knew or should have known that there were serious questions surrounding the propriety of Madoff's trading operations and his purported results, or that Madoff's generated purported results would have been impossible to achieve under his alleged investment strategy, and took no steps in a good faith effort to prevent or remedy that situation, proximately causing million of dollars of losses;

(e) the Beacon Defendants committed the egregious actions outlined herein, and the Beacon Defendants cannot be expected to prosecute claims against themselves and persons or entities (such as Ivy) with whom they have extensive inter-related business, professional and personal, including familial, entanglements, if Plaintiffs demanded that they do so. The Beacon Defendants, because of these relationships, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Beacon Fund;

(f) the Beacon Defendants participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and therefore they are not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein;

(g) the Beacon Defendants exhibited a sustained and systemic failure to fulfill their obligations, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

(h) the Beacon Defendants would be forced to sue themselves and persons with whom have extensive business and personal entanglements, which it will not do, thereby excusing demand;

(i) the acts complained of constitute violations of the fiduciary and contractual duties owed by the Beacon Defendants and these acts are incapable of ratification;

(j) the Beacon Fund has been exposed to significant losses due to the wrongdoing complained of herein, yet the Beacon Defendants have not filed any lawsuits against themselves, or others who were responsible for

that wrongful conduct to attempt to recover for the Beacon Fund any part of the damages the Beacon Fund has suffered;

(k) the Beacon Defendants lack sufficient independence to make a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants; and

(l) notwithstanding Beacon Defendants' appointment of an outside law firm as the Beacon Fund's attorneys, the outside law firm lacks sufficient independence to make a disinterested decision on whether to pursue the claims alleged herein against Defendants. Without impugning their integrity, attorneys retained by the Beacon Defendants cannot possibly evaluate in a disinterested, independent and objective manner whether it is in the best interest of the Beacon Fund to sue the very persons who retained those attorneys and have agreed to pay their legal fees.

160. Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, the Beacon Defendants either knew of the financial risks to the Beacon Fund's assets or recklessly turned a blind eye to them. Such conduct is not protected by the business judgment rule and exposes the Beacon Defendants to substantial liability in this action and excuses demand.

161. Demand upon other Members of the Beacon Fund is excused because they are so numerous and widespread that such demand would be impracticable and unfeasible.

## SUBSTANTIVE ALLEGATIONS

### A. Summary of Allegations

162. On March 12, 2009, Madoff pled guilty to eleven counts in the criminal information filed by the United States Attorney's Office, including one count of securities fraud in violation of Title 17, C.F.R. § 240.10b-5, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s). In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that

he never employed the "split-strike conversion" strategy he touted, and that he never had custody of the securities he purportedly held for his investment advisory clients.

163. On March 18, 2009 the United States Attorney's Office charged Madoff's accountant David Friehling ("Friehling") of Friehling & Horowitz, CPAs, P.C., with securities fraud, aiding & abetting investment-adviser fraud, and four counts of filing false audit reports with the Securities & Exchange Commission. The criminal information alleges that Friehling did not conduct a meaningful audit of BMIS under the required Generally Accepted Auditing Standards ("GAAS") or in conformity with Generally Accepted Accounting Principles ("GAAP"), that he falsely certified audited financial statements for BMIS, including balance sheets, statements of income, statements of cash flows and reports of internal control, and that he lacked the requisite independence to audit BMIS in a manner consistent with the industry's professional standards.

164. On August 11, 2009 BMIS' Chief Financial Officer, Frank DiPascali, Jr., pleaded guilty to ten counts in the criminal information filed by the United States Attorney's Office, including conspiracy to commit securities fraud, investment adviser fraud, falsifying book and records of a broker-dealer, falsifying books and records of an investment adviser, mail fraud, wire fraud, and international money laundering. In his plea allocution, Di Pascali said that, "there was one simple fact that Bernie Madoff knew, that I knew . . . [i]t was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time . . ."

165. On November 13, 2009, the U.S. Attorney charged two individual computer programmers who worked for Madoff, Jerome O'Hara and George Perez, with aiding Madoff in the perpetuation of his massive fraud by providing the technical support he needed. The U.S. Attorney alleges that the two individuals developed software that generated false trade data.

Registered investment managers, investment advisors and fiduciaries do not have the luxury of blind reliance on such materials, no matter how sophisticated the appearance, because their fiduciary and contractual obligations require them to obtain independent third-party verification of the data being reported.

166. In order to keep the Ponzi scheme running, Madoff needed money from new investors. Madoff limited the feeder funds he would deal with directly to those who would accept the lucrative fees but not perform due diligence. Consequently, Madoff accepted investments from funds managed by, among others, the Beacon Defendants and Ivy.

167. The Beacon Ivy and Jeanneret Defendants, through the use of Offering Memoranda, financial statements, investment management agreements and other devices defrauded investors by representing their ability to perform supervisory and due diligence functions over the assets that they placed with Madoff while aware of the strong likelihood that Madoff was a fraud or, alternatively, in reckless disregard of their duties as fiduciaries to further investigate troubling facts that they knew attended Madoff's operations. The Beacon Ivy and Jeanneret Defendants were unable (and/or unwilling) to conduct due diligence on Madoff's operations in compliance with their representations to the Classes, and their fiduciary, contractual and other obligations to the Classes. Defendants willfully turned a blind eye to their inability to independently verify Madoff's reported returns and induced Plaintiffs and members of the Class into investing with them while concealing their failure to carry out the due diligence they represented to undertake. Defendants pursued and persisted in this fraudulent course of conduct in order to reap the inflated management fees that were available only through investing with Madoff.

**B. New York Attorney General Action Against Defendant Ivy Asset Management**

168. The Attorney General of the State of New York has used its authority to subpoena documents such as internal e-mails and memoranda, and compel sworn testimony under GBL §§ 352(1) and 352(2), to conduct an investigation of its allegations in a complaint against Ivy, Larry Simon and Wohl filed on May 11, 2010 in the Supreme Court of the State of New York.

169. The facts alleged in Plaintiffs' Second Amended Complaint are based in part on new facts gathered from Plaintiffs' own independent investigation and interviews, as well as evidence in the NY AG's Complaint, and substantiate the allegations against Defendants. References to the NY AG's complaint herein will be in the following format: "NYAG Ivy Action, ¶ _____."

170. In response to the AG's complaint, Defendant Larry Simon selectively released certain letters sent to JPJA, the Beacon Defendants, and other clients to the press that purport to exculpate Ivy from the fraudulent conduct alleged. To the contrary, the letters provide further support to the allegations against Ivy, JPJA, and the Beacon Defendants.

**C. Defendants, Through the Use of Offering Memoranda and Other Devices, Engaged in a Scheme To Defraud Investors**

**1. Ivy Meets Defendants Danziger and Markhoff And Encourages Investments In Madoff**

171. At all relevant times BAMC served as the Managing Member for the Beacon Fund. Danziger and Markhoff, as the sole control persons for BAMC, determined and delivered investment advice for a fee to Plaintiffs and members of each Class, and exercised authority and control over the disposition of the Beacon Fund's assets, and invested virtually all of the assets with Madoff.

172. In the early 1990s, the Beacon Defendants were introduced to Ivy and, at that time, Simon encouraged the Beacon Defendants to form a new fund that would retain Ivy as an

investment consultant to the fund's manager. (NYAG Ivy Action, ¶38). Accordingly, in 1993, the Beacon Defendants formed Andover Associates Management Corporation which was to be the General Partner of Andover Associates L.P. ("Andover"), a fund that retained Ivy as its Investment Consultant. Andover was the Beacon Defendants' first foray into investing with Madoff as general partners of an investment fund and, with the help of Ivy, would be the blueprint for the Beacon Fund.

173. In 1995, the Beacon Defendants entered into a consultant agreement with Ivy that specifically contemplated the establishment of the Beacon Fund for the express purpose of investing with Madoff. Pursuant to the agreement dated February 17, 1995, Ivy was specifically compensated for introducing BAMC (the Managing Member of the Beacon Fund) to Madoff and BMIS:

> WHEREAS, Ivy has introduced the Principals [of BAMC] to [BMIS], an entity that generally invests in securities following convertible bond hedging and option hedging strategies…; and
>
> WHEREAS, the Principals understand the MADOFF strategies and the risks associated therewith; and
>
> WHEREAS, the Principals [of BAMC] intend to form an investment limited liability company named BEACON ASSOCIATES LLC for the purpose of pooling investment funds to be managed by MADOFF.

(Consultant Agreement at 1.)

174. BAMC also retained Ivy to provide administrative services to help manage the Funds' business. Its administrative services under the Consultant Agreement included but were not limited to:

> (a) Reconcile all MADOFF statements against trade tickets received and dividends and interest accrued;
>
> (b) Maintain original books of entry for all MADOFF

activity. This including posting the following: (i) cash contributions to and withdrawals from the brokerage account(s); (ii) purchase and sales activity; (iii) interest and dividends collected;

(c) Calculate changes in monthly value of the MADOFF account(s) based on posting of the above activity.

(Consultant Agreement at 3-4).

175. Ivy entered into this agreement in spite of the fact that, by that time, Larry Simon, had expressed to a prospective investor his suspicion "that Madoff could be a Ponzi scheme . . ." NYAG Ivy Action, ¶ 50. In spite of this early suspicion, Larry Simon and Ivy facilitated Madoff investments by BAMC's clients for the next 13 years knowing that Ivy's access to Madoff would be the means by which BAMC would make its clients' investments.

176. In consideration for the consulting and administrative services that Ivy provided, BAMC paid 50% of all fees BAMC earned as the Beacon Fund's manager. (Consultant Agreement at 6). In addition to sharing in the management fees, BAMC and Ivy shared in undisclosed referral fees that were structured in a manner so as to incentivize the Beacon Defendants to market Madoff's investment services:

> In the event that the Managing Member, one or more of the Principals or any Affiliate shall introduce a person or entity to MADOFF, or should any person or entity previously introduced to MADOFF by the Managing Member, one or more of the Principals or any Affiliate introduce any person or entity to MADOFF, and any such persons or entities open an account or otherwise invests with MADOFF (each an "Investor" and collectively, "Investors"), and as a result thereof, the Managing Member, one or more of the Principals and/or an Affiliate derives Additional Fees arising out of, relating to or in connection with MADOFF, the Principal shall […] give written notice to IVY, which notice shall indicate the name and address of the Investor and the particulars of all arrangements with the Investor and/or MADOFF.

* * *

> In addition to the compensation referred to in Section 4 above, IVY shall be entitled to receive and the Managing Member and/or Principals shall pay to IVY fifty (50%) percent [. . .] of all fees, compensation, commissions, bonuses, charges and other remuneration of any kind received by the Managing Member, one or more of the Principals and/or by an Affiliate arising out of, relating to or otherwise received in connection with the introduction of Investors to MADOFF and/or the investment of funds by Investors with MADOFF (collectively, "Additional Fees").

(Consultant Agreement at 7-9.)

177. The Beacon Defendants solicited investments into the Beacon Fund pursuant to offering memoranda and other materials from individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds. BAMC served as the Managing Member of the Beacon Fund and, as Managing Member, invested Beacon Fund assets with Madoff. Prior to the revelation of the Madoff fraud, the reported net asset value of Beacon I was $560,000,000, approximately 72% of which was invested with Madoff.

178. Participation in the Beacon Fund was offered primarily through substantially identical offering memoranda for each of the two LLCs, as amended and revised from time to time. The first Offering Memorandum issued on behalf of Beacon I (then known as Beacon Associates LLC) was issued on or about June 15, 2000 ("the June 15, 2000 Offering Memorandum"). A similar Offering Memorandum was subsequently issued on behalf of Beacon II, and subsequently revised by identical Offering Memoranda for Beacon I and Beacon II, which were issued on August 9, 2004 ("the August 9, 2004 Offering Memoranda"). Collectively, these Offering Memoranda are referred to as "the Offering Memoranda." In the Offering Memoranda, Ivy is represented as integral to the selection of outside Managers. According to the Offering

Memoranda, Defendant BAMC, with the advice of Defendant Ivy, made all investment allocation and reallocation decisions and management selections on behalf of the Beacon Fund:

> The Company's assets are allocated and reallocated to and from the Managers pursuant to the Managing Member's allocation strategies, following consultation by the Managing Member with [Ivy] (the "Investment Consultant").
>
> * * *
>
> [Ivy], a Delaware corporation registered as an Investment Adviser, acts as an investment consultant to the Managing Member ("Investment Consultant"). The Investment Consultant does not have any discretion to invest or allocate the Company's assets.

(Beacon Offering Memorandum dated June 15, 2000 ("Beacon OM") at 2-3).

> The Managing Member (**after consultation with the Investment Consultant [Ivy] and its Advisory Board**) allocates and reallocates the Company's assets. The Managing Member also reviews the Company's portfolio of investments on a regular basis.
>
> The Managing Member is responsible for selecting the Company's Managers (both directly and through the investment pools they manage), and for monitoring the Managers' performance and their adherence to the stated investment objectives ….
>
> Both quantitative and qualitative criteria are factored into the continuing evaluation of Managers, including analyses of: type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation with traditional investments such as stocks and bonds.
>
> **Analysis of the performance records of existing and prospective Managers is combined with evaluation of a number of less tangible qualitative factors** in an effort to identity Managers whose collective trading results have historically demonstrated not only substantial returns, but also a low degree of cross-correlation with each other. . . .
>
> The Managing Member (**after consulting with the Investment Consultant** and the Managing Member's Advisory Board), selects Managers that are not generally available to the investing public (the access to whom might otherwise be limited or unavailable),

> and which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; . . . .

*Id.*, at 9-10 (emphasis added) .

179. However, these representations were false and misleading given that, by Larry Simon's own admission in an email dated December 16, 1998, Ivy was the "asset allocator and introducer." Ivy was responsible for the Beacon Fund's access and exposure to Madoff. NYAG Ivy Action, ¶ 6.

180. The Offering Memoranda stated that BAMC and Ivy would conduct thorough due diligence with respect to the investments of the Beacon Fund. As stated in the August 9, 2004 iteration of the Offering Memoranda:

> The Managing Member (**after consultation with the Investment Consultant [Defendant Ivy]** and the Managing Member's Advisory Board) allocates and reallocates the company's assets. The Managing Member also reviews the Company's portfolio of investments on a regular basis.
>
> The Managing Member is responsible for selecting the Company's strategies and for selecting the Managers and the Investment Pools they manage, and for monitoring the Company's performance and for monitoring the Managers' adherence to their stated investment strategies and objectives. . .
>
> Both quantitative and qualitative criteria are factored into the evaluation of Managers, including analyses of type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation with traditional investments such as stocks and bonds.
>
> Analysis of the performance records of existing and prospective Managers is combined with evaluation of a number of less tangible qualitative factors in an effort to identity Managers whose (i) collective trading results have historically demonstrated substantial returns, while making use of various hedging techniques in an attempt to limit risk and, (ii) strategies and/or investments which

> have a low degree of cross-correlation with each other and with the Managing Member's Large Cap Strategy. . . .
>
> The Managing Member (**after consulting with the Investment Consultant** and the Managing Member's Advisory Board), selects strategies and Managers that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable), and in the case of Managers, which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; the rise of hedging strategies as part of the Manager's investment approach; diversification benefits relative to other Managers; a quality and stable organization; a market independent (market neutral) investment approach; and an ability to consistently and effectively apply its investment approach. Certain criteria may be emphasized above others in the selection and retention of particular Managers and strategies.

As noted above, prior versions of the Offering Memoranda contained substantially similar language assuring due diligence in the selection of managers. (Beacon OM at 9-10; Beacon I Offering Memorandum dated August 9, 2004 ("Beacon I OM") at 10-11; Beacon II Offering Memorandum dated August 9, 2004 ("Beacon II OM") at 11-12).

181. In addition, the OMs contain explanations of the split-strike conversion strategy. (*See* Beacon OM at 12-13; Beacon I OM at 12; Beacon II OM at 13).

182. The Offering Memoranda also tout Defendant Ivy's pre-eminence as a "global leader in alternative investment fund-of-funds portfolio management." The Beacon Defendants leveraged Ivy's reputation, and that of Ivy's parent, BONY, to bolster the appearance that the Beacon Fund was a sound investment:

> The Managing Member has engaged the Investment Consultant, Ivy Asset Management Corp., a wholly owned subsidiary of The Bank of New York Company Inc., to provide advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and to provide certain administrative services to the Managing Member. The Investment Consultant is a registered

> Investment Adviser under the Advisers Act, with approximately $13 billion of assets under management. The Investment Consultant is a global leader in alternative investment fund-of-funds portfolio management. Since 1984, the Investment Consultant's clients have participated in niche styles and sophisticated strategies of investing. The Investment Consultant's clientele includes Fortune 500 companies, defined benefit plans, multi-national insurance corporations, high net worth investors, global investment banking firms, foundations and endowments, Taft-Hartley pension plans, private family businesses, offshore investors and corporate entities, professional money managers, registered investment companies, and the Investment Consultant's principals and employees.

(Beacon I OM at 27; Beacon II OM at 28.)

183. In addition, the OMs also tout the organizational capacity of Ivy to monitor and evaluate outside managers:

> Ivy currently employs 46 employees, 9 of whom are engaged in research and monitoring performance of independent investment managers.

(Beacon OM at 25). Similarly, the Beacon I OM states:

> [Ivy]'s **staff of approximately 125 includes 25 research analysts and other investment professionals who devote 100% of their time to researching, reviewing, monitoring and analyzing current and prospective alternative investment managers**, 21 Certified Public Accountants, 13 CFA Charterholders and 8 CFA candidates.

(Beacon I OM at 27) (emphasis added).

184. Given that Ivy introduced BAMC to Madoff, managed two Proprietary Funds, Rosewood Associates and Birchwood Associates (hereinafter "Rosewood" and "Birchwood"), that were similarly designed to invest in Madoff's split-strike strategy, the source of the misrepresentations concerning the split-strike strategy could only have come from Ivy. In fact, by the time of the Beacon offering in 2000, Ivy had already helped establish the Income Plus Fund with Defendant JPJA and facilitated millions of dollars of investments in Madoff. Also, the

statements concerning Ivy's expertise, capacity and its specific resources could only have come from Ivy. As such, Plaintiffs and members of the Class reasonably attributed those statements in OM's to Ivy at the time of their dissemination and understood them to be made by and Ivy. Accordingly, on information and belief, Ivy was aware of and approved the representations made in the Beacon Fund Offering Memoranda. This conclusion is further supported by the letter agreement between Ivy and BAMC, signed by Defendant Larry Simon and dated November 28, 2005, which attaches the Beacon Fund Offering Memorandums and an Amendment thereto

185. Neither the Offering Memoranda nor any other offering materials used to solicit investments in the Beacon Fund, and pursuant to which employee benefit plan assets were invested in these entities, provided that the Fund's assets were or would be blindly entrusted to Madoff, BMIS, or other Madoff-controlled entities. Rather, the June 15, 2000 Offering Memorandum indicated that an unnamed manager controlling "a substantial majority of the Company's assets" would employ the Split-Conversion Hedged Option Transaction ("split strike conversion") strategy described in § D.1, *infra*. The unnamed Manager referred to was Madoff or BMIS, and due diligence would have revealed that he was not and could not achieve the returns he was reporting using the purported "split-strike conversion" strategy. On or before the issuance of the August 9, 2004 Offering Memoranda, the reference to this Manager was excised from the Offering Memoranda. As revised, the Offering Memoranda stated:

> A significant portion of the Company's assets are allocated to a strategy adopted by the Managing Member involving a portfolio of Large Cap Stocks hedged with options ("Large Cap Strategy"). The balance of the Company's assets are allocated among independent investment managers ("Managers") indirectly through investment in other investment funds ("Investment. Pools") which the Managers manage . . . The Company's assets are allocated and reallocated among strategies and to and from Managers by the Managing Member, following consultation with Ivy Asset

> Management Corp. (the "Investment Consultant") and the Managing Member's Advisory Board.

Notwithstanding these provisions of the Offering Memoranda indicating that the "Large Cap Strategy" would be employed by BAMC to invest a significant portion of the Company's assets, no one, including the Beacon Defendants, Ivy, or Madoff in fact employed such a strategy. In fact, the Beacon Defendants and Ivy entrusted the bulk of the Beacon Fund's assets to Madoff and BMIS to manage. Once these assets were entrusted to Madoff and BMIS, the Beacon Defendants and Ivy abdicated their duties of due diligence, inquiry and prudence and knowingly or recklessly accepted at face value whatever records Madoff, BMIS or entities associated with them chose to provide despite many red flags that indicated that Madoff could not be actually using his stated investment strategy. Other Beacon Fund assets were assigned by BAMC and Ivy to outside managers to manage, but the August 9, 2004 Offering Memoranda clearly provided for the outside management only of assets not allocated to the so-called "Large Cap Strategy," in contradistinction to the assets allocated to the Large Cap Strategy "adopted by the Managing Member," which should have been under the BAMC's direct control.

186. During the Class Period, Ivy, BAMC and JPJA knew numerous facts about Madoff's operations and investments made in Bernard L. Madoff Investment Securities ("BLMIS") that put them on fraud alert, compounded existing suspicions concerning his operations, and gave rise to new suspicions altogether, all of which counseled against placing Plaintiffs' and Class members' assets in harm's way. Indeed, Ivy would not place other of its institutional clients in Madoff due to these concerns and had an actual embargo against doing so which BONY touted in its public filings when the Madoff fraud was disclosed publicly. These facts and concerns include, but are not limited to: (a) the insufficient options trading to support Madoff's strategy; (b) the fact that Madoff reported trades at prices that were outside the daily

ranges reported on the exchange; (c) the probability that Madoff was improperly running a "managed income stream"; (d) the probability that Madoff was misappropriating client assets to support his market-making business; (e) Madoff's inconsistent and contradictory explanations for how he traded enough options to support his strategy; (f) Ivy's internal rule limiting its Proprietary Funds' allocation to Madoff to 3%; (g) Ivy's signals to the Beacon Defendants and JPJA that it was unable to grasp how Madoff was reporting such consistent returns; and (h) the fact that Friedberg's audited financials of the Beacon Fund disclosed that data concerning certain investments was unavailable to support its "unqualified" audit opinions. Nonetheless, blinded by their avarice, Ivy, BAMC and JPJA continued to conceal material facts about their own inability to replicate Madoff's results, perform due diligence on Madoff's operations and all of their external and independent indicia that Madoff was a fraud. Defendants' promotion of and access to Madoff caused Plaintiffs and Class members substantial damages in an amount to be proven at trial.

## D. <u>Ivy's Scheme to Defraud</u>

### 1. <u>Ivy Learns Facts That Indicate That Madoff is a Fraud</u>

187. A critical part of Madoff's split-strike strategy was the trading of Standard & Poor's 100 Index options ("OEX options"). *See, e.g.*, Response to RFP from Local 267 dated August 29, 1995, at 2. In Harry Markopolos' ("Markopolos") November 7, 2005 Submission to the SEC ("Markopolos 2005 Submission"), Markopolos listed as Red Flag # 4, the fact that the amount in total OEX listed call options outstanding was not nearly enough to generate the level of income on Madoff's total amount of assets under management. Almost nine years prior to Markopolos' submission, Ivy had identified the same red flag and observed that the volume of OEX options traded on the exchange would not even support a split-strike strategy for the assets

Ivy and its clients had with Madoff. NYAG Ivy Action, ¶ 54. In an internal memorandum dated March 13, 1997 and stored on Ivy's database, Defendant Wohl wrote about his knowledge and that of Ivy's Chief of Investment Management (who, upon information and belief, is Defendant Sloan):

> [Ivy's Chief of Investment Management] and I have checked the outstanding OEX options for open interest and the max seems to support only about $1B of invested dollars. We think he is managing far more than that. We should explore this further!

NYAG Ivy Action, ¶ 52.

188. Upon discussions with another fund manager, upon information and belief, Defendant Sloan confirmed that the options volume being traded was "well short of any reasonable estimate of the number of contracts Madoff should have based on any reasonable guess as to capital under management." NYAG Ivy Action, ¶ 55 (quoting Ivy internal memorandum). Furthermore, discussions with this fund manager raised the additional possibility that Madoff was running a "managed income stream" based on the fund manager's assessment of an investor's returns as reflected in Madoff generated brokerage statements. *Id.* at ¶ 56.

189. Later that same year, Ivy's suspicions concerning the impossible options volumes were further validated when, upon information and belief, Defendant Sloan noted in an internal Ivy memorandum dated May 16, 1997, that Madoff's confirmations stated that he traded 917 OEX calls on a day that Bloomberg reported that only 578 were traded, and that the price Madoff reported was well below the exchange traded prices reported by Bloomberg. NYAG Ivy Action, ¶ 57. In this memorandum, which was distributed to Defendant Wohl, Defendant Sloan wrote: "This is a clear example of our inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with the independent information that is available to us." *Id.*

190. Adding to the mounting evidence, Defendant Sloan noticed another fact which Markopolos independently identified as a tell-tale sign of the ongoing fraud: that Madoff's trade confirmations often reported prices that were outside the reported trading range for a given day. He stated that it is "unusual for an account, a customer, to be able to trade at a price, you know, substantially outside what's reported as being the range of that security for that day." NYAG Ivy Action, ¶ 57.

191. Larry Simon knew that the options volume that Madoff was purportedly trading was impossible but, upon information and belief did not tell Beacon or Jeanneret Defendants, nor did he inform the Plaintiffs and the Classes. Instead Simon questioned Madoff about the options volume discrepancy. Madoff nonsensically responded that "it was 'rare' and 'not the norm' for his trades to exceed the volume traded on the Chicago Board of Exchange ("CBOE"). NYAG Ivy Action, ¶ 58. Larry Simon later testified that Madoff's explanation was inconsistent with his own observation of a large discrepancy between the amount available on the exchange and the volume Madoff would have needed to support his assets under management. *Id.* at ¶ 59. Confidential witnesses have revealed during investigation that they were personally told by Defendant Simon of his and Ivy's failed efforts to verify and replicate Madoff's results.

192. In fact, Ivy (which represented in its ADVs that it was reconciling trade information) could have easily confirmed its own logical inferences that Madoff's trade confirmations were indeed fraudulent and that he was, in reality, not trading OEX options. The Options Price Reporting Authority (OPRA) reports each trade that is executed and price quotations for options generated by each options exchange, including the Chicago Board Options Exchange.[4] With Madoff's falsified trade confirmation, Ivy could have obtained the trade

[4] Options trading information is gathered by OPRA from the various exchanges where the options are traded and then disseminated to the public through Market Data Vendors, such as Bloomberg and the CBOE.

execution data for the particular dates that Madoff purportedly executed trades from a Market Data Vendor. Ivy would have seen that no OEX index options traded at the prices Madoff reported on a given day and thus confirmed that Madoff was falsifying his trade confirmations and was not actually trading the OEX options at all. With access to the Madoff's trade confirmation Ivy could have and should have confirmed that Madoff was a fraud.

193. Indeed, Markopolos explained that anyone with access to Madoff's falsified trade confirmations, could have easily confirmed that Madoff was not actually trading OEX options:

> Rep. Ackerman: But there was nothing they could do to check it out, that he didn't actually buy it.
>
> Markopolos: You could. **As an individual investor you could not.** But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price. **They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers. And you would have seen that no OEX index options traded at those prices that day.**

Markopolos' Testimony before the House Committee on Financial Services on February 4, 2009.

194. The discrepancies in Madoff's returns, Ivy's acknowledged inability to replicate or confirm Madoff's purported trading strategy and the fact that Ivy could have confirmed that Madoff was falsifying his trade confirmations, but did not, are additionally alarming in light of auditor Friedberg's statements in its audits of the Fund, that it could not obtain data on specific investments, an additional fact that should have alerted both Ivy and JPJA to the ongoing fraud. In the Income Plus fund, which JPJA managed, the auditor made a similar statement about the unavailability of certain information in conducting its audits.

195. Despite serious suspicions (indeed actual knowledge) that Madoff was a fraud (including specific suspicions that he was operating a Ponzi scheme), upon information and belief, Ivy failed to disclose its knowledge to the Beacon and Jeanneret Defendants, nor did Ivy inform Plaintiffs and members of the Class. For example Ivy knew that, in 1999 after Madoff indicated that he would not take any additional direct investments from Income Plus (NYAG Ivy Action, ¶ 101), JPJA had, by Ivy's encouragement, entered into a DIMA with Plaintiff Local 73 Retirement Fund which specifically authorized direct investments in the Beacon Fund. *See* Local 73 Retirement Fund DIMA dated September 17, 1999, at p. 2. The Investment Guidelines attached to, and incorporated by the DIMA, specifically incorporate the Beacon Associates OMs. *Id.* at p. 14 ("The Fund assets allocated to this Investment Manager, as determined by the Trustees, may be invested in the Income Plus Investment Fund or Beacon Associates, LLC. All such investments shall be made in accordance with the Offering Memorandum of the applicable investment program"). Upon information and belief, JPJA entered into substantially similar DIMAs with other members of the Jeanneret Subclass based on Larry Simon's recommendation.

196. Rather than stop taking money for access to Madoff or disclosing the troubling facts they learned indicating that Madoff was a fraud to BAMC and JPJA, or Plaintiffs and the Class, as Ivy was obligated to do in its fiduciary capacity, it actively concealed these facts in furtherance of its own pecuniary interests. Ivy's conduct relative to other clients barring Madoff investments is an admission that it understood its obligations but failed to fulfill them as to Plaintiffs and the Class.

197. During 1997 and 1998, Ivy continued to obtain an ever growing mountain of evidence and growing conviction of Madoff's ongoing fraud. These facts included:

a. Madoff's second explanation regarding his options trades in which he stated that he traded options on domestic exchanges other than CBOE to supplement his CBOE trading—an assertion that Ivy either knew, or was reckless in not knowing, was false given that Simon testified that he attempted to confirm this fact. NYAG Ivy Action, ¶ 60. OEX options **have never traded on any exchange other than the CBOE**. Simple website searches confirmed the same; indeed, an informational brochure on CBOE states that "OEX and XEO are established markets **traded only at [CBOE]**";

b. Ivy's suspicion that Madoff was misappropriating his clients' money to support his market-making business. *Id.* at ¶ 62 (quoting internal Ivy memorandum dated May 20, 1997 distributed to Larry Simon and Wohl); and

c. Ivy's serious concerns regarding Madoff's practice of self-clearing and his retention of a small unknown accounting firm. *Id.* at ¶ 65 (citing Wohl's testimony that "he could not think of any broker-dealer of Madoff's size that was audited by a firm with less than five employees").

## E. Ivy Conceals Facts From The Members of the Class While Limiting Its Proprietary Fund Exposure to Madoff

198. In blatant disregard of its fiduciary duties and in furtherance of its scheme to defraud Plaintiffs and members of each Class, Ivy repeatedly concealed the material facts described above. Rather than convey to JPJA, BAMC or the members of the Classes the seriously troubling facts that Ivy had documented internally, Ivy chose to vouch for Madoff's credibility and only communicate the mildest of concerns that were grossly inadequate in light of what Ivy actually knew. For example, in a letter from Ivy to Defendant Danziger dated July 28, 2000, regarding the performance of the Andover and Beacon funds, Ivy advised the Beacon

Defendants to diversify the Fund's allocation while withholding the material information that, *inter alia*, Ivy was unable to "make sense" of Madoff's strategy given its attempts at independently verifying his trades:

> **Despite Madoff's stellar record, we continue to be concerned by his unwillingness to be fully forthcoming about capital under management and other aspects of his business,** and we reiterate our strong recommendation that the outsized allocations to his strategy be reduced

Ivy Letter to Danziger dated July 28, 2000.

199. This fraudulently misleading disclosure stops far short of revealing that Madoff had repeatedly lied to Ivy about his trading strategy to avoid admitting that Ivy knew that it was physically impossible for Madoff to be executing his purported strategy.

200. Prior to the dissemination of the July 28, 2000 Ivy Letter, Defendant Sloan had considered the legal adequacy of a disclosure that did not address the material facts that Ivy knew. In an internal Ivy memorandum dated May 1997, he responded to a suggestion by Defendant Wohl that Ivy should continue telling clients that it merely was unable to assure itself of Madoff's strategy, by writing, "I just question whether this goes far enough in view of our **misgivings**…" NYAG Ivy Action, ¶ 94.

201. In stark contrast to the suggestion to the innocuous suggestion to diversify the Fund's portfolio without recommending that Beacon eliminate Madoff in July of 2000, Ivy had already undertaken more drastic self-protective measures for its own Proprietary Funds. In 1998, Ivy had an internal asset allocation rule that capped allocation of assets of its Proprietary Funds to any single manager at 6-7%. (NYAG Ivy Action, ¶ 66.) In Madoff's case, Ivy adopted a special rule limiting Proprietary Fund allocations to 3% of a fund's assets. (*Id.* quoting testimony by Defendant Sloan that explained limitation was because "[Ivy] obviously had a number of issues that concerned [it] about Madoff").

202. Ivy withdrew all of its Proprietary Funds from Madoff in 2000 when it was acquired by BONY. Prior to that, Ivy, realizing that its advice was being followed by, among others, BAMC and JPJA, maintained a 3% allocation in Madoff **to intentionally and specifically deceive its Advisory Clients, including the members of the Class**. Defendant Larry Simon articulated this startling aspect of the scheme in a December 1998 e-mail to Defendant Wohl:

> ***We have said that it is important to maintain at least some level of Ivy fund investments with Madoff in order to send a message to [our] advisor clients that we have confidence in BLM [i.e. Madoff].***

NYAG Ivy Action, ¶ 67. In furtherance of its scheme, Ivy sent false and misleading letters to JPJA in July and August of 1998 which touted Madoff's performance and contained the same mild and inadequate advice concerning diversification. *Id.* at ¶ 68.[5]

203. The impossible options volume that Madoff would need to support his strategy, a fact that Markopolos so clearly pointed out in his 2005 submission, was indeed a glaring red flag. Each time Ivy wrestled with that irreconcilable discrepancy and the principals spoke to Madoff, they received Madoff's inconsistent and conflicting explanations concerning his strategy. None of these facts were disclosed to BAMC, JPJA, Plaintiffs and the Classes as Ivy intentionally maintained its 3% exposure to Madoff to mislead them. On December 15, 1998, in a due diligence meeting with Larry Simon and Defendant Sloan, Madoff proffered another lie, namely that 30 to 50% of his option trading was done off-exchange, with unidentified counterparties such as "major banks and institutions." NYAG Ivy Action, ¶ 70. This directly conflicted with Madoff's earlier explanation that off-exchange trading was "rare" and "not the norm." *See*

---

[5] The fact that Ivy's representations were false by no means exonerates the Beacon or Jeanneret Defendants, which had independent and affirmative duties to validate Madoff's strategy and independently verify the representations that Ivy was making.

NYAG Ivy Action, ¶ 58. Also, Wohl acknowledged when he testified that he had never heard of OEX options being bought or sold off-exchange in large volume:

> Q: So you had nothing but [Madoff's] word for the fact that he was making trades in volume over the counter right?
>
> A: Yes. That's why I told you that they [the purported off-exchange trades] concerned me greatly.

NYAG Ivy Action, ¶ 72 quoting Wohl testimony.

204. The December 15, 1998 meeting gave Ivy cause for further concern because Madoff explained that his success was attributable to his efficiency in executing trades and not due to his expert market timing as Defendant Sloan had originally presumed. NYAG Ivy Action, ¶ 74. Over the next ten years, Ivy would proceed to actively conceal these additional troubling facts from BAMC, JPJA, and Plaintiffs and members of the Classes.

205. For Defendant Wohl, the December 15, 1998 meeting marked a point where Ivy had to have concluded that Madoff was a fraud. Accordingly, Wohl recommended that Ivy withdraw all of its Proprietary Funds from Madoff. In an email dated December 16, 1998, Wohl wrote to Larry Simon:

> I'm concerned that he [Madoff] now admits that he does not execute all of the index options on the exchange
>
> that there are 'unknown' counterparties
>
> that if these options are not paid off he'd lose less than 100%
>
> **It remains a matter of faith based on great performance – this doesn't justify any investment, let alone 3%.**

NYAG Ivy Action, ¶ 75 (quoting Wohl e-mail) (emphasis in original).

206. Larry Simon's e-mail response to Wohl's proposal that Ivy withdraw all of its Proprietary Funds from Madoff cuts to the heart of Ivy's *scienter*. Simon took no issue with

Wohl's assessment of investments with Madoff but instead, placed Ivy's financial interest front and center in expressing his concern that withdrawing from Madoff would cause Ivy's Advisory Clients to terminate Ivy, thereby bringing to an abrupt end the reliable stream of revenue that these 'in-the-dark' clients represented. Simon wrote:

> Amount we now have with Bernie in Ivy's partnerships is probably less than $5 million. The bigger issue is the 190 mill or so that our relationships have with him which leads to two problems, we are on the legal hook in almost all of the relationships and the fees generated are estimated based on 17+% returns .... [to be] $1.275 Million
>
> **Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?**

NYAG Ivy Action, ¶ 76 (quoting Simon e-mail) (emphasis added).

207. As alleged by the NYAG, $300 million in assets represented approximately 18% of Ivy's total assets under management and $1.6 million in fees represented over approximately 16% of Ivy's total revenue. NYAG Ivy Action, ¶ 77. Larry Simon's main concern was not for his clients but for the metric on which they had grown their business, as evident when he testified that, "asset management firms in the industry [. . .] are ranked by asset[s] under management." *Id.*

208. The dual concerns of dropping in the industry ranking and losing over 16% of Ivy's revenue precipitated Ivy's decision to maintain a Madoff position despite its knowledge that Madoff had lied to them about its options trading and its growing conviction that he was a fraud. Ivy's growth, achieved by keeping assets under management high, directly translated to a concrete and personal benefit for Larry Simon and Howard Wohl. In 2001, after Larry Simon

and Howard Wohl had sold Ivy to BONY, each having received $100 million in consideration, Simon wrote to Wohl in an email:

> . . . [W]ho would have thought that the $5 million would lead to $145 mill and [JPJA's] funds) . . . it helped to contribute towards building Ivy's AUM and credibility, **despite our real concerns about BLM [Madoff]**.

NYAG Ivy Action, ¶ 118 (quoting Larry Simon e-mail dated June 2001) (emphasis added).

209. Ivy was motivated to continue generating inflated fees and maintaining an artificially high rank amongst its industry peers, and decided to reject Wohl's proposal as well as a "middle of the road approach" in which Defendant Sloan envisioned that Ivy would withdraw its Proprietary Funds from Madoff and put its Advisory Clients on notice that it had done so. In a December 17, 1998 e-mail sent to Larry Simon and Wohl, he justified this approach as follows:

> . . . **Legally, we will of course still have liability as investment advisor . . . I imagine that our letters to clients would serve to at least partially exculpate Ivy should the worst happen**. . . .

