UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: BEACON ASSOCIATES LITIGATION,

**OPINION
& ORDER**

This Document Relates to:

09 Civ. 777 (LBS)

ALL ACTIONS

SAND, J.

> Plaintiffs in these consolidated cases are investors in the Beacon Associates investment fund ("Beacon"), which served as a "feeder fund" to Bernard L. Madoff Securities LLC ("BMIS").  Plaintiffs bring claims against various Defendants associated with the Beacon Fund based on losses ultimately sustained as a result of Madoff's massive Ponzi scheme.  All Defendants have moved to dismiss the Second Consolidated Amended Complaint ("SCAC").  For the following reasons, the motions are granted in part, denied in part.[1]

## I.     Background[2]

> The basic facts surrounding Madoff's historic Ponzi scheme are now well known.  Madoff was a prominent and respected member of the investing community, and had served as a member of the NASDAQ stock market's Board of Governors and as the vice-chairman of the National Association of Securities Dealers ("NASD").  Madoff's investment company, BMIS, had operated since approximately 1960.  Madoff, who was

---

[1] A chart setting forth all of the holdings in this opinion appears at page 80.
[2] The Background section is based on facts alleged in the SCAC and supporting documentation submitted to the Court, as well as facts alleged in the New York Attorney General's complaint against Ivy filed on May 11, 2010 in New York State Supreme Court, on which Plaintiffs rely.  *See* Complaint, *People v. Ivy Asset Management, LLC*, No. 450489/2010 (N.Y. Sup. Ct. May 11, 2010) ("NYAG Compl.").

notoriously secretive, claimed he utilized a "split-strike conversion strategy" to produce consistently high rates of return on investment. The split-strike conversion strategy supposedly involved buying a basket of stocks listed on the Standard & Poor's 100 index and hedging through the use of options.

However, since at least the early nineties, Madoff did not actually engage in any trading activity. Instead, Madoff generated false paper account statements and trading records; if a client asked to withdraw her money, Madoff would pay her with funds invested by other clients. During this time, Madoff deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). On December 11, 2008, news broke that Madoff had been operating a multi-billion dollar Ponzi scheme for nearly twenty years. Madoff pleaded guilty to securities fraud and related offenses on March 12, 2009, and was subsequently sentenced to 150 years in prison.

Many individuals and institutions that invested with Madoff did so through feeder funds such as the Beacon Fund. Investors would invest in the feeder fund, which would then invest its assets with Madoff. The Beacon Fund invested approximately 71% of its assets with Madoff. NYAG Compl. ¶ 43. Between 1995 and 2008, Beacon invested approximately $164 million with Madoff and withdrew approximately $26 million, leaving a net investment of approximately $138 million. *Id.* In November 2008, just prior to the revelation of Madoff's fraud, the reported value of the Beacon Fund's Madoff account was approximately $358 million. *Id.*

After Madoff's fraud became public, the Beacon Fund's managing members decided to liquidate the Beacon Fund and distribute its remaining assets. The fund's

liquidation forms the subject matter of another action before this Court and Magistrate Judge Peck. *See Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, No. 09 Civ. 6910 (AJP), 2010 WL 2947076 (S.D.N.Y. July 27, 2010); *Rounds v. Beacon Assocs. Mgmt. Corp.*, No. 09 Civ. 6910 (LBS), 2009 WL 4857622 (S.D.N.Y. Dec. 16, 2009).[3]

### a.   Formation of the Beacon Fund

In 1983, Defendants Lawrence Simon and Howard Wohl formed Ivy Asset Management, LLC ("Ivy"). Ivy is a registered investment advisor, and provides three categories of services: (i) providing investment advice to asset managers and other investment advisors, (ii) managing the assets of high net worth individuals and institutions, and (iii) managing proprietary funds of funds ("FOFs") in which Ivy, Ivy's principals, and certain qualified individuals invested. A client introduced Simon and Wohl to Madoff in 1987, and Ivy then began to invest the assets of some of its proprietary funds with Madoff.

---

[3] Several other actions before this Court and other courts relate to the Beacon Fund's Madoff losses. Derivative claims on behalf of Beacon Associates LLC II were brought against Defendants in New York State Supreme Court. *See Sacher v. Beacon Associates Management Corp.*, No. 005424/09, 2010 WL 1881951 (N.Y. Sup. Ct. Apr. 26, 2010). Justice Bucaria stayed the *Sacher* action pending resolution of this consolidated action because "all of the defendants in [*Sacher*] are also defendants in the federal action" and the actions "are sufficiently similar." *Id.* at *16.

Claims related to the Beacon Fund are also pending before this Court in *Newman v. Family Management Corp.*, 08 Civ. 11215 (LBS) (S.D.N.Y. Dec. 23, 2008). *Newman* is brought by investors in the FM Low Volatility Fund, a "sub-feeder fund" that invested in Beacon. Also before this Court is *Wolf Living Trust v. FM Multi-Strategy Investment Fund, L.P.*, 09 Civ. 1540 (S.D.N.Y. Feb. 2, 2009), brought by investors in a related sub-feeder fund that also invested in Beacon. Defendants in both *Newman* and *Wolf Living Trust* have moved to dismiss, and those motions are now fully submitted.

Investors in another sub-feeder fund that was invested in Beacon, First Frontier, L.P., bring claims against many of the defendants in the instant action in *Saltz v. First Frontier, L.P.*, 10 Civ. 964 (S.D.N.Y. Feb. 2, 2010). The Defendants in *Saltz* have moved to dismiss the complaint.

On August 9, 2010, Defendant Ivy moved for an order to show cause why this Court should not stay discovery pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78u-4(b)(3)(D) in *Hecht v. Andover Associates Management Corp.*, 006110/2009 (N.Y. Sup. Ct. Apr. 1, 2009), pending this Court's resolution of the motions to dismiss in this action and *Newman*. *Hecht* involves many of the same Defendants as this action and *Newman*. *See infra*, note 5. We temporarily enjoined discovery in *Hecht* until the matter was fully briefed and we rendered a decision on the order to show cause.

In the late 1980s, Simon met John P. Jeanneret in a restaurant in upstate New York.  Jeanneret offered asset management and investment consulting services to upstate New York union pension and welfare funds as president and owner of J.P. Jeanneret Associates, Inc. ("JPJA"), alongside director Paul L. Perry.  In 1990, Ivy introduced Jeanneret to Madoff.  In 1991, Ivy and JPJA entered into a advisory agreement under which JPJA would pay Ivy 50% of any fees it earned by placing investors with Madoff or other Ivy-recommended investment managers.  If the number of JPJA clients invested with Ivy-recommended managers dropped below two, Ivy would instead be entitled to receive 60% of the investment management fees.  In 1992, JPJA founded the Income Plus Investment Fund ("Income Plus") as a vehicle through which pension funds could invest with Madoff.[4]  JPJA would amass a total of over $1 billion in pension fund assets under management by 2008.

In 1991 or 1992, Ivy was introduced to Joel Danziger, Esq., and Harris Markhoff, Esq.  Danziger and Markhoff practiced law together at the firm Danziger & Markhoff, LLP, and also managed two investment partnerships.  Simon encouraged Danziger and Markhoff to found and manage an investment fund, with Ivy acting as the managers' investment consultant.  Danziger and Markhoff formed Andover Associates Management Corporation ("AAMC"), which they owned and of which they were the principals, to serve as general partner for the investment fund.  Prior to the formation of the fund, AAMC entered into a consulting agreement with Ivy under which AAMC would pay Ivy 50% of any fees it earned, and Ivy would evaluate and recommend investment managers. In 1993, Danziger and Markhoff founded Andover Associates, LP ("Andover"), with

---

[4] This action does not involve claims relating to the Income Plus fund.  Claims against the Jeanneret Defendants based on investments in the Income Plus fund are pending in another action in this District, *In re J.P. Jeanneret Associates, Inc., et al.*, No. 09 Civ. 3907 (CM).

AAMC serving as the general partner.  Andover invested with several managers recommended by Ivy, including Madoff.[5]

This arrangement served as the blueprint for Danziger and Markhoff's second feeder fund, Beacon Associates, LLC ("Beacon"),[6] which is the focal point for the claims in this action.  Danziger and Markhoff formed Beacon Associates Management Corporation ("BAMC") to serve as the fund's general partner.  In 1995, BAMC entered into a consulting agreement with Ivy.  The agreement noted that Ivy had "introduced the Principals [of BAMC] to Madoff," and that the "Principals intend to form an investment limited liability company . . . for the purpose of pooling investment funds to be managed by Madoff."  Rosenthal Decl. Ex. D ("1995 BAMC-Ivy Agreement"), at 1.  BAMC agreed to pay Ivy 50% of all management fees it earned, as well as 50% of all fees it earned through introducing a third party to Madoff.  In return, Ivy agreed to provide BAMC with certain administrative services, including maintaining account records for all Beacon monies invested in BMIS, reconciling BMIS account statements against "trade tickets received and dividends and interests accrued," maintaining original "books of entry" for all of Beacon's BMIS accounts reflecting account activity, and calculating "changes in monthly value" of Beacon's BMIS accounts based on the foregoing data.  *Id.* at 3–4.

Participation in the Beacon Fund was offered to investors through confidential Offering Memoranda ("OMs").  Offering Memoranda were released in 2000 and 2004,

---

[5] This action does not involve claims relating to the Andover fund.  Claims against Danziger, Markhoff, and others based on investments in the Andover fund are asserted in an action pending in New York State Supreme Court, *Hecht v. Andover Associates,* No. 6110/09.  *See supra* note 3.

[6] Danziger and Markhoff would later create a second LLC, called "Beacon Associates LLC II," which invested its assets in the first Beacon Associates, LLC, later renamed "Beacon Associates LLC I."  The "Beacon Fund" refers to both Beacon LLC entities.

and were substantially identical.  The minimum capital contribution was generally $500,000.  The OMs represented that BAMC retained sole discretion to invest and reallocate Beacon assets, and would do so after consultation with Ivy.  BAMC was responsible for selecting investment managers with which to invest (such as BMIS), and for "monitoring the Managers' performance and their adherence to their stated investment strategies and objectives."  Rosenfeld Decl. Ex. C ("2004 OM"), at 10. BAMC represented that it would "factor[] in" analyses of risk control, speed of recovery from drawdowns, experience, organizational infrastructure, and correlation with traditional investments such as stocks and bonds into its "continuing evaluation of Managers."  2004 OM, at 10.

The OMs described Ivy, which was acquired by the Bank of New York Company, Inc. ("BONY") in 2000, as a "global leader in alternative investment fund-of-funds portfolio management" with "approximately $12 billion of assets under management." *Id.* at 27.  It further stated that Ivy's "staff of approximately 125 includes 25 research analysts and other senior investment professionals who devote 100% of their time to researching, reviewing, monitoring and analyzing current and prospective alternative investment managers, 21 Certified Public Accountants, 13 CFA Charterholders, and 8 CFA candidates." *Id.*

Both iterations of the OMs contained extensive cautionary language about the risks of investing with Beacon.  The OMs explained that the investments would not be diversified, and the 2000 OM explained that a "substantial majority" of the fund's assets would be placed with a single manager employing a "Split-Conversion Hedged Option Transaction strategy."  SCAC ¶ 185.  The "manager" referred to was Madoff.  The 2004

6

OM did not refer to this "manager," but instead notified investors that a "significant portion of the Company's assets are allocated to a strategy adopted by the Managing Member involving a portfolio of Large Cap Stocks hedged with options ('Large Cap Strategy')."  2004 OM, at 1.  The OM cautioned that "[t]he evaluation and due diligence process may vary among Managers and will be dependent on each Manager's individual disclosure practice."  *Id.* at 11.  It also warned that, "[a]lthough the Managing Member endeavors to verify the integrity of its Managers and broker it utilizes, there is always the risk that they could mishandle or convert the securities or assets under their control."  *Id.* at 22.  Generalized cautionary language was repeated throughout the OM, such as "[a]n investment in the Company involves a high degree of risk," "many of the Company's investments are inherently speculative," and "the Company does not control its Managers, their choice of investments, or other investment decisions[,] which are totally within the control of the selected managers."  *Id.* at 2, 14.  It also notified investors that "the identity of the Managers will not be disclosed except as required by law or by financial reporting rules."  *Id.* at 2.

    Madoff ceased accepting additional investments from JPJA's Income Plus fund sometime in 1999.  Simon suggested to Jeanneret that he could circumvent Madoff's limitation on additional investments by investing client assets in the Beacon Fund. Thereafter, JPJA executed amendments to Discretionary Investment Management Agreements ("DIMAs") with union pension fund clients.  The DIMAs incorporated the terms of the 2004 Beacon II OM and explicitly anticipated the investment of client funds in the Beacon Fund.  The DIMAs certified that JPJA was a fiduciary to the client and would comply with the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001 *et seq.* The DIMAs provided that JPJA would "perform its duties . . . with the care, skill, prudence, and diligence, under the circumstances then prevailing, . . . and shall diversify the investment account assets so as to avoid the risk of losses." SCAC ¶ 278. The DIMAs also described the use of options as hedges to limit risk in the underlying investments, supposedly an essential part of Madoff's proprietary investment strategy.

### b. Ivy's Doubts Concerning Madoff and Ivy's Representations to BAMC and JPJA

The Ivy defendants were aware of rumors calling into question Madoff's bona fides since the early 1990s. In 1991, Simon allegedly told a prospective investor that "Madoff could be a Ponzi scheme" and that "they did not know how much [Madoff] was running." NYAG Compl. ¶ 50.

In 1997, Ivy became suspicious that the number of Standard & Poor's 100 Index options ("OEX options") traded on a given day at the Chicago Board of Options ("CBOE") was insufficient to support Madoff's stated investment strategy based on Ivy's estimate of the amount of money Madoff had under management. Wohl wrote in an internal Ivy memorandum in 1997 that "We should explore this further!" NYAG Compl. ¶ 52. An Ivy employee wrote in 1997 of further suspicions, noting that "understanding Madoff is like finding Pluto . . . you can't really see it . . . you do it through inference, its effect on other objects." NYAG Compl. ¶ 56. Later that year, an internal Ivy memorandum noted that Madoff's records of option trades were inconsistent with the number of option trades and their prices as reported by Bloomberg. The memo stated, "This is a clear example of our inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with the independent information that is available to us." NYAG Compl. ¶ 57.

Simon asked Madoff about these irregularities on a return flight from a meeting with investors in 1997.  Madoff explained that it was "rare" for him to trade options in excess of the volume reported on the CBOE, and that he traded small amounts of OEX options on foreign exchanges.  Madoff provided a second explanation later that year or the next, claiming that he also sometimes traded options on domestic exchanges other than the CBOE.  Around this time period, Ivy was also concerned that Madoff might be using client money to fund his separate market-making business, that there was no independent verification of Madoff's trades because of his practice of "self-clearing," and that Madoff used a small accounting firm without an established reputation.

These concerns led Ivy to limit its proprietary investment in Madoff to 3% of the fund's value, whereas the general rule was to limit investments to 6–7%.  Wohl argued that Ivy should divest its Madoff investments completely in 1998, but Simon responded, "[w]e have said that it is important to maintain at least some level of Ivy fund investments with Madoff in order to send a message to [our] advisor clients that we have confidence in [Madoff]."  NYAG Compl. ¶ 67.

On August 8, 1997, Ivy wrote to Jeanneret, "As you know, we have not been able to assure ourselves as to how Bernie is able to successfully trade as much money as we believe he manages."  SCAC ¶ 282.  In August 1998, Ivy sent letters to Danziger and Jeanneret stating that Ivy's only concern about Madoff was his continued ability to manage such a large pool of assets successfully.  Ivy wrote that Madoff's "[p]erformance continues to be extremely strong. . . . We continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results. They will not quantify the total amount that they manage, but we estimate it to be at least

$3 billion. . . . As a result, we recommend a below median allocation." NYAG Compl. ¶ 68.

On December 15, 1998, Ivy met with Madoff again, and Madoff provided a third explanation of his option trading practices. He claimed that up to 50% of his option trading was done off-exchange, with counter-parties he identified only as major banks and institutions. Wohl testified that Madoff's explanation concerned him because he had never heard of OEX options being traded off-exchange in large volumes.

The day after the meeting with Madoff, Wohl proposed that Ivy withdraw all of its proprietary funds from Madoff. He wrote that investment with Madoff "remains a matter of faith based on great performance—this doesn't justify any investment, let alone 3%." NYAG Compl. ¶ 75. Simon responded,

> Amount we now have with Bernie in Ivy's partnerships is probably less than $5 million. The bigger issue is the 190 mill or so that our relationships have with him which leads to two problems, we are on the legal hook in almost all of the relationships and the fees generated are estimated based on 17+% returns .... [to be] $1.275 Million

> Are we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever "escape" the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?

NYAG Compl. ¶ 76. $300 million represented approximately 15% of Ivy's total assets under management (which was calculated to include assets held by advisory clients such as BAMC and JPJA). $1.6 million in fees represented approximately 16% of Ivy's annual revenue.

