| | |
|---|---|
| HILDA L. SOLIS, Secretary of the United States Department of Labor,<br><br>Plaintiff,<br><br>vs.<br><br>BEACON ASSOCIATES MANAGEMENT CORP.; ANDOVER ASSOCIATES MANAGEMENT CORP.; JOEL DANZIGER; HARRIS MARKHOFF; BEACON ASSOCIATES LLC I; BEACON ASSOCIATES LLC II; ANDOVER ASSOCIATES LLC I; IVY ASSET MANAGEMENT LLC (F/K/A IVY ASSET MANAGEMENT CORP.); LAWRENCE SIMON; HOWARD WOHL; J.P. JEANNERET ASSOCIATES, INC.; JOHN JEANNERET; PAUL PERRY; and INCOME PLUS INVESTMENT FUND,<br><br>Defendants. | Master File No: 1:09-cv-0777 -LBS-AJP<br><br><br>Civil Action No. 1:10-cv-08000 -LBS-AJP<br><br>AMENDED COMPLAINT FOR ERISA VIOLATIONS |

## AMENDED COMPLAINT FOR ERISA VIOLATIONS

Plaintiff Hilda L. Solis, Secretary of the United States Department of Labor (the "Secretary"), alleges:

1.   This action is filed under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq., against the fiduciaries of union-sponsored and single-employer employee benefit plans that invested with Bernard L. Madoff and his firm, Bernard L. Madoff Investment Securities LLC ("Plans"). The Defendant fiduciaries breached their fiduciary duties to the Plans by recommending, making, and maintaining investments with Madoff, losing hundreds of millions of dollars of assets needed for the pension and health benefits of thousands of workers. The Defendant fiduciaries caused the Plans to invest with Madoff over many years, and

imprudently failed to cause the Plans to divest their Madoff investments, even though the Defendant fiduciaries had strong indications, suspicions, and red flags of Madoff's misconduct. Faced with the choice between protecting hundreds of millions of dollars of ERISA Plan assets or protecting the millions of dollars of fees they received for the Madoff investments, the Defendants chose to further their own financial interests and risk the Plans' money, failing to take prudent actions to investigate or monitor Madoff and his purported trading, and failing to disclose to the Plans, or in Ivy's case, to the Jeanneret and Beacon fiduciaries, the extent of the known risks, irregularities, and suspected misconduct by Madoff.

2. Ivy Asset Management LLC (formerly Ivy Asset Management Corp.) and its founders, Larry Simon and Howard Wohl (the "Ivy Defendants"), were investment managers and advisors that began investing with Madoff in approximately 1987. The Ivy Defendants introduced Madoff to J. P. Jeanneret Associates, Inc., and its principals, John P. Jeanneret and Paul Perry (the "Jeanneret Defendants"), and recommended investments with Madoff for the Jeanneret Defendants' ERISA Plan clients, starting in 1991. The Ivy Defendants introduced Madoff to Joel Danziger and Harris Markhoff, and their investment management companies, Beacon Asset Management Corp. and Andover Asset Management Corp. (the "Beacon Defendants"), and recommended investments with Madoff for the Beacon Defendants' ERISA Plan assets, starting in the early 1990s. The Plans' Madoff investments were made through direct accounts with Madoff, through the Jeanneret Defendants' fund of funds (Income Plus Investment Fund) and through the Beacon Defendants' funds (Beacon Associates LLC I, Beacon Associates LLC II, and Andover Associates LLC I). Over the course of its relationship with the Jeanneret and

Beacon Defendants, Ivy received nearly half of the fees that the Plans paid to the Jeanneret firm, Beacon Associates, and Andover Associates.

3. The Ivy, Jeanneret and Beacon Defendants violated their fiduciary duties of prudence and loyalty to the Plans, failing to take appropriate steps to properly invest and protect the Plans' assets, while extracting tens of millions of dollars in fees for themselves. The Ivy Defendants failed to disclose to the Jeanneret and Beacon Defendants their strong suspicions that Madoff was engaged in improper conduct, the reasons for those suspicions, and the information they had supporting those suspicions. The Ivy Defendants also failed to take prudent actions to follow up on and investigate known risks and irregularities regarding Madoff and his trading and other red flags of Madoff's potential misconduct, and failed to prudently conduct the monitoring and due diligence functions that they were obligated to provide to the Jeanneret and Beacon Defendants. For their part, the Jeanneret and Beacon Defendants ignored warnings they received from Ivy and also failed to take prudent steps to investigate the many other known red flags of irregularities about Madoff and his purported trading. Instead, as Jeanneret remarked, they were just betting (with the Plans' money) that Madoff was legitimate.

4. The Jeanneret Defendants also engaged in self dealing by instituting a two-tier fee arrangement, which provided for higher fees for Madoff investments than for other investments. By exercising their discretion to recommend and make Madoff investments for Plans, they set their own compensation and acted in their own interests, in violation of the loyalty, prudence and prohibited transactions provisions of ERISA.

## JURISDICTION AND VENUE

5.   This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502(a)(2) & (5), 29 U.S.C. §§ 1109 and 1132(a)(2) & (5), to redress violations and enforce the provisions of Title I of ERISA.

6.   This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.   Venue with respect to this action lies in the Southern District of New York pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## PARTIES

8.   The Secretary, pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) & (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, filing and prosecuting claims against fiduciaries who breach their duties under Title I of ERISA.

9.   Defendant Ivy Asset Management LLC is a Delaware Limited Liability Company with its principal office in Jericho, New York.  Ivy is a registered investment adviser under the Investment Advisers Act of 1940.  Since 2000, Ivy has been a wholly owned subsidiary of The Bank of New York Mellon Corporation (formerly The Bank of New York).

10. Defendants Lawrence Simon and Howard Wohl co-founded Ivy in 1984. Simon and Wohl, at all relevant times, were the chief executives and the persons principally responsible for the management of Ivy.  Prior to the Bank of New York's acquisition of Ivy in 2000, Simon and Wohl were also Ivy's principal owners.

11. Defendant J.P. Jeanneret Associates, Inc. (the "Jeanneret firm") is a New York corporation with its principal office in Syracuse, New York. At all relevant times, the Jeanneret firm was an investment management and consulting firm with mostly ERISA Plan clients. The firm is a registered investment advisor under the Investment Advisers Act of 1940. The Jeanneret firm also was the investment manager of the Income Plus Investment Fund ("Income Plus"), which was a pooled investment fund. Approximately 70 Plan clients of the Jeanneret firm invested with Madoff through direct investments, investments in Income Plus, and investments in the Beacon and Andover Funds described below.

12. Defendants John Jeanneret ("Jeanneret") and Paul Perry ("Perry"), at all relevant times, were the Jeanneret firm's owners and executives, and the persons responsible for the management of the Jeanneret firm. Jeanneret is the firm's Chief Executive Officer and principal owner. Perry is the firm's director and co-owner.

13. Income Plus is joined as a defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure to assure that complete relief can be granted.

14. Defendant Beacon Associates Management Corporation ("Beacon Associates") is a New York corporation with its principal office in White Plains, New York. At all relevant times, Beacon Associates was the Managing Member of Beacon Associates LLC I ("Beacon I"), Beacon Associates LLC II ("Beacon II") and their predecessor funds (collectively, "the Beacon Funds"), which were pooled investment funds.

15. Defendant Andover Associates Management Corporation ("Andover Associates") is a Delaware corporation with its principal office in White Plains, New

York. At all relevant times, Andover Associates was the Managing Member of Andover Associates LLC I, and its predecessor funds (the "Andover Funds"), which were pooled investment funds.

16. Defendants Joel Danziger ("Danziger") and Harris Markhoff ("Markhoff"), at all relevant times, were the principals and persons responsible for the management of Beacon Associates and Andover Associates. Danziger was the President and Director of Beacon Associates and Andover Associates. Markhoff was the Vice President, Secretary, Treasurer and Director of Beacon Associates and Andover Associates.

17. The Beacon and Andover Funds are joined as defendants pursuant to Rule 19(a) of the Federal Rules of Civil Procedure to assure that complete relief can be granted.

<u>**GENERAL ALLEGATIONS**</u>

18. The Jeanneret firm was, at relevant times, the "investment manager" within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38), for approximately 70 Plans, which are employee benefit plans within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and subject to the coverage of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a). Therefore, the Jeanneret firm was a fiduciary of those Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of the authority or control it exercised over the management or disposition of the Plans' assets. In its contracts with the Plans, the Jeanneret firm acknowledged its fiduciary status. As an investment manager and fiduciary, the Jeanneret firm was also a party in interest to the Plans within the meaning of ERISA § 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B).

19. Jeanneret and Perry, at all relevant times, exercised authority or control respecting the management or disposition of the Plans' assets, and were personally responsible for all of the Plans' investments in Madoff, in Income Plus, and with the Beacon and Andover Funds. Therefore, Jeanneret and Perry were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The Jeanneret firm, Jeanneret and Perry hereafter are referred to collectively as the "Jeanneret Defendants."

20. At all relevant times, more than 25% of Income Plus's assets were derived from investments by ERISA-covered employee benefit plans and similar investors (such as Individual Retirement Accounts) as defined in applicable regulations. See 29 C.F.R. § 2510.3-101. The Jeanneret Defendants, at all relevant times, exercised authority or control respecting management or disposition of the Plans' assets invested in Income Plus. Therefore, the Jeanneret Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans' investments in Income Plus.

21. At all relevant times, more than 25% of the Beacon Funds' assets were derived from investments by ERISA-covered employee benefit plans and similar investors (such as Individual Retirement Accounts) as defined in applicable regulations. See 29 C.F.R. § 2510.3-101. Beacon Associates, at all relevant times, exercised authority or control respecting the management or disposition of the Plans' assets in the Beacon Funds. Therefore, Beacon Associates was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans' investments in the Beacon Funds.

22. At various times, more than 25% of the Andover Funds' assets were derived from investments by ERISA covered employee benefit plans and similar investors (such as Individual Retirement Accounts) as defined in applicable regulations.  See 29 C.F.R. § 2510.3-101.  Andover Associates, at all relevant times, exercised authority or control respecting the management or disposition of the Plans' assets in the Andover Funds. Therefore, Andover Associates was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans' investments in the Andover Funds.

23. Danziger and Markhoff, at all relevant times, exercised authority or control respecting the management or disposition of the Plans' assets that were invested in the Beacon Funds and Andover Funds and were personally responsible for all of the Beacon and Andover Funds' investments of Plan assets.  Therefore, Danziger and Markhoff were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans' investments in the Beacon Funds and Andover Funds.  Beacon Associates, Andover Associates, Danziger, and Markhoff hereafter are referred to collectively as the "Beacon Defendants."

24. Ivy Asset Management Corp. ("Ivy"), at all relevant times, was the investment advisor and consultant to the Jeanneret firm with respect to the investments made by the Jeanneret firm's ERISA Plan clients, to Jeanneret's Income Plus Fund, to Beacon Associates and Andover Associates, and to the Beacon Funds and Andover Funds.

25. Ivy was started by Larry Simon and Howard Wohl in 1984.  Originally, Ivy's business was creating and managing proprietary investment vehicles that Ivy offered to investors.  These included the Rosewood, Birchwood, Maplewood, and Oakwood limited

partnerships. Ivy's limited partnerships invested with investment managers that Ivy selected, and in approximately 1987, Ivy began investing with Madoff. In its early years, Ivy established an expertise in identifying, researching, and gaining access to investment managers, including Madoff, that it used for Ivy's proprietary funds' investments and later recommended to the clients for whom Ivy served as an investment advisor.

26. Jeanneret started the Jeanneret firm in 1988, after working for many years in a law firm, Blitman & King, which represented many union employee benefit plans. Jeanneret worked for Blitman & King from 1973 to 1988. Originally, Jeanneret worked on estate tax returns. After ERISA was passed in 1974, he began doing administrative work with ERISA Plans. After a period of time, Jeanneret performed some simple investment services for the ERISA plans while working for Blitman & King. Describing the kind of investing he did for the ERISA plans, Jeanneret testified that:

> [A] lot of it was very simple--simple stuff where banks were doing some horrible job or they were leaving millions of dollars uninvested that we could get better yields for them, and so I got involved with some of the Blitman and King clients doing some investment work at that time. . . . I was predominantly used to invest in things like CDs and things of that sort for their clients that needed help. There'd be a client that, you know, had hundreds of thousands of dollars uninvested or whatever and we could get better yields for them because of, you know, connections with different situations and aware of various alternatives. And so I would get involved with them doing investing, and mostly in fixed income. . . . There was one fund, which was IBEW 1249 Pension Fund that we invested in some stocks and bonds, but that was a strange situation. . . .

The rest of his investing experience with the plans was with straightforward fixed income investments.

27. In 1988, Jeanneret left Blitman & King and formed the Jeanneret firm, seeking to do investment management and consulting work for ERISA plans, including those with which he had become acquainted while working at Blitman & King. One of

his initial clients was the Engineers Joint Pension Fund, for which he was hired as a consultant. In the years between 1988 and 1991, several ERISA Plans hired Jeanneret as an investment manager after Blitman & King decided to cease its investment activities for the plans.

28. In 1989, Jeanneret was introduced to Ivy when Ivy proposed to become an investment manager of the Engineers Joint Pension Fund. Ivy originally proposed that the Engineers Joint Pension Fund invest in one of Ivy's proprietary limited partnership funds that invested with several Ivy-researched and selected investment managers, including Madoff. The Pension Fund advised Ivy that it would not invest in Ivy's limited partnership funds because the limited partnership agreements contained exculpatory clauses. Thereafter, Ivy proposed that the Pension Fund invest with Madoff directly rather than invest in an Ivy limited partnership. The Pension Fund asked Jeanneret for his opinion regarding Ivy's proposal. Jeanneret had never heard of Madoff before. After obtaining information from Ivy about Madoff and his performance, including Larry Simon's statement that Madoff had not lost money on an annual basis in nearly thirty years using the investment strategy that was proposed, and meeting with Madoff with Ivy, Jeanneret recommended that the Pension Fund accept Ivy's proposal to invest with Madoff, through Ivy. Ivy became the investment manager for the Pension Fund and initially invested $5 million of the fund's assets with Madoff in April 1990. Ivy continued as the investment manager for the Engineers Joint Pension Fund from 1990-2008, recommending many additional investment managers that were used for Pension Fund investments over the ensuing 18 years.

29. Following Jeanneret's introduction to Ivy in connection with the Engineers Joint Pension Fund, Jeanneret had discussions with Ivy about Ivy's experience and ability to research and identify investment managers using various investment strategies, and about Ivy's access to those managers for investments. Prior to this time, most of the Taft-Hartley ERISA plans with which Jeanneret had been involved were invested primarily in conservative fixed-income investments. In fact, when the Jeanneret firm initially became investment manager for many of the Plans, the management agreements and investment guidelines only permitted this type of investments. Jeanneret sought to gain the benefit of Ivy's sophistication and expertise in researching, identifying and recommending investment managers engaged in a variety of investment strategies, and to gain access to the investment managers Ivy recommended, for the Jeanneret firm's ERISA Plan clients. Ivy understood that Jeanneret represented ERISA Plan clients, and understood that the Jeanneret Defendants were looking to Ivy to provide its expertise, recommendations, and access to investment managers for the Jeanneret firm's ERISA Plan clients. Ivy also knew that the Jeanneret Defendants looked to expand its ERISA Plan client base with Ivy-recommended managers, for the mutual benefit of the Jeanneret and Ivy firms.

30. In May 1991, Ivy and the Jeanneret firm entered into an agreement, which provided, in part:

> WHEREAS, [Jeanneret] Associates is an investment advisor, registered under the Investment Advisers Act of 1940 . . . and is in the business of managing funds of its clients ("Clients") and advising its Clients of various investment opportunities; and

> WHEREAS, Ivy has certain experience, sources of information and contacts with investment managers which [Jeanneret] Associates would like to avail themselves of and Ivy is willing to provide such services and information to [Jeanneret] Associates. . . .

NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, the parties hereto agree as follows:

2. Term. Subject to the provisions of Section 12 below, the term of this Agreement ("Initial Term") shall commence on May 15, 1991 ("Commencement Date") and continue through and including May 14, 2001, and thereafter, this Agreement shall continue on a year-to-year basis ("Additional Term"; Initial Term and Additional Term shall hereinafter collectively be referred to as "Term") unless either party gives notice to the other of its intent to terminate this Agreement. . . .

3. <u>Duties and Responsibilities</u>. During the Term of this Agreement, Ivy shall perform the following services for [Jeanneret] Associates:

    (a)   research, identify, monitor, evaluate and meet with potential investment managers;

    (b)   recommend investment managers to [Jeanneret] Associates;

    (c)   advise [Jeanneret] Associates as to the availability of opportunities to invest Client funds with particular investment managers;

    (d)   monitor, evaluate and meet with investment managers that are managing Client funds invested through [Jeanneret] Associates;

    (e)   assess the performance of investment managers managing Client funds invested through [Jeanneret] Associates and make periodic recommendations with respect to such performance;

    (f)   maintain such records as are mutually deemed appropriate by Ivy and [Jeanneret] Associates relating to the recommendation, retention, performance and services of investment managers recommended by Ivy and selected by [Jeanneret] Associates to manage the Client funds invested through [Jeanneret] Associates;

    (g)   provide [Jeanneret] Associates with such documentation as it reasonably requires with respect to investments of Client funds with investment managers such that [Jeanneret]

Associates may maintain compliance with the record-keeping requirements of the Advisers Act.

The above-listed services shall be provided to [Jeanneret] Associates in a timely and expeditious manner during the Term so as to enable [Jeanneret] Associates to make any necessary investment decisions for allocations in connection with the Client funds managed by [Jeanneret] Associates. . . .

