UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: BEACON ASSOCIATES LITIGATION | 09 Civ. 777 (LBS) (AJP) |

| | |
|---|---|
| BUFFALO LABORERS SECURITY FUND, WELFARE FUND AND WELFARE STAFF FUND et al., | |
| Plaintiffs, | 09 Civ. 8362 (LBS) (AJP) |
| v. | |
| J.P. JEANNERET ASSOCIATES, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| ERNEST A. HARTMAN et al., | 09 Civ. 8278 (LBS) (AJP) |
| Plaintiffs, | |
| | MEMORANDUM & ORDER |
| v. | |
| IVY ASSET MANAGEMENT LLC, et al., | |
| Defendants. | |

SAND, J.

    Before the Court is Defendant Ivy Asset Management LLC's motion for partial

reconsideration of Judge McMahon's January 4, 2011 Order, granting in part and denying in part

Defendant's motion to dismiss the claims asserted against it in *Buffalo Laborers Security Fund v.*

*J.P. Jeanneret Associates*, *Inc.* ("*Buffalo Laborers*"), No. 09 Civ. 836.  Defendant asks the Court

to reconsider several portions of Judge McMahon's Order, as applied to the claims in *Buffalo*

*Laborers* and, by stipulation of the parties, to the claims in a related case,  *Hartman v. Ivy Asset*

1

*Management LLC* (*"Hartman"*), No. 09 Civ. 8278, with which it has been consolidated for pretrial purposes.  Ivy also moves the Court to dismiss two claims against it raised by the *Hartman* Plaintiffs but not raised in *Buffalo Laborers* and therefore not subject to either Judge McMahon's Order or the parties' stipulation.

For the following reasons, Defendant's motion for partial reconsideration and Defendant's motion to dismiss are granted in part and denied in part.

### I.      Background

*Hartman* and *Buffalo Laborers* are two of a number of lawsuits pending before this Court brought by, or on behalf of, clients of the investment and asset management company, J.P. Jeanneret Associates ("JPJA"), who lost money after they invested in what turned out to be the massive Ponzi scheme orchestrated by Bernard L. Madoff.  The lawsuits concern the liability not of Madoff himself, but of JPJA and Ivy Management Associates LLC ("Ivy"), which entered into an agreement with JPJA in 1991 to provide it access to recommended investment managers, such as Madoff.[1]

Both *Hartman* and *Buffalo Laborers* were originally assigned to Judge McMahon. However, Judge McMahon agreed to transfer the two cases to these chambers in response to the Secretary of Labor's request that all ERISA-related claims against JPJA and Ivy be consolidated before one judge.  *See* Order Transferring ERISA Case (09 Civ. 8278) and Transferring Same to the Docket of the Hon. Leonard B. Sand, Jan. 4, 2011 ("McMahon Order").  In the January 4 Order in which she transferred *Buffalo Laborers* to this Court, Judge McMahon also disposed of

---

[1] A more extensive description of the history of the relationship between Madoff, JPJA, and Ivy can be found in *In re Beacon,* 745 F.Supp.2d 386 (S.D.N.Y. 2010).

the various motions to dismiss raised by the defendants in that case.  By stipulation, the parties in *Hartman* agreed to apply Judge McMahon's Order to the claims in *Hartman*, to the extent they overlapped with the claims in *Buffalo Laborers*.  The defendants expressly reserved the right to appeal and seek reversal of the January 4 Order, as applied to both cases.

In the motion before this Court, Ivy has exercised that right. It has asked the Court to reconsider four of the holdings in Judge McMahon's Order.  It has also asked the Court to dismiss two claims raised by the *Hartman* Plaintiffs that were not raised by the *Buffalo Laborers* Plaintiffs and therefore were not implicated by the January 4 Order or subsequent stipulation.

## II.   The Motions for Reconsideration

Reconsideration of a previous order by the court is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.,* 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citation and internal quotation marks omitted).  To prevail, "the movant must demonstrate 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 701 (S.D.N.Y. 2001) (quoting *Doe v. NYC Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)).  "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256–57 (2d Cir. 1995).

### A.  Claims Relating to the Direct Investors

Ivy first asks this Court to reconsider Judge McMahon's decision to deny its motion to dismiss all claims against it that relate to the "Direct Investors"—those JPJA clients who invested directly in Madoff rather than placing their assets in one of the feeder funds that channeled money to Madoff, such as the Beacon Fund discussed in *In re Beacon Assoc. Litigation* ("*Beacon*"), 745 F. Supp. 2d 386 (S.D.N.Y. 2010).