NYAG Ivy Action, ¶ 79 (quoting Defendant Sloan's e-mail) (emphasis added). Defendant Sloan testified that "should the worst happen" referred to the possibility that Madoff was a fraud. *Id.* at ¶ 80.

210. Ivy had a duty to BAMC, JPJA and Plaintiffs and members of the Class to not mislead them concerning Madoff and to fully disclose and not conceal from them the negative facts that Ivy knew about Madoff. As of December, 1998, these included at least the following: (a) there was insufficient OEX option trading to support Madoff's strategy; (b) Madoff might be misappropriating client funds to fund his market-making business, and if Madoff was doing this, the returns he reported as trade results were actually payments by him for his unauthorized use of client funds; (c) Madoff had just told Ivy a third obviously false story about how he traded his options that was at odds with what Madoff previously had said; (d) Madoff's previous two

explanations regarding his option trading were inconsistent with the third and also obvious falsehoods; (e) Ivy had earlier in 1998 instituted a special 3% limitation on the Proprietary Funds' investments with Madoff to both limit its direct exposure to Madoff and to mislead Plaintiffs and the Classes about Madoff; (f) both Wohl and Defendant Sloan had recommended that Ivy withdraw all of the Proprietary Funds' investments from Madoff because of their concerns about Madoff; (g) Despite this, Ivy had not withdrawn its Proprietary Funds because Simon believed withdrawal might cause Ivy's Advisory Clients to terminate their relationship with Ivy, which would reduce Ivy's revenues and assets under management; and (h) it was rumored, and Ivy suspected, that Madoff's operation was a Ponzi scheme. Ivy also possessed the contemporaneous knowledge that Plaintiffs and members of the Class were holders of interests in the Beacon Fund, pursuant to which their assets were being allocated to Madoff solely by virtue of Ivy's relationship with Madoff and its efforts to promote his services.

211. Only two weeks after Larry Simon, Wohl, and Defendant Sloan considered withdrawing Ivy's Proprietary Funds from Madoff (though ultimately deciding to maintain a position for fear of losing business), Simon and Wohl met with JPJA and another Ivy client on December 30, 1998. In this meeting, Larry Simon continued Ivy's pattern of concealment by glossing over some generally known uncertainties concerning Madoff while making other statements that were outright false and fraudulent. NYAG Ivy Action, ¶¶ 84-87. For example, JPJA's contemporaneous notes of the meeting show that Simon stated that: (a) Ivy's due diligence "shows no problem for Madoff," a false statement; (b) Ivy "tend[s] not to have more than 5-7% with any one mgr," a false statement because it omitted to disclose the fact that Ivy had imposed a lower 3% limit for Ivy's Proprietary Funds' exposure to Madoff because of Defendants' concerns about Madoff; and (c) "Madoff accountant is ok but small," a false

statement because of Ivy's internal concern about Madoff's accountant and its complete lack of any basis on which to say that the accountant was ok. *Id.* at ¶ 87.

212. This pattern of deception carried over into 1999, when, on January 12, Ivy sent a letter to, among others, JPJA, stating that Ivy wished to "clarify and expand on some of the points regarding Bernard L. Madoff's strategies." Ivy Letter dated January 12, 1999. The letter went on to falsely state that, "We have no reason to believe that the Madoff account is anything other than what Ivy's experience has shown and what the record demonstrates it to be." *Id.* It continued, "we cannot 'close the loop' in a manner that gives us total comfort," and restated Ivy's concern regarding Madoff's lack of a separate custodian for the securities he traded and Ivy's philosophy of "limiting investments (generally between 8% and 15%, depending on the circumstances) to any manager in Ivy's roster of alternative investment managers." *Id.* However, this purported caveat was vague and in and of itself false given that Ivy internally limited its Proprietary Funds to a 3% allocation vis-à-vis Madoff and would have eliminated its Madoff exposure altogether but for its desire to give the false impression that it had confidence in Madoff. Moreover, Ivy never communicated its misgivings to BAMC, JPJA, Plaintiffs and members of the Class although it knew that they were relying on Ivy's conduct. Given that JPJA was the attorney-in-fact to Plaintiffs and members of the Jeanneret Subclass pursuant to the DIMAs between JPJA and Jeanneret Subclass members, Ivy's misrepresentations made to JPJA are *de facto* statements made to Plaintiffs. (*See, e.g.*, September 23, 2005 DIMA between Local 267 Insurance Fund and JPJA; September 17, 1999 DIMA between Local 73 Retirement Fund and JPJA at 2; November 1, 1990 DIMA between Local 267 Pension Fund and JPJA at 1).

213. In 1999, with Ivy actively engaged in its own scheme aimed at misleading Plaintiffs and members of each Class, Ivy received information from another prominent hedge

fund manager that confirmed its earlier suspicion that Madoff was misappropriating client funds by making unauthorized subordinated loans of client money to his market-making operation. NYAG Ivy Action, ¶ 95. As memorialized by Defendant Sloan in an internal e-mail dated January 21, 1999, the informant told Defendant Sloan that one of Madoff's employees validated the subordinated loan theory as what Madoff's strategy really was. *Id.* This not only meant that Madoff was misappropriating client assets for his own use, but also that Madoff had, on a previous occasion, lied to Ivy by representing that there was no relationship between his money management operation and his market-making business. *Id.* at ¶¶ 63, 96. In breach of its fiduciary duty Ivy did not disclose this revelation to Plaintiffs and members of each Class, and in furtherance of its deceptive scheme, concealed this fact in subsequent interactions with JPJA.

214. Ivy was asked if it should have disclosed its concerns about the potential that Madoff was misappropriating assets. Defendant Wohl on Ivy's behalf, testified that they had not disclosed their concerns and in defiance of the obvious, stated that; "I don't think it was germane to the overall question. **No.**" NYAG Ivy Action, ¶ 97 (emphasis supplied). On the other hand, Larry Simon admitted that Ivy stopped asking any further questions after receiving information corroborating the suspicion that Madoff was misappropriating client assets, but he could not justify the decision:

> Q: Why didn't you? Why didn't you? Why did not Ivy pursue whether, in fact, this was what Madoff was doing, first, when it was Ivy's or some members' of it thought, and second, after [The Hedge Fund Manager's] report of his conversation with somebody at Madoff, why didn't Ivy pursue the matter further?
>
> A. I can't tell you.

*Id.* at ¶ 98.

215. Ivy pressed ahead with its deceptive scheme notwithstanding this corroborative and reliable information that confirmed Ivy's serious suspicions (indeed actual knowledge) that

Madoff was a fraud. In January of 1999, Ivy sent letters to JPJA and Danziger of the Beacon Fund that stated:

> **<u>Bernard L. Madoff</u> –** Performance continues to be extremely strong. The account was up by .... <u>As we have stated many times, while we have no reason to believe there is anything improper in the Madoff operation, we continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results.</u> They will not quantify the total amount that they manage, but we estimate it to be at least $5 billion, and likely more. As a result, we recommend a below median allocation.

NYAG Ivy Action, ¶ 99 (emphasis added).[6] That Ivy had "no reason to believe" that there was anything improper in the Madoff operation was a flagrant lie. As set forth herein, hat Ivy's only concern stemmed from Madoff's ability to manage such a large pool of capital was also a false and misleading statement given the facts it actually knew and had concerns it expressed internally.

216. In July of 1999, Ivy sent JPJA another misleading letter containing language identical to the January 1999 letter in which it stated that, *inter alia*, it had "no reason to believe that there is anything improper in the Madoff operation . . .." NYAG Ivy Action, ¶ 99. On the other hand, Ivy's advice to prospective investors interested in Madoff was to steer clear of a potentially fraudulent enterprise. *Id.* at ¶ 100 (quoting internal Ivy note memorializing September 1999 meeting with prospective business partner which stated that prospective business partner "appeared to be taken aback by the suggestion that the explanation of how it [Madoff] works could be that something improper is being done").

217. Underlying Ivy's persistent fraudulent conduct was its desire to keep the flow of revenue generated by BAMC's clients, *i.e.* Plaintiffs and members of the Class, generated. For

[6] The mere fact that the letter sought to ward off concerns of Madoff being "improper" should have prompted a further inquiry from BAMC and JPJA.

example, Ivy and BAMC executed an amendment to the 1995 Consultant Agreement, increasing its fees that it was to receive through BAMC's management of the Beacon Fund to 60% of the fees collected from "New Investors" defined as those whose membership commenced on or after May 1, 2000. (*See* "First Amendment to Agreement," dated May 1, 2000 at ¶ D).

218. As set forth above, having secured even more lucrative fees as a result of its scheme and in spite of its serious concerns regarding Madoff, Ivy participated in the June 4, 2000 offering of interests in Beacon Associates LLC pursuant to which it undertook to perform the due diligence and monitoring duties set out in the OM. Less than two months later, Ivy sent the July 28, 2000 letter in which it withheld material facts concerning Madoff's illegitimate operations and merely expressed discomfort with Madoff's unwillingness to divulge information about his strategy. However, Ivy utterly failed to make even such a limited disclosure to Plaintiffs and the Class who reasonably relied on Ivy's good faith execution of its duties as set forth in the OMs. Therefore, Ivy's deceptive conduct which concealed material facts is at the root of the damages suffered by Plaintiffs and members of the Class.

219. Ivy's deceit showed no signs of relenting in the months leading up to BONY's acquisition of Ivy in 2000. At a meeting with JPJA on April 4, 2000, Ivy vouched for Madoff's legitimacy. NYAG Ivy action, ¶ 102. Ivy's notes of the meeting reflect the following startling exchange:

> In addition, John [*i.e.*, J.P. Jeanneret] asked, "is he [Madoff] essentially legitimate?" [Ivy's Director of Research][7] responded, "essentially legitimate" and went on to say that we had not been able to fully close the loop on him and therefore Madoff is limited to no more than 4% in the Ivy funds.

*Id*.

[7] Believed upon information and belief to be Defendant Geiger.

220. Ivy's representation that Madoff was "essentially legitimate" was false and in direct contravention of its duties as enumerated in the Beacon Fund OMs as well as its duty to disclose material information in its capacity as a fiduciary who was actively promoting Madoff's investment services for a fee. Ivy had no basis for stating that Madoff was legitimate and in fact, knew several facts indicating that he was not, namely that: (a) Madoff was misappropriating client funds for his market-making operation; (b) there was insufficient OEX option trading either on or off exchange to support Madoff's purported OEX option trades; (c) Madoff had told Defendants multiple lies about his option trading; and (d) Fund Manager had informed Ivy of evidence that Madoff was "managing returns." Ivy concealed this material information from BAMC, JPJA, Plaintiffs and members of each Class thereby depriving them the opportunity to withdraw their assets from Madoff and avoid substantial damages. Further, in contravention of its fiduciary duties, Ivy failed to disclose to BAMC, JPJA, Plaintiffs and the Class that it had a "4%" cap on Madoff allocations for its Proprietary Funds.

221. As indicated by BONY in its 10-K filed for FY 2008, Ivy withdrew all of its Proprietary Funds' investments with Madoff in 2000.

> On Dec. 11, 2008, Bernard L. Madoff was arrested by the FBI and sued by the SEC for engaging in a massive "Ponzi-scheme" investment fraud through his broker dealer and investment advisory company, [BMIS]. [BONY] has no direct exposure to the Madoff fraud. ***[Ivy], a subsidiary that primarily manages funds-of-hedge-funds has not had any funds-of-funds investments with Madoff since 2000.*** Several investment managers contracted with Ivy as a sub-advisor and one pension fund contracted with Ivy as investment manager; a portion of these funds were invested with Madoff and likely suffered losses as a result of the Madoff fraud.

Bank of New York, 10-K for FY 2008, at 29 (emphasis added).

222. Larry Simon testified that he told the Beacon and Jeanneret Defendants that the reason for Ivy's withdrawal of its Proprietary Funds was because Madoff demanded it in light of

Madoff's objection to BONY's impending acquisition of Ivy which Madoff perceived to create a potential conflict of interest. NYAG Ivy Action, ¶ 104. However, this testimony is contradicted by Larry Simon's son, Sean Simon, who testified that he did not remember any demand by Madoff that Ivy withdraw its funds during the conversation in which Madoff purportedly expressed such a mandate. *Id.* at ¶ 105. Instead, Sean Simon stated that on at least two other occasions, Ivy had elected to withdraw from Madoff and an internal Ivy memorandum dated August 20, 2001 quotes him as telling a prospective client who inquired about Ivy's investments with Madoff that, "Ivy had chosen not to invest with Madoff in its proprietary funds . . ." *Id.*

223. Ivy's Director of Client Development confirmed Sean Simon's version of the story in an e-mail:

> **We used to use Madoff in our funds but elected to get out when we figured it was just too risky** since we couldn't get our arms around how he does what he does. It isn't that the strategy is complex. **It is just that a number of questions that raise doubts.** We have known Madoff for a long time and have only the kindest things to say about him. However, from a business standpoint, **we thought we couldn't continue to take the risk**.

NYAG Ivy Action, ¶ 106 (emphasis supplied). Wohl concurred.

224. Additionally, a Confidential Witness who was formerly employed by Ivy confirmed Ivy's internal embargo against Madoff and elaborated that institutional investors would not be introduced to Madoff because it was known within Ivy that he operated under an unacceptable level of secrecy and could not pass due diligence.

225. The only logical inference that can be drawn from Ivy's contemporaneous withdrawal of its Proprietary Funds from Madoff as it was being acquired by BONY is that BONY knew of Ivy's relationship with Madoff. BONY's pre-acquisition due diligence of Ivy, if properly conducted, would have unearthed the litany of facts already documented by Ivy personnel in internal e-mails, memoranda and notes stored in Ivy's records. *See, e.g.*, § D.1,

*supra*. BONY also had access to the numerous red flags and suspicions swirling in the market place, as set forth below. In the interest of limiting Ivy's exposure to liability as a fiduciary of the fund-of-funds it managed, BONY caused Ivy to divest its Madoff investments. Nevertheless, BONY continued to allow Ivy to advise other fund managers to place their money with Madoff in its capacity as a sub-advisor. This way BONY directly benefitted from the millions of dollars in sub-advisory and incentive fees Ivy earned as a result of Madoff's Ponzi-scheme, without having direct exposure to the fraud in the form of Proprietary Fund investments with Madoff. Sean Simon's 2008 e-mail to BONY is indicative of BONY's influence and control over Ivy's decision to withdraw from Madoff, stated with respect to Madoff: "**[W]e fired him in 2000.**" NYAG Ivy Action, ¶ 105 (emphasis supplied by NYAG).

226. BONY's acquisition of Ivy added another wrinkle to Ivy's ongoing deception. While Ivy told some prospective investors and clients that Ivy had chosen to withdraw its funds from Madoff and recommended against investing with Madoff, Ivy continued to conceal the material facts it had acted upon from the members of the Class. In January of 2001, Larry Simon told one of Ivy's clients that had made a small investment with Madoff that Ivy had withdrawn the Proprietary Funds' assets from Madoff, and that the client should follow suit. NYAG Ivy Action, ¶ 107. Similarly, an August 20, 2001 internal Ivy memorandum summarized a meeting with another client as follows:

> I mentioned that we no longer have funds with Madoff in our Proprietary Funds. He said we can take [client]'s money out whenever we wanted- "without hesitation." **If it's not good enough for us, then it should be out of [client].**

NYAG Ivy Action, ¶ 108 (emphasis supplied by NYAG).

227. Ivy knew that Plaintiffs and members of the Class would have reached the same decision as the client who was told that Ivy had taken its money out of Madoff. Rather, in

furtherance of its scheme, Ivy sent JPJA and BAMC a letter dated August 3, 2001 mischaracterizing and understating its concerns with Madoff and not revealing the key fact that Ivy was out of Madoff. Ivy wrote:

> **Bernard L. Madoff**—Year-to-date, through June 30, 2001, Madoff returned 7.1%. We take this opportunity to state our long-held concerns about the continued ability of this manager to produce consistent returns on what must be an enormous amount of capital under management, and **to note our inability to perform due diligence due to limitations set by Madoff.** For these reasons, we recommend harvesting profits or otherwise trimming allocations to this manager.

Ivy Letter dated August 3, 2001 to JPJA.[8] Once again, as with Ivy's previous false statements, Ivy's letter omitted to mention any of the facts or concerns enumerated in § D.1, *supra*. Furthermore, the statement that Ivy was unable "to perform [its] usual and customary due diligence due to limitations set by Madoff" should have itself triggered an independent investigation by BAMC and JPJA. Ivy failed to disclose that by that time, Ivy had, of its own volition, *chosen* to cease due diligence of Madoff following its divestiture of the Proprietary Funds' Madoff positions. NYAG Ivy Action, ¶ 42 (citing Larry Simon's testimony). Yet, as will be discussed herein, in 2004, Ivy participated in a second offering of interests in the Beacon Fund in which it was represented to have the same duties of due diligence that were previously enumerated in the 2000 OM.

228. Throughout 2001 and into 2002, Ivy carefully steered other investors away from Madoff while concealing that fact and other material facts from Plaintiffs and members of the Class so that they would remain invested in Madoff and continue generating Ivy's inflated fees. Ivy maintained its assets under management in the form of Plaintiffs' and the Classes' assets while harboring the knowledge that Madoff was a fraud. For example, in an e-mail dated June

[8] Similar letters were sent to BAMC and JPJA in February of 2001. NYAG Ivy Action, ¶ 111.

29, 2001, Defendant Wohl wrote that "**Madoff can personally bankrupt the Jewish community if he is not 'real.'**" In an e-mail dated April 1, 2002, he responded to a subordinate's attempt to analyze Madoff's consistent success by writing, "**Ah, Madoff. You omitted one other possibility – he's a fraud!**" NYAG Ivy Action, ¶ 113.

229. An internal Ivy memorandum dated January 14, 2002 memorializes Ivy telling a prospective client that Ivy could not overcome "qualitative issues" regarding Madoff and therefore, "no matter how successful he continue[d] to be, we are [not] satisfied as a fiduciary to invest client assets [with Madoff]." NYAG Ivy Action, ¶ 114. Then, in March of 2002, Ivy's Director of Investment Research adamantly rejected an opportunity to invest in Madoff that was offered to Ivy, in an e-mail stating: "Let's not spend another second on it." *Id.* at ¶ 115. Wohl echoed this strong aversion to Madoff in a December 2002 e-mail in which he responded with one word, "NO," when asked by a subordinate whether Ivy would be interested in Madoff for managed accounts. *Id.* Ivy likewise advised other clients to avoid investing with Madoff and represented that it had not recommended allocations to Madoff. *Id.* at ¶ 116.

230. Yet, Ivy simultaneously continued to perform its duties vis-à-vis the Beacon Fund seemingly in good faith and, as a result deceived Plaintiffs and Class members. For example, on December 31, 2002, Ivy disseminated false and misleading statements of "Monthly Partnership Returns" which were printed on its stationary. *See* Monthly Partnership Returns dated December 31, 2002. Ivy disseminated similarly false and misleading statements throughout the Class Period while contemporaneously and secretly believing that Madoff was a fraud.

231. These fraudulent financial statements helped Ivy maintain the carefully managed illusion designed to mislead Plaintiffs' and members of each Class while furthering the pecuniary interests of Defendants Simon and Wohl. Responding to a suggestion from Wohl that

Ivy exclude another pension fund's Madoff investment from Ivy's responsibility and try to make up the fees elsewhere, Simon wrote:

> You may spending too much time in the sun! If we give up Madoff, John [Jeanerret] has opportunity to move in. In addition, they . . .would negotiate in an even lower fee arrangement knowing their mentality.

NYAG Ivy Action, ¶ 117 (quoting Larry Simon March 21, 2001 e-mail). Simon then went onto remind Wohl that JPJA's clients' funds, *i.e.*, the assets of Plaintiffs' and members of each Class, played an instrumental role in the growth of Ivy's assets under management and, therefore in its eventual rise to prominence that culminated in BONY's $100 million payout to Larry Simon and Wohl. *Id.* at ¶ 118. Simon tellingly articulated a question in this e-mail that evinces BONY's influence, control and culpable participation in Ivy's fraud: "Legal question: Now that BNY owns Ivy, who has the ultimate liability." *Id.* at ¶ 119.

232. As Ivy continued to mislead Plaintiffs and members of each Class through its deceptive conduct and material omissions, Defendant Wohl remained steadfast in his position that Madoff was not to be recommended to prospective clients. In a January 2003 e-mail, Wohl expressed this by stating, "Madoff (NOT)!" NYAG Ivy Action, ¶ 115.

233. Yet, that same month, Ivy and BAMC entered into a Third Amendment to the Consultant Agreement dated January 1, 2003 in which Ivy's fee apportionment was adjusted to offset finders fees that the Beacon Defendants may have paid to third parties in order to lure more investors into the Beacon Fund, and ultimately, into Madoff. Paragraph 2 of the amendment reads:

> <u>Compensation:</u> In consideration of the introduction of the Principals and the Managing Member to Madoff and to Other Managers, if any, and for Ivy's administrative services to Managing Member, Managing Member shall, within fifteen (15)

> days after receipt of any Fees (as hereinafter defined) and profit allocation, pay to Ivy:
>
> (a) Forty-five percent (45%) of the Net Fees received by Managing Member from the LLC and Beacon on account of the period commencing January 1, 2003. The first such payment or payments, as the case may be, shall be reduced by the amount paid by the Managing Member to Ivy as compensation in excess of the amount otherwise payable to Ivy without taking into account the provisions of paragraph 2D(1)(b) of the First Amendment to the Original Agreement. **For the purpose hereof, Net fees shall mean the Fees as defined in the second sentence of paragraph 4 of the Original Agreement reduced by payments to third parties by virtue of such parties referring investors to the [Beacon Fund], *provided that Ivy approves in advance the agreement for such payments*.**
>
> (b) Fifty percent (50%) of the profit allocation received by the Managing Member from [the Beacon Fund] for the period commencing January 1, 2003.

Third Amendment to the Consultant Agreement dated January 1, 2003 at ¶ 2. The substance of this amendment bespeaks Ivy's role in the scheme to defraud Plaintiffs and members of the Class because it clearly demonstrates that Ivy was not engaged only in the mere provision of services to BAMC. Instead, built into its relationship with BAMC was a system by which the Beacon Defendants were incentivized to seek out, and even pay for access to new investors in order to keep the flow of assets that ultimately funded Madoff's Ponzi scheme. However, these "finder's fees" were also subject to Ivy's approval.

234. Then, on August 9, 2004, Ivy once again lent its name and imprimatur to the second offering of interests in the Beacon Fund (*see* Beacon I and Beacon II OM) and, at least outwardly, assumed identical duties to those it had assumed by the terms of the 2000 OM. *See*

§ C.1, *supra*. However, the 2004 OMs neglected to mention the critical fact that Ivy would be doing nothing because, as discussed *supra*, Ivy had ceased conducting due diligence on Madoff when it withdrew its Proprietary Funds from his operations. Instead the 2004 OM fraudulently stated:

> The Managing Member (after consulting with the Investment Consultant and the Managing Member's Advisory Board), selects strategies and Managers that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable), and in the case of Managers, which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; the use of hedging strategies as part of the Manager's investment approach; diversification benefits relative to other Managers; a quality and stable organization; a market independent (market neutral) investment approach; and an ability to consistently and effectively apply its investment approach. Certain criteria may be emphasized above others in the selection and retention of particular Managers and strategies.

Beacon II 2004 OM at 2, Beacon I 2004 OM at 10. This statement materially misrepresented Ivy's actual role which could not possibly involve any meaningful consultation for a majority of the Beacon Fund's assets which were invested in Madoff. However, taken in the context of the entire offering containing statements regarding Ivy's expertise and its staff which "devote[d] 100% of [its] time to researching, reviewing, monitoring, and analyzing current and prospective alternative investment managers," Plaintiffs and the Class attributed these statements to Ivy at the time of their dissemination. Moreover, due to its role as a provider of administrative services to the Beacon Fund, Ivy was well aware that the OM statement that the "Large Cap Strategy" had been adopted by BAMC was false; in fact this money continued to be entrusted to Madoff and BMIS.

235. However, by the time the 2004 OM was disseminated, Ivy had concluded, based on its investigation and prolonged exposure to Madoff's operations, that it could not justify <u>any</u>

level of investment in Madoff, at least, for its Proprietary Funds and the several prospective investors it steered away from Madoff. Yet, Ivy and BAMC induced further investments in the Beacon Fund by Plaintiffs and members of the Class while having no basis for making the statements contained in the 2004 OM. As was the case with the 2000 OM, Plaintiffs and members of the Class understood the speakers of the above-referenced misstatements to be Ivy (and BAMC) at the time they were disseminated.

### F. Under The Aegis of BONY, Ivy Ranks Madoff As One Of Its Top Risks But Conceals This Fact From Plaintiffs And Members of Each Class While Attempting To Insulate Itself From Madoff Liability

236. Defendant BONY acquired Ivy, in part, to market its pool of clientele which included Taft-Hartley pension plans such as those provided by Local 73 and Local 267. *See* Press Release: The Bank of New York Co., Inc. Agrees to Acquire Ivy Asset Management, Aug. 9, 2000, PRNewswire; Press Release: The Bank of New York Co., Inc. Completes Acquisition of Ivy Asset Management, Oct. 4, 2000, PRNewswire. In 2000, Ivy touted that it caters to Taft-Harley pension plans on its website.

237. After the acquisition, BONY continued to market Ivy as a primary player in its portfolio of asset managers servicing pension funds. For example, in a 2006 BONY publication, *Improving Pension Liability Management with Liability Benchmarks,* BONY lists Ivy Asset Management as a member of its asset management team, BNY Mellon Asset Management.

238. In July 2007, through the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation of Pittsburgh, the Bank of New York Mellon (hereinafter "BNY Mellon") was formed.

239. According to BNY Mellon's website, BNY Mellon Asset Management is "The 'umbrella organization' for all of the company's affiliated investment management firms and *is*

*responsible* for U.S. and non-U.S. retail, intermediary and institutional distribution of investment management and related services."

240. BNY Mellon Asset Management, consistent with BONY's initial impetus for acquiring Ivy, specifically identified itself as a provider of investment services to Taft-Hartley pension plans. Its website describes its service as follows:

> The unique approach of BNY Mellon Asset Management's Taft-Hartley Group brings together the strengths of each of the specialty investment management firms and channels them *through a single point of contact*. This approach ensures a sustained level of excellent client service combined with strong, consistent investment performance. Working with our group offers your benefit funds broader management diversification while saving on administration.

241. Unlike the opaque wall behind which Madoff operated, BNY Mellon Asset Management represented that its affiliated investment firms "provide asset management service that is responsive to our clients' needs, ***transparent in its processes***, and consistently working to pursue strong performance and results for clients." BNY Mellon Asset Management website, http://www.bnymellon.com/products/assetmanagement/index.html, as of Sept. 24, 2009.

242. At some or all relevant times, BONY participated in and influenced Ivy's decisions. For example, the Ivy Executives and the Ivy Strategic Operating Committee were responsible for meeting consistently with senior management at BONY to discuss strategies and synergies.

243. As Steven Pisarkiewicz (Chairman of the Board of Directors of Defendant Ivy from July 2003 until approximately April of 2007) stated in a January 6, 2006 press release, "Ivy is a critical component of our growing investment management business and is strategically important to The Bank of New York."

244. BONY exercised oversight over Ivy; was responsible, at least in part, for Ivy's corporate compliance, audit, and risk management; and subjected Ivy to multiple BONY corporate compliance policies. For example, BONY noted that "[a]s a subsidiary of BONY, Ivy is subject to multiple corporate compliance policies and benefits from corporate wide training around compliance and ethics matters." In addition, in public investor relations filings, BNY Mellon stated that in addition to Ivy's management oversight and compliance infrastructure, "[a]ugmenting this are service functions shared with The Bank of New York Mellon Corporation ("BONY") such as Compliance, Internal Audit, IT Security and Risk Management."

245. Indeed, as early as 2005, Ivy, under the aegis of BONY, had formed an internal Global Risk Management Committee (the "Committee") to assess and address Ivy business risks. NYAG Ivy Action, ¶ 122.

246. On BONY's website, the Committee's purpose was stated as follows:

> [T]o assist the Board of Directors in fulfilling its oversight responsibilities with regard to (a) the risks inherent in the business of the Corporation and the control processes with respect to such risks, (b) **the assessment and review of credit, market, fiduciary, liquidity, reputational, operational, fraud, strategic, technology, data-security and business continuity risks**, (c) the risk management activities of the Corporation ***and its subsidiaries***, and (d) ***fiduciary activities of the Corporation's subsidiaries***.
>
> In carrying out its oversight responsibilities, each Committee members shall be entitled to rely on the integrity and expertise of those persons providing information to the Committee and on the accuracy and completeness of such information, ***absent actual knowledge of inaccuracy***.

(BONY website on "Risk Committee" as of October 13, 2007).

247. In 2005 and 2007, the Committee made lists of what it considered to be Ivy's ten largest risks. Both lists ranked Madoff as one of Ivy's top ten business risks. The 2005 list, which also ranked the risks in order of danger to Ivy, ranked Madoff as Ivy's fourth largest risk.

Neither Ivy nor BONY disclosed this crucial and material fact to Plaintiffs or members of each Class. Yet they continued to allow Plaintiffs and class Members to remain invested with Madoff, and Ivy continued to reap management fees under Ivy's CAs with JPJA and BAMC.

248. Having ranked Madoff as one of its top ten business risks, Ivy and BONY sought to insulate itself from any potential liability arising from its sub-advisory relationships with BAMC, the Managing Member of the Beacon Fund, and JPJA, the Managing Member of Income Plus. Accordingly, in 2006 and 2007 respectively, Ivy executed new consulting agreements with each manager that expressly excluded Madoff from its scope of services which required it to research, monitor, evaluate and meet with outside managers. *See* Beacon Consulting Agreement dated January 1, 2006 (hereinafter "2006 CA"); *see also* Amended and Restated Subadvisory Agreement between Ivy and JPJA.

249. An additional effect of these agreements, which were undisclosed to Plaintiffs and members of each Class, was to downgrade Madoff to a "Non-Recommended Manager."

> (a) research, identify, monitor, evaluate and meet with existing and potential investment managers **other than Madoff or any investment manager that manages LLC funds that was not recommended to the Managing Member by IVY ("Non-Recommended Manager")**;
>
> (b) recommend in writing investment managers to Managing Member;
>
> (c) advise Managing Member in writing as to the allocation of LLC funds among investment managers, including timing of retaining and terminating investment managers **other than Madoff;**
>
> (d) monitor, evaluate and meet with investment managers that are managing LLC funds, **provided however that the parties acknowledge that the Managing Member has expressly requested that Ivy not monitor or evaluate or meet with any representatives of Madoff including Bernard L. Madoff through whom one of the strategies employed by the LLC is executed or with any Non-Recommended Manager;**

> (e) assess the performance of investment managers which are managing LLC funds and make periodic written recommendations to Managing Member in connection therewith **other than Madoff or any Non-Recommended Manager;**
>
> The above referenced Consulting Services shall be provided to Managing Member in a timely and expeditious manner during the Term of this Agreement so as to enable Managing Member to make any necessary decisions for allocations in connection with the funds of the LLC **other than funds invested with Madoff or with any Non-Recommended Manager.**

2006 CA at 3 (emphasis added).

250. Ivy's and BONY's conduct exhibits a pattern of knowing and culpable deceptive conduct and misrepresentations and concealment that hid from Plaintiffs and members of each Class, highly material facts concerning Madoff's operations. Ivy and BONY <u>uncovered facts</u> that gave them serious suspicions (or actual knowledge) that Madoff was a fraud. Yet, loath to forego a stream of revenue that came at little to no cost, Ivy and BONY chose, instead, to defraud Plaintiffs and members of the Class in furtherance of their own financial interests.

251. BONY benefited from the fees Ivy received as a result of its relationships with Madoff and JPJA, which were reported as part of BONY's total earnings in their financial statements. Furthermore, in its financial statements filed with the SEC, BONY specifically referenced earnings from Ivy as an important contributing source to BNYCo's own earnings. For example:

a. In 2000, the Ivy acquisition is mentioned in BONY's "Summary of Results" in its 10-K filing. Among other references to Ivy, BONY stated that its "[p]rivate client services and asset management fees were up 21% to $296 million in 2000, led by strong business flows in the BNY Hamilton Funds, as well as by *the acquisitions of Ivy Asset Management Corp. and Estabrook Capital Management, Inc.*" (Emphasis added.)

b. In BONY's 10-Q for the period ended June 30, 2002, BONY commented that "Fees were also favorably impacted by continued strong flows into alternative investment funds offered by the Company's Ivy Asset Management subsidiary and demand for the Company's retail investment products."

c. In an 8-K filed with the SEC on July 17, 2003, BONY attached a press release singling out Ivy as an important contributor to the rise in BONY's asset management fees, stating that "[t]he sequential quarter increase reflects the continued strong demand for alternative investments from Ivy Asset Management as well as higher fees from the private client services business. The increase from the second quarter of 2002 and on a year-to-date basis was due to strong performance from Ivy Asset Management and acquisitions." BONY's 10-Q for the period ended June 30, 2003 makes the same points.

d. BONY's 10-Q for the period ended September 30, 2003 also references BONY's growth in private client services and asset management fees "reflect higher price levels as well as the continued strong demand for alternative investments from Ivy Asset Management and higher short-term money management fees, partially offset by higher seasonal tax-oriented fees in the second quarter." Indeed, this 10-Q notes more than a three-fold increase of Ivy's "grown assets under management from $2.4 billion when it was acquired in 2000 to $8 billion at September 30, 2003."

e. In BONY's 10-K for 2003, Ivy was again singled out for mention as a contributor to the growth of private client services and asset management fees. Among other things, the 10-K stated that "Ivy, a fund of funds hedge fund manager, continues to attract new assets at a rapid pace. Ivy ended 2003 with $9.1 billion of assets under management, up 42% for the year."

f. BONY's 10-K for 2004 noted the significant contribution Ivy made to overall earnings. Specifically, the 10-K identified a 17% increase in private client services and asset management fees that was "primarily due to exceptional growth at the Company's fund of funds manager, Ivy Asset Management." The 10-K also recognized an increase in revenues from Europe reflected "increased revenue from [depositary receipts] and Ivy" and an increase in revenues in Asia was "primarily due to the sale of Wing Hang and higher revenue from Ivy."

g. BONY's 10-K for 2005 noted that a 9% increase in private client services and asset management fees from the previous year was "driven by another strong performance at Ivy and double-digit growth in fixed income asset management and separate account services." The 2005 Form 10-K also noted that the improvement in income before taxes in the Private Bank and BNY Asset Management Segment between 2003 and 2005, from $175 million to $199 million, "is primarily attributable to strong revenue growth at Ivy Asset Management." In addition, an increase in assets under management during that same time period, from $89 million at December 31, 2003 to $105 million at December 31, 2005 was attributed to "growth in Ivy, institutional equity products, and liquid assets as well as a rise in equity market values." Finally, the 2005 Form 10-K also noted that increased revenues in Asia reflected "strength in investor services, execution services and Ivy."

h. BONY's 10-K for 2006 recognized that the increase in income before taxes in the Private Bank and BNY Asset Management Segment of $30 million over the previous year was "primarily attributable to strong revenue growth at Ivy, the acquisitions of Alcentra and Urdang, and higher fee levels in Private Banking."

i. BONY's Form 10-Q, filed on August 8, 2007, noted an increase in performance fees "reflecting organic growth and strong results at our alternative asset

management subsidiaries, Ivy, Alcentra and Urdang." The higher performance fees were also noted as one of the primary reasons for an increase in fees and other revenue during the first six months of 2007.

## G. The Beacon and Jeanneret Defendants' Scheme to Defraud and Their Fraudulent Misrepresentations

252. The Beacon and Jeanneret Defendants' fraud ran parallel to that of Ivy's. It also similarly involved fiduciaries who knew certain facts regarding Madoff that put them on fraud alert but who ultimately chose a disloyal path of concealment and fraudulent misstatements and omissions in furtherance of their own financial interest.

253. Notwithstanding any misrepresentations by Ivy to the Beacon and Jeanneret Defendants, the Beacon and Jeanneret Defendants had independent and affirmative obligations to investigate Madoff, and in light of the facts that they knew and the representations made to them, and the information available to them, the Beacon and Jeanneret Defendants are liable for their own wrongdoing to the Plaintiffs and the members of the Classes.

254. Immediately after the Madoff fraud was disclosed, on or about December 16, 2008, Defendant Paul Perry specifically conceded in an admission against interest to several Trustees of Plaintiffs that he had tried to replicate Madoff's results multiple times but their calculations and analysis *never* supported Madoff's reported results. This fact alone put JPJA on fraud alert given that (a) it was a registered investment adviser and held itself out as an investment professional; and (b) the split-strike strategy was, as explained by Ivy's Director of Client Development, not complex. *See* § E, *supra*. Additionally, JPJA had access to the publicly available information relied upon by Markopolos as well as the other red flags that put several other investment managers on fraud alert. *See* § G.2, *infra*.

255. Throughout the Class Period, the Beacon and Jeanneret Defendants were confronted with additional facts that warranted further investigation or withdrawal of the assets of Plaintiffs and members of the Class from Madoff.

256. From the outset, the Beacon and Jeanneret Defendants either knew, or were reckless in not knowing, that the volume of OEX options trading on the CBOE could not possibly support Madoff's strategy for the amount of assets under his management. *See* § D.1, *supra*.

257. The Beacon and Jeanneret Defendants also had equal and independent access to numerous red flags (*see infra* at § G) that caused other investment managers to avoid investing with Madoff. However, like Ivy, they too were seduced by the fraudulently inflated performance and low volatility that allowed them to earn management fees that were available through Madoff without Madoff purporting to take a cut. Without Madoff's fabricated performance record to sell, these Defendants had nothing comparable to market; dropping Madoff would have been a huge financial setback. As a result, these Defendants continued to expose Plaintiffs and members of the Class to a financial disaster while knowing that such a risk was inevitable, and recklessly disregarded their duties altogether.

258. As Markopolos testified before Congress, because Madoff was only compensated through the commissions he charged from the trades he purportedly executed for his investors, funds-of-funds managers had a strong financial incentive to invest with Madoff:

> [Investment Managers] were paid so much to look the other way. . . . Mr. Madoff was purporting to only be taking commissions from this product. Even though he was a fund manager, who usually would take a one percent management fee and 20 percent of the profits, he was so generous as a human being that he was offering those fees to the feeder funds to lure in new victims.

* * *

> To deliver 12 percent annual return, he needed to be earning a 16 percent gross, because there were four percent in fees. And he was passing the four percent in fees along to the feeder funds and keeping only a smidgen for himself.
>
> And so those feeder funds were incentivized not to ask the questions, to be willfully blind, if you will, and not get too intrusive into the Madoff scheme.

Markopolos Testimony, Feb. 4, 2009.