In response to these concerns, Fred P. Sloan, then Ivy's Chief of Investment Management, suggested a "middle of the road approach" in which Ivy would "terminate

all [Madoff] investments for the [proprietary] Ivy Funds," then "write to the advisory

clients telling them we have done so and the reasons why . . . [t]hen leave the rest up to

them."  NYAG Compl. ¶ 76.  Sloan reasoned that "we will of course still have liability as

an investment advisor, particularly for the ERISA entities, but we will have insulated

ourselves from liability as GP of our funds. . . . I image that our letters to clients would

serve to at least partially exculpate Ivy should the worst happen."  *Id.*  Sloan explained

that "[f]ull withdrawals from the Ivy funds would send a very clear message to the clients

regarding Ivy's concerns about this investment."  *Id.*  Sloan doubted that "Jeanneret and

others" would "walk away from Madoff" if Ivy withdrew its proprietary money because

"they are quite satisfied with Madoff and would not want to leave," and in "the case of

Jeanneret, he hardly listens to our advice at all."  *Id.*  This middle of the road approach

would "enable [Ivy] to preserve the majority of fees while reducing our legal risk."  *Id.*

However, this strategy was not adopted, and Ivy retained its 3% investment in Madoff.

On December 30, 1998, two weeks after the e-mail exchange, Simon and Wohl

met with Jeanneret and another Ivy client.  The client wanted to increase greatly its

Madoff investment, but Simon recommended a smaller increase, citing Madoff's age, the

inability to replicate his results, and the small size of his accounting firm.  The client

asked if it should completely withdraw from Madoff instead, but Simon only

recommended limiting total investment with Madoff.  Jeanneret's notes from this meeting

reflect that Ivy's due diligence "shows no problem for Madoff," that Ivy "tend[s] not to

have more than 5–7% with any one mgr," and that "Madoff['s] accountant is ok but

small."  NYAG Compl. ¶ 87.

On January 12, 1999, Ivy sent a letter to the client and Jeanneret to "clarify and expand" on what had been discussed in the meeting.  NYAG Compl. ¶ 88.  The letter stated that "[w]e have no reason to believe that the Madoff account is anything other than what Ivy's experience has shown and what the record demonstrates."  *Id.*  It continued, "due to a lack of external corroborative evidence, we cannot 'close the loop' in a manner that gives us total comfort," and restated Ivy's concern regarding Madoff's lack of a separate custodian for the securities he traded and Ivy's practice of "limiting investments (generally between 8% and 15%, depending on the circumstances) to any manager in Ivy's roster."  *Id.*  In January and July of 1999, Ivy sent letters to Danziger and Jeanneret that said, "As we have stated many times, while we have no reason to believe there is anything improper in the Madoff operation, we continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results."  *Id.*

In internal notes memorializing a September 1999 meeting with a prospective business partner, a non-advisory client, Ivy noted that he "appeared to be taken aback by the suggestion that the explanation of how [Madoff] works could be that something improper is being done."  NYAG Compl. ¶ 100.  When Ivy met with Jeanneret in April 2000, internal Ivy notes record that Jeanneret asked, "is [Madoff] essentially legitimate?," to which Defendant Adam L. Geiger, Ivy's Director of Research, responded, "essentially legitimate."  *Id.* ¶ 102.  Geiger went on to explain that Ivy had not been able to "fully close the loop on him and therefore Madoff is limited to no more than 4% in the Ivy funds."  *Id.*

In the fall of 2000, Ivy completely withdrew its proprietary investments from Madoff.  Ivy was about to be acquired by BONY, a transaction in which Simon and Wohl would make approximately $100 million each.  SCAC ¶ 92.  Simon testified that he told Danziger that Madoff had demanded the withdrawal; he further elaborated to Jeanneret that Madoff's reason for the demand was that he believed BONY's acquisition of Ivy would create a potential conflict of interest.  However, Simon's son, Sean Simon, wrote to a prospective client on August 20, 2001 that "Ivy had chosen not to invest with Madoff in its proprietary funds but had exposure through Beacon and one customized account."  NYAG Compl. ¶ 105.  Sean Simon reiterated this in 2008 when he told BONY that "we fired [Madoff] in 2000."  *Id.*  Wohl would later testify that "we chose to terminate our relationship with Madoff."  *Id.* ¶ 106.

In January 2001, Simon advised a client with a small investment in BMIS to divest completely, which the client did.  In August 2001, an internal Ivy memorandum noted that Wohl told a client that Ivy had withdrawn its proprietary funds from Madoff, and the client responded that, "if it's not good enough for [Ivy], then it should be out of [client]."  NYAG Compl. ¶ 108.  Another internal memorandum from September 2001 reflected that Simon told a client, "we have exposure remaining through mandate of individual clients but no current investment within our proprietary funds.  Madoff provided a good example of some red flags raised by research and overall process of Ivy in regards to risk/reward."  *Id.* at 109.

In March 2001, Wohl suggested to Simon that Ivy exclude a large pension fund client that was heavily invested in Madoff from Ivy's responsibility; Simon responded, "You may be spending too much time in the sun!  If we give up Madoff, [Jeanneret] has

opportunity to move in." NYAG Compl. ¶ 117. Simon wrote in June 2001 that this client's assets with Madoff "helped to contribute towards building Ivy's [assets under management] and credibility, despite our real concerns about [Madoff]." *Id.* ¶ 118. Simon concluded, "legal question: Now that [BONY] owns Ivy, who has the ultimate liability??" *Id.* ¶ 119.

Ivy again sent letters to Danziger and Jeanneret in February of 2001, listing the growth in Madoff's assets under management as Ivy's only concern. Letters sent in August of 2001 and 2002 also noted that Ivy was "unable to perform [its] usual and customary due diligence due to limitations set by Madoff." *Id.* ¶ 112. Simon testified that Madoff had not prohibited Ivy from making due diligence visits, but that Ivy had decided to stop making due diligence visits after Ivy withdrew its proprietary investment because it decided that Ivy was no longer welcome.

On June 29, 2001, Wohl wrote that "Madoff can personally bankrupt the Jewish community if he is not 'real.'" *Id.* ¶ 113. On April 1, 2002, Wohl responded to a subordinate's attempt to analyze Madoff's consistent success by writing, "Ah, Madoff. You omitted one other possibility—he's a fraud!" *Id.* An internal Ivy memorandum from January 14, 2002 reflects that Ivy told a client that, due to "qualitative issues" with Madoff, "no matter how successful he continue[s] to be, we are [not] satisfied as a fiduciary to invest client assets" with him. *Id.* ¶ 114. When Wohl was asked by a subordinate whether Ivy would be interested in investing with Madoff, Wohl responded "NO." *Id.* ¶ 115. Around this time, Ivy wrote to another advisory client with money invested in Madoff that "we have not recommended allocations to [Madoff]." *Id.* ¶ 116.

In a January 2003 email discussing potential managers to recommend to a client, Wohl wrote, "Madoff (NOT!)." *Id.* ¶ 115.

In 2002, 2003, and 2004, Ivy again sent letters to Danziger and Jeanneret listing Madoff's growing assets under management as Ivy's only concern. Ivy sent no further written reports to Danziger and Jeanneret after 2004. In 2005 and 2007, Ivy assessed its ten largest business risks, and Madoff was included both times.

On January 1, 2006, BAMC and Ivy executed a new advisory contract, which was not disclosed to Plaintiffs. This contract explicitly excluded Madoff from the managers Ivy agreed to research, monitor, meet with, and evaluate. In the contract, Madoff was down-graded to a "Non-Recommended Manager." SCAC ¶ 249. The contract stated that "[BAMC has expressly requested that Ivy not monitor or evaluate or meet with any representatives of Madoff including Bernard L. Madoff." *Id.* On December 1, 2007, Ivy made similar amendments to its advisory agreement with JPJA.

### c. Friedburg's Role as Auditor of the Beacon Fund

Pursuant to the Beacon OMs, Plaintiffs received quarterly unaudited account statements and yearly audited statements. For example, one of the unaudited quarterly statements issued just prior to the revelation of Madoff's fraud in 2008 stated that Beacon's Madoff account was "approximately 75% in U.S. Treasury securities for most of September, thereby largely insulating [the Fund] from the chaotic market losses over the past month." *Id.* ¶ 268.

Friedberg was engaged to perform audits of the Beacon Fund financial statements. These audits were to be performed in accordance with Generally Accepted Auditing Standards ("GAAS"), established by the Accounting Standards Board ("ASB") of the

American Institute of Certified Public Accountants ("AICPA").  GAAS required

Friedburg to "obtain reasonable assurance about whether the financial statements are free

of material misstatement, whether caused by error or fraud."  *Id.* ¶ 370.  If an independent

third party was the "custodian of a material amount of the audited entity's assets," GAAS

also required the auditor to consider whether the third party's response to a request for

confirmation would provide "meaningful and appropriate audit evidence."  *Id.* ¶ 375.

Plaintiffs allege numerous red flags which they claim should have prompted

further inquiry by Friedburg.  First, there was no published SAS 70 audit report available

for BMIS.  A SAS 70 audit report is a widely recognized auditing standard developed by

the AICPA and represents that a service organization such as an investment adviser has

been the subject of an in-depth audit of their control objectives and control activities.

Second, the vast majority of the Beacon Fund was invested in BMIS, increasing risk.

Third, Madoff's accounting firm, Friehling & Horowitz, had been telling the AICPA that

it did not perform audits for fifteen years, despite serving as Madoff's auditor.  Fourth,

Madoff ran his own "back office," which entailed that BMIS calculated its own net asset

values and prepared its own account statements.

BAMC's engagement letter with Friedberg states that BAMC had "made

available to [Friedberg] all financial records and related data."  *Id.* ¶ 391.  In addition,

Friedberg's May 8, 2008 audit report states that Friedberg "examin[ed], on a test basis,

evidence supporting the amounts and disclosures in the financial statements."  *Id.*

In each audit report, Friedberg expressed its unqualified opinion that the Beacon

Fund's financial statements "present fairly, in all material respects, the financial position

of [the fund] . . . and the results of its operations and changes in net assets for the year

then ended, in conformity with accounting principles generally accepted in the United States of America."  *Id.* ¶ 403.

### d.   Alleged "Red Flags" Suggesting that Madoff was a Fraud

Plaintiffs allege that many publicly available facts suggested that Madoff was a fraud, and that many private investors decided Madoff was suspicious after examining the publicly available data.  The alleged red flags include: Madoff's intense secretiveness; investors' inability to replicate Madoff's results using his claimed strategy; the low correlation of Madoff's performance to the market, despite the fact that his hedging strategy should have closely correlated to overall market performance; the suspiciousness of Madoff's claims to buy a security at its daily high and sell it at its daily low consistently; instances of Madoff's records reflecting a trade of a security at a price outside of the daily reported range for that security; the fact that an insufficient volume of options were traded on certain days to support Madoff's stated strategy; Madoff's decision to forego the standard hedge fund management fee of 1% plus 20% of profits and settle for commissions on trades, possibly to avoid heavier audit requirements; Madoff's stated practice of liquidating all securities at the end of each reporting quarter and investing the proceeds in treasury bills, ensuring that auditors could not verify the existence of Madoff securities for that period; Madoff's lack of a third-party custodian to hold BMIS's securities; Madoff's use of a small, unknown accounting firm; the fact that BMIS audits did not show any customer activity; the fact that key positions at BMIS were staffed by Madoff's family members; and Madoff's use of paper documentation of account activity and trades despite BMIS's supposed technological sophistication.

The SEC and FINRA failed to catch Madoff's fraud.  In the SEC's investigation of its failure to catch Madoff, it noted that "numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise."  *Id.*  ¶ 413.  As early as 2002, Rogerscasey, a domestic registered investment adviser, warned clients away from Madoff feeder funds.  In 2005, Harry Markopolos submitted a complaint to the SEC alleging that Madoff was a fraud.  Hedge fund adviser Acorn Partners doubted Madoff's bona fides.  Many European hedge funds avoided Madoff because he did not pass their due diligence.  In 2007, investment manager Akasia advised clients not to invest with Madoff after becoming suspicious of him.  In July 2008, Albourne Partners, a London due diligence firm, advised a client to liquidate a $10 million investment in a Madoff feeder fund.

### e.  Discovery of Madoff's Fraud and Aftermath

On December 11, 2008, Madoff was arrested by federal authorities for operating a multi-billion dollar Ponzi scheme.  Plaintiffs allege that immediately after the Madoff fraud was disclosed, on or about December 16, 2008, Perry conceded to several Trustees of Plaintiff pension funds that he had tried to replicate Madoff's results multiple times, but the calculations and analysis never supported Madoff's reported results.

On March 12, 2009, Madoff pleaded guilty to securities fraud and related offenses arising out of his Ponzi scheme.  On March 18, 2009, the United States Attorney's Office indicted BMIS's accountant, David Friehling of Friehling & Horowitz, CPAs, P.C., on charges of securities fraud, filing false audit reports, and related offenses.  On August 11, 2009, BMIS's Chief Financial Officer, Frank DiPascali, pleaded guilty to conspiracy to

commit securities fraud and related offenses.  On November 13, 2009, the United States

Attorney's Office charged two computer programmers with aiding Madoff's scheme by

developing software to generate false trading data.

On May 11, 2010, the Attorney General of the State of New York ("NY AG")

filed a civil complaint against Ivy, Simon, and Wohl in the Supreme Court of the State of

New York, alleging that the Ivy Defendants committed fraud and related offenses.

Plaintiffs' SCAC is "based in part" on the allegations contained in the NY AG's

complaint.

## II.    Standard of Review

On a motion to dismiss, a court reviewing a complaint will consider all material

factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  *Lee*

*v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999).  "To survive dismissal, the

plaintiff must provide the grounds upon which his claim rests through factual allegations

sufficient to raise a right to relief above the speculative level."  *ATSI Commc'ns Inc. v.*

*Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (internal quotation marks omitted).

Ultimately, the plaintiff must allege "enough facts to state a claim to relief that is

plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  "[A]

simple declaration that defendant's conduct violated the ultimate legal standard at issue . .

. does not suffice."  *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

Allegations of fraud must meet the heightened pleading standard of Rule 9(b),

which requires that the plaintiff "state with particularity the circumstances constituting

fraud."  Fed. R. Civ. P. 9(b).  The complaint must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991) (internal citations omitted).

On a motion to dismiss, a court is not limited to the four corners of the complaint; a court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### III.   Discussion

#### a.   Federal Securities Fraud Claims

Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), prohibits conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." *Field v. Trump*, 850 F.2d 938, 946–47 (2d Cir. 1988). Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." *Id.* The SEC rule implementing the statute, Rule 10b-5, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in

order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

In order to state a securities fraud claim under Section 10(b), a "plaintiff must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*ECA*") (quoting *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir. 2003)).

Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z-1, 78u-4.  *See ATSI Commc'ns*, 493 F.3d at 99.  Under the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, with intent "to deceive, manipulate or defraud."  15 U.S.C. § 78u-4(b)(1), (2).  "Therefore, '[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter."  *ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

### i.  Ivy Defendants

### 1.  Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319 (2007) (internal quotation marks and citation omitted).  "[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group."  *ECA*, 553 F.3d at 197 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001)).

Moreover, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.  The Court must consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct."  *Tellabs,* 551 U.S. at 314.  In determining whether a plaintiff adequately pleads scienter, the Court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323.

Scienter can be shown by (1) demonstrating that a defendant had motive and opportunity to commit fraud, or (2) providing evidence of conscious recklessness.  *See South Cherry*, 573 F.3d at 108–09.  Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence."  *South Cherry*, 573 F.3d at 109 (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)). Recklessness is "at the least, . . . an extreme departure from the standards of ordinary care

. . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak,* 216 F.3d at 308.  Thus, scienter is adequately pleaded when the "complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information that they had a duty to monitor . . . ." *South Cherry*, 573 F.3d at 110 (quoting *Novak,* 216 F.3d at 311).

Plaintiffs plead facts persuasively indicating that the Ivy Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Id.*  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts." *Novak*, 216 F.3d at 308.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

Ivy's alleged knowledge of facts and information indicating that investing with Madoff was a highly risky venture strongly suggests that Ivy's public statements to BAMC and JPJA were not accurate.  Plaintiffs persuasively allege that Ivy knew, *inter alia*, that (1) Madoff's records of option trades were inconsistent with the number of option trades and their prices as reported by Bloomberg in 1997, providing a "clear example of [an instance] where his trades for our accounts are inconsistent with the

independent information that is available to us," NYAG Compl. ¶ 56; (2) Madoff

provided dubious and shifting explanations of how his business operated, which led Wohl

to propose complete divestment from Madoff in 1998; (3) there was a possibility that

Madoff was using client money to fund his separate market-making business; (4) there

was no independent verification of Madoff's trades because of his practice of "self-

clearing"; and (5) Madoff used a small accounting firm without an established reputation.

Plaintiffs also persuasively allege that Ivy had grave doubts about Madoff, doubts

which were candidly discussed in internal memoranda and e-mails and which led Ivy to

steer other investors away from Madoff.  For example, Simon advised a client to divest

completely from Madoff in January 2001, and an internal Ivy memorandum from January

14, 2002 reflects that Ivy told a client that, due to "qualitative issues" with Madoff, "no

matter how successful he continue[s] to be, we are [not] satisfied as a fiduciary to invest

client assets" with him.  *Id.* ¶ 114.