4. <u>[Jeanneret] Associates' Client List</u>. Upon execution of this Agreement, [Jeanneret] Associates shall provide Ivy with a list of all Clients whose funds may be invested with investment managers introduced to [Jeanneret] Associates by Ivy ("Client List"). . . .[Jeanneret] Associates shall update the Client List on a quarterly basis and provide the updated list to Ivy within fifteen (15) days of the end of each calendar quarter during the Term . . . . Contemporaneously with the delivery to Ivy of the Client List or any update thereof, [Jeanneret] Associates shall deliver to Ivy copies of the investment advisory contracts between Associates and each Client on such list as they relate to the services that [Jeanneret] Associates is retaining Ivy for pursuant to this Agreement (including any amendments thereto). Copies of any amendments to a Client's advisory contract with [Jeanneret] Associates executed subsequent to the date hereof shall also be promptly forwarded to Ivy . . . .

5. <u>Compensation</u>. As compensation for services provided to [Jeanneret] Associates hereunder, Ivy shall, except as otherwise set forth herein, receive fifty (50%) percent of those fees ("Fees") received by Associates from any Client on the Client List with respect to funds invested with investment managers introduced to <u>[Jeanneret]</u> Associates by Ivy. . . .

6. <u>Minimum Investments</u>. (a) As of the Commencement Date, Clients of [Jeanneret] Associates shall have made and shall maintain a minimum investment ("Minimum Investment") of $4,000,000 with investment managers introduced to it by Ivy.

(b) Commencing eighteen (18) months from the Commencement Date and for the duration of the Term thereafter, [Jeanneret] Associates shall have funds from not less than two (2) clients invested with investment managers introduced to it by Ivy. If at any time [Jeanneret] Associates fails to comply with the terms of this Section 6(b), the percentage of Fees payable to Ivy as compensation under Section 5 above shall be increased from fifty (50%) to sixty (60%) percent for any [such] period. . . .

\*          \*          \*          \*

13. <u>Accounting and Access to Books and Records</u>.

(a) <u>Accounting</u>. Within ninety (90) days after the end of each calendar year, [Jeanneret] Associates shall deliver a schedule to Ivy detailing the collection of all Fees for the calendar year just ended which were paid to [Jeanneret]Associates by Clients utilizing the services of investment managers recommended by Ivy and the dates and amounts of Fees paid. The schedule shall also state the percentage of Fees received by Associates from such Clients which were paid to Ivy and that [Jeanneret] Associates received all Fees from its Clients that it was entitled to receive.

(b) <u>Access to Books and Records</u>. [Jeanneret] Associates shall maintain true, accurate and complete books and records. Upon reasonable advance written notice, Ivy shall have the right to review and copy the books and records of [Jeanneret] Associates relating solely to Clients which have utilized investment managers recommended by Ivy for the sole purpose of verifying the Fees paid to [Jeanneret] Associates and the compensation paid hereunder.

31. As a result of the provisions of the May 1991 written agreement between Ivy and the Jeanneret firm and amendments thereto, and in accordance with the Ivy and Jeanneret Defendants' unwritten agreements, arrangements or understandings during the period from 1991 through 2008, it was mutually understood and agreed that Ivy would (and did) provide on a regular basis investment advice directly or indirectly (by providing such advice to the Jeanneret Defendants) to Jeanneret's ERISA Plan clients regarding the value of securities or other property, and/or recommendations as to the advisability of investing in, purchasing, or selling securities or other property. This investment advice included, in particular, advice concerning the selection of investment managers, the value of and advisability of purchasing securities representing shares in partnerships, funds, and investment companies that provided access to investment managers, and the evaluation and allocation of Plan investments with investment managers. Ivy's investment advice included recommendations that Jeanneret's Plan clients make direct investments with

Madoff, that they invest in the Beacon Funds, and that they invest with other Ivy-recommended investment managers and Ivy proprietary funds. The Ivy Defendants provided such investment advice to the Jeanneret firm as the fiduciary for the ERISA Plans pursuant to the agreements, arrangements and understandings between Ivy and the Jeanneret Defendants. It was mutually understood and agreed that the Jeanneret Defendants would rely on Ivy to provide regular advice that would be a primary basis for the Jeanneret's Defendants' investments for their ERISA Plan clients with investment managers, including Madoff, who Ivy recommended and to whom Ivy provided access.

32. The Jeanneret Defendants provided Ivy with lists of its ERISA Plan clients and copies of the investment advisory and investment management agreements between Jeanneret and the Plans, as required by the agreements between the Jeanneret firm and Ivy. The discretionary investment management agreements that permitted Madoff investments referenced attached investment guidelines (which Ivy received) authorizing the Plan to invest in the specific Madoff investment strategies, including the split-strike conversion strategy, that were described in the guidelines. Those investment guidelines also described the investment goal of each of the Plans that invested directly with Madoff as: "The maintenance of a conservative investment policy, with respect to investment of assets, with the primary objective being preservation of capital." Several of the investment guidelines added the clause "consistent with the overall objective of long-term growth in the [Plan's] assets." Several of the Plans' guidelines stated, in addition, that the Plan sought "[a]chievement of the maximum possible investment return consistent with the aforementioned primary objective." In accordance with its agreements with the Jeanneret firm, the Ivy Defendants knew the Jeanneret firm's ERISA

Plan clients, knew their investment objectives, and provided individualized investment advice to the Jeanneret firm regarding the Plans' direct investments in Madoff and their investments in the Beacon Funds, as well as other Ivy-recommended investment managers.

33. Initially, the Jeanneret Defendants' ERISA Plan clients invested with Madoff through direct accounts, arranged by Ivy. The Ivy Defendants recommended Madoff (and Madoff's specific investment strategies) to the Jeanneret Defendants for investments by Jeanneret's ERISA Plan clients. Approximately seventeen of Jeanneret's ERISA Plan clients made direct investments with Madoff, pursuant to Ivy's recommendation. In accordance with its agreement and understandings with the Jeanneret firm, Ivy's recommendations were a primary basis for the Jeanneret Defendants' allocation of their ERISA clients' assets to Madoff, as well as their continuing to remain invested with Madoff.

34. Ivy was also the gateway for the Plans' direct investments with Madoff. Ivy arranged the direct investments by the Jeanneret firm's Plan clients with Madoff and obtained Madoff's approval for the investments. When one of Jeanneret's Plan clients decided that it wanted to make such an investment (pursuant to Ivy's recommendation), Jeanneret told Ivy about the Plan that wanted to invest in a direct account with Madoff, and told Ivy how much the Plan wanted to invest. The Ivy Defendants then contacted Madoff on the Plan's behalf in order to obtain Madoff's approval for the Plan's investment. If, based on Ivy's recommendation, Madoff agreed to accept the investment, a brokerage account was set up for the plan, through Ivy. During the entire time the Plans had direct accounts with Madoff (generally from the early to mid-1990s until

2008), Ivy kept the records for all of the Jeanneret-client Plans that made direct investments with Madoff, including the records for each investment and withdrawal by each Plan, and the earnings and losses for each of the Plans' direct accounts throughout the history of their Madoff investments.

35. Howard Wohl of Ivy described the questions from Madoff that Ivy had to answer in order to gain Madoff's approval for a proposed Jeanneret-Plan client investor's direct investment with Madoff, including asking whether Ivy could vouch for the Plan:

> My recollection is that the questions [Madoff asked Ivy] related to who the [Jeanneret client] investor was and who they represented, whether they were somebody that we [Ivy] knew and in essence could vouch for, what the intended amount of money was and the timing of such investment.

36. In the years following the 1991 Jeanneret-Ivy agreement, the Jeanneret firm's and Ivy's businesses grew substantially. An important factor in their growth was the investments by Jeanneret's Plan clients with Ivy-recommended managers, particularly Madoff. As Larry Simon of Ivy said to Howard Wohl of Ivy in 2001: "([W]ho would have thought the $5 mill [that the Engineers Joint Pension Fund initially invested] would lead to $145 mill and J[ohn] J[eanneret]'s funds)[;] however it helped to contribute toward building Ivy's AUM and credibility despite our real concerns about BLM." Jeanneret became the investment manager for an increasing number of ERISA Plans, entering into discretionary investment management agreements with investment guidelines specifically permitting direct investments in Madoff and Madoff's specified investment strategies (and many of the Plans subsequently entered into new agreements or amended investment guidelines to permit investments with Income Plus and the Beacon Funds). The Plans, through Ivy, opened direct accounts with Madoff.

37. Approximately seventeen of Jeanneret's Plan clients invested tens of millions of dollars in direct investments with Madoff over the years, through Ivy. Those investments greatly benefitted the Jeanneret firm and Ivy, which split equally the fees the ERISA Plans paid for those investments. (In the later years of their relationship, Ivy received a somewhat reduced percentage of the fees paid by the Plans for their direct investments with Madoff).

38. The nature of the Jeanneret and Ivy Defendants' relationship and the shared interests in Jeanneret's Plan clients' direct investments with Madoff is reflected in a June 10, 1996 letter from John Jeanneret to Larry Simon of Ivy entitled "Periodic Expenses of Joint Fee Accounts." (Emphasis added.) In that letter, Jeanneret advised Simon of Jeanneret's marketing efforts soliciting Madoff investments from identified ERISA plans for the joint benefit of the Jeanneret and Ivy Defendants. Jeanneret described expenses that his firm incurred in connection with the Onondaga County Carpenters Pension Fund (which invested directly with Madoff) to "maintain[] the account relationship" and "maintain significant revenues to Ivy and Jeanneret Associates." Jeanneret also advised Ivy that the Jeanneret firm had paid for a report that was utilized for marketing efforts with IBEW Local 325's Annuity and Welfare plans, and "obtained two new clients [who invested directly in Madoff]." Jeanneret told Ivy that Jeanneret had "utilized that report in several other cases where possible new accounts are pending." Jeanneret also told Ivy that he expected that the Plumbers Local 112 Pension Fund would place $3-4 million in a Madoff account with the benefit of a report for which Jeanneret had agreed to pay half the cost. Jeanneret stated that while his firm has generally absorbed the marketing costs of obtaining "joint clients," he would expect Ivy to pay for expenses involved with

obtaining this "new Madoff account," which could be a substantial new client. (The Plumbers Local112 Pension Fund did, in fact, become a new Madoff direct account in 1996.) Jeanneret ended the letter with the following: "I believe that we have developed a mutually beneficial business relationship, which is also in the best interest of <u>our clients</u>. I would certainly hope that sharing the incidental expenses of maintaining or developing new clients would not be an impediment to our future progress." (Emphasis added.)

39. The Ivy Defendants also provided advice regarding the investment allocations of Jeanneret's Plan clients, including those that invested directly with Madoff, on a regular basis through advice to their fiduciary investment manager, the Jeanneret firm. Indeed, in December 1998, Larry Simon explicitly acknowledged that Ivy was the "<u>asset allocator and introducer</u>" for the Jeanneret firm's Plan clients' direct investments with Madoff (whose investments Simon estimated at $100 million), as well as for the Madoff investments of the Income Plus and Beacon and Andover Funds. Howard Wohl and others at Ivy advised and made recommendations to the Jeanneret Defendants with respect to the investment allocations of the Jeanneret firm's Plan clients, including those that invested directly with Madoff, particularly with respect to the size of their Madoff investments.

40. Ivy also recommended additional investment managers to the Jeanneret Defendants for investments by the Jeanneret firm's ERISA Plan clients, including the Plans that invested directly with Madoff. Some of the Plans, including plans that invested directly with Madoff, also invested with other Ivy-recommended managers, including Perry Partners, Elliott Associates, Northern Asset Management, and Ivy's own proprietary fund, Maplewood II. For example, the Local 1249 Insurance Plan, which

invested directly with Madoff, also invested with Ivy-recommended managers Elliott Associates, Northern Asset Management, and Perry Partners.  The Local 1249 Pension Plan, which invested directly with Madoff, also invested with Ivy-recommended manager Elliott Associates.  Similarly, the Empire Carpenters Welfare, Pension and Annuity Funds, three of the seventeen Plans that invested directly with Madoff, also invested $8.5 million in Ivy's proprietary fund, Maplewood II.  (Indeed, Ivy wrote directly to the Empire Carpenters' funds in an effort to encourage the Plans to invest with Maplewood II, addressing in part the Plan's concerns about the investment of Maplewood II with non-U.S. investors, and describing Ivy as "a fiduciary which is an investment advisor registered under the Investment Advisers Act of 1940.").

41. Howard Wohl of Ivy testified about Ivy's recommendations of investment managers (in addition to Madoff) for Jeanneret's Plan clients even before the Income Plus Fund was established in 1993.  Describing Ivy's process for deciding which investment managers to recommend to those Plans (which included Plans that invested directly with Madoff), Wohl testified that "[i]t was from that pool of managers that we had done research that we provided such recommendations to Mr. Jeanneret."  Mr. Wohl further testified that he believed Jeanneret "identified the specific clients" for whom Ivy provided the recommendations.  Wohl testified that Jeanneret provided Ivy with parameters to help Ivy choose the investment managers Ivy recommended to Jeanneret for those Plan clients.  Wohl testified that those "[p]arameters indicated such things as the type of concentration, types of managers permitted, types of managers excluded and other stated requirements be it years in business, assets under management . . . and "[h]ow diversified or concentrated the portfolio would be."

42. In 1992, the Jeanneret Defendants decided to form their own fund of funds, the Income Plus Fund, as an investment vehicle for their ERISA Plan clients and others. Income Plus was established in 1993. In December 1992, Ivy and the Jeanneret firm amended their May 1991 agreement, described above, to include Income Plus. The amendment described the Income Plus Fund as a group trust "being established to pool investment funds of certain pension and profit sharing trusts and certain governmental plans to be managed by a number of independent investment managers utilizing certain identified hedging and arbitrage strategies." In the amended Ivy-Jeanneret agreement, Ivy agreed to provide the same services with respect to the Income Plus Fund as it had originally agreed to provide to the Jeanneret firm with respect to its Plan clients, including researching, identifying, evaluating and meeting with potential investment managers, recommending investment managers, advising about opportunities to invest with investment managers, assessing the performance of investment managers with whom Income Plus invested, and making recommendations with respect to the performance of investment managers. The amendment provided that with respect to the Income Plus Fund, Ivy was to be paid at least 50% of the fees that Income Plus paid the Jeanneret firm. (The Ivy-Jeanneret agreement was subsequently amended to reduce somewhat Ivy's percentage of the fees Income Plus paid to the Jeanneret firm). The December 1992 amendment also extended the "Initial Term" of the Jeanneret-Ivy agreement from May 14, 2001 to December 31, 2004.

43. As a result of the provisions of the written agreements between Ivy and the Jeanneret firm, and in accordance with the Ivy and Jeanneret Defendants' unwritten agreements, arrangements or understandings during the period from 1993 through 2008,

it was mutually understood and agreed that Ivy would (and did) provide on a regular basis investment advice directly or indirectly (by providing such advice to the Jeanneret Defendants) for the Plans' Income Plus investments regarding the value of securities or other property, and/or recommendations as to the advisability of investing in, purchasing, or selling securities or other property.  This investment advice included, in particular, advice concerning the selection of investment managers, the value of and advisability of purchasing securities representing shares in partnerships, funds, and investment companies that provided access to investment managers, and the evaluation and allocation of the Plans' Income Plus investments with investment managers, including Madoff.  Such investment advice was provided by the Ivy Defendants to the Jeanneret Defendants as the fiduciaries for the Plans' Income Plus investments, pursuant to the agreements, arrangements and understandings between Ivy and the Jeanneret Defendants. It was mutually understood and agreed that the Jeanneret Defendants would rely on Ivy to provide regular advice that would be a primary basis for the Plans' Income Plus investments with investment managers, including Madoff.

44. Ivy was also responsible for administrative and recordkeeping responsibilities with respect to Income Plus investments with the investment managers used to invest the Plans' Income Plus investments.

45. Pursuant to its agreements with the Jeanneret firm, the Ivy Defendants made individualized recommendations of particular investment managers, including Madoff, that Income Plus used to invest Plan assets, recommended allocations among the investment managers utilized by Income Plus, and monitored the performance of those investment managers.  During Income Plus's entire investment history, from 1993 until

2008, every outside investment manager the Jeanneret firm used for Income Plus was an Ivy-recommended manager. For a short time, the Jeanneret firm itself managed a small portion of Income Plus's assets, but with that one exception, all investments Income Plus made were with investment managers that the Ivy Defendants recommended. Income Plus invested with approximately 42 investment managers recommended by Ivy.

46. The Ivy Defendants recommended specific investment managers that fit the investment criteria of Income Plus and its ERISA Plan investors. Larry Simon testified that he understood that Income Plus's criteria for investment managers "were to utilize alternative investment managers specializing in fixed income strategies and low volatility with reasonable rates of return," and that when Ivy recommended investment managers for Income Plus, it attempted to meet Income Plus's investment criteria. In a February 1998 letter to the Jeanneret firm, Larry Simon and Howard Wohl described "Income Plus' risk-averse mandate." In meetings with and letters to the Jeanneret firm, the Ivy Defendants regularly provided advice with respect to the investments of Income Plus's assets with Madoff and about the appropriate allocation of its investments among Madoff and other investment managers based on Income Plus' described investment criteria.

47. Madoff was one of the many Ivy-recommended investment managers for Income Plus. Over the period 1993-2008, Income Plus at all times had a high concentration of its assets invested with Madoff, including direct investments with Madoff and later, through investments in the Beacon Funds. Income Plus's heaviest investment concentration was its direct Madoff investments, which ranged from approximately 34-70% of Income Plus's assets.

48. Thirty-five of the Jeanneret firm's Plan clients invested in Income Plus, including six of the seventeen Plans that also invested with Madoff directly.

49. Like the Jeanneret Defendants, Joel Danziger and Harris Markhoff were introduced to Madoff by Ivy, and like the Jeanneret Defendants, the Beacon Defendants' access to Madoff for investments by the Beacon and Andover Funds was dependent upon the Ivy Defendants.