Ivy makes three arguments in support of reconsideration.  First, it argues that the decision to allow the Direct Investors claim to proceed was without justification given Judge McMahon's statement in the January 4 Order that in disposing of the various motions to dismiss before her, she was relying upon this Court's reasoning in *Beacon*, 745 F.Supp.2d 386 (S.D.N.Y. 2010). *Beacon* did not involve any Direct Investor claims but exclusively concerned claims brought by investors in the Beacon Fund.  Ivy takes this to mean that Judge McMahon  "did not… offer any reason for denying Ivy's motion to dismiss [these claims] other than not wanting to transfer a matter with open motions."  Def.'s Memo Supp. Partial Recons. ("Ivy Memo") 3.  It concludes from this fact that Judge McMahon "left the question [of Ivy's liability towards the Direct Investors] for this Court," and on this ground, urges reconsideration.  *Id.*

Second, Ivy argues that the interests of "justice and judicial efficiency" would be advanced were the Court to reconsider the plausibility of the Direct Investor claims without deference to Judge McMahon's decision.  Ivy Memo 4.  Doing so, it argues, would ensure the same result is reached in these cases and in a related case, *Solis v. Beacon Associates Management Corp.* ("*Solis*"),  No. 10 Civ. 8000, which also involves Direct Investor claims against Ivy (though brought by the Secretary of Labor rather than private plaintiffs) and is also pending before this Court.

4

Third, Ivy argues that the decision was substantively wrong because neither the *Buffalo Laborers* nor the *Hartman* Complaints allege sufficient facts to make out a plausible claim that Ivy acted as a fiduciary with respect to the Direct Investors, under the "investment advice for a fee" prong of the fiduciary definition set out in ERISA §3(21)(A) and approved in *Beacon*.  *See* 745 F. Supp. 2d at 422–23 (citing 29 U.S.C. § 1002(21)(A)).  It accepts Judge McMahon's decision denying its motion to dismiss the claims predicated upon its fiduciary responsibility towards investors in the feeder funds, given the decision in *Beacon* to allow the virtually identical claims raised by the plaintiffs in that case to proceed.  Ivy argues, however, that the holding in *Beacon* does not apply to the Direct Investors, given 1) differences in the nature of the class and 2) differences in the amount of evidence Plaintiffs provide in their Complaints to support the inference that Ivy acted as a fiduciary with respect to this group of investors  by providing them  "individualized" investment advice, "on a regular basis,"  "pursuant to a mutual agreement, arrangement or understanding, that such services will serve as a primary basis for investment decisions with respect to plan assets," as the regulations require.  *See* 29 C.F.R. § 2510.3–21(c)(1)(ii)(B).[2]

Ivy notes, for example, that unlike investors in feeder funds like the Beacon Fund, none of the Direct Investors signed contracts with JPJA in which Ivy was named specifically as an

---

[2] In making this argument, Ivy incorporates arguments it made in the motion to dismiss it filed on February 16, 2011 in *Solis*.  Plaintiffs challenge the validity of this act of incorporation on the grounds that Ivy's decision to answer the Amended Complaint the Secretary of Labor filed in response to its motion to dismiss, rather than to renew the motion, makes the original motion "moot" and hence unavailable for incorporation.  *See* Pls.' Memo Opp. Partial Recons., *Hartman*, No. 09 Civ. 8278, 5–6; Pls.' Memo Opp. Partial Recons., *Buffalo Laborers*, No. 09 Civ. 836, 1–2.  This argument is not persuasive.  The fact that Ivy chose to answer the Amended Complaint in Solis says nothing about the viability or validity of the arguments it made in the motion to dismiss.  In considering Ivy's arguments for reconsideration, this Court has therefore taken into account arguments Defendant made in the *Solis* motion to dismiss, as well as in both the briefs it filed in support of reconsideration of the McMahon Order.

"investment advisor."  Def.'s Memo. Supp. Mot. Dismiss, *Solis*, No. 10 Civ. 8000, 12.   It also

notes that, whereas feeder funds like Beacon were single, homogenous entities, the Direct

Investors represented "dozens of separate and distinct entities, each of which possessed its own

investment portfolio and needs, its own individual trustees, its individual relationship with JPJA

and its own independent account with Madoff."  Def.'s Reply Memo Further Supp. Partial

Recons. 3–4.  Ivy argues that this fact means that it would have been extremely difficult, even

impossible, to provide individualized investment advice to all of the Direct Investors, and

unlikely that it would have agreed to do so.  *Id.* at 4.   These factual differences,  it claims, in the

nature of the Direct Investors as a class and in the amount of evidence about them provided in

the Complaints, mean that Plaintiffs have failed to make out a claim that is, as Fed. R. Civ. P.

12(b)(6) requires, "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

For this reason, it argues, Judge McMahon's decision should be reconsidered, and the Direct

Investor claims dismissed.