259. In the Beacon Fund's OMs, the Beacon Defendants made several false and misleading representations concerning the extent to which they had researched and evaluated the purported strategy to be employed in managing the Fund's assets. Had BAMC actually done as represented, it would have known that the numbers Madoff was reporting were impossible. Therefore, it either had no reasonable basis to adopt the strategy espoused in the Beacon Fund OMs, or alternatively and even more damning, like Ivy, it too knew that Madoff's assets under management required astronomical volumes of OEX trading which did not exist. In either case, BAMC was more intent on achieving the inflated management fees available through Madoff than it was in safeguarding the assets of Plaintiffs' and of members of the Class. Similarly, the Jeanneret Defendants either knew, or recklessly disregarded this fact, and, as described herein, placed its financial interests ahead of those of the members of the Jeanneret Subclass.

**1. <u>BAMC and the Beacon Defendants</u>**

260. As discussed above, Ivy introduced the Beacon Defendants to Madoff in the early 1990s and, in 1995, entered into a Consultant Agreement with BAMC, the newly formed corporation that would be the Managing Member of the Beacon Fund, which was established for the express purpose of investing with Madoff. (Consultant Agreement at 1).

261. Pursuant to the Consultant Agreement and subsequent amendments thereto, Ivy's recommendation was the primary basis for BAMC's allocation of its clients' assets to Madoff.

BAMC stood in a fiduciary relationship to Plaintiffs and members of the Class. As such, it was not entitled to blindly rely on Ivy's advice in making investment decisions, while confronted with troubling facts concerning Madoff's operations and Ivy's implausible representations in letters and meetings that should have caused BAMC to investigate further or withdraw the client assets from Madoff entirely.

262. At least as early as January 1999, the Beacon Defendants were on fraud alert. In January of 1999, Ivy sent a letter to Defendant Danziger stating the following:

> **Bernard L. Madoff –** Performance continues to be extremely strong. The account was up by .... As we have stated many times, while we have no reason to believe there is anything improper in the Madoff operation, we continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results. They will not quantify the total amount that they manage, but we estimate it to be at least $5 billion, and likely more. As a result, we recommend a below median allocation.

(NYAG Ivy Action, ¶ 99 quoting January 1999 letter to Danziger) (emphasis supplied by NYAG). Ivy sent another letter containing identical language in July 1999. *Id.* The fact that the Investment Consultant for the Beacon Fund expressed misgivings about the outside manager to whom a significant portion of the Fund's assets were allocated should have provoked a more searching inquiry and investigation by the Beacon Defendants. Second, this fact also made it incumbent on the Beacon Defendants to disclose this material fact to the Beacon Fund's investors. In utter dereliction of their fiduciary duties, the Beacon Defendants chose not to do so.

263. Instead, less than a year later, without having assured itself that Madoff was a legitimate investment manager employing a sound investment strategy, BAMC issued OMs for Beacon Associates LLC and Beacon Associates II LLC dated June 15, 2000 which falsely stated that:

> Both quantitative and qualitative criteria are factored into the continuing evaluation of Managers, including analyses of: type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation, with traditional investment indices.

(Beacon OM 2000 at 2). The truth was that THE BEACON DEFENDANTS did not conduct any such evaluation of Madoff's strategy and, in spite of Ivy's concerns about Madoff and in wanton disregard for the interests of the Plaintiffs and the Class, issued fraudulent OMs that deliberately omitted Ivy's and BAMC's concerns while inducing investors to place assets in the Beacon Fund.

264. The Beacon Defendants continued to turn a blind eye and a deaf ear to evidence that should have put them on fraud alert. In February 2001, Ivy sent another letter to Defendant Danziger which read:

> **Bernard L. Madoff** - During 2000, Madoff returned… These returns, while outperforming the broader markets, are lower than those of previous years. ***Due to our ongoing concerns regarding Madoff's growth in assets under management, Ivy has decided to continue to seek additional managers in order to decrease manager specific risk***.

(NYAG Ivy Action, ¶ 111 quoting Ivy letter dated February 2001) (emphasis supplied).

265. In August of 2001 and 2002, the Beacon Defendants were put on notice of another startling fact which should have prompted a further inquiry by the Beacon Defendants or immediate withdrawal of the Beacon Fund's assets from Madoff. *Id.* at ¶ 112. In Ivy's August 2000 and 2001 letters, Ivy wrote that it was unable "to perform [its] usual and customary due diligence due to limitations set by Madoff." *Id.* Notwithstanding the fact that Ivy misrepresented the reason for its inability to perform due diligence, this fact that Ivy admitted that it was not performing its "customary" due diligence as had been represented to Plaintiffs and the Class in

the 2000 and 2004 Beacon Fund OMs, should have prompted BAMC to immediately disclose this material fact to the Beacon Fund investors and withdraw the assets from Madoff if it could not satisfy itself of the legitimacy of Madoff's operations. Once again, the Beacon Defendants did neither.

266. BAMC received similar letters from Ivy between 2002 and 2004 and chose to conceal the concerns surrounding Madoff from Plaintiff and the Class members while continuing to invest assets with Madoff and BMIS, and, in August of 2004, issued another fraudulent Beacon OM. (*See* NYAG Ivy Action, ¶¶ 120-121).

267. In 2006, BAMC and Ivy entered into a new Consultant Agreement, the 2006 CA, which expressly excluded Madoff from Ivy's scope of due diligence. The 2006 CA was not disclosed to the Class. The 2006 CA states that BAMC "expressly requested that IVY not monitor or evaluate or meet with any representatives of Madoff including Bernard L. Madoff." This is a brazen breach of BAMC's obligations to the Beacon Fund's investors, as BAMC conducted no diligence nor did it have the capacity to do so. However, considering the fact that Ivy had, at least as early as August 2001, ceased performing due diligence on Madoff and had notified the Beacon Defendants of same, this term in the 2006 CA is indicative of the collusive nature of BAMC's and Ivy's scheme; it was drafted for the sole purpose of creating a paper trail that Ivy could attempt to use to exculpate itself in the event of potential litigation (which Ivy anticipated was coming). In any case, the 2006 CA was yet another step in furtherance of BAMC's scheme to defraud the Beacon Fund's investors.

268. On October 20, 2008, six weeks before Madoff turned himself in to the authorities, the Beacon Defendants disseminated another fraudulent letter that induced Plaintiffs and Class members to remain invested in the Beacon Fund. This letter enclosed an unaudited

statement of each member's capital account as of October 1, 2008 and represented that the Beacon Fund was "approximately 75% in U.S. Treasury securities for most of September, thereby largely insulating [the Fund] from the chaotic market losses over the past month." (Beacon Letter to Investors dated October 20, 2008). Had the Beacon Defendants, in observance of their fiduciary duties, attempted to perform a routine third-party verification as to the existence of the Treasury securities, BAMC would have discovered that no such Treasuries were being held in the Beacon Fund's accounts. Nonetheless, BAMC disseminated this fraudulent letter without having a reasonable basis to believe that such assets existed and without disclosing the material facts discussed herein.

**2. JPJA**

269. At all relevant times JPJA served as Plaintiffs' Investment Manager and did so for other similarly situated Jeanneret Subclass members.

270. In the late 1980's, Defendant J.P. Jeanneret met Defendant Lawrence Simon of Ivy in a restaurant in upstate New York. At that time Simon and J.P. Jeanneret began discussing placement of clients' assets with Madoff's investment management services.

271. Defendant Simon, the former President and CEO of Ivy Asset Management introduced Defendant JPJA in 1989 to Madoff.

272. By that time, Defendant J.P. Jeanneret had established JPJA and was providing investment management services to, *inter alia*, Taft-Hartley clients such as members of the Jeanneret ERISA Subclass, *i.e.*, employee benefit plan clients.

**a. The JPJA-Ivy Agreement**

273. On May 15, 1991, JPJA and Ivy entered into an investment consulting agreement ("Ivy-JPJA Agreement"). Like the Consultant Agreement with BAMC, Ivy was entitled to 50%

of the fees collected by JPJA from clients it placed in the Beacon Fund. Ivy-JPJA Agreement at 5. JPJA and Ivy agreed to the following terms:

- Ivy agreed to make available to JPJA, its "sources of information and contacts with investment managers" (*i.e.* Madoff).
- JPJA agreed to provide Ivy with a list of its clients whose assets would be placed with investment managers recommended by Ivy. JPJA agreed to update this list periodically and Ivy agreed to keep the list confidential. JPJA also agreed to provide Ivy with copies of the investment management agreements that JPJA executed with its clients.
- Ivy agreed to (a) research, identify, monitor, evaluate and meet with potential investment managers; (b) recommend investment managers to JPJA; (c) advise JPJA as to the availability of opportunities to invest Client funds with particular investment managers; (d) monitor, evaluate and meet with investment managers that are managing Client funds invested through JPJA; (e) assess the performance of investment managers managing Client funds invested through JPJA and make periodic recommendations with respect to such performance; (f) maintain such records as are mutually deemed appropriate by Ivy and JPJA relating to the recommendation, retention, performance and services of investment managers recommended to Ivy and selected by JPJA to manage the Client funds invested through JPJA; and (g) provide JPJA with such documentation as it reasonably requires with respect to investments of Client funds with investment managers such that JPJA may maintain compliance with the record-keeping requirements of the Advisers Act.
- As compensation for its services, Ivy received 50% of management fees collected by JPJA in connection with the funds invested with investment managers introduced to JPJA by Ivy.
- JPJA agreed to maintain at least two clients who invest with investment managers introduced to them by Ivy, and a minimum total investment of $4,000,000.
- Ivy agreed to use reasonable care in providing its services but disclaimed liability to JPJA for acts and omissions by any investment manager that it recommended, and any matter arising out of or in connection with the agreement, except for matters arising out of Ivy's gross negligence or willful misconduct.

1991 Ivy Agreement, at pp. 1-3.

274. Pursuant to the 1991 CA and subsequent amendments thereto, Ivy's recommendation was the primary basis for JPJA's allocation of its clients' assets to Madoff. JPJA stood in a fiduciary relationship to Plaintiffs and members of the Jeanneret Subclass. As such, it was not entitled to blindly rely on Ivy's advice in making investment decisions, while confronted with troubling facts concerning Madoff's operations and Ivy's implausible representations in letters and meetings that should have caused JPJA to investigate further or withdraw the client assets from Madoff entirely.

275. Nonetheless, using Ivy's connection to Madoff, JPJA developed a client portfolio consisting primarily (if not exclusively) of upstate New York pension and welfare funds and amassed assets under management of over $1 billion. All the while, the Jeanneret Defendants either knew that Madoff was likely engaged in a fraudulent scheme or, in reckless disregard for their duties as a fiduciary, failed to act when confronted with numerous signals that alerted JPJA to the very real likelihood that Madoff's operations was illegitimate.

276. By virtue of its fee sharing provision with JPJA, and a similar fee sharing provision with BAMC (described *supra* in § C.1), Ivy was apparently collecting investment advisor fees twice for essentially the same underlying investments by Jeanneret Subclass members; first, a fee based on the amount of assets Ivy managed for clients of JPJA and, second, a fee based on its consulting services provided to the Beacon Fund.

**b. <u>JPJA's Investment Management Agreements</u>**

277. Defendant JPJA, through the means of, *inter alia*, the DIMAs executed with the various union pension funds, repeatedly misrepresented its investment strategy to investors. Under the DIMAs between JPJA and various members of the Jeanneret ERISA Subclass, JPJA's duties are defined as follows:

> **[JPJA is] the [Local 73 Retirement] Board's attorney-in-fact** to invest and reinvest any and all assets deposited with [the Beacon Fund] for investment by the Investment Manager [JPJA], as fully as the [Local 73] Board itself could do.
>
> The Investment Manager hereby accepts this appointment, hereby acknowledges that it is a fiduciary with respect to the Fund Investment Account Assets, certifies that it is an "Investment Manager" as defined in ERISA Section 3(38), and agrees to supervise and direct the investment of the assets of the Fund in accordance with […] the written investment policy adopted by the Board (hereinafter the "Investment Guidelines" …
>
> Subject to the attached Investment Guidelines, the Investment Manager may, in its full discretion and without obligation on its part to give prior notice to the Board, (a) buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities, and (b) establish and execute security transactions, through accounts with such brokers or dealers as the Investment Manager may select, except to the extent otherwise directed by the Board; provided however, **that all such activities shall be conducted in a manner consistent with the Investment Guidelines and the Investment Manager's obligations hereunder, the requirements of ERISA and any other applicable local, state or federal laws, rules or regulations**.

September 17, 1999 DIMA between Local 73 Retirement Fund and JPJA, hereinafter the "1999 DIMA", at 1 (emphasis added). Therefore, by the terms of its contract with Local 73, JPJA was an ERISA fiduciary. Upon information and belief, other members of the Jeanneret ERISA Subclass also retained JPJA under substantially similar DIMAs, establishing fiduciary relationships with JPJA.

278. The "Investment Guidelines" referred to in the DIMA incorporated by reference, the Beacon II OM and authorized JPJA to effectuate allocation of the Local 73 Retirement Fund's assets to the Beacon Fund. However, this authorization was subject to the following language in the 1999 DIMA:

> [JPJA] shall perform its duties [. . .] with the care, skill, prudence, and diligence, under the circumstances then prevailing, [. . .] and shall diversify the Investment Account assets so as to avoid the risk of losses . . .

(*See* 1999 DIMA at 4).

279. The Jeanneret Defendants lulled would-be investors into a false sense of security by engendering the false impression that (i) JPJA had a factual basis for its representations with respect to the hedging strategy employed by Madoff and, (ii) that indeed, JPJA itself exercised control over the portfolio's level of risk exposure. JPJA made the following representations regarding its investment philosophy:

> This is a basic hedged equity portfolio strategy. Stocks are purchased based upon significant weighting in the S&P 100 Stock Index. This causes our portfolio of stocks to increase and decrease in a fashion almost identical to the Index. The portfolio is maintained at a 90% or greater correlation to the S&P 100 Stock Index at all times. The portfolio is hedged by purchase of S&P 100 Index puts approximately 1% under the then current Index level. This portfolio put protection is effective <u>at all times</u>. In addition, index calls are sold against the portfolio, which are fully covered, approximately 2% above the existing Index level. This allows for approximately 1.50% per month (18% annualized) upside potential for the equity portfolio while simultaneously providing excellent downside protection. The result has been returns significantly in excess of the S&P Index, with much less volatility.
>
> * * * * *
>
> We control risk by maintaining put protection on the portfolio at all times. These put assets increase significantly in value if the S&P index declines, thus lessening downside risk of the stock portfolio. We have developed risk measurements and adhere to those measurements . . .

(Response to Request for Proposal from Local 267 dated August 29, 1995, at 2) (Emphasis in original.) Substantially similar representations were made to other Jeanneret Subclass members.

280. Because JPJA's investment decisions vis-à-vis Plaintiffs' and other Class Members' assets were largely, as a practical matter, based on Ivy's investment recommendations pursuant to its consulting agreement with JPJA, Ivy stood in a fiduciary relationship with Plaintiffs and Jeanneret Subclass members.

281. In fact, JPJA exposed Plaintiffs and members of the Jeanneret Subclass to Beacon upon Larry Simon's suggestion, after Madoff stopped accepting additional investments from the Income Plus Fund (another Madoff feeder-fund managed by JPJA) sometime in 1999. (NYAG Ivy Action, ¶ 101). However, by this time, The Jeanneret Defendants already had knowledge of Ivy's concerns regarding Madoff's legitimacy but nevertheless persisted in their own fraudulent scheme.

282. An early signal from Ivy that Ivy had serious suspicions about Madoff (albeit a muted one in light of what Ivy actually knew) came in 1997. On August 8, 1997, Ivy sent JPJA a letter regarding the allocation of the Income Plus Fund's assets in which Ivy stated the following: "As you know, **we have not been able to assure ourselves as to how Bernie is able to successfully trade as much money as we believe he manages** . . .." Ivy Letter to JPJA dated August 8, 1997 (emphasis supplied). Because Ivy's recommendation was the primary basis for JPJA's selection of Madoff as an outside manager, this letter should have caused The Jeanneret Defendants to question why its sub-advisor was questioning Madoff's strategy. Its duties as a fiduciary compelled it to seek independent verification of Madoff's strategy and where such verification was unobtainable, it should have acted to safeguard the assets of Plaintiffs and members of the Jeanneret Subclass from Madoff.

283. In disregard of their duties, the Jeanneret Defendants failed to disclose to Plaintiffs and members of the Class that Ivy was unable "to assure [itself]" as to how Madoff was achieving his reported returns, instead choosing to advance its own pecuniary interests.

284. In addition to the management fees that JPJA shared with Ivy, its consulting agreements with Ivy contained provisions that created unseemly incentives for JPJA to abandon its fiduciary duties in the interest of sustaining their lucrative fee arrangements.

285. Pursuant to Ivy's agreement with JPJA, JPJA also had the incentive to maintain a loyal contingent of clients invested with Madoff because if the number of JPJA clients invested with Ivy-recommended managers dropped below two, Ivy would be entitled to receive 60% of the investment management fees as opposed to 50%. Agreeing to this incentive itself constituted a conscious breach of the fiduciary duty of loyalty by JPJA. This provision elevates JPJA's self-interest at the expense of its duties of candor, loyalty, due diligence and prudence that, if observed, would have avoided the massive losses suffered by members of the Jeanneret Subclass.

286. Because of these incentives, the Jeanneret Defendants willfully ignored what the numerous red flags surrounding Madoff's operations portended and instead, substituted for its own due diligence, a sheepish reliance on Ivy's false reassurances.

287. On December 30, 1998, JPJA attended a meeting with Ivy's Larry Simon and Wohl. *See* § E, *supra*. At this meeting, Simon and Wohl concealed many of the facts that gave rise to Ivy's serious concerns regarding Madoff. However, Ivy also discussed certain red flags that should have provoked a more searching inquiry by JPJA given its fiduciary role vis-à-vis Plaintiffs and members of the Jeanneret Subclass. Specifically, Simon discussed the fact that no

one had been able to replicate Madoff's results,[9] the fact that Madoff had custody of the securities, and the fact that his accountant was a small unknown firm which made assessing Madoff's risk difficult. NYAG Ivy Action, ¶ 84. The Jeanneret Defendants never disclosed these concerns to Plaintiffs and members of the Jeanneret Subclass.

288. However, JPJA's contemporaneous notes from the December 30, 1998 meeting reflect a fiduciary whose skepticism was compromised. NYAG Ivy Action, ¶ 87. JPJA noted that Ivy's due diligence "shows no problem for Madoff" and that "Madoff accountant is ok but small." *Id.* Seemingly relying entirely on this and other reassurances by Ivy, the Jeanneret Defendants were content in collecting management and incentive fees while failing to disclose the risks posed by Madoff and failing to pursue any measures that independently allayed any concerns aroused by the red flags surrounding Madoff.

289. By a letter dated January 12, 1999 and sent to, among others, JPJA, Ivy again signaled its discomfort with Madoff. The letter read in relevant part:

> I'd like to take this opportunity to clarify and expand on some points regarding Bernard L. Madoff's strategies. Over a period of more than 11 years, Ivy has considered, reviewed, analyzed and performed due diligence regarding the Madoff firm and the strategies employed. We have no reason to believe that the Madoff account is anything other than what Ivy's experience has shown and what the record demonstrates it to be. In response to a question from [a pension fund Trustee] we noted that, due to a lack of external corroborative evidence, **we cannot 'close the loop' in a manner that gives us total comfort.** This is due to aspects of this investment manager's operations and Ivy's philosophy which include:
>
> - There is no separate custodian function for the securities that Madoff buys and sells.
>
> - Ivy's philosophy for the lasts fifteen years has been and continues to be that we recommend limiting investments

[9] Simon also admitted his own inability to replicate Madoff's results directly to Confidential Witness # 2 during investment discussions.

> (generally between 8 and 15%, depending on circumstances) to any manager in Ivy's roster of alternative investment managers. We acknowledge that a number of our advisory clientele have chosen to ignore Ivy's recommendations regarding concentration limits.

Ivy Letter dated January 12, 1999 (emphasis added). Ivy also sent JPJA two additional letters in January and July of 1999 conveying substantially the same discomfort alluded to in the above-quoted letter. *See* § E, *supra*. Faced with these obtuse messages concerning Ivy's inability to "close the loop," the Jeanneret Defendants should have pressed Ivy for a more detailed explanation and determined, through Ivy and independently, what exactly made Ivy uncomfortable until it was able to unearth a satisfactory answer. These red flags were consistent with the Jeanneret Defendants' own failed efforts to replicate and verify Madoff's results. If there was no satisfactory answer, the Jeanneret Defendants' fiduciary duties compelled them to withdraw and safeguard the assets of Plaintiffs and of the members of the Jeanneret Subclass from Madoff.

290. Moreover, in light of Ivy's repeated statements that it was unable to understand Madoff's strategy, the Jeanneret, Beacon and Ivy Defendants had an affirmative duty to disclose this fact to Plaintiffs and members of the Class. Especially given that Ivy's recommendation formed the primary basis for JPJA's Madoff allocations, the fact that JPJA omitted to disclose that the recommendation was not unqualified further compounded the deceit being exacted on Plaintiffs and the Jeanneret Subclass by Ivy and the Jeanneret Defendants

291. Then in a meeting on April 4, 2000 with Ivy, JPJA came to know an additional fact which was inconsistent with what Ivy had represented to be its investment philosophy. Ivy's notes of the meeting read:

> In addition, John [*i.e.* J.P. Jeanneret] asked, "is he [Madoff] essentially legitimate?" [Ivy's Director of Research] responded, "essentially legitimate" and went on to say that

> we had not been able to full close the loop on him and therefore Madoff is limited to no more than 4% in the Ivy funds.

*Id.* That JPJA felt the need to inquire about Madoff's legitimacy bespeaks JPJA's and Jeanneret's state of mind that JPJA was, in 2000 dubious of Madoff's integrity. But while JPJA was seemingly more interested in hearing from Ivy that Madoff was legitimate so that it could continue to invest with Madoff, Ivy tipped its hand in revealing that it limited Madoff allocations to no more than 4% of its Proprietary Funds. This was inconsistent with Ivy's previous representation in its January 12, 1999 letter (*supra* at § E), that it limited investments to between 8% and 15% for any single manager. Neither JPJA nor Ivy disclosed to Plaintiffs or members of the Jeanneret Subclass the special limitation that Ivy imposed on its Proprietary Fund allocations to Madoff.

292. Following Ivy's acquisition by BONY in 2000 and before Ivy purported to absolve itself of all Madoff-related duties in its secret 2007 CA with JPJA, Ivy sent JPJA another letter in which it conceded that it was unable to perform due diligence on Madoff (although it lied about exactly why this was this case). *See* § E, *supra*. In a letter dated August 3, 2001, Ivy wrote:

> **<u>Bernard L. Madoff</u>**—Year-to-date, through June 30, 2001, Madoff returned 7.1%. We take this opportunity to state our long-held concerns about the continued ability of this manager to produce consistent returns on what must be an enormous amount of capital under management, **and to note our inability to perform due diligence due to limitations set by Madoff.** For these reasons, we recommend harvesting profits or otherwise trimming allocations to this manager.

Ivy Letter dated August 3, 2001 to JPJA (emphasis added). Rather than seek out answers or disclose material facts to Plaintiffs and members of each Class, such as Ivy's internal Madoff threshold and its inability to conduct due diligence on Madoff, the Jeanneret Defendants were

content in reporting on the consistent and positive performance of Madoff's strategy. In fact, Defendants Jeanneret and Perry of JPJA and Defendant Larry Simon made frequent representations to Plaintiffs and the Class regarding the consistent positive performance of Madoff's strategy and that it was less risky with higher returns. (*See, e.g.*, Local 267 Pension Fund Board of Trustees' Meeting Minutes dated Aug. 12, 1999, at 3). In addition, the financial records that were produced by Ivy as a result of its monitoring and recordkeeping duties as the Investment Consultant of the Beacon Fund, and that formed the basis of performance reports disseminated to Plaintiffs and members of each Class contained material misrepresentations and omissions, including the fact that despite numerous attempts to replicate Madoff's results, JPJA could not do so. *See, e.g.,* Local 73 Retirement Fund Beacon Associates LLC Performance Report dated June 30, 2003. In reality, the Jeanneret Defendants and Ivy had no reasonable basis to believe that Madoff's investment strategy was capable of such results. Ivy also prepared and disseminated on its stationary false and misleading performance reports at relevant times concerning the purported performance of the Fund, which falsely reported returns of the Fund to the Fund's investors. For example, a performance report as of December 31, 2002 purports to show the Fund's monthly and year-end gross and net return for calendar year 2002, which was false and misleading because it was based in large part on Madoff's fictitious returns. Similarly, November 30, 2007 and December 31, 2007 reports purport to show results for each month in 2007 and year to date compounded gross and net returns. These returns were also false and misleading because they were based in large part on Madoff's fictitious returns.

293. In addition to the incomplete and muted signals that Ivy communicated (but which the Jeanneret Defendants either willfully disregarded or recklessly failed to act on), JPJA had repeated forewarnings from the notes to the audited financial statements of the Beacon Fund

that Defendant Friedberg produced in its capacity as the Fund's auditor. Although Friedberg invariably issued unqualified audit opinions, in its Notes to Financial Statements, Friedberg disclosed a fact that should have put both BAMC and JPJA on fraud alert. Note 5 to the December 31, 2004 financials of Beacon Associates LLC I reads in relevant part:

> All investments are in private investment funds located in the United States of America. ***The Company is not able to obtain the specific investments at some of the underlying private investment funds due to lack of available data***.

(December 31, 2004 Independent Auditor's Report of Beacon Associates LLC I, Note 5 to Financial Statements). *See also* December 31, 2003 Independent Auditor's Report of Beacon Associates LLC, Note 5 to Financial Statements; December 31, 2005 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements; December 31, 2007 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements.

294. The Beacon and Jeanneret Defendants knew or should have known that Defendant Friedberg could not obtain the requisite evidentiary support to issue unqualified audit opinions. Despite this knowledge, BAMC allowed Friedberg to issue these unqualified and misleading reports to Plaintiffs and members of the Class, notwithstanding their awareness of the fact that sufficient evidential basis to support such unqualified opinions simply could not be obtained. JPJA also knew or should have known of the lack of information about specific investments appended to the audited financials of the Income Plus Fund. *See, e.g.*, December 31, 2003 Report of Margolin, Winer & Evens LLP Audited Financials of the Income Plus Fund, Note 6 ("The Fund is not able to obtain the specific investments at some of the underlying private investment funds due to lack of available data"). These notes could have only been speaking of investments with Madoff because such investments did not exist.

295. Defendant Friedberg's disclaimer in its annual audits that it was unable to obtain data concerning underlying investments, taken together with Ivy's letters expressing its discomfort with Madoff and JPJA's own inability to replicate Madoff's results, and the red flags described herein, either placed the Beacon and Jeanneret Defendants on fraud alert (which would explain their desire to repeatedly accept Ivy's representations regarding Madoff), or the Beacon and Jeanneret Defendants were reckless in ignoring facts that a reasonable and prudent fiduciary would have immediately considered to be significant, actionable and worthy of further investigation.

## H. Facts Bearing on Defendants' Fiduciary Status

296. ERISA treats as fiduciaries not only persons explicitly named as plan fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such Plan **or exercises any authority or control respecting management or disposition of its assets**, **(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such Plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such Plan."** ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). (emphasis added).

297. The Department of Labor promulgated a regulation defining when a person is deemed to be rendering "investment advice for a fee" within the meaning of ERISA § 3(21)(A) as follows:

> (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and

> (ii) Such person either directly **or indirectly** (e.g. through or together with any affiliate)—
>
> (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
>
> (B) Renders any advice described in [(i), above] on a regular basis to the plan pursuant to a mutual, agreement arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 CFR § 2510.3-21 (emphasis added). Subsequently, the Department of Labor interpreted its regulation to include advice with respect to the selection and monitoring of investment managers or funds as investment advice that could be advice conferring fiduciary status subject to the regulation. *See* A.O. 84-04 A, 1984 ERISA LEXIS 45 (Jan. 4, 1984) (entity whose services are described as providing advice involving the evaluation of investment managers and the allocation of assets among existing managers treated as investment advice). Recently the DOL reiterated its position in the preamble to a regulation implementing certain provisions of the Pension Protection Act. In the preamble the DOL explained that "[i]t has long been the view of the Department that the act of making individualized recommendations of particular investment managers to plan fiduciaries may constitute the provision of investment advice within the meaning of section 3(21)(A)." 74 FR 3822, 3824 (Jan. 21, 2009).

298. DOL has similarly clarified in an Interpretive Bulletin that advice to persons exercising control over the disposition of plan assets would be considered advice "to the plan" within the meaning of the regulation. *See* 29 CFR 2509.96-1.

299. ERISA § 3(38), 29 U.S.C. § 1002(38), defines an investment manager as a fiduciary, as follows:

> The term "investment manager" means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) –
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.]; (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a(a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary; (iii) is a bank, as defined in that Act; or (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and
>
> (C) has acknowledged in writing that he is a fiduciary with respect to the plan.

**1. <u>Jeanneret Defendants' Fiduciary Status</u>**

300. At some or all relevant times, the Jeanneret Defendants served as fiduciaries of various Plans named as plaintiffs in the Complaint ("Named Plans") within the meaning of ERISA.

301. All of the Named Plans and the other Plans whose participants and fiduciaries are members of the Jeanneret Subclass entered into DIMAs with JPJA. In those agreements, JPJA certified that it was an "investment manager" as that term is defined in ERISA § 3(38) and that it would perform its duties as an investment manager "with the care, skill, prudence, and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims, and shall diversify the Investment Account Assets so as to minimize the risk of large losses . . . ." JPJA exercised the authority conferred on JPJA by these DIMAs with the Plans whose participants are members of the Jeanneret ERISA Subclass by causing those Plans to invest in the Beacon Fund, and through the Beacon Fund with Madoff and BMIS. By reason of the foregoing, JPJA is a fiduciary under ERISA § 3(21)(A).

302. The Individual Jeanneret Defendants also qualify as fiduciaries under ERISA § 3(21)(A). Dr. Jeanneret, as founder, chief executive officer, and majority shareholder of JPJA, and Defendant Perry, as Director, Vice President, and minority shareholder, personally controlled and dominated JPJA. Defendants Dr. Jeanneret and Perry provided investment management and investment advice to the Plans and effectively exercised authority and control over the management and disposition of the Plans' assets. For example:

a. The website for JPJA stated that Defendants Dr. Jeanneret and Perry served as investment managers, and that they were directly responsible for investment management and consulting services.

b. Defendants Dr. Jeanneret and Perry corresponded with the Plans regarding investments in the Beacon Fund, attended meetings of the Boards of Trustees of the Plans that invested in the Beacon Fund, and signed key documents related to JPJA's status as an investment manager, including Discretionary Investment Management Agreements, fee agreements for investment management services, and investment guidelines.

c. The Form ADV, Part II documents that JPJA filed with the Securities and Exchange Commission stated that Defendants Dr. Jeanneret and Perry were the "two individuals responsible for investment management and for giving investment advice."

303. By reason of the foregoing, at all relevant times, Defendants Dr. Jeanneret and Paul Perry were fiduciaries of each of the Plans within the meaning of ERISA.

**2. <u>Beacon Defendants' Fiduciary Status</u>**

304. At some or all relevant times, the Beacon Defendants served as fiduciaries within the meaning of ERISA with respect to each of the Plans whose participants are members of the ERISA Class; each of these Plans invested in the Beacon Fund. Participation in the Beacon Fund was offered primarily through Offering Memoranda that were virtually identical to one another and represented that, Defendant BAMC, in consultation with Defendant Ivy, made all investment allocation and reallocation decisions on behalf of the Beacon Fund.

305. Because BAMC was assigned authority or control over the management and disposition of the ERISA covered employee benefit plan assets held by the Beacon Fund by the documents and instruments governing those entities, including those assets which were in turn entrusted by the Beacon Fund to the discretion and control of Madoff, BAMC has at all relevant times been a fiduciary with respect to the ERISA covered plan investors in the Beacon Fund within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

306. Defendants Joel Danziger and Harris Markhoff own (beneficially and of record) 100% of the issued and outstanding voting shares of the BAMC (constituting 1% of the outstanding stock of the Beacon Fund). All of the non-voting common stock of BAMC (consisting of 99% of the total outstanding stock) is held by the immediate families of defendants Danziger and Markhoff. As set forth below, the Individual Beacon Defendants also qualify as fiduciaries under ERISA § 3(21)(A)(i).

307. Joel Danziger, as the President and a Director of BAMC, personally controlled and dominated BAMC. By virtue of the control he exercised over the management and

disposition of ERISA covered employee benefit plan assets invested in the Beacon Fund, has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Beacon Fund, and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

308. Harris Markhoff, as the Vice President, Secretary, Treasurer and a Director of BAMC, personally controlled and dominated BAMC. By virtue of the control he exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Beacon Fund, Markhoff has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Beacon Fund, and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

**3. <u>Ivy and BONY Defendants' Fiduciary Status</u>**

309. On information and belief, at some or all relevant times, Ivy offered three core services. First, Ivy managed funds of funds, which Ivy marketed to qualified investors in the form of limited partnerships. These funds of funds, which Ivy referred to as proprietary funds of funds ("Proprietary Funds"), included investments from Ivy, Ivy's principals, and certain qualified investors. Second, Ivy managed the assets of high-net-worth individuals and institutional clients ("managed account clients"). For each of these clients, Ivy created individual funds of funds, and Ivy had discretion over manager selection, manager termination, and asset allocation for these accounts. Third, Ivy rendered investment advice to other investment advisers and asset managers ("advisory clients").

310. In the case of the Jeanneret and Beacon Defendants, Ivy's advisory services were key to the investment decisions these Defendants made regarding the Plan assets that are the subject of this litigation because of the reliance these defendants placed on the advice, honesty

and candor of Ivy. By providing misleading information and advice to these fiduciaries, and omitting relevant information learned in the course of Ivy's attempts at due diligence, Ivy exercised authority and control over the management or disposition of plan assets and likewise caused Ivy to obtain discretionary authority or control not pursuant to agreement, arrangement or understanding with respect to purchasing or selling securities or other property with these plan assets within the meaning of 29 CFR § 2510.3-21 defining the provision of investment advice for a fee. The means by which Ivy exercised the aforementioned authority or control are detailed below.

311. At some or all relevant periods, all the Individual Ivy Defendants discussed above in paragraphs were fiduciaries of the Plans in the Jeanneret Subclass and the ERISA class within the meaning of ERISA because they determined the investment advice to be given by Defendant Ivy, and exercised de facto authority and control over Plan assets.

312. Specifically, as discussed *supra,* in 1998, Larry Simon was Ivy's CEO and President, Howard Wohl was Ivy's Vice President and Chief Investment Officer, and Fred Sloan was Ivy's Chief of Investment Management. Defendants Simon, Wohl, Sloan and other Ivy Defendants, learned a series of material and disturbing facts about Madoff and his operations between 1997 and 1998 that supported their determination that investor money should not be invested with Madoff. For example, Simon, Wohl, and Sloan knew knew that Madoff lied to Ivy on numerous occasions about how and where he traded OEX options. Madoff's numerous lies were in response to direct questions from Simon, Wohl and Sloan about Madoff's OEX option trading, given Ivy's determination that there were insufficient OEX options in the marketplace to support Madoff's purported trading split-strike conversion strategy. See § D.1.

313. By December 16, 1998, the facts Ivy knew about Madoff led Ivy to determine that investor money should not be placed with Madoff. Nonetheless, Ivy kept a small portion of its proprietary funds invested with Madoff until 2000 to give the false impression that Ivy continued to have confidence in Madoff. When Ivy finally dropped Madoff from its proprietary funds in or about 2000, Ivy misrepresented that Madoff had been dropped at Madoff's request, rather than as a result of Ivy' misgivings about Madoff's honesty and suitability.

314. Despite the knowledge of the truth, Simon, Wohl, Sloan, Geiger and on information and belief, the other Ivy Defendants consciously hid the truth from BAMC and JPJA and misled them about Madoff because they were unwilling to give up the management fees they would lose if BAMC and JPJA were told the truth about Madoff's fraudulent operations, and shared that information with the Plaintiffs and members of the Classes.

315. The purposes of several committees at Ivy, and the responsibilities of various individuals, illustrate the fiduciary nature of both the Ivy Individual Defendants' and Ivy Committee Defendants' responsibilities. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Ivy's Manager Approval Committee, at some or all relevant times, approved all new investment managers. On information and belief, at some or all relevant times, Defendants Joseph Burns, Alan Chuang, Sean Cumiskey, Stuart Davies, Adam Geiger, Robert Meschi, Mark Santero, Lawrence Simon, Sean Simon, Howard Wohl, and Gregory van Inwegen served on the Manager Approval Committee. By controlling the advice provided by Ivy to JPJA and BAMC and by providing advice indirectly through Ivy, these members of the Manager Approval Committee served as fiduciaries to the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised authority or control respecting management or disposition of the Plans' assets, and/or

rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the Manager Approval Committee and its members were fiduciaries of each of the Plans as alleged below.

316. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, Ivy's Investment Committee, at some or all relevant times, approved all new investment managers, reviewed the risk profile of approved managers, removed managers from the approved list, and set investment parameters for Ivy's portfolios, among other things. On information and belief, at some or all relevant times, Defendants Joseph Burns, Alan Chuang, Sean Cumiskey, Stuart Davies, Farzine Hachemian, Robert Meschi, Peter Noris, and Gregory van Inwegen served on the Investment Committee. Additionally, at some or all relevant times, Defendant Sean Simon served as a non-voting advisory member of the Investment Committee, who had veto power over the committee's decisions in circumstances where they deemed necessary. As explained in more detail below, .by controlling the advice provided by Ivy to JPJA and BAMC and by providing advice indirectly through Ivy at some or all relevant times, these members of the Ivy Investment Committee members served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the the members of the Ivy Investment Committee were fiduciaries of each of the Plans as alleged below.

317. On information and belief, based on Defendant Ivy's Part II, Form ADV filings with the Securities and Exchange Commission, at some or all relevant times Defendant Ivy Strategic Operating Committee managed the business operations of Defendant Ivy and was

responsible for entering into investment advisory agreements, establishing investment advisory fees, and selecting investment managers. On information and belief, at some or all relevant times, Defendants Adam Geiger and Sean Simon served on the Strategic Operating Committee. By controlling the advice provided by Ivy to JPJA and BAMC and by providing advice indirectly through Ivy, at some or all relevant times, these members of the Ivy Strategic Operating Committee served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, the Ivy Strategic Operating Committee and its members were fiduciaries of each of the Plans as alleged below.

318. By reason of their memberships on one or more of the Ivy Committees, and/or by their actions outside of such committees, at some or all relevant times, by controlling the investment advice provided by Ivy to JPJA and BAMC and by providing investment advice through Ivy all of the Individual Ivy Defendants were fiduciaries of the Plans within the meaning of ERISA because they determined the investment advice to be given by Defendant Ivy, and thereby exercised de facto authority and control over Plan assets and/or received compensation in exchange for providing investment advice.