Despite Ivy's grave concerns over Madoff, and Wohl's explicit consideration of

the possibility that Madoff might be a "fraud" in 2002, NYAG Compl. ¶ 113, BAMC and

JPJA were told in letters from 2001–04 that "we have no reason to believe there is

anything improper in the Madoff operation," and that the primary risk associated with

investing with Madoff was the size of assets under his control.  NYAG Compl. ¶ 88.

This contradiction between what Ivy told BAMC and JPJA and what Ivy privately knew

about Madoff supports a strong inference of scienter.

This inference is bolstered by Ivy's motive and opportunity to commit fraud.  "In

order to raise a strong inference of scienter through 'motive and opportunity' to defraud,

Plaintiffs must allege that [defendant] or its officers 'benefited in some concrete and

personal way from the purported fraud.'"  *ECA*, 553 F.3d at 197 (quoting *Novak,* 216

F.3d at 307–08).  "Motives that are common to most corporate officers, such as the desire

for the corporation to appear profitable and the desire to keep stock prices high to

increase officer compensation, do not constitute 'motive' for purposes of this inquiry."

*Id.*

Under Plaintiffs' theory of Ivy's motive to commit fraud, Ivy realized in the late

1990s that investing with Madoff was too risky given Ivy's many doubts.  However, Ivy

did not want to lose BAMC and JPJA as advisory clients because Ivy included advisory

clients' assets under management ("AUM") when calculating its own AUM.  Ivy's AUM

was a key factor in its success and its eventual sale to BONY, a transaction in which

Simon and Wohl each made approximately $100 million.  Ivy also believed that it would

not escape any legal liability already incurred as a result of being the "allocator and

introducer" if it warned BAMC and JPJA away from Madoff, and thus had little to gain

by divulging the full extent of its doubts.  Thus, Ivy developed a strategy through which it

would not reveal the full extent of its doubts to BAMC and JPJA, but limit its liability by

divesting its proprietary Madoff investment and advising new clients not to invest with

Madoff.[7]

This theory alleges more than a garden-variety motive for business success and

personal profits.  *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468

(S.D.N.Y. 2008) (holding that in pleading scienter, "arguing that the motive for

defrauding investors was to increase the company's profits or to increase officer

---

[7] Before the addition of the New York Attorney General's allegations in Plaintiffs' SCAC, Plaintiffs
primarily relied on Madoff's unusual practice of not charging a management fee, which allowed Ivy to reap
larger than normal fees, to show motive.  Given the strength of the new allegations in the SCAC, the Court
need not reach the question of whether large fees would be probative of motive to commit fraud.

compensation is not sufficient"), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 Fed. Appx. 404 (2d Cir. 2009).  It alleges more than a desire to keep Ivy's AUM high and retain clients.  *See, e.g.*, *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 620–21 (S.D.N.Y. 2010) (economic interest in retaining clients not probative of motive to ignore Madoff's fraud).  Rather, Plaintiffs' theory alleges that Ivy carefully balanced the risks and rewards of revealing the true severity of its concerns to two classes of clients: those clients for whom Ivy had already incurred potential legal liability would be sent veiled messages, while new clients would be strongly and explicitly steered away from Madoff.  The Ivy defendants benefited concretely and personally from such a course of conduct by keeping Ivy's AUM high enough to be acquired by BONY *while* managing their legal liability.  Ivy advised BAMC and JPJA to deploy their assets in the most advantageous way given that Ivy had likely already incurred legal liability, and Ivy limited its additional exposure to legal liability by providing much stronger warnings to clients who had not already invested large sums with Madoff.

With the benefit of the New York Attorney General's allegations, Plaintiffs plead facts adequately supporting this theory of Ivy's motive.  Simon, Wohl, and Sloan explicitly discussed the pitfalls of sending too strong a signal of discomfort with Madoff to BAMC and JPJA in 1998.  In arguing against withdrawing Ivy's proprietary investment with Madoff, Simon wrote, "[a]re we prepared to take all the chips off the table, have assets decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever 'escape' the legal issue of being the asset allocator and introducer, even if we terminate all Madoff related relationships?"  NYAG Compl. ¶ 76.  Simon would later acknowledge the crucial role that advisory client assets

invested with Madoff played in Ivy's success and the lingering worries over legal liability for introducing those clients to Madoff. Simon wrote in June 2001 that a large advisory client's Madoff investment "helped to contribute towards building Ivy's [assets under management] and credibility, despite our real concerns about [Madoff]." *Id.* ¶ 118. Simon concluded, "legal question: Now that [BONY] owns Ivy, who has the ultimate liability??" *Id.* ¶ 119.[8]

In sum, Plaintiffs' allegations of contradictions between Ivy's statements to BAMC and JPJA and the facts Ivy knew, as well Plaintiffs' allegations of Ivy's motive and opportunity, raise a strong inference of scienter. This inference is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Based on the facts alleged, Ivy's possession of intent to deceive BAMC and JPJA is at least as strong an inference as a mere uncertainty as to Madoff's bona fides on Ivy's part.

### 2.  Misstatement or Omission upon Which Plaintiffs Relied in Connection with the Purchase or Sale of Securities

Ivy contends that even if the Court finds scienter adequately pled, Ivy did not make any statement or omission to upon which Plaintiffs relied. Ivy argues that

---

[8] As Ivy argues, it is indeed troubling to suppose that a well-established industry leader would deliberately shut its eyes to the possibility of fraud. First, such behavior is more plausible when a firm is not well-established and has little to lose. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118 (VM), 2010 WL 3341636, at *24 (S.D.N.Y. Aug. 19, 2010) (motive adequately pleaded when feeder fund was "little more than an unfamiliar marketing group that served to feed Madoff's fraudulent scheme, with little standing in the world and certainly no apparent expertise"). Second, it is doubtful that if Ivy firmly believed Madoff operated a Ponzi scheme, Ivy would wait for the scheme to implode and risk its business and reputation. *See Schmidt v. Fleet Bank*, Nos. 96 Civ. 5030, 96 Civ. 7836, 96 Civ. 9705, 96 Civ. 9706 (AGS), 1998 WL 47827, at *6 (S.D.N.Y. Feb. 4,1998) ("Ponzi schemes are doomed to collapse."); *Shields*, 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."). However, it does not appear that Ivy firmly believed that Madoff was operating a Ponzi scheme, but rather had more generalized, albeit grave, doubts. And while these concerns would ordinarily militate against a finding of motive to commit fraud, the e-mail conversations cited above plainly indicate that a finding of motive is "cogent and *at least as* compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added).

essentially all of its communications were made only to BAMC and JPJA, and that Ivy's direct statements to Plaintiffs were limited to periodic performance reports on the Madoff investments.  These performance reports were printed on Ivy letterhead, but stated that "[t]he information presented is based on estimates provided by the individual hedge funds the Portfolio invests with as of or prior to the date of this report and is preliminary, unaudited and subject to change."  Hart Supp. Decl. Ex. F.  Furthermore, Ivy points to the fact that its consulting agreements with BAMC and JPJA explicitly provided that Ivy was exclusively retained to advise the managing member of the respective funds, and would not provide advice directly to the funds or the funds' investors.  The BAMC-Ivy agreement also stated that third parties were not intended beneficiaries of the contract, and the Beacon OMs informed plaintiffs of this fact.  Additionally, Ivy maintains that it had no role in drafting the Beacon OMs and JPJA DIMAs, and that no statement was attributed to Ivy in the Beacon OMs and the JPJA DIMAs.

This lack of direct communication between Ivy and Plaintiffs poses difficulties for pleading reliance in light of the Court of Appeals for the Second Circuit's recent decision in *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010) ("*PIMCO*").  The *PIMCO* court held that "a secondary actor can be held liable in a private damages action brought pursuant to Rule 10b-5 only for false statements attributed to the secondary actor at the time of dissemination."  603 F.3d at 148.  In reaffirming the "bright-line" attribution rule, the court held that "[t]he mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient" to hold a secondary actor liable under Rule 10b-5.  *Id.* at 155 (quoting *Lattanzio v. Deloitte &*

*Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007)).  "To be cognizable, a plaintiff's claim against a secondary actor must be based on that actor's own 'articulated statement,' or on statements made by another that have been explicitly adopted by the secondary actor." *Id*. at 155.  The *PIMCO* court identified "parties who are not employed by the issuing firm whose securities are the subject of the allegations of fraud" as "secondary actors." *Id.* at 148 n.1.

Plaintiffs argue that even if no statements in the Beacon OMs and JPJA DIMAs were explicitly attributed to Ivy, BAMC was acting as Plaintiffs' agent, and misrepresentations made to an agent are deemed to made to the principal.  Plaintiffs cite some authority for this proposition,[9] but Ivy cites no authority whatsoever in opposition to this general legal principle or its application in a federal securities fraud action. Indeed, courts have endorsed such a "fraud on the agent theory" in 10b-5 cases.  *See Bd. of Trs., Vill. of Bolingbrook Police Pension Fund v. 909 Corp.*, 33 F.3d 56 (7th Cir. 1994) (table decision) ("[T]his court recognized in *O'Brien* . . . that fraud against [a plaintiff's] agent by a broker gives either the agent or his principal the right to maintain a 10b-5 action against the broker. . . . In the circumstance in which the broker defrauds the agent, . . . the principal should be able to vindicate the wrong done to it through its agent.") (citing *O'Brien v. Cont'l Ill. Nat'l Bank & Trust Co.,* 593 F.2d 54, 63 (7th Cir. 1979)); *In re Fine Host Corp. Secs. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998) ("Under well-

---

[9] *See* Restatement (First) of Agency § 315 (1933); 3 Am. Jur. 2d, *Agency* § 287 (2010); *Schneider v. Lazard Freres & Co.*, 552 N.Y.S.2d 571, 575 (N.Y. App. Div. 1990) ("We do not think it a startling proposition that a principal is in privity with his agent's agent, or with anyone else his agent deals with on his behalf[,] . . . so that a negligent statement made by a third person to an agent and relied on by the agent to the principal's detriment is actionable by the principal."); *Harmelin v. Man Fin., Inc.*, No. 06-1944, 2007 WL 2702638, at *16 (E.D. Pa. Sept. 12, 2007) (where agent for Offshore Fund relied on information provided to it to calculate net asset value of Offshore Fund, and Offshore Fund, in turn, relied on that calculation in assessing fund's performance, "any intentional misrepresentations or omissions with respect to [the agent] would lead to deception of the Offshore Fund and its investors").

settled principles of agency law, one who defrauds an agent is liable to the principal. . . . In other words, a principal may sue [pursuant to 10b-5] when it is his agent who has been defrauded.  Applying that general principle of agency law to this action, plaintiffs need only allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants.").  It would be a strange result to allow a third party to make misrepresentations to a principal's agent, misrepresentations which played a leading role in causing catastrophic investment losses to the principal and relatively minor harm to the agent himself, and permit the third party to escape liability to the principal under the federal securities laws.[10]

There exists a rebuttable presumption that Plaintiffs' agents relied on BAMC's omissions.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) ("[I]f there is an omission of a material fact by one with a duty to disclose,[11] the investor to whom the duty was owed need not provide specific proof of reliance.") (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 154 (1972)); *see also duPont v. Brady,* 828 F.2d 75, 78 (2d Cir. 1987) ("[I]f the plaintiff proves that the facts withheld are material in the sense that a reasonable investor might have considered them important, reliance will be presumed." (internal citation omitted)).  "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly

---

[10] Additionally, Plaintiffs have sufficiently alleged that BAMC and JPJA were acting as their agents, as the Beacon OMs and the JPJA DIMAs explicitly authorize BAMC and JPJA to act as Plaintiffs' attorneys-in-fact.  *See, e.g.*, *Mantella v. Mantella*, 701 N.Y.S.2d 715, 716 (N.Y. App. Div. 2000) ("The relationship between an attorney-in-fact and his principal has been characterized as agent and principal.").

[11] Ivy was under a duty to fully disclose its doubts to BAMC and JPJA once it made assessments of Madoff.  *See infra* pp. 32–33 (discussing duty to update or correct past statements if they are untrue when made or become misleading due to intervening events); *see also Chiarella v. United States,* 445 U.S. 222, 228–29 (1980) (duty to disclose "arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them").

altered the total mix of information made available." *In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 482 (2d Cir. 2008) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988)) (internal quotation marks omitted).  *Cf. Affiliated Ute,* 406 U.S. at 153–54 (explaining that facts are material if "a reasonable investor might have considered them important in the making of [a] decision").  There can be no doubt that Ivy's alleged omissions were material under this standard.  *See In re Sadia, S.A. Securities Litigation*, No. 08 Civ. 9528 (SAS), 2010 WL 2884737, at *7 (S.D.N.Y. July 20, 2010) ("Material facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.  They include any fact which in reasonable and objective contemplation might affect the value of the corporation's stock or securities." (quoting *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir. 1997)) (internal quotation marks omitted)).

Ivy's primary defense to a fraud on the agent theory is to argue that the alleged misrepresentations it made to BAMC and JPJA were not made in connection with the purchase or sale of securities.  Ivy argues that the only securities ever purchased directly by Plaintiffs were their ownership interests in the Beacon Fund, and BAMC could not be acting as Plaintiffs' agent in that transaction because Plaintiffs had not yet invested in the fund.

Under Section 10(b), actionable fraud must be "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  The "in connection with" factor must be construed "not technically and restrictively, but flexibly to effectuate its remedial purpose."  *SEC v. Zandford*, 535 U.S. 813, 820–21 (2002).  "The Supreme Court has defined the scope of 'in connection with' very broadly to encompass a 'fraudulent

scheme in which the securities transactions and breaches of fiduciary duty coincide.'" *Levinson v. PSCC Servs., Inc.*, No. 09 Civ. 269 (PCD), 2009 WL 5184363, at *6 (D. Conn. Dec. 23, 2009) (*quoting Zandford*, 535 U.S. at 825); *see also Ling v. Deutsche Bank, AG*, No. 04 Civ. 4566 (HB), 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005) ("[T]he requirement is satisfied when the securities transactions and breaches complained of coincide and are not independent events."). Accordingly, it has been found that feeder fund defendants' "alleged misrepresentations and omissions relate to Madoff's purported purchase and sale of securities with Plaintiffs' funds[,] . . . [as] the omnibus account created by Defendants was clearly for the purpose of allowing Madoff to purchase and sell securities using Plaintiffs' funds." *Levinson*, 2009 WL 5184363, at *7.

The Court finds the reasoning in *Levinson* persuasive. Ivy's alleged misrepresentations related to its appraisal of Madoff, who was alleged to be making securities trades with Plaintiffs' money on a regular basis. Ivy was also responsible for reporting the results of Madoff's purported securities transaction to Plaintiffs. Moreover, pursuant to the Beacon OMs, Ivy was to be consulted each time BAMC made a decision to allocate or reallocate Plaintiffs' funds with different managers. Lastly, and most importantly, Ivy's alleged misrepresentations placed upon Ivy a continuing duty to update or correct past statements when they became known to be misleading. *See In re NovaGold Resources Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("The duty to correct applies to statements that are false at the time they are made, and it arises 'when [the defendant] learned that its prior statement . . . was untrue.' In contrast, the more limited duty to update applies to 'a statement made misleading by intervening events, even if the statement was true when made.'" (quoting *Lattanzio*, 476 F.3d at 154;

*Overton v. Todman and Co.*, 478 F.3d 479, 487 (2d Cir. 2007))); *see also In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (holding that duty to update prior statements arises when those statements "have become misleading as the result of intervening events"), *cited in Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 Fed. Appx. 260, 263 (2d Cir. 2010) (table decision).  Accordingly, even if Ivy had rarely spoken about Madoff, Ivy was under a continuing duty to disclose its true concerns so as to render prior statements of opinion not misleading during the time period Madoff was making trades with Plaintiffs' money.  This satisfies section 10(b)'s "in connection with the purchase or sale of any security" requirement.  15 U.S.C. § 78j(b).

Accordingly, Plaintiffs state a viable claim for securities fraud against Ivy under section 10(b).[12]

### 3.   10(b) and 20(a) Claims Against Individual Ivy Defendants and BONY

In addition to 10(b) claims against Ivy, Plaintiffs bring claims against Simon and Wohl for primary violations of section 10(b).  Ivy's arguments against individual liability for Simon and Wohl rest entirely on arguments rejected in the course of finding Ivy liable under section 10(b).  Moreover, Simon and Wohl are alleged to have made many of the alleged misrepresentations underlying the claims against Ivy and to have played the leading roles in the allegedly fraudulent course of conduct.  Accordingly, Plaintiffs state viable individual claims against Simon and Wohl under section 10(b).[13]

---

[12] As Plaintiffs have pleaded a viable claim based on Ivy's misstatements or omissions, the Court declines to consider the Plaintiffs' "scheme" theory of liability, which in any event would face serious obstacles in light of *PIMCO*, 603 F.3d 144 (2d Cir. 2010), and *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

[13] Of the Individual Ivy defendants, individual 10b-5 claims were only asserted against Simon and Wohl.