50. Danziger and Markhoff were lawyers in White Plains, NY, with a practice that included some ERISA plans. They had previously managed a couple of investment partnerships, in which their law clients had invested. Danziger and Markhoff met Larry Simon of Ivy in approximately 1991. Larry Simon introduced them to Madoff. Soon after their introductions to Ivy and Madoff, Danziger and Markhoff created the Andover Fund, managed by Andover Associates. Andover Associates entered into an agreement with Ivy in which Ivy agreed to research and recommend investment managers, to advise Andover Associates about the allocation among investment managers, including retaining or terminating investment managers, and to monitor, evaluate and meet with investment managers managing Andover funds. Thereafter, Andover Associates invested Plan assets with many Ivy-recommended investment managers, including Madoff.

51. Andover Associates used Ivy-recommended managers for virtually all of the Andover Funds' investments. Over the course of the period 1993-2008, virtually all of the investments made by the Andover Funds were with investment managers that the Ivy Defendants recommended, including Madoff. The Andover Funds used approximately 35 investment managers that Ivy recommended. The heaviest concentration of the Andover Funds' investments was with Madoff.

52. Ivy was responsible for monitoring the performance of the investment managers that it recommended to Andover Associates and for recommending investment allocations among those investment managers. Ivy also performed administrative responsibilities with respect to investments made by Andover with Ivy-recommended managers. In return, Ivy originally received half of the fees that Andover Associates received as investment manager of the Andover Funds. That percentage was reduced somewhat in later years.

53. In 1995, Danziger and Markhoff expressed interest in creating a fund that, at least initially, would invest all of its assets with Madoff. That fund was the original Beacon Associates LLC Fund ("Beacon II"). Creating such a fund depended on Ivy, because Ivy was the source of Beacon Associates' access to investment with Madoff. Larry Simon of Ivy agreed to provide that access for Beacon. Accordingly, in 1995, Beacon Associates and Ivy entered into an agreement which expressly acknowledged that Ivy had introduced Madoff to Beacon Associates and provided that Beacon Associates would pay Ivy half of the management fees that Beacon Associates received from investors in Beacon. Ivy's compensation was primarily for its recommending, introducing and providing continued access to Madoff.

54. Thereafter, in accordance with the agreements and understandings, written and unwritten, between Ivy and Andover Associates and between Ivy and Beacon Associates, Ivy monitored and provided performance information about the investment managers used by the Andover and Beacon Funds, made individualized recommendations about the advisability of both the Andover Funds' and the Beacon Funds' investments with particular investment managers, including Madoff, and made

recommendations about the allocations among investment managers used by the Andover and Beacon Funds. Over a period of many years, in accordance with the agreements and understandings between Ivy and the Beacon Defendants, Ivy regularly provided advice and recommendations evaluating the investment managers used by the Andover and Beacon Funds, and made recommendations regarding the selection of investment managers and the allocation of the Andover and Beacon Funds' investments among investment managers.

55. Although Beacon II was originally 100% invested with Madoff, Ivy thereafter recommended additional investment managers for investments for the fund. Beacon II began investing with other Ivy-recommended investment managers starting in 1999. Between 1999 and 2008, the two Beacon Funds invested with approximately thirteen Ivy-recommended investment managers. All or virtually all of the investment managers used by Beacon Associates were managers recommended by Ivy, including Madoff. The two Beacon Funds at all times invested at least 71% of their assets with Madoff.

56. The Beacon and Andover Funds' Offering Memoranda identified Ivy as their Investment Consultant, responsible for advising Andover Associates and Beacon Associates on the selection of investment managers and the allocation of assets among investment managers. The Offering Memoranda described the qualitative and quantitative analyses that were used to select investment managers and allocate the Funds' assets. These analyses were performed by Ivy.

57. The 1995 Beacon Offering Memorandum, issued when Madoff was the sole investment manager utilized by Beacon II, confirmed Ivy's role as Investment Consultant to the Beacon Fund, with responsibilities that included "monitoring of ongoing manager

performance and client record-keeping, continuing communications with [Beacon Associates] and related services."

58. Starting in 1999, Beacon began investing with other investment managers that Ivy recommended. Between 1999 and 2004, Ivy recommended four investment managers, in addition to Madoff, that the Beacon Funds used to invest Plan assets. New Offering Memoranda for Beacon Funds and an Andover Fund were issued in 2004. The 2004 Offering Memoranda described Ivy's responsibilities identically with respect to both the Beacon and Andover Funds. The 2004 Offering Memoranda for the Beacon and Andover Funds, reflecting the agreements and understandings between Ivy and Beacon Associates and between Ivy and Andover Associates, described Ivy as the "Investment Consultant" to Beacon Associates and Andover Associates, and stated that Ivy provides advice to Beacon Associates and Andover Associates with respect to the selection and allocation of the Beacon and Andover Funds' assets among Managers and Investment Pools. The 2004 Offering Memoranda provided that Beacon Associates and Andover Associates, "after consultation with Ivy, allocates and reallocates the [Beacon and Andover Funds'] assets," and that Andover Associates and Beacon Associates, after consultation with Ivy, "selects strategies and Managers that are not generally available to the investing public (the access to which and whom [sic] might otherwise be limited or unavailable) . . . ." The 2004 Offering memoranda for both the Beacon and Andover Funds described the quantitative and qualitative criteria and performance records analyzed for the selection of investment managers used by the Funds, as maintained, developed and analyzed by Ivy.

59. The Beacon and Andover Offering Memoranda described Ivy as a "global leader in alternative investment fund-of-funds portfolio management" with "approximately $12 billion of assets under management" and stated that Ivy's "staff of approximately 125 includes 25 research analysts and other senior investment professionals who devote 100% of their time to researching, reviewing, monitoring and analyzing current and prospective alternative investment managers, 21 Certified Public Accountants, 13 CFA Charterholders, and 8 CFA candidates."

60. In accordance with the agreements and understandings between Ivy and the Beacon Defendants, the Ivy and Beacon Defendants understood that the Beacon Defendants used Ivy's services, advice and recommendations on a regular basis to identify and gain access to investment managers and strategies not generally available to the investing public (including Madoff and his split-strike conversion strategy) that were available through Ivy. The Ivy Defendants were aware that the ERISA Plans invested in the Andover and Beacon Funds to achieve this individualized purpose, and the Ivy Defendants agreed and understood that they would regularly provide advice that would serve as a primary basis for satisfying those needs through their recommendations of investment managers used by the Beacon and Andover Funds, and their evaluations and recommendations regarding the investment allocations among those managers.

61. A November 28, 2005 letter agreement between Ivy and Beacon Associates also demonstrates that Ivy was providing investment advice to Beacon Associates for the Beacon Funds, recommending investment managers and allocations among managers and investment pools. The agreement stated that:

> Ivy currently performs two distinct types of services: (i) consulting
> services to [BAMC], as managing member of the Companies, which

28

include providing advice with respect to Manager selection and allocation of the Companies' assets among Managers and Investment Pools (the "Consulting Services"); and (ii) administrative and accounting services to the Companies (the "Administrative Services"). In consideration for such services, [Ivy] currently [is] paid by us. . . .

62. In 1999, upon Ivy's advice and recommendation, the Jeanneret Defendants started investing Plan assets with the Beacon Fund, after Madoff refused to accept any more direct investments from Jeanneret's ERISA Plan clients and refused to accept additional investments from Jeanneret's Income Plus fund. The apparent reason for Madoff's refusal was his concern about the possibility of regulatory scrutiny of Jeanneret's ERISA Plan clients' investments with Madoff. Madoff's refusal to accept Jeanneret's ERISA Plan clients' investments was a red flag of possible misconduct, but the Jeanneret, Beacon and Ivy Defendants failed to investigate or even question Madoff about his refusal to accept investments from Jeanneret's ERISA Plan clients, apparently out of fear that Madoff would return the money that they had invested with him.

63. Instead, the Ivy Defendants, knowing that Madoff was still accepting investments from Beacon Associates, recommended that the Jeanneret Defendants have their ERISA Plan clients invest with Madoff by investing in Beacon II, whose assets were totally, or almost totally, invested with Madoff, as a means of obtaining Madoff investments for Jeanneret's Plan clients despite Madoff's restriction of direct investments by Jeanneret's Plan clients and Income Plus. The Jeanneret Defendants followed Ivy's recommendation, investing their ERISA Plan clients in the Beacon Funds over the succeeding years. From 1999 through 2008, pursuant to the Ivy Defendants' recommendation, the Jeanneret Defendants invested tens of millions of dollars of its ERISA Plan clients' assets in Beacon Funds, including assets of six of the seventeen

Plans that also invested directly with Madoff pursuant to the Ivy Defendants'
recommendation. The Jeanneret Defendants also had Income Plus, which primarily held
ERISA Plan assets, invest in the Beacon Funds. Throughout this time, the Jeanneret
Defendants knew that the Ivy Defendants were responsible for recommending the
investment managers used by the Beacon Funds, including Madoff.

64. The Ivy Defendants knew that Jeanneret's ERISA plan clients' investments
were responsible for a large percentage of the total investments in the Beacon Funds.
The investments by the Jeanneret firm's ERISA Plan clients in direct Madoff
investments, investments in Income Plus, and investments in the Beacon and Andover
Funds contributed to building Ivy's assets under management, contributed to its
credibility, and contributed to its appeal to the Bank of New York, which acquired Ivy in
2000 in a transaction that resulted in nearly $100 million payments each to Defendants
Larry Simon and Howard Wohl.

65. Ivy was, at all relevant times, an investment advisor for a fee under ERISA §
3(21)(A)(ii), 29 U.S.C. § 1102(A)(ii), and the Department of Labor's accompanying
regulation, and thus was a fiduciary of the ERISA Plans with respect to their investments
with Madoff through direct accounts, through their investments with Income Plus, and
through their investments with the Beacon and Andover Funds. Ivy recommended the
advisability of specific investment managers and specific investment strategies, including
Madoff and his split-strike conversion strategy, to each of the ERISA fiduciaries
responsible for investing the Plans' assets, and provided advice evaluating those
investment managers and recommendations for the allocation of investments among

them.  In return, over the years, Ivy received nearly half of the fees that the Plans paid to the Jeanneret firm, Beacon Associates, and Andover Associates.

66. Ivy was the investment advisor responsible for recommending the advisability of particular investments and investment managers, including Madoff, and the allocation of investments to:  (1) the Jeanneret firm, the investment manager for each of the Plans, which invested the Plans in Madoff through direct accounts, through Income Plus, through the Beacon Funds, and through the Andover Funds;  (2) Income Plus Fund, a fiduciary in which many Plans' assets were invested; (3) Beacon Associates, a fiduciary that invested the Plan assets invested in the Beacon Funds; and (4) Andover Associates, a fiduciary that invested the Plan assets invested in the Andover Funds.

67. Pursuant to the agreements and understandings between Ivy and the Jeanneret firm, Ivy made recommendations to the investment manager for the Plans with respect to the advisability of investing with particular investments and investment managers, including direct investments with Madoff and his split-strike conversion strategy, and investments in the Beacon Funds.  Ivy's recommendations and advice were made on regular basis, from 1991 to 2008, pursuant to mutual agreements, arrangements and understandings with the Jeanneret firm that Ivy's investment advice would serve as a primary basis for investment decisions with respect to the Plans' assets, and that Ivy would provide individualized investment advice for the Plans' investments.

68. Pursuant to the agreements and understandings between Ivy and the Jeanneret firm, Ivy made recommendations to the Jeanneret firm with respect to the advisability of Income Plus investing Plan assets with particular investments and investment managers, including Madoff and his split-strike conversion strategy.  Ivy's recommendations and

advice were made on a regular basis, from 1993-2008, pursuant to mutual agreements, arrangements and understandings with the Jeanneret firm that Ivy's investment advice would serve as a primary basis for investment decisions for Income Plus with respect to Plan assets, and that Ivy would provide individualized investment advice for the Plans' Income Plus investments.

69. Pursuant to the agreements and understandings between Ivy and Andover Associates, Ivy made recommendations to Andover Associates regarding the advisability of the Andover Funds' investing Plan assets with particular investments and investment managers, including Madoff and his split-strike conversion strategy. Ivy's recommendations and advice were made on a regular basis pursuant to agreements, arrangements and understandings with Andover Associates that Ivy's investment advice would serve as a primary basis for investment decisions with respect to the Plan assets invested in Andover, and that Ivy would provide individualized investment advice for the investment of the Plans' assets.

70. Pursuant to the agreements and understandings between Ivy and Beacon Associates, Ivy made recommendations to Beacon Associates regarding the advisability of the Beacon Funds' investing Plan assets with particular investments and investment managers, including Madoff and his split-strike conversion strategy. Ivy's recommendations and advice were made on a regular basis pursuant to agreements, arrangements and understandings with Beacon Associates that Ivy's investment advice would serve as a primary basis for investment decisions with respect to plan assets invested in the Beacon Funds, and that Ivy would provide individualized investment advice for the investment of the Plans' assets.

71. While the Ivy Defendants' advice to the Jeanneret Defendants regarding their Plan clients' investments and Income Plus' investments, and their advice to the Beacon Defendants with respect to the Beacon and Andover Funds' investments, nominally addressed the selection of managers and the allocation of assets among them, their advice to place assets with advisors such as Madoff, who purported to follow a well defined strategy such as the split-strike conversion strategy, effectively amounted to advice to purchase particular securities at certain market prices. Advice to invest with Madoff's split-strike conversion strategy amounted to advice to invest in the securities dictated by Madoff's strategy of purchasing a basket of S&P 100 stocks highly correlated with the S & P 100 index, and hedging those stock purchases by buying a quantity of OEX index puts to hedge against a downturn of those securities and selling a quantity of OEX index calls to generate income to pay for the hedge. Indeed, the investment guidelines that permitted Jeanneret's ERISA Plan clients to invest directly with Madoff expressly authorized Madoff's split-strike conversion investment strategy rather than authorize the selection of Madoff as an investment manager to invest Plan assets. Ivy's investment advice to follow this strategy of security purchases was made to the Jeanneret Defendants and the Beacon Defendants for the Plan assets invested by the Jeanneret firm's ERISA Plan clients, by Income Plus, and by the Beacon and Andover Funds, and was a primary basis for those investments.

72. Larry Simon, at all relevant times, exercised control and discretion over the investment advice that Ivy provided to the Jeanneret firm, Beacon Associates, and Andover Associates regarding the investment of the ERISA Plans' assets. Simon exercised control and discretion over Ivy's individualized recommendations of particular

investment managers, including Madoff, to the Jeanneret firm, Beacon Associates, and Andover Associates for investment of the Plans' assets. Therefore, Defendant Simon was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised control over Ivy's provision of investment advice for a fee with respect to moneys or other property of each Plan.

73. Howard Wohl, at all relevant times, exercised control and discretion over the investment advice that Ivy provided to the Jeanneret firm, Beacon Associates, and Andover Associates regarding the investment of the ERISA Plans' assets. Wohl exercised control and discretion over Ivy's individualized recommendations of particular investment managers, including Madoff, to the Jeanneret firm, to Beacon Associates, and to Andover Associates for investment of the Plans' assets. Therefore, Defendant Wohl was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised control over Ivy's provision of investment advice for a fee with respect to moneys or other property of each Plan.

## ERISA VIOLATIONS

### Defendants' Disloyalty and Imprudence

74. Bernard L. Madoff, founder of Bernard L. Madoff Investment Securities LLC ("BLMIS") (hereafter referred to collectively as "Madoff"), was arrested on December 11, 2008 on charges related to his operation of an estimated $65 billion Ponzi scheme. Madoff pled guilty to securities fraud, investment adviser fraud, mail fraud, wire fraud, money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan. He was sentenced to 150 years in prison.

75. From the commencement of their respective investments with Madoff, the Ivy, Jeanneret and Beacon Defendants failed to take prudent steps to investigate pertinent facts regarding Madoff, his firm, his purported trading strategies, his purported trading, and his purported investment performance. Each relied on Madoff's stated historical performance in making their determinations to invest with him, and each kept investing with Madoff because of his purportedly successful performance and because of the large fees and prestige they obtained from the Madoff investments.

76. Each of the Defendants failed to make sufficient inquiry about even basic issues and known concerns, including the lack of an independent custodian for the securities Madoff supposedly traded, the unknown and small accounting firm that served as auditor for Madoff's broker-dealer, or the improbability that Madoff was able to generate the consistent profits he reported – returns that were reported in a national hedge fund publication as baffling to experts. The defendants were happy that Madoff accepted their investments, allowing them to receive huge fees based on the investments with him, and were willing to be the "low maintenance" clients that Madoff told them he preferred.

77. By early 1997, however, the Ivy Defendants discovered information raising serious doubts about Madoff and Madoff's claimed trading and trading strategy. By the end of 1998, those doubts ripened into a belief by Howard Wohl and Ivy's Chief of Investment Management that Ivy should eliminate all of Ivy's proprietary investments with Madoff and should tell the Jeanneret and Beacon Defendants specifically why they felt that way. But the Ivy Defendants decided not to do that because it would have jeopardized the enormous fees and the huge assets under management that Ivy obtained because of the direct Madoff investments of the Jeanneret firm's Plan clients and the

Madoff investments of Income Plus and the Beacon and Andover Funds. Internally and with other customers, the Ivy Defendants openly discussed the likelihood that Madoff was engaged in "improper conduct," and in 2001 Howard Wohl remarked internally that Madoff could bankrupt the entire Jewish community if he is "not real," reflecting the true nature and extent of Wohl's concerns. By 2002, Wohl responded to an internal analysis regarding Madoff's performance by saying, simply: "You omitted one possibility. He is a fraud." Notably, the Ivy Defendants did not disclose those concerns to the Jeanneret or Beacon Defendants.