      None of these arguments are persuasive.  The fact that Judge McMahon failed to provide

an explicit justification for her decision is, on its own, obviously insufficient to justify

reconsideration under the strict standard imposed on motions to reconsider in the Second Circuit.

Ivy has not demonstrated that Judge McMahon's decision is in conflict with our decision in

*Beacon*.  It has merely pointed out that the decision is not easily explained by the *Beacon*

decision.  An absence of justification is not the same thing, however, as the presence of error or

likelihood of injustice a party moving for reconsideration must demonstrate to prevail in the

Second Circuit.  *Doe v. NYC Dep't of Soc. Servs.*, 709 F.2d at 789.  This standard is not affected

by Judge McMahon's indication in the January 4 Order that she was personally amenable to this

Court's reconsideration of her decision concerning the Direct Investor claims.  McMahon Order

2.  Judge McMahon's personal openness to reconsideration does nothing to mitigate the efficiency and cost concerns that make the bar for motions to reconsider so high.  It certainly does not mean that we will treat the Direct Investor claims as if they are originally before this Court.

Ivy's second argument is also not persuasive.  The fact that the claims against the Direct Investor will proceed in *Solis*, regardless of the disposition of these claims, means that any gains in judicial efficiency achieved by dismissing the Direct Investor claims in these cases will be slim to none.  Doing so would mean only that the *Hartman* and *Buffalo Laborers* Plaintiffs would be unable to argue these claims on their own behalf.  Reconsidering Judge McMahon's decision regarding the Direct Investors thus seems more likely to result in disuniformity and injustice than the reverse.

Finally, although Ivy's evidentiary arguments may point to potentially significant differences between the Direct Investor and feeder fund claims, they are not sufficient to justify reconsideration under the strict Second Circuit standard.  Ivy points to no case law demonstrating that Judge McMahon's conclusion was in clear error.  *See Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. N.Y. 1981) (noting that "mere doubt . . . is not enough" to warrant reconsideration of a prior decision) (quoting *Zdanok v. Glidden*, 327 F.2d 944, 953 (2d. Cir. 1964)).  Nor does Ivy provide any evidence that, in reaching her decision, Judge McMahon overlooked controlling decisions or data that would "reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d at 256–57.  For these reasons, Defendant's motion to reconsider with respect to the Direct Investor claims is denied.

**B.  The Prohibited Transaction Claim**

Ivy also moves the Court to reconsider Judge McMahon's decision to deny its motion to dismiss Count Four of the *Buffalo Laborers* Complaint, as applied by stipulation to Count Four of the *Hartman* Complaint as well.  Both claims assert that, by receiving fees based on the falsely-inflated value of Madoff-invested assets, Ivy violated ERISA § 406(a)(1)(c), which prohibits transactions in which plan fiduciaries cause the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.  29 U.S.C. § 1106(a)(1)(c).

Ivy argues that the decision to allow these claims to proceed must have been a mistake, given Judge McMahon's  reliance upon our decision in *Beacon,* which dismissed a very similar prohibited transaction claim because of lack of evidence that, when it received its excessively inflated fees, Ivy knew or should have known that they were the result of fraud.  *Beacon*, 745 F. Supp. 2d at 421 (noting that, to succeed on a prohibited transaction claim, plaintiffs must show that the defendant "knew or should have known that the transaction constituted" a prohibited transaction) (citing *Reich v. Compton,* 57 F.3d 270, 280 (3d Cir.1995)).  This argument is more persuasive than the previous argument regarding the Direct Investors since, in denying Ivy's motion to dismiss this claim,  Judge McMahon didn't merely depart from the four corners of *Beacon's* text but appears to have reached a result in direct conflict with it.  It is therefore difficult to understand how Judge McMahon reached this result other than in error.

Plaintiffs attempt to resolve this difficulty by distinguishing their prohibited transaction claim from the one raised in *Beacon*.  The *Hartman* Plaintiffs argue that their claim differs from the prohibited transaction claim alleged by the plaintiffs in *Beacon* because it does not require them to prove that Ivy knew that Madoff was running a Ponzi scheme but instead alleges only that Ivy knew or should have known that "Madoff was falsifying returns in some way, even if they did not know the mechanism."  Pls.' Memo Opp. Partial Recons., *Hartman*, No. 09 Civ.

8

8278 ("Hartman Opp'n"), 26.  In fact, in *Beacon,* we dismissed the plaintiffs' prohibited transaction claim not because we found insufficient evidence in plaintiffs' complaint that Ivy knew, or should have known, that Madoff was running a Ponzi scheme but because we found insufficient evidence in the Complaint to "support the inference that Ivy knew or should have known that Madoff was falsifying account statements."  745 F. Supp. 2d at 428.  This is essentially the same allegation the *Hartman* Plaintiffs raise; their attempt to distinguish the claims on the basis of the law therefore fails.