319. As further discussed below, at all relevant times, Ivy was a fiduciary of each of the Plans within the meaning of ERISA.

**a. <u>Ivy controlled JPJA's and BAMC's access to Madoff</u>**

320. The Jeanneret Defendants used Ivy's services to identify alternative investment managers and strategies that were not typically known or available to the general investing public and to gain access to investment managers that were available through Ivy's network. In

that regard, Plaintiffs are informed and believe that Ivy and the Ivy Defendants then employed by Ivy introduced JPJA, BAMC to Madoff and helped them gain access to Madoff and his purported "split-strike conversion" strategy in or about 1990 with respect to JPJA and 1995 with respect to BAMC.

321. On information and belief, the access to Madoff's services as an investment manager granted to JPJA and BAMC was at all relevant times entirely subject to the authority and control of Ivy; in fact, based on its control of access to Madoff, Ivy used the fiduciary authority of BAMC and JPJA as an instrument to market Madoff's investment management services to the Plans whose participants belong to the ERISA Class as well as the Jeanneret Subclass. In reality, the Beacon and Jeanneret Defendants were entirely reliant on Ivy not only for access to Madoff, but for the selection of and access to hedge fund and unregulated managers not available to the general public.

322. By controlling JPJA's and BAMC's access to Madoff and serving as the only qualified source of advice and information on Madoff's operations, Ivy was able to selectively provide misleading information about Madoff without contradiction from other advisors to JPJA, BAMC in order to create the false impression that Madoff was not a fraud. In general terms:

a. Ivy represented to BAMC and JPJA that it had no reason to believe there was anything improper in Madoff's operations when, in fact, they had reason to believe the contrary as set forth below.

b. When Madoff was unwilling to accept additional assets for management from the Income Plus Fund, an investment fund managed by JPJA and comprised entirely of ERISA plan assets, it was Ivy who proposed to JPJA that they could continue to access Madoff by purchasing shares in the Beacon Fund on behalf of their ERISA plan clients thereby earning

Ivy a fee from BAMC as well as, on information and belief, from JPJA. By these means, Ivy effectively controlled the decision by JPJA to invest Plan assets in Beacon, knowing that it was a conduit to Madoff.

c. Likewise, Ivy effectively controlled the decision by BAMC to entrust the plan assets held by the Beacon Fund to Madoff, serving as the Beacon Fund's sole source of access to Madoff and acting as the moving force behind the creation of the Beacon Fund for the purpose of funneling assets to Madoff.

d. Ivy was paid by both JPJA and BAMC with management fees obtained from ERISA covered plans to provide access to Madoff.

**b. JPJA and BAMC relied on misleading advice from Ivy in deciding to <u>invest with Madoff</u>**

323. By providing misleading information and advice to these fiduciaries, and omitting relevant information learned in the course of Ivy's attempts at due diligence Ivy exercised authority or control over the disposition of Plan assets with in the meaning of ERISA § 3(21)(A)(i) of those Plans whose participants are members of the ERISA Class and Jeanneret Subclass and obtained discretionary authority or control not pursuant to agreement, arrangement or understanding with respect to purchasing or selling securities or other property with these plan assets within the meaning of 29 CFR § 2510.3-21(c)(1)(i) and (ii)(A) defining, in part, the provision of investment advice for a fee.

324. Specifically, Ivy provided misleading information and advice to both the Beacon and Jeanneret Defendants on which they relied indicating that Ivy believed that Madoff was a legitimate and trustworthy manager.

325. For example, the day after Madoff told Ivy his third lie about his option trades (December 16, 1998), Wohl sent an email to Simon recommending that Ivy withdraw all of the

funds they personally managed from Madoff, including some of their own money, writing: "I'm concerned that he [Madoff] now admits that he does not execute all of the index options on the exchange that there are 'unknown' counterparties that if these options are not paid off he'd lose less than 100%. It remains a matter of faith based on great performance - this doesn't justify any investment, let alone 3%." Simon did not disagree – instead focusing on the lost fees and assets under management that Ivy would suffer if it made accurate disclosures about Madoff's operations:

> Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?

326. On December 17, 1998, in response to Wohl and Simon's competing emails, Sloan recommended a "middle of the road approach" that would "enable [][Ivy] to preserve the majority of the fees." Sloan recommended that Ivy "terminate all BLM investments for the Ivy funds[] Write to advisory clients [such as JPJA and BAMC] telling them we have done and the reasons why.." Sloan concluded that this approach "would serve to at least partially exculpate Ivy should the worst happen" and later testified that "should the worst happen" meant Madoff was a fraud. *See* discussion in § E.

327. Sloan's suggestion was not adopted. Ivy did not withdraw its Proprietary Fund investments from Madoff. Ivy decided not to disclose to clients what it knew about Madoff's repeated lies and instead continued to conceal negative facts and mislead BAMC and JPJA about Madoff's operations for 10 years.

328. Ivy concealed material negative facts about Madoff and affirmatively misled BAMC and JPJA into believing that Madoff's operations were legitimate by stating in letters in January of 1999 to Danziger and in July of 1999 to Jeanneret that "we have no reason to believe

there is anything improper in the Madoff operation" and expressing as Ivy's only concern whether Madoff could sustain his performance with a large amount of assets under management. At the same time, Ivy withheld from BAMC and JPJA specific information that indicated that Madoff was not legitimate and that this information had caused Ivy itself to believe that Madoff was not legitimate.

329. Similar letters were sent each year through 2004 which raised no additional concerns apart from including a false statement that that Madoff had prevented Ivy from completing its due diligence in letters sent in 2001 and 2002 by preventing on-site visits.

330. At a meeting with JPJA on April 4, 2000, Ivy took its deception one step further by vouching for Madoff's legitimacy. Ivy's notes of the meeting state than JPJA questioned Madoff's legitimacy by asking, "is he [Madoff] essentially legitimate?" and Ivy's then Director of Research, Adam Geiger, responded that "essentially legitimate." Defendant Larry Simon who was present at the meeting, did not contradict or qualify this answer.

331. At all relevant times, Ivy withheld material information from the Jeanneret and Beacon Defendants, and through them the plans whose assets they invested and the participants and beneficiaries of those plans, including:

a. Madoff could not possibly be executing and deriving his returns from the split strike conversion strategy that he claimed to follow because the options trading volume critically necessary to support Madoff's purported strategy did not exist, even for the assets Ivy and its clients had with Madoff, which was a small fraction of the total assets Madoff managed using this purported strategy,

b. Madoff repeatedly provided inconsistent information and untrue information to Ivy, particularly about where he traded the OEX options – claiming that: 1) he

traded OEX options on exchanges other than the CBOE, which is impossible because the only exchange that OEX options are traded is the CBOE; and 2) that he executed substantial OEX options trades off-exchange (over-the-counter), which is implausible because no substantial trading of OEX options occurred off exchange; leaving Ivy with no other conclusion than Madoff was repeatedly lying about his purported options trading;

c. At least some of the options trades that Madoff reported having executed on behalf of the Ivy's clients were at prices and volumes outside the range for trades occurring on that day and therefore must have been fraudulent. The price and volumes of Madoff's purported options trades could easily be checked by Ivy against publicly available trading data, but Ivy either neglected to do so or had done so and suppressed the results of its inquiry;

d. Ivy had received reliable information that Madoff was misappropriating client assets from a prominent hedge fund manager in or about January 21, 1999;

e. Madoff denied market timing and attributed his performance to efficient execution when this provided no explanation for the performance he reported;

f. Madoff had custody of the assets he managed and self-cleared his supposed transactions so that Ivy could not independently confirm the existence of the assets Ivy managed;

g. Madoff's accountant was a tiny firm;

h. Ivy had received reliable information that Madoff was managing (i.e., manipulating) the return streams that he reported to clients, independent of their actual returns;

i. Ivy was aware of rumors that Madoff was a Ponzi scheme;

j. Ivy did not consider Madoff a suitable manager for the proprietary funds that it Ivy itself managed though it maintained a small allocation to Madoff in those funds from

1998 until 2000 solely to deceive its existing advisory clients into believing that Ivy had confidence in Madoff -- which it did not. In fact, key Ivy personnel believed that those investments should be terminated and/or additional disclosures made to the Jeanneret and Beacon Defendants concerning Ivy's conviction that investments with Madoff were ill-advised due to the risk that he was a fraud, but that these disclosures were not made due to Defendant Larry Simon's fear of losing fees in connection with assets invested with Madoff by JPJA and the Beacon Fund;

In or about 2000 and thereafter Ivy excluded Madoff from the managers that Ivy would utilize in the investment funds that Ivy managed and excluded Madoff from the managers that Ivy would recommend to new advisory clients; at least three clients were affirmatively advised not to invest with Madoff. Nevertheless, Defendant Larry Simon on behalf of Ivy falsely told Jeanneret and Danziger that Madoff was no longer included in the funds that Ivy managed at Madoff's request, rather than as a result of Ivy's many concerns about Madoff, including that he was a fraud.

**c. Ivy provided investment advice for a fee pursuant to 29 CFR § 2510.3-21(c) (1)(i) and (ii)(B)**

332. On information and belief, at all relevant times, Ivy provided the following services to JPJA: investment manager evaluations, investment manager recommendations, and performance monitoring. On further information and belief, at some or all relevant times, JPJA compensated Ivy with fees ranging from 40% to 60%,of the fees received by JPJA as set forth in more detail in § G.2.a .

333. The above-described relationship between Ivy and JPJA was established, at least in part, pursuant to an Agreement for Services made on May 15, 1991 ("Ivy-Jeanneret Services Agreement") wherein Ivy agreed to provide a number of services, including to:

(a) research, identify, monitor, evaluate and meet with potential investment managers;

(b) recommend investment managers to [JPJA];

(c) advise [JPJA] as to the availability of opportunities to invest client funds with particular investment managers;

(d) monitor, evaluate and meet with investment managers that are managing Client funds invested through [JPJA];

(e) assess the performance of investment managers managing Client funds invested through [JPJA] and make periodic recommendations with respect to such performance;

(f) maintain such records as are mutually deemed appropriate by Ivy and [JPJA] relating to the recommendation, retention, performance and services of investment managers recommended by Ivy and selected by [JPJA] to manage the client funds invested through [JPJA]; and

(g) provide [JPJA] with such documentation as it reasonably requires with respect to investments of Client funds with investment managers such that [JPJA] may maintain compliance with the record-keeping requirements of the Advisers Act.

334. The Ivy-Jeanneret Services Agreement mandated that the above-described services "be provided to [JPJA] in a timely and expeditious manner . . . so as to enable [JPJA] to make any necessary investment decisions for allocations in connection with the Client funds managed by [JPJA]." As a result of this provision in the Ivy-Jeanneret Services Agreement, and as a result of and in accordance with JPJA's unwritten mutual agreements, arrangements or understandings with Ivy, plaintiffs are informed and believe that Defendant Ivy agreed to provide and did provide on a regular basis investment advice directly or indirectly (by providing such advice to JPJA) to the Plans whose participants are members of the Jeanneret subclass regarding the value of securities or other property, and/or recommendations as to the advisability of investing in , purchasing, or selling securities or other property, including, in particular, advice

concerning the selection of investments managers and the value of and advisability of purchasing securities representing shares in partnerships, funds, and investment companies that provided access to investment managers. Such investment advice was provided by Ivy and the Ivy Defendants other than Ivy itself indirectly through Ivy and pursuant to the agreements, arrangements and understandings between Ivy and JPJA.

335. As part of the aforesaid investment advice regularly provided was advice by Ivy to the Plans whose participants are members of the Jeanneret Subclass, provided indirectly through JPJA, concerning the value of securities representing interests in the Beacon Fund and the advisability of investing in, purchasing or selling securities representing interests in the Beacon Fund among whose sub-managers were at all relevant times, Madoff and BMIS.

336. Further, as a consequence of the Ivy-Jeanneret Services Agreement and, on information and belief, in accordance with JPJA's unwritten mutual agreements, arrangements or understandings with Ivy, it was agreed, arranged or understood that the advice provided by the Ivy Defendants to the Plans whose participants are members of the Jeanneret ERISA subclass (by providing advice to JPJA) would be the primary basis for investment decisions with respect to those ERISA covered plan assets managed by JPJA. As discussed, in an email dated December 16, 1998 Simon acknowledged that Ivy was the "asset allocator and introducer" that for its advisory clients such as BAMC and JPJA.

337. Moreover, according to the Ivy-Jeanneret Services Agreement, JPJA agreed to "deliver to Ivy copies of the investment advisory contracts between [JPJA] and each Client on such [Client] list as they relate to the services that [JPJA] is retaining Ivy for pursuant to this Agreement (including any amendments thereto)." As a result of this provision, Plaintiffs are informed and believe that Defendant Ivy received copies of all the investment advisory contracts

that Plaintiffs' Plans executed with JPJA, as well as any amendments thereto, and the Ivy Defendants were thereby aware of the particular needs of Plaintiffs' Plans with respect to such items as investment policies/strategy, overall portfolio composition, and/or diversification of Plan investments.

338. Plaintiffs are further informed and believe, and based thereon allege, that as a result of Defendant Ivy's receipt of copies of all investment advisory contracts that Plaintiffs' Plans executed with JPJA, the Ivy Defendants and the Jeanneret agreed, arranged or understood between them that investment advice the Ivy Defendants were to provide to the Plans whose participants were members of the Jeanneret ERISA subclass by providing such advice to JPJA would be individualized investment advice to these Plans based on the particular needs of these plans regarding such matters as, among other things, investment policies or strategies, overall portfolio composition, or diversification of investments. On information or belief, this advice took into account, among other things the particular desire of JPJA as investment manager of those plans whose participants are members of the Jeanneret subclass to gain access to managers not generally available to the public who could reputedly provide superior performance with minimal risk and correlation to the stock market. Even in its deception of its advisory clients, Ivy was providing individualized advice by consciously providing different advice to its "Madoff-dependent"(who were told that there was "no reason to believe there is anything improper in the Madoff operation") and "non Madoff dependent clients"(who were told not to invest with Madoff due to the potential that he was a fraud, as discussed, *supra*).

339. In exchange for Ivy's provision of the fiduciary services specified in the Ivy-Jeanneret Services Agreement, JPJA agreed to pay Ivy "fifty (50%) percent of those fees . . . received by [JPJA] from any Client on the Client List with respect to funds invested with

investment managers introduced to [JPJA] by Ivy." Moreover, JPJA was incentivized to keep its clients invested with Madoff because its share of the investment management fees would decrease to 40% (and Ivy's share of the fees would correspondingly increase to 60%) if JPJA had less than two clients invested with investment managers introduced to the firm by Ivy.

340. On information and belief, based on the 1993 Offering Memorandum for the Income Plus Fund, JPJA and Ivy amended the above-described Ivy-Jeanneret Services Agreement on December 1, 1992, to account for the organization of the Income-Plus Group Trust and Fund, but it otherwise remained the same.

341. On information and belief, based on the 2003 Offering Memorandum for the Income Plus Fund, Ivy continued to provide the same services described above.

342. Pursuant to amended consultant agreements executed between 2005 and 2007, Ivy's fees were reduced from 50% to 40% of the fees that JPJA and BAMC collected from Plaintiffs and Class members.

343. In addition to the fiduciary duties that Ivy undertook in its written and unwritten agreements, arrangements and understandings with JPJA referred to above and the its written and unwritten agreements, arrangements and understandings with BAMC and its principals Danziger and Markhoff described below, Ivy also represented that it would undertake the responsibilities of due diligence, monitoring, and transparency as an investment adviser. On its website, Ivy acknowledged that the hedge fund industry "requires constant due diligence" and that its key strengths include "continual manager monitoring" and "manager due diligence." Furthermore, Ivy highlighted its "commitment to ethical conduct and transparency," and noted that it is Ivy's responsibility to "continually educate our clients on global market issues, competitive forces and

changing dynamics; share information on portfolio construction and our related activities; and most importantly, serve our clients' interests in advance of our own."

344. During the Class Period, Defendant BAMC offered Memberships in the Beacon Fund to qualified investors such as the Plans whose participants are members of the ERISA Class.

345. As discussed in § C.1, participation in the Beacon Fund was offered primarily through Offering Memoranda that were virtually identical to one another and represented that, Defendant BAMC, in consultation with Defendant Ivy, made all investment allocation and reallocation decisions on behalf of the Beacon Fund.

346. According to the Offering Memoranda, BAMC retained Ivy to provide investment advice regarding the selection of fund managers and the allocation of the Beacon Fund's assets. Ivy was also to provide "administrative services" gave it access to purported Madoff trading records that allowed Ivy to determine that Madoff had lied about the extent of hedging in his strategy and that Madoff was likely a fraud. Specifically, the Offering Memoranda state:

> Pursuant to an agreement between the Managing Member and [Ivy], the Investment Consultant provides advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and also provides certain administrative and accounting services to the Managing Member.

Beacon I Offering Mem. at 2-3; Beacon II Offering Mem. at 3.

347. The Offering Memoranda also tout Defendant Ivy's pre-eminence as a "global leader in alternative investment fund-of-funds portfolio management." The Beacon Defendants leveraged Ivy's reputation, and that of Ivy's parent, BONY, to bolster the appearance that the Beacon Fund was a sound investment:

> The Managing Member has engaged the Investment Consultant, Ivy Asset Management Corp., a wholly owned subsidiary of The Bank of New York Company Inc., to provide advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and to provide certain administrative services to the Managing Member. The Investment Consultant is a registered Investment Adviser under the Advisers Act, with approximately $13 billion of assets under management. The Investment Consultant is a global leader in alternative investment fund-of-funds portfolio management. Since 1984, the Investment Consultant's clients have participated in niche styles and sophisticated strategies of investing. The Investment Consultant's clientele includes Fortune 500 companies, defined benefit plans, multi-national insurance corporations, high net worth investors, global investment banking firms, foundations and endowments, Taft-Hartley pension plans, private family businesses, offshore investors and corporate entities, professional money managers, registered investment companies, and the Investment Consultant's principals and employees.

Beacon I Offering Mem. at 27; Beacon II Offering Mem. at 28.

348. In fact, Ivy, from time to time, on a regular basis, in meetings with the Beacon Defendants, and in letters to Danziger as a principal of BAMC, provided advice with respect to the risks associated with investing the Beacon Fund's assets with Madoff in particular and about the appropriate allocation to Madoff and other managers of these assets in light of the particular needs of the Beacon Fund, including gaining access to managers not generally available to the public as set forth in Beacon Offering Memoranda. (Beacon Offering Memorandum dated June 15, 2000 ("Beacon Offering Mem.") at 9-10; Beacon I Offering Memorandum dated August 9, 2004 ("Beacon I Offering Mem.") at 10-11; Beacon II Offering Memorandum dated August 9, 2004 ("Beacon II Offering Mem.") at 11-12).

349. The assets of the Beacon Fund included employee benefit plan assets which retained their character as such because more than 25% of the Beacon Fund's assets at all times were derived from investments by ERISA covered employee benefit plans whose participants are

members of the ERISA Class and similar investors (such as Individual Retirement Accounts) as defined in applicable regulations.

350. Notwithstanding that various agreements between BAMC and Ivy omit reference to Ivy's role as an investment consultant to BAMC with respect to the Beacon Fund's assets, based on the Offering Memoranda and the letter agreement dated November 28, 2005 between Defendant Larry Simon on behalf of Defendant Ivy and Defendant Danziger on behalf of Defendant BAMC, it is clear that at all relevant times Ivy was aware of and had agreed to their role as an Investment Consultant to the Beacon Fund whose duties included "consulting services to us [Beacon Asset Management Corp.], as managing member of the Companies [the Beacon Fund], which includes providing advice with respect to Manager selection and allocation of the companies' assets among Managers and Investment Pools ("the Consulting Services")" and this agreement attached a Supplement to and copies of the Beacon Fund Offering Memoranda from 2004, which confirmed Defendant Ivy's advisory responsibilities.

351. On information and belief, it is the November 29, 2005 letter agreement and the various Offering Memoranda pertaining to the Beacon Fund, which at all relevant times identified Ivy as the Investment Consultant with respect to the assets of the Beacon Fund, that accurately reflected Ivy's true agreement, arrangement and understanding with BAMC, and not the exculpatory documents that Ivy requested or required that BAMC execute in order to maintain the access to Madoff that was available exclusively through Ivy. As the Beacon Fund Offering Memoranda revealed, Defendants Danziger and Markhoff had no discernible experience managing investments and intended to manage the Beacon Fund in their spare time. (Beacon Offering Mem. at 9-10; Beacon I Offering at 10-11; Beacon II Offering Memorandum at 11-12). At the same time the Beacon Fund Offering memoranda touted the extensive

qualifications of Defendant Ivy, referring to it not as an investment consultant but as "the Investment Consultant." Beacon I Offering Mem. at 27; Beacon II Offering Mem. at 28.

352. Thus, it was agreed, understood and arranged, as well as represented to Beacon Fund investors, that Defendant Ivy would provide and did provide on a regular basis investment advice directly or indirectly (by providing such advice to BAMC) to the Plans whose participants are members of the ERISA Class and who invested in the Beacon Fund regarding the value of securities or other property, and/or recommendations as to the advisability of investing in, purchasing, or selling securities or other property, including, in particular, advice concerning the selection of investment managers for the Beacon Fund including Madoff.

353. While the advice nominally addressed the selection of managers and the allocation of assets among them, advice to place assets with advisors such as Madoff who purported to follow a well defined strategy such as the split-strike conversion strategy, effectively amounted to advice to purchase particular securities at certain market prices. In the case of the Madoff's split-strike conversion strategy, advice to invest with Madoff amounted to advice to invest in the securities dictated by Madoff's ostensible strategy, a diversified basket of S&P 100 stocks chosen to correlate with the index and to hedge such purchases by buying a quantity of OEX index puts just sufficient to hedge against a downturn and to sell a quantity of OEX index calls approximately sufficient to pay for the hedge; the quantity of puts and calls was understood to finance the hedge while remaining neutral on the direction of the of the index. Madoff himself explained to Ivy that the execution of this strategy did not involve market timing, and that his results were simply the result of efficient execution of this mechanical approach.

354. Investment advice to follow this very specific strategy of security purchases by entrusting money to Madoff to execute this purportedly mechanical strategy was provided by Ivy

and by the Ivy Defendants (indirectly through Ivy and BAMC) to the Plans whose assets BAMC managed through the investment in the Beacon Fund. Such investment advice was provided pursuant to the agreements, arrangements and understandings between Ivy and BAMC. Further, as a consequence of the agreements, arrangements and understandings, on information and belief, and in accordance with BAMC's unwritten mutual agreements, arrangements or understandings with Ivy, the advice provided by Ivy to the Plans whose participants are members of the ERISA Class was the primary basis for investment decisions with respect to those ERISA covered plan assets managed by BAMC (by providing advice to BAMC), as evidenced by the Offering Memoranda stating that Ivy was the Investment Consultant to the Beacon Fund, touting Ivy's expertise while identifying no expertise belonging to BAMC or its management, and disclosing that Danziger and Markhoff would be running the fund in the spare time that they did not devote to their primary careers, which were unrelated to investment management. As discussed above, in an email dated December 16, 1998 Simon acknowledged that Ivy was the "asset allocator and introducer" that for its advisory clients such as BAMC and JPJA.

355. Moreover, because the purpose of the Beacon Fund, as disclosed in its Offering Memoranda was to provide access to managers "that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable)," the Plans' whose participants are members of the ERISA Class have invested in the Beacon Fund to achieve this individualized purpose, a purpose known to Ivy as the Beacon Fund's Investment Consultant. Accordingly, the Ivy Defendants were aware of the particular needs of the Plans whose Participants are members of the ERISA Class and in accordance with those needs Defendant Ivy had entered into an agreement, arrangement or understanding with BAMC that Ivy would give advice to BAMC with respect to such items as investment policies/strategy,

overall portfolio composition, and/or diversification of Plan investments within the Beacon Fund, based on the needs of the Plan investors in the Beacon Fund. In accordance with such agreement, arrangement or understanding, the Ivy Defendants, through Ivy and BAMC, provided such advice to the Plans whose participants are members of the ERISA Class and whose assets were invested through the Beacon Fund.

356. Even in its deception of its advisory clients, Ivy was providing individualized advice by consciously providing different advice to its "Madoff-dependent"(who were told that there was "no reason to believe there is anything improper in the Madoff operation") and "non Madoff dependent clients"(who were told not to invest with Madoff due to the potential that he was a fraud, as discussed, *supra*).

357. By reason of the foregoing, at all relevant times, Ivy was a fiduciary of the Plans within the meaning of ERISA.

**d. Defendant BONY and the BONY Defendants are fiduciaries**

358. On information and belief, BONY, Ivy's 100% owner, participated in, influenced, and/or controlled Ivy's exercise of the functions that created Ivy's fiduciary status, and/or BONY directly or indirectly received compensation for the investment advice provided by Ivy. BONY's participation in, influence over, and/or control of Ivy is illustrated by the following examples:

A. At some or all relevant times, high-ranking BONY executives served in management or policy-making positions at Ivy, including on Ivy's Board of Directors and in that capacity exercised control over the investment advice provided by Ivy to JPJA and BAMC and provided investment advice through Ivy:

1. Defendant Kevin Bannon simultaneously served as Executive Vice President – Chief Investment Officer for The Bank of New York and a member of Ivy's Board of Directors.

2. Defendant Steven Pisarkiewicz served as Executive Vice President of the Bank of New York while also serving as Chairman of Ivy's Board of Directors.

3. Defendant Jonathan Little served simultaneously on BONY's Executive Committee and Ivy's Board of Directors.

4. Defendant Ronald O'Hanley served as Vice Chairman of BONY as well as a member of the BONY's Executive Committee. He simultaneously served on Ivy's Board of Directors.

B. At some or all relevant times, BONY participated in and influenced Ivy's decisions. For example, the Ivy Executives and the Ivy Strategic Operating Committee were responsible for meeting consistently with senior management at BONY (formerly BNYCo.) to discuss strategies and synergies.

C. On information and belief, BONY's Board of Directors oversaw, reviewed, assessed, managed, and controlled the risk management and fiduciary activities of Ivy. For example, BONY's website stated that Defendant Risk Committee of the Board of Directors at BONY (formerly BNYCo.) was responsible for assisting "the Board of Directors in fulfilling its oversight responsibilities with regard to (a) the risks inherent in the business of the Corporation and the control processes with respect to such risks, (b) the assessment and review of credit, market, ***fiduciary***, liquidity, reputational, operational, fraud, strategic, technology, data-security and business-continuity risks, (c) the risk management activities of the Corporation and its subsidiaries, and (d) ***fiduciary***

***activities of the Corporation's subsidiaries.***" (Emphasis added.) More specifically, the Risk Committee and its members had the following responsibilities:

1. To "review significant financial and other risk exposures and the steps management has taken to monitor, control, and report such exposures, including, without limitation, credit, market, ***fiduciary***, liquidity, reputational, operational, fraud, strategic, technology, data-security and business-continuity risks";

2. To "***review reports on fiduciary activities of the Corporation's businesses***";

3. To "***provide general oversight of the Corporation's investment of fiduciary assets***";

4. To "***adopt the Corporation's fiduciary policy statement*** and, from time to time, ***consider other policies of the Corporation's subsidiaries concerning fiduciaries***";

5. To "evaluate risk exposure and tolerance and approve appropriate transactional or trading limits";

6. To "review and evaluate [BONY's] policies and practices with respect to risk assessment and risk management and annually present to the Audit and Examining Committee of the Board [of Directors] a report summarizing the Committee's review of the Corporation's methods for identifying and managing risks";

7. To "review reports and significant findings of the Risk Sector and the Internal Audit Department with respect to the risk management activities of the

Corporation, together with management's responses and follow-up to these reports";

8. To "review significant reports from regulatory agencies relating to risk issues, and management's responses." (Emphases added.)

D. On information and belief, BONY exercised oversight over Ivy; was responsible, at least in part, for Ivy's corporate compliance, audit, and risk management; and subjected Ivy to multiple BONY corporate compliance policies. For example, BONY noted that "[a]s a subsidiary of BONY, Ivy is subject to multiple corporate compliance policies and benefits from corporate wide training around compliance and ethics matters." In addition, in public investor relations filings, BONY stated that in addition to Ivy's management oversight and compliance infrastructure, "[a]ugmenting this are service functions shared with The Bank of New York Mellon Corporation ('BONY') such as Compliance, Internal Audit, IT Security and Risk Management."

E. Ivy and BONY marketed their close relationship.

1. BONY's website notes that it is able to provide "fund-of-hedge fund strategies through Ivy Asset Management, a wholly-owned subsidiary of The Bank of New York Mellon and well respected hedge fund manager worldwide."

2. Ivy's website notes that one of its "key strengths" is its "synergistic" relationship with BONY, and that its ability to "deliver the best quality work and produce the highest quality products" was "enhanced by the relationship with our parent company, The Bank of New York Mellon Corporation."

3. In a letter Ivy sent to its clients discussing its merger with BONY, Ivy wrote that "BNY's full array of services and capabilities will be made available to you."

4. When BNYCo. acquired Ivy, it did so, in part, to promote itself as providing services to Taft-Hartley pension plans, which were among Ivy's key clients.

5. After BNYCo. acquired Ivy, it continued to market Ivy as one of its asset managers with pension funds as clients.

6. BONY publicized the critical role Ivy played in BONY's investment management services. As Defendant Pisarkiewicz stated in a January 6, 2006 press release, "Ivy is a critical component of our growing investment management business and is strategically important to The Bank of New York."

F. Ivy and BONY described their close relationship in communications with Plaintiffs and in the governing documents the Fund:

1. In the 2004 Offering Memorandum, both Ivy and BONY (in its previous capacity as BNYCo.) were described as the investment "Consultant" to the Beacon Fund. For example, the 2004 Offering Memoranda stated: "The Managing Member has engaged Ivy Asset Management Corp., a wholly owned subsidiary of The Bank of New York Company, Inc., to provide advice to the Managing Member with respect to the Manager selection and allocation of [the Beacon Funds'] assets among managers and investment pools . . . ."

2. BONY described itself as being responsible for investment management services, including by implication those services provided by Ivy to Taft-Hartley pension plans like Plaintiffs' Plans.

3. At relevant times, BONY's website stated that BONY Asset Management is "The 'umbrella organization' for all of the company's affiliated investment management firms and is responsible for U.S. and non U.S. retail, intermediary and institutional distribution of investment management and related services."

4. At relevant times, BONY identified itself on its website as "bring[ing] together" the services provided to Taft-Hartley pension plans through its "specialty investment management firms," which includes Ivy.

5. At relevant times, BONY stated on its website that services to Taft-Hartley pension plans that were provided through its specialty investment management firms are "channel[ed] . . . through a single point of contact."

359. Upon information and belief, BNYCo. and BONY were specifically aware of Ivy's relationships with Madoff, BAMC and JPJA, and benefitted from those relationships, as shown by the following examples:

A. Upon information and belief, BONY, in conducting due diligence of Ivy in connection with the merger in 2000, and in its subsequent role as Ivy's corporate parent, together with the individual BONY Defendants gained constructive or actual knowledge of Ivy's relationship with Madoff, BAMC and JPJA, and was aware and/or should have been aware of the numerous red flags surrounding Madoff, and became aware of the specific misgivings that Ivy had regarding Madoff as well as Ivy's history of giving reassuring advice about Madoff to JPJA and BAMC, notwithstanding those

misgivings. As a result, BONY identified exposure to Madoff as one of the principle risks to Ivy's business, knowing full well that the majority of that exposure came in connection with advice given by Ivy to JPJA and BAMC in connection with investments in and by the Beacon Fund respectively, and the information withheld by Ivy from JPJA and BAMC.

B. BNYCo. and BONY benefitted from the fees Ivy received as a result of its relationships with Madoff and JPJA, which were reported as part of BNYCo.'s total earnings in its financial statements. Furthermore, in its financial statements filed with the SEC, BNYCo. specifically referenced earnings from Ivy as an important contributing source to BNYCo.'s own earnings. For example:

1. In 2000, the Ivy acquisition is mentioned in BNYCo.'s "Summary of Results" in its 10-K filing. Among other references to Ivy, BNYCo. stated that its (i.e., BNYCo.'s) "[p]rivate client services and asset management fees were up 21% to $296 million in 2000, led by strong business flows in the BNY Hamilton Funds, as well as by the *acquisitions of Ivy Asset Management Corp.* and Estabrook Capital Management, Inc." (Emphasis added.)

2. In BNYCo.'s 10-Q for the period ended June 30, 2002, BNYCo. commented that "[f]ees were also favorably impacted by continued strong flows into alternative investment funds offered by the Company's Ivy Asset Management subsidiary and demand for the Company's retail investment products."

3. In an 8-K filed with the SEC on July 17, 2003, BNYCo. attached a press release singling out Ivy as an important contributor to the rise in BNYCo.'s asset management fees, stating that "[t]he sequential quarter increase reflects the continued

strong demand for alternative investments from Ivy Asset Management as well as higher fees from the private client services business. The increase from the second quarter of 2002 and on a year-to-date basis was due to strong performance from Ivy Asset Management and acquisitions." BNYCo.'s 10-Q for the period ended June 30, 2003 makes the same points.

4. BNYCo.'s 10-Q for the period ended September 30, 2003 also referenced that BNYCo.'s growth in private client services and asset management fees "reflect higher equity price levels as well as the continued strong demand for alternative investments from Ivy Asset Management and higher short-term money management fees, partially offset by higher seasonal tax-oriented fees in the second quarter." Indeed, this 10-Q noted more than a three-fold increase in Ivy's "assets under management[,] from $2.4 billion when it was acquired in 2000 to $8 billion at September 30, 2003."

5. In BNYCo.'s 10-K for 2003, Ivy was again singled out for mention as a contributor to the growth of private client services and asset management fees. Among other things, the 10-K stated that "Ivy, a fund of funds hedge fund manager, continues to attract new assets at a rapid pace. Ivy ended 2003 with $9.1 billion of assets under management, up 42% for the year."

6. BNYCo.'s 10-K for 2004 noted the significant contribution Ivy made to overall earnings. Specifically, the 10-K identified a 17% increase in private client services and asset management fees that was "primarily due to exceptional growth at the Company's fund of funds manager, Ivy Asset Management." The 10-K also recognized an increase in revenues from Europe reflected "increased revenue from

[depositary receipts] and Ivy" and an increase in revenues in Asia was "primarily due to the sale of Wing Hang and higher revenue from Ivy."

7. BNYCo.'s 10-K for 2005 noted that a 9% increase in private client services and asset management fees from the previous year was "driven by another strong performance at Ivy and double-digit growth in fixed income asset management and separate account services." The 2005 Form 10-K also noted that the improvement in income before taxes in the Private Bank and BNY Asset Management Segment between 2003 and 2005, from $175 million to $199 million, "is primarily attributable to strong revenue growth at Ivy Asset Management." In addition, an increase in assets under management during that same time period, from $89 million at December 31, 2003 to $105 million at December 31, 2005 was attributed to "growth in Ivy, institutional equity products, and liquid assets as well as a rise in equity market values." Finally, the 2005 Form 10-K also noted that increased revenues in Asia reflected "strength in investor services, execution services and Ivy."

8. BNYCo.'s 10-K for 2006 recognized that the increase in income before taxes in the Private Bank and BNY Asset Management Segment of $30 million over the previous year was "primarily attributable to strong revenue growth at Ivy, the acquisitions of Alcentra and Urdang, and higher fee levels in Private Banking."

9. BONY's Form 10-Q, filed on August 8, 2007, noted an increase in performance fees "reflecting organic growth and strong results at our alternative asset management subsidiaries, Ivy, Alcentra and Urdang." The higher performance fees were also noted as one of the primary reasons for an increase in fees and other revenue during the first six months of 2007.

360. On information and belief, based in part upon BONY and BNYCo.'s websites and the companies' filings with the Securities and Exchange Commission, Defendant BONY (formerly BNYCo.) Risk Committee (hereinafter "Risk Committee") was responsible for overseeing the fiduciary activities of BONY's (formerly BNYCo.'s) subsidiaries, including Ivy; reviewing fiduciary risks at BONY; reviewing reports on the fiduciary activities of BONY's businesses; providing general oversight of BONY's investment of fiduciary assets; and adopting BONY's fiduciary policy statement and considering other policies of BONY's subsidiaries (including Ivy) concerning fiduciary activities. On information and belief, at some or all relevant times Defendants Frank J. Biondi, Jr., Nicholas M. Donofrio, Edmund F. Kelly, Michael J. Kowalski, John A. Luke, Jr., Paul Myners, Mark A. Nordenberg, Catherine A. Rein, William C. Richardson, Brian L. Roberts, Samuel C. Scott, III, Richard C. Vaughan, and Wesley W. von Schack served on the Risk Committee. At some or all relevant times, by controlling the investment advice that Ivy provided to JPJA and BAMC and providing investment advice indirectly through Ivy, the Risk Committee and its members served as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised authority or control respecting management or disposition of the Plans' assets, and/or rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of each Plan. As such, each of the members of the Risk Committee were fiduciaries of each of the Plans whose participants are members of the ERISA Class as alleged below.

361. By reason of the foregoing, the BONY Defendants were fiduciaries with respect to the assets of the Plans whose participants are members of the Jeanneret subclass and the ERISA class because:

a. they exercised control over the advice provided by Ivy to JPJA and BAMC with respect to the investments in and by the Beacon Fund respectively and exercised control over the material information that Ivy withheld from JPJA and BAMC. Through the exercise of the aforesaid control the BONY defendants indirectly exercised control over the management or disposition of plan assets invested in and by the Beacon Fund and were therefore fiduciaries with respect to these Plans within the meaning of ERISA § 3(21)(A)(i), having exercised authority or control with respect to the management or disposition of Plan assets;

b. were investment advisors for a fee pursuant to 29 CFR 2510.3-21 (c) (1)(i) and (ii)(A) by reason of the exercise of the same authority or control over Plan assets described in subparagraph A. above which amounted to discretionary authority or control over such Plan assets, which was exercised NOT pursuant to agreement, arrangement or understanding;

c. were investment advisors for a fee pursuant to 29 CFR 2510.3-21 (c) (1)(i) and (ii)(B) because they exercised control over the advice provided by Ivy to JPJA and BAMC with respect to the investments in and by the Beacon Fund respectively and control over the material information that Ivy withheld from JPJA and BAMC, such that the investment advice provided by Ivy to JPJA and BAMC described herein was provided by the BONY defendants indirectly through or together with their affiliate Ivy.