In order to state a control person claim pursuant to section 20(a), Plaintiffs must allege facts showing (1) "a primary violation by the controlled person," (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." *ATSI Commc'ns*, 493 F.3d at 108 (internal quotation marks omitted).  A finding of "control" under the second prong requires a fact-intensive inquiry into the "power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See In re IPO Secs. Litig.*, 241 F. Supp. 2d 281, 393 (S.D.N.Y. 2003) (internal citation omitted).  This "fact-intensive inquiry . . . generally should not be resolved on a motion to dismiss." *Katz v. Image Innovations Holdings, Inc.,* 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).  Plaintiffs need to meet the PSLRA's heightened pleading standards only for the third prong, involving culpable participation.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170–71 (S.D.N.Y. 2008).

Ivy does not contest that section 20(a) claims against Simon and Wohl are adequately pleaded so long as an underlying 10(b) violation by Ivy survives the motion to dismiss.  Ivy's Supp. Mem. Resp. SCAC, at 41 n.38.  While Ivy maintains that Plaintiffs have not sufficiently alleged Geiger's and Sloan's control over Ivy, Plaintiffs have alleged that Geiger and Sloan were high-level executives at Ivy with discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally.  These allegations of control suffice to survive a motion to dismiss.  *See Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3341636, at *27 (S.D.N.Y. Aug. 18, 2010) (control adequately pleaded against "high-level player[s]" who

participated in feeder fund's decision-making).  Additionally, Plaintiffs show Geiger's

and Sloan's culpable participation by identifying specific statements attributed to them

bearing directly on Ivy's misrepresentations.  For instance, Sloan suggested a strategy in

1998 to "insulate[] [Ivy] from liability as GP of our funds" while maintaining advisory

clients' investments with Madoff.  NYAG Compl. ¶ 76  Geiger represented to Jeanneret

in 2000 that Madoff was "essentially legitimate."[14]  *Id.* ¶ 102.

However, Plaintiffs fail to plead that BONY was sufficiently culpable or involved

in the underlying securities fraud violation.  Plaintiffs assert that BONY required Ivy to

withdraw its proprietary investment with Madoff, but this is contradicted by Ivy's

statements that either (a) Madoff requested that Ivy divest, or (b) Ivy decided to divest

before it was acquired by BONY.  Plaintiffs also assert that Ivy formed a risk assessment

committee "under the aegis of BONY," and ranked Madoff as one of Ivy's largest risks.

These unspecific allegations fail to meet the heightened pleading standard for the third

prong; an inference of culpable participation is not "at least as compelling as" the

opposing inference that BONY was not privy to Ivy's specific doubts about Madoff.

*Tellabs*, 551 U.S. at 314.  The section 20(a) claims against BONY are dismissed.

### ii.  Beacon Defendants

#### 1.  Misstatement or Omission upon Which Plaintiffs Relied in Connection with the Purchase or Sale of Securities

Plaintiffs point to language in the Beacon OMs concerning the due diligence that

BAMC had and would perform on investment managers as the Beacon Defendants'

offending material misstatements.  In the OMs, BAMC promised to "monitor[] the

---

[14] Plaintiffs have not pleaded facts with sufficient specificity to establish the other Individual Ivy Defendants' culpable participation.  Accordingly, the section 20(a) claims against the Individual Ivy Defendants other than Simon, Wohl, Geiger, and Sloan are dismissed.

Managers' performance and their adherence to their stated investment strategies and objectives."  2004 OM at 10.  However, the OMs also advised Plaintiffs that "[t]he evaluation and due diligence process may vary among Managers and will be dependent on each Manager's individual disclosure practice."  *Id.* at 11.

The Court of Appeals for the Second Circuit has held that when a business promises to conduct due diligence, but is incompetent or mismanaged and fails to uphold its promise, an aggrieved investor's remedy lies in a breach of contract action rather than a federal securities fraud action.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.").  However, authority indicates that a securities fraud claim lies when a defendant knows it cannot perform due diligence or does not intend to complete its promise.  *See id.* ("[The failure to carry out a promise] does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform."); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("[M]aking a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration[15] for the transfer of securities. . . . Such a promise, however, must encompass particular actions and be more than a generalized promise to act as a faithful fiduciary.").

Having made representations to Plaintiffs regarding the due diligence BAMC did perform and would perform, BAMC was under a duty to update or correct those statements if they were misleading *ab initio* or if they became misleading due to

---

[15] BAMC's promise to conduct due diligence formed part of the consideration for the Plaintiffs' purchase of interests in the Beacon Fund.

intervening events.  *See NovaGold*, 629 F. Supp. 2d at 301 ("The duty to correct applies

to statements that are false at the time they are made, and it arises 'when [the defendant]

learned that its prior statement . . . was untrue.'  In contrast, the more limited duty to

update applies to 'a statement made misleading by intervening events, even if the

statement was true when made.'" (internal citation omitted)).

        Plaintiffs were advised that due diligence would vary according to the investment

manager's disclosure practices.  2004 OM at 11.  Thus, when Ivy sent BAMC veiled and

muted messages regarding the extent and quality of due diligence it was able to perform

on Madoff, these tepid warnings did not render the Beacon Defendants' representations

regarding due diligence misleading.  *See, e.g.*, NYAG Compl. ¶ 112 (2001 Ivy letter to

Danziger stating that Ivy was "unable to perform [its] usual and customary due diligence

due to limitations set by Madoff").  However, the Beacon OMs' cautionary language

could not reasonably be read to suggest that absolutely no due diligence would be

performed on the investment manager who controlled not less than 70% of the Beacon

Fund's assets.  Accordingly, the Beacon OMs' due diligence language became

misleading once BAMC learned that no due diligence would be performed on Madoff.

        The most compelling inference from the facts alleged is that the Beacon

Defendants were not in a position to perform adequate due diligence on Madoff, given

that Ivy had greater access to Madoff and was nonetheless itself restricted by Madoff.

Additionally, it appears that the Beacon Defendants depended on Ivy to perform

essentially all due diligence on Madoff, as evidenced by, *inter alia*, letters Ivy sent

BAMC discussing Madoff due diligence.  *See, e.g.*, NYAG Compl. ¶ 112 (2001 Ivy letter

to Danziger stating Ivy was "unable to perform [its] usual and customary due diligence

due to limitations set by Madoff").  The Beacon Defendants' duty to disclose thus arose

when they learned that Ivy was no longer performing due diligence on Madoff.  The

earliest specific fact alleged indicating that Ivy had ceased due diligence on Madoff is the

2006 amended advisory agreement.  While Jeanneret had received more explicit letters

from Ivy since 2001 that noted Ivy's "*inability* to perform due diligence due to limitations

set by Madoff," SCAC ¶ 227 (emphasis added), Plaintiffs do not allege that Danziger had

received any equally explicit statement prior to the 2006 amended advisory agreement.

Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance on this

omission; the fact that BAMC signed a contract under which it released Ivy from

performing any due diligence on the investment manager who controlled over 70% of the

Beacon Fund's monies is plainly material.  *See Affiliated Ute,* 406 U.S. at 153–54

(explaining that facts are material if "a reasonable investor might have considered them

important in the making of [a] decision").  Furthermore, as with Ivy, the Beacon

Defendants' duty to correct and/or update coincided with Madoff's sales of securities.

*See Levinson*, 2009 WL 5184363, at *7.

Loss causation is established if Plaintiffs allege "that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch

& Co., Inc.,* 396 F.3d 161, 173 (2d Cir.) (internal citation and quotation marks omitted),

*cert. denied,* 546 U.S. 935 (2005).  Plaintiffs can prove loss causation by showing "that

the loss was foreseeable and caused by the materialization of the risk concealed by the

fraudulent statement."  *In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir.

2010) (quoting *ATSI Commc'ns,* 493 F.3d at 107).  "A misrepresentation is 'the

proximate cause of an investment loss if the risk that caused the loss was within the zone

of risk *concealed* by the misrepresentations." *Omnicom*, 597 F.3d at 513 (quoting *Lentell,* 396 F.3d at 173) (internal quotation marks omitted). Here, losses from Madoff's misappropriation were within the zone of risk concealed by the non-disclosure of the fact that the activities of the investment manager controlling over 70% of the Beacon Fund's assets were not subject to any due diligence.

### 2.  Scienter

The failure of the Beacon Defendants to disclose the fact that Ivy would not be performing due diligence on Madoff to Plaintiffs, even as the Beacon Defendants signed an agreement explicitly exculpating Ivy from such responsibilities, presents "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA,* 553 F.3d at 198.  The agreement states that BAMC "expressly requested that Ivy not monitor or evaluate or meet with any representatives of Madoff including Bernard L. Madoff," and BAMC's failure to disclose this agreement to Plaintiffs strongly indicates an intent to deceive Plaintiffs about the due diligence being performed on Madoff.  SCAC ¶ 267. Indeed, this agreement was not disclosed to Plaintiffs until the commencement of the instant litigation.  The Beacon Defendants were under an ongoing duty to disclose information "whenever secret information render[ed] prior public statements materially misleading." *In re Time Warner,* 9 F.3d at 268.  Their failure to do so strongly indicates that they "knew facts or had access to information suggesting that their public statements were not accurate." *ECA,* 553 F.3d at 199.  A finding of scienter is the most persuasive inference based on the facts alleged.

However, the Court notes that Plaintiffs' theory that BAMC should have discovered that Madoff was operating a Ponzi scheme based on various "red flags" is

unavailing.   According to the Plaintiffs' own allegations, Ivy provided BAMC with

muted signals regarding the risks of investing with Madoff, and never disclosed its true

doubts or the facts upon which those doubts were based to BAMC.  Furthermore, there is

no allegation that BAMC was actually aware of the publicly available red flags.  As other

courts to consider similar red flag allegations in the aftermath of the Madoff affair have

found, "[P]laintiffs do not allege that Markopolos ever discussed his assessment that

Madoff was operating a Ponzi scheme with [Defendants] or published it in the press,

[P]laintiffs do not assert that the [Defendants] knew that Madoff's returns could not be

replicated by others, and [P]laintiffs do not claim that investors who elected not to deal

with Madoff informed the [Defendants] of their decisions."  *In re Tremont Secs. Law,

State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010); *see also S.E.C. v.

Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2,

2010) (rejecting scienter allegations because "the complaint supports the reasonable

inference that Madoff fooled the defendants as he did individual investors, financial

institutions, and regulators").  Rather, Plaintiffs' red flag theory is essentially that

rejected by the Court of Appeals for the Second Circuit in *South Cherry*: had BAMC

investigated Madoff, it would have uncovered that he was a fraud.  *See* 573 F.3d at 112

(rejecting scienter allegations when the "[c]omplaint alleged that '[i]f' [defendant] had

asked various questions earlier, it would have further questioned the Bayou Accredited

financial records or recognized the need to ask further questions"); *see also infra* pp. 42–

45 (discussing similar claims against the Friedburg defendants).

        Accordingly, Plaintiffs plead a viable securities fraud claim against BAMC based

on the failure to disclose that no due diligence was being performed on Madoff by Ivy in

2006.  Furthermore, Plaintiffs unquestionably plead Section 20(a) control person liability against Danziger and Markhoff under the standards discussed above.  Danziger and Markhoff are adequately alleged to be culpable in the primary violation and to control the Beacon Fund as its principals.

### iii.   JPJA Defendants

The above 10b-5 analysis for the Beacon Defendants applies almost identically to the Jeanneret Defendants.  Pursuant to the DIMAs JPJA entered with pension funds, JPJA promised to "supervise and direct the investment of the assets of the Fund in accordance with" the Plan's investment policy and applicable standards of care.  Cook Decl. Ex. C ("1990 DIMA"), at 4.  JPJA knew that it was unable to supervise clients' Madoff investment in 2007 at the latest, when it also signed an amended contract with Ivy explicitly excusing Ivy from performing due diligence on Madoff.[16]

The knowledge that Ivy had stopped performing due diligence, coupled with the fact that Defendant Perry admitted that JPJA was unable to replicate Madoff's results on its own, rendered JPJA's prior promise to supervise clients' investments materially misleading.  *See Affiliated Ute,* 406 U.S. at 153–54.  This knowledge created a duty to update and/or correct prior representations regarding due diligence, *see NovaGold*, 629 F. Supp. 2d at 301.  Plaintiffs are entitled to a presumption of reliance on JPJA's failure to disclose, *see Affiliated Ute,* 406 U.S. at 153–54, which coincided with Madoff's purported securities trades.  *See Levinson*, 2009 WL 5184363, at *7.  Losses from Madoff's fraud were within the zone of risk concealed by the failure to disclose that no

---

[16] While JPJA did receive some stronger language from Ivy regarding its inability to perform due diligence on Madoff in 2001, Ivy resumed sending JPJA the same muted signals it sent BAMC thereafter.  JPJA may have been misled about the level of due diligence performed by Ivy prior to the 2007 consulting agreement, but not afterwards.

due diligence was performed on Madoff.  *See Omnicom*, 597 F.3d at 513.  Furthermore,

a finding of scienter is at least as plausible as any competing inference because JPJA

entered into a secret agreement with Ivy in 2007 releasing Ivy from any responsibility of

monitoring Madoff. [17]  *See Tellabs,* 551 U.S. at 314.

Plaintiffs adequately plead control and culpable participation by Jeanneret to state

a claim under section 20(a), as he signed the 2007 consulting agreement.  However,

Plaintiffs' section 20(a) claims against Perry are dismissed because Plaintiffs have not

alleged that Perry had a role in the decisions to excuse Ivy from due diligence obligations

and not to inform Plaintiffs of this fact.  Perry's admission of JPJA's inability to replicate

Madoff's results does not suggest that Perry played a role in these decisions.

### iv.   Friedburg Defendants

"The standard for pleading auditor scienter is demanding."  *In re Scottish Re*

*Group Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) (internal citation and

quotation marks omitted).  "For recklessness on the part of a non-fiduciary accountant to

satisfy securities fraud scienter, such recklessness must be conduct that . . .

approximate[s] an actual intent to aid in the fraud being perpetrated by the audited

company."  *Rothman v. Gregor,* 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks

omitted).  Pleading auditor scienter in conformity with the PSLRA is satisfied by alleging

---

[17] Because Plaintiffs have adequately pleaded a claim against JPJA under 10b-5, Plaintiffs' claims against Jeanneret for rescission under the Investment Advisers Act of 1940 ("IAA") survive the motion to dismiss as well.  *See* 15 U.S.C. § 80b-6(2).  "Section 206 [of the IAA] makes it unlawful for any investment adviser 'to employ any device, scheme or artifice to defraud . . . [or] to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.'"  *Wellington Int'l Commerce Corp., v. Retelny*, 727 F. Supp. 843, 845 (S.D.N.Y. 1989) (quoting 15 U.S.C. § 80b-6).  "Section 215 provides that contracts whose formation or performance would violate the Investment Advisers Act 'shall be void . . . as regards the rights of' the violator and knowing successors in interest. *Id.* (quoting 15 U.S.C. § 80b-15).  The Jeanneret defendants argue that the IAA claims fail because Plaintiffs do not meet the standards of Rule 9(b), but the Court has found a 10b-5 claim adequately alleged against JPJA under Rule 9(b) and the PSLRA.

that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re IMAX Secs. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008).

Plaintiffs allege that Friedburg violated GAAP and GAAS by failing to corroborate the Madoff account statements. "Allegations of GAAP and GAAS violations alone are insufficient" to plead scienter. *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182 (HB), 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005). However, "[a]llegations of [an auditor ignoring] 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004). But "the auditor must have actually been aware of the red flags . . . . [O]nly those red flags that [the auditor] is alleged to have known of, or that are so obvious that [the auditor] must have known of them, can support an inference of intent." *Stephenson,* 700 F. Supp. 2d at 623. "[M]erely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." *In re IMAX Secs. Litig.,* 587 F. Supp. 2d at 484.

Plaintiffs allege a litany of red flags, but fail to allege sufficiently that Friedburg ever became aware of them. Rather, Plaintiffs' reasoning is redolent of that rejected in *South Cherry*—had Friedburg conducted a thorough investigation, Friedburg *would have* become aware of various red flags. *See* SCAC ¶ 396 ("[A]ttempts [to investigate Madoff as required by GAAS] *would have* revealed serious questions about Madoff and his

trading results." (emphasis added)); *id.* ¶ 398 ("[H]ad an auditor sought to confirm [Madoff's trading with his putative counterparties], the fraud *would have* been immediately revealed . . . ." (emphasis added)); *id.* ¶ 399 ("Any meaningful attempt at seeking corroboration of the existence of assets and occurrence of trades independent of BMIS *would have* uncovered the fraud.  Because Friedberg issued unqualified audit opinions on the Beacon Fund's financial statements, it is clear that Friedberg did not attempt to obtain this independent corroboration." (emphasis added)).  Such allegations do not support a strong inference that Friedburg was aware of red flags and acted with scienter.[18]  *See Anwar*, 2010 WL 3341636, at *66 ("As in *South Cherry,* the SCAC is replete with allegations that the defendants would have learned the truth as to those aspects of the funds if the defendants had performed the due diligence they promised." (quoting 573 F.3d at 112) (internal quotation marks and alterations omitted)).  The more plausible competing inference is that Friedburg failed to conduct a thorough investigation because of reliance on Madoff's reputation as an industry leader.  *Cf. Anwar*, 2010 WL 3341636, at *68 ("[I]t is a more compelling inference that the PwC Member Firms were duped by FGG or were merely negligent in the exercise of professional duties they owed to the Funds.").