78. Despite increasingly serious doubts about Madoff, the Ivy Defendants never shared the truth about the extent of their information and doubts about Madoff with the Jeanneret and Beacon Defendants. Starting in 1997, Ivy regularly sent letters to the Jeanneret firm, Andover Associates, and Beacon Associates that raised concerns about Madoff, and Ivy regularly recommended that their clients reduce their investments with Madoff. But Ivy was not honest and candid with the Jeanneret or Beacon Defendants about the full extent of Ivy's information and doubts about Madoff, including: information and concerns about the veracity of Madoff's claimed trading and trading strategy; that Madoff was likely engaged in improper conduct; the strong possibility that Madoff was "not real," and "a fraud;" and that Ivy's principal investment expert, Howard Wohl, and his second-in-command, the Chief of Investment Management, each believed that Ivy should withdraw its own investments from Madoff. Nor did the Ivy Defendants ever advise or recommend that the Jeanneret and Beacon Defendants divest the Plans' investments with Madoff.

79. At the same time, while the Ivy Defendants wrongly failed to disclose to the Jeanneret and Beacon Defendants the full extent of their concerns about Madoff and the factual bases for those concerns, the Jeanneret and Beacon Defendants failed to follow up or investigate the concerns that Ivy expressed to them. Although Ivy's communications raised red flags that demanded investigation, the Jeanneret and Beacon Defendants failed to take prudent steps to follow-up to protect the Plans' interests. They were generally reluctant to follow Ivy's recommendations to reduce their Madoff allocations because of their own financial interests. The Jeanneret and Beacon Defendants also did not disclose to their ERISA Plan investors that for years Ivy had been sending them letters expressing concerns about Madoff and recommending that they reduce their Madoff allocations.

80. A critical requirement of Madoff's so-called split-strike conversion strategy was the ability to buy and sell Standard & Poor's 100 Index ("OEX") options in sufficient volume to effectuate his purported trading strategy. Indeed, the Beacon and Andover Funds' offering memoranda explicitly highlighted the risk of insufficient options to effectuate the strategy. Those offering memoranda also described the possible counterparty credit risk that counterparties on options would not abide by their obligations.

81. Early on, Madoff claimed that he purchased and sold OEX options traded on the Chicago Board Options Exchange ("CBOE") to effectuate his strategy. In March 1997, Howard Wohl and Ivy's Chief of Investment Management checked the volume of OEX options traded on the CBOE and discovered that the total amount traded on the CBOE could only support approximately $1 billion of Madoff's split-strike conversion strategy trading. Ivy believed that Madoff was managing far more than $1 billion, so this

raised serious questions about whether Madoff was really trading as he claimed. Wohl wrote: "We should explore this further!"

82. Wohl told the Jeanneret and Beacon Defendants that he had questions about the availability of sufficient OEX options for Madoff's trading, but thereafter the Ivy Defendants became aware of additional information and inconsistent and incredible explanations by Madoff that sounded blaring alarms about Madoff and convinced Wohl that no investment with Madoff was justifiable. The Ivy Defendants did not share that information with the Jeanneret and Beacon Defendants.

83. In May 1997, Ivy's Chief of Investment Management contacted another hedge fund manager that invested with Madoff and posed the question "about the fact that the overall open interest in put and call options in our accounts with Madoff seem to be way below any reasonable estimate of the number of contracts Madoff should have based on any reasonable guess as to capital under management." The hedge fund manager not only confirmed Ivy's concern with "this problem," but also told Ivy's Chief of Investment Management about facts that suggested that Madoff was falsifying his performance returns, giving investors a "managed return stream." The hedge fund manager said "understanding Madoff is like finding Pluto . . . . you can't really see it . . . you do it through inference." The hedge fund manager repeated Ivy's Chief of Investment Management's statement that Madoff "could possibly be on the up and up," and Ivy's Chief of Investment Management said that "Toto is still tugging at the curtain." Ivy did not share this information, or these concerns about Madoff, with the Jeanneret and Beacon Defendants.

84. A few days later, Ivy's Chief of Investment Management followed up on the Madoff "options problem" by comparing the options Madoff supposedly bought for just Ivy clients' accounts (i.e., Jeanneret's Plan clients' direct investments, Income Plus, Beacon Funds, Andover Funds, and others) and compared that with the total volume of options traded on the CBOE. He found that there weren't enough options traded on the CBOE even to support Madoff's supposed trades for Ivy clients ("our accounts"), much less the assets invested with Madoff by other clients and feeder funds. Moreover, Ivy's Chief of Investment Management found that Madoff reported that the trades were executed at better prices than any of the actual CBOE trades reported that day, which would be very unusual. Ivy's Chief of Investment Management noted internally that: "This is a clear example of our inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with the independent information that is available to us." (Emphasis added). The Ivy Defendants did not disclose these important and troubling discoveries with the Jeanneret and Beacon Defendants. Nor did the Ivy Defendants confront Madoff with these disturbing discoveries. Instead, the Ivy Defendants told the Jeanneret Defendants simply that they were not being prudent by concentrating their investments so heavily with Madoff.

85. A few days later, on May 20, 1997, Ivy's Chief of Investment Management wrote to Wohl, Simon and others within Ivy concerning Ivy's view that Madoff was using the money invested by the managed accounts (i.e., the Madoff investments by Jeanneret's Plan clients, Income Plus, and the Beacon and Andover Funds) as a subordinated lender to his market making business, and that the investment returns Madoff reported for those accounts included compensation for Madoff's use of their

money. If, as Ivy suspected, that was what Madoff was doing, it would mean that Madoff was misappropriating the money invested with him by Jeanneret's Plan clients, Income Plus, and the Beacon and Andover Funds, and falsifying the trading and performance of their investments. Despite their suspicions, the Ivy Defendants did not disclose to the Jeanneret and Beacon Defendants even the possibility that Madoff was misappropriating money and falsifying investment trading and performance.

86. Instead of alerting the Jeanneret and Beacon Defendants to their growing concerns, Ivy decided to reduce its own investments with Madoff to only 2-4% of its proprietary funds' assets and stated internally that Ivy should "continue to make our relationships [including the Jeanneret and Beacon Defendants] aware of our inability to 'close the loop' (i.e., to get 100% certainty as to the nature of his trading) and our recommendation that they, too, reduce their investments to a limited percentage of assets."

87. Even Ivy's Chief Investment Officer questioned whether noting their inability to "close the loop" and recommending reductions in Madoff investments went far enough in view of Ivy's "misgivings," and suggested getting counsel's opinion whether that disclosure was sufficient. The Ivy Defendants did not do so. Instead, the Ivy Defendants followed the vague "inability to close the loop" prescription in communications with the Jeanneret and Beacon Defendants, combined with recommendations that they reduce their Madoff allocations.

88. In June 1997, on a plane ride with Madoff, Simon asked Madoff about the possibility of trading options in excess of what was reported on the CBOE. Simon asked the question because of Wohl's and the Chief of Investment Management's discoveries in

May 1997, that there were not enough options traded on the CBOE to support the amount of trading Madoff supposedly did, or even enough to support the trading of Ivy's accounts (and the outside hedge fund manager's awareness of "this problem"). Madoff told Simon that it was rare and not the norm for Madoff to trade options greater than the exchange reports. Madoff said that some OEX options were traded off the CBOE, on foreign exchanges, but "very small" amounts, and that some banks have written options contracts in excess of what is reported on the exchange, but very few times. Madoff's statement that it was rare for Madoff to trade options in excess of the exchange volume was clearly inconsistent with what Ivy's investment department had observed in May.

89. Ivy shared with the Beacon Defendants Madoff's statements about the possibility of trading options in excess of the exchange volume, but the Ivy Defendants did not disclose to them, or to the Jeanneret Defendants, that Madoff's explanation was inconsistent with Ivy's observations regarding the volume of trading on the CBOE in May (and the outside hedge fund manager's awareness of "the problem," as communicated to Ivy in May). Neither did Ivy confront Madoff with the inconsistency, nor ask him for an explanation for it.

90. In August 1997, Ivy wrote to Jeanneret and Danziger, reporting on the performance of investment managers with which Income Plus and the Andover Funds were invested and making recommendations about those investments. In each letter, Wohl and Simon wrote regarding Madoff, "As you know, we have not been able to assure ourselves as to how Bernie is able to successfully trade as much money as we believe he manages," and recommended a reduction of Income Plus's and the Andover Funds' investments with Madoff. The letters did not mention any of Ivy's other

misgivings about Madoff. For their part, the Jeanneret and Beacon Defendants failed

even to ask Ivy, their investment consultant, what it meant by saying that it could not

assure itself as to how Bernie was able to successfully trade the money he managed and

failed to follow Ivy's recommendation to reduce their Madoff investments.

91. In February 1998, Ivy wrote to Jeanneret:

> Though we have been pleased with this account's performance, we question their
> continuing ability to manage what must be an enormous pool of capital with such
> consistently outstanding results. As you know, Madoff will not quantify the total
> amount that they manage, but we estimate it to be at least $2 billion, and likely
> more. We are recommending that, in view of Income Plus' risk-averse mandate,
> this allocation be reduced.

Ivy did not mention its other major misgivings about Madoff. The Jeanneret Defendants

did nothing to follow-up about the concern Ivy did raise and did not follow Ivy's

recommendation to reduce the Madoff allocation.

92. A few days later in February 1998, Larry Simon and Ivy's Director of

Research met with Madoff. Madoff explained to them that market timing and volatility

analysis were the keys to the success of his split-strike conversion strategy. After the

meeting, the investment department member wrote an internal Ivy message stating:

> I think it's fair to say that this is a real operation. I think he probably has
> the systems in place to create optimal baskets of stock. I do question their
> ability to avoid any monthly losses for the last 3 years in what amounts to
> a volatility trade. There is some sort of symbiosis between these
> businesses to which we're not entirely privy.

This reflected Ivy's view that Madoff was likely using his market making business to

provide the falsely consistent returns on Plan investments that he reported to the

Jeanneret and Beacon Defendants.

93. The Ivy Defendants did not disclose to the Jeanneret or Beacon Defendants

these doubts about the veracity of Madoff's claimed investment performance or the belief

that there was something about the relationship between Madoff's market making business and his investment management business that was responsible for the incredible lack of losses reported by Madoff. The Ivy Defendants did not disclose to the Jeanneret and Beacon Defendants the Ivy Defendants' suspicion that Madoff's market making business was subsidizing the managed money investors' returns.

94. In August 1998, Simon and Wohl wrote to Jeanneret that although Madoff's reported performance continued to be extremely strong, Ivy recommended that Income Plus reduce its Madoff investment to a "below median" allocation, recommending a dramatic cut in Income Plus's Madoff exposure. The only reasons Ivy gave for this recommendation was that Madoff did not disclose the amount of assets he had under management, which he had never done, and Ivy's questioning of Madoff's ability to manage successfully the amount of assets Ivy believed Madoff managed. None of Ivy's other misgivings about Madoff were disclosed.

95. On December 15, 1998, Ivy personnel and Jeanneret met with Madoff. At this meeting, Madoff offered a new explanation of where he bought and sold the options supporting his split-strike conversion investments. Madoff now claimed that he traded 50-75% of the index options off the exchange, with major counterparties. Madoff also offered a new explanation for the success of his trading, saying that it was his ability to execute trades efficiently and at the best price that makes the strategy produce the returns it does and denying that he was an expert market timer. This was a complete reversal of his prior explanation that his ability to time the market was the key to his success. Ivy's Chief of Investment Management's internal notes on the meeting stated: "I do not believe we will ever solve the Madoff puzzle." The Ivy Defendants did not disclose to

the Jeanneret and Beacon Defendants that Madoff had given a completely different explanation for the success of his trading strategy than he had given before.

96. Most significantly, Madoff's new claim that he was obtaining 50-75% of his options off the exchange with unknown counterparties was the last straw for Howard Wohl. Ivy had previously discovered that there were not enough exchange-traded options to support Madoff's trading, and Madoff had previously claimed that he rarely traded options in excess of what was reported on the exchange, which was inconsistent with what Ivy had observed itself. Madoff also had previously told Ivy that very few options were traded off the CBOE. Madoff's new claim was inconsistent with everything he had said before and was unbelievable. Wohl had never heard of S&P 100 index options being traded off the exchange in large volume.

97. The day after the meeting, Wohl wrote to Larry Simon and the Chief of Investment Management at Ivy, telling them that no investment in Madoff was justified in light of the revelations from the Madoff meeting the day before. Wohl wrote: "[H]e now admits that he does not execute all of the index options on the exchange[;] that there are 'unknown' counterparties[;] that if these options are not paid off he'd lose less than 100%[;] it remains a matter of faith based on great performance-this doesn't justify any investment, let alone 3%." (Three percent was the amount Ivy's own funds had invested with Madoff at that time.)

98. Larry Simon's response demonstrated that Ivy was more concerned with its own financial interests than in protecting the ERISA Plans' investments that were at risk with Madoff. Simon wrote to Wohl and Ivy's Chief of Investment Management that a bigger issue than Ivy's 3% investment with Madoff was the approximately $200 million

that Ivy's clients (the Jeanneret ERISA Plans' direct accounts, Income Plus, the Beacon and Andover Funds, the Engineers Joint Pension Fund, and some smaller accounts) had invested with Madoff. Simon noted that Ivy was on the legal hook for those relationships and that these accounts were generating large fees for Ivy, as well as contributing greatly to Ivy's assets under management. Simon did not want to sacrifice those benefits, especially since he doubted whether Ivy could avoid legal liability even if it withdrew its Madoff investment, because Ivy had introduced Madoff to those clients and had recommended their investment allocations. Simon wrote: "Are we prepared to take all the chips off the table, have assets [under management] decrease by over $300 million and our overall fees reduced by $1.6 million or more, and, one wonders if we ever 'escape' the legal issue of being the <u>asset allocator and introducer</u>, even if we terminate all Madoff relationships?" (Emphasis added).

99. Ivy's Chief of Investment Management responded to Wohl and Simon with a proposal that Ivy:

> [t]erminate all BLM investments for the Ivy funds (the $5 mil or so)[.] Write to the advisory clients [the Jeanneret Defendants, Beacon Defendants and others] telling them we have done so and the reasons why. Then leave the rest to them.
>
> Here are my reasons: Legally, we will of course still have liability as investment advisor, particularly for the ERISA entities, but we will have insulated ourselves from liability as G[eneral] P[artner] of our [Ivy proprietary] funds. I imagine that our letters [recommending that the Jeanneret and Beacon Defendants reduce their Madoff exposure] would serve to at least partially exculpate Ivy should the worst happen [i.e., should Madoff be discovered to be a fraud].
>
> We have said that it is important to maintain at least some level of Ivy fund investments with Madoff in order to send a message to the advisory clients that we have confidence in BLM . . . . However, in view of Howard's deep concerns (which I share, though not to the same extent), Ivy should perhaps no longer express the same vote of confidence in

Madoff. Full withdrawals from the Ivy funds would send a very clear
message to the clients regarding Ivy's concern about this investment.

100. The Ivy Defendants rejected this proposed course of action because of Ivy's

own financial interests, described by Simon above. Ivy did not terminate its own Madoff

investments, thereby maintaining its false "vote of confidence" in Madoff, and did not

disclose to the Jeanneret and Beacon Defendants the concerns that Ivy had about Madoff

or the fact that both Wohl and Ivy's Chief of Investment Management had recommended

that Ivy terminate its Madoff investments.

101. In fact, two weeks later, in a meeting with the Engineers Joint Pension Fund,

Ivy indicated, falsely, that it had no reason to distrust Madoff and no reason to believe

that the Madoff accounts were anything other than what they purported to be. The Ivy

Defendants did not tell the Engineers Joint Pension Fund about the reasons they

suspected that Madoff was a fraud. Instead, Ivy talked about general risk management

principles for limiting the Madoff investment to 15% because Ivy did not believe in

putting all eggs in the basket of ANY manager. In fact, Howard Wohl, who two weeks

earlier had written that no investment in Madoff was justified after Madoff claimed to be

obtaining 50-75% of his options in off-exchange trades with unknown counterparties,

wrote that he told the Engineers Joint Pension Fund simply that Ivy lacked outside

corroborating evidence to "close the loop" in a way that gives us complete confidence,

noting that there was no separate custodian for Madoff's trading. Incredibly, Ivy agreed

to speak with Madoff on behalf of the pension fund to get his approval to *increase* the

pension fund's investment with Madoff.

102. The following month, in January 1999, Ivy's Chief of Investment

Management wrote a "High Importance" e-mail to other Ivy managers about a

conversation he had with a hedge fund manager with whom Ivy invested. The hedge fund manager said that he had met with someone he has known for a long time who works for Madoff, and the hedge fund manager asked that person about the theory [that Ivy also had expressed internally] that Madoff was using the managed money accounts as a subordinated lender for his money market business and that the managed money returns Madoff reported reflected compensation from his market making business for the use of the money. Ivy's Chief of Investment Management was told that the person who worked for Madoff responded, "You can think of it that way." The Ivy Defendants did not share this information, or even its suspicion about the "subordinated lender theory," with the Jenneret or Beacon Defendants.

103. Instead, Ivy wrote to Jenneret:

As we have stated many times, while we have <u>no reason to believe there is anything improper</u> in the Madoff operation, we continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results. They will not quantify the total amount that they manage, but we estimate it to be at least $5 billion, and likely more. As a result, we recommend a below median allocation.

(Emphasis added.) Ivy sent a nearly identical letter in January to the Beacon Defendants regarding the Beacon Funds' and Andover Funds' investments.

104. These communications were patently false. Ivy had multiple reasons to believe there was something improper in the Madoff operation, and Ivy's investment people, including Wohl, Ivy's Chief of Investment Management, and Ivy's Director of Research, strongly suspected that there were improprieties with Madoff's supposed trading and his claimed investment returns, described above. Rather than disclose these concerns and recommend that Jenneret and the Beacon Defendants withdraw the ERISA Plans' Madoff investments, Ivy repeated only that it questioned Madoff's continued

ability to successfully manage enormous assets and recommended a reduced allocation. Ivy also sent similar letters to Jeanneret and Danziger in July of 1999 that said: "As we have stated many times, while we have no reason to believe there is anything improper in the Madoff operation, we continue to question their ability to manage what must be an enormous pool of capital with such consistently outstanding results."