The *Buffalo Laborers* Plaintiffs meanwhile attempt to distinguish the claims on the basis of the facts, rather than the law, arguing that even if the plaintiffs in *Beacon* pled insufficient facts in their Complaint to raise a plausible inference that Ivy knew or should have known that the asset values were falsely reported, their Complaint does not suffer from the same deficiency. This argument is also unpersuasive, given that almost all of the facts they invoke to support the inference that Ivy knew or should have known of the false asset values was also discussed or averred to in our opinion in *Beacon*.  *Compare* Pls.' Memo Opp. Partial Recons., *Buffalo Laborers*, No. 09 Civ. 836 ("Buffalo Laborers Opp'n"), 20–21 (citing Buffalo Laborers First Am. Compl. ("BLFAC") ¶¶ 113, 114, 116, 118–21, 126–29, 133, 137),  *with Beacon,* 745 F. Supp. 2d at 397–99.

Plaintiffs' failure to distinguish their claims from the prohibited transaction claim dismissed in *Beacon* means that Judge McMahon's decision with respect to it must be understood as an oversight that failed to take into account "matters . . . that might reasonably be expected to alter the conclusion reached by the court."  *Shrader*, 70 F.3d at 257.  For this reason, Ivy's motion to reconsider this portion of the McMahon Order is granted and, for the reasons

provided in *Beacon*, 745 F. Supp. 2d at 427–28, the prohibited transaction claims asserted in Count Four of the *Buffalo Laborers* and *Hartman* Complaints are dismissed.

### C. Claims Against the Ivy Committee Defendants

Ivy also moves the Court to reconsider Judge McMahon's decision to allow claims against the Ivy Manager Approval Committee, the Ivy Investment Committee and the Ivy Strategic Operating Committee ("the Ivy Committee Defendants") to proceed. It argues that the decision is in conflict with this Court's decision in *Beacon,* dismissing all claims against individual Ivy employees other than Lawrence Simon, Howard Wohl, and Adam Geiger on the grounds that "conclusory assertions and descriptions of job titles," are insufficient to state a claim for fiduciary liability under ERISA. *Beacon*, 745 F. Supp. 2d at 428. In her January 4 Order, Judge McMahon applied this reasoning to similarly dismiss all claims against individual Ivy employees other than Simon, Wohl, and Geiger for presumably this reason. Ivy argues that this reasoning applies equally to the claims Plaintiffs raise against the Ivy Committee Defendants and that Judge McMahon's failure to dismiss the claims against the Committee was therefore an oversight, meriting reconsideration.

Ivy also points to contrary decisions that it suggests Judge McMahon overlooked. These include a district court opinion and a recommendation from a magistrate judge which conclude that committees cannot be fiduciaries under ERISA, given the exclusion of the term "committee" from the list of eleven categories of "persons" subject to personal liability for breach of fiduciary duty provided in ERISA § 3(9), 29 U.S.C. § 1002(9). *Tatum v. R.J. Reynolds Tobacco Co.*, No. 02 Civ. 00373 (T), 2007 WL 1612580, at *8 (M.D.N.C. May 31, 2007) (arguing that "[g]iven the comprehensive nature of ERISA, the omission of "committee" from that definition [provided in 29 U.S.C. § 1002(9)] cannot be considered simply a drafting oversight" and concluding that

10

"[c]ommittees are . . . not properly subject to ERISA breach of fiduciary duty claims"); *David v. Alphin*, No. 07 Civ. 11I (DLH), 2008 WL 5244483, at *9 (W.D.N.C. July 22, 2008) (recommending the dismissal of ERISA claims based on committee liability for the reasons articulated in *Tatum*).  Ivy also cites a New Jersey district court opinion that dismissed ERISA claims against a corporate Compensation Committee because it found that the committee "[was] not, by itself, a legal entity having the capacity to sue or be sued."  *In re RCN Litig.,* No 04 Civ. 5068 (SRC), 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006).

The *Buffalo Laborers* Plaintiffs cite in response competing district court opinions that conclude that committees *are* proper defendants under ERISA.[3]  They cite for example a recent decision from the Southern District of New York in which Judge Baer concluded specifically that internal committees should be considered proper defendants for ERISA breach of fiduciary duty claims, given the breadth of the definition of fiduciary provided by 29 U.S.C. § 1002(9). *Veera v. Ambac Plan Admin. Comm.,* No. 10 Civ. 4191, 2011 WL 43534 (S.D.N.Y. Jan. 6, 2011) (noting that ERISA defines "person" broadly "to include such informal entities as an 'unincorporated organization, association, or employee organization" and concluding that committees are a like kind of entity).  They cite as well a Texas district court case from 2003, which held that "when an administrative committee acts in the denial of plan benefits or as a fiduciary in breach of its fiduciary duties, it may be sued."  *In re Enron Corp. Secs., Derivative & ERISA Litig*., 284 F. Supp. 2d 511, 617 (S.D. Tex. 2003).  They also note that there is no evidence that Judge McMahon's failure to dismiss the claims against the Ivy Committee Defendants was an oversight, given that the issue was fully briefed by both sides.