## I. Based on Actual Knowledge And Red Flags, Any Competent Investment Advisor Would Conclude That Madoff Was Engaged in Fraud, But Defendants Ignored These Obvious Signs of Fraud Because Their Relationship With Madoff Benefitted Them Financially

362. JPJA and Ivy were experienced investment professionals and registered investment advisers. They knew the appropriate level of due diligence required of them as it was

plainly set out in the OMs, DIMAs, and consulting agreements. As attorneys who had experience managing investment partnerships, the Beacon Defendants likewise knew the appropriate level of due diligence, prudence and loyalty that was required of them as fiduciaries. Nonetheless, they intentionally failed to perform the required due diligence and instead remained recklessly, if not willfully, blind to the Madoff fraud.

363. Ivy knew that Madoff was a fraud based on the facts it uncovered during the Class Period which included that: (a) Madoff was misappropriating client funds for his market-making operation; (b) there was insufficient OEX option trading either on or off exchange to support Madoff's purported OEX option trades; (c) Madoff had told Defendants multiple lies about his option trading; (d) Fund Manager had informed Ivy of evidence that Madoff was "managing returns;" and (e) the other facts set forth in § H.3.

364. JPJA knew that it was unable to verify that Madoff was employing the above-stated strategy and knew the results such a strategy would produce were not the same as the results Madoff was recording. JPJA and BAMC also knew, but did not tell Plaintiffs and the Class that Ivy lacked the necessary access to Madoff's operations to act as the investment consultant pursuant to the Beacon Fund's OMs, and in fact, had chosen to entirely stop performing due diligence in 2000. In addition, JPJA and BAMC had direct knowledge that Ivy was not entirely comfortable with Madoff given its numerous letters discussing its concerns about Madoff, such as the inability to "close the loop."

365. The Beacon, Jeanneret and Ivy Defendants chose to (a) keep Ivy's purported disclaimer of liability (in the 2006 CA with respect to the Beacon Fund and the 2007 CA with respect to the Income Plus Fund) concealed from Plaintiffs and members of each Class, and (b) lead members of each Class to believe that they had actually verified the reported results of

the split-strike conversion strategy and exercised a level of control over the investment strategy so as to avoid undue risk. In truth, the BAMC's, Ivy's and JPJA's decision to invest with Madoff was made while knowing that an independent evaluation of the veracity of the strategy and results reported by Madoff did not support his results. BAMC, Ivy and JPJA also could not apprise themselves of the functions of Madoff's operations, as no one was allowed access, and the Ivy Defendants ceased asking questions when Madoff's answers made no sense. Contrary to the OMs and DIMAs, they simply functioned as a pass-through to Madoff for which they collected substantial fees as investment advisors.

366. The only cogent explanation for the Beacon, Ivy and Jeanneret Defendants' failure to investigate critically in light of their actual knowledge and the myriad and specific red flags identified herein, and Ivy's specific knowledge that Madoff had offered incredible and inconsistent explanations for its results, and the Beacon and Jeanneret Defendants' unwillingness to critically assess the information provided by Ivy regarding certain concerns (albeit muted and misleading ones) is that they were content to collect substantial fees from Plaintiff and members of the Class using their long-term relationship with Madoff and BMIS, and did not want to end their lucrative relationship with Madoff and/or the entities he owned and controlled due to the fees and the need to maintain assets under management. As discussed *supra* at § E, Ivy's fees generated from the assets of its advisory clients, including Plaintiffs and the Class, comprised a substantial portion of its revenue. In addition, Ivy's relationship with Madoff was the driving force behind the growth of its assets under management and ensured Ivy's high ranking in the hedge fund industry. These factors translated into a $100 million payout for each of Ivy's founders, Defendants Larry Simon and Wohl.

367. The action brought by the NYAG against Ezra Merkin, a fund manager who invested heavily with Madoff, describes the same financial incentive that Markopolos testified to before Congress (*supra* at § G) and that Ivy so single-mindedly pursued. The NYAG described Merkin's incentive as follows:

> Merkin's incentive to invest Ariel and Gabriel funds with Madoff is clear from the compensation arrangements he had with the other managers: of the outside managers he used, Madoff was the cheapest, since Madoff charged no management fee or incentive fee, and simply took a $0.04 per share brokerage commission already built into the reported stock and option prices for Madoff's trades. Thus, on the Madoff portion of the portfolio, for doing almost nothing, Merkin could keep his full 20% incentive fee in addition to the 1% management fee – a much better deal for Merkin even than Ascot, where he took only a 1% to 1.5% management fee. In contrast, Cerberus charged Merkin an annual management fee of 1% for the assets it managed, plus an annual incentive fee of 9% of profits. Cohanzick received an annual management fee of 1% plus an incentive fee of 10% less the current money market return. Thus, the assets given to Cerberus yielded Merkin only an 11% incentive fee after paying Cerberus's 9% fee, and Cohanzick even less.

(*Cuomo v. Merkin*, Civ. No. 450879/2009, at ¶ 80.)

368. The Beacon Defendants, Ivy and JPJA were unjustly enriched as a result of their relationship with Madoff. In addition to collecting the fees foregone by Madoff, JPJA also collected management and incentive fees set forth in the DIMAs.

## J. <u>Allegations Regarding Auditor Friedberg</u>

369. Friedberg was engaged to perform audits of the Beacon Fund financial statements during the Class Period. These audits were to be performed in accordance with Generally Accepted Auditing Standards ("GAAS"), established by the Accounting Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA").

370. The AICPA has set forth its requirements for compliance with GAAS in its Codification of Statements on Auditing Standards (the "AU"), which specify that "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02. In so doing, "the auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures." AU § 150.02. Once it understands the entity and its environment and designed appropriate audit procedures, "the auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit." *Id.*

371. One of the principal standards of GAAS is that "the auditor must exercise due professional care in the performance of the audit and the preparation of the report." AU § 150.02. Amplifying on that standard, GAAS specifies that "due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."

**1. <u>GAAS Requirements</u>**

372. GAAS requirements fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards. The General Standards provide guidance to the auditor on the exercise of due professional care. The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of evidential matter sufficient to allow the auditor a reasonable basis for rendering an opinion regarding the financial

statements under audit. The Standards of Reporting provide guidance to the auditor on the content of the audit report and the auditor's responsibility contained therein. (AU § 150.02.)

373. GAAS required Friedberg to exercise due professional care in the performance of its audits and the preparation of its reports. (AU §§ 150.02, 230.02.) Due professional care required Friedberg to exercise professional skepticism, an attitude that includes a questioning mind and a critical assessment of audit evidence. (AU § 230.07.)

374. An auditor's professional skepticism is particularly critical when assessing the possibility of fraud. GAAS notes that "because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud...." The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest." (AU § 316.13.)

375. The auditor's responsibility to exercise professional skepticism extends to information obtained from independent third parties like brokers and securities custodians. GAAS notes that "there may be circumstances (such as for significant, unusual year-end transactions that have a material effect on the financial statements or where the [independent third party] respondent is the custodian of a material amount of the audited entity's assets) in which the auditor should exercise a heightened degree of professional skepticism relative to

these factors about the respondent. In these circumstances, the auditor should consider whether there is sufficient basis for concluding that the confirmation request is being sent to a respondent from whom the auditor can expect the response will provide meaningful and appropriate audit evidence." (AU § 330.27).

376. Under the applicable requirements, auditors are responsible for using due professional care and judgment to, *inter alia*:

(a) evaluate and determine the adequacy of arrangements for custody of assets, including receiving adequate assurances that there are proper controls over the custody of assets held by others;

(b) confirm the existence, custody and value of portfolio securities both at year end and selected interim dates;

(c) test an appropriate sample of portfolio transactions for proper authorization, extensions, trade dates and reasonableness of transaction pricing;

(d) test and evaluate calculations of income, gains and losses from securities transactions;

(e) evaluate compliance with investment strategies; and

(f) assess additional factors, including non-financial factors, which may have an impact on internal controls and the presentation of financial position and results.

377. GAAS required Friedberg to obtain a sufficient understanding of the Beacon Fund's Audited Entities and their environment, including their internal controls, in order to assess the risk of material misstatement of the Beacon Fund's financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. (AU § 150.02.)

378. As part of the process of obtaining an understanding of the Beacon Fund and its environment, Friedberg was required to obtain an understanding of, among other things, the hedge fund industry in general, and, in particular, the nature of the Beacon Fund and the objectives, strategies, and related business risks that may result in a material misstatement in the financial statements of the Beacon Fund. This included obtaining an understanding of the Beacon Fund's operations, ownership, governance, structure, how they were financed, and the types of investments they made. (AU §§ 314.21, 314.26.)

379. As part of the process of obtaining an understanding of the Beacon Fund's internal controls, GAAS required Friedberg to evaluate the design of those controls, and determine whether they had been implemented. (AU § 14.40.) Additionally, if Friedberg planned to rely on the internal controls of the Beacon Fund, GAAS required it to determine that these controls were operating effectively. (AU §§ 318.13, 318.23, 318.24, 318.45.) "Internal control is a process – effected by those charged with governance, management, and other personnel – designed to provide reasonable assurance about the achievement of the entity's objectives with regard to reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations." (AU § 314.41.)

380. GAAS recognizes that an understanding of an entity and its environment, including its internal controls, does not provide by itself a sufficient basis for forming an opinion on an entity's financial statements. Rather, GAAS requires the auditor to perform further audit procedures. (AU § 150.02.) Further audit procedures include "tests of controls" and/or "substantive procedures."

381. Tests of controls are used to "obtain audit evidence that controls operate effectively. This includes obtaining audit evidence about how controls were applied at relevant

times during the period under audit, the consistency with which they were applied, and by whom or by what means they were applied." (AU § 318.26.) Substantive procedures are performed to detect material misstatements, and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures. (AU § 318.50.)

382. Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures. (AU § 318.09, 318.51.) Therefore, GAAS required Friedberg to design and perform substantive procedures for each of the Beacon Fund's material balance sheets and income statement accounts – such as the Beacon Fund's investments and their investment income. More specifically, Friedberg was required to test (a) the existence and valuation of the Beacon Fund's securities at every balance sheet date; (b) the Beacon Fund's ownership of those securities; (c) the occurrence and accuracy of the Beacon Fund's transactions in US. Treasury obligations, stocks, and options; and (d) the reasonableness of the Beacon Fund's reported investment income. (AU § 318.09, 318.51, 326.15, 332.21-22, 332.25.)

383. Friedberg knew or recklessly disregarded that BAMC (as Managing Member of the Beacon Fund) engaged Madoff and/or BMIS to perform the functions of investment advisor, prime broker, and custodian of the Beacon Fund's investments.

384. This concentration of functions at BMIS created risks requiring special audit consideration – what GAAS calls "significant risks." (AU § 314.110.) Because primarily all the Beacon Fund's investment and income information available to Friedberg was based on information from Madoff and/or BMIS, Friedberg needed to do more than rely solely on the procedures it performed with respect to the Beacon Fund. (AU §§ 314.1 15, 318.53, 332.20.) In

these circumstances, Friedberg should have determined whether an auditor conducted adequate procedures to satisfy itself of the effectiveness of BMIS's internal controls (AU §§ 332.18, 332.20), and the existence of assets and the occurrence of trades reported by BMIS.

385. Another red flag that, under the prevailing industry standards, should have put Friedberg on inquiry notice and be cause for further investigation into BMIS' operations, was the fact that there was no published SAS 70 audit report available for BMIS. A SAS 70 audit report is a widely recognized auditing standard developed by the AICPA and represents that a service organization such as an investment adviser has been through an in-depth audit of their control objectives and control activities. . SAS 70 audits are typically performed by reputable and independent accounting firms, and unqualified SAS 70 reports demonstrate that the service organization has established effectively designed control objectives and control activities. In preparing the financial statements of a hedge fund such as the Beacon Fund (the "user organization"), the independent auditor (the "user auditor") may rely on a SAS 70 audit report to gain an understanding of a service organization's (in this case, BMIS) internal controls sufficient to plan the audit in accordance with standards recognized by the AICPA and set out in GAAS. However, because no such SAS 70 report, either prepared by Freihling & Horowitz, or a truly independent and reputable auditing firm, existed for BMIS, Friedberg was under an obligation to independently gain an understanding of the operational controls at BMIS that would satisfy the principle of professional skepticism and comply with the standards set out in GAAS and recognized by the AICPA. Friedberg either failed to conduct an independent inquiry into BMIS or, if they did, were unable to carry out such an undertaking given Madoff's impermeable shroud of secrecy. In any case, Friedberg had no reasonable basis upon which it could responsibly issue

unqualified audit opinions of the Beacon Fund given the utter dearth of information regarding Madoff's investment advisory services.

386. In view of the concentration of functions at BMIS and the lack of a SAS 70 audit report of BMIS, among other red flags, Friedberg should have obtained additional audit evidence relating to the effectiveness of the functions performed by BMIS relevant to the Beacon Fund's reported investments and investment income. (AU §§ 332.18, 332.20.)

387. For example, Friedberg should have obtained additional audit evidence about the operating effectiveness of those controls relating to initiation, recording, processing, and reporting of BMIS's investment advisory clients' transactions (including those of the Beacon Fund), and those relating to the custody of BMIS's investment advisory clients' investments (including those of the Beacon Fund). (AU §§ 318.25, 332.18, 332.20.)

388. In addition, an AICPA publication entitled "Alternative Investments – Audit Considerations, A Practice Aid for Auditors," which was intended to assist auditors in their audits of hedge funds and funds of funds, provides that the extent of the audit evidence necessary to conclude on the sufficiency and the appropriateness of audit evidence increases as: (a) the percentage of alternative investments to both the total assets, as well as the total investment portfolio increases; and (b) the nature, complexity and volatility of the underlying investments increases. Here, because the investments in BMIS accounted for the vast majority of the Beacon Fund's assets and BMIS's operations were opaque, this should have alerted Friedberg that the highest level of audit evidence would be required in order to opine on the Beacon Fund's financial statements.

389. Additionally, that BMIS was audited by a three-person accounting firm should have been a red flag warranting further inquiry into the bona fides of F & H. Had Friedberg

conducted itself in a manner consistent with GAAS, it would have discovered that F & H had been telling the AICPA for 15 years that it did not conduct audits. *See* article by Alison Abkowitz, "Madoff's auditor . . . doesn't audit?" in CNN Money.com, December 19, 2008.

390. Under these circumstances, Friedberg should have taken additional steps to verify the Beacon Fund's investments with BMIS, including, *inter alia*: observing the Beacon Defendants' visits and telephone calls with BMIS; inspecting other documentation showing the Beacon Fund's investments with BMIS; and reviewing periodic statements from BMIS reflecting the investment activity and comparing that activity with amounts recorded by the Beacon Fund.

**2. Auditor Friedberg Acted Improperly**

391. Friedberg had access to information that should have called into question the accuracy of its audits. BAMC's engagement letter with Friedberg states that BAMC "have made available to [Friedberg] all financial records and related data." In addition, Friedberg's May 8, 2008 audit report states that Friedberg "examin[ed], on a test basis, evidence supporting the amounts and disclosures in the financial statements." Friedberg also reviewed materials that BAMC received from Madoff.

392. For the reasons described herein, Friedberg could not have obtained sufficient audit evidence about the operating effectiveness of controls at BMIS, or reasonably have satisfied itself about the existence of the investments and the reasonableness of the reported investment income by performing substantive audit procedures. Nevertheless, it recklessly issued unqualified audit opinions on the Beacon Fund's financial statements, on which the members of the Class justifiably relied.

393. In view of the unreliability of the audit evidence, as described above, Friedberg should not have issued unqualified audit opinions on the Beacon Fund's financial statements

unless additional audit procedures were performed, the results of which reasonably satisfied Friedberg that the reported securities existed and the reported investments were reasonably stated. If these required procedures could not be performed, then GAAS required that Friedberg disclaim an opinion on the Beacon Fund's financial statements. (AU § 508.62.)

394. Moreover, Friedberg failed to consider in doing its audits that the Beacon Fund did not have sufficient internal controls for evaluating the veracity of the financial returns that Madoff reported to the Beacon Fund. The Beacon, Jeanneret and Ivy Defendants were unable or unwilling to analyze with a critical eye the financial returns claimed by Madoff, or the data available to the those Defendants to conduct such a critical analysis. The financial returns that Madoff reported were routinely fabricated. Nevertheless, Friedberg opined that the financial statements of the Beacon Fund presented fairly in all material respects the financial position and results of operations of the Beacon Fund and thus, concealed from Plaintiffs and the Class, the risk that the Funds' investment returns were fictitious.

395. Further, in auditing the financial statements for the Beacon Fund, Friedberg knowingly or recklessly disregarded the likelihood of fraud, as evidenced by numerous red flags, including: (a) that the Beacon Fund's investments were heavily concentrated in a single manager, Madoff; (b) that Madoff's purported trading strategy and returns were unable to be replicated by others in the financial industry (including Ivy and JPJA) and were consistently achieved despite the performance of the overall financial market; (c) that Madoff did not employ any third party administrators and custodians; Madoff instead ran his own back office operations – *i.e.*, the calculation of net asset values, and the preparation of account statements, etc.; (d) that the Beacon Fund relied solely on Madoff to provide reports on the performance of the Beacon Fund's investments; (e) that there was a discrepancy between the trading activity in which

Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts; (f) that Madoff lacked transparency and limited access to his books and records; (g) that Madoff later admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance; (h) that no SAS 70 audit report was available for BMIS and (i) that BMIS was audited by a small operation, as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors.

396. Because of the foregoing red flags and other warnings discussed herein, the need for heightened professional skepticism required that the procedures performed by Friedberg include seeking corroboration of the existence of the assets and the occurrence of trades from sources independent of BMIS. (AU §§ 326.08, 326.11.) Such attempts would have revealed serious questions about Madoff and his trading results. For example, Madoff and BMIS claimed to hold all of its investment advisory clients' assets – purportedly billions of dollars – in U.S. Treasuries at the end of each reporting period. An auditor having access to BMIS's books and records could have sought to corroborate the existence of these positions – especially given the large amount reported. However, no such confirmations were possible. As Madoff admitted in his plea allocution, Madoff and BMIS held no investment advisory clients' assets in Treasuries, let alone billions of dollars worth. Rather, according to Madoff, BMIS held only cash in an account at Chase Manhattan Bank, from which he operated his Ponzi scheme.

397. Friedberg also could have sought to corroborate Madoff's and/or BMIS's purported purchases and sales of equities for the Beacon Funds by (a) instructing Madoff and BMIS to request confirmation of these trades from depository or clearing organizations or counterparties to the trades, and (b) reconciling the trades to settlement reports from these

organizations or counterparties. Such procedures would have revealed either that no such trades had occurred, or that the amounts were wildly inconsistent with the trades that the Beacon Fund reported Madoff and/or BMIS had made.

398. With respect to the over-the-counter option trades Madoff and/or BMIS claimed to make for their investment advisory clients, Madoff testified to the SEC on or about May 19, 2006 that the counterparties to his purported option contracts were "basically European banks," and that there is "an affirmation that's generated electronically" and an electronic "master option agreement" that is attached to the affirmation that documented these option trades. Madoff admitted in his plea allocution that these option trades never occurred. Thus, had an auditor sought to confirm this documentation with these European bank counterparties (or any other counterparty), the fraud would have been immediately revealed. The Ivy Defendants had an actual suspicion and actual knowledge about this red flag.

399. Any meaningful attempt at seeking corroboration of the existence of assets and occurrence of trades independent of BMIS would have uncovered the fraud. Because Friedberg issued unqualified audit opinions on the Beacon Fund's financial statements, it is clear that Friedberg did not attempt to obtain this independent corroboration.

400. Accordingly, under no circumstances would a reasonable accountant have issued unqualified opinions on the Beacon Fund's financial statements, or claimed that its audits were performed in accordance with GAAS. By doing so, Friedberg acted, at a minimum, recklessly.

### 3. Friedberg Disseminated False Audit Reports to Plaintiffs and the Class

401. Although Friedberg failed to perform their audits of the Beacon Fund in accordance with GAAS, it nevertheless sent to Beacon investors unqualified audit opinions with respect to the financial statements of each of the Beacon Fund.

402. In each of its audit reports, Friedberg stated that it conducted its audits in accordance with GAAS, to the extent that it involved an examination of the "evidence supporting the amounts and disclosures in the financial statements," and an assessment of, "the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation." (*See e.g.*, Certified Consolidated Financial Statements by Friedberg, Smith & Co., P.C., for Beacon Associates LLC I, FY 2007). However, as discussed above, an examination of the evidence supporting the reported amounts was impossible given the opaque nature of Madoff's trading and operations. In fact, its audits contained the following language which severely undermines its basis for certifying an "unqualified opinion":

> All investments in private investment funds are in limited partnerships located primarily in the United States of America. ***The Company is not able to obtain the specific investments at some of the underlying private investment funds due to lack of available data***.

(December 31, 2004 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements). *See also* December 31, 2003 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements; December 31, 2005 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements; December 31, 2007 Report of Independent Public Accountants, Note 5 to Notes to Consolidated Financial Statements.

403. In each audit report, Friedberg expressed its unqualified opinion that the Beacon Fund's financial statements "present fairly, in all material respects, the financial position of [the fund]. . . and the results of its operations and changes in net assets for the year then ended, in conformity with accounting principles generally accepted in the United States of America." (*Id.*) The grounds supporting this representation of an unqualified opinion were so flimsy that Friedberg could not have possessed a genuine belief in its veracity.

404. Because Friedberg violated GAAS in the face of known dangers arising from, *inter alia*, the concentration of functions at BMIS and the myriad red flags discussed above, it was reckless, at a minimum, for Friedberg to issue unqualified audit opinions on the Beacon Fund's financial statements.

**4. Beacon Investors Justifiably Relied on the Auditor Friedberg's Audit Opinions to Their Detriment**

405. Friedberg knew or recklessly disregarded the fact that potential investors and Members would rely on the audit opinions it issued concerning the Beacon Fund's financial statements. Had Friedberg issued anything other than an unqualified audit opinion with respect to the Beacon Fund, Plaintiffs and the Class would not have invested in the Beacon Fund, and immediately would have redeemed any existing investments.

406. Friedberg's certification of financial statements without an adequate verification of the reported returns proximately caused Plaintiffs and the Class to retain and purchase membership interests in the Beacon Fund. Accordingly, Plaintiffs and the Class were damaged by Friedberg's wrongful conduct.

**5. Friedberg Smith Breached Its Duties to the Beacon Fund**

407. Friedberg Smith breached its duties to the Beacon Fund and the Class in connection with the annual audits of the Beacon Fund by failing to comply with GAAS by reason of, *inter alia*, the following:

(a) failing to properly assess the controls over the custody of portfolio securities and to determine that there were inadequate controls over the custody of securities purportedly held by Madoff and his firm;

(b) failing to confirm the existence, custody and value of portfolio securities purportedly held by Madoff and his firm both at year end and at any interim dates;

(c) failing to test a sample of portfolio transactions purportedly executed by the Madoff firm for proper authorization, extensions, trade dates and reasonableness of transaction pricing;

(d) failing to properly test and evaluate the reported income, gains and losses from securities transactions;

(e) failing to assess whether the investments purportedly made by Madoff and his firm were consistent with their purported investment strategies; and

(f) failing to appropriately assess the multiple "red flags" relating to the Madoff investments discussed above and how those factors may have an impact on internal controls, the presentation of financial position and results, and additional audit testing to mitigate the risks highlighted by these "red flags."

408. Had Friedberg Smith properly planned and performed its annual audits in accordance with GAAS and with proper consideration of the risks caused by the investment of hundreds of millions of dollars in a discretionary account managed by an outside Manager with multiple "red flag" warning signs, it would have undertaken additional tests relating to the Madoff firm's management and purported custody of Beacon Fund assets including but not limited to: (1) audit tests that did not rely exclusively upon the paper confirmation tickets and account statements sent by the Madoff firm to BAMC; (2) an assessment of Madoff and his firm's purported strategy of converting investments to US Treasury Bills at year-end, including obtaining a credible explanation of this highly unusual practice; (3) additional confirmation that the Madoff firm actually purchased and held US Treasury Bills for the Beacon Fund's benefit at the end of each audit year; (4) conducting appropriate testing procedures of the Madoff firm's operations and internal control and custody procedures; and (5) assessing and obtaining a

credible explanation of why the trading results of Madoff and his firm were significantly different from those which would be expected under the trading strategy they purported to follow.

409. Had Friedberg Smith complied with its professional duty by conducting GAAS-compliant audits of the Beacon Fund, Friedberg Smith would have determined, *inter alia*, that:

(a) there were inadequate controls over the custody of portfolio securities purportedly held by the Madoff firm;

(b) that the portfolio securities purportedly held by the Madoff firm were in fact non-existent and valueless;

(c) the transactions purportedly executed by the Madoff firm were fictitious in that a substantial portion of the transactions were listed at prices at which were objectively unreasonable as they were outside the securities' trading range for the date of the purported transactions and there was no proper documentary substantiation for the execution of the Beacon Fund's securities transactions purportedly made by the Madoff firm;

(d) the income, gains and losses from securities transactions were false in that they were based on objectively unreasonable trade prices;

(e) the investments purportedly made by Madoff and his firm were inconsistent with their purported investment strategy in that the returns claimed to have been received were wildly divergent from those to be expected from the strategy and that Madoff and his firm always converted the investments to cash or cash equivalents at each year end; and

(f) the multiple "red flags" relating to the investments made by Madoff and his firm discussed above, were indicators that the investment of hundreds of millions of dollars with Madoff constituted a substantial audit risk, and that had appropriate audit procedures to

address that risk been undertaken, Friedberg Smith would have determined that the transactions purportedly undertaken by the Manager and the securities purportedly held by the Madoff firm were wholly fictitious.

289. Had Friedberg Smith complied with its professional duty and conducted the audits of the Beacon Fund in compliance with GAAS, it would have not issued unqualified audit opinions as to the financial position of the Beacon Fund.

**K. Defendants Willfully Ignored Dozens of Warning Signs That Madoff's Operations Were Not Legitimate**

410. At the root of Defendants' culpable conduct is the fact that Madoff unabashedly operated behind a shroud of secrecy that Defendants had to necessarily accede to, in order to place the Fund's assets under his management. As described in § D *supra*, Defendants had a pecuniary interest in accepting Madoff's *modus operandi* in total disregard of their duties as investment managers and fiduciaries because Madoff only collected commissions on the purported trades he executed, thereby leaving a greater portion of the Fund's assets from which Defendants collected their respective percentages of fees. As a result, Defendants willfully ignored red flags that Madoff was operating a fraud. By failing to conduct due diligence on Madoff's operations, or if conducted, a proper one, Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class, engaged in a course of business that operated as a fraud upon Plaintiff and Class members, and caused their statements regarding their ongoing due diligence and oversight of outside investment managers to be materially false and misleading.

a. Madoff Publicly Spoke of Secrecy: Madoff perpetuated the secrecy in his public statements. As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry (hereinafter, "*MAR/Hedge* article"): "'[Madoff] won't reveal how much capital is

required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'" Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

b. When MAR/Hedge probed into the substance of Madoff's strategy, Madoff deflected the question and invoked his reputation as an industry professional; "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

c. On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote: "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance – even though they don't understand how he does it. 'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's. 'People who have all the trade confirmations and statements still can't define it very well.' . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money."

d. "When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.'" "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manger who took over a pool of assets that included an

investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

e. In essence, dealing with Madoff meant that a fund manager was required to willfully abrogate his or her contractual and fiduciary obligations to the fund's investors in exchange for the benefits of highly consistent returns and the lucrative management fees that flowed therefrom. The Beacon, Ivy, and Jeanneret Defendants were no different in their complicity and fell in line with Madoff's *modus operandi* which dated back to the inception of his practice as an investment manager. In his interview with Frontline, Michael Bienes recounted the following:

> **Q:** How did you check up on Bernie to make sure that everything was OK on his end?
>
> We did not.
>
> **Q:** Why not?
>
> I was gonna walk in and say, "Bernie, let me see your books"? He'd show me the door. He was my income. He was my life. How could I do such a thing?
>
> * * *
>
> I never used [Madoff's] name. I never used his name. **To me, it was like the secret name of God.** Even when we had the business, I tried not to use his name.
>
> * * *
>
> I never brought people to him. I brought people to me, not him.
>
> * * *
>
> [Regarding bringing other funds to Madoff]: "Let me tell you something. You want to do this? You don't go to Bernie. You come to us." . . .
>
> "Work through us." Yeah. "You work through us." Because Bernie was the well. If you have a well that's supplying cool, clear

> water, you don't want everybody to come and feed their cattle there.

(Frontline Program, Michael Bienes (emphasis added).)

f. The pressure to remain under the radar was common to all fund managers who dealt with Madoff. In her interview with Frontline, Sherry Shameer Cohen, a registered sales assistant and secretary for the Fairfield Greenwich Group, fund managers of the Fairfield Sentry Funds that were substantially exposed to Madoff, explained the paradoxical desire to preserve secrecy and inconspicuousness:

> I remember talking to Jeff [partner of the Fairfield Greenwich Group] at that time I had started to transition into becoming a writer, and I said to him: "You know, you're doing really great stuff. Wouldn't it be great to, like, pitch stuff up to *Forbes* or *Fortune* or something like that?"
>
> And he says: "No, no, no. I don't want too much attention being drawn to us. I don't want too many people calling." And that should have tipped me off, because most companies want more customers.
>
> * * *
>
> ***Don't ask, don't tell***: ***That seems to be their unofficial policy***. As long as the money comes rolling in, why ask? Why jeopardize something?

(Frontline Program, Sherry Cohen) (emphasis added).

g. In her interview with Frontline, Sandra Manzke, CEO of Maxam Capital, another Madoff feeder-fund, corroborated the "don't ask, don't tell" policy that fund managers uniformly followed with respect to their Madoff accounts:

> **Q:** Did Madoff say to you, "Don't put me on your prospectus"?
>
> Yes. He did. [. . .] That was one of, always, Bernie's conditions of getting an account.

> **Q:** But you've publicly called for transparency. That's transparency.
>
> Yes. But many funds and investors were very secretive. They didn't mention that they had money with Madoff. It was something you didn't talk about.

(Frontline Program, Sandra Manzke.) Like the Fairfield fund managers and Ms. Manzke of Maxam Capital, the Beacon, Ivy and Jeanneret Defendants complied with Madoff's "don't ask, don't tell" policy and remained willfully blind to the myriad warning signs that Madoff was a fraud, in complete disregard of the duties they owed to Plaintiff and Class members.

411. The numerous warnings signs included, but were not limited to, the following:

a. <u>Suspect Strategy</u>: The description of Madoff's split-strike conversion strategy was inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14-year period. Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so. Michael Markov, a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them." Between May 1999 and October 2005, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy used by Madoff, sent several complaints to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy. As reported in the *MAR/Hedge* article: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

b. <u>Impossibly Low Correlation to the market</u>: As Markopolos explained in "Red Flag #10" of his 2005 memo to the SEC:

> It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market [as measured by the fund's beta[10]] where its returns are supposedly being generated from. This makes no sense! The strategy depicted retains 100% of the single-stock downside risk since they own only index put options and not single stock put options.

The performance of a fund that actually employs a "split-strike conversion" strategy would track the market's performance. Markopolos explained in his SEC submission that "In 2000 I ran a regression of BM's hedge fund returns using the performance data from Fairfield Sentry Limited. [BMIS] had a .06 correlation to the equity market's return which confirms the .06 Beta that Fairfield Sentry Limited lists in its return numbers." This beta, which indicates almost negligible correlation to the market, is impossible to achieve without losing money. Funds that actually use the split-strike conversion strategy, must sell out-of-the money calls to realize positive returns, but this increases the correlation to the market because this increases the size of the "collar," which makes it less effective at protecting against market moves. In short, the performance of a truly functional "split-strike conversion" strategy is necessarily correlated with the market because, to try to eliminate the correlation with the market (resulting in a beta close to zero), a manager would have to buy in-the-money puts. These puts, however, are prohibitively expensive because the monthly premium to maintain in-the-money puts would eclipse any potential positive returns.

c. Suspect Market-Timing & Trade Execution Prices: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported

[10] The beta coefficient, is used to measure how sensitive the expected performance of an investment is to the market. A beta of zero is not correlated to the market. A positive beta means that the performance will generally follow the market. The higher the beta the more strongly it follows the market. A beta of one means indicates that the performance of the investment is completely correlated to the market.

results. Additionally, Madoff sent to his clients, paper confirmation tickets reflecting each trade he purportedly made, in addition to the monthly paper account statements, both of which disclosed the price at which each purchase or sale was supposedly made. According to allegations by, *inter alia*, Irving Picard, trustee for the liquidation of BMIS, several monthly account statements and trade tickets reflected trades purchased or sold on behalf of clients' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question. (*See, e.g.*, *Picard v. Merkin*, No. 08-01789 (BRL) at p. 16, (S.D.N.Y. Bankruptcy, May 6, 2009)). Customer statements that reflected options being traded, likewise should have put Defendants on notice because Madoff's options trades were always profitable, *i.e.*, there was no incentive for a counterparty to continuously take the other side of those trades since it would always lose money. *See* Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 31.

d. Impossible Options Volumes: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume. A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges. Testifying before the House Committee on Financial Services on February 4, 2009, Markopolos explained that *any* hedge fund manager should have been able to determine that Madoff was a fraud based solely on the basis of analyzing options volumes:

> Markopolos: A lot of the victims thought that they were getting a highly diversified portfolio. . . . [Madoff] was purporting to own 30 to 35 of the bluest chip stocks, the largest companies

| | |
|---|---|
| | in America. And they'd see that on their statements. And they felt very comfortable owning those companies, and they considered it a very diversified basket, because it really was a diversified basket. |
| Rep. Ackerman: | But there was nothing they could do to check it out, that he didn't actually buy it. |
| Markopolos: | You could. As an individual investor you could not. ***But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price.*** They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers. And you would have seen that no OEX index options traded at those prices that day. |

Testimony of Harry Markopolos before the House Committee on Financial Services, February 4, 2009 (hereinafter, "Markopolos Testimony") (emphasis added). Indeed, the August 31, 2009, SEC OIG Madoff Report concluded that, "a simple inquiry to one of several third parties could have immediately revealed the fact that Madoff was not trading in the volume he was claiming. (Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 39).

e. No Standalone Hedge Fund: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions he was charging. This is particularly suspicious because a hedge fund requires annual audits. Indeed, the *MAR/Hedge* article highlighted this fact as particularly suspect because BMIS was willing to earn commissions off the trades rather than "set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself . . ." In his November 7, 2005 submission to the SEC ("Markopolos SEC Submission"), Markopolos reiterated this peculiar arrangement:

> **MOST IMPORTANTLY**, why would [Madoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits? Doing some simple math on [Madoff]'s 12% average annual return stream to investors, the hedge fund, before fees would have to be earning average annual returns of 16%. Subtract out the 1% management fee and investors are down to 15% [of profits]. 20% of the profits would amount to 3% so investors would be left with [...] 12% annual returns. . . . Total fees to the third party FOF's would amount to 4% annually. Now why would [Madoff] leave 4% in average annual fee revenue on the table unless he were a Ponzi Scheme?

(Markopolos SEC Submission, Nov. 5, 2005, at 3). Fund managers and Investment Advisers, including the Beacon, Ivy and Jeanneret Defendants, benefited from this arrangement because obtaining similar services from another hedge fund would have reduced the amount of fees received by Defendants.

f. Cash Positions: BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions. Indeed, Irving Picard, the court-appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never (at least during the Class Period) engaged in any trades. Victims' quarter-end and year-end reports often reflected positions in only United States Treasury Bills. As Markopolos explained to the House Committee on Financial Services, this practice was indicative of the underlying fraud being perpetuated by Madoff and was cause for further investigation:

> Markopolos: If you're not holding any financial instruments that are recordable at year-end marking period or quarter-end marking period, especially if you're in treasury bills, which are book entry form only – there's no physical securities there – there was nothing there for the auditors ever to inspect.

(Markopolos Testimony.)

g. Lack of a Third Party Custodian and Administrator: The Beacon Fund's assets with BMIS were not held by a third party custodian but rather by Madoff himself. Moreover, BMIS initiated trades in the accounts, executed the trades, and served as custodian and administrator for the accounts. Thus, instead of using an outside prime broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which analyzes hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets . . . There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen." In his interview with the PBS program, *Frontline: The Madoff Affair* (hereinafter, "Frontline program"), Frank Casey, a colleague of Markopolos, explained why relying on the trade confirmations and account statements provided by BMIS was an exercise in futility and did not constitute due diligence:

> Thierry [a French money manager] said: "Well I've been doing this due diligence on [Madoff] . . . I get reports every day of which positions are bought, which are sold, and which options are purchased and which are sold." And he had, I remember, two or three clerks logging everything into a computer, all the confirmations that he was receiving from [BMIS] . . .
>
> I said: "Why are you bothering logging in all these pieces of paper? He can make that up. There's no check and balance here. . . . I wouldn't even bother having two or three clerks log this thing in. ***I would just have one guy, once a week, sit down, look over the trades at the end of the week and see if any of them were trading outside of the day's range***."

Frontline: The Madoff Affair, Interview Transcript of Frank Casey, available at PBS.org (emphasis added).

h. Obscure and Ill-Equipped Auditor: BMIS was audited by Friehling & Horowitz ("F&H"), which had three employees, of which one was 78-years old and living in Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in Rockland County, NY, was 13 feet by 18 feet. As Representative Sherman of California remarked during the February 4 testimony of Markopolos before Congress, it was physically impossible for a three person accounting firm staffed with one active CPA to properly audit a $17 billion firm:

> Now it is physically impossible for one CPA to audit a $17 billion firm. But even if it was possible, you're supposed to be an independent auditor. Independence includes not getting more than, say, about a fifth of your revenue from any one client. So unless you think that one CPA could audit a $17 billion operation and be done in a couple of months, you've got a fraudulent financial statement in your hand, not to mention your professional expertise focused on the fact that you cannot earn those kinds of continuously positive, even returns.

(Representative Sherman, Markopolos Testimony.) Indeed, managers of feeder funds who dealt with Madoff early on in his career as an investment adviser harbored reservations about the apparent inadequacy of Madoff's chosen auditor. In his interview with the Frontline Program, Michael Bienes, a money manager who funneled funds into Madoff's operation during its nascent stages expressed his concern about Madoff's accountant, Jerry Horowitz of Friehling Horowitz, P.C.:

> Jerry was a nice guy, very quick, very good. [. . .] And guess what? He was Bernie's accountant. . . . Then I was saying to myself for a second: "What's with this old man? He can't be Bernie's accountant; he's not independent." But Jerry was Bernie's accountant, and Jerry was a one-man show . . .
>
> **Q:** Wasn't that a red flag [that Madoff used such a small accounting firm]?

> To me, I was always wondering about it, because . . . [a]uditing is a very labor-intensive business. That's why all the accounting firms wanted to get into consulting. It's just, auditing is so labor-intensive, they can't make a profit. And I was always wondering about Jerry doing this.