We also join the courts that have found the alleged red flags to be either not so obvious that an auditor must have known of them or not strong enough to support an inference of scienter.  *See Stephenson*, 700 F. Supp. 2d at 623–24 (finding following red flags not so obvious that auditor must have known of them: "BMIS' transactions were at

---

[18] The allegation that Friedburg may have had access to various letters Ivy sent to BAMC does not support an inference of scienter because there is no allegation that Friedburg actually reviewed these letters.  "[M]erely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient."  *In re IMAX Secs. Litig.*, 587 F. Supp. 2d at 484.

variance with market evidence; . . . BMIS did not permit access to its computers, and many of its reported trades could not have actually taken place at the prices reported; . . . BMIS' independent auditor, Friehling and Horowitz, was small, not well known, and not properly certified"); *see also Anwar*, 2010 WL 3341636, at *65 (rejecting following red flags, if known to auditor, as indicative of intent to deceive: "Madoff did not provide electronic confirmations to the Funds that he managed, and instead gave them delayed, paper confirmation of supposed trades[;] . . . Madoff purport[ed] to turn consistent investment returns during good times and bad times in the market[;] . . . All of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets—a highly unusual arrangement with no checks and balances."); *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362 (S.D.N.Y. 2010) (finding that similar red flag allegations against auditor of Madoff feeder fund did not establish scienter).  Plaintiffs' additional red flag allegations, such as Madoff's lack of an industry standard SAS 70 report, either are not sufficiently alleged to have been known to Friedburg, or do not support an inference of an intent "approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company."  *Rothman v. Gregor,* 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted).[19]

The securities fraud claims against Friedburg are dismissed.

### b.  ERISA Claims

---

[19] Plaintiffs also raise allegations relating to Footnote Five of the audited Beacon financials, which states that Friedburg "is not able to obtain the specific investments at some of the underlying private investment funds due to lack of available data."  Zieff Decl. Ex. A ("2007 Financials"), at 8.  However, this note pertains to investments comprising approximately twenty-five percent of the Beacon Fund's assets (i.e., the non-Madoff holdings).  Moreover, even if this note was read to refer to Madoff, it would simply corroborate the inference that Friedburg did not investigate Madoff, rather than the inference that Friedburg was aware of the various alleged red flags.

Plaintiffs raise a number of claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against the Beacon, Ivy, BONY, and Jeanneret Defendants.  Counts against all four groups of Defendants include breach of the fiduciary duty of prudence (Count VIII), failure to comply with documents and instruments governing the plan (Counts IX–X), misrepresentation, failure to disclose, and concealment of breach of fiduciary duty (Count XI), and co-fiduciary liability (Count XII).  Plaintiffs also assert a claim for disgorgement of profits against the Ivy and BONY Defendants (Count XIII).

ERISA's primary purpose is to "protect beneficiaries of employee benefit plans." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009) (citing 29 U.S.C. § 1001(b)).  ERISA holds plan fiduciaries to the "[p]rudent man standard of care" in exercise of their duties.  29 U.S.C. § 1104(a).  ERISA measures prudence "according to the objective 'prudent person' standard developed in the common law of trusts." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.), *cert. denied*, 469 U.S. 1072 (1984).  Trustees' fiduciary obligations to the participants and beneficiaries of an ERISA plan have been described as "the highest known to the law."  *Chao v. Merino*, 451 F.3d 174, 182 (2d Cir. 2006) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982)).

Specifically, ERISA lists four duties required of fiduciaries.  Fiduciaries are to (1) act "solely in the interest of the participants and beneficiaries," and for the purpose of benefiting participants and defraying reasonable administration expenses; (2) discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing"; (3) diversify investments "so as to minimize the risk of large losses"; and (4)

act "in accordance with the documents and instruments governing the plan" so long as they are consistent with ERISA itself.  29 U.S.C. §§ 1104(a)(1)(A)–(D).

### i.  The Jeanneret & Beacon Defendants[20]

Plaintiffs assert four claims against the Jeanneret and Beacon Defendants: breach of the duty of prudence and loyalty (Count VIII), failure to comply with documents and instruments governing the plan (Counts IX and X), prohibited transaction (Count X), and co-fiduciary liability (Count XII).[21]

### 1.  Duty of Prudence

ERISA requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  When assessing the Defendants' decisions, the Court must focus on facts as they existed at the time of the challenged transaction.  *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006).  Hindsight cannot form the basis of an ERISA claim.  *Id.*; *Katsaros v. Cody*, 744 F.2d at 279 (fiduciary conduct must be viewed "from the perspective of the

---

[20] Neither party moves to dismiss the ERISA claims against the individual Jeanneret and Beacon Defendants on the grounds that personal liability is only warranted under "special circumstances."  *See infra* pp. 65–66.  Accordingly, the Court does not consider this argument here and addresses the claims as to all Jeanneret and Beacon Defendants.

[21] The SCAC also alleges "Concealment of Breach of Fiduciary Duty" against the Jeanneret and Beacon Defendants in Count XI.  Count XI describes Ivy's alleged failures to disclose material facts to the Jeanneret and Beacon Defendants.  However, it does not identify the section of ERISA under which Plaintiffs seek relief, nor does it include any factual allegations of wrongdoing by the Jeanneret or Beacon Defendants.  *See* JPJA Supp. Mem. 13–14.  In supplemental pleading, Plaintiffs identify ERISA § 413, 29 U.S.C. § 1113, as the operative section.  Pls.' Supplemental Mem. Opp'n Mot. Dismiss 93.  Section 413 states: "[I]n the case of fraud or concealment, [an ERISA breach of fiduciary duty] action may be commenced not later than six years after the date of discovery of such breach or violation."  29 U.S.C. § 1113.  This provides Plaintiffs with a potentially longer statute of limitations period.

To the extent that Plaintiffs include the concealment charge in Count XI in order to meet this standard, the Court finds they have sufficiently pleaded fraud or concealment to obtain the extended limitations period.  However, Plaintiffs do not sufficiently plead an independent claim for concealment against the Jeanneret and Beacon Defendants in Count XI.

time of the [challenged] decision rather than from the vantage point of hindsight").

However, where a "fiduciary was aware of a risk to the fund, he may be held liable for

failing to investigate fully the means of protecting the fund from that risk." *Chao v.*

*Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (finding defendant's "silence and failure to

take any action to protect the fund fell far short of the duties she assumed as a fiduciary

and led to the loss the Fund experienced" when associate later embezzled funds); *see also*

*Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) (finding defendant

breached ERISA's prudence standards by failing to investigate or inform beneficiaries of

suspicions regarding problems with plan maintenance).

  The Jeanneret Defendants do not dispute their status as ERISA fiduciaries with

respect to the investment of employee benefit plan assets.  Rather, they assert that

Plaintiffs fail to allege more than speculative facts that give rise to ERISA claims.  *See*

*Twombly*, 550 U.S. at 555 (plaintiff seeking to survive motion to dismiss must allege

facts that "raise a right to relief above a speculative level").  Giving the Plaintiffs' factual

allegations the "careful and holistic evaluation" they deserve, *Braden v. Wal-Mart Stores,*

*Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (noting ERISA plaintiffs often "lack the inside

information necessary to make out their claims in detail unless and until discovery

commences"), the Court finds that Plaintiffs plead sufficient facts to "allow[] the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

  As the Jeanneret Defendants acknowledge, Plaintiffs' breach of the fiduciary duty

of prudence arguments essentially mirror those raised in the 10b-5 claims.  They allege

that the Jeanneret Defendants were aware that Ivy had ceased performing due diligence

on Madoff, which presented a potential material risk to the Beacon Fund, but failed to act

on that knowledge.  Accordingly, Plaintiffs plead a viable claim for breach of the duty of

prudence under ERISA.  The Jeanneret Defendants' motion to dismiss Count VIII is

denied.

This same reasoning supports denial of the Beacon Defendants' motion to dismiss

Count VIII.  Like the Jeanneret Defendants, the Beacon Defendants do not dispute their

status as fiduciaries, which gives rise to a duty to "employ[] the appropriate methods to

investigate the merits of the investment and to structure the investment."  *Henry v.

Champlain Enters., Inc.*, 445 F.3d at 618.  As held *supra*, Plaintiffs adequately allege

Beacon became aware that no due diligence would be performed on Madoff, but did

nothing to address the risk that this presented.  Plaintiffs have alleged sufficient facts to

make it plausible that Defendants breached their duty of prudence under ERISA.  The

Beacon Defendants' motion to dismiss Count VIII is denied.

### 2.   Failure to Comply with Plan Documents and Prohibited Transactions

Plaintiffs next allege the Jeanneret and Beacon Defendants violated ERISA §

1104(a)(1)(D), which requires fiduciaries to act in accordance with plan documents.

Specifically, they allege Defendants received management fees based in part on assets

and returns that turned out to be fictional.  Plaintiffs assert that, because the DIMAs and

OMs governing the plans required investment management fees to be calculated as a

percentage of actual assets under management, the miscalculation violated the

agreements.  We disagree.

Section 1104(a) requires Defendants to act according to the "[p]rudent man

standard of care" in complying with plan documents.  29 U.S.C. § 1104(a).  "The plain

meaning of this provision is that if the terms of the plan documents and instruments are consistent with ERISA, a plan trustee has a fiduciary duty to adhere to those terms." *Cement and Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 185 (E.D.N.Y. 2005).  According to the Supreme Court, the section is intended to limit discretion by providing fiduciaries with a straightforward rule where an issue is expressly covered by plan documents.  *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S.Ct. 865, 875 (2009) (finding administrator had duty under ERISA to follow designation in plan documents over conflicting federal common-law waiver); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (ERISA's statutory scheme "is built around reliance on the face of written plan documents").  This rule "forecloses any justification for enquiries into nice expressions of intent, in favor of the virtues of adhering to an uncomplicated rule."  *Id.*

Claims under this section typically involve noncompliance with guidelines and procedures set out in the documents.  *See, e.g., L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Com'n of Nassau Cnty., Inc.*, 634 F. Supp. 2d 290, 313 (E.D.N.Y. 2009) (finding defendant breached section 1104(a)(1)(D) when it failed to terminate coverage for member that did not make premium payments as required by documents); *Dardaganis v. Grace Capital, Inc.*, 664 F. Supp. 105, 108 (S.D.N.Y. 1987), *aff'd in part and vacated in part*, 889 F.2d 1237, 1242–43 (2d Cir. 1989) (failure of investment manager to adhere to plan guidelines limiting stock investments to no more than 50% of total assets was held to violate section 404(a)(1)(D) and to subject manager to liability for losses on stocks purchased after 50% limit had been reached).  It does not generally apply to areas where fiduciaries are given discretion, so long as the actions comply with the

letter of the documents. *Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir. 1999) (finding investment manager had not violated section 404(a)(1)(D) or plan guidelines by investing in derivatives); *Ganton Tech., Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 466 (2d Cir. 1996) ("When plan documents give the trustees the discretion to interpret plan terms, we will not substitute our judgment for theirs unless the trustees' interpretation is arbitrary and capricious.").

These cases differ significantly from the type of claim Plaintiffs advance. Given the asset figures reported to the Jeanneret and Beacon Defendants, their calculation of fees appears entirely consistent with the manner described in the Plan documents. In providing the terms by which fees were to be calculated, the DIMAs and OMs presumably anticipated that Defendants would use the figures reported to them to calculate fees. Plaintiffs do not really contend that Defendants' actions violated these procedures, but that Defendants knew or should have known the figures were false and used them anyway. This is a repackaging of their prior allegations of failure to discover the Madoff Ponzi scheme, and is unrelated to the terms stated on the face of the plan documents. As such, these claims are better addressed under the breach of the duty of prudence (above) and as prohibited transactions (below). The claims under section 1104(a)(1)(D) are dismissed.

In the alternative, Plaintiffs allege the receipt and retention of fees based on the miscalculated assets constituted a prohibited transaction under ERISA § 1106(a). Section 1106(a)(1)(D) prohibits a fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer

to, or use by or for the benefit of a party in interest, of any assets of the plan."[22]  As fiduciaries, the Jeanneret and Beacon Defendants are parties in interest for the purposes of ERISA.  Section 1106 "requires proof that the fiduciary in question either knew or reasonably should have known that the transaction constituted" a prohibited transaction. *Reich*, 57 F.3d at 280.  The provision does not prohibit a fiduciary from "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan."  29 U.S.C. § 1108(c)(2).

Plaintiffs allege the investment management fees paid were unreasonable to the extent they were based on assets misappropriated by Madoff.  They allege the Jeanneret and Beacon Defendants knew or should have known, based on a series of publicly available red flags, that these calculations were based on false data, and they thus engaged in an improper transfer of plan assets.  This would require finding that the red flags were sufficiently obvious that the Defendants should have known Madoff was a fraud, and that the figures reported were false.  The Court has already considered and rejected this argument in the context of the Beacon and Friedburg 10b-5 claims.  Because Plaintiffs do not allege sufficient factual evidence of the Defendants' knowledge, the claims in Count X are dismissed.

Plaintiffs also allege the Beacon Defendants violated their duty to act in accordance with plan documents by investing Beacon Fund assets with Madoff (Count IX).  Plaintiffs claim Beacon failed to comply with plan documents when they invested

---

[22] The Court of Appeals for the Third Circuit interpreted this claim as having five elements:  "(1) the person or entity is '[a] fiduciary with respect to [the] plan'; (2) the fiduciary 'cause[s]' the plan to engage in the transaction at issue; (3) the transaction 'use[s] plan assets'; (4) the transaction's use of the assets is 'for the benefit of' a party in interest; and (5) the fiduciary 'knows or should know' that elements three and four are satisfied."  *Reich v. Compton*, 57 F.3d 270, 279 (3d Cir. 1995).

the Beacon Fund's assets with Madoff, "even though they knew or should have known that, neither Madoff nor BAMC ever employed the split-strike conversion strategy or the 'Managing Members Large Cap Strategy' described in the Offering Memoranda."  SCAC ¶ 513.  The Beacon Defendants respond that the OMs are not plan documents or instruments within the meaning of ERISA, and, even if they were, Defendants complied with their terms.  Whether or not the OMs are plan documents, Plaintiffs fail to allege adequately that investing Beacon monies with Madoff was a breach of fiduciary duty. The claim that Beacon should have known Madoff was lying about his strategy is essentially a repackaging of Plaintiffs' already rejected red flag theory.  The claims against Beacon in Count IX are dismissed.[23]

### 3.  Co-fiduciary Liability

Finally, Plaintiffs allege co-fiduciary liability under 29 U.S.C. § 1105(a).  The section reads:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

---

[23] While Plaintiffs also name the Jeanneret Defendants in Count IX, they do not allege any facts that suggest investing in Madoff constituted a failure to comply with plan documents.  If the Court were to construct such an argument, our analysis of it would parallel that of the allegations against Beacon and fail for the same reasons.  Count IX is dismissed with respect to the Jeanneret Defendants.

29 U.S.C. § 1105(a).  As to the Beacon Defendants, Plaintiffs first allege they knowingly participated in the improper charging and retention of inappropriately calculated fees by Defendant Ivy in violation of section 1105(a)(1).  Because the Court has held that the calculation of fees was not a breach of fiduciary duty, the claim under § 1105(a)(1) is dismissed.

Next, Plaintiffs allege the Beacon, Ivy, and BONY Defendants violated section 1105(a)(2) by "their failures to comply with their own fiduciary responsibilities, [which] enabled one or more other fiduciaries to commit a fiduciary breach."  SCAC ¶ 540.  By agreeing to halt the performance of due diligence on Madoff, Plaintiffs allege Beacon and Ivy each facilitated the other's fiduciary breach.  Because the Court has allowed the aforementioned theories of breach to go forward, it is premature to dismiss the enabling claims at this time, and the motion to do so is denied.  Because the Court has dismissed Plaintiffs breach of fiduciary duty claims against BONY, *see infra* pp 65–66. , the enabling claim is also dismissed.

As to the Jeanneret Defendants, Plaintiffs allege Defendants violated section 1105(a)(2) by channeling Plaintiffs' investments into the Beacon Fund without conducting meaningful oversight.  Plaintiffs allege this enabled breaches committed by the Ivy, Beacon, and BONY Defendants.  That Ivy's breaches were enabled by Jeanneret's lack of oversight is sufficiently plausible to counsel against dismissal at this time, and the motion to do so is denied.  As to Beacon, the only breach plausibly committed is a similar failure to conduct due diligence.  Plaintiffs do not allege a connection between the Jeanneret and Beacon breaches that would suggest one facilitated the other.  Nor do they suggest that, had the Jeanneret Defendants conducted due

diligence, Beacon would have done so as well.  Because Plaintiffs fail to allege facts supporting a reasonable inference that the breach by Jeanneret Defendants enabled that of the Beacon Defendants, the claim is dismissed.  The claims against Jeanneret with regard to BONY fail for the same reasons stated above.