105. By contrast, in September 1999, Ivy told a completely different story to a prospective business associate. The notes of the meeting with the prospective business associate, which Larry Simon, Ivy's Chief of Investment Management, and Howard Wohl attended, state that the prospective business partner "appeared taken aback by the suggestion that the explanation of how it [Madoff] works could be that something improper is being done." (Emphasis added.)

106. For their part, the Jeanneret and Beacon Defendants failed to take appropriate steps to follow up with Ivy and were reluctant to reduce the Madoff investments they made for the Plans because of their own financial interests. Ivy's curious and repeated recitation that it had no reason to believe there was anything improper with Madoff, as well as other discussions it had with the Jeanneret and Beacon Defendants about whether Madoff was legitimate or whether there was reason to distrust Madoff, should have caused the Jeanneret and Beacon Defendants to question Ivy more diligently about the reasons for Ivy's concerns and its recommendations for sharp reductions in their Madoff investments. Instead, the Jeanneret and Beacon Defendants recognized that the Madoff investment returns were a major reason for their success and for their appeal to the ERISA Plans that invested with them, and they did not want to jeopardize or reduce the assets they managed, and the enormous fees they obtained, by

asking too many questions.  They, like the Ivy Defendants, allowed their own financial interests to override their fiduciary obligations to the Plans.

107.  Indeed, the Jeanneret Defendants told Ivy that they viewed the Income Plus Fund as a Madoff fund, which was easier for them to market, and that when they raised more money they would be more amenable to investing with other managers.  They told Ivy that they recognized that they weren't adhering to diversification principles, but Income Plus needed performance numbers to raise more capital, and they were therefore reluctant to reduce their Madoff investment.  The Beacon Defendants told Ivy virtually the same thing with respect to the Beacon Funds.  They discussed making the Beacon Funds more diversified due to concerns about Madoff, but told Ivy they were afraid of the income they could possibly lose if their investors did not want the change.  The Beacon Funds retained more than 70% concentration with Madoff, even when the assets it ostensibly had under management approached half a billion dollars.

108.  In April 2000, while discussing with Ivy the possible addition of investment managers for Income Plus, Jeanneret asked Ivy if Madoff was legitimate.  The fact that Jeanneret asked the question reveals that Jeanneret was aware of serious questions about Madoff.  Indeed, Jeanneret had remarked that they were all betting on Madoff being legitimate and said that Larry Simon believed he was.  Ivy's Director of Research responded that Madoff was "essentially legitimate," once again repeated Ivy's "we are unable to fully close the loop" mantra, and stated that Ivy had therefore limited its own Madoff investments to no more than 4%.  This assurance of Madoff's essential legitimacy was inconsistent with Ivy's strong suspicions that Madoff was engaged in improper conduct.  Ivy failed to disclose the reasons for Ivy's suspicions and failed to

disclose the fact that Wohl and Ivy's Chief of Investment Management recommended that Ivy withdraw its Madoff investments entirely and the fact that Ivy's Chief of Investment Management had recommended withdrawing its Madoff investments so that its advisory clients, like the Jeanneret and Beacon Defendants (and their Plan investors), were not deceived into thinking that Ivy had confidence in Madoff.

109. In July 2000, Ivy wrote to the Jeanneret and Beacon Defendants that despite Madoff's stellar record, Madoff's unwillingness to be forthcoming about capital he manages and other aspects of his business led Ivy to reiterate its strong recommendation that the Jeanneret and Beacon Defendants reduce their Madoff allocations for the Income Plus, Andover and Beacon Funds. Again, Ivy failed to disclose the real reasons for and the extent of its concerns regarding Madoff. At the same time, the Jeanneret and Beacon Defendants failed even to ask Ivy, the investment advisor and consultant responsible for monitoring, evaluating, meeting with, and assessing the performance of Madoff, what Ivy meant when it said that Madoff was unwilling to be forthcoming about "other aspects of his business." Nor did the Jeanneret and Beacon Defendants follow Ivy's recommendation to reduce their Madoff allocations.

110. Shortly thereafter, the Bank of New York ("BoNY") acquired Ivy. Following the BoNY acquisition, Madoff returned to Ivy the money that Ivy's proprietary funds had invested with him. Ivy told Jeanneret that the reason Madoff returned Ivy's money was because of a perceived conflict of interest involving BoNY, which Jeanneret later admitted made no sense. However, Simon's son, Sean Simon, wrote to a prospective client on August 20, 2001 that "Ivy had chosen not to invest with Madoff in its proprietary funds but had exposure through Beacon and one customized account."

Sean Simon reiterated this in 2008 when he told BoNY that "we fired [Madoff] in 2000." Wohl later testified that "we chose to terminate our relationship with Madoff."

111. Most importantly, after the BoNY acquisition, Ivy stopped conducting due diligence meetings with Madoff. Larry Simon admitted that Madoff did not do anything to bar or prohibit Ivy from meeting with him, as Ivy was obligated to do under its agreements and understandings with the Jeanneret firm, Beacon Associates and Andover Associates. Ivy's failure to meet and ask questions of Madoff was a patent breach of its agreements with the Jeanneret firm, Beacon Associates, and Andover Associates, which required Ivy to meet with, evaluate, monitor, and assess the performance of Madoff. Ivy's failure to meet with Madoff as required left Madoff free to meet alone with Jeanneret, Perry, Danziger and Markhoff, who were far less sophisticated than Ivy's principals and investment department personnel and less likely to challenge Madoff's representations. Indeed, Ivy noted in an internal e-mail after hearing from Danziger about Danziger's meeting with Madoff, that Bernie was relaxed, "sans the questioning of Larry [Simon] and Howard [Wohl]." Forsaking their obligation to meet with Madoff was not only a breach of Ivy's contractual obligations with the Jeanneret and Beacon Defendants but also a breach of their fiduciary obligations to the Plans.

112. At the same time, the Jeanneret and Beacon Defendants breached their fiduciary obligations by failing to prudently question Madoff or retain other expert assistance, given their inability and lack of qualifications and expertise to monitor and assess Madoff's performance and purported trading strategy themselves. The Jeanneret and Beacon Defendants had touted Ivy's expertise and the role Ivy played with respect to selecting, monitoring, and evaluating the investment managers used by Income Plus and

the Beacon and Andover Funds. Although Jeanneret had a PhD in Economics, he did not have the expertise needed to monitor and question Madoff about his purported trading for the Jeanneret Defendants' Plan clients' investments. Danziger and Markhoff, two lawyers from White Plains, were far less knowledgeable and sophisticated, and were ill-equipped to question Madoff or to monitor and assess his purported trading. As a result, Madoff was not subject to probing inquiry about his purported trading and could easily offer explanations that the Jeanneret and Beacon Defendants readily accepted. The Jeanneret and Beacon Defendants did not disclose to their ERISA Plan clients and investors that Ivy, their touted investment advisor and consultant, had ceased meeting with Madoff.

113. In February 2001, Ivy sent letters to the Jeanneret and Beacon Defendants. The only concern mentioned was Ivy's "ongoing concerns about Madoff's growth in assets under management." Ivy said that, as a result, it had "decided to seek additional managers in order to decrease manager specific risk." These letters were even more watered-down versions of Ivy's previous letters, without explicit recommendations to reduce Madoff exposure. At the same time, the Jeanneret and Beacon Defendants were happy with the reported Madoff returns, which allowed them to continue generating huge fees, and showed no interest in reducing their Madoff investments. To the contrary, the Jeanneret Defendants strongly urged ERISA Plans to invest in the Beacon Funds, emphasizing the Beacon Funds' history of consistent positive returns with low volatility and making extraordinary and unwarranted claims for the Beacon Funds' expected performance.

114. In March 2001, Ivy expressed its displeasure internally when the Engineers Joint Pension Fund was reluctant to reduce its Madoff exposure, criticizing the fund for being unsophisticated and greedy. Ivy also criticized John Jeanneret, who Larry Simon said "prefers to be an ostrich" (sticking his head in the sand). But Ivy had never leveled with the Engineers Joint Pension Fund or the Jeanneret Defendants about Ivy's real concerns with Madoff. Howard Wohl reacted by suggesting that Ivy could "swing a deal, excluding Madoff from our program and keeping the same fee arrangement for the rest," trying to escape Ivy's legal responsibility for the Madoff investments that it had recommended.

115. Larry Simon, focused on Ivy's financial interests, responded: "You may be spending too much time in the sun! If we give up Madoff, John [Jeanneret] has opportunity to move in [and take over Ivy's position as investment manager of the fund]." Simon said that Ivy's option was to get enough new business to replace the fees it received from the Engineers Joint Pension Fund and then walk away. And he raised the "Legal question:" "Now that BoNY owns Ivy, who has the ultimate liability??"

116. In early May 2001, MarHedge and Barron's, two widely read investment industry publications, reported widespread skepticism, including the skepticism of many industry experts and professionals, about Madoff and his reported performance with his so-called split strike conversion investment strategy. Some of the concerns contained in the report were ones that Ivy had expressed internally but had not conveyed to the Jeanneret and Beacon Defendants.

117. The MarHedge publication reported that "[m]ost of those who are aware of Madoff's status in the hedge fund world are baffled by the way the firm has obtained

such consistent, nonvolatile returns month after month and year after year." MarHedge

reported that another fund using a similar strategy, named "Gateway," had "experienced

far greater volatility and lower returns during the same period," and cited the views of

industry experts and questioned Madoff's performance for many reasons, including:

    a. "the relative complete lack of volatility in the reported monthly returns;"

    b. the consistency of Madoff's returns, questioned by current and former traders, money managers, consultants, quantitative analysts and fund-of-fund executives, including many familiar with split-strike conversion strategy, a dozen of whom offered their views/opinions/speculation on condition of anonymity;

    c. reported losses of no more than 55 basis points in just four months out of 139, while generating consistent returns of 1.5% per month and 15% annually;

    c. "the related ability to buy and sell the underlying stocks without noticeably affecting the market;"

    d. that "no one has been able to duplicate similar returns using the strategy;"

    e. that Madoff allows feeder funds to get the incentive fees while Madoff provides investment strategy and executes trades, making only commissions;

    f. that "Madoff securities is willing to earn commissions off the trades but not set up a separate asset management division;"

    g. that Madoff chooses not to manage the funds on a proprietary basis and keep the investing profits for himself; and

    h. speculation that at least part of the reported investment management returns came from other activities related to Madoff's market making, which reflected the market making business using the managed money accounts as "pseudo equity."

The article also stated that Madoff claimed to use over-the-counter ("OTC") options

almost exclusively for his split-strike conversion strategy.

    118. The Barron's article, published shortly after the MarHedge article, echoed

many of the same observations, and raised additional questions and doubts about Madoff

and his reported performance supposedly using the split-strike conversion strategy.

Barron's observed:

> Some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. . . . Three options strategists at major investment banks [said] they couldn't understand how Madoff churns out such numbers.  Adds a former Madoff investor: "Anybody who's a seasoned hedge fund investor knows the split-strike conversion is not the whole story.  To take it at face value is a bit naïve."

119.  The Barron's article also raised a question about Madoff using his market making business to subsidize the returns of the money management clients.

120.  Barron's also highlighted Madoff's unusual secrecy, quoting an investment manager:

> What Madoff told us was, "If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here," says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  "When he couldn't explain [to my satisfaction] how they were up or down in a particular month," he added, "I pulled the money out."

121.  Ivy forwarded the articles to the Jeanneret and Beacon Defendants without comment.  As noted above, both of the articles advanced the theory that Madoff's reported investment returns for his managed money clients had been so consistent that people on Wall Street speculated that Madoff used his market-making operation to subsidize and smooth his hedge fund returns.  This was precisely the "subordinated lender theory" that Ivy had repeatedly expressed internally during the late 1990's as a likely explanation for how Madoff supposedly obtained consistent returns using a volatility strategy, and about which Ivy had gotten confirmation from an outside hedge fund manager.  Yet Ivy never told the Jeanneret and Beacon Defendants about Ivy's concern that Madoff was improperly using their investments for his market making

operation, or that Madoff was falsifying their investment returns, or that an outside hedge fund manager had told Ivy that a Madoff employee lent credence to that theory. Nor did Ivy tell the Jeanneret and Beacon Defendants, after the MarHedge and Barron's article came out, that Ivy had the same concerns raised in those articles.

122. Similarly, after reading in the MarHedge article that Madoff supposedly used over-the-counter rather than exchange-traded options to support his split-strike conversion strategy, Ivy still did not disclose to the Jeanneret and Beacon Defendants its long-held skepticism about the veracity of Madoff's claimed options trading. Nor did it express any views about Madoff's supposed use of OTC options to support a reported $6-7 billion of assets under management, which Ivy surely did not believe was possible. Nor did Ivy do anything to follow-up on any of the concerns and suspicions raised in the articles.

123. The Jeanneret and Beacon Defendants also did virtually nothing to follow up on those concerns. Even after receiving years of recommendations by Ivy to reduce their Madoff investments, and reading about the reported concerns of experts, the Jeanneret Defendants did not conduct any investigation, consult any experts, or do anything to follow up on the serious questions and concerns raised in the articles.

124. Instead, Jeanneret called Madoff, who was on a golf course in Germany. A few days later, on May 9, 2001, Jeanneret wrote a reassuring letter to the trustees of the Engineers Joint Pension Fund, stating that there was nothing new in the articles and nothing to worry about. Jeanneret did not even communicate to the rest of his ERISA Plan clients about the MarHedge or Barron's articles or the concerns raised in them. In fact, the Jeanneret Defendants did not disclose to any of their other ERISA Plan clients

that for years Ivy had raised concerns about Madoff and recommended reductions in Madoff exposure.  The Engineers Joint Pension Fund was the only client who received Ivy's letters, because Ivy, as investment manager to Engineers Joint Pension Fund, sent them directly.

125.  The Beacon Defendants also did virtually nothing to follow up or investigate the concerns raised in the articles, although they had also received years of warnings about Madoff from their investment consultant, Ivy.  The Beacon Defendants did not conduct any investigation, consult any experts, or do anything to follow up on the serious questions and concerns raised in the articles.  In fact, the Beacon Defendants did not disclose to any of the ERISA Plans that invested in the Beacon and Andover Funds that for years Ivy had raised concerns about Madoff and recommended reductions in Madoff exposure.

126.  The Jeanneret and Beacon Defendants also glossed over the Barron's article's mention of Madoff's unusual demands for secrecy, although Madoff had made similar demands that they not mention in disseminated materials that they invested with Madoff.  In fact, Madoff told Beacon Associates to remove Madoff's name from the Beacon offering memorandum in 2000.

127.  When Larry Simon wrote to internal Ivy management to tell them that Jeanneret had told him about speaking to Madoff about the MarHedge and Barron's articles while Madoff was playing golf in Germany, Simon joked:  "Does Germany have extradition rules?  (Only kidding???)."  This e-mail revealed Ivy's belief that Madoff was likely engaged in fraudulent conduct.  Simon did not make similar jokes about other investment managers.  Howard Wohl, reacting to the articles, wrote to Simon and Ivy's

managers:  "We long wondered how this sizeable investment management operation could escape public scrutiny."

128.  On June 29, 2001, Howard Wohl wrote internally to Ivy's management that "Madoff can personally bankrupt the Jewish community if he is not 'real.'"  The same day, Wohl complained about the fees Ivy got from the Engineers Joint Pension Fund, and Simon reminded him that the $5 million investment that the pension fund made in 1990 led to $145 million and to the investments by the Jeanneret firm's ERISA Plan clients, which contributed to building Ivy's assets under management and its credibility, "despite our real concerns about BLM."  Wohl replied with a suggestion of having the pension fund sign a new Madoff letter saying that Ivy didn't advise them, suggesting a means to escape Ivy's legal responsibility for the pension fund's Madoff investments.

129.  In August 2001, Ivy wrote letters to the Jeanneret and Beacon Defendants restating its concerns about the amount of assets Madoff had under management and noting "our inability to perform full due diligence due to limitations set by Madoff" and recommended trimming the Income Plus, Beacon and Andover Funds' Madoff allocations.  Ivy's statement that it was unable to perform full due diligence due to limitations set by Madoff was false.  Madoff had not imposed limitations on Ivy.  Ivy also, once again, failed to mention any of the other serious doubts and concerns about Madoff.  For their part, the Jeanneret and Beacon Defendants did nothing to follow up on Ivy's statement that it was unable to perform full due diligence or to address any due diligence deficiencies arising from Ivy's failure to conduct full due diligence.

130.  Also in August 2001, Howard Wohl had a conversation with another client, telling the client that Ivy no longer had Madoff investments in Ivy's proprietary funds.

Wohl noted that the client said Ivy could take out the client's Madoff investments too, "without hesitation," because "[i]f it's not good enough for us [Ivy], then it should be out of [the client's investments]." Wohl noted that Ivy should withdraw the client's money quickly, within 11 days, by September 1, or at the latest, by October 1. Ivy also advised other clients and proposed investors not to invest with Madoff. An internal Ivy memorandum from January 14, 2002 reflects that Ivy told a client that, due to "qualitative issues" with Madoff, "no matter how successful he continue[s] to be, we are [not] satisfied as a fiduciary to invest client assets" with him. By contrast, during all the years that Ivy served as investment advisor and consultant to the Jeanneret and Beacon Defendants, the Ivy Defendants never recommended that Jeanneret's ERISA Plan clients, or the ERISA Plans invested with Income Plus, or the Beacon or Andover Funds, withdraw their Madoff investments. Ivy was making too much money on those Madoff investments, and its advice to them was influenced by its own financial interests.