---

[3] The *Hartman* Plaintiffs do not contest Ivy's motion to reconsider and dismiss the claims against the Committee Defendants.  Hartman Opp'n 5 n.7.

Plaintiffs' argument is the more persuasive, given the greater proximity and recency of Judge Baer's ruling and the lack of any necessary conflict between Judge McMahon's decision and the *Beacon* opinion, which did not in fact rule one way or the other on the issue of the Committee Defendants, since none of the defendants named in *Beacon* were committees. As Ivy points out, the holdings in *Veera* and *In re Enron Corp.* are inconsistent with a well-established line of precedent, holding that unincorporated subdivisions of a corporate entity have no legal personality and cannot satisfy judgments or be sued.  Ivy Memo 13–14 (citing *United States v. ITT Blackburn Co*., 824 F.2d 628, 631 (8th Cir. 1987); *Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 654 (S.D.N.Y. 1998); *Salzstein v. Bekins Van Lines, Inc.,* 747 F. Supp. 1281, 1282 n.11 (N.D. Ill. 1990); *EEOC v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 76 (D.D.C. 1999), *aff'd* 254 F.3d 315 (D.C. Cir. 2000)).  It is not obvious, however, that these precedents can or should apply to ERISA claims, given evidence in the legislative history of Congress's broad remedial goals and the breadth of the statutory language.  *In re Enron Corp.*, 284 F. Supp.2d at 544 ("Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives.") (quoting *Arizona State Carpenters Pension Trust Fund v. Citibank (Arizona),* 125 F.3d 715, 720 (9th Cir. 1997)).

Furthermore, although it is true that the *Hartman* and *Buffalo Laborers* Complaints do not provide extensive factual support for the claims against the Ivy Committee Defendants,  they do arguably provide more than merely "conclusory assertions and job titles."  Both Complaints cite, for example, the description of the functions and responsibilities of the various committees provided in the Form ADV filings Ivy deposited with the Securities and Exchange Commission to support their assertions that the named committees functioned as fiduciaries with respect to both the Direct Investors and the investors in the feeder funds.  BLFAC ¶¶ 49, 50; Hartman

Second Am. Compl. ("HSAC") ¶¶ 38–40.  Because it fails to demonstrate either clear error or oversight on Judge McMahon's part, Ivy's  motion for reconsideration with respect to the Committee Defendants is denied.

### D.  The Disgorgement Claim

The last portion of the January 4 Order that Ivy moves the Court to reconsider is Judge McMahon's decision to deny its motion to dismiss the disgorgement claim against it raised in Count Five of the *Buffalo Laborers* Complaint to proceed, as applied, by stipulation, to Count Six of the *Hartman* Complaint.  These claims assert that, in the event that Ivy is not found to be an ERISA fiduciary, it would still be jointly and severally liable under ERISA's civil remedial provision, § 502(a)(3), 29 U.S.C. § 1132(a)(3), for disgorgement of all profits generated from the unlawful transactions of others, if shown to have had actual or constructive knowledge of the circumstances that rendered those transactions unlawful.

Ivy asserts that these claims, for the disgorgement of a non-fiduciary, have no basis in law and that, in allowing them to proceed, Judge McMahon committed a clear error that warrants reconsideration.  It points to case law that purportedly supports this point, including an opinion from the Eleventh Circuit Court of Appeals, *Herman v. South Carolina National Bank*, 140 F.3d 1413 (11th Cir. 1998), which provides that "ERISA contains no provision requiring non-fiduciaries to avoid participation in a fiduciary's breach of fiduciary duty;" as well as a 1993 Supreme Court opinion,  holding that non-fiduciaries cannot be liable under ERISA for ordinary money damages.  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)  (cited by *Gerosa v. Savasta & Co.*, 329 F.3d 317, 322 (2d Cir. 2003)).