Frontline Program Transcript, PBS.org. On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme. The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

i. Audit Reports: Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker – not a firm with $17 billion in customer accounts.

j. Family Run Operation: Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece). As noted by a due diligence team from Société Générale's investment bank, a European bank that internally blacklisted Madoff and prohibited the bank from doing business with him, the fact that Madoff's brother, Peter Madoff, was the chief compliance officer at BMIS was a significant red flag that informed their decision to avoid Madoff entirely. Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2003.

k. Lack of Electronic Access: BMIS was supposedly technologically advanced but Funds did not have electronic access to their accounts at BMIS. Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting

documentation. This lack of technological sophistication in Madoff's reporting methods aroused the suspicion of Ms. Cohen at Fairfield Greenwich Group:

> So I looked at [the statements from Madoff], and I said, "Something is very strange." Every bank statement, every brokerage house statement that I've ever seen, is usually on a very thick paper, and it's got a big logo emblazoned on it, and it's got lots and lots of small print on the front and on the back. . . . None of that was on there. It just looked as if it came off a typewriter or [a] dot matrix [printer]. . . . ***I mean, it's so easy these days to perpetuate a fraud with something that looks more impressive, but here it looked so unprofessional.*** . . . ***And that's why I don't understand how could they not question any of these things. It doesn't look like a normal statement***.

(Frontline Program, Sherry Cohen (emphasis added).)

## L. Investment Professionals Who Did Conduct Due Diligence Concluded that the Red Flags Were Evidence That Madoff Was Operating a Fraud

412. Investment professionals who actually investigated the legitimacy of Madoff's operations concluded, based on the numerous red flags and the absence of any legitimate explanation from Madoff as to how he could generate such consistent results, that his operation must be a fraud.

413. The SEC OIG Madoff Report acknowledges that several private entities concluded that Madoff's investment services were unsavory given the multitude of red flags:

> The OIG also found that ***numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise***. Specifically, Madoff's description of both his equity and options trading practices immediately led to suspicions about Madoff's operations. With respect to his purported trading strategy, many simply did not believe that it was possible for Madoff to achieve his returns using a strategy described by some industry leaders as common and unsophisticated. In addition, there was a great deal of suspicion about Madoff's purported options trading, with several entities not believing that Madoff could be trading options in such high volumes where there was no evidence that any counterparties had been trading options with Madoff. The private entities' conclusions were drawn from the same "red flags" in

> Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

(Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, at 25) (emphasis added).

414. For example, the SEC's Investigative Report describes how one CEO of a company with a fund-of-funds business decided to avoid investing with Madoff:

> The CEO was suspicious and obtained copies of an investor's last few account statements from [BMIS], and compared a sample of trades on the statements with what was actually going on in the markets on the day Madoff was trading. The CEO stated he found this "pattern which really seemed weird where the – where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day," noting that "of course, nobody can do that." His "suspicion was that the fact pattern that [he] had seen seemed consistent with a Ponzi scheme." The CEO said he "didn't conclude that that was the case, but [he] certainly thought there was enough of a risk that that was the case that, you know, [he] certainly wouldn't touch it with a 10-foot pole."

(*Id*. at 414). Ivy routinely reviewed the Beacon Fund's account statements and concluded that Madoff's purported trading activity was impossible. Instead of acting on this conclusion, Ivy, in willful and wanton or reckless disregard for its duties to the Beacon Fund and its investors, failed to take any action to pull the Beacon Fund's assets out of Madoff.

415. In his 2005 SEC Submission, Markopolos set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS. Among those already discussed above and several others, he identified the following red flags:

a. "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! . . . However, BM's performance numbers show only 7 extremely small [monthly] losses during 14 years and these numbers are too good to be

true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"

b. "Madoff does not allow outside performance audits."

c. "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."

d. "Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%."

416. As summed up by Markopolos: "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings. Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money? Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

417. In 2007, investment manager Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a. Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b. Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

418. Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing. The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

419. In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of BMIS, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

420. Similar concerns informed Société Générale's due diligence team to internally blacklist Madoff and advise wealthy clients at its private banks against investing with him. Indeed, as Drago Indjic, a project manager at the Hedge Fund Center of the London Business School noted, many European hedge fund companies saw the tell-tale signs of a Ponzi scheme all along:

> Madoff did not pass due diligence for many European hedge fund companies . . . Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is Ponzi scheme.

Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.

421. In July 2008, the managers of the Fort Worth Employees' Retirement Fund heeded the advice of Albourne Partners, a London due diligence firm, and liquidated its $10 million stake in the Rye Select Broad Market Fund, a fund that was entirely invested with Madoff. According to a December 31, 2008 article in BusinessWeek, Albourne Partners had "long-standing concerns about Madoff's trading strategy and consistent returns" and "had urged clients for nearly a decade to avoid affiliate funds such as Rye." Matthew Goldstein, *The Madoff Case Could Reel in Former Investors*, Dec. 31, 2008, BusinessWeek.

422. Rogerscasey, a domestic registered investment adviser providing investment consulting services globally, issued several adverse ratings of Madoff-related feeder funds such as Fairfield Greenwich and Tremont dating as far back as 2002, "based largely on concerns about the integrity of the Madoff structure." A Rogerscasey newsletter published in December 2008 enumerates the several warnings it issued regarding Madoff:

- June 4, 2002 – We are exceedingly negative on Madoff as a hedge fund.

- November 21, 2002 – [Tremont's] largest exposure . . . is to Madoff . . . Where Tremont receives limited independent third-party transparency. . . . The only third-party, independent transparency that Madoff provides to its investors is being 100% in cash at the end of each year, so that its auditor can verify with Madoff's banker . . . that the cash is real. Madoff has no prime broker and no plan administrator. It acts as a broker/dealer, self-clears, and sends its own trade confirms to its investors all of whom have "cash" accounts.

- February 27, 2003 – [Fairfield Greenwich] claims its due diligence is based on [employee name] at their firm checking the trade confirms that Madoff's broker dealer sends them. However, our point of view is that, since Madoff is self clearing, it could be making up its statements and tickets.

- February 26, 2004 – Although Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . ***The Madoff exposure is a potential disaster. Even though some products would not be directly affected . . . Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.***

Rogerscasey Flash, December 2008 at 1-2 (Emphasis added).

423. The Rogerscasey Newsletter reiterates what Markopolos and several other industry professionals had expressed time and again regarding Madoff's investment strategy, that "Madoff's returns [. . .] were too good to be true." To reach this conclusion, Rogerscasey merely examined the returns of a mutual fund known to employ the so-called split-strike conversion strategy and found that, "there are months, and indeed some years, of negative performance." *Id.* at 2.

424. The Beacon, Ivy, Jeanneret and BONY Defendants willfully ignored what were apparent red flags to many other industry professionals who concluded that investing with Madoff was a mistake because of the high probability that Madoff was either engaged in a fraudulent course of conduct, by front-running or a Ponzi scheme, or simply did not come forward with enough confirmatory information to satisfy the standard of adequate due diligence. By egregiously disregarding the likelihood of fraud, and failing to investigate the doubtful practices of Madoff, the Beacon, Ivy, Jeanneret and BONY Defendants abandoned their fundamental duty to perform due diligence as fiduciaries to investors in the Beacon Fund, but

nevertheless collected their substantial management and incentive fees. As discussed above, conducting "due diligence" solely based on the information Madoff provided to feeder fund managers could not, in any sense of the term, constitute "due diligence" given the anomalous structure of Madoff's operation. Rogerscasey described the importance of maintaining a high standard of due diligence as follows:

> One key factor for effectiveness in this area is the operational due diligence resources in place at a hedge fund of funds with dedicated, experienced staff that can review the back office and operations of their underlying hedge funds. We consider it best practice in this area that the head of operational due diligence at a hedge fund of funds should have a reasonable level of seniority within the organization and should be in a position to veto investment with any hedge fund where there are operational concerns.

(Rogerscasey Newsletter, at 2-3.)

425. Madoff's anomalous operational structure warranted a heightened level of due diligence. As noted above, Madoff was his own prime broker and custodian of all the assets he managed. Chris Addy told *The Wall Street Journal* on December 13, 2008 that such conduct was unusual because without an independent custodian, there was no one "involved who could prove the existence of assets." According to Addy, "There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer."

426. According to Rogerscasey, operational concerns that should prevent an investment from taking place are:

- An independent custodian. Madoff appears to have had custody of the assets within his firm, making it impossible to confirm investors' balances independently.

- An independent administrator to value the portfolio independently and strike monthly net asset values.

- An independent auditor with the expertise to audit potentially complex investment strategies.

*Id.* The Beacon, Ivy, Jeanneret and BONY Defendants held such positions of seniority that empowered, and indeed, obligated them to veto investments which raised serious concerns in terms of integrity. In dereliction of their duties, Beacon, Ivy, Jeanneret and BONY Defendants ignored what their peers in the industry, after performing the most basic due diligence, found to be unacceptable signs of impropriety. Instead of pulling the Beacon Fund out of Madoff, the Beacon Defendants and Ivy committed over 70% of its assets to his fraudulent scheme while collecting substantial fees. The JPJA placed their blind faith in Madoff's strategy solely based on his reputation in the industry rather than on an independent evaluation required of a fiduciary, let alone the sound and prudent evaluation required of ERISA covered employee benefit plans.

427. Defendants were presented with a litany of anomalous facts and practices of Madoff and BMIS that made Madoff's representations obviously false, and put them on fraud alert. Defendants were thus aware of facts which alerted them to the danger of Madoff's fraud.

## M. ERISA Plaintiffs are Entitled to the Six-Year Limitations Period from the Time of Discovery of Ivy's Breach of Fiduciary Duty

428. As discussed above in § D, and pled in Count XI (Claim for Misrepresentation, Failure to Disclose Material Facts to BAMC and JPJA and Concealment of Breach of Fiduciary Duty) the Ivy Defendants acting on their own and from the date of Ivy's acquisition by BONY, acting subject to the control of the BONY Defendants, breached their ERISA fiduciary duties, in part, by fraudulently misrepresenting facts to BAMC and, JPJA about Madoff's suitability as a manager of Plan assets and his legitimacy. BAMC and JPJA acted in reliance on these fraudulent misrepresentations.

429. As further set forth in Count XI, the Ivy Defendants acting on their own and from the date of Ivy's acquisition by BONY, acting subject to the control of the BONY defendants, also breached their fiduciary duty of prudence and loyalty by failing to disclose material facts bearing on Madoff's and BMIS's suitability as a manager of Plan assets as discussed in § H.3 *infra*.

430. Ivy's non-disclosure of such material facts allowed Ivy to conceal their various breaches of fiduciary duties as pled in this Complaint from the Plaintiffs, the ERISA class and the Jeanneret ERISA subclass until Madoff confessed to running a Ponzi scheme at the end of December 2008.

431. Because the Ivy and BONY Defendants' breaches of fiduciary duty includes fraud and because these defendants concealed their breaches of duty from Plaintiffs, the ERISA Class and the Jeanneret ERISA subclass, Plaintiffs, the ERISA Class and the Jeanneret ERISA subclass are entitled to a six-year limitations period from the time of discovery that the Ivy and BONY Defendants had breached their fiduciary duties as alleged herein, *i.e.* sometime in or after December of 2008, as provided for in ERISA § 413, 29 U.S.C. § 1113.

432. As further set forth in Count XI, and as detailed in § G.2, *infra*, the Jeanneret Defendants and the Beacon Defendants received various warnings from Ivy suggesting, albeit in a muted and misleading fashion, that Madoff might not be a suitable manager for Plan investments. These defendants concealed their own breaches of fiduciary duty (which required them to further investigate or otherwise act on the concerns raised with them by Ivy) by failing to disclose these warnings to Plaintiffs and to the Jeanneret Subclass and the ERISA Class respectively. Because the Jeanneret Defendants and the Beacon Defendants concealed their breaches of duty from the Plaintiffs, the ERISA Class and the Jeanneret ERISA subclass,

Plaintiffs, the ERISA Class and the Jeanneret ERISA subclass are entitled to a six-year limitations period from the time of discovery that the Jeanneret and Beacon Defendants breached their fiduciary duties as alleged herein, i.e. sometime in or after December of 2008, as provided for in ERISA § 413, 29 U.S.C. § 1113.

## CLAIMS FOR RELIEF

## DIRECT COUNTS[11]

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Brought on Behalf of the Investor Class (including the Jeanneret Investor Subclass)),[12] Against Ivy, Larry Simon and Howard Wohl)

433. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

434. During the Investor Class Period, Ivy, Larry Simon and Howard Wohl (hereinafter the "Ivy 10b-5 Defendants"): (a) orchestrated a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Investor Class Period, did deceive the investing public, including Plaintiffs and members of the Investor Class; (b) made various deceptive and untrue statements of material fact, and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and members of the Class; and (c) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiffs and members of the Investor Class (including the Jeanneret Investor Subclass). Defendants, individually and in concert, directly and indirectly, by the use of means

[11] For the Court's convenience, a chart of the Counts asserted is annexed as Appendix A.
[12] Counts brought on behalf of the Investor Class include claims on behalf of the Jeanneret Investor Subclass.

and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information from the members of the Class as specified herein.

435. **10b-5(a) and (c)**: The Ivy 10b-5 Defendants engaged in the following deceptive conduct, in the investment sphere, in violation of Rule 10b-5(a) and (c), upon which Plaintiffs and members of the Income Plus class relied:

a. Ivy, through its founders Larry Simon and Howard Wohl, and later joined by Defendants Adam Geiger and Sean Simon, orchestrated the scheme by introducing Beacon to Madoff in the early 1990's for the purpose of retaining Ivy's investment services, and serving as the primary conduit through which Beacon placed Plaintiffs' and other Class members' assets with Madoff.

b. In 1995, Ivy entered into an advisory agreement with Beacon in contemplation of the Beacon Fund, which would enable BAMC to invest its clients' assets in Madoff and obligated BAMC to pay Ivy 50% of all fees that it earned from any of its clients whose assets were placed with Madoff or any other Ivy recommended manager. As set forth herein, Ivy entered into this agreement while Ivy's principals, Larry Simon and Howard Wohl, possessed the contemporaneous suspicion "that Madoff could be a Ponzi scheme," (NYAG Ivy Action, ¶ 50), and while knowing that Ivy's recommendation would be the principal basis upon which JPJA would make its investment decisions for its clients.

c. BAMC and Ivy, through its founders Larry Simon and Howard Wohl, formed the Beacon Fund and intended Madoff to be one of its principal managers and to market it as a way for investors to invest in Madoff. Accordingly, BAMC executed an amendment to its 1995 agreement with Ivy which obligated Beacon to pay to Ivy 50% of all fees earned by BAMC

as manager of the Beacon Fund and a performance fee. Ivy, in turn, was obligated to advise BAMC with respect to investing the Beacon Fund's assets and to conduct due diligence on managers to whom BAMC allocated the Beacon Fund's assets. In fact, as Larry Simon himself admitted in an email dated December 16, 1998, Ivy acted as an "asset allocator and introducer" and was responsible for Beacon's exposure to Madoff. (NYAG Ivy Action, ¶ 6).

d. In or about 2000, OMs were issued offering interests in the Beacon Fund. As set forth herein, the OMs contained materially false and misleading statements regarding the level of oversight and due diligence that would be provided to investors, and the validity of the purported investment strategy that would be employed in managing the Fund's assets. These misstatements were directed by the Ivy 10b-5 Defendants, and Ivy's role as the "Investment Consultant" with expertise in alternative investment strategies upon whose advice BAMC would rely in making investment allocation decisions was prominently and repeatedly disclosed to prospective investors. The OMs also represented that Ivy would perform "certain administrative and accounting services." Beacon II 2004 OM at 3. However, BAMC and the Ivy 10b-5 Defendants specifically created the Beacon Fund for the purpose of investing the Fund's assets, through Ivy, with Madoff, so as to generate substantial fees. The Offering Memoranda falsely state that Ivy "does not have any discretion to invest or allocate the Fund's assets." The OMs also represent that Ivy's responsibilities "include monitoring of ongoing Manager performance and client record keeping, continuing communications with the Managing Member and related services." (Beacon II 2000 OM at 25). Further, the OMs include statements that Ivy would together with BAMC, evaluate outside Managers based on "quantitative and qualitative criteria" such as "risk control," "organizational infrastructure," and whether the outside manager is from a "quality and stable organization." (Beacon OM at 9-10; Beacon I OM at 10-11; Beacon II OM

at 11-12.) The services that Defendants represented that Ivy (a registered investment adviser) would be performing, gave a patina of legitimacy to the scheme. Plaintiffs reasonably relied on these statements and presumed that Ivy would employ its expertise in good faith to fulfill its enumerated duties. Therefore, the Ivy 10b-5 Defendants' fraudulent conduct made the ultimate deception of Plaintiffs and the Class Members necessary or inevitable. As part and parcel of the scheme, Ivy's role with respect to the Beacon Fund was misrepresented.

e. Over many years, the Ivy 10b-5 Defendants and BAMC invested nearly three-quarters of the Beacon Fund's assets with Madoff and caused the dissemination OMs in 2000 and 2004, while deceiving the public by actively concealing the following facts:

i. that the Ivy 10b-5 Defendants had a reasonably high suspicion that Madoff was running a Ponzi scheme (NYAG Ivy Action, ¶ 50);

ii. that Defendants Wohl and Sloan had recommended to Simon that Ivy withdraw its own Proprietary Funds' investments from Madoff, and that the Ivy 10b-5 Defendants had internally adopted a special rule for Madoff, limiting its Proprietary Fund allocations to Madoff to 3% of the Fund's assets (NYAG Ivy Action, ¶ 75);

iii. that the volume of OEX options traded on the CBOE was insufficient to support a split-strike strategy for the amount of assets the Ivy 10b-5 Defendants believed Madoff had under management (NYAG Ivy Action, ¶ 58);

iv. that the Ivy 10b-5 Defendants, through conversations with another Fund Manager, had strong reason to believe that Madoff was employing a "managed income stream" (NYAG Ivy Action, ¶ 56);

v. that an internal Ivy memorandum to Defendant Wohl dated May 16, 1997 noted that Madoff's confirmations stated that he traded 917 OEX calls on a day that

Bloomberg reported that only 578 were traded, and that the price Madoff reported was well below the exchange trade prices reported by Bloomberg (NYAG Ivy Action, ¶ 57);

vi. that Madoff claimed that he traded options on domestic exchanges other than CBOE to explain his inordinately high volumes of OEX option trading which the Ivy 10b-5 Defendants knew, or were reckless in not knowing, to be impossible given that "OEX is proprietary product of the CBOE, and has never been licensed to any other exchange for trading, and since its inception, the OEX has never traded on any exchange, domestic or foreign, other than on the CBOE." (NYAG Ivy Action, ¶ 61);

vii. that by May of 1997, the Ivy 10b-5 Defendants were concerned that Madoff's reported returns did not come from trades but instead were payments Madoff was making for his unauthorized use of client money to support his market making business. (NYAG Ivy Action, ¶ 62);

viii. that the Ivy 10b-5 Defendants' concerns about Madoff's legitimacy were further compounded when, in December of 1998, Madoff offered the Ivy 10b-5 Defendants another explanation for his option trading claiming that 30 to 50% of his option trading was done off-exchange which the Ivy 10b-5 Defendants knew, or were reckless in not determining, was impossible and also contradicted Madoff's prior representation that he did little off-exchange. (NYAG Ivy Action, ¶ 70);

ix. that the Ivy 10b-5 Defendants' concerns about Madoff's legitimacy were further compounded when, in December of 1998, Madoff denied that he was an expert market timer and said his success was due to his ability to execute trades more efficiently than others. (NYAG Ivy Action, ¶ 74);

x. that Ivy's principal, Defendant Wohl, believed that investing with Madoff was "a matter of faith based on great performance [which did not] justify any investment." (NYAG Ivy Action, ¶ 75);

xi. that Madoff was rated as one of Ivy's top ten risks in lists created by Ivy's Global Risk Management Committee (NYAG Ivy Action, ¶ 122); and

xii. that the Ivy 10b-5 Defendants had serious concerns because Madoff self-cleared and was audited by a small unknown accounting firm. (NYAG Ivy Action, ¶ 65).

f. The Ivy 10b-5 Defendants concealed the above referenced facts from Plaintiffs and Investor Class members, by pursuing a deceptive course of conduct that included, but was not limited to:

i. maintaining a 3-4% investment in Madoff for its Proprietary Funds to foster the false impression for Ivy's advisory clients, such as Beacon (and therefore the members of the Classes), that Ivy had confidence in Madoff and failing to communicate this internal limitation to Plaintiffs and the Class. (NYAG Ivy Action, ¶ 67);

ii. sending false and misleading letters in July and August of 1998, January and July of 1999, February of 2001, August of 2001, and August of 2002 to JPJA, Jeanneret and Danziger that significantly downplayed Ivy's concerns about Madoff while failing to communicate Ivy's serious concerns that should have been conveyed by to Plaintiffs and the Class. (NYAG Ivy Action, ¶ 68);

iii. making fraudulent statements in a meeting with JPJA and one of JPJA' clients on December 30, 1998, which represented that Ivy's due diligence "show[ed] no problem for Madoff" and that Ivy did not maintain more than 5-7% with any one manager, when

in fact Ivy had imposed a lower 3% limit for Madoff for Ivy's proprietary funds while failing to communicate these concerns to Plaintiffs and the Class. (NYAG Ivy Action, ¶¶ 84-87);

iv. steering certain prospective investors interested in investing with Madoff away from Madoff's operation citing Ivy's fiduciary duties, while continuing to encourage the investment of Plaintiffs' and Investor Class members' assets in Madoff. (NYAG Ivy Action, ¶ 108);

v. vouching for Madoff's legitimacy to JPJA in a meeting with JPJA on April 4, 2000 while failing to communicate its serious concerns about Madoff to Plaintiffs and the Class. (NYAG Ivy Action, ¶ 115);

vi. withdrawing from Madoff all of Ivy's Proprietary Funds' investments in 2000 and failing to disclose the actual reason for such withdrawal. (NYAG Ivy Action, ¶¶ 104-106);

vii. concealing material information concerning Madoff in meetings and telephone conversations after 2004 (NYAG Ivy Action, ¶ 123); and

viii. executing new agreements with JPJA (concerning the Income Plus feeder fund), and Beacon (concerning the Beacon Fund), in 2007 and 2006 respectively, that specifically purported to exclude Madoff from the managers who Ivy was obligated to research, monitor, evaluate and meet with, while failing to disclose the existence or substance of these agreements to Plaintiffs and other Investor Class members.

g. Ivy's conduct was communicated to Plaintiffs and the members of the Classes, who reasonably relied on the Ivy 10b-5 Defendants' good faith performance of their duties, as reflected in the OMs and other documents cited herein. Notably, the Beacon Defendants were not investment professionals, but rather were attorneys. Thus, Ivy's prominent

role as Investment Consultant was critical to the success of the Fund, Based on the Ivy 10b-5 Defendants deceptive conduct, this made the ultimate deception of Plaintiffs and the Class Members necessary or inevitable.

436. **10b-5(b) Omissions:** The Ivy 10b-5 Defendants knew that the advice they would dispense to BAMC and JPJA would be relied upon by BAMC and JPJA in making investment allocation decisions for the benefit of Plaintiffs and other members of the Investor Class. As such, members of the Investor Class and Ivy shared a relationship approaching privity. Accordingly, the Ivy 10b-5 Defendants had a duty to disclose material information concerning Madoff's investment services to the Beacon and Jeanneret Defendants and Plaintiffs and members of the Investor Class. Additionally, Ivy had a duty to disclose as a participant in the Investor offering which was compensated for its services and insider relationship with Madoff. Rather than do so, the Ivy 10b-5 Defendants engaged in active concealment and omitted to disclose such facts to the detriment of Plaintiffs and members of the Investor Class. Ivy also failed to disclose to Plaintiffs and members of the Investor Class of its inability to replicate Madoff's results. Plaintiffs and members of the Investor Class relied on the experience and expertise in alternative investment fund-of-funds portfolio management that the Ivy 10b-5 Defendants brought to the engagement. Moreover, Ivy also disseminated false and misleading performance reports at relevant times concerning the purported performance of the Fund, which falsely reported returns of the Fund to the Fund's investors. Ivy also prepared and disseminated on its stationary false and misleading performance reports at relevant times concerning the purported performance of the Fund, which falsely reported returns of the Fund to the Fund's investors. For example, a performance report as of December 31, 2002 purports to show the Fund's monthly and year-end gross and net return for calendar year 2002, which was false and

misleading because it was based in large part on Madoff's fictitious returns. Similarly, November 30, 2007 and December 31, 2007 reports purport to show results for each month in 2007 and year to date compounded gross and net returns. These returns were also false and misleading because they were based in large part on Madoff's fictitious returns. Having chosen to prepare and disseminate purported performance reports, Ivy undertook a duty to disclose to the Fund's investors all material information concerning the underlying investments of the Fund, most notably the Ivy 10b-5 Defendants' long term serious concerns regarding Madoff, as alleged in detail herein, especially in light of the fact that the Beacon Fund was substantially invested with Madoff at all relevant times.

437. In addition to the duties of full disclosure imposed on the Ivy 10b-5 Defendants as a result of their making affirmative statements, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with SEC regulations, including truthful, complete and accurate information with respect to the Fund. The Individual Ivy 10b-5 Defendants' primary liability arise from the following facts: (i) they were high-level executives and directors of Ivy during the Relevant Period and were members of Ivy's management team; (ii) by virtue of their responsibilities and activities as senior officers, they were privy to and participated in the drafting, reviewing, and/or approving the misleading statements, omissions, releases, reports, and other public representations alleged to be false and misleading herein; (iii) they knew or had access to the material adverse non-public information about Madoff which were not disclosed; and (iv) they were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

438. Moreover, pursuant to the DIMA's, JPJA acted as the "attorney-in-fact" for its clients, which Ivy knew. Accordingly, any statements or omissions made by the Ivy 10b-5 Defendants to BAMC or JPJA were *de facto* statements to the clients, and the Ivy 10b-5 Defendants had the obligation to provide full and complete disclosure of all material facts to BAMC and JPJA for further dissemination to the clients. BAMC was the agent of the investors in the Beacon Fund, and Ivy's misrepresentations or omissions made to BAMC are *de facto* statements made to Plaintiffs.

439. **10b-5 (b) Misrepresentations:**[13] Due to the fact that the Ivy 10b-5 Defendants functioned as insiders with respect to the Beacon Offering, and were the sources of the material misstatements appearing in the Beacon OMs, the misstatements may be fairly attributed to them given their collective expertise and disclosures concerning their management of similar investment funds. As discussed herein, the Ivy 10b-5 Defendants were, for all intents and purposes, "insiders" for purposes of the Beacon Offering given their long-standing relationship with Madoff and the role they played in promoting Madoff's services to BAMC and countless other investors. Second, the Ivy 10b-5 Defendants were represented as having the relevant expertise in the strategy espoused in the Beacon OMs given their experience with Ivy's proprietary funds, Rosewood and Birchwood. As such, Plaintiffs and Investor Class members attributed statements concerning Ivy, its role and expertise, and the split strike strategy, to Ivy at the time the statements were disseminated. In addition, Plaintiffs attributed the statements concerning Ivy's duties with respect to the selection of managers for the Beacon Fund's assets to the Ivy 10b-5 Defendants, as stated above.

---

[13] Plaintiffs recognize that the Second Circuit's recent decision in *Pacific Inv. Management Co. LLC v. Mayer Brown LLP*, --- F.3d ----, 2010 WL 1659230 (2d Cir. Apr. 27, 2010) bears on these claims. We note that Circuit Judge Parker's concurring opinion in the decision recognized a split among Circuits on the issue of attribution and, indeed, the lack of clarity within the Second Circuit itself, given prior Second Circuit decisions. Judge Parker then indicated that the case was an appropriate one for either *en banc* or Supreme Court review.

The source of these statements could only have been the Ivy 10b-5 Defendants because 1) the Ivy 10b-5 Defendants introduced the Beacon Defendants to Madoff and had a long-standing relationship with Madoff; and 2) the Ivy 10b-5 Defendants knew the level of expertise and resources Ivy possessed and the level of due diligence and evaluation that Ivy could exercise over allocations made to outside managers. The Ivy 10b-5 Defendants' deceptive conduct, which concealed material facts concerning Madoff's operation, made the statements in the OMs materially misleading and only the Ivy 10b-5 Defendants could correct these misstatements by disclosing their serious concerns to the Beacon and Jeanneret Defendants and Plaintiffs and other Investor Class Members. The Ivy 10b-5 Defendants' pattern of concealment and deception rendered these statements false and misleading, and that the public relied upon these statements in making an investment decision. The Individual Ivy 10b-5 Defendants' primary liability arise from the following facts: (i) they were high-level executives and directors of Ivy during the Relevant Period and were members of Ivy's management team; (ii) by virtue of their responsibilities and activities as senior officers, they were privy to and participated in the drafting, reviewing, and/or approving the misleading statements, omissions, releases, reports, and other public representations alleged to be false and misleading herein; (iii) they knew or had access to the material adverse non-public information about Madoff which were not disclosed; and (iv) they were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

440. For the same reason, the materially misstated financial reports that were disseminated to Plaintiffs and other Investor Class members are fairly attributable to the Ivy 10b-5 Defendants because Ivy was responsible for the administrative and accounting functions that formed the basis for these reports and was in possession of material information that revealed

that the data was fabricated. These reports were relied on by Plaintiffs and other Investor Class members in deciding to purchase interests in the Fund, and continuing to invest in the Fund.

441. Ivy also disseminated false and misleading performance reports at relevant times concerning the purported performance of the Fund, which falsely reported returns of the Fund to the Fund's investors. For example, a performance report as of December 31, 2002 purports to show the Fund's monthly and year-end gross and net return for calendar year 2002, which was false and misleading because it was based in large part on Madoff's fictitious returns. Similarly, November 30, 2007 and December 31, 2007 reports purport to show results for each month in 2007 and year to date compounded gross and net returns. These returns were also false and misleading because they were based in large part on Madoff's fictitious returns.

442. Moreover, pursuant to the DIMA's, JPJA acted as the "attorney-in-fact" for its clients, which Ivy knew. BAMC was the agent of the investors in the Beacon Fund, and Ivy's misrepresentations and omissions made to BAMC are *de facto* statements made to Plaintiffs. Accordingly, any statements made by the Ivy 10b-5 Defendants to BAMC or JPJA were *de facto* statements to the clients, and the Ivy 10b-5 Defendants had the obligation to provide full and complete disclosure of all material facts to BAMC and JPJA for further dissemination to the clients.

443. The purpose and effect of such conduct and fraudulent misstatements was, among other things, to create a false appearance of initial and ongoing due diligence in furtherance of the scheme to defraud the Fund's investors and induce Plaintiffs and the other members of the Investor Class to purchase Membership interests in the Fund and to remain invested in the Fund, the assets of which the Ivy 10b-5 Defendants ultimately funneled to BMIS and Madoff's fraudulent investment services.

444. ***Scienter*: Conscious Recklessness**— In light of the facts alleged herein, the Ivy 10b-5 Defendants were consciously reckless and possessed a state of mind approximating actual intent to deceive given the deceptive course of conduct outlined herein. The Ivy 10b-5 Defendants acted with reckless disregard for the truth by acting in a highly unreasonable manner and by failing to notify members of the Investor Class that assets of the Fund were invested in a suspect manner suggestive of either a Ponzi scheme or unlawful front-running being perpetuated by Madoff, in an extreme departure from the standards of ordinary care instead chose to conceal their serious and contemporaneous reservations concerning the legitimacy of Madoff's investment services, as reflected in internal emails and various letters, information that would have been material to a reasonable investor in making an investment decision. As alleged at length herein, the Ivy 10b-5 Defendants were unable to replicate Madoff's results, had actual knowledge of serious problems with Madoff, that, among other suspicious facts, Madoff had lied to them and was not engaged in OEX transactions, and therefore that Madoff was a fraud, including their own inability and unwillingness to conduct due diligence on Madoff, and acted to protect their own interests (including by withdrawing Ivy's own proprietary investments in Madoff in 2000, and entering into agreements which sought to protect Ivy from Madoff exposure), while knowing that the Plaintiffs and Class members remained substantially exposed to Madoff. In addition, Ivy ignored the myriad red flags that are alleged at length herein, which caused other investment professionals to conclude that Madoff was an unacceptable risk.

445. ***Scienter*: Motive and Opportunity—** The Ivy 10b-5 Defendants, and in particular, Larry Simon and Howard Wohl, were motivated to further the scheme due to two reasons which amount to a concrete and personal benefit:

a. First, in collecting 50% of Beacon's inflated management and incentive fees that were uniquely available by placing assets under Madoff's management, as alleged herein. In 1998, fees that Ivy collected from Plaintiff, the Class and other similarly situated clients, amounted to approximately 16% of Ivy's total revenue and represented a steady flow of income for Ivy throughout the Investor Class Period (NYAG Ivy Action, ¶ ¶ 77, 117)(citing a 2001 e-mail from Defendant Larry Simon to Defendant Wohl in which Simon responds to a suggestion by Wohl to terminate Ivy's relationship with one of its own clients who was heavily exposed to Madoff, by replying: "You may be spending too much time in the sun! If we give up Madoff, John [Jeanneret] has opportunity to move in");

b. Second, to maintain its ranking in the industry because the amount of assets that were exposed to Madoff through Ivy's clients in 1998, totaled approximately $300 million and represented 18% of Ivy's AUM. According to Defendant Larry Simon's sworn testimony, asset management firms are ranked by AUM and therefore, the well being of the Ivy 10b-5 Defendants was inextricably tied to their ability to maintain a critical mass of clients with Madoff. (NYAG Ivy Action, ¶ 18)(June 2001 e-mail from Larry Simon to Wohl stating "[W]ho would have thought that the $5 mill would lead to $145 mil and [Jeanneret's] funds . . .it helped to contribute to building Ivy's AUM and credibility, despite our real concerns about BLM [Madoff]"). Ivy's principals, Larry Simon and Wohl were handsomely rewarded for their deceptive conduct spanning nearly two decades; in 2000, each received a concrete and personal benefit of more than $100 million for selling Ivy to the Bank of New York.

446. **Reliance & Causation**: In ignorance of the false and misleading nature of the acts described herein and the deceptive and manipulative devices and contrivances employed by the Ivy 10b-5 Defendants, Plaintiffs and the other members of the Investor Class relied, to their

detriment, on such deceptive conduct, misleading statements and omissions in purchasing and maintaining Memberships in the Beacon Fund. Indeed, Beacon investors were required to sign Subscription Agreements stating that the investor has "carefully read [and] understands" the Offering Memorandum, and has "relied . . . on the information in the [Offering] Memorandum." Subscription Agreement at S-2, ¶¶ 2, 4.

447. The deceptive conduct and materially false statements and omissions particularized in this Complaint were material to, and directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the members of the Classes.

448. Lead Plaintiffs' and the Classes' losses were proximately caused by the Ivy 10b-5 Defendants' active and primary participation in the scheme to defraud and misrepresentations and omissions as alleged herein. If Defendants had not engaged in the wrongdoing alleged herein, Plaintiffs and members of the Investor Class would not have invested in the Beacon Fund, or would have redeemed those interests long before the fraud was revealed. Following the revelation of the Madoff Ponzi scheme, the investments of Plaintiffs and members of the Investor Class were decimated. Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and other members of the Investor Class.

449. By reason of the foregoing, the Ivy 10b-5 Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices,

and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Investor Class in connection with their purchases of Memberships in the Beacon Fund.

450. **Damages:** As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Investor Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

**COUNT II**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Brought on Behalf of the Investor Class (including the Jeanneret Investor Subclass), Against BAMC)**

451. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

452. During the Investor Class Period, BAMC: (i) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Investor Class Period, did deceive the investing public, including Plaintiffs and members of the Investor Class; (ii) made various deceptive and untrue statements of material fact, and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and members of the Investor Class; and (iii) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiffs and members of the Investor Class. Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information from the members of the Class as specified herein.

453. **10b-5(b) Omissions:** In addition to the duties of full disclosure imposed on BAMC as a result of making affirmative statements, or participation in the making of affirmative statements and reports to the investing public, BAMC had a duty to promptly disseminate

truthful information that would be material to investors, in compliance with SEC regulations, including truthful, complete and accurate information with respect to the Fund.

454. As set forth herein, BAMC had a duty to disclose to Plaintiffs and members of the Investor Class its inability to conduct due diligence on Madoff and his operations and omitted to disclose this fact.

a. BAMC failed to disclose to Plaintiffs and members of the Class that Ivy expressed concerns about Madoff in letters sent to BAMC by the Ivy 10b-5 Defendants. (NYAG Ivy Action, ¶ 90). These concerns put BAMC on fraud alert, and should have caused BAMC to conduct extensive due diligence on Madoff. Yet, BAMC instead chose to remain silent about these letters, never once communicating to Plaintiffs that concerns had been raised;

b. BAMC failed to disclose its own inability to conduct due diligence on Madoff, and that it was blindly relying on Ivy, despite having received letters sent to BAMC by the Ivy 10b-5 Defendants, which put BAMC on fraud alert, including information reflecting Ivy's concerns over Madoff's operations which should have caused BAMC to investigate Madoff independently of Ivy. In addition, BAMC ignored the myriad red flags that are alleged at length herein, which caused other investment professionals to conclude that Madoff was an unacceptable risk. As alleged herein, the OMs failed to disclose the fact that Madoff's *modus operandi* would not permit them to conduct adequate due diligence.

c. BAMC failed to disclose the fact that it entered into the 2006 CA with Ivy, which sought to relieve Ivy of any obligations of monitoring and evaluating Madoff, thereby rendering the OMs even more false and misleading. Plaintiffs and members of the Investor Class relied on the role that the Ivy Defendants (as investment professionals) would play in analyzing

managers to whom assets had been entrusted, especially given the fact that the Defendants Danziger and Markhoff are attorneys and not registered investment professionals.

455. **<u>10b-5(b) Misrepresentations</u>:** As alleged herein, the OMs contained materially false and misleading statements regarding the level of oversight and due diligence that BAMC and Ivy would provide to investors with regards to outside investment managers while knowing, or recklessly disregarding the fact that Madoff's *modus operandi* would not permit them to conduct adequate due diligence. As part and parcel of BAMC's scheme, BAMC directed the dissemination of false and misleading statements in the OMs as alleged herein (and adopted those false statements which Class Members reasonably attributed to Ivy), including false and misleading statements concerning the allocation and reallocation of the Fund's assets, the monitoring of the Fund's performance, monitoring Madoff's adherence to investment strategies and objectives, ongoing analysis of Madoff, the level of due diligence that could be performed on Madoff's operations, and the extent to which it had researched and evaluated the purported strategy to be employed in managing the Fund's assets), as well as the dissemination of misleading financial statements and quarterly and annual financial and audit reports that were the product of inadequate due diligence.