Finally, Plaintiffs allege the Jeanneret Defendants violated section 1105(a)(3) because they were aware of the "Beacon Defendants' failure to comply with the investment strategy they purported to follow" in the OMs and the Beacon Defendants' decision to invest in Madoff, despite knowledge that he did not comply with the required strategy.  SCAC ¶ 542.  The Court has held that neither act was a breach of the Beacon Defendants' fiduciary duties under ERISA.  Thus, Plaintiffs' section 1105(a)(3) claim is dismissed.

### ii.  Ivy Defendants

#### 1.  Fiduciary Status Under ERISA

Ivy's principal argument against ERISA liability is that it is not an ERISA fiduciary.  "To determine whether a person or entity is a fiduciary under ERISA, courts employ a functional test that focuses on the nature of the functions performed rather than on the title held."  *Zang v. Paychex, Inc.*, No. 08 Civ. 6046, 2010 WL 3021909, at *8 (W.D.N.Y. Aug. 2, 2010).  Under the relevant provision of ERISA, "[A] person is a fiduciary with respect to a plan to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."[24]  29 U.S.C. § 1002(21)(A).

---

[24] Because the Court finds Ivy to be an ERISA fiduciary under the "investment advice for a fee" test, the Court declines to consider Plaintiffs' arguments based upon Ivy's control over plan assets.  *See* 29 U.S.C. § 1022(21)(A) (person is ERISA fiduciary if he "exercises any discretionary authority or discretionary control respecting management of [an ERISA] plan or exercises any authority or control respecting

Regulations define "Investment advice" within the meaning of section 3(21)(A)(ii)[25] as

follows:

> A person shall be deemed to be rendering "investment advice" to an
> employee benefit plan . . . only if:
>
> (i) Such person renders advice to the plan as to the value of securities or
> other property, or makes recommendation as to the advisability of
> investing in, purchasing, or selling securities or other property; and
>
> (ii) Such person either directly or indirectly (e.g., through or together with
> any affiliate)—
>
>> (A) Has discretionary authority or control, whether or not pursuant
>> to agreement, arrangement or understanding, with respect to
>> purchasing or selling securities or other property for the plan; or
>>
>> (B) Renders any advice described in paragraph (c)(1)(i) of this
>> section on a regular basis to the plan pursuant to a mutual
>> agreement, arrangement or understanding, written or otherwise,
>> between such person and the plan or a fiduciary with respect to the
>> plan, that such services will serve as a primary basis for investment
>> decisions with respect to plan assets, and that such person will
>> render individualized investment advice to the plan based on the
>> particular needs of the plan regarding such matters as, among other
>> things, investment policies or strategy, overall portfolio
>> composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1).  Ivy protests that the services it provided do not fall under

this definition because (i) it provided advice about investment advisors rather than

individual investments; (ii) it provided advice to BAMC rather than to the ERISA plans

that invested in the Beacon Fund; (iii) Ivy's advice to BAMC was not "individualized";

(iv) Ivy's advice to BAMC was not for a fee; and (v) Ivy's advice to BAMC was not the

primary basis for its decision to invest in Madoff.

---

management or disposition of its assets, . . . [or] he has any discretionary authority or discretionary
responsibility in the administration of such plan").
[25] Section 3(21)(A) of ERISA is codified at 29 U.S.C. § 1002(21)(A).

As to the fact that Ivy advised BAMC about investment advisors rather than individual investments, the Department of Labor (DOL) has interpreted this arrangement to fall under the definition of "investment advice" provided by the statute and regulations. *See* 74 Fed. Reg. 3822, 3824 (Jan. 21, 2009) ("It has long been the view of the Department that the act of making individualized recommendations of particular investment managers to plan fiduciaries may constitute the provision of investment advice within the meaning of section 3(21)(A).").[26] Furthermore, the Supreme Court has stated, "We normally accord particular deference to an agency interpretation of longstanding duration [because] well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 487 (2004) (citations and internal quotation marks omitted); *see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).

Ivy argues that the DOL's interpretation bears only on section 408(g)(1) of ERISA, which governs investment advice given directly to plan participants and beneficiaries and is not at issue in the instant case.  However, this argument is incorrect because the January 21, 2009 rule states the DOL's longstanding interpretation of the relevant section of ERISA, section 3(21)(A), and merely applies this interpretation to section 408(g)(1).  *See* 74 Fed. Reg. 3822, 3824 ("The fiduciary nature of [advice regarding selection of investment managers] does not, in the Department's view, change merely because the advice is being given to a plan participant or beneficiary.").  Ivy next argues that no deference is due to this statement from the January 21, 2009 rule because it

---

[26] The January 21, 2009 rule was withdrawn on other grounds, but the above quoted provision of the preamble was reinstated by the Department of Labor on May 17, 2010.  *See* 75 Fed. Reg. 9360, 9361 (to be codified at 29 C.F.R. § 2550).

appears in the preamble to a rule, citing *Saunders v. City of New York*, 594 F. Supp. 2d

346, 355 (S.D.N.Y. 2008).  *Saunders* discussed deference under *Chevron, U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984), rather than *Skidmore* deference,

which is at issue here.  While a regulatory preamble might not be entitled to dispositive

force under *Chevron*, the Court finds the DOL's longstanding position persuasive

because it rests on a "body of experience and informed judgment to which courts and

litigants may properly resort for guidance."[27]  *Alaska Dep't of Envtl. Conservation* , 540

U.S. at 487.  Additionally, contrary to Ivy's suggestion, no retroactivity issue is raised by

the DOL's restatement of a longstanding position.

In opposing the first consolidated amended complaint, Ivy raised the argument

that under the "plain language" of 29 C.F.R. § 2510.3-21(c)(1), Ivy was not a fiduciary

because it did not provide advice "to the plan[s]" that invested in the Beacon Fund. *Id.*

This argument was not raised again in either of Ivy's two submissions post-dating the

SCAC, and is unpersuasive in light of the language of 29 C.F.R. § 2510.3-21(c)(1).  As

found above, Ivy made "recommendations as to the advisability of investing in,

purchasing, or selling securities or other property," and such advice was rendered

pursuant to an agreement "between such person and the plan or a fiduciary with respect

to the plan . . . ."  *Id.*  Namely, Ivy's advice was rendered pursuant to agreements with

---

[27] Moreover, the Court is not persuaded by Ivy's citation to *Cohrs v. Salomon Smith Barney, Inc*., No. 03 Civ. 505 (KI), 03 Civ. 506 (KI), 2005 WL 2104535 (D. Or. Aug. 31, 2005), *aff'd sub nom*, *Stahly v. Salomon Smith Barney, Inc*., 319 Fed. Appx. 654 (9th Cir. 2009).  *Cohrs* held that the recommendation of investment advisors did not constitute "investment advice" sufficient to impose fiduciary duties under ERISA.  *Cohrs*, 2005 WL 2104535, at *18.  The *Cohrs* court did not cite or consider the DOL's longstanding view to the contrary, nor did it cite any authority directly on point.  Furthermore, the Court of Appeals for the Ninth Circuit did not adopt the district court's reasoning on this issue because it relied on a separate ground for affirmance.  *Stahly*, 319 Fed. Appx. at 657.  And while the *Cohrs* court may have considered the connection between the Defendants' recommendation of an investment manager and that investment manager's independent decision to purchase or sell securities "too attenuated" to form the basis for ERISA fiduciary status, 2005 WL 2104535, at *18, there is a close connection in the instant case between Ivy's recommendation and discussion of Madoff's purported strategy and Madoff's purported execution of that strategy.

BAMC and JPJA, and no party contends that BAMC and JPJA were not ERISA fiduciaries.

Ivy argues that its advice was not "individualized" as to any particular ERISA plan. "To be 'individualized' within the meaning of the regulation, advice must pertain to investment policies or strategy or portfolio composition or diversification. . . . In other words, the advice must address the individual needs of the plan." *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 709 (W.D. Mich. 2007) (citing 29 C.F.R. § 2510.3-21(c)(1)(ii)(B)). However, "to be 'individualized,' the advice need not be arbitrary or divorced from general principles of investment generated by a firm. . . . Obviously, the writers of the regulation were attempting to differentiate individualized investment advice, which is based upon the particular needs of the plan, from the general promotion of a product or service, pursuant to which a stockbroker might 'recommend' a security to its customers at large." *Ellis*, 484 F. Supp. 2d at 709 & n.2.

Ivy's advice was not of the character of a stockbroker recommending a particular security to its customers at large; rather, Ivy made recommendations about fund diversification and allocations between various investments on an on-going basis. Moreover, an investment advisor need not review the entire allocation of a plan's assets to provide individualized investment advice. For example, an advisor may render "advice as to one type of investment and profess[] to understand [a plan's] needs *in that area*." *Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1118 (9th Cir. 1994) (emphasis added). Pursuant to the Beacon OMs, Ivy provided advice to funds regarding managers not generally available to the public. 2004 OM, at 10–11. Furthermore, the length of Ivy's relationship with BAMC and JPJA, as well as the

frequency of their communications about investment allocations, counsel in favor of finding Ivy's advice to be individualized. *See id.* ("The relationship of the parties, which developed over the course of nine years, coupled with the evidence of regular meetings between [the advisor] and the [plan] Trustees to discuss investment strategy, provided [the advisor] with sufficient information about the Trust to enable him to render individualized investment advice."). Indeed, it was Ivy that suggested to Jeanneret that he invest fund assets in Beacon to circumvent Madoff's limitations on accepting additional investments from Jeanneret's Income Plus fund. Drawing all inferences in favor of the non-moving party, these allegations are sufficient to survive a motion to dismiss, and the motion to do so is denied. *See Lee*, 166 F.3d at 543.

Ivy next argues that it did not provide investment advice for a fee because, pursuant to the 1995 consulting agreement, Ivy was paid only for "administrative services" relating to the Beacon Fund's Madoff accounts. However, the Court must "employ a functional test that focuses on the nature of the functions performed" in determining ERISA fiduciary status, rather than focus myopically on contractual language isolated from the totality of the alleged facts. *Zang*, 2010 WL 3021909, at *8. First, the 1995 consulting agreement, under which Ivy was paid fees, states the agreement was made because BAMC "desire[d] to compensate IVY for its introduction to Madoff, [and] to avail [itself] of the experience and assistance of IVY." 1995 BAMC-Ivy Agreement, at 2. Second, Plaintiffs allege Ivy provided ongoing investment advice to Danziger regarding Beacon's Madoff allocations took place over a multi-year period. Third, the Beacon OM explains that Ivy is an investment advisor, touts Ivy's credibility as an investment advisor, and provides that Ivy would be consulted as to all allocations of

Beacon funds.  Fourth, any possibility that Ivy was being compensated only for ministerial services is belied by a November 28, 2005 agreement between Ivy and BAMC, which states that

> Ivy currently performs two distinct types of services: (i) consulting services to [BAMC], as managing member of the Companies, which include providing advice with respect to Manager selection and allocation of the Companies' assets among Managers and Investment Pools (the 'Consulting Services'); and (ii) administrative and accounting services to the Companies (the 'Administrative Services').  In consideration for such services, you currently are paid by us . . . .

Rosenthal Decl. Ex. D, pt. III ("November 28, 2005 Letter Agreement"), at 5.  These alleged facts are sufficient under the required functional analysis.

Similar arguments underlie Ivy's objection that its advice did not "serve as a primary basis for investment decisions with respect to plan assets."  29 C.F.R. § 2510.3-21(c)(1).  Ivy's claim that it performed "purely 'ministerial' functions for a benefit plan" is unavailing in light of the above noted considerations.  *Zang*, 2010 WL 3021909, at *8.  Moreover, "the regulation does not require that a [fiduciary's] advice be 'the' primary basis for investment decisions," *Ellis*, 484 F. Supp. 2d at 709, but merely "a" primary basis.   Plaintiffs persuasively allege that Ivy's advice as to Madoff was a primary basis for investment decisions.  Ivy introduced BAMC to Madoff, Ivy provided advice about allocating funds to and from Madoff, the Beacon OM provides that all allocation decisions would be made after consulting with Ivy, and there is no indication that BAMC or the Beacon Fund received substantial investment advice from any other party.  While BAMC might have disregarded some of Ivy's muted advice to pursue a "below median allocation" to Madoff despite his "extremely strong" performance, NYAG Compl. ¶ 68,

there can be no doubt that Ivy's advice provided a primary basis for the Beacon Fund's investment decisions relating to Madoff.

Accordingly, Plaintiffs successfully plead Ivy's fiduciary status under ERISA.[28] Ivy's arguments against Plaintiffs' claim for disgorgement under 29 U.S.C. §§ 1109(a), 1132(a)(2) are premised on the rejected contention that Ivy was not a fiduciary, and Ivy's motion to dismiss the claim for disgorgement is denied.[29]

### 2. Breach of Fiduciary Duty, Failure to Comply with Plan Documents, and Prohibited Transactions

The duties of prudence and care require an ERISA fiduciary to act "solely in the interest of the participants and beneficiaries," and to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing." 29 U.S.C. §§ 1104(a)(1)(A)–(D). The allegations against Ivy, which have been outlined in detail above, show that Ivy had grave doubts about Madoff, but failed to communicate them to BAMC and JPJA. Indeed, an internal Ivy memorandum from 2002 stated that Ivy was not "satisfied as a fiduciary to invest client assets" with Madoff. NYAG Compl. ¶ 114. This suffices to show a breach of the duty of prudence.

Ivy responds by repeating the argument that it was under no duty to provide investment advice, which the Court has rejected in finding Ivy's ERISA fiduciary status adequately pled. Ivy also argues that a fiduciary need only exercise care prudently and with diligence "under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B), and

---

[28] Having found Ivy's fiduciary status based on allegations relating to Ivy's relationship with BAMC, the Court need not consider those allegations relating to Ivy's relationship with JPJA, as all JPJA funds involved in this action were invested in the Beacon Fund.

[29] *See* 29 U.S.C.A. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.")

that a fiduciary's actions are not to be judged "from the vantage point of hindsight."

*Chao v. Merino*, 452 F.3d at 182 (quoting *Kastaros v. Cody*, 744 F.2d at 279).  However,

the Court need not evaluate the issue from the "vantage point of hindsight" because Ivy

itself said in 2002 that it was not "satisfied as a fiduciary to invest client assets" with

Madoff.  *Id.*; NYAG Compl. ¶ 114.  And while a fiduciary need not "disclose its internal

deliberations," *Flanigan v. Gen. Elec.*, 242 F.3d 78, 85 (2d Cir. 2001) (quoting *Mullins v.*

*Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994)), Ivy's failure to disclose that it was not

"satisfied as a fiduciary to invest client assets" with Madoff violated its fiduciary duty to

disclose.  *See Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge*

*Sec., Inc.*, 93 F.3d 1171, 1182 (3d Cir. 1996) (defining duty to disclose as "what a

reasonable fiduciary, exercising care, skill, prudence and diligence, would believe to be

in the best interest of the beneficiary to disclose" (internal quotation marks omitted)).

Ivy's understated recommendation of a reduced Madoff allocation did not satisfy its duty

to disclose under these circumstances.

Plaintiffs also sufficiently allege that Ivy breached its duty of loyalty for the same

reasons that Plaintiffs adequately plead motive under the 10b-5 claims, discussed above.

Plaintiffs allege that Ivy decided not to disclose the full extent of its doubts about Madoff

to BAMC and JPJA because it believed that it would not reduce its legal liability by

doing so, and it wished to keep its AUM high.  Simon wrote in 1998, "one wonders if we

ever 'escape' the legal issue of being the asset allocator and introducer, even if we

terminate all Madoff related relationships?"  NYAG Compl. ¶ 76.  Simon wrote in June

2001 that a client with a large Madoff investment "helped to contribute towards building

Ivy's [assets under management] and credibility, despite our real concerns about

[Madoff]." *Id.* ¶ 118.  Simon concluded, "legal question: Now that [BONY] owns Ivy, who has the ultimate liability??" *Id.* ¶ 119.  These allegations suffice to show that Ivy's conflict of interest "impeded [its] prudent decision-making with respect to the Plan." *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 479 (S.D.N.Y. 2005).

However, Plaintiffs' claims against Ivy for failure to comply with plan documents and for engaging in a prohibited transaction fail for the same reasons as those claims fail against the Jeanneret and Beacon defendants.  These claims are a repackaging of Plaintiffs' theory that Ivy knew Madoff was operating a Ponzi scheme.  Even though Ivy certainly knew more than the Beacon or Jeanneret Defendants, the totality of the allegations do not suggest this level of knowledge of Madoff's wrongdoing on Ivy's part. Ivy appears to have been uncertain as to exactly how Madoff operated, and it was this uncertainty, rather than knowledge of Madoff's Ponzi scheme, that led it to discuss serious doubts about Madoff, withdraw its proprietary funds from Madoff, and counsel some advisory clients to avoid Madoff.  For instance, Wohl summarized Ivy's Madoff doubts in 1998 by saying that investment with Madoff "remains a matter of faith based on great performance—this doesn't justify any investment, let alone 3%." NYAG Compl. ¶ 75.  The isolated allegation that Simon heard a rumor in 1991 that Madoff might be a Ponzi scheme does not alter the inference raised by the totality of the allegations.  While Ivy's conduct suffices to state claims based on its failure to disclose these doubts, the facts alleged do not support the inference that Ivy knew or should have known that Madoff was falsifying account statements.  Plaintiffs' claims for failure to comply with plan documents and engaging in a prohibited transaction are therefore dismissed.