131. In April 2002, Wohl wrote to an internal Ivy employee who was analyzing the Madoff investment performance, "Ah Madoff. You omitted one possibility – he's a fraud." Nevertheless, in subsequent letters to the Jeanneret and Beacon Defendants, Ivy merely reiterated its concerns about the amount of assets Madoff had under management and Ivy's professed inability to conduct its customary due diligence on Madoff. Meanwhile, Ivy was sending copies of the MarHedge and/or Barron's articles to other clients or prospective clients and advising them not to invest with Madoff or a Madoff feeder fund. Ivy also wrote to an advisory client with money invested in Madoff that "we have not recommended allocations to [Madoff]." And when Wohl was asked by a subordinate whether Ivy would be interested in investing with Madoff, Wohl responded

"NO." In a January 2003 email discussing potential managers to recommend to a client, Wohl wrote, "Madoff (NOT!)."

132. Ivy and BoNY were, however, concerned about Ivy's potential legal liability with respect to Madoff. In December 2002, Ivy's Director of Investments asked Simon, with respect to the Engineers Joint Pension Fund: "What can be done about the Madoff situation, and what potential liability exposure do we have as fiduciary?" Simon responded that there was not much Ivy could do, noting that Ivy had recommended many times that the Engineers Joint Pension Fund reduce its Madoff investments, but stated: "As to fiduciary exposure, even if we resign as fiduciaries I'm not sure we could escape the almost 13 year record of placing them there." Simon's comments reflected both Ivy's responsibility for the pension fund's Madoff investments, and its recognition that there was a strong likelihood that Madoff was a fraud – a belief that Ivy did not share with the Jeanneret or Beacon Defendants.

133. Instead, Ivy continued sending letters to the Jeanneret and Beacon Defendants recommending reduced Madoff allocations and repeating its concerns about the amount of assets under Madoff's management and Ivy's professed inability to do its customary due diligence.

134. Fearful of its legal liability regarding the Madoff investments of the Jeanneret Plan clients, Income Plus, the Beacon and Andover Funds, and at least one other fund manager, Ivy devised a plan to try to get itself off the hook for the Madoff investments it had recommended to them, suspecting that Madoff was a ticking time bomb. In 2006, 2007, and 2008, Ivy presented new agreements to the Jeanneret and Beacon Defendants and to another fund of funds manager that Ivy had recommended

invest with Madoff.  The new agreements carved out Madoff from Ivy's responsibilities.

The agreements provided that Ivy would research, identify, monitor, evaluate, and meet

with existing and potential investment managers <u>other than Madoff</u> or any investment

manager not recommended by Ivy; advise, in writing, how funds should be allocated

among investment managers, including timing of retaining and terminating investment

managers <u>other than Madoff</u>; assess the performance of investment managers that are

managing the client's funds and make periodic written recommendations to the client in

connection therewith <u>other than Madoff</u> or any non-recommended manager; advise the

client as to the availability of opportunities to invest client funds with particular

investment managers, <u>other than with respect to Madoff</u> or any other manager not

recommended by Ivy.  (Emphasis added.)

135.   With the Beacon Defendants, Ivy went one step further, including in the

new agreements with Andover Associates and Beacon Associates the statement that "the

parties acknowledge that <u>the Managing Member [Andover Associates/Beacon</u>

<u>Associates] has expressly requested that IVY not monitor or evaluate or meet with any</u>

<u>representatives of Madoff including Bernard L. Madoff</u>."  (Emphasis added.)  As

Danziger later testified, this statement that Ivy put into the agreements was patently false.

136.   The Jeanneret and Beacon Defendants did not disclose to the Plans that had

invested directly with Madoff, in Income Plus, or in the Beacon or Andover Funds, that

they had entered into new agreements with Ivy that eliminated Ivy's responsibilities to

meet with, research, monitor, evaluate, and make allocation recommendations, including

recommendations regarding retention and termination of investment managers, with

respect to Madoff.

137. The Jeanneret and Beacon Defendants also breached their fiduciary obligations to the Plans by agreeing to carve out Madoff from Ivy's responsibilities without retaining another expert advisor and consultant, because the Jeanneret and Beacon Defendants were not capable of monitoring the Plans' investments without the benefit of an expert consultant.

138. These new carve out agreements also reflected Ivy's state of mind about the dangers of the Madoff investments and were an obvious attempt to escape liability for them. Ivy sought to absolve itself from responsibility for the Jeanneret Defendants' Plan clients' direct Madoff investments, and the Income Plus, Beacon and Andover Funds' Madoff investments without ever disclosing to the Jeanneret and Beacon Defendants the true nature and extent of their information and suspicions about Madoff and without advising or recommending that the Jeanneret and Beacon Defendants withdraw the Plans' Madoff investments.

139. These new agreements in which Ivy carved out Madoff from its responsibilities should have been another red flag for the Jeanneret and Beacon Defendants, but their contentment with the large fees Madoff generated for them, Madoff's consistent performance numbers, and their hubris, caused them not to question Ivy's obvious motive for the new agreements.

140. From the time of Ivy's recommendations that the Jeanneret and Beacon Defendants' invest Plan assets with Madoff, and the commencement of those investments by the Plans, the Ivy, Jeanneret and Beacon Defendants failed to take prudent steps to obtain information and investigate Madoff, his firm, his purported trading strategy, his purported trading, and his purported investment performance. From the beginning, the

Ivy, Jeanneret and Beacon Defendants failed to investigate red flags of potential misconduct and irregularities. When the Ivy Defendants discovered irregularities with respect to Madoff that indicated that Madoff was engaged in improper and likely fraudulent conduct, the Ivy Defendants both failed to take prudent steps to follow up on those discoveries and failed to disclose them to the Jeanneret and Beacon Defendants.

141. There were many red flags regarding Madoff and his purported trading strategy. The lack of a sufficient volume of options to support Madoff's strategy was a known risk, recognized by all. So, too, was the potential counterparty credit risk involved with over the counter options trading. Indeed, both of those risks were explicitly identified in the Andover and Beacon Offering Memoranda. In 1997, Ivy discovered many facts that led them to conclude that Madoff's supposed options trading was a fraud. Ivy discovered: that there were not enough options traded on the CBOE to support the presumed size of Madoff's assets under management; that there were fewer options traded on the entire exchange one day than Madoff reported he had traded for just Ivy's clients; that Madoff reported trading at prices better than any reported trades on the CBOE; that Madoff claimed he rarely traded options in excess of what was reported on the CBOE, or obtained options from other sources, which was inconsistent with Ivy's observations; and that Madoff later changed his story (apparently because he recognized that people knew or suspected that there were not enough exchange-traded options to support his split-strike conversion strategy) and claimed that he obtained 50-75% of his options over-the-counter from "unknown counterparties," a story which Howard Wohl did not believe and which caused Wohl to tell Ivy's other managers that no investment with Madoff was justified.

142.  Madoff later told the Jeanneret and Beacon Defendants that an increasing amount of the options he bought and sold were obtained over-the-counter with major counterparties, rather than from listed OEX index options.  Madoff's supposed use of OTC trades for virtually all of his options trading was also reported in the MarHedge article in 2001.  Madoff thereafter told the Jeanneret Defendants that he obtained collateral from the counterparties with whom he traded options to protect against the counterparty credit risk involved with OTC options, and Jeanneret relayed that information to the Beacon Defendants.

143.  The Ivy Defendants wrongly failed to tell the Jeanneret and Beacon Defendants about much of the information they had about Madoff's supposed options trading, as well as the extent of Ivy's strong suspicion that Madoff's stories about his trading were false.  The Ivy Defendants also failed to take prudent steps to confront Madoff with the inconsistencies that Ivy discovered and to seek evidence of Madoff's claimed options trades.  For example, Ivy did not ask Madoff who the supposed counterparties were for his supposed OTC trades, did not ask for evidence of the supposed option trades, did not consult any experts about the availability of sufficient OTC S&P 100 index options, and did not do anything else to investigate Madoff's claimed OTC options trading.

144.  The Jeanneret and Beacon Defendants, knowing that Wohl had raised the question of whether there were sufficient options traded to support Madoff's supposed split-strike conversion trading for the large assets under his management, did nothing to request or obtain evidence from Madoff of these supposed OTC options.  They did not ask to see the options contracts, they did not ask for evidence of the alleged collateral,

they did not inquire how the options contracts were arranged or kept track of, and they did not consult experts about the availability or cost of such a large number of S&P 100 index OTC options or do anything else to investigate this claim, although the Jeanneret and Beacon Defendants were clearly aware of the option risks, as described in the Beacon and Andover Funds' offering memoranda.

145. Another red flag of potential irregularity, which all of the defendants recognized, was the absence of an independent custodian for the securities Madoff supposedly purchased for the Plans, for Income Plus, and for the Beacon and Andover Funds. Indeed, the Beacon Funds' and Andover Funds' offering memoranda explicitly highlighted the risk of fraud stemming from the absence of an independent custodian. The Jeanneret Defendants discussed their concern with Madoff regarding the custody of the securities as early as 1992, and Harris Markhoff raised his concern about Madoff's supposed custody over Beacon's assets with Joel Danziger in early 1996. Madoff repeatedly assured the Jeanneret Defendants from the early 1990s and through 2008 that the securities he purchased were held in segregated accounts at the Deposit Trust Corporation ("DTC"). The Ivy and Beacon Defendants apparently never even asked Madoff about the custody of assets, even though the Ivy Defendants noted to others the risk that there was no independent custodian for Madoff's supposed trading. However, during all the years that they invested with and/or recommended Madoff, with hundreds of millions of dollars of investments, the Jeanneret, Beacon and Ivy Defendants never even asked Madoff to produce evidence of the custody of the securities he supposedly purchased for them. They never asked him for records demonstrating that the securities

were held at DTC and never asked for his authorization to request records from DTC of his supposed security holdings.

146. Another red flag known to all the Defendants was the consistency of Madoff's performance and his ability to generate consistently positive returns even in down markets, while using a strategy that supposedly generated profits from market timing and volatility trading of S&P 100 stocks. The investment performance reported to the Ivy, Jeanneret and Beacon Defendants was remarkable, and as reported in the MarHedge article, was baffling to experts in the industry. All of the Defendants read the articles and knew they reported that experts were baffled by Madoff's consistent profits and lack of losses. The Ivy Defendants were suspicious of the numbers and were convinced that the reported consistent performance was not based on Madoff's supposed split-strike conversion strategy. As the reporter for the Barron's article wrote: "Anybody who's a seasoned hedge fund investor knows the split-strike conversion is not the whole story. To take it and face value is a bit naïve." Ivy did not take it at face value. Ivy believed that, if Madoff was not a complete fraud, his reported consistent performance for his managed money clients was a result of the relationship with his money market business, to which Ivy "was not privy." Indeed, like the other experts mentioned in the MarHedge and Barron's articles, the Ivy Defendants strongly suspected that Madoff was using the money invested by the Jeanneret Defendants' Plan clients and the Income Plus, Beacon and Andover Funds (and other feeder funds) as, in essence, a subordinated lender to Madoff's market making business and that the market making business compensated those investors for the use of their money, subsidizing their returns and accounting for the false consistency of their returns. If that were true, it meant that Madoff was wrongly

misappropriating the money invested by the Defendants' Plan clients and the Income Plus, Beacon, and Andover Funds and falsifying their trading and investment returns. But the Ivy Defendants never told the Jeanneret and Beacon Defendants of their suspicions, or their evidence, that that was what Madoff was doing.

147. The Jeanneret and Beacon Defendants received investment performance numbers from Madoff that raised serious questions, but rather than take appropriate steps to question or investigate Madoff's purported performance, the Jeanneret and Beacon Defendants used those numbers to boast about their performance, market their investments to the Plans, and make unrealistic claims about their ability to achieve returns. The Jeanneret and Beacon Defendants were aware that the numbers were "amazing" but chose to use those results to tout their products and their performance rather than question whether the results were too good to be true.

148. For example, the performance numbers indicated that Madoff's performance using a strategy based on S&P 100 securities, with a basket of stocks supposedly having a 95% correlation to the S&P 100 index, had virtually no correlation to the performance of the S&P 100 index. The numbers showed, and the Jeanneret and Beacon Defendants emphasized in their marketing materials, that the investments had virtually no months in which they sustained losses and outperformed the S&P with 1/5[th] or 1/6[th] of the volatility of the S&P. Madoff's numbers indicated that his trading yielded double digit positive returns during the bear markets of 2000-2002. Faced with these incredible results, and notwithstanding their knowledge that the experts cited in the MarHedge and Barron's articles expressed serious questions about Madoff's reported performance, the Jeanneret, Beacon and Ivy Defendants did nothing to investigate how Madoff could achieve those

results. Neither did they investigate the statements in the MarHedge article that others using a similar strategy, like the Gateway Fund, had very different performance results. The Jeanneret, Beacon and Ivy Defendants did not consult any experts to analyze or evaluate Madoff's reported performance or to assess the feasibility of his claimed results. The Jeanneret and Beacon Defendants not only accepted the numbers at face value, but also used them to make exaggerated and unrealistic claims to customers that they had a strategy that would generate strong positive returns regardless of the direction of the stock or bond markets.

149. Madoff's desire for secrecy was another red flag of potential irregularity to which the Jeanneret and Beacon Defendants acceded rather than question. The Barron's article in 2001 focused on Madoff's secrecy and the oddity of his requests that investors not disclose the fact that he invested for them. The Beacon and Jeanneret Defendants knew about Madoff's desire for secrecy first-hand. The Beacon Fund's initial offering memorandum in 1995 explicitly identified Madoff as the investment manager for the Fund, explained that Madoff was responsible for the Fund's investments, and described his strategies. However, in subsequent Andover and Beacon Funds' offering memoranda, no mention was made of Madoff or his strategies. In 2000, the Beacon offering memorandum removed Madoff's name, in response to Madoff's request. In 2004, Madoff complained that although his name had been removed, the descriptions of the investment strategy in the 2000 offering memorandum could still allow readers to identify him. Acceding to Madoff's request to disguise the offering memoranda even further, the Beacon Defendants changed the Beacon and Andover Funds' offering memoranda so that they falsely described the Madoff trading as their own, dubbing it as

the "Managing Member's Large Cap Strategy." The Beacon and Andover Funds' offering memoranda thus offered the fiction that it was Danziger and Markhoff who were responsible for executing the investment strategy for the money that was invested with Madoff for Madoff's execution of his split-strike conversion strategy. This demonstrates how far the Beacon Defendants were willing to go to appease Madoff and ensure that he would keep accepting their investments.

150. The Beacon Defendants told Jeanneret that they had removed Madoff from their offering memorandum, acquiescing to Madoff's demand. This was hardly surprising to Jeanneret, since Madoff had also told Jeanneret that he did not want investments with him to be publicized. When Jeanneret referred to Madoff investments made by his ERISA Plans or Income Plus, he did not describe them as Madoff investments, but rather as investments in a "Limited Volatility Equity Strategy." By contrast, the Income Plus Fund's reports named all other investment managers it used by name. Jeanneret acknowledged, when he wrote to the Engineers Joint Pension Fund after the MarHedge and Barron's articles were published, that "Madoff does not like to publicize his money management functions for a number of reasons."

151. Similarly, the Ivy, Jeanneret and Beacon Defendants acquiesced rather than challenge Madoff's refusal to divulge the amount of assets he had under management, and the Jeanneret and Beacon Defendants failed to heed the admonitions of Ivy about its concerns that Madoff was unwilling to be forthcoming about that and other aspects of his business.

152. The enormous growth in Madoff's assets under management also should have caused greater scrutiny and investigation from the Ivy, Jeanneret and Beacon

Defendants, but did not.  Over a span of 11 years, Madoff's assets under management were estimated to have grown seventeen-fold from $1 billion to over $17 billion.  Ivy reported ever-increasing estimates in Madoff's assets under management over the years, from $1 billion in 1997, to $5 billion in 1999.  In 2001, the MarHedge and Barron's articles estimated Madoff's assets under management at $6-7 billion.  In 2002, Madoff self-reported assets under management of $10-15 billion, and in 2008, Madoff reported $17 billion under management.  Ivy repeatedly cautioned the Jeanneret and Beacon Defendants about the ability of Madoff to generate the reported returns with the enormous growth of assets under management, and the Beacon and Andover Funds also stated in their offering memoranda that increased assets under management presented a risk factor for successful performance.

153.  The Ivy Defendants never gave the Jeanneret and Beacon Defendants more specific information about how the amount of assets under management affected the ability of Madoff to pursue his strategy.  For example, as Madoff's assets under management skyrocketed, it became increasingly implausible, or impossible, that he could trade sufficient options to support those assets.  The Ivy Defendants surely recognized that, but did not disclose it to the Jeanneret and Beacon Defendants.  For their part, the Jeanneret and Beacon Defendants ignored Ivy's repeated admonitions about Madoff's assets under management, continued investing Plan assets with Madoff, and maintained existing investments with him, despite the exponential growth in assets under management and without any prudent investigation to assess how he was possibly able to maintain his reported performance unaffected by the enormous growth in assets under management.