These cases do not render Judge McMahon's decision in error.  Although they make clear that non-fiduciaries have no *obligation* to avoid participating in a breach of fiduciary duty, they

13

also note that when non-fiduciaries *do* participate in a fiduciary breach, they may be liable for equitable relief, even if not ordinary money damages. *See Mertens,* 508 U.S. at 255 (recognizing that nonfiduciaries may be liable under ERISA § 502(a)(3) for equitable relief such as injunction or restitution)*; Herman,* 140 F.3d at 1422 (following *Mertens* in finding that "non-fiduciaries may be… required under § 502(a)(5) to disgorge ill-gotten plan assets or profits obtained through participation in transactions prohibited by [ERISA] § 406"); *Gerosa*, 329 F.3d 317 at 321 (identifying "the antique equitable remedy of restitution" as a form of equitable relief for which a non-fiduciary may be liable under ERISA) (citing *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 144-45 (2d Cir. 1999)).

In the alternative, Ivy argues that even if in some cases non-fiduciaries may be liable under ERISA for equitable relief, relief is not available in this case because the relief Plaintiffs demand—namely, the disgorgement of the profits Ivy received from its contract with JPJA—is legal, rather than equitable, in nature.  This argument also fails.  Although  a demand for the restitution or disgorgement of money or property is usually characterized as equitable only when the action seeks "to restore to the plaintiff particular funds or property in the defendant's possession," *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214 (2002)—rather than,  as is the case here, general profits received pursuant to contract—the Supreme Court has carved out from this rule an exception for "profits produced by the defendant's use of [the plaintiff's] property."  The demand for the disgorgement of profits of this kind will be characterized as equitable, "even if [the plaintiff] cannot identify a particular *res* containing the profits sought to be recovered."  *Id.* at 214 n.2.  *See also Harris Trust & Savings Bank, v. Salomon Smith Barney Inc.,* 530 U.S. 238, 243 (2000) (recognizing as equitable relief both the

14

restitution of money or property originally belonging to the plaintiff and the disgorgement of any profits made by the defendant upon its sale).

Plaintiffs' disgorgement claim fits within this limited exception.  Although the profits Plaintiffs seek to recover from Ivy cannot be clearly traced to a particular sum of money or property once clearly in Plaintiffs' possession,  they are alleged to result from the improper use of Plaintiffs' property.  The relief Plaintiffs seek can therefore be characterized as equitable, under the exception set forth in *Knudson.  See also FTC v. Verity Int'l, Ltd*., 443 F.3d 48, 66-67 (2d Cir. 2006) ("We emphasize that equitable restitution is not limited to an award of the very funds that unjustly enriched the defendant and are still in the defendant's possession. Rather, tracing principles apply to allow a plaintiff to follow unjustly obtained funds into their product in the defendant's possession.").  The motion for reconsideration with respect to the disgorgement claim is therefore denied.

### III. The Motions for Dismissal

Ivy also moves the Court to dismiss two claims raised by the *Hartman* plaintiffs that were not raised in *Buffalo Laborers* and therefore not affected, either directly or via stipulation, by Judge McMahon's January 4 Order.  The parties have agreed that these claims should be governed by the ordinary standards imposed on motions to dismiss under Fed. R. Civ. P. 12(b)(6).  To survive dismissal under this standard, "the plaintiff must provide the grounds upon which his claim rests through 'factual allegations sufficient to raise a right to relief above the speculative level.'"  *ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all

15

reasonable inferences in favor of the plaintiff. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999). Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 ( 2009). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1940 (citing *Twombly*, 550 U.S. at 570).

## A.  The Failure To Act in Accordance with Plan Documents Claim

Ivy asks the Court to dismiss Count Three of the *Hartman* Complaint, which alleges that, by failing to ensure that investments in the Income-Plus Fund were diversified—as the plan documents promised they would be—Ivy violated ERISA § 404(a)(1)(D), which requires fiduciaries to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Ivy argues that because it was JPJA, not itself, that was exclusively responsible for plan diversification, it cannot be held responsible for the plan's failure to diversify.

Indeed, the Court of Appeals of the Second Circuit has made clear that ERISA imposes liability on fiduciaries only with respect to those actions over which they exercise authority and control. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) ("As this Court has observed, 'a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility.'") (quoting *HL Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987)). Ivy points to the 1993 and 2003 Income-Plus Fund Offering Memoranda ("OMs"), both of which  assert that "all decisions regarding the investment, maintenance and withdrawal of Investment Fund assets will be made by the Investment Manager [JPJA] in its sole and absolute discretion," Ivy Memo 10 (citing Rosenthal

Decl., Exs. A, B),  as evidence that it possessed neither authority or control over plan diversification, and therefore cannot be held liable for any losses plaintiffs sustained as a result of the failure to diversity Plan assets.  It also points to the Discretionary Investment Management Agreements investors signed when they invested in the Income Plus Fund, which vested responsibility for ensuring the diversification of the Fund with JPJA.  Ivy Memo 10 (citing HSAC ¶ 101).