456. The purpose and effect of such conduct and fraudulent misstatements was, among other things, to create a false appearance of initial and ongoing due diligence in furtherance of the scheme to defraud the Fund's investors and induce Plaintiffs and the other members of the Investor Class to purchase Membership interests in the Fund and to remain invested in the Fund, the assets of which the Ivy 10b-5 Defendants ultimately funneled to BMIS and Madoff's fraudulent investment services.

457. **<u>10b-5(a) and (c)</u>**: BAMC engaged in the following deceptive conduct, in the investment sphere, in violation of Rule 10b-5(a) and (c), upon which Plaintiffs and members of the Investor relied:

a. BAMC failed to disclose to Plaintiffs and members of the Class that Ivy expressed concerns about Madoff in letters sent to BAMC by the Ivy 10b-5 Defendants. (NYAG Ivy Action, ¶ 90). These concerns put BAMC on fraud alert, and should have caused BAMC to conduct extensive due diligence on Madoff. Yet, BAMC instead chose to remain silent about these letters, never once communicating to Plaintiffs that concerns had been raised;

b. BAMC failed to disclose that its was blindly relying on Ivy's reassurances, despite having received information which put BAMC on fraud alert, including information reflecting Ivy's concerns over Madoff's operations which should have caused BAMC to investigate Madoff independently of Ivy.

c. BAMC entered into the 2006 CA with Ivy, which sought to relieve Ivy of any obligations of monitoring and evaluating Madoff, contrary to representations made to Plaintiffs and members of the Investor Class in the OMs.

458. ***<u>Scienter</u>*****<u>: Conscious Recklessness</u>**— In light of the facts alleged herein, BAMC was consciously reckless and possessed a state of mind approximating actual intent to deceive given the deceptive course of conduct and misstatements and omissions outlined herein. BAMC acted with reckless disregard for the truth by acting in a highly unreasonable manner and by failing to notify members of the Investor Class that assets of the Fund were invested in a suspect manner suggestive of either a Ponzi scheme or unlawful front-running being perpetuated by Madoff, in an extreme departure from the standards of ordinary care instead chose to conceal from Plaintiffs and other Investor Class members, their actual knowledge of Ivy's serious and

contemporaneous reservations concerning the legitimacy of Madoff's investment services, information that would have been material to a reasonable investor in making an investment decision. BAMC also knew or should have known of the myriad red flags which should have put BAMC on fraud alert.

459. ***Scienter*: Motive and Opportunity—** BAMC was motivated to further the scheme due to the inflated management, referral and incentive fees that were uniquely available by placing assets under Madoff's management because of his practice of charging only a commission based on the trades he purportedly executed, rather than charging a percentage of the alleged investments' return. This allowed BAMC to report a higher return on the investments, which in turn, added to their portfolio value and increased the basis upon which their percentage fees were calculated. BAMC had the opportunity to perpetuate the scheme given that they exercised control over the assets of the members of the Investor Class.

460. **Reliance & Causation**: In ignorance of the false and misleading nature of the acts described herein and the deceptive and manipulative devices and contrivances employed by BAMC, Plaintiffs and the other members of the Investor Class relied, to their detriment, on such deceptive conduct, misleading statements and omissions in deciding to invest and stay invested in Madoff. Indeed, Beacon investors were required to sign Subscription Agreements stating that the investor has "carefully read [and] understands" the Offering Memorandum, and has "relied . . . on the information in the [Offering] Memorandum." Subscription Agreement at S-2, ¶¶ 2, 4. Thus, Lead Plaintiffs and other Investor Class members were required to and did read the representations in the OMs, and reasonably relied on those representations in making their investment decisions.

461. The deceptive conduct and materially false statements and omissions particularized in this Complaint were material to, and directly or proximately caused or were a substantial contributing cause of the damages sustained by, Plaintiffs and the members of the Class.

462. Plaintiffs and the other members of the Investor Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial. Lead Plaintiffs' and the Class' losses were proximately caused by BAMC's active and primary participation in the scheme to defraud and misrepresentations and omissions as alleged herein. If Defendants had not engaged in the wrongdoing alleged herein, Plaintiffs and members of the Investor Class would not have invested in the Beacon Fund, or would have redeemed those interests long before the fraud was revealed. Following the revelation of the Madoff Ponzi scheme, the investments of Plaintiffs and members of the Investor Class were decimated. BAMC's conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and other members of the Investor Class.

463. By reason of the foregoing, BAMC directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Investor Class in connection with their investment contracts executed with BAMC. BAMC's conduct was communicated to Plaintiffs and the Class, who reasonably relied on the BAMC's good faith performance of its

duties, as reflected in the OMs and other documents cited herein. This made the ultimate deception of Plaintiffs and the Class Members necessary or inevitable.

464. **Damages:** As a direct and proximate result of their wrongful conduct, Plaintiffs and members of the Investor Class substantial suffered damages in connection with their investments in an amount to be proved at trial.

**COUNT III**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Brought on Behalf of the Jeanneret Investor Subclass, Against JPJA)**

465. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

466. During the Jeanneret Investor Subclass Period, JPJA: (a) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Jeanneret Investor Subclass Period, did deceive the investing public, including Plaintiffs and members of the Jeanneret Investor Subclass; (b) made various deceptive and untrue statements of material fact, and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and members of the Jeanneret Investor Subclass; and (c) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiffs and members of the Jeanneret Investor Subclass. Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information from the members of the Class as specified herein.

467. **10b-5(b) Omissions:** In addition to the duties of full disclosure imposed on JPJA as a result of making affirmative statements, or participation in the making of affirmative

statements and reports to the investing public, JPJA had a duty to promptly disseminate truthful information that would be material to investors, in compliance with SEC regulations, including truthful, complete and accurate information with respect to the Fund.

468. As set forth herein, JPJA had a duty to disclose to Plaintiffs and members of the Jeanneret Investor Subclass their inability to conduct adequate due diligence and omitted to disclose this fact.

a. JPJA failed to disclose to Plaintiffs and members of the Class that Ivy expressed concerns about Madoff in discussions and letters sent to JPJA by the Ivy 10b-5 Defendants stating in words or in substance that they could not "close the loop" on Madoff. NYAG Ivy Action ¶ 90. These concerns put JPJA on fraud alert, and should have caused JPJA to conduct further extensive due diligence on Madoff. Yet, JPJA instead chose to remain silent about these letters, never once communicating to Plaintiffs that concerns had been raised;

b. JPJA also failed to disclose to Plaintiffs and members of the Jeanneret Investor Subclass of its inability to replicate Madoff's results;

c. JPJA failed to disclose that its was blindly relying on Ivy's reassurances, despite having received information which put JPJA on fraud alert, including information reflecting Ivy's concerns over Madoff's operations which should have caused JPJA to investigate Madoff independently of Ivy. In addition, JPJA ignored the myriad red flags that are alleged at length herein, which caused other investment professionals to conclude that Madoff was an unacceptable risk. JPJA failed to disclose the fact that Madoff's *modus operandi* would not permit it to conduct adequate due diligence.

d. JPJA failed to disclose the fact that it entered into the 2007 CA with Ivy, which sought to relieve Ivy of any obligations of monitoring and evaluating Madoff.

469. **<u>10b-5(b) Misrepresentations</u>:** For the reasons stated herein, JPJA issued DIMAs containing materially false and misleading statements regarding the level of oversight and due diligence JPJA would provide to investors with regards to outside investment managers while knowing, or recklessly disregarding the fact that Madoff's *modus operandi* would not permit them to conduct adequate due diligence. As part and parcel of JPJA's scheme, JPJA directed the dissemination of false and misleading statements in the responses to RFPs, misleading financial statements and audit reports that were the product of inadequate due diligence and that Plaintiffs and other Jeanneret Investor Subclass members relied on.

470. The purpose and effect of such conduct and fraudulent misstatements was, among other things, to create a false appearance of initial and ongoing due diligence in furtherance of the scheme to defraud investors and induce Plaintiffs and the other members of the Jeanneret Investor Subclass to elect to retain Madoff's fraudulent investment services.

471. **<u>10b-5(a) and (c)</u>**: JPJA engaged in the following deceptive conduct, in the investment sphere, in violation of Rule 10b-5(a) and (c), upon which Plaintiffs and members of the Jeanneret Investor Subclass relied:

a. JPJA failed to disclose to Plaintiffs and members of the Class that Ivy expressed concerns about Madoff in discussions and letters sent to JPJA by the Ivy 10b-5 Defendants stating in words or in substance that they could not "close the loop" on Madoff. NYAG Ivy Action ¶ 90. These concerns should have put JPJA on fraud alert, causing JPJA to conduct further extensive due diligence on Madoff. Yet, JPJA instead chose to remain silent about these letters, never once communicating to Plaintiffs that concerns had been raised;

b. JPJA concealed from Plaintiffs its failure to replicate Madoff's results, though it repeatedly attempted and failed to do so each time;

c. JPJA failed to disclose that its own inability to conduct due diligence on Madoff, and that it was blindly relying on Ivy, despite having received information which put JPJA on fraud alert, including information reflecting Ivy's concerns over Madoff's operations which should have caused JPJA to investigate Madoff independently of Ivy. In addition, JPJA ignored the myriad red flags that are alleged at length herein, which caused other investment professionals to conclude that Madoff was an unacceptable risk.. JPJA blindly relied on Ivy's reassurances as its sole basis for investing the assets of members of the Jeanneret Investor Subclass with Madoff;

d. JPJA entered into the 2007 CA with Ivy, which sought to relieve Ivy of any obligations of monitoring and evaluating Madoff.

472. ***Scienter*: Conscious Recklessness**— In light of the facts alleged herein, JPJA was consciously reckless and possessed a state of mind approximating actual intent to deceive given the deceptive course of conduct outlined herein. JPJA acted with reckless disregard for the truth by acting in a highly unreasonable manner and by failing to notify members of the Jeanneret Investor Subclass that assets of the Fund were invested in a suspect manner suggestive of either a Ponzi scheme or unlawful front-running being perpetuated by Madoff, in an extreme departure from the standards of ordinary care instead chose to conceal from Plaintiffs and other Jeanneret Investor Subclass members, their knowledge of Ivy's serious and contemporaneous reservations concerning the legitimacy of Madoff's investment services, information that would have been material to a reasonable investor in making an investment decision.

473. ***Scienter*: Motive and Opportunity—** JPJA was motivated to further the scheme due to the inflated management and incentive fees that were uniquely available by placing assets under Madoff's management because of his practice of charging only a commission based on the

trades he purportedly executed, rather than charging a percentage of the alleged investments' return. This allowed JPJA to report a higher return on the investments, which in turn, added to their portfolio value and increased the basis upon which their percentage fees were calculated. JPJA had the opportunity to perpetuate the scheme given that they exercised control over the assets of the members of the Jeanneret Investor Subclass.

474. **Reliance & Causation**: In ignorance of the false and misleading nature of the acts described herein and the deceptive and manipulative devices and contrivances employed by JPJA, Plaintiffs and the other members of the Jeanneret Investor Subclass relied, to their detriment, on such deceptive conduct, misleading statements and omissions in deciding to invest and stay invested in Madoff. Plaintiffs and the other members of the Jeanneret Investor Subclass have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial. Lead Plaintiffs' and the Class' losses were proximately caused by JPJA's active and primary participation in the scheme to defraud and misrepresentations and omissions as alleged herein. If Defendants had not engaged in the wrongdoing alleged herein, Plaintiffs and members of the Jeanneret Investor Subclass would not have invested with JPJA, or would have redeemed their investments long before the fraud was revealed. Following the revelation of the Madoff Ponzi scheme, the investments of Plaintiffs and members of the Jeanneret Investor Subclass were decimated. JPJA's conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and other members of the Jeanneret Investor Subclass.

475. The deceptive conduct and materially false statements and omissions particularized in this Complaint were material to, and directly or proximately caused or were a substantial contributing cause of the damages sustained by, Plaintiffs and the members of the Class.

476. By reason of the foregoing, JPJA directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Jeanneret Investor Subclass in connection with their investment contracts executed with JPJA. JPJA's conduct was communicated to Plaintiffs and the Class, who reasonably relied on the JPJA's good faith performance of its duties, as reflected in the documents cited herein. This made the ultimate deception of Plaintiffs and the Class Members necessary or inevitable.

477. **Damages:** As a direct and proximate result of their wrongful conduct, Plaintiffs and members of the Jeanneret Investor Subclass substantial suffered damages in connection with their investments in an amount to be proved at trial.

**COUNT IV**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Brought on Behalf of the Investor Class (including the Jeanneret Investor Subclass), Against Friedberg)**

478. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

479. During the Investor Class Period, Defendants: (a) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Investor Class Period, did deceive the investing public, including Plaintiffs and members of the Investor Class; (b) made various deceptive and untrue statements of material fact, and/or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading to Plaintiffs and members of the Class; and (c) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiffs and members of the Investor Class.

480. In particular, Friedberg's scheme, plan and course of conduct, acts, practices and course of business unfolded as follows:

a. As the Beacon Fund's auditors, Freidberg knew or should have known that nearly three-quarters of the Beacon Fund's assets were not invested according to strategies set forth in the Offering Memoranda, but in fact were part of Madoff's Ponzi scheme;

b. Friedberg recklessly engaged in the issuance and certification of fraudulent financial statements and audit reports that purported to be in compliance with GAAS. Friedberg knew, or should have known, that it did not, nor could it, conduct audits in conformance with GAAS and the accounting principles adopted by the AICPA because of Madoff's secretive operations. Nevertheless, year after year, it issued clean audit reports on financial statements purporting to be in conformance with GAAS and containing false and misleading information regarding the Beacon Fund's investments;

c. In a note to the financial statements in audit opinions issued by Friedberg for the Beacon Fund, Friedberg admitted as much, stating that "[t]he Fund is not able to obtain the specific investments at some of the underlying private investment funds to the lack of available data." Because of the lack of evidentiary support, Friedberg should not have issued unqualified audit opinions that the Fund's financials "present fairly, in all material respects, the financial position of [the fund]. . . and the results of its operations and changes in net assets for the year then ended, in conformity with accounting principles generally accepted in the United

States of America." Plaintiffs and members of the Investor Class relied on Friedberg's unqualified audit opinions to their detriment, as alleged herein;

d. The purpose and effect of such conduct was, among other things, to create a false appearance of initial and ongoing due diligence in furtherance of the scheme to defraud the Fund's investors and induce Plaintiffs and the other members of the Investor Class to purchase and/or retain Membership interests in the Fund, the assets of which Defendants ultimately funneled to BMIS and Madoff's fraudulent investment services;

e. Had Plaintiffs and members of the Investor Class known of the material facts that Friedberg wrongfully concealed and misrepresented, and the falsity of Friedberg's representations in the audit reports, Plaintiffs and Investor Class members would not have purchased and/or retained their Memberships in the Beacon Fund;

f. Plaintiffs and members of the Investor Class, as a result of their purchase of Memberships in the Beacon Fund, and by reason of Friedberg's wrongful misrepresentations and omissions, have sustained, damages, and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial;

g. By reason of the foregoing, the loss to Plaintiffs and the members of the Class was within the zone of risk that Friedberg was retained to protect against and therefore Friedberg is jointly and severally liable to Plaintiffs and other Investor Class members;

h. Friedberg's fraudulent acts were willful and wanton, and stood in violation of GAAS. Accordingly, Plaintiffs and members of the Investor Class are entitled to damages;

i. Friedberg's conduct was communicated to Plaintiffs and the Class, who reasonably relied on the unqualified audit opinions issued by Friedberg and which were

communicated directly to members of the Class. This made the ultimate deception of Plaintiffs and the Class Members necessary or inevitable.

481. In ignorance of the false and misleading nature of the acts described herein and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiffs and the other members of the Investor Class relied, to their detriment, on such deceptive conduct, misleading statements and omissions in purchasing Memberships in the Beacon Fund. Plaintiffs and the other members of the Investor Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

482. As a result of Friedberg's conduct in furtherance of this scheme, investors from the Class have suffered substantial losses.

483. If Friedberg had not engaged in the wrongdoing alleged herein, Plaintiffs and members of the Investor Class would not have invested in the Beacon Fund. Following the revelation of the Madoff Ponzi scheme, the investments of Plaintiffs and members of the Investor Class were decimated.

484. As set forth herein, Friedberg had a duty to disclose to Plaintiffs and members of the Investor Class its inability to issue unqualified audit opinions. Friedberg also ignored obvious signs of fraud. The danger of fraud was so obvious that Friedberg must have been aware of the fraud, given that it knew that it was were unable to independently verify Madoff's purported investment strategy or operations.

485. By reason of the foregoing, Friedberg directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Investor Class in connection with their purchases of Memberships in the Beacon Fund.

486. As a direct and proximate result of their wrongful conduct, Plaintiffs and members of the Investor Class suffered damages in connection with their investments.

**COUNT V**
**By Investor Class (including the Jeanneret Investor Subclass) for Violation of Section 20(a) of the Exchange Act**
**(Against Danziger and Markhoff)**

487. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

488. Danziger and Markhoff acted as controlling persons of BAMC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of BAMC's operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BAMC, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading, and participation in the scheme and course of conduct alleged herein. Danziger and Markhoff had the ability to prevent the issuance of the allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme and course of conduct.

489. Danziger and Markhoff had direct and supervisory involvement in the day-to-day operations of BAMC and, therefore, had the power to control or influence the particular allegedly false and misleading statements giving rise to the securities violations alleged herein.

490. Danziger and Markhoff were directly involved in the actions of BAMC, and were thus culpable participants in the actions perpetrated by BAMC.

491. By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by BAMC, Danziger and Markhoff are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Memberships in the Beacon Fund.

**COUNT VI**
**By Investor Class (including the Jeanneret Investor Subclass) for**
**Violation of Section 20(a) of the Exchange Act**
**(Against Jeanneret and Perry)**

492. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

493. Jeanneret and Perry acted as controlling persons of JPJA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of JPJA' operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of JPJA, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading, and participation in the scheme and course of conduct alleged herein.

494. Jeanneret and Perry had direct and supervisory involvement in the day-to-day operations of JPJA and, therefore, had the power to control or influence the particular allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme or course of conduct.

495. Jeanneret and Perry oversaw the Discretionary Investment Management Agreements that various Jeanneret Investor Subclass members executed with JPJA, within which there were repeated misrepresentations of JPJA' investment strategy to investors. Pursuant to the Discretionary Investment Management Agreements between JPJA and the members of the

Jeanneret Investor Subclass, JPJA agreed to supervise and direct the investment of the assets of the members of the Jeanneret Investor Subclass. However, Jeanneret and Perry knew that the monies would be invested with Madoff, by virtue of JPJA' participation in the Beacon Fund, and thus, they could not be supervised and directed to the degree represented in the investment management agreements.

496. Jeanneret and Perry were directly involved in the actions of JPJA, and were thus culpable participants in the actions perpetrated by JPJA.

497. By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by JPJA, Jeanneret and Perry are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Jeanneret Investor Subclass suffered damages in connection with their purchases of Memberships in the Beacon Fund.

**COUNT VII**
**By Investor Class (including the Jeanneret Investor Subclass)**
**for Violation of Section 20(a) of the Exchange Act**
**(Against Individual Ivy Defendants and BONY)**

498. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

499. Individual Ivy Defendants acted as controlling persons or entities of Ivy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of Ivy's operations, and/or intimate knowledge of Ivy's contractual agreement with BAMC and JPJA, and intimate knowledge of BAMC's and JPJA's operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ivy, and thus, by virtue of such control over Ivy, indirect influence and control over BAMC and JPJA, including the content and dissemination of

the various statements that Plaintiffs allege herein as false and misleading. In particular, in addition to Defendants Larry Simon and Howard Wohl, the following Ivy Individuals had direct knowledge of Ivy's serious concerns regarding Madoff and culpably participated in Ivy's concealment spanning two decades and breach of its duty to disclose:

a. Defendant Fred P. Sloan, at various times during the Class Period served as Ivy's Chief Executive Officer, Director of Research, Chief of Investment Management, and Chief Investment Officer, and is, upon information and belief, through counsel's continuing independent research and investigation, the individual who is referred to as the "Chief of Investment Management" in the NYAG Ivy Action (*see* NYAG Ivy Action, ¶¶ 4, 52, 55-57, 62, 66, 67, 68, 70-71, 74, 75, 79). Accordingly, and upon information and belief, Defendant Sloan had knowledge of the facts, and participated in the conduct, alleged *supra*;

b. Defendant Geiger, who, at various times during the Class Period served as Ivy's Director of Research, Vice President and Head of Research, Director of Investments and Managing Director of Investments, is, upon information and belief, through counsel's independent research and investigation, the individual who is referred to as the "Director of Research" in the NYAG Ivy Action (*see* NYAG Ivy Action, ¶ 102). Accordingly, and upon information and belief, Defendant Geiger, had direct, personal knowledge, and/or constructive knowledge of the facts outlined *supra*, but nevertheless represented to Jeanneret, at a meeting on April 4, 2000, that Madoff was "essentially legitimate" (NYAG Ivy Action, ¶ 102).

c. At various times spanning the Class Period, the remaining Ivy Individual Defendants held positions of influence and control at Ivy and either had direct and personal knowledge or, alternatively, constructive knowledge of Ivy's serious concerns regarding Madoff's legitimacy, given their access to Ivy's "Inform system database which allowed Ivy

employees to record, share and access information, reports, and commentary on hedge fund managers and clients" (NYAG Ivy Action, ¶ 52, fn. 1). As such, the remaining Ivy Individual Defendants were on actual or constructive notice of Madoff's suspect operations and Ivy's ongoing deception of its clients, including Plaintiffs and other members of the Classes. Therefore, these defendants culpably participated in the fraud by remaining silent and breaching their duty to disclose material information concerning Madoff to Plaintiffs and other members of the Classes.

500. BONY, by virtue of its acquisition of Ivy in 2000, which was mainly due to Ivy's Taft-Hartley pension plan clientele, had the power to influence and control, and did influence and control the decision making of Ivy from the time of its acquisition to the time of the revelation of Madoff's fraud in December 2008. This includes BONY's involvement in Ivy's withdrawal of its Proprietary Funds from Madoff in 2000 and Ivy's execution of undisclosed contracts that disclaimed its due diligence and monitoring duties with respect to Madoff.

501. BONY was on either actual or constructive notice regarding Ivy's serious concerns about the legitimacy of Madoff's operations by virtue of its access to Ivy's Inform database that documented such concerns. Additionally, in conducting its due diligence prior to acquiring Ivy, BONY would have no doubt encountered the facts outlined *supra* which informed Ivy's knowledge that Madoff was a fraud. As such, BONY caused Ivy's withdrawal of its Proprietary Funds from Madoff in 2000 in order to shield itself from any potential liability. A March 21, 2001 email from Larry Simon to Wohl evinces BONY's wariness of incurring Madoff liability. NYAG Ivy Action, ¶ 117.

502. By 2005, Ivy, under BONY's control, had formed an internal "Global Risk Management Committee" that assessed and addressed Ivy's business risk. (NYAG Ivy Action, ¶

122). In 2005 and 2007, the Global Risk Management Committee made lists of what it considered as Ivy's ten largest risks. *Id.* Both lists rated Madoff as one of Ivy's top ten risks and the 2005 list ranked Madoff as Ivy's fourth largest risk. *Id.* Armed with this grave risk assessment, BONY had the power and control over Ivy to ensure that proper disclosures were made to Plaintiffs and other Class members. Nonetheless, BONY neglected to exercise its authority in such a manner. Instead it chose to culpably participate in Ivy's fraud as Ivy executed secret agreements with Beacon Associates Management Corp. and JPJA in 2006 and 2007 respectively, which excluded Madoff from the managers who Ivy was obligated to research, monitor, evaluate, and meet with.

503. By virtue of their positions as controlling persons or entities, the Individual Ivy Defendants and BONY are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the members of each Class suffered damages in connection with their purchases of Memberships in the Beacon Fund and/or their investments with JPJA that were ultimately invested with Madoff.

**COUNT VIII**
**By the ERISA Class and the Jeanneret ERISA Subclass for Breach of Fiduciary Duty of Prudence and Loyalty Pursuant to ERISA**
**(<u>Against the Beacon, Ivy, BONY and Jeanneret Defendants</u>)**

504. ERISA Plaintiffs who are Trustees and/or participants in employee benefit plans ("ERISA Plaintiffs") repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

505. ERISA § 404(a)(1)(B) requires that a fiduciary to an employee benefit plan discharge his duties solely in the interest of the participants and beneficiaries of the plan they serve "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

506. ERISA § 404(a)(1)(A) requires that a fiduciary to an employee benefit plan act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A).

507. As set forth in detail *supra*, the Beacon, Ivy and BONY Defendants were fiduciaries within the meaning of ERISA § 3(21), with respect to the management and disposition of the assets invested in the Beacon Fund of those Plans whose participants are members of the ERISA Class. Likewise, the Jeanneret, Ivy and BONY Defendants were fiduciaries within the meaning of ERISA § 3(21) with respect to the assets of those Plans whose participants are members of the Jeanneret ERISA Subclass whose assets were invested in the Beacon Fund by the Jeanneret Defendants acting as investment manger for such Plans. As such, the Beacon Defendants, Ivy and the BONY defendants owed a duty of prudence and loyalty to ERISA Plaintiffs and ERISA Class members, and the Jeanneret Defendants, Ivy and the BONY Defendants owed a duty of prudence and loyalty to the ERISA Plaintiffs and the Jeanneret ERISA Subclass.

508. The Beacon, Ivy and BONY Defendants breached their duties of prudence and loyalty with respect to the management of the Plan assets held by the Beacon Fund by, *inter alia*:

a. Failing to sufficiently investigate the investments controlled by Madoff or BMIS to insure that they were a safe, prudent, honest and suitable investment for employee pension benefit plans and their participants and beneficiaries;

b. Failing to identify warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS;

c. Failing to act on warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS by:

i. Entrusting the assets of the Beacon Fund to Madoff and BMIS or advising that they be so entrusted; and

ii. Failing to cause the withdrawal of the assets of the Beacon Fund from Madoff and BMIS or failing to advise without qualification that they be so removed.

509. The Ivy and BONY Defendants breached their duty of prudence and loyalty with respect to the management of the Plan assets held by the Beacon Fund as set forth above despite:

i. Having knowledge of specific facts about Madoff that indicated that investor money should not be invested with Madoff;

ii. Having concluded that Madoff had lied in describing his purported strategy and that the strategy could not possibly have been followed due to the lack of OEX options available to support that assets that Madoff controlled and purportedly managed;

iii. Advising other clients not to invest with Madoff; and Limiting and ultimately removing Ivy's proprietary funds' investments with Madoff.

All the foregoing acts and omissions occurred, at least in part, because the Beacon, Ivy and BONY Defendants put their interest in BAMC and Ivy continuing to receive management and/or referral fees ahead of the interests of the participants and beneficiaries of the plans for which they served as fiduciaries. Without the consistently high returns and low volatility purportedly

offered by Madoff, these Defendants understood that they risked losing assets under management and the fee income that was dependent on those assets under management, fee income that was enhanced by Madoff's policy of purportedly not taking a fee for his management services, charging instead for brokerage. The Jeanneret, Ivy and BONY Defendants breached their duties of prudence and loyalty with respect to the management of the Plans assets owned by the Jeanneret ERISA Subclass in connection with the investment of those Plan assets in the Beacon Fund by, *inter alia*:

a. Failing to sufficiently investigate the investments controlled by Beacon, Ivy and BONY Defendants, Madoff or BMIS to insure that they were a safe, prudent, honest and suitable investment for union pension benefit plans and their participants and beneficiaries;

b. Failing to identify warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS in which the Beacon Fund predominantly invested;

c. Failing to act on warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS in which the Beacon Fund predominantly invested by:

iv. Entrusting the assets of the employee benefit plan clients that JPJA served as an investment manager to the Beacon, Ivy and BONY Defendants, and ultimately to BMIS through the Beacon Fund, or advising that they be so entrusted; and

v. Failing to withdraw the assets of the employee benefit plan client that it served as an investment manager from the Beacon Fund or failing to advise that they be so removed.

510. As a result of the above-described conduct, the Beacon, Ivy and BONY Defendants have acted in violation of ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B). As such, these Defendants are liable pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) to restore any losses and disgorge any profit resulting from each such breach to the employee benefit plans covered by ERISA that invested and remained invested in the Beacon Fund and as a result suffered losses through the investment by these Defendants of the Beacon Fund's assets in accounts managed or controlled by Madoff or Madoff Securities. Likewise, the Jeanneret, Ivy and BONY Defendants are liable to restore any losses and disgorge any profit resulting from each such breach to the employee benefit plans whose participants are members of the Jeanneret ERISA subclass and whose assets were invested in the Beacon Fund by JPJA acting as an investment manager. Each of the employee benefit plans whose participants are members of the ERISA Class or the Jeanneret ERISA Subclass lost money through the investment of the Beacon Fund in accounts managed or controlled by Madoff or BMIS.

**COUNT IX**
**By the ERISA Class for Breach of Fiduciary Duty –**
**Failure to Comply with Documents and Instruments Governing the Plan by**
**Entrusting Employee Benefit Plan Assets to Madoff or BMIS**
**Directly by the Beacon Fund or Indirectly by Investing in the Beacon Fund**
**(Against the Beacon, Ivy, BONY and Jeanneret Defendants)**

511. ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

512. ERISA § 404(a)(1)(D) requires that a fiduciary with respect to an employee benefit plan act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Pursuant to the Offering Memoranda governing the Beacon Fund in effect from in or before June of 2000, the Beacon Fund's assets were invested with two managers. One of those managers was Madoff, although he was not identified by name in the

document; he managed the majority of the Beacon Fund's assets in accordance with what is referred to herein as the split-strike conversion strategy (referred to in the offering memoranda also as the "Split-Conversion Hedged Option Transaction"). Beginning in or about August of 2004 and thereafter the Amended Offering Memoranda for the Beacon Fund provided that the Managing Member (i.e. BAMC) and not a "Manager" would employ the same strategy, referred to now as "Managing Member's Large Cap Investment Strategy."

513. The Beacon, Ivy and BONY Defendants caused or allowed the Beacon Fund to transfer to accounts managed by Madoff all Beacon Fund assets allocated to the so-called split-strike conversion strategy or the "the Managing Member's Large Cap Investment Strategy," referred to in the successive Beacon Offering Memoranda, even though they knew or should have known that, neither Madoff nor BAMC ever employed the split-strike conversion strategy or the "Managing Member's Large Cap Strategy" described in the Offering Memoranda, and that BAMC never directly managed money at all but entrusted the assets of the Beacon Fund entirely to outside managers including Madoff.

514. Had the Beacon, Ivy, and BONY Defendants operated the Beacon Fund in accordance with their governing documents, including the Offering Memoranda, Madoff would not have been in a position to misappropriate the assets of the employee benefit plans of Plaintiffs and ERISA Class members. In particular, if these Defendants had assured that Madoff had actually employed the split-strike conversion strategy or if, from date on which the applicable offering memoranda provided that the Managing Member, rather than an outside manager would adopt the "Managing Member's Large Cap Strategy," BAMC had actually managed the assets that were allocated to this strategy rather than entrusting those assets to Madoff, the assets of the Beacon Fund could not have been misappropriated by Madoff.

515. As such, pursuant to ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), the Beacon, Ivy and BONY Defendants are liable to restore any losses to the employee benefit plans covered by ERISA that invested in the Beacon Fund and as a result suffered losses through the investment of assets allocated, pursuant to the applicable Offering Memoranda, to the split-strike conversion strategy or the "Managing Member's Large Cap Strategy" by entrusting those assets to Madoff and Madoff Securities in violation of the documents and instruments governing the plans insofar as their assets were invested in the Beacon Fund. Likewise, these Defendants are liable to disgorge any profits they made through each such breach.

**COUNT X**
**By ERISA Class and Jeanneret ERISA Subclass for Breach of Fiduciary Duty – Failure to Comply with Documents and Instruments Governing the Plan, Breach of the Duty of Loyalty, and Violation of 29 U.S.C. § 1106(a)(1)(D) & 1106(b) Prohibiting Transfer to or Use By or For the Benefit of a Party in Interest of Plan Assets and Self Dealing by ERISA Fiduciaries**
**(Against the Jeanneret, Beacon, Ivy and BONY Defendants)**

516. ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

517. ERISA § 404(a)(1)(A) requires that a fiduciary to an employee benefit plan act "(A) for the exclusive purpose of: (i) providing benefits to participants and beneficiaries; and (ii) defraying the reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

518. ERISA requires that a fiduciary with respect to an employee benefit plan act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

519. ERISA § 406(a) prohibits a fiduciary with respect to an employee benefit plan from directly or indirectly causing the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." The Beacon, Ivy, BONY and Jeanneret Defendants are each "parties in interest" as that term is used in ERISA, which include fiduciaries and service

providers to any employee benefit plan in the definition of party in interest. 29 U.S.C. § 1106(a)(1)(D).

520. ERISA § 406(b)(3) prohibits a fiduciary with respect to an employee benefit plan from receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b)(3).

521. The Beacon, Ivy and BONY Defendants caused or allowed the Beacon Fund, which held ERISA covered employee benefit plan assets and was therefore subject to ERISA, to transfer to Beacon Defendants, Ivy and indirectly to BONY millions of dollars in investment management fees based on ERISA covered employee benefit plan assets under management entrusted to Madoff or BMIS, when these assets had in fact been misappropriated by Madoff as part of the Ponzi scheme he operated. Under the terms of the documents and instruments governing the Beacon Fund, including the various Beacon Offering Memoranda pursuant to which employee benefit plans invested, Defendant BAMC received a monthly fee amounting to 1.5% of assets under management annually, a portion of which was shared by agreement with Defendant Ivy. This fee has been fully paid to the Beacon Fund and a portion of it already shared with Defendant Ivy based on assets under management as reported in the financial statements of Beacon. No portion of this fee however, has been refunded, even though the amount of the fee was calculated based on, in large part, misappropriated or entirely fictional assets and profits falsely claimed by Madoff or entities controlled by him to be held for investment on behalf of the Beacon Fund.

522. By causing or allowing this fee to be paid and subsequently retained without adjustment, based on purely fictional assets or assets which had been misappropriated, the Beacon Defendants, Ivy and BONY have violated 29 U.S.C. § 1104(a)(1)(D), insofar as the

documents and instruments governing entitlement to fees calls for fees to be paid on assets actually managed through the Beacon Fund. Further, 29 U.S.C. § 1106(a)(1)(D) prohibits direct or indirect transfers of plan assets to parties in interest, and transfers can only exempt if paid pursuant to a contract or reasonable arrangement for no more than reasonable consideration. Because the transfer at issue here was either in violation of the contract that provided for its payment, not paid pursuant to a reasonable contract or arrangement if the contract or arrangement permitted a fee based on fictional assets, or if in compliance with a contract, amounted to more than reasonable compensation having been paid on misappropriated or fictional assets and profits, the transfer violated 29 U.S.C. § 1106(a)(1)(D).

523. Ivy further violated 29 U.S.C. § 1106(b)(3) under ERISA by sharing undisclosed referral fees from BAMC in connection with transactions involving ERISA covered plan assets. The referral fees have been fully paid to Ivy and shared with BONY and through their compensation with the other Ivy Defendants. No portion of this fee however, has been refunded, even though the fee was explicitly paid to Ivy in consideration for the Ivy's referral to Madoff rather than in consideration for the investment management services that the Beacon and Ivy and BONY Defendants bound to perform as ERISA fiduciaries.

524. Pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C.§ 1132(a)(2) and (3), by virtue of the above described unlawful payment, receipt and retention of fees directly or indirectly by the Beacon Defendants, the Ivy Defendants and the BONY defendants, each are liable to disgorge the fees they directly or indirectly unlawfully received and to restore: 1) any losses to the Plans whose participants are members of the ERISA Class; and 2) those fees that were unlawfully paid to Defendants BAMC and Ivy.

525. In addition, the Jeanneret Defendants received investment management fees from the Plans whose participants are members of the Jeanneret ERISA Subclass. Like the fees received by Beacon and Ivy, these fees were based in part on entirely fictional assets and returns reported by BAMC in connection with the Beacon Fund's investment with Madoff. By receiving and retaining these fees the Jeanneret Defendants violated 404(a)(1)(D) because their Investment Management Contracts did not permit the payment of fees other than as a percentage of actual assets under management. By receiving and retaining these fees the Jeanneret Defendants violated 406(a)(1)(D) because the payment of fees based on fictional assets amounts to the use of plan assets for the benefit of a party in interest, which is not exempt because it is not pursuant to a reasonable contract or arrangement and amounts to more than reasonable compensation.

526. Pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C.§ 1132(a)(2) and (3), by virtue of the above described unlawful payment, receipt and retention of fees directly or indirectly by the Jeanneret Defendants are liable to disgorge the fees they directly or indirectly unlawfully received and to restore: 1) any losses to the Plans whose participants are members of the Jeanneret ERISA Subclass; and 2) those fees that were unlawfully paid to the Jeanneret Defendants.

**COUNT XI**
**By the ERISA Class and Jeanneret ERISA Subclass Claim for Misrepresentation, Failure to Disclose Material Facts to BAMC and JPJA by Ivy and BONY Defendants and Concealment of Breach of Fiduciary Duty By All Defendants**
**<u>(Against the Ivy, BONY, Beacon and Jeanneret Defendants)</u>**

527. ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

528. As discussed above in § D.1, the Ivy Defendants and the BONY Defendants (acting through Ivy) breached their breached its ERISA fiduciary duties, in part, by committing

fraud, specifically misrepresenting to BAMC and JPJA, as detailed herein, that Madoff and BMIS were legitimate when the Ivy and BONY Defendants were in possession of extensive facts demonstrating that Madoff was a liar and a fraud.

529. In addition, ERISA 404(a)(1)(A) & (B) includes a duty to disclose all relevant information to plan participants and to co-fiduciaries.