### 3.   Individual Ivy Defendants and BONY Defendants

"An individual cannot be held liable for corporate ERISA violations solely by virtue of his role as officer, shareholder, or manager." *NYSA-ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 206 (S.D.N.Y. 1999) (internal quotation marks citation omitted).  "Under special circumstances, however, the imposition of personal liability for a corporation's ERISA obligations may be warranted." *Trs. of the Bldg. Serv. 32B-J Pension, Health and Annuity Fund v. Hudson Serv. Corp.*, 871 F. Supp. 631, 638 (S.D.N.Y. 1994) (internal quotation marks omitted).  "These 'special circumstances' include: (1) knowingly participating in a fiduciary's breach of ERISA trust obligations; (2) conspiring to divert ERISA funds for personal benefit; (3) intermingling personal and corporate assets; (4) engaging in fraudulent conduct; or (5) where the individual is in fact the corporation or the corporation's alter ego." *Id.* (citation omitted).  Specific allegations relating to fraud or knowing participation in breach are pleaded as to Simon, Wohl, Geiger, and Sloan.  The motion to dismiss these claims is denied.  However, Plaintiffs' conclusory assertions and descriptions of job titles do not suffice to state a claim for individual fiduciary liability as to the other individual Ivy defendants, and these claims are dismissed.

Plaintiffs' claims against BONY and the individual BONY defendants are conclusory, and fail to state a claim for fiduciary status.  Plaintiffs plead no specific facts indicating that BONY or the individual BONY defendants were involved in or knew of any of the alleged wrongdoing on the part of Ivy; their allegations are mainly based on job descriptions culled from BONY's website, without any specific allegations that the individuals were connected with misconduct.  Plaintiffs' allegations regarding the Ivy

"risk committee" formed "under the aegis of BONY" are far too vague to support a connection between these defendants and Ivy's alleged violations.  *See Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1242 (2d Cir. 1989) (holding that corporate officers, directors, and partners "are liable as fiduciaries under section 1109 only if they personally breach a fiduciary duty").  Moreover, "[a]s a general principle, 'a parent corporation … is not liable for the acts of its subsidiaries.'"  *Trs. of the Local 464A UFCW Pension Fund v. Wachovia Bank, N.A.*, No. 09 Civ. 668 (WJM), 2009 WL 2152074, at *3 (D.N.J. July 14, 2009) (dismissing ERISA claims against a corporate parent, holding that "[a]bsent a showing sufficient to pierce the corporate veil, there is no basis upon which to find a fiduciary relationship between [parent corporation] and Plaintiffs") (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).  Plaintiffs' ERISA claims against BONY and the individual BONY defendants are dismissed.

### c.  State Law Claims

Plaintiffs assert multiple state common law claims against Defendants, including common law fraud (Count XIV), aiding and abetting common law fraud (Count XV), breach of fiduciary duty (Counts XVI and XXIV), aiding and abetting breach of fiduciary duty (Counts XXI, XXII, XXIX, and XXX), negligent misrepresentation (Counts XVIII and XXVI), gross negligence (Counts XIX and XXVII), unjust enrichment (Counts XX and XXVIII), malpractice (Count XXXI), and breach of contract (Counts XVII, XXV, and XXXII).  Defendants assert that most of these claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), Pub. L. No. 105–353, 112 Stat. 3227 (1998) (codified as amended at 15 U.S.C. § 78bb), and by New York's Martin Act.  *See* N.Y. Gen. Bus. L. § 352 *et seq.*

### i.  SLUSA Preemption

Defendants move to dismiss Plaintiffs' direct common law claims for fraud (Count XIV), aiding and abetting common law fraud (Count XV), breach of fiduciary duty (Count XVI), breach of contract (Count XVII), negligent misrepresentation (Count XVIII), gross negligence (Count XIX), unjust enrichment (Count XX), and aiding and abetting breach of fiduciary duty (Counts XXI and XXII) as barred by SLUSA.[30] SLUSA was enacted in 1998 to prevent class action plaintiffs from circumventing the heightened pleading requirements under the PSLRA through artful pleading. *Ring v. AXA Fin., Inc.*, 483 F.3d 95, 97–98 (2d Cir. 2007) (describing history of PSLRA and SLUSA).  By raising the bar for securities fraud lawsuits, the PSLRA had the unintended consequence of steering plaintiffs to state court, where they sought to avoid the PSLRA by reformulating their allegations as state common law claims.  *Id.*  SLUSA was intended to reverse that trend by forbidding plaintiffs from filing certain types of class actions in state court. *Barron v. Igolnikov*, 09 Civ. 4471 (TPG), 2010 WL 882890, at *3 (S.D.N.Y. Mar. 10, 2010).

SLUSA preemption has essentially four components: (1) the suit must be a "covered class action";[31] (2) the action must be based on state or local law; (3) the action must concern a "covered security"; and (4) the defendant must have misrepresented or

---

[30] 15 U.S.C. §§ 78bb(f)(1), 77p(b).  SLUSA reads, in pertinent part:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

[31] A covered class action is a lawsuit in which damages are sought on behalf of more than 50 prospective class members and common questions of law or fact predominate over questions affecting only individual members of the class. 15 U.S.C. § 78bb(f)(5)(B)(i)(I).

omitted a material fact or employed a manipulative device or contrivance "in connection with the purchase or sale" of that security.  *Barron*, 2010 WL 882890, at *4 (citing *Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 690–91 (S.D.N.Y. 2006)).  If an action satisfies these criteria, the defendant may remove it to federal district court, which must dismiss the action.[32]  15 U.S.C. § 78bb(f)(1); *Ring*, 483 F.3d at 98.

It is undisputed that the class action here is "covered"[33] and that Plaintiffs assert state law claims.  Likewise, Plaintiffs do not dispute that they allege misrepresentations and omissions.  Instead they argue that SLUSA preemption does not apply because these representations were made in connection with LLC interests, which they assert are not "covered securities."

A "covered security" includes any security that is listed or authorized for listing on the New York Stock Exchange or another national exchange, as well as securities issued by investment companies registered with the SEC.  *See* 15 U.S.C. §§ 77r(b). Defendants do not rebut Plaintiffs' assertion that LLC interests are not covered securities under the act.  Instead, they assert that the misrepresentations alleged are "in connection with" a different set of covered securities—those purportedly purchased and sold by Madoff.

The "in connection with" requirement is given broad construction.  In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, the Supreme Court held that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or

---

[32] SLUSA does not actually pre-empt any state cause of action, but denies plaintiffs the right to use the class action device to vindicate certain claims.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 87 (2006) ("The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.").

[33] Plaintiffs' complaint states they "believe that Class members number in the hundreds, if not thousands." SCAC ¶ 147(a).

by someone else."  547 U.S. 71, 85–86 (2006) (noting "presumption that Congress

envisioned a broad construction follows not only from ordinary principles of statutory

construction but also from the particular concerns that culminated in SLUSA's

enactment").

There is "no question that Madoff's Ponzi scheme was 'in connection with' the

purchase and sale of securities." *Levinson*, 2009 WL 5184363, at *9.  Madoff told

investors that he would purchase and sell securities in the Standard & Poor's 100 Index,

and he used prices from the public markets on the trade documentation he sent to

customers.  *Barron*, 2010 WL 882890, at *5.  That the trades never took place does not

preclude finding a connection.  *See id.*; *see also Schnorr v. Schubert*, No. 05 Civ. 303,

2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) (preempting claims under SLUSA

where defendant engaged in Ponzi scheme by promising to invest putative class's money

in nationally listed and traded securities but never actually executed any trades).  At issue

here is whether Defendants' misrepresentations, which had the effect of facilitating

Madoff's fraud, were made "in connection with" the purchase and sale of securities.

Other courts to consider this issue in the context of the Madoff affair found that

Defendant's misrepresentations did so coincide.  In a well-reasoned decision, the District

Court for Connecticut considered the "nature of the parties' relationship, and whether it

necessarily involved the purchase and sale of securities."  *Levinson*, 2009 WL 5184363,

at *11 (citing *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 302 (3d Cir. 2005)).

In the case at bar, Plaintiffs allege misrepresentations in the OMs regarding "the

investment strategies and objectives of the Beacon Fund."  Although the shares of the

Beacon Fund are not covered securities, the objective of the fund was to manage

Plaintiffs' investment using a strategy that inevitably included the purchase and sale of covered securities.  Furthermore, Plaintiffs allege false and misleading statements and omissions regarding "Defendants' due diligence and monitoring of Madoff and BMIS," including "the performance and feasibility of Madoff's purported trading strategy" utilizing indisputably covered securities.  These allegations are sufficient to meet SLUSA's broad requirement of a misrepresentation or omission in connection with the purchase or sale of a covered security.  *See Dommert v. Raymond James Fin. Servs., Inc.*, No. 06 Civ. 102, 2007 WL 1018234, at *11 (E.D. Tex. Mar. 29, 2007) (finding in connection requirement met where purpose of investment agreements was to "utilize [the plaintiff's] assets and expand upon those assets, presumably with the purchase and sale of securities").  The aforementioned state law claims are dismissed.

Plaintiffs request leave to replead their state law claims to avoid SLUSA preemption.  While leave to replead should be "freely given when justice so requires," Fed. R. Civ. P. 15(a), it may be denied if repleading would be futile.  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).  Here, Plaintiffs' state law claims are based on the same underlying transactions alleged under a theory of securities fraud, which the Court has allowed to proceed.  Because it would inevitably rest on the same or similar allegations as contained in the SCAC, repleading would be futile, and Plaintiffs' request is denied.

### ii.  Martin Act Preemption

Defendants contend that the majority of Plaintiffs' remaining state law claims are preempted by New York's Martin Act.  *See* N.Y. Gen. Bus. L. § 352 *et seq*.  These claims include breach of fiduciary duty (Counts XVI and XXIV), aiding and abetting

breach of fiduciary duty (Counts XXI, XXII, XXIX, and XXX), negligent

misrepresentation (Counts XVIII and XXVI), gross negligence (Counts XIX and XXVII),

unjust enrichment (Counts XX and XXVIII), and breach of contract (Counts XVII and

XXV).[34]

The Martin Act prohibits:

> (a) Any fraud, deception, concealment, suppression, false pretense or
> fictitious or pretended purchase or sale;
>
> (b) Any promise or representation as to the future which is beyond
> reasonable expectation or unwarranted by existing circumstances;
>
> (c) Any representation or statement which is false, where the person who
> made such representation or statement: (i) knew the truth; or (ii) with
> reasonable effort could have known the truth; or (iii) made no reasonable
> effort to ascertain the truth; or (iv) did not have knowledge concerning the
> representation or statement made.

N.Y. Gen. Bus. L. § 352-c(1).  The Act gives the New York Attorney General the

exclusive authority to enforce its provisions and grants him investigatory, regulatory, and

remedial powers aimed at preventing and prosecuting fraudulent securities practices.  *See*

N.Y. Gen. Bus. L. § 353; *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, 906

N.E.2d 1049, 1054 (N.Y. 2009); *Kralik v. 239 E. 79th St. Owners Corp.*, 5 N.Y.3d 54,

58–59 (N.Y. 2005); *CPC Intl. v. McKesson Corp.*, 70 N.Y.2d 268, 277 (N.Y. 1987).  It is

well settled that there is no private right of action under the Martin Act.  *McKesson*, 70

N.Y.2d at 276–77.  However, there has been some disagreement as to whether the Martin

Act also preempts common law claims falling within its purview.

The New York Court of Appeals has not explicitly addressed preemption of non-

fraud common law claims that fall within the scope of the Martin Act.  However, the

---

[34] The Court has already held that Counts IX, for common law fraud, and Counts XI, XII, XIII, XIV, and
XV are preempted by SLUSA.  The Martin Act, however, offers broader preemption because the claims
need not be class claims to be preempted.

overwhelming majority of courts to consider the issue have found that such claims are

preempted.  *See Stephenson*, 700 F. Supp. 2d at 613–16 (discussing history of

preemption); *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 421 (S.D.N.Y. 2007)

("The vast majority of state and federal courts have found that causes of action related to

a plaintiff's securities fraud claim that do not include scienter as an essential element are

typically preempted by the Martin Act."), *aff'd sub nom*, *South Cherry St., LLC v.

Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009); *Pro Bono Invs., Inc. v. Gerry*, No. 03

Civ. 4347 (JGK), 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005) (noting New York

courts and federal courts "almost without exception" have held Martin Act precludes

common law claims).  In its only case to address the subject, the Court of Appeals for the

Second Circuit recognized Martin Act preemption of common law claims involving

securities, citing "principles of federalism and respect for state courts' interpretation of

their own laws."  *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001)

(dismissing breach of fiduciary duty claim as preempted by Martin Act).

    The question of preemption has been raised and decided in multiple cases arising

in the fallout of the Madoff affair.  These suits were brought by investors seeking relief

from investment funds, their managers, and auditors for losses suffered when Madoff's

Ponzi scheme collapsed.  As in the case at bar, many plaintiffs claimed there were "red

flags" raised by Madoff's transactions that should have prompted further investigation by

defendants and warnings to investors.  In all but one of these Madoff-related cases,

*Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3022848 (S.D.N.Y

July 29, 2009), the courts dismissed the common law claims as preempted by the Martin

Act.  *See Stephenson*, 700 F. Supp. 2d at 613–16 (dismissing breach of fiduciary duty,

negligence, gross negligence, and aiding and abetting breach of fiduciary duty claims as preempted) (Holwell, J.); *Barron*, 2010 WL 882890, at *6 (dismissing claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, and unjust enrichment) (Griesa, J.); *In Re Tremont*, 703 F. Supp. 2d at 373 (dismissing breach of fiduciary duty, negligent misrepresentation, and aiding and abetting breach of fiduciary duty claims as preempted) (Griesa, J.); *Meridian Horizon Fund LP v. Tremont Grp. Holdings, Inc.*, No. 09 Civ. 3708 (TPG), 2010 WL 1257567, at *9 (S.D.N.Y. Mar. 31, 2010) (dismissing common law claims for negligence as preempted) (Griesa, J.).

The recent *Anwar* decision argued that axioms of statutory interpretation, legislative history, and sound policy speak against preemption.  *Anwar*, 2010 WL 3022848, at *3–4, 12.  The New York Attorney General made similar arguments in amicus briefs submitted in two cases currently pending in New York's First Department. *See* Brief for the Attorney General of the State of New York as Amicus Curiae, *CMMF, LLC v. J.P. Morgan Inv. Mgmt., Inc.*, No. 601924/09 (N.Y. App. Div. 2010) (arguing Martin Act does not preempt independent common law causes of action in area of investment securities); Brief for the Attorney General of the State of New York as Amicus Curiae, *Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Mgmt., Inc.*, No. 603755/08 (N.Y. App. Div. 2010) (same).[35]

Opinions of the Attorney General on issues of state law are "entitled to careful consideration by courts, and quite generally regarded as highly persuasive."  *Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 87 (1975) (quoting *Jones v. Williams*, 45 S.W.2d 130, 131 (Tex. 1931)).  But they are not dispositive.  *Id.*; *see also Cedar Shake & Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 625 (9th Cir. 1993) ("That the

---

[35] Both cases were argued May 26, 2010, but have not yet been decided.

Attorney General has issued a reasonable opinion on the question, however, is not

dispositive.").  In *Nanopierce*, this Court reviewed the history of Martin Act preemption

and found that New York precedent on the issue heavily favored preemption.

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003

WL 22052894 *1–4 (S.D.N.Y. Sept. 2, 2003) (discussing history of preemption under

Martin Act).  The New York and federal courts have rested on the decision of the New

York Court of Appeals in *McKesson*, which found no private right of action under the

Martin Act.  According to the New York courts upholding preemption, to sustain a cause

of action for common law claims covered by the Martin Act "would be, in effect, to

recognize a private right of action under the Martin Act contrary to [*McKesson*]."  *Horn*

*v. 440 E. 57th Co.*, 151 A.D.2d 112, 120 (N.Y. App. Div. 1989); *see also Rego Park*

*Gardens Owners, Inc. v. Rego Park Gardens Assocs.*, 595 N.Y.S.2d 492, 494 (N.Y. App.

Div. 1993) (dismissing negligent misrepresentation claim "because this cause of action

sought, in essence, to pursue a private cause of action under the Martin Act").  Very little

has changed in the landscape of New York courts' rulings since *Nanopierce*.[36]  Indeed,

the same policy arguments set out in the NY AG's briefs were considered and rejected.

*See Nanopierce*, 2003 WL 22052894, at *3–4 (considering arguments raised in *Cromer*

*Fin. Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *3–4 (S.D.N.Y. Sept. 19,

2001)).