154.  The Ivy, Jeanneret and Beacon Defendants continued to invest plan assets with Madoff, and to maintain existing investments with Madoff, without taking prudent steps to investigate other aspects of Madoff, his firm, his purported trading strategy, his purported trading, and his purported investment performance, including without limitation, the following aspects that should have caused suspicion or at least concern:

a.  BLMIS, reportedly a major Wall Street broker-dealer with hundreds of millions of dollars of equity, employed an unknown and exceptionally small accounting firm as its accountant and auditor.  The Ivy, Jeanneret and Beacon Defendants all recognized that BLMIS's use of this firm was a red flag, but failed to take prudent steps to inquire about the small and unknown accounting firm and auditor employed by BLMIS.

b. Madoff gave the Jeanneret and Beacon Defendants explanations about his trading strategy, its goals, and his expectations about the strategy that did not make sense, but the Jeanneret and Beacon Defendants did not take appropriate steps to analyze or evaluate Madoff's explanations or to consult experts about those explanations, but rather accepted them at face value.

c.  Madoff told the Jeanneret and Beacon Defendants that he wanted-low maintenance clients.  Rather than raising questions about Madoff's desire for low maintenance, the Jeanneret and Beacon Defendants acted to curry Madoff's favor as low-maintenance clients.

d.  Madoff consistently reported each year-end that he was only invested in Treasury securities and held no equities.  This pattern was a red flag for fraudulent conduct or an attempt to avoid regulatory review.  Neither the Ivy,

Jeanneret, nor Beacon Defendants obtained a satisfactory explanation for why Madoff reportedly sold off all securities before year end, and the Defendants did not consult any experts about the propriety of that conduct.

e.  The Madoff account statements and trade confirmations sent to the Ivy, Beacon and Jeanneret Defendants were patently deficient in the information provided, failing to provide basic information that should have been expected from a firm such as BLMIS.  In addition, they were provided to the Ivy, Jeanneret and Beacon Defendants only in paper form through the mail, without the ability to see, confirm or verify the supposed trades in "real time."  The deficiencies in the account statements and trading information from Madoff, who professed to have sophisticated technology, were known red flags that the Ivy, Jeanneret and Beacon Defendants ignored.  Instead, Jeanneret joked with Ivy about getting Madoff's trading information in "real time."

f.  The Ivy, Jeanneret and Beacon Defendants did not request trade tickets from Madoff or take any other steps to attempt to verify that the trades reported by Madoff were actually made.  Instead, they simply accepted that the trades reported on the paper confirmations and account statements were real.

g.  Ivy's explanation that Madoff returned the money that Ivy had invested with him after Ivy was acquired by the Bank of New York because of a purported "conflict of interest" was a red flag that the Jeanneret and Beacon Defendants ignored.  Madoff's claimed explanation for why he was returning Ivy's money made no sense.

h.  Madoff sent documents to the Jeanneret Defendants that falsely described the nature of his trading, indicating that Madoff was acting in a non-discretionary capacity and executing trades at the direction of the Jeanneret Defendants.  This was false, as the Jeanneret Defendants knew, but rather than question Madoff, or discontinue investing with Madoff or divest investments already made, the Jeanneret Defendants advocated that fiction as a way to keep Madoff from being disclosed on a plan's Form 5500 filing with the Department of Labor.

i.  In 2006 and 2007, the Ivy Defendants insisted on amendments to its respective consulting agreements with Beacon Associates, Andover Associates, and the Jeanneret firm to remove from those agreements any duties to research, monitor, evaluate, meet, or assess the performance of Madoff.  This was yet another warning that the Ivy Defendants did not want to be responsible for the Plans' direct Madoff investments, and the Madoff investments of Income Plus, and the Beacon and Andover Funds and wanted to remove itself from all duties that could implicate it in the Jeanneret Plan clients', Income Plus's and the Beacon and Andover Funds' continued investments of hundreds of millions of dollars with Madoff.  Ivy terminated its future responsibilities with respect to Madoff, but the Ivy Defendants never advised the Jeanneret and Beacon Defendants about the true nature and extent of Ivy's concerns about Madoff or recommended that the Jeanneret and Beacon Defendants divest the Plans' investments with Madoff.  The Jeanneret and Beacon Defendants ignored the Ivy Defendants' obvious attempt to disentangle themselves from responsibility for Madoff.

### Jeanneret Defendants' Improper Fee Structure and
### Double Investment Advisory Fees from ERISA Plans

155. The Jeanneret firm received several forms of compensation from the Plans. It received a percentage of plan assets under management as an investment management fee. For some Plans, the percentage of compensation depended upon the type of investment that Jeanneret made.

156. For Madoff investments, the Jeanneret Defendants utilized a two-tier fee structure. The Jeanneret firm received a higher percentage of compensation for assets it placed in Madoff investments than for those that it placed in non-Madoff investments.

157. The Jeanneret Defendants created an inherent conflict of interest by utilizing a two-tier fee structure because their compensation was based on which investment they recommended. The Jeanneret Defendants thus had an added incentive to recommend Madoff investments and could set their own compensation by exercising their discretion to recommend that the Plans invest with Madoff.

### Defendants' Material Misrepresentations and Failures to Disclose Material Facts
### Constitute Fraud or Concealment Under ERISA Section 413, 29 U.S.C. § 1113

158. ERISA Section 413, 29 U.S.C. § 1113, states, in pertinent part: "[I]n the case of fraud or concealment, [an ERISA breach of fiduciary action] may be commenced not later than six years after the date of discovery of such breach or violation."

159. The Ivy, Jeanneret and Beacon Defendants each made fraudulent material misrepresentations and failed to disclose material facts about Madoff, his firm, his purported trading strategy, his purported trading, his purported investment performance, and the red flags that should have caused suspicion or at least concern. Those material misrepresentations and failures to disclose material facts were made with fraudulent

intent, constituted breaches of fiduciary duty with regard to the investment of ERISA plan assets, and had the purpose and effect of concealing the Defendants' breaches of fiduciary duty.

160. As described above, the Ivy Defendants made many material misrepresentations and failed to disclose material facts to the Jeanneret and Beacon Defendants, as fiduciaries of the ERISA Plans that invested with Madoff directly, through Income Plus, and through the Beacon and Andover Funds. Those material misrepresentations and failures to disclose material facts include the following:

a. Failing to disclose that there were not enough options traded on the CBOE to support Madoff's trading for Ivy's clients, much less the additional assets under Madoff's management;

b. Failing to disclose that Madoff reported options trades at better prices than the range of those traded on the CBOE, which was highly suspicious;

c. Failing to disclose that those options discoveries reflected, in Ivy's view, a "clear example of [Ivy's] inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with available independent information that is available to us."

d. Failing to disclose Ivy's belief that Madoff was using money invested in the managed accounts (*i.e.,* the Madoff investments by Jeanneret's Plan clients, Income Plus, and the Beacon and Andover Funds) as a subordinated lender to his market making business and that the investment returns Madoff reported for those accounts included compensation for Madoff's use of their money in his market

making business, and the information Ivy obtained from an outside hedge manager corroborating that suspicion;

e.  Failing to disclose Ivy's belief, based in part on information it received from an outside fund manager, that Madoff was likely misappropriating money and falsifying the investment trading and performance of the ERISA Plan investors who invested in Madoff directly and through Income Plus and the Beacon and Andover Funds.

f.  Failing to disclose information that Ivy obtained indicating that Madoff may be employing a "managed income stream" so that investors obtained consistent returns;

g.  Falsely and deceptively maintaining investments with Madoff in Ivy's proprietary funds for the express purpose of representing a false vote of confidence in Madoff to the Jeanneret and Beacon Defendants;

h.  Failing to disclose that Madoff's explanation that he rarely bought or sold options other than on the CBOE was inconsistent with Ivy's own findings;

i.  Failing to disclose that Madoff gave inconsistent explanations of the source of his options for his split-strike conversion strategy;

j.  Failing to disclose Madoff's complete reversal in explaining the key to his trading success, first claiming that it was his ability to time the market that was key, and then changing his story to say he was not an expert market timer, but rather that his returns were a result of his ability to execute trades efficiently and at the best price;

k.  Failing to disclose that Madoff's claim in December 1998 that he was obtaining 30-50% of his options in over-the-counter trading was contrary with everything he said before, and was not believed by the Ivy Defendants.

l.  Failing to disclose that in December 1998, in response to Madoff's claim that he was obtaining 30-50% of his option over the counter with unknown counterparties, Howard Wohl concluded that no investment in Madoff was justified;

m.  Falsely and deceptively representing that the Ivy Defendants had no reason to distrust Madoff and no reason to believe that the Madoff accounts were anything other than what they reported to be, when the Ivy Defendants had many reasons to distrust Madoff and many reasons to believe that the accounts were not what they were reported to be, as described above;

n.  Falsely and deceptively representing in repeated letters to the Jeanneret and Beacon Defendants that the Ivy Defendants' concerns with Madoff were primarily about the amount of assets Madoff had under management, without disclosing the many other real concerns they had, as described above;

o.  Falsely and deceptively representing that the Ivy Defendants were concerned because they could not "close the loop" about Madoff in a way that gave them confidence, when there were many other undisclosed reasons for their concern, as described above;

p.  Falsely and deceptively representing that "we have no reason to believe there is anything improper in the Madoff operation," when the Ivy Defendants strongly suspected that there were improprieties with Madoff's supposed trading and his

claimed investment returns, as described above, and when Ivy personnel told others that "the explanation of how [Madoff] works could be that something improper is being done;"

q.  Failing to disclose that, as a result of the information Ivy obtained, described above, Howard Wohl strongly suspected that Madoff was "not real" and was "a fraud;"

r.  Falsely and deceptively representing that Ivy could not do due diligence on Madoff, and that it was unable to do due diligence because of limitations imposed by Madoff, when there was no reason Ivy could not have done due diligence, and there were no limitations imposed by Madoff that prevented Ivy from doing so;

s.  Falsely and deceptively representing that Madoff mandated that Ivy take back the money that its proprietary funds had invested with Madoff, when it was Ivy who chose to terminate those investments;

t.  Failing to disclose that the Ivy Defendants did not believe Madoff's claims about obtaining options over-the-counter to support his split strike conversion strategy;

u.  Falsely and deceptively representing to the Jeanneret Defendants that Madoff was "essentially legitimate" when there were many reasons, described above, that the Ivy Defendants did not believe that Madoff was essentially legitimate;

v.  Failing to disclose that because of their information and beliefs about suspected improprieties with Madoff, the Ivy Defendants were advising other clients not to invest with Madoff or to divest their investments; and

w. Failing to disclose the facts supporting the Ivy Defendants' belief that Madoff's reported returns were not simply a result of his split-strike conversion trading strategy.

161. The Ivy Defendants made these material misrepresentations and failed to disclose material facts with fraudulent intent. As described above, the Ivy Defendants knew facts and had access to information that indicates that they knew that their representations were inaccurate and that they intentionally failed to disclose material facts to the Jeanneret and Beacon Defendants. The contradictions between what the Ivy Defendants told the Jeanneret and Beacon Defendants and what they discussed internally demonstrates their fraudulent intent.

162. The Ivy Defendants made these material misrepresentations and failed to disclose material facts in order to continue receiving huge fees from the Jeanneret Defendants' Plan clients' direct Madoff investments and the Income Plus, Beacon and Andover Funds' Madoff investments, and because the increase in Ivy's assets under management from these investments increased its status and prestige and was an important factor in its success and eventual sale to the Bank of New York. The Ivy Defendants made a clear choice not to disclose this information to the Jeanneret and Beacon Defendants because they did not want to lose the benefits of the increased assets under management and fees and they did not believe that they could escape legal liability if they warned the Jeanneret and Beacon Defendants away from Madoff since, as Larry Simon admitted, Ivy was the "introducer and allocator" for those investments. Accordingly, the Ivy Defendants chose not to disclose the full extent of their doubts to

the Beacon and Jeanneret Defendants, while advising other clients and potential clients not to invest with Madoff or to withdraw their investments.

163. The Jeanneret and Beacon Defendants, fiduciaries of the ERISA Plans, relied on the Ivy Defendants' material misrepresentations and material omissions.

164. The Beacon Defendants made material misrepresentations and failed to disclose material facts to its ERISA Plan investors in the Beacon and Andover Funds. Their misrepresentations and failures to disclose material facts include the following:

a. Failing to disclose to the ERISA Plan investors that Ivy had communicated to the Beacon Defendants that Ivy was unable to perform due diligence on Madoff, and that Madoff had imposed limitations that prevented Ivy from doing due diligence;

b. Failing to disclose to the ERISA Plan Investors that Beacon Associates and Andover Associates entered into new agreements with Ivy in 2006 that expressly carved out and excluded Madoff from Ivy's responsibilities to meet with, research, monitor, evaluate, and make allocation recommendations, including recommendations regarding retention and termination of investment managers. In previous communications and Offering Memoranda, the Beacon Defendants had touted and emphasized Ivy's ability and reputation, and the importance of Ivy's role as investment advisor to the Beacon and Andover Funds for manager selection and due diligence, but the Beacon Defendants failed to disclose to the ERISA Plan investors that they had entered into agreements by which Ivy would not perform those functions for the Beacon and Andover Funds; and

c. Failing to disclose that Ivy, the touted investment advisor to the Beacon and Andover Funds, had repeatedly sent letters to the Beacon Defendants communicating concerns about Madoff and recommending that the Beacon and Andover Funds reduce their exposure to Madoff.

165. The Beacon Defendants made these material misrepresentations and failed to disclose material facts with fraudulent intent. The Beacon Defendants failure to disclose that Ivy was not performing the represented due diligence with respect to Madoff, and thereafter that the Beacon Defendants had entered into agreements that explicitly removed those responsibilities entirely, demonstrates the Beacon Defendants' fraudulent intent. The same is true with respect to the Beacon Defendants' failure to disclose to the ERISA Plan investors in the Beacon and Andover Funds that Ivy had repeatedly sent letters raising concerns about Madoff, and advising the Beacon Defendants to reduce the Funds' Madoff exposures. The Beacon Defendants knew that the spectacular growth of their Funds, and especially the Beacon Funds, was because of Madoff, and the Beacon Defendants did not want to disclose negative information about Madoff that could cause investors to leave the Beacon and Andover Funds.

166. The ERISA Plan investors in the Beacon and Andover Funds relied on the Beacon Defendants' material misrepresentations and material omissions.

167. The Jeanneret Defendants made material misrepresentations and failed to disclose material facts to their ERISA Plan clients that invested in Madoff directly and through investments in the Income Plus, Beacon and Andover Funds. Their material misrepresentations and failures to disclose material facts include the following:

a. Failing to disclose to the ERISA Plan investors that Ivy had communicated to the Jeanneret Defendants that Ivy was unable to perform due diligence on Madoff and that Madoff had imposed limitations that prevented Ivy from doing due diligence;

b. Failing to disclose that the Jeanneret firm entered into a new agreement with Ivy in 2007 that expressly carved out and excluded Madoff from Ivy's responsibilities to meet with, research, monitor, evaluate, and make allocation recommendations, including recommendations regarding retention and termination of investment managers; and

c. Failing to disclose that Ivy had repeatedly sent letters to the Jeanneret Defendants communicating concerns about Madoff, and recommending that the Jeanneret Defendants reduce Madoff exposure.

168.  The Jeanneret Defendants made these material misrepresentations and failed to disclose material facts with fraudulent intent.  The Jeanneret Defendants' ERISA Plan clients had increased and the Jeanneret firm's assets under management had grown exponentially over the years because of the Madoff investments, and the Jeanneret Defendants described their Income Plus Fund as a Madoff fund.  The Jeanneret Defendants received tens of millions of dollars in fees from the ERISA Plans' Madoff investments, and the Jeanneret Defendants did not want to disclose material information that might cause the ERISA Plans to reduce the investments that they maintained with the Jeanneret Defendants.

169. The Jeanneret Defendants' ERISA Plan clients that invested with Madoff, through direct investments and investments in the Income Plus, Beacon and Andover Funds, relied upon the Jeanneret Defendants' material omissions.

## FIRST CLAIM FOR RELIEF
### (Against the Ivy Defendants)

170. Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 169 inclusive.

171. At all relevant times, the Ivy Defendants were fiduciaries to the ERISA Plans with respect to the Plans' direct Madoff investments and their investments in the Income Plus, Beacon and Andover Funds, and were investment advisors to the Jeanneret and Beacon Defendants, responsible for evaluating, recommending, and advising them about investment managers to employ and about the opportunities to invest with investment managers, meeting with those managers, assessing and monitoring them, and making recommendations to the Jeanneret and Beacon Defendants regarding the allocation of assets among investment managers, including whether to retain or terminate investment managers.

172. During the period between 1991 through 2008, the Jeanneret Defendants invested the ERISA Plans' assets with Madoff through direct investments with Madoff, investments in Income Plus, and investments in the Beacon and Andover Funds, pursuant to Ivy's recommendations and Ivy's access to Madoff. During the period between 1993 and through 2008, the Beacon Defendants invested Plans' assets with Madoff that the Plans had invested with the Beacon and Andover Funds, pursuant to Ivy's recommendations and Ivy's access to Madoff. The Jeanneret and Beacon Defendants

retained the vast majority of the Plans' Madoff investments and continued making new investments with Madoff until Madoff's Ponzi scheme collapsed in December 2008.

173.   The Ivy Defendants failed to take prudent steps to investigate, evaluate, or monitor Madoff, his firm, his purported trading strategy, his purported trading, and his purported investment performance; failed to take proper steps to follow up and investigate the red flags of impropriety it discovered itself, as well as warnings of impropriety by Madoff that it received from outside sources; failed to take prudent steps to follow up or investigate known risks and irregularities concerning Madoff; failed to disclose to the Jeanneret and Beacon Defendants the full extent and seriousness of the information and suspicions that the Ivy Defendants had about Madoff and the likely improper conduct concerning his purported trading as described above; and failed to advise the Jeanneret and Beacon Defendants to divest the Plans' investments with Madoff, which, as Ivy knew, was the prudent thing to do.  The Ivy Defendants did not disclose to the Jeanneret and Beacon Defendants the full extent of their information and concerns about Madoff, or advise them to divest their Madoff investments, because Ivy was more concerned with its own financial interests rather than the interests of the Plans.

174.   The Ivy Defendants also failed to protect the ERISA Plans and their participants and beneficiaries' interests by failing to properly determine if the Plans' investments with Madoff were prudent by, among other things:

(a) failing to structure or conduct prudent inquires to obtain information and investigate pertinent facts regarding Madoff and investments with Madoff;

(b)  failing to investigate appropriately the explicit warnings and red flags described above;

(c)  failing to take appropriate steps, including hiring necessary experts, to analyze and evaluate Madoff's reported performance and his purported trading strategy and execution;

(d) failing to take appropriate steps to verify the trades reportedly executed by Madoff and the existence and custody of the securities that Madoff purportedly purchased for the Plans, for Income Plus, and for the Beacon Funds and Andover Funds in which the Plans invested;

(e)  failing to take appropriate steps to investigate Madoff's accountant and auditor;

(f)  failing to take appropriate steps to test and evaluate Madoff's representations about his trading and performance;

(g)  failing to take appropriate steps, including consulting needed experts, to test and evaluate Madoff's claims regarding the purchase and sale of options for his investment strategy;

(h)  failing to take appropriate steps, including consulting needed experts, to evaluate and analyze the adequacy of the records and information provided by Madoff; and

 (i) failing to meet with Madoff after the BoNY acquisition of Ivy, in breach of its obligations to the Jeanneret and Beacon Defendants and the Plans, and failing to satisfy its obligation to the Jeanneret and Beacon Defendants and the Plans to monitor Madoff's performance.