The *Hartman* Plaintiffs argue in response that, notwithstanding what the plan documents say, facts introduced in the Complaint demonstrate that Ivy did in fact exert control over whether, and to what extent, Plan assets were invested with Madoff and that the claim for relief asserted in Count Three is therefore a plausible one.  They note, for example, an email from Lawrence Simon, quoted in the Complaint, in which Simon acknowledges Ivy's role as an "asset allocator" with respect to Madoff-invested funds.  Hartman Opp'n 39 (quoting HSAC ¶ 180).  They also point to the evidence in the Complaint demonstrating Ivy's importance as a "conduit" between JPJA and Madoff.  *Id.*

These facts are insufficient to raise the right to relief above a speculative level.  Although they do support the inference that Ivy acted as a fiduciary with respect to the Investment Plus Fund by providing it regular, individualized investment advice for a fee—as this Court previously concluded in *Beacon*, 745 F.Supp.2d at 426—they do not demonstrate that Ivy actually possessed authority over the ultimate composition of the Fund, or its diversification.  They do not, for example, demonstrate that Ivy possessed the authority to *prevent* JPJA from investing Investment Plus Fund assets with other managers if it so chose.  Nor do they provide any reason to believe that Ivy possessed any authority over, or knowledge about, the extent to which Madoff himself ensured the diversification of the Fund.

Because Plaintiffs fail to plead any facts showing that Ivy possessed a significant degree of control over the diversification of plan assets, they fail to state a claim for relief under ERISA ERISA § 404(a)(1)(D) that is plausible on its face.  For this reason, the motion to dismiss Count Three of the *Hartman* Complaint is granted.

**B.  The "Anti-Kickback" Claim**

Ivy also moves the Court to dismiss Count Eight of the *Hartman* Complaint, which charges Ivy with violating ERISA § 406(b)(3),  or what Ivy refers to as the "reverse kickback" provision.  This provision prohibits a plan fiduciary from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(3).  Plaintiffs claim that the fees Ivy received from JPJA violated this provision because they resulted from transactions involving the assets of the plan (namely, the decision to invest plan assets with Madoff) made by a party dealing with the plan (namely, JPJA) that Ivy received for its "own personal account."  HSAC ¶¶ 249–250.

Ivy argues that Plaintiffs fail to state a plausible claim for relief under this provision because ERISA § 406(b)(3) applies only to transactions in which a plan fiduciary, with discretionary investment authority over the plan, causes plan funds to be invested with a third party in exchange for some benefit to itself.  Ivy Memo 7–8.  It argues in other words that § 406(b)(3) does not apply to those, like Ivy, who qualify as fiduciaries under ERISA because they provide "investment advice for a fee," not because they exert discretionary control over plan assets.  *See* 29 U.S.C. § 1002(21)(A) (describing the various kinds of fiduciaries recognized by the statute).  For this reason, it claims that Plaintiffs would only have made out a plausible claim under  § 406(b)(3) if they had alleged that the money "flowed in the other direction," so that it

18

was Ivy (or some other third party) paying JPJA in connection with transactions involving plan assets, not JPJA paying Ivy.[4]  Ivy Memo 8.

This argument is unpersuasive.  Although Ivy cites a number of cases in which courts have found  payments from third parties to fiduciaries with discretionary authority over plan assets to violate § 406(b)(3), it cites no cases which declare this to be the *only* kind of transaction prohibited by the provision, or which preclude § 406(b)(3) from applying to other kinds of ERISA fiduciaries.  Several of the cases it cites instead note the broad range of conduct to which Congress intended the provision to apply.  *See Chao v. Linder*, No. 05 Civ. 3812 (JBM), 2007 WL 1655254, at *7 (N.D. Ill. May 31, 2007) (noting Congress's intent to "prevent fiduciaries from engaging in *any* conduct that might have the potential to cause them to be disloyal to the plan");  *Brink v. Da Lesio*, 496 F. Supp. 1350, 1367-1368 (D. Md. 1980) (arguing for a strict construal of the prohibited transaction provision in light of Congress's broad remedial aims).