530. The Ivy Defendants acting subject to the control of the BONY Defendants (following Ivy's acquisition by BONY) withheld material facts from their co-fiduciaries, BAMC and JPJA. By withholding such material facts, the Ivy and BONY Defendants concealed their breaches of their fiduciary duty from BAMC, JPJA, the ERISA Plaintiffs and the Jeanneret ERISA Subclass. The material facts that the Ivy Defendants failed to disclose to BAMC, JPJA, the ERISA Plaintiffs and the Jeanneret Subclass, include:

531. Ivy withheld material facts from their co-fiduciaries, BAMC and JPJA. By withholding such material facts, Ivy concealed its breaches of fiduciary duty from BAMC, JPJA, the ERISA Class and the Jeanneret ERISA Subclass. The material facts that Ivy failed to disclose to BAMC, JPJA, the ERISA Plaintiffs and the Jeanneret ERISA Subclass, include:

a. the fact that Madoff could not possibly be executing and deriving his returns from the split strike conversion strategy that he claimed to follow because the options trading volume critically necessary to support Madoff's purported strategy did not exist;

b. that Madoff repeatedly provided inconsistent information and untrue information to Ivy, particularly about where he traded the OEX options – claiming that: 1) he traded OEX options on exchanges other than the CBOE, which is impossible

because the only exchange that OEX options are traded is the CBOE; and 2) that he executed substantial OEX options trades off-exchange (over-the-counter);

c. that at least some of the options trades that Madoff reported having executed on behalf of the Ivy's clients were at prices and volumes outside the range for trades occurring on that day and therefore must have been fraudulent;

d. that Ivy had received reliable information that Madoff was misappropriating client assets from a prominent hedge fund manager in or about January 21, 1999;

e. Madoff denied market timing and attributed his performance to efficient execution when this provided no explanation for the performance he reported;

f. Madoff had custody of the assets he managed and self-cleared his supposed transactions so that Ivy could not independently confirm the existence of the assets Ivy managed;

g. Ivy had received reliable information that Madoff was managing (i.e., manipulating) the return streams that he reported to clients, independent of their actual returns;

h. Ivy was aware of rumors that Madoff was a Ponzi scheme;

i. that Ivy believed that Madoff was an inappropriate investment for investors and advised other clients not to invest with Madoff;

j. that Ivy had stopped investing its proprietary funds in Madoff;

532. Ivy also made material misrepresentations to the Beacon and Jeanneret Defendants, including:

a. Ivy's representations to BAMC and JPJA that they had no reason to believe there was anything improper in Madoff's operations when, in fact, they had reason to believe the contrary as set forth above.

b. the fact that Ivy maintained a small allocation to Madoff in its proprietary funds from 1998 until 2000 solely to deceive its existing advisory clients into believing that Ivy had confidence in Madoff -- which it did not.

533. Through Ivy's misrepresentations and its non-disclosure of material facts Ivy concealed its breaches of fiduciary duty from the ERISA plaintiffs and the Jeanneret ERISA Subclass until Madoff confessed to running a Ponzi scheme at the end of December 2008.

**COUNT XII**
**By ERISA Class for Co-Fiduciary Liability**
**(Against the Beacon, Ivy and Jeanneret Defendants and BONY)**

534. ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

535. ERISA § 405(a)(1) imposes liability on a fiduciary if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. 29 U.S.C. § 1105(a)(1).

536. ERISA § 405(a)(2) imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, the fiduciary has enabled another fiduciary to commit a breach. 29 U.S.C. § 1105(a)(2).

537. ERISA § 405(a)(3) imposes liability on a fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. 29 U.S.C. § 1105(a)(3).

538. The Beacon, Ivy and Jeanneret and BONY Defendants, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty alleged herein against each of the others, apart from the breaches of duty that Ivy concealed from the Beacon Defendants and Jeanneret Defendants, and took no steps to remedy those breaches. As such, each is liable as a co-fiduciary for breaches of the other fiduciaries, pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

539. Ivy was responsible in assisting the Beacon Defendants in the performance of their fiduciary responsibilities, by advising them and by performing administrative responsibilities as set forth previously; the Individual Ivy Defendants and BONY Defendants who controlled Defendant Ivy in the performance of its fiduciary duties each knowingly participated in the failure of the Beacon Defendants to prudently and loyally manage plan assets comprising the Beacon Fund, the failure of the Beacon Defendants to operate the Beacon Fund in accordance with the documents and instruments governing the Beacon Fund,, and the failure of the Beacon Defendants to charge and retain only reasonable fees calculated based only on actual assets under management by sharing in and retaining improperly calculated fees. The Beacon Defendants knowingly participated in the improper charging and retention of inappropriately calculated fees by Defendant Ivy, by splitting those fees with Ivy. As such, Beacon, Ivy and BONY Defendants are each liable for the breaches of the others in which they participated pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

540. By their failures to comply with their own fiduciary responsibilities, each of the Beacon Defendants, Ivy Defendants, and BONY Defendants enabled one or more other fiduciaries to commit a fiduciary breach, and each is therefore liable for the breaches committed by each other fiduciary under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

541. The Jeanneret Defendants, who were ERISA fiduciaries by virtue of their Investment Management Agreements with the Plans whose participants were members of the Jeanneret ERISA Subclass, were assigned the authority and control over the investments of these Plans. In dereliction of its duties under ERISA, the Jeanneret Defendants abdicated control of the Jeanneret ERISA Subclass members' investments when they channeled such investments to the Beacon Fund without any meaningful oversight. As such, the Jeanneret Defendants were in violation of duties described by ERISA, enabling the breaches by the Beacon, Ivy and BONY defendants and each is therefore liable for the breaches committed by each other fiduciary under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

542. Further, the Jeanneret Defendants were aware of the Beacon Defendants' failure to comply with the investment strategy they purported to follow in their Offering Memorandum, as they knew of the Beacon Defendants involvement with Madoff and decision to relinquish control over Beacon Fund investments to Madoff, which in and of itself was a breach of ERISA fiduciary duties by the Beacon Defendants, and failed to take any action to remedy those breaches, making them liable for those breaches pursuant to ERISA § 405(a)(3).

543. As a direct and proximate consequence of Defendants' breaches of their responsibilities as co-fiduciaries, the Plans lost principal and investment returns, and the Defendants, or some of them, profited from the use of the Plans' assets by receipt of management, advisory and/or consulting fees. As such they are liable for these losses and to disgorge any profits received in connection with the breach of their responsibilities as co-fiduciaries.

**COUNT XIII**
**By ERISA Class and the Jeanneret ERISA Subclass Claim for Disgorgement of Profits**
**(Against Ivy and the BONY Defendants)**

544. ERISA Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

545. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant, beneficiary, or fiduciary to bring an action for appropriate equitable relief to redress violations and/or enforce provisions of Title I of ERISA.

546. In the event that Ivy or the BONY Defendants are not fiduciaries under ERISA § 3(21) with regard to any of the claims set forth above, Ivy and the BONY Defendants is liable under ERISA § 502(a)(3) for the ERISA violations set forth above, because they knowingly participated in those violations and as a consequence and part of their participation in those violations received fees from both JPJA and BAMC. Accordingly, they must restore to the Plans all fees and profits thereon received by those Defendants on account of the Plans' investments of assets in Madoff and Madoff-related investments.

**COUNT XIV**
**By Investor Class (including Jeanneret Investor Subclass) for Common Law Fraud**
**(Against the Ivy 10b-5 Defendants, and the Beacon and Jeanneret Defendants and Friedberg)**

547. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

548. Plaintiffs and other members of the Investor Class, in reasonable and justifiable reliance upon the statements and representations made by the Beacon Defendants, as previously set forth herein, purchased Memberships in the Beacon Fund. Plaintiffs and other members of the Investor Class would not have purchased their Memberships in the Beacon Fund except for their reliance upon the representations made by the Beacon Defendants in the Offering

Memoranda set forth herein, and would not have purchased them had they been aware of the false and misleading statements, material omissions and concealment by the Beacon Defendants or the fact that Beacon Associates, the Managing Member, had abdicated its duty of oversight and entrusted a majority of the Beacon Fund's assets to Madoff-related entities.

549. At the time the statements, representations and omissions were made by the Beacon Defendants in the Offering Memoranda and the periodic financial statements, the Beacon Defendants knew or should have known them to be false and intended to deceive Plaintiffs and other members of the Investor Class by making such statements and representations.

550. Plaintiffs and other members of the Investor Class also reasonably and justifiably relied upon the Ivy 10b-5 Defendants' actions and omissions set forth herein that Ivy would advise the Managing Member regarding the selection and allocation of the Beacon Fund's assets. In reality, Ivy knew or should have known that the majority of the Beacon Fund's assets were invested with Madoff-related entities without any adequate due-diligence having been performed, and that the various Beacon Offering Memoranda failed to disclose this information. Moreover, the Ivy 10b-5 Defendants had actual serious suspicions (indeed actual knowledge) that Madoff was a liar, a fraud and an unsuitable risk for their clients, but had chosen not to share their evidence and conclusions with BAMC or Jeanneret in order to protect their interest in the fee income generated for Ivy by Madoff, and that the various Beacon Offering Memoranda failed to disclose this information.

551. Plaintiffs and other members of the Investor Class also reasonably and justifiably relied upon Jeanneret Defendants' representations and omissions set forth herein that they would direct and supervise the investments of the Jeanneret Investor Subclass members. In reality, Jeanneret Defendants knew or should have known that the majority of the assets were invested

with the Beacon Fund, and ultimately, with Madoff-related entities. As such, no control or supervision was possible due to Madoff's policy of nondisclosure.

552. Similarly, as the Beacon Fund's auditors, Friedberg knew or should have known that the majority of the Beacon Fund's assets were not invested in a "Large Cap Strategy," as stated in the Offering Memoranda, but in fact were part of Madoff's Ponzi scheme. Friedberg nevertheless issued unqualified audit opinions without a sufficient evidentiary basis for doing so and failed to disclose to Plaintiffs and Investor Class Members the material risk that the reported returns of the Beacon Fund could be fictitious.

553. At the time of the false statements, misrepresentations and omissions set forth above, each of these Defendants intended that Plaintiffs and other members of the Investor Class would act on the basis of the misrepresentations and omissions contained in the Offering Memoranda in determining whether to purchase and/or retain Memberships in the Beacon Fund. Plaintiffs and other Investor Class members reasonably relied thereon to their detriment in making such decisions.

554. Moreover, in the October 2008 Letter, the Beacon Defendants falsely stated that approximately 75% of the Beacon Fund was invested in "U.S. Treasury securities for most of September, thereby largely insulating us from the chaotic market losses over the past month," when, in fact, less than two months later, it was revealed that the Beacon Fund lost over 74% of its value as a result of being invested in Madoff entities.

555. Had Plaintiffs and other members of the Investor Class known of the material facts that the Ivy 10b-5, Beacon, and Jeanneret Defendants and Friedberg wrongfully concealed and misrepresented, and the falsity of the Beacon, Ivy and Jeanneret Defendants', and

Friedberg's representations, Plaintiffs and other Investor Class members would not have purchased and/or retained their Memberships in the Beacon Fund.

556. Plaintiffs and other members of the Investor Class, as a result of their purchase of Memberships in the Beacon Fund or other investments with Madoff and by reason of the wrongful conduct and misrepresentations by the Ivy 10b-5, Beacon, and Jeanneret Defendants and Friedberg, have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

557. By reason of the foregoing, the Beacon, Ivy and Jeanneret Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Investor Class members.

558. The fraudulent acts by these Defendants were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

**COUNT XV**
**By Investor Class (including the Jeanneret Investor Subclass) for Aiding and Abetting Common Law Fraud**
**(Against Ivy and BONY)**

559. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

560. As BAMC's investment consultant, Ivy Asset Management had actual knowledge of the misrepresentations BAMC was disseminating to Plaintiffs and other Investor Class members. With that knowledge, Ivy Asset Management knew of the fraudulent course of conduct being pursued by the Beacon Defendants, or was willfully blind to substantial evidence of such fraudulent conduct.

561. As Ivy's parent, BONY also had actual knowledge of the misrepresentations being disseminated by the Beacon Defendants and Ivy itself. With that knowledge, BONY knew

of the fraudulent course of conduct being pursued by the Beacon and Ivy Defendants, or was willfully blind to substantial evidence of such fraudulent conduct.

562. Ivy Asset Management substantially assisted the fraud perpetrated by the Beacon Defendants by (i) failing to disclose the inadequate level of due diligence being performed on Madoff and BMIS while BAMC continued to represent to Plaintiffs that it was living up to its duties of oversight and monitoring; and (ii) providing account reconciliation and bookkeeping services to BAMC and its clients, upon which BAMC relied to create the appearance of due diligence while knowing that the data provided by BMIS was inherently unreliable and cause for further inquiry.

563. BONY substantially assisted the fraud perpetrated by the Beacon and Ivy Defendants by (i) failing to disclose the inadequate level of due diligence being performed on Madoff and BMIS while BAMC and Ivy continued to represent to Plaintiffs that they were living up to their duties of oversight and monitoring; and (ii) providing Ivy with greater means to market Madoff's fraudulent services through its extensive worldwide network of clients.

564. Plaintiffs and the Investor Class have suffered damages proximately caused by Ivy Asset Management's and BONY's aiding and abetting of the Beacon Defendants' fraudulent conduct, in an amount to be proven at trial.

**COUNT XVI**
**By Investor Class (including the Jeanneret Investor Subclass) for Breach of Fiduciary Duty**
**(<u>Against the Ivy 10b-5, Beacon and Jeanneret Defendants, and Friedberg</u>)**

565. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

566. The Beacon Defendants owed and continue to owe Plaintiffs and the Investor Class fiduciary obligations. By reason of their fiduciary relationships, the Beacon Defendants

owed and continue to owe Plaintiffs and the Investor Class the highest obligations of good faith, fair dealing, loyalty, and due care. As such, they were duty bound to manage the assets of the Beacon Fund for the benefit of its members.

567. The Ivy 10b-5 Defendants owed and continue to owe fiduciary duties Plaintiffs and the Investor Class. As such, the Ivy 10b-5 Defendants were duty bound to provide services in connection with the management of the assets of the Beacon Fund for the benefit of its members.

568. Jeanneret Defendants, as Investment Manager to the members of the Jeanneret ERISA Subclass, owed and continue to owe Plaintiffs and the Jeanneret Investor Subclass fiduciary duties. As such, they were duty bound to manage their clients' assets for their clients' benefit.

569. Friedberg owed and continued to owe fiduciary duties to the Beacon Fund, Plaintiffs and other Class members to certify and confirm that financial statements accurately reflect the true financial condition and position of the Beacon Fund.

570. As a result of the Beacon Defendants' and Ivy 10b-5 Defendants' abrogation of their duties to use due care in the management of the assets of the Beacon Fund for the benefit of the Beacon Fund's Members, as alleged herein, as well as the Jeanneret Defendants' abrogation of their duties to supervise and direct the Jeanneret Investor Subclass members' investments in any reasonable fashion by investing in the Beacon Fund, which they knew invested monies with Madoff, the Beacon, Ivy and Jeanneret Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Plaintiffs and the Investor Class. In particular, the Ivy Defendants had concluded based on solid evidence as set forth herein, that Madoff was a liar and a fraud, but failed to take appropriate steps to protect

the investors in the Beacon Fund, including disclosure of its evidence and conclusions to Plaintiffs, the Investor Class, and Jeanneret Investor Subclass, BAMC and JPJA. The remaining Defendants named in this count were on notice that Madoff was a fraud, including having received warnings from Ivy, however, muted and misleading, but took no steps to protect the investor class and the Jeanneret Investor Subclass. All of the Defendants named in this count acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

571. In addition, as a result of Friedberg's failure to adequately investigate the Beacon Fund's investments and base its audits upon evidentiary grounds that would satisfy GAAS and the AICPA's professional standards, Friedberg failed to fulfill its fiduciary duty owed to the Beacon Fund, Plaintiffs and other members of the Investor Class by concealing the material risk that the Beacon Fund's returns were fictitious. Friedberg acted in bad faith, with gross negligence and with complete disregard of its obligation to use due care, including without limitation ensuring that the Beacon Defendants were investing the Fund's assets in accordance with the Offering Memoranda and were using reasonable and prudent investment standards. Further, Friedberg breached its fiduciary duties to investors in the Beacon Fund as Friedberg knew or should have known that the audit reports would be used by investors to assess the Beacon Fund's financial strength, the investors would rely on these audit reports in making their investment decisions, and Friedberg was aware that investors would rely on these reports.

572. In addition, Friedberg breached its fiduciary duties by falsely certifying the Beacon Fund's financial statements.

573. As a proximate result of the Beacon, Ivy and Jeanneret Defendants' and Friedberg's bad-faith breaches of their fiduciary duties, Plaintiffs and other Investor Class

members have sustained damages, suffered mental and emotional distress, and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

574. By reason of the foregoing, the Beacon, Ivy and Jeanneret Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Investor Class members.

575. The Beacon, Ivy and Jeanneret Defendants' and Friedberg's fraudulent acts were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

**COUNT XVII**
**By Investor Class (including the Jeanneret Investor Subclass) for Breach of Contract**
**(Against the Beacon and Jeanneret Defendants)**

576. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

577. Plaintiffs and Beacon Defendants were parties to the Subscription Agreement with respect to the Beacon Fund, which incorporated the Beacon Fund's Operating Agreement and Offering Memoranda.

578. Plaintiffs and Jeanneret Defendants were parties to the Discretionary Investment Management Agreement with respect to the union pension funds.

579. Under those documents and others incorporated therein, Beacon and Jeanneret Defendants were required to conduct themselves in accordance with the representations made in those documents, including selecting proper investment managers or advisers to whom to delegate the Beacon Fund's investment authority, performing adequate due diligence of the funds of funds with whom the Beacon Defendants invested the Beacon Fund's assets, monitoring performance of the Beacon Fund's investments, and supervising and directing investments made on behalf of the Beacon Fund.

580. The Beacon and Jeanneret Defendants breached their contracts with Plaintiffs and Investor Class members by failing to perform the represented actions set forth in the Subscription Agreements (which incorporated the Operating Agreements and Operating Memoranda) and Discretionary Investment Management Agreements, respectively.

581. As a result, Plaintiffs suffered damages, including the loss of their investments in the Beacon Fund.

**COUNT XVIII**
**By Investor Class (including the Jeanneret Investor Subclass) for Negligent Misrepresentation**
**(Against the Beacon, Ivy and Jeanneret Defendants and Friedberg)**

582. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

583. The Beacon, Ivy and Jeanneret Defendants owed to the Beacon Fund, Plaintiffs and other Investor Class members a duty (a) to act with reasonable care in preparing and disseminating the Offering Memoranda, Discretionary Investment Management Agreements and other documents and representations relied upon by Plaintiffs and other Investor Class members in deciding to purchase their Membership interests in the Beacon Fund or to make investments with JPJA, and (b) to use reasonable diligence in determining the accuracy of, and in preparing the information contained in, the Offering Memoranda and Discretionary Investment Management Agreements, and other documents such as performance reports.

584. In addition, Friedberg knew that its audited financial reports would be provided to the Beacon Fund's Members and potential investors in the Beacon Fund, and would be relied on by them in making investment decisions concerning the Beacon Fund.

585. Accordingly, Plaintiffs and Investor Class Members are in privity or at least approaching privity with each of the Defendants named in this Count. The Beacon, Ivy, and

Jeanneret Defendants and Friedberg were aware that the information contained in the Offering Memoranda, Discretionary Investment Management Agreements and audit reports and financial reports would be used by investors to assess the risk of investing in the Beacon Fund. Further, the Defendants were aware that all statements made in these materials would be relied on by investors, and Defendants prepared and disseminated these materials with the understanding that investors would reasonably rely on all representations made.

586. The Beacon, Ivy and Jeanneret Defendants and Friedberg failed to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memoranda and Discretionary Investment Management Agreements, as well as other representations, including the audited annual financial statements.

587. Neither the Offering Memoranda, nor the Discretionary Investment Management Agreements or other offering material used in soliciting investment in the Beacon Fund ever disclosed that a majority of the Beacon Fund's assets would be blindly entrusted to Madoff, BMIS or other Madoff-controlled entities, without the requisite level of due diligence and oversight being performed. Indeed, to the contrary, the Offering Memoranda contained several statements that delineated an elaborate structure of oversight, evaluation and supervision of outside Investment Managers that, at the time made, could not have been true given Madoff's secretive operation.

588. Similarly, the Discretionary Investment Management Agreements never disclosed that full and total control would be abdicated to Madoff. In fact, such Agreements stated quite the opposite, with representations being made that Jeanneret Defendants would be able to fully supervise the assets invested with them, even though certain investments would be made in the Beacon Fund.

589. Defendants breached the duty to use reasonable care by failing to disclose the material facts that the Ivy Defendants had concluded that Madoff was a fraud, and that Defendants were *not*:

a. Performing adequate due diligence in connection with Plaintiffs' and Investor Class members' investments;

b. Monitoring and overseeing Plaintiffs' and Investor Class members' investments; and/or

c. Safeguarding those investments from excessive risks of loss.

590. Defendants knew that investors would rely on the account statements provided by Jeanneret in selecting between investment management firms.

591. Plaintiffs reasonably, justifiably, and materially relied upon the expectation that Defendants would vet, monitor, oversee, safeguard, and audit Plaintiff's and Investor Class members' investments.

592. Plaintiffs and other Investor Class members would not have entrusted their capital to Defendants had they known that Defendants were not conducting due diligence, were not monitoring and overseeing Plaintiffs' and Investor Class members' investments and were not safeguarding those investments.

593. As a direct, foreseeable and proximate result of this negligence, Plaintiffs and other Investor Class members have sustained damages, suffered mental and emotional distress, and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

594. By reason of the foregoing, the Beacon, Ivy and Jeanneret Defendants and Friedberg are jointly and severally liable to Plaintiffs and other Class members.

**COUNT XIX**
**By Investor Class (including the Jeanneret Investor Subclass) for Gross Negligence and Mismanagement**
**(Against the Beacon, Ivy and Jeanneret Defendants)**

595. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

596. The Beacon Defendants and Ivy were charged with the responsibility of investing Plaintiffs' and other Investor Class members' money in a manner consistent with the Beacon Fund's investment objectives as set forth in the Offering Memoranda.

597. The Jeanneret Defendants were retained by the members of the Jeanneret Investor Subclass to invest their money in a manner consistent with the agreed upon investment guidelines and terms of Jeanneret's Discretionary Investment Management Agreement, ERISA and the Beacon Fund's investment objectives as set forth in the Offering Memoranda.

598. The Beacon, Ivy and Jeanneret Defendants owed fiduciary duties to the Beacon Fund, Plaintiffs and the Investor Class to conduct, manage, and supervise their investments in good faith and with due care. As set forth above, the Beacon, Ivy and Jeanneret Defendants breached their fiduciary duties to the Beacon Fund, Plaintiffs and the Investor Class by acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries.

599. The Beacon, Ivy and Jeanneret Defendants should have prevented, through the exercise of reasonable diligence, the improper investing of a majority of the Beacon Fund's assets into Madoff-related vehicles.

600. The Beacon, Ivy and Jeanneret Defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

601. Plaintiffs and the Investor Class relied to their detriment on the Beacon, Ivy and Jeanneret Defendants to discharge their duties as fiduciaries in a careful and prudent manner.

602. As a direct and proximate result of the gross negligence and misconduct of the Beacon, Ivy and Jeanneret Defendants, Plaintiffs and the Investor Class have been harmed. These Defendants are liable to Plaintiffs and the Investor Class in an amount to be determined at trial.

603. The Beacon, Ivy and Jeanneret Defendants' acts were willful and wanton, and Plaintiffs and other Investor Class members are entitled to punitive damages.

**COUNT XX**
**By Investor Class (including the Jeanneret Investor Subclass) for Unjust Enrichment (Against the Beacon, Ivy and Jeanneret Defendants, Friedberg and BONY)**

604. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

605. As a result of the misconduct detailed herein, the Beacon Fund has been forced to begin liquidating, and Plaintiffs' and the other Investor Class members' investments have been decimated; yet the Beacon, Ivy and Jeanneret Defendants, Friedberg, and BONY have reaped substantial fees, dividends, and other pecuniary benefits at the expense of Plaintiffs and the Investor Class.

606. The Beacon, Ivy and Jeanneret Defendants, Friedberg, and BONY have therefore been unjustly enriched, and equity and good conscience require that these Defendants disgorge to Plaintiffs and the Investor Class all such unjust enrichment in an amount to be determined at trial. As a proximate result of the Beacon, Ivy and Jeanneret Defendants', Friedberg's, and BONY's breaches of their duties, Plaintiffs and other Investor Class members have sustained damages and lost a substantial part of their respective investments in an amount to be proven at trial.

**COUNT XXI**
**By Investor Class (including the Jeanneret Investor Subclass) for Aiding and Abetting Breaches of Fiduciary Duty**
**(Against Ivy and BONY)**

607. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

608. As BAMC's Investment Consultant, Ivy Asset Management had actual knowledge of the investments Beacon Associates was making on behalf of the Beacon Fund. With that knowledge, Ivy Asset Management knew of the fiduciary duty breaches by the Beacon Defendants, or was willfully blind to substantial evidence of such breaches.

609. Ivy Asset Management substantially assisted the breaches of fiduciary duty of the Beacon Defendants by failing to conduct the due diligence and oversight it was retained to perform.

610. Similarly, as Ivy Asset Management's parent company, BONY had knowledge of Ivy Asset Management's investment consulting business, including its consulting the Beacon Fund regarding its investment strategy. With that knowledge, BONY knew of the breaches of fiduciary duty by Ivy.

611. BONY substantially assisted the fiduciary duty breaches of Ivy by providing Ivy with access to its global portfolio of clients to which Ivy marketed the fraudulent services of Madoff and BMIS.

612. Plaintiffs and the Investor Class have suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy Asset Management, in an amount to be proven at trial.

**COUNT XXII**
**By Investor Class (including the Jeanneret Investor Subclass) for Aiding and Abetting a Breach of Fiduciary Duty**
**(Against Friedberg)**

613. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

614. The Beacon Defendants owed Plaintiffs and the Investor Class fiduciary duties as alleged herein.

615. By committing the acts alleged herein, the Beacon Defendants breached their fiduciary duties owed to Plaintiffs and the Investor Class.

616. Friedberg aided and abetted the Beacon Defendants in breaching their fiduciary duties owed to Plaintiffs and the Investor Class, disseminated false and misleading yearly audit reports and opinions concerning Beacon's financial statements, and was an active and knowing participant in the Beacon Defendants' breaches of fiduciary duties owed to Plaintiffs and the Investor Class. Among other things, Friedberg knowingly or recklessly ignored information that indicated or should have indicated that (i) there were insufficient controls in place to exercise meaningful oversight over Madoff's operations; and (ii) the money invested by Plaintiffs and the Class in Beacon was invested with Madoff and/or BMIS and that Madoff and/or BMIS were involved in a Ponzi scheme.

617. Plaintiffs and the Investor Class have suffered damages proximately caused by Friedberg's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, in an amount to be proven at trial.

**COUNT XXIII**
**By Investor Class (including the Jeanneret Investor Subclass) For Rescission Under the Investment Advisers Act**
**(Against JPJA)**

618. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

619. JPJA acted as "Investment Advisers" to Plaintiffs and other members of the Investor Class pursuant to the Investment Advisers Act.

620. By executing Discretionary Investment Management Agreements, JPJA executed "investment advisory contracts" under the Investment Advisers Act.

621. JPJA executed a contract with Plaintiffs and other members of the Jeanneret Investor Subclass. This contract, which incorporated the Beacon Fund's Confidential Offering Memoranda, designated JPJA as Investment Adviser to Plaintiffs and other members of the Class.

622. As a registered Investment Adviser, JPJA was responsible for meeting the statutory standards set forth in the Investment Advisers Act, 15 U.S.C. § 80b-6(2). Specifically, JPJA could not engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

623. JPJA breached its duties to Plaintiffs and the other Investor Class members by engaging in a course of conduct which operated as a fraud or deceit on Plaintiffs and the Class.

624. JPJA failed to disclose that it was unable to conduct meaningful oversight into Madoff and BMIS, which would serve the roles of fund advisor, broker/dealer, and custodian of the Beacon Fund's assets. Such information was material and the Plaintiffs and other members of the Investor Class would not have invested in the Beacon Fund had JPJA made it known to them.

625. The Jeanneret Defendants knowingly misrepresented that they had conducted adequate due diligence on Madoff and on the controls in place within his firm to ensure that having Madoff and BMIS fulfill multiple roles would not put the assets of the Beacon Fund at risk.

626. The Jeanneret Defendants knowingly misrepresented the extent of ongoing monitoring they claimed to be providing with respect to the investments entrusted to Madoff.

627. Plaintiffs and other Investor Class members have been damaged as a result JPJA's breach of its duties under the Investment Advisers Act.

628. As a result, Plaintiff and the other Investor Class members are entitled to rescission of their investment adviser contracts with JPJA, and to recover all fees and commissions paid in connection with Plaintiff's and other Investor Class members' investments in the Beacon Fund.

## DERIVATIVE COUNTS

### COUNT XXIV
### Breach of Fiduciary Duty
### (Derivatively on behalf of Nominal Defendant, the Beacon Fund, Against the Beacon Defendants, Ivy and Friedberg)

629. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

630. Derivative Plaintiff brings this count for breach of fiduciary duty derivatively on behalf of the Beacon Fund against the Beacon Defendants, Ivy and Friedberg.

631. As a proximate result of the Beacon Defendants', Ivy's and Friedberg's breaches of their fiduciary duties, the Beacon Fund has sustained damages, in an amount yet to be determined, and to be proven at trial.

632. By reason of the foregoing, the Beacon Defendants, Ivy and Friedberg are jointly and severally liable to the Beacon Fund.

633. The Beacon Defendants', Ivy's and Friedberg's acts were willful and wanton, and the Beacon Fund is entitled to punitive damages.

**COUNT XXV**
**Breach of Contract**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund, Against Ivy)**

634. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

635. Derivative Plaintiff brings this count for breach of contract derivatively on behalf of the Beacon Fund against Ivy.

636. Ivy breached its contracts with the Beacon Fund by failing to perform those and other duties owed to the Fund, as set forth in the Consulting Agreement between BAMC and Ivy.

637. Under the Consulting Agreement between BAMC and Ivy, Ivy owed the Beacon Fund a duty to use reasonable care in providing its services, including reconciling all Madoff statements against trade tickets received and dividends and interest accrued, maintaining original books of entry for all Madoff activity, and calculating changes in monthly value of the Madoff accounts. Ivy failed to perform these services and therefore breached the provisions of the Consulting Agreement by virtue of the conduct described herein.

638. As a result, Ivy is liable for the damages suffered by the Beacon Fund, in an amount to be proven at trial.

**COUNT XXVI**
**Negligent Misrepresentation**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against the Beacon Defendants, Ivy and Friedberg)**

639. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

640. Derivative Plaintiff brings this count for negligent misrepresentation derivatively on behalf of the Beacon Fund against the Beacon Defendants, Ivy and Friedberg, for negligently misrepresenting to The Fund their knowledge of Madoff's fraud, suspicions of Madoff's wrongdoing and knowledge of the myriad red flags, all as alleged in detail herein. The Fund is in privity or at least approaching privity with each of the Defendants named in this Count.

641. As a direct, foreseeable and proximate result of this negligence, the Beacon Fund sustained damages, in an amount yet to be determined, and to be proven at trial.

642. By reason of the foregoing, the Beacon Defendants, Ivy and Friedberg are jointly and severally liable to the Beacon Fund.

**COUNT XXVII**
**Gross Negligence and Mismanagement**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against the Beacon Defendants and Ivy)**

643. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

644. Derivative Plaintiff brings this count for gross negligence and mismanagement derivatively on behalf of the Beacon Fund against the Beacon Defendants and Ivy. These Defendants owed fiduciary duties to the Beacon Fund to conduct, manage, and supervise the Beacon Fund's asseets in good faith and with due care. As set forth above, these defendants

breached their fiduciary duties to the Beacon Fund by acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries.

645. These defendants, through the exercise of reasonable diligence, should not have allowed the Beacon Fund's assets to be invested with Madoff.

646. These defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

647. As a direct and proximate result of the gross negligence and misconduct of the Beacon Defendants and Ivy, the Beacon Fund was harmed. These Defendants are liable to the Beacon Fund in an amount to be determined at trial.

648. The Beacon Defendants' and Ivy's acts were willful and wanton, and Plaintiffs and other Class members are entitled to punitive damages.

**COUNT XXVIII**
**Unjust Enrichment**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against the Beacon Defendants, Ivy, Friedberg and BONY)**

649. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

650. Derivative Plaintiff brings this count for unjust enrichment derivatively on behalf of the Beacon Fund against the Beacon Defendants, Ivy, Friedberg and BONY.

651. As a result of the misconduct detailed herein, the Beacon Fund's assets have been decimated, yet these Defendants have reaped substantial fees, dividends and other pecuniary benefits at the expense of the Beacon Fund.

652. Equity and good conscience require that these Defendants disgorge to the Beacon Fund and all such unjust enrichment in an amount to be determined at trial.

**COUNT XXIX**
**Aiding and Abetting Breaches of Fiduciary Duty**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against Ivy and BONY)**

653. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

654. Derivative Plaintiff brings this count for aiding and abetting breaches of fiduciary duty derivatively on behalf of the Beacon Fund against Ivy and BONY.

655. The Beacon Fund suffered damages proximately caused by Ivy's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, as well as BONY's aiding and abetting of the breach of fiduciary duties by Ivy, in an amount to be proven at trial.

**COUNT XXX**
**Aiding and Abetting a Breach of Fiduciary Duty**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against Friedberg)**

656. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

657. Derivative Plaintiff brings this count for aiding and abetting breaches of fiduciary duty derivatively on behalf of the Beacon Fund against Friedberg.

658. The Beacon Fund suffered damages proximately caused by Friedberg's aiding and abetting of the breach of fiduciary duties by the Beacon Defendants, in an amount to be proven at trial.

**COUNT XXXI**
**Malpractice and Professional Negligence**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund, Against Friedberg)**

659. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

660. Defendant Friedberg assumed professional responsibility for independently auditing the Fund's financial reports, undertook to exercise its professional skill and talent on behalf of and/or for the benefit of the Funds and its members, and had a duty to exercise professional competence and due professional care in doing so.

661. In auditing the Fund, Friedberg had a duty to use due professional care in planning and performing the audits, maintaining independence from management, assessing internal control and audit risks, obtaining sufficient competent evidential matter to support the audits, exercising professional skepticism, and expanding its audit procedures in light of the many red flags and risk factors described herein, confirming the Fund's compliance with GAAP, and otherwise complying with GAAS.

662. As a result of its auditing activities, Friedberg negligently and recklessly ignored the fact that the Fund's reported financial results were inconsistent with GAAP and that the Beacon Defendants did not have sufficient evidence regarding the Fund's assets that were under Madoff's control to support the audits.

663. Friedberg failed to exercise professional competence, due professional care, professional skepticism and independence in planning to audit, and in auditing the Fund.

664. Furthermore, Friedberg failed to conduct proper due diligence, failed to investigate the numerous red flags and risk factors described herein, failed to adequately evaluate

the Beacon Defendants' internal controls and audit risks, failed to obtain and evaluate sufficient competent evidence and confirmations to support the audits, and failed to identify the excessive risks affecting the funds under Madoff's control.

665. Further still, Friedberg failed to expand its audit procedures and failed to perform effective audit testing to obtain more reliable, persuasive audit evidence in light of the apparent risks.

666. As a direct and proximate result of Friedberg's professional negligence and/or gross negligence, the Fund lost substantially all of its capital, and thereby suffered damages in an amount to be proven at trial.

**COUNT XXXII**
**Breach of Contract**
**(Derivatively on behalf of Nominal Defendant, the Beacon Fund,**
**Against Friedberg)**

667. Derivative Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

668. Derivative Plaintiff brings this count for breach of contract derivatively on behalf of the Beacon Fund against Friedberg.

669. In connection with its audits of the Fund, Friedberg and the Beacon Defendants entered into audit engagement letters pursuant to which Friedberg represented and agreed that it would perform certain services on behalf of the Fund. Among the represented services were the following:

a. Performing the audit in accordance with GAAS;

b. Testing the Beacon Defendants' accounting records and other procedures;

c. Test "documentary evidence supporting the transactions recorded in the accounts, and direct confirmations of certain assets and liabilities with selected

investment managers and financial institutions" (*See, e.g.*, Audit Engagement Letter dated January 24, 2008);

d. Planning and performing audits to obtain reasonable assurance that the Fund's financial statements are free of material misstatement; and

e. Obtaining an understanding of the Fund and its environment, including internal controls, sufficient to assess the risks of material misstatement of the financial statements.

670. As set forth herein, in breach of its agreements with the Fund (through the Beacon Defendants), Friedberg failed to perform the services identified hereinabove.

671. As a result, Friedberg is liable for the damages suffered by the Fund, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. determining that this action may be maintained as a class action, designating Plaintiffs as Lead Plaintiffs, and certifying Plaintiffs as Class Representatives for the Classes and Subclasses that they are members of under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. declaring that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission, Section 20(a) of the Exchange Act, Sections 1104 and 1105 of the Employee Retirement Income Security Act, Section 80b-6(2) of the Investment Adviser's Act, and New York common law;

C. awarding compensatory damages in favor of Plaintiffs and the Classes, and in the case of the ERISA Class and the Jeanneret ERISA Subclass, in favor of the employee benefit plans that suffered losses as a result of violations of ERISA against all Defendants, jointly and

severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including both pre-judgment and post-judgment interest thereon, to the extent allowed by law;

D. awarding punitive damages in favor of Plaintiffs and the other Class members for Defendants' wrongful conduct, in an amount to be determined at trial;

E. awarding disgorgement of profits in favor of Plaintiffs and the Class consisting of all management fees, incentive fees, commissions and referral fees received by the Defendants, or any of them, from Madoff and/or BMIS during the Class Period, and in the case of the ERISA Class and the Jeanneret ERISA Subclass, in favor of the employee benefit plans whose purported assets and profits served as the basis for any such fee or commission;

F. alternatively rescinding the Discretionary Investment Management Agreements;

G. awarding Plaintiffs and the Class or the Plans they sue on behalf of prejudgment interest on all damages recovered, to the extent allowed by law;

H. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

I. granting Plaintiffs and the Class or the Plans they sue on behalf of such other and further relief as the Court may deem just and proper; and

J. in connection with the derivative claims, awarding damages in favor of the Beacon Fund against Defendants, jointly and severally, with the proceeds of any such award being used in connection with the liquidation of the Beacon Fund, for the benefit of the members of the Classes.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: June 21, 2010

LOWEY DANNENBERG COHEN
& HART, P.C.

By: __/s/__Barbara Hart__________________________
Barbara Hart (BH-3231
Thomas M. Skelton (TS-7908)
One North Broadway
White Plains Plaza, 5th Floor
White Plains, New York 10601
914-997-0500

*Lead Counsel*

COHEN MILSTEIN SELLERS &
TOLL PLLC

Catherine A. Torell (CT-0905)
150 East 52nd Street, Thirtieth Floor
New York, NY 10022
212-838-7797

Marc I. Machiz (*pro hac vice*)
255 S. 17th Street, Suite 1307
Philadelphia, PA 19103
267-773-4682

Lisa M. Mezzetti (LM-5105)
Karen L. Handorf (*pro hac vice*)
Anna K. Ryon -Walthall
Michelle C. Yau
1100 New York Avenue, NW, Suite 500 West
Washington, DC 20005
202-408-4600

*ERISA Counsel*

BERNSTEIN LIEBHARD LLP

Sandy A. Leibhard
Jeffrey M. Haber
Joseph R. Seidman, Jr.
Jeffrey D. Lerner

*Investor Counsel*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Daniel W. Krasner
Gregory M. Nespole
Demet Basar
Stacey T. Kelly
270 Madison Avenue
New York, NY 10016

*Additional Plaintiffs' Counsel*