---

[36] Plaintiffs suggest the New York Court of Appeals tacitly rejected Martin Act preemption of common law claims in the recent *Kerusa* case.  *Kerusa*, 906 N.E.2d 1049.  Their reliance on *Kerusa* is misplaced.  In *Kerusa*, the court held that common law fraud claims, traditionally excluded from preemption, are preempted where they are based solely on nondisclosures or violations of requirements created by the Martin Act itself.  *Kerusa*, 906 N.E.2d at 1055.  "Nothing in the opinion suggests that the Court of Appeals, in expanding Martin Act preemption into the fraud realm, intended to diminish it with respect to other types of claims."  *Stephenson*, 700 F. Supp. 2d at 614–15.

Although the NY AG's brief sheds light on potential uncertainty in this area of law, the weight of opposing authority, including Second Circuit Court of Appeals precedent, compels this Court to reaffirm its recognition of Martin Act preemption.

The Martin Act preempts common law securities claims sounding in fraud or deception that do not require pleading or proof of intent, and that are based on conduct that is "within or from" New York.  *Barron*, 2010 WL 882890, at *5 (citing *Owens v. Gaffken & Barringer Fund, LLC*, No. 08 Civ. 8484 (PKC), 2009 WL 3073338, at *12 (S.D.N.Y. Sept. 21, 2009)).  Here, Plaintiffs' common law claims arise from their ownership of limited partnership interests in the Beacon Fund.  Because limited partnership interests are considered securities for the purposes of the Martin Act, these claims meet the first prong.  N.Y. Gen. Bus. Law § 352(1); *Barron*, 2010 WL 882890, at *5; *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65 (2d Cir. 1993).

To satisfy the Martin Act's geographic prong, the acts must be "within or from" New York, meaning that a substantial portion of the events giving rise to the claim must have occurred in New York.  N.Y. Gen. Bus. Law § 352-c(1); *See Barron,* 2010 WL 882890, at *5 (citing *Sedona Corp v. Ladenburg Thalmann & Co. Inc.*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n.9 (S.D.N.Y. 2008).  The nexus with New York in the instant case is clear.  As Plaintiffs note in the SCAC, "[s]ubstantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects" took place in New York.  SCAC ¶ 29.  The individual and corporate Defendants maintain their primary offices in New York, and they administered Plaintiffs' investments here.

Further, the Madoff scheme, through which Plaintiffs' investments were lost, was also centered in New York.

Finally, Plaintiffs' claims sound in fraud or deception and do not require pleading or proof of intent.  "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim."  *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004).  Each claim arises from alleged misrepresentations and omissions by the Defendants with respect to their performance of due diligence and other supervisory services.  The claims are rooted in the same actions from which the securities law fraud claims arise, but do not require proof of scienter.  They are therefore exactly of the kind routinely dismissed as preempted.  *See Stephenson,* 700 F. Supp. 2d at 613–14 (distinguishing breach of fiduciary duty and negligent misrepresentation claims from common law fraud and finding they "mimic" claims under the Martin Act); *see also In re Bayou*, 534 F. Supp. 2d at 421 (dismissing breach of fiduciary duty claim against investment advisor for allegedly conducting inadequate due diligence before recommending investment in hedge fund that turned out to be Ponzi scheme); *Owens v. Gaffken & Barriger Fund, LLC*, No. 08 Civ. 8414 (PKC), 2009 WL 3073338, at *13 (S.D.N.Y. Sept. 21, 2009) (dismissing unjust enrichment and conversion claims arising out of plaintiff's investment where "[a]ccording to the complaint, the Fund's investment strategy was not in accord with the plaintiff's expectations, and the Fund's losses have led to the plaintiff's initial investment being unreturned").

Because Plaintiffs' common law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, gross negligence, and unjust enrichment fall within the purview of the Martin Act, they are dismissed.

Plaintiffs' breach of contract claims share the same fate.  Although breach of contract claims have been brought alongside other common law claims in many of the aforementioned Martin Act cases, the courts have not analyzed the claims for preemption.[37]  Breach of contract claims have been discussed separately from breach of fiduciary duty, negligence, and unjust enrichment claims, which are typically discussed together under a single Martin Act heading.  *See, e.g., Stephenson*, 700 F. Supp. 2d at 611–12 (dismissing breach of contract claims as derivative but not addressing Martin Act preemption); *Sabella v. Scantek Med., Inc*., No. 08 Civ. 453 (CM) (HBP), 2009 WL 3233703, at *31 (S.D.N.Y. Sept. 25, 2009) (allowing breach of contract claims to go forward without addressing preemption); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009); *In re Bayou*, 534 F. Supp. 2d at 418.

The question is whether the Plaintiffs' particular breach of contract claim is within the purview of the Martin Act, meaning a securities claim "within or from" New

---

[37] Defendants overstate the authority on this issue.  They rely on *In re Tremont* and *Kassover*, neither of which actually involved a breach of contract claim.  *In re Tremont*, 2010 WL 1257580, at *8 (stating Plaintiffs' line of cases has been repeatedly rejected); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 39 (S.D.N.Y. 2008).  The *Kassover* court stated in dicta that it "does not share its reasoning for concluding that breach of contract claims should be treated like common law fraud claims and not be preempted by the Act" because unlike fraud, breach of contract does not require proof of scienter.  *Kassover*, 619 F. Supp. 2d at 39.  But, as the court acknowledged, the issue was moot because the plaintiffs did not raise the claim.  The *Kassover* court cites *In re Bayou*, 534 F. Supp. 2d at 421, for its proposition that "causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted by the Martin Act."  *Kassover*, 619 F. Supp. 2d at 39.  However, *In re Bayou* itself analyzes the breach of contract claims separately from the breach of fiduciary duty claim, which it found preempted under the Martin Act.  *In re Bayou*, 534 F. Supp. 2d at 418, 422 (finding contract void under statute of frauds but not discussing it under preemption).

York sounding in fraud or deception that does not require pleading or proof of intent.  A breach of contract claim may sound in fraud where, "when the promise is made, the defendant secretly intended not to perform or knew that he could not perform."  *Guary v. Winehouse*, 190 F.3d 37, 44 (2d Cir. 1999) (quoting *Mills*, 12 F.3d at 1176); *see also Felton v. Morgan Stanley Dean Witter*, 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006) (holding common law breach of contract claim sounded in fraud where it was also "a quintessential example of a fraudulent omission of a material fact under the federal securities laws").

Here, Plaintiffs' breach of contract claims stem from the representations in the Beacon Fund's Operating Agreement and OMs, as well as in the agreement between Beacon and Ivy, that oblige the Defendants to perform due diligence and monitor the fund's investments.  Plaintiffs allege Defendants knew or should have known the statements were false at the time they were made, and that Defendants "intended to deceive Plaintiffs and other members of the Investor Class by making such statements and representations."  SCAC ¶ 549.  Plaintiffs also allege Defendants knew or should have known they could not perform, as "no control or supervision was possible due to Madoff's policy of nondisclosure."  *Id.* at ¶ 551.  Plaintiffs' allegations demonstrate that fraud is an inextricable part of the claims as alleged in the SCAC.  As such, they are dismissed.

### iii.   Remaining State Law Claims

Two derivative claims against Defendant Friedburg remain: malpractice (Count XXXI) and breach of contract (Count XXXII).[38]  Friedburg urges the Court to decline to

---

[38] Friedburg does not assert that the claims are preempted by the Martin Act.  As such, the Court expresses no opinion with regard to this issue.

exercise jurisdiction over these claims.[39]  In deciding whether to exercise jurisdiction

over supplemental state-law claims, district courts should balance the values of judicial

economy, convenience, fairness, and comity.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

343, 350 (1988); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In reviewing

such a decision to retain jurisdiction we consider factors such as judicial economy,

convenience, fairness, and comity." (citing *Nowak v. Ironworkers Local 6 Pension Fund*,

81 F.3d 1182, 1191 (2d Cir. 1996))).  "In general, where the federal claims are dismissed

before trial, the state claims should be dismissed as well."  *Marcus v. AT&T Corp.*, 138

F.3d at 57 (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994)).

   While federal claims remain as to other Defendants, and supplemental jurisdiction

is permissible, there are a number of compelling reasons to decline jurisdiction as to these

claims even while deciding other state law claims on the merits.  *See* 28 U.S.C. §

1367(c)(4) (permitting courts to decline supplemental jurisdiction where there are

"compelling reasons for declining jurisdiction").  The remaining claims against Friedberg

involve compliance with GAAS standards that apply exclusively to auditors and differ

greatly from the allegations of securities fraud and ERISA violations common to the

remaining Defendants.  While the Plaintiffs remain constant, the Defendants and claims

differ significantly.  *See Nathel v. Siegal*, 592 F. Supp. 2d 452, 474 (S.D.N.Y. 2008)

(finding federal securities law claims against co-defendants did not provide federal

question jurisdiction over malpractice claim where accountant did not participate in the

alleged fraud).  "[I]t would not serve the ends of judicial efficiency for the . . .

---

[39] Plaintiffs suggest that the Court has original jurisdiction over their state law claims under the Class Action Fairness Act ("CAFA").  28 U.S.C. § 1332.  CAFA vests the federal courts with jurisdiction over certain class actions alleging state law claims.  *Id.*  Because Counts XXXI and XXXII are brought in a derivative, rather than class, capacity, CAFA is not implicated.

Defendants to continue as co-defendants in the securities fraud that forms the core of

Plaintiffs' grievances."  *Id*.  Moreover, the dismissal is unlikely to prejudice the parties as

the litigation is still in its early stages.  *Graham v. Barriger*, 699 F. Supp. 2d 612, 637

(S.D.N.Y. 2009) (finding dismissal appropriate "particularly considering that discovery

has not commenced and that the federal claims have been dismissed at the pleading

stage").

      Thus, the Court declines to exercise supplemental jurisdiction, and these claims

are dismissed without prejudice.

## IV.   Conclusion

      For the reasons set forth herein, the Court rules as follows:[40]

| Complaint | Defendant | Count | Holding | Location |
|---|---|---|---|---|
| **Securities Law Claims** | | | | |
| Section 10(b) | Ivy | I | Dismissal Denied | pp. 21–33 |
| | Simon & Wohl | I | Dismissal Denied | p. 33 |
| | BAMC | II | Dismissal Denied | pp. 35–41 |
| | JPJA | III | Dismissal Denied | pp. 41–42 |
| | Friedberg | IV | Dismissal Granted | pp.42–45 |
| Section 20(a) | Danziger & Markhoff | V | Dismissal Denied | p. 41 |
| | Jeanneret | VI | Dismissal Denied | p. 42 |
| | Perry | VI | Dismissal Granted | p. 42 |
| | Simon, Wohl, Geiger & Sloan | VII | Dismissal Denied | pp. 34–35 |
| | Other Indiv. Ivy Defendants | VII | Dismissal Granted | pp. 34–35 |
| | BONY | VII | Dismissal Granted | p. 35 |
| IAA Rescission | JPJA | XXIII | Dismissal Denied | p. 42 |
| **ERISA Claims** | | | | |
| ERISA Breach of Duty of Prudence and Loyalty | Beacon Defendants | VIII | Dismissal Denied | p. 49 |
| | Ivy | VIII | Dismissal Denied | pp. 62–64 |
| | Simon, Wohl, Geiger & Sloan | VIII | Dismissal Denied | p. 65 |
| | Other Indiv. Ivy Defendants | VIII | Dismissal Granted | p. 65 |
| | BONY Defendants | VIII | Dismissal Granted | pp. 65–66 |
| | Jeanneret Defendants | VIII | Dismissal Denied | pp. 47–49 |
| ERISA Failure to Comply with Plan Documents | Beacon Defendants | IX, X | Dismissal Granted | pp. 49–53 |
| | Ivy | IX, X | Dismissal Granted | pp. 62–64 |
| | Simon, Wohl, Geiger & Sloan | IX, X | Dismissal Granted | p. 65 |
| | Other Indiv. Ivy Defendants | IX, X | Dismissal Granted | p. 65 |
| | BONY Defendants | IX, X | Dismissal Granted | pp. 65–66 |
| | Jeanneret Defendants | IX, X | Dismissal Granted | pp. 49–52 |

---

[40] The Court has considered all of the parties' other arguments and found them to be moot or without merit.

| ERISA Duty to Disclose | Ivy | XI | Dismissal Denied | pp. 62–64 |
|---|---|---|---|---|
| | Simon, Wohl, Geiger & Sloan | XI | Dismissal Denied | p. 65 |
| | Other Indiv. Ivy Defendants | XI | Dismissal Granted | p. 65 |
| | BONY Defendants | XI | Dismissal Granted | pp. 65–66 |
| | Beacon Defendants | XI | Dismissal Denied | p. 47 |
| | Jeanneret Defendants | XI | Dismissal Denied | p. 47 |
| ERISA Co-fiduciary Liability | Beacon Defendants | XII | Dismissal Denied | pp. 53–55 |
| | Ivy | XII | Dismissal Denied | pp. 53–55 |
| | Simon, Wohl, Geiger & Sloan | XII | Dismissal Denied | p. 65 |
| | Other Indiv. Ivy Defendants | XII | Dismissal Granted | p. 65 |
| | Jeanneret Defendants | XII | Dismissal Denied | pp. 53–55 |
| | BONY | XII | Dismissal Granted | pp. 53–55 |
| ERISA Disgorgement of Profits | Ivy | XIII | Dismissal Denied | p. 62 |
| | BONY Defendants | XIII | Dismissal Granted | pp. 65–66 |
| **Direct State Law Claims** | | | | |
| Common Law Fraud | Ivy 10b-5 Defendants | XIV | Dismissal Granted | pp. 66–70 |
| | Beacon Defendants | XIV | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XIV | Dismissal Granted | pp. 66–70 |
| | Friedburg | XIV | Dismissal Granted | pp. 66–70 |
| Aiding & Abetting Common Law Fraud | Ivy | XV | Dismissal Granted | pp. 66–70 |
| | BONY | XV | Dismissal Granted | pp. 66–70 |
| Breach of Fiduciary Duty | Ivy 10b-5 Defendants | XVI | Dismissal Granted | pp. 66–70 |
| | Beacon Defendants | XVI | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XVI | Dismissal Granted | pp. 66–70 |
| | Friedburg | XVI | Dismissal Granted | pp. 66–70 |
| Breach of Contract | Beacon Defendants | XVII | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XVII | Dismissal Granted | pp. 66–70 |
| Negligent Misrepresentation | Beacon Defendants | XVIII | Dismissal Granted | pp. 66–70 |
| | Ivy Defendants | XVIII | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XVIII | Dismissal Granted | pp. 66–70 |
| | Friedburg | XVIII | Dismissal Granted | pp. 66–70 |
| Gross Negligence | Beacon Defendants | XIX | Dismissal Granted | pp. 66–70 |
| | Ivy Defendants | XIX | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XIX | Dismissal Granted | pp. 66–70 |
| Unjust Enrichment | Beacon Defendants | XX | Dismissal Granted | pp. 66–70 |
| | Ivy Defendants | XX | Dismissal Granted | pp. 66–70 |
| | Jeanneret Defendants | XX | Dismissal Granted | pp. 66–70 |
| | Friedburg | XX | Dismissal Granted | pp. 66–70 |
| | BONY | XX | Dismissal Granted | pp. 66–70 |
| Aiding & Abetting Breach of Fiduciary Duty | Ivy | XXI | Dismissal Granted | pp. 66–70 |
| | BONY | XXI | Dismissal Granted | pp. 66–70 |
| | Friedburg | XXII | Dismissal Granted | pp. 66–70 |
| **Derivative State Law Claims** | | | | |
| Breach of Fiduciary Duty | Beacon Defendants | XXIV | Dismissal Granted | pp. 70–78 |
| | Ivy | XXIV | Dismissal Granted | pp. 70–78 |
| | Friedburg | XXIV | Dismissal Granted | pp. 70–78 |
| Breach of Contract | Ivy | XXV | Dismissal Granted | pp. 70–78 |
| | Friedburg | XXXII | Dismissal Granted | pp. 78–80 |
| Negligent Misrepresentation | Ivy | XXVI | Dismissal Granted | pp. 70–78 |
| | Friedburg | XXVI | Dismissal Granted | pp. 70–78 |
| | Beacon Defendants | XXVI | Dismissal Granted | pp. 70–78 |
| Gross Negligence | Ivy | XXVII | Dismissal Granted | pp. 70–78 |
| | Beacon Defendants | XXVII | Dismissal Granted | pp. 70–78 |

| Unjust Enrichment | Ivy | XXVIII | Dismissal Granted | pp. 70–78 |
|---|---|---|---|---|
| | Friedburg | XXVIII | Dismissal Granted | pp. 70–78 |
| | Beacon Defendants | XXVIII | Dismissal Granted | pp. 70–78 |
| | BONY | XXVIII | Dismissal Granted | pp. 70–78 |
| Aiding & Abetting Breach of Fiduciary Duty | Ivy | XXIX | Dismissal Granted | pp. 70–78 |
| | BONY | XXIX | Dismissal Granted | pp. 70–78 |
| | Friedburg | XXX | Dismissal Granted | pp. 70–78 |
| Malpractice | Friedburg | XXXI | Dismissal Granted | pp. 78–80 |

SO ORDERED.


Dated:  October 5, 2010

      New York, NY

_____

U.S.D.J.

82