175. By their conduct described above, the Ivy Defendants:

(a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

(b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

176. As a result of their conduct described above, the Ivy Defendants caused the Plans to suffer financial losses for which they are jointly and severally liable, and received unjust profits which they must disgorge, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

## SECOND CLAIM FOR RELIEF
**(Against the Jeanneret Defendants for Investments with Madoff)**

177. Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 176 inclusive.

178. At all relevant times, the Jeanneret Defendants were responsible for and oversaw all investment management decisions as to the ERISA Plans' assets. The Jeanneret Defendants were responsible for taking prudent steps to investigate and monitor the Plans' investments, including their direct investments with Madoff and their investments with Income Plus, the Beacon Funds, and the Andover Funds.

179.  During the period from 1991 through 2008, the Jeanneret Defendants repeatedly invested ERISA Plans' assets with Madoff, and failed to divest the Plans' investments with Madoff, without taking prudent steps to investigate, evaluate, or monitor Madoff, his firm, his purported trading strategy, his purported trading, and his purported investment performance.

180.  The Jeanneret Defendants failed to take appropriate or prudent steps to investigate or follow up on the information and concerns they received from Ivy about Madoff and the other red flags of potential misconduct and irregularities, as described above.  The Jeanneret Defendants did not conduct any investigation, consult any experts, or do anything to follow up on the serious questions they raised.  Neither did they disclose to their ERISA Plan clients that Ivy had raised those concerns and recommended reductions in their Madoff exposure.  Instead, the Jeanneret Defendants continued to pocket tens of millions of dollars in fees from the Plans' investments with Madoff.

181.  The Jeanneret Defendants failed to protect the ERISA Plans and their participants and beneficiaries' interests by failing to properly determine if the Plans' investments with Madoff were prudent by, among other things:

(a)  failing to structure or conduct prudent inquiries, fact-gathering and investigations with respect to Madoff and the investments with Madoff;

(b)  failing to investigate appropriately the warnings and red flags described above;

(c)  failing to take appropriate steps, including hiring necessary experts, to analyze and evaluate Madoff's reported performance and his purported trading strategy and execution;

(d)  failing to take appropriate steps to verify the trades reportedly executed by Madoff and the existence and custody of the securities that Madoff purportedly purchased for the Plans, for Income Plus, and for the Beacon Funds and Andover Funds in which the Plans invested;

(e)  failing to take appropriate steps to investigate Madoff's accountant and auditor;

(f)  failing to take appropriate steps to test and evaluate Madoff's representations about his trading and performance;

(g)  failing to take appropriate steps, including consulting needed experts, to test and evaluate Madoff's claims regarding the purchase and sale of options for his investment strategy;

(h)  failing to take appropriate steps, including consulting needed experts, to evaluate and analyze the adequacy of the records and information provided by Madoff;

 (i)  accepting Madoff's false statements about the nature of the trading Madoff was conducting for the Jeanneret Defendants and misrepresenting the nature of the trading relationship and the discretion exercised by Madoff in order to avoid disclosure of Madoff to regulators;

(j)  failing to inform the Plans about the concerns expressed by Ivy and Ivy's recommendations to reduce investments with Madoff, and failing to inform the Plans about the concerns raised in the MarHedge and Barron's articles;

(k)  accepting Ivy's failure to meet with Madoff and its failure to monitor and assess the performance of Madoff after the BoNY acquisition of Ivy, failing to

take prudent steps to require Ivy to satisfy its obligations, and in Ivy's absence, attempting to obtain pertinent information about Madoff and Madoff's trading themselves without the benefit of Ivy or another sophisticated investment advisor;

(l) entering into an agreement with Ivy in 2007 that eliminated Ivy's responsibilities for meeting with, evaluating, monitoring, and making investment recommendations regarding Madoff, and failing to disclose to their ERISA Plan clients that they had entered into such an agreement with Ivy; and

(m) knowing the risks and potential red flags associated with Madoff, failing to divest the ERISA Plans' Madoff investments in direct investments, investments in Income Plus, and investments in the Beacon and Andover Funds.

182. By their conduct described above, the Jeanneret Defendants

(a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

(b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

183. As a result of their conduct described above, the Jeanneret Defendants caused the Plans to suffer financial losses for which they are jointly and severally liable, and received unjust profits which they must disgorge, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

## THIRD CLAIM FOR RELIEF
### (Against the Jeanneret Defendants for Self-Dealing)

184.  Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 183 inclusive.

185.  The Jeanneret Defendants operated under a two-tier fee structure that provided for higher fees for Madoff investments than for other investments, thereby enabling the Jeanneret Defendants to set their own compensation by exercising their discretion to recommend and make Madoff investments for Plans.

186.  By utilizing a fee structure that enabled them to set their own compensation as described above, the Jeanneret Defendants

(a)  failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

(b)  dealt with assets of Plans in their own interest or for their own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1); and

(c)  acted on behalf of or represented a party whose interests were adverse to those of the Plans and their participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

187.  As a result of their conduct described above, the Jeanneret Defendants caused the Plans to suffer financial losses for which they are jointly and severally liable, and received unjust profits which they must disgorge, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

# FOURTH CLAIM FOR RELIEF
## (Against the Beacon Defendants)

188.  Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 187 inclusive.

189.  At all relevant times, the Beacon Defendants were responsible for and oversaw all investment management decisions as to the Plans' assets invested in the Beacon Funds and Andover Funds.  The Beacon Defendants had fiduciary responsibility for the Plans' investments in the Beacon Funds and Andover Funds.

190.  During the period from approximately 1992 through 2008, the Beacon Defendants repeatedly invested Plans' assets with Madoff, and failed to divest the Plans' investments with Madoff, without taking prudent steps to investigate, evaluate, or monitor Madoff, his firm, his purported trading strategy, his purported trading, and his purported investment performance.

191.  The Beacon Defendants failed to take appropriate or prudent steps to investigate or follow up on the concerns they received about Madoff and the red flags of potential misconduct and irregularities, as described above.  The Beacon Defendants did not conduct any investigation, consult any experts, or do anything to follow up on the serious questions they raised.  Instead, they continued to pocket millions of dollars of fees from the Plans' investments with Madoff.

192.  The Beacon Defendants failed to protect the Plans and their participants and beneficiaries' interests by failing to properly determine if the Plans' investments with Madoff were prudent by, among other things:

(a)  failing to structure or conduct prudent inquiries and investigation with respect to Madoff and the investments with Madoff;

(b)  failing to investigate appropriately the warnings and red flags described above;

(c)  failing to take appropriate steps, including hiring necessary experts, to analyze and evaluate Madoff's reported performance and his purported trading strategy and execution;

(d) failing to take appropriate steps to verify the trades reportedly executed by Madoff, and the existence and custody of the securities Madoff purportedly purchased for the Beacon Funds and Andover Funds in which the Plans invested;

(e)  failing to take appropriate steps to investigate Madoff's accountant and auditor;

(f) failing to take appropriate steps to test and evaluate Madoff's representations about his trading and performance;

(g) failing to take appropriate steps, including consulting needed experts, to test and evaluate Madoff's claims regarding the purchase and sale of options for his investment strategy;

(h) failing to take appropriate steps, including consulting needed experts, to evaluate and analyze the adequacy of the records and information provided by Madoff;

(i)  acceding to Madoff's demands for secrecy, and making false statements in the Beacon Funds' and Andover Funds' offering memoranda representing that

Beacon Associates and Andover Associates, rather than Madoff, were responsible for Madoff's purported trading;

(j) failing to inform the Plans about the concerns and recommendations they received from Ivy to reduce the allocations to Madoff, and the concerns raised in the MarHedge and Barron's articles;

(k) accepting Ivy's failure to meet with Madoff and after the BoNY acquisition of Ivy, failing to take prudent steps to require Ivy to satisfy its obligations, and in Ivy's absence, attempting to conduct due diligence by meeting with Madoff themselves without the benefit of Ivy or another sophisticated investment advisor;

(l) entering into agreements with Ivy in 2006 that eliminated Ivy's responsibilities for meeting with, evaluating, monitoring, and making investment recommendations regarding Madoff, and failing to disclose to the ERISA Plan investors in the Beacon and Andover Funds that they had entered into such an agreement with Ivy; and

(m) knowing the risks and potential red flags associated with Madoff, failing to divest the ERISA Plans' Madoff investments in the Beacon and Andover Funds.

193. By their conduct described above, the Beacon Defendants:

(a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

(b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C.

§ 1104(a)(1)(B).

194. As a result of their conduct described above, the Beacon Defendants have
caused the plans to suffer financial losses for which they are jointly and severally liable,
and received unjust profits which they must disgorge, pursuant to ERISA § 409(a), 29
U.S.C. § 1109(a).

## FIFTH CLAIM FOR RELIEF
### (Co-fiduciary liability against the Beacon, Ivy and Jeanneret Defendants)

195. Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and
incorporates by reference the averments and allegations of paragraphs 1 through 194
inclusive.

196. The Beacon, Ivy and Jeanneret Defendants, each of whom were fiduciaries
within the meaning of ERISA, knew of the breaches of fiduciary duty by each of the
fiduciaries described above (except for the breaches of duty that Ivy concealed from the
Beacon and Jeanneret Defendants), and failed to take reasonable steps under the
circumstances to remedy those breaches. Therefore, each is liable for the breaches of
each other fiduciary, pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

197. The Ivy Defendants were responsible for advising the Jeanneret and Beacon
Defendants in the performance of their fiduciary responsibilities, as described above.
The Ivy Defendants each knowingly participated in the failure of the Jeanneret and
Beacon Defendants to prudently and loyally manage Plan assets that were invested with
Madoff directly, with Income Plus, and with the Beacon and Andover Funds. Therefore,
the Ivy Defendants each are liable for the breaches of the Jeanneret and Beacon
Defendants, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

198. By their failures to comply with their own fiduciary responsibilities, each of the Beacon Defendants, Ivy Defendants, and Jeanneret Defendants enabled one or more other fiduciaries to commit fiduciary breaches. Therefore, each is liable for the breaches of each other fiduciary, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

### SIXTH CLAIM FOR RELIEF
### (Alternative Claim Against the Ivy Defendants for Knowing Participation in the Jeanneret and Beacon Defendants' Fiduciary Breaches)

199. Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 198 inclusive.

200. The Ivy Defendants knew about the Jeanneret and Beacon Defendants' breaches of their fiduciary obligations to the Plans, described above, and knowingly participated in, encouraged, and provided substantial assistance to the Jeanneret and Beacon Defendants' breaches by, among other things: recommending investments with Madoff; obtaining approval from Madoff to permit the Jeanneret and Beacon Defendants' investments of the Plans' assets; failing to disclose to the Jeanneret and Beacon Defendants the full extent of Ivy's knowledge and suspicions about Madoff; failing to recommend that the Jeanneret and Beacon Defendants withdraw all of the money the Plans had invested with Madoff; providing incomplete and misleading information to the Jeanneret and Beacon Defendants; and ceasing to meet with, monitor, and assess the performance of Madoff, thereby contributing to the Jeanneret and Beacon Defendants' failure to take prudent action to investigate the investments with Madoff and causing them not to divest the Plans' Madoff investments, which was the prudent thing for them to do.

201.  By knowingly participating in the Jeanneret and Beacon Defendants' breaches of their fiduciary obligations, the Ivy Defendants received unjust profits which they must disgorge, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

## Prayer for Relief

**WHEREFORE**, the Secretary of Labor prays that this Court enter an order:

1.  Requiring Ivy Asset Management LLC, Lawrence Simon, Howard Wohl,  J.P. Jeanneret Associates, Inc., John Jeanneret, Paul Perry, Beacon Associates Management Corp., Andover Associates Management Corp., Joel Danziger, and Harris Markhoff, jointly and severally, to restore to the Plans all losses suffered by the Plans as a result of the violations described in the complaint;

2.  Requiring Ivy Asset Management LLC, Lawrence Simon, Howard Wohl, J.P. Jeanneret Associates, Inc., John Jeanneret, Paul Perry, Beacon Associates Management Corp., Andover Associates Management Corp., Joel Danziger, and Harris Markhoff to disgorge any profits or financial benefits they realized as a result of the violations described in the complaint;

3.  Permanently enjoining Ivy Asset Management LLC, Lawrence Simon, Howard Wohl, J.P. Jeanneret Associates, Inc., John Jeanneret, Paul Perry, Beacon Associates Management Corp., Andover Associates Management Corp., Joel Danziger, and Harris Markhoff from directly or indirectly, individually or through any entity or any other person, serving or acting in any capacity, including as a fiduciary or service provider, with respect to any employee benefit plan covered by ERISA; and

4.  Granting such other relief as may be equitable, just and proper.

Dated: March 7, 2011

For the Secretary:

H. PATRICIA SMITH
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor of Labor
Plan Benefits Security Division

RISA D. SANDLER
Counsel for Fiduciary Litigation

ROBERT FURST
Senior Trial Attorney
Furst.robert@dol.gov
DC Bar # 347211
New York Bar # 1350404

ELIZABETH GOLDBERG
Trial Attorney
Goldberg.elizabeth@dol.gov
New York Bar # 4392312

THOMAS TSO
Trial Attorney
Tso.thomas@dol.gov
DC Bar # 975830

U.S. Department of Labor
P.O. Box 1914
Washington, D.C. 20013
(202) 693-5600

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March, 2011, true and correct copies of the Secretary of Labor's Amended Complaint in the instant case were sent via U.S. mail and electronic mail to the following:

Tab K. Rosenfeld
Steven Michael Kaplan
Rosenfeld & Kaplan, L.L.P.
535 Fifth Avenue  Suite 1006
New York, NY 10017
tab@rosenfeldlaw.com
steve@rosenfeldlaw.com

Robin Bergen
Steven J. Kaiser
Nowell Bamberger
Cleary Gottlieb Steen & Hamilton, LLP
2000 Pennsylvania Avenue, NW
Washington, DC  20006
rbergen@cgsh.com
skaiser@cgsh.com
nbamberger@cgsh.com

Lewis Liman
Jeffrey A. Rosenthal
Cleary Gottlieb Steen & Hamilton, LLP
1 Liberty Plaza
New York, NY 10006
lliman@cgsh.com
jrosenthal@cgsh.com

Brian Whitely
Carolyn Marcotte
Hiscock & Barclay, LLP
One International Place • 26th Floor
Boston, MA 02110
bwhiteley@hblaw.com
cmarcotte@hblaw.com

John Cook
John Nichols
Hiscock & Barclay, LLP
One Park Place
300 South State Street

Syracuse, New York 13202
jcook@hblaw.com
jnichols@hblaw.com

Arthur Glenn Jakoby
David Rosenfield
Herrick, Feinstein, LLP
2 Park Avenue
New York, New York 10016
ajakoby@herrick.com
drosenfield@herrick.com

Barbara Hart
Thomas M. Skelton
Todd S. Garber
Deborah A. Rogozinski
Lowey, Dannenberg, Cohen & Hart
White Plains Plaza
One North Broadway
White Plains, New York  10501
bhart@lowey.com
tskelton@lowey.com
tgarber@lowey.com
drogozinski@lowey.com

Marc Machiz
Lisa Mezzetti
Michelle Yau
Anna K. Ryon
Catherine A. Torell
Karen L. Handorf
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
mmachiz@cmht.com
myau@cohenmilstein.com
lmezzetti@cohenmilstein.com
annaryon@gmail.com
ctorell@cohenmilstein.com
khandorf@cohenmilstein.com

Daniel W. Krasner
Demet Basar
Gregory Mark Nespole
Stacey Theresa Kelly

Kate Marietta McGuire
Daniel Tepper
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
krasner@whafh.com
basar@whafh.com
nespole@whafh.com
skelly@whafh.com
mcguire@whafh.com
tepper@whafh.com

Daniel V. Shapiro
Paul Shechtman
Stillman Friedman & Shechtman, P.C.
425 Park Avenue
New York, New York 10022
dshapiro@stillmanfriedman.com
pshechtman@stillmanfriedman.com

Thomas E. L. Dewey
David Marden
Dewey Pegno & Kramarsky LLP
220 East 42nd Street
New York, NY  10017
tdewey@dpklaw.com
dmarden@dpklaw.com

Robert Morvillo
Gregory Morvillo
Morvillo, Abramowitz, Grand, Iason,
        Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017
rmorvillo@maglaw.com
gmorvillo@maglaw.com

Anthony Albanese
Jonathan Polkes
Weil Gotschal & Manges LLP
767 Fifth Avenue
New York, NY 10153
anthony.albanese@weil.com
jonathan.polkes@weil.com

James Joseph Sabella
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York, NY 10017
jsabella@gelaw.com

Louis Gerard Corsi
Stephen Jacobs
Landman Corsi Ballaine & Ford PC
120 Broadway, 27th Floor
New York, NY 10271
lcorsi@lcbf.com
SJacobs@lcbf.com

Jeffrey Lewis
Margo Hasselman
Andrew Lah
Lewis Feinberg Lee Renaker & Jackson P.C.
476 9th Street
Oakland, California  94607
JLewis@lewisfeinberg.com
mhasselman@lewisfeinberg.com
alah@lewisfeinberg.com

David Preminger
Keller Rohrback
2nd Floor
770 Broadway
New York, NY 10003
dpreminger@KellerRohrback.com

Peter H. LeVan, Jr.
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
plevan@btkmc.com


Dated: March 7, 2011

Thomas Tso
Attorney for the U.S. Department of Labor