---

[4] To further support its narrow reading of § 406(b)(3) Ivy cites a Department of Labor Advisory Opinion stating that "a fiduciary does not engage in an act described in section 4975(c)(1)(E) [of the Internal Revenue Code] if the fiduciary does not use any of the authority, control or responsibility which makes such person a fiduciary to cause a plan to pay additional fees for a service provided by such fiduciary or to pay a fee for a service furnished by a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary." DOL Adv. Op. 2005-1 A, 2005 WL 1208697, at *5 (May 11, 2005) (quoted in *Ruppert v. Principal Life Ins. Co*., No. 07 Civ. 344, 2009 WL 5667708, at *24 (S.D. Iowa Nov. 5, 2009).  Although directly addressed to transactions prohibited by the Internal Revenue Code, the Department of Labor noted in the Opinion that the same analysis provided therein would apply equally to transactions prohibited by ERISA § 406(a) and (b).  *Id.*  Ivy thus invokes the Opinion to argue that, because Plaintiffs do not allege that Ivy caused the plan to pay additional fees for its services, or caused it to pay for services from a third party in whom Ivy had an interest, no violation of § 406(b)(3) occurred.  We do not agree.  "Advisory opinions, unlike regulations produced pursuant to 'a formal adjudication or notice-and-comment rulemaking,' do not have 'the force of law.' *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  As such, interpretations contained in an advisory opinion "are entitled to respect . . . , but only to the extent that those interpretations have the power to persuade." *Id.*  In this case, we do not find the narrow interpretation of the § 406(b) provided in the Advisory Opinion persuasive, given 1) the exhortation by the Second Circuit to construe § 406(b) broadly, 2) the fact that the Opinion was written to address questions of liability under the Internal Revenue Code and only in passing was applied to ERISA, and 3) the general disfavor towards this interpretation of the prohibited transaction provision evident in the case law.  *See, e.g., Ruppert v. Principal Life Ins. Co*., No. 07 Civ. 344, 2010 WL 6794683 (S.D. Iowa Mar. 31, 2010), *vacating* 2009 WL 56677;  *Chao v. Linder*, No. 05 Civ. 3812 (JBM), 2007 WL 1655254 (N.D. Ill. May 31, 2007).

This legislative history has led the Second Circuit to call for § 406(b) to be "broadly construed." *Lowen v. Tower Asset Management*, 829 F.2d 1209, 1213 (2d Cir. 1987).  In light of this command, we refuse to limit the application of the provision to apply only to one kind of ERISA fiduciary, as Ivy suggests.  Instead, we construe it to apply to any transaction in which an entity that qualifies as a fiduciary under *any* of the prongs provided in § ERISA 3(21)(A) receives compensation for services it provides in its capacity as plan fiduciary from a party "dealing with such plan" and in connection to a transaction involving plan assets.

Under this standard, Plaintiffs have made out a plausible claim for relief.  Ivy does not contest Plaintiffs' assertion that it received consideration from JPJA for services it provided in its capacity as investment advisor and in connection with transactions involving plan assets. This Court has previously found that, in providing investment advice to JPJA, Ivy was acting as an ERISA fiduciary.  *Beacon,* 745 F. Supp. 2d at 422–23.  In their Amended Complaint, Plaintiffs also plead  sufficient facts to make it plausible to infer that the consideration Ivy received from JPJA was "for its own personal account" insofar as it was "receive[d] . . .  as a result of its fiduciary function . . .  [and] could be used to benefit the fiduciary at the expense of plan participants or  beneficiaries."  *Haddock v. Nationwide Fin. Servs. Inc.*, 419 F. Supp. 2d 156, 169-170 (D. Conn. 2006).  The fact that Ivy received payment from JPJA *only* when it recommended its clients invest in Ivy-recommended managers may well have provided Ivy a significant incentive to tailor its investment advice to favor such recommendations even "at the expense of plan participants or beneficiaries," thus potentially creating the kind of conflict between its self-interest and its fiduciary duty that § 406(b)(3) was drafted in order to combat.

Plaintiffs have thus met their burden with respect to all of the elements in a § 406(b)(3) claim.  Ivy could potentially defend against this claim were it able to show that the payments it

received from JPJA were covered by the exemption from liability that ERISA § 408(c)(2) provides for "reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of duties with the plan." 29 U.S.C. § 1108(c)(2).  It has not done so thus far, however.  The burden of proving that payments that otherwise would violate § 406(b) are covered by the § 408 exemption lies squarely with the defendant. *See Lowen,* 829 F.2d at 1215 (holding that the burden is on the defendant to prove, by clear and convincing evidence, that the 408(c)(2) exemption applies because "the compensation it received was for services other than a transaction involving the assets of a plan").  The motion to dismiss Count Eight of the *Hartman* Complaint is therefore denied.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for reconsideration is denied with respect to the Direct Investor, Committee Defendant, and Disgorgement Claims and granted with respect to the Prohibited Transaction Claim (Count Four of the *Hartman* and *Buffalo Laborers* Complaints), and Defendant's motion to dismiss is granted with respect to Count Three and denied with respect to Count Eight of the *Hartman* Complaint. [5]

SO ORDERED.

Dated: September 26, 2011
   New York, NY

           _____
                U.S.D.J.

---

[5] The Court has considered all of the parties' other arguments and found them to be moot or without merit.

21