UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: BEACON ASSOCIATES LITIGATION

This Document Relates to:

ALL ACTIONS

**MEMORANDUM**
**& ORDER**
09 Civ. 777 (LBS)

---

Sand, J.,

Plaintiffs in these consolidated cases are investors in the Beacon Associates LLC I and II investment funds (collectively, the "Beacon Fund" or "Fund") who lost money when the Fund invested its assets with Bernard Madoff ("Madoff") and his firm, Bernard L. Madoff Securities LLC ("BLMIS"). Plaintiff bring claims under §§ 10(b) and 20(a) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78(t)(a), the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-15, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against various individuals and companies associated with the Fund.

Plaintiffs have moved the Court, pursuant to Federal Rule of Civil Procedure 23, to certify two classes and two subclasses. For the reasons provided below, Plaintiffs' motion is granted.

I.      **Background[1]**

Plaintiffs are union pension funds and individuals who invested in the Beacon Fund between 2000 and 2008 and who suffered losses after the Fund invested a majority of its assets with Madoff and BLMIS. As is by now well known, Madoff did not use the funds entrusted to him by investors such as the Beacon Fund to engage in trading, as he claimed; instead, he used new clients' money to prop up the massive Ponzi scheme he ran for almost twenty years by using

---

[1] A more detailed description of the facts of this case is provided in *In re Beacon Assoc. Litig.*, 754 F. Supp. 2d 386, 393 (S.D.N.Y. 2010).  Unless otherwise indicated, all facts in the Background section are taken from that opinion, and the documents on which it relied.

it to provide fictitious "returns" for older clients. The scheme was eventually discovered and on December 11, 2008, Madoff was arrested by federal officials. He later pled guilty to securities fraud and related offenses, and was sentenced to 150 years in prison.  Soon after Madoff's fraud became public, on December 11, 2008, BAMC informed its members that it was going to liquidate the fund and distribute its remaining assets to the members. The Fund's Madoff investments—which were considerable—were written off as a loss.[2]

On June 21, 2010 Plaintiffs filed the Second Amended Class Action and Derivative Complaint ("SAC"). In the SAC, they brought claims under the Exchange Act, the IAA, ERISA and New York state law against a variety of individuals and institutions associated with the Beacon Fund for various misrepresentations and breaches of fiduciary duty committed in connection to the Fund's Madoff investments. Defendants moved to dismiss the case in its entirety.

In an Order filed on October 5, 2010, we dismissed Plaintiffs' state law claims but sustained a number of Plaintiffs' federal claims against three sets of actors: first, Beacon Associates Management Corporation ("BAMC"), the entity that operated the Beacon Fund, as well as its founders, Harris Markhoff ("Markhoff") and Joel Danziger ("Danziger") (collectively the "Beacon Defendants"); second, J.P. Jeanneret Associates, Inc. ("JPJA"), which provided investment advice to the ERISA-covered pension plans that invested in the Fund, its president John P. Jeanneret, Ph.D. ("Jeanneret"), and director Paul L. Perry ("Perry") (collectively, the "Jeanneret Defendants"); third, Ivy Asset Management LLC ("Ivy"), its founders Lawrence Simon ("Simon") and Howard Wohl ("Wohl"), and Ivy executives Fred Sloan ("Sloan") and

---

[2] Litigation subsequently ensued over the calculation method used to determine what proportion of the Beacon Fund's remaining assets was returned to each member. *See Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, 725 F. Supp. 2d 451 (S.D.N.Y. 2010).  No one disputed, however, BAMC's assumption that the $358 million the Fund had invested with Madoff as of December 11, 2008 was a "theft loss." *Id.* at 452.

Adam Geiger (Geiger") (collectively the "Ivy Defendants"). *In re Beacon*, 754 F. Supp. 2d 386 (S.D.N.Y. 2010) ("the October 5 Order"). Ivy provided JPJA and BAMC research and advice about investment managers for their clients' funds. During the relevant period, it also provided JPJA and BAMC access to what at the time were Madoff's coveted investment services.

In the October 5 Order, we held that Plaintiffs had adequately alleged that the Ivy Defendants engaged in securities fraud and breached their obligations as ERISA fiduciaries when they failed to inform either JPJA or BAMC about the serious doubts concerning the legitimacy of Madoff's operations that they began to have as early as the mid 1990s, if not before. *Id.* at 410-411. We also found that Plaintiffs had adequately alleged that the Beacon Defendants engaged in securities fraud and breached their ERISA fiduciary duties when they failed to disclose to the members of the Beacon Fund that, as a result of amendments to their contract with Ivy in December 2006 that absolved Ivy of any responsibility to provide BAMC advice or information about Madoff, no due diligence would be performed on Madoff's management of the Fund's assets.[3] *Id.* at 414. We sustained similar allegations against the Jeanneret Defendants for their failure to disclose to their clients that they would not be able to fulfill their contractual obligation to "supervise and direct the investment of [their clients' assets]." *Id.* at 414–415. We concluded that the Jeanneret Defendants must have realized that they would be unable to actively supervise the management of their clients' assets no later than December 1, 2007, when JPJA's contract with Ivy was amended to explicitly exclude Madoff from the list of investment managers for whom Ivy provided JPJA research, monitoring and advice. *Id.* at 414–415.

Plaintiffs now move the Court to certify two classes and two subclasses. To litigate their Exchange Act and IAA claims, Plaintiffs seek certification of a class ("the Investor Class")

---

[3] Prior to the 2006 contractual amendments, Ivy was obligated under the terms of its contract with BAMC to calculate on an ongoing basis the value of the Fund's Madoff investments, as well as to perform other administrative duties with respect to the Fund's Madoff investments. *In re Beacon,* 754 F. Supp. 2d at 396.

consisting of all investors in the Beacon Fund who had not redeemed their interest in the Funds as of Dec. 11, 2008—the date of Madoff's arrest. They also seek certification under 23(b)(3) of a subclass of this class consisting of all investors who invested in the Beacon Funds as the result of the investment advice of the Jeanneret Defendants ("the Jeanneret Investor Subclass").

To litigate their ERISA claims, Plaintiffs seek certification under Rule 23(b)(1), or in the alternative Rule 23(b)(3), of a class consisting of all fiduciaries, participants and beneficiaries of any ERISA-covered employee benefit plan that invested in the Beacon Fund at any time through the present (the "ERISA Class"). They also seek certification of a subclass of this class consisting of all ERISA-covered employee benefit plans that invested in the Beacon Fund as a result of the investment managements services of the Jeanneret Defendants ("the Jeanneret ERISA Subclass").

## II.    Standard of Review

Plaintiffs seeking class certification bear the burden of demonstrating by a preponderance of the evidence that the proposed class or subclass meets each of the requirements for class certification set forth in Federal Rule of Civil Procedure 23. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 202 (2d Cir. 2008); Fed. R. Civ. P. 23(c)(5) ("[A] class may be divided into subclasses that are each treated as a class under this rule."). When assessing the merits of a motion for class certification, a court must take into account "all of the relevant evidence admitted at the class certification stage." *Teamsters,* 546 F.3d at 202 (quoting *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.),* 471 F.3d 24, 42 (2d Cir. 2006)). The court must determine that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re IPO*, 471 F.3d at 41. "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23

4

requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.* However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.*

In the Second Circuit, "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility" when assessing motions for class certification. *Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). "[I]f there is an error to be made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'" *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 275 (S.D.N.Y. 2008) (quoting *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir. 1968)).

### III.    Discussion

#### A.    The Investor Class and Jeanneret Investor Subclass

Plaintiffs seek certification of the Investor Class and Jeanneret Investor Subclass under Rule 23(b)(3), which allows certification when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Defendants challenge the adequacy of the proposed class and subclass on a number of grounds. First, the Ivy Defendants argue that some or all of the members of the class lack standing to pursue the federal securities claims against them. Second, Ivy Defendants argue that the class claims are barred by the statute of repose set forth in 28 U.S.C. §1658(b)(2). Third, Ivy Defendants argue that the Investor Class, as Plaintiffs define it, is overbroad, because it includes members who invested in the Beacon Fund after December 1, 2006—the date Ivy amended its

contract with BAMC. They argue that the Jeanneret Investor Subclass is similarly overbroad because it includes members that invested in the Beacon Fund after December 31, 2007—the date on which Ivy amended its contract with JPJA. Finally, Defendants argue that Plaintiffs fails to show that the class satisfies the Rule 23(a) prerequisites and Rule 23(b) requirements for class certification.

We deal with the first four objections, before examining whether Plaintiffs have demonstrated by a preponderance of the evidence that the class satisfies each of the Rule 23 requirements. *In re IPO,* 471 F.3d at 41 ("[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met.").

### 1. Standing

The Ivy Defendants argue that class certification is improper because none of the class representatives and, in all likelihood, none of the proposed members of the Investor Class, have standing to litigate the § 10(b) Exchange Act claims against them under the *Birnbaum* Rule, which limits standing in securities fraud cases to defrauded purchasers or sellers of securities. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731-732 (1975) (affirming the rule as set forth in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952)). Defendants argue that none of the members of the class are defrauded purchasers or sellers of securities, as the *Birnbaum* Rule requires, because none of them were induced by Ivy's misrepresentations to make investments with Madoff and BLMIS. It was only BAMC that made investments in Madoff as a consequence of Ivy's alleged misrepresentations and omissions. Hence, Ivy Defendants argue, it is only BAMC that has standing to raise a direct §10(b) claim against Ivy for the fraud alleged in the SAC under the *Birnbaum* Rule.

We do not agree. In our October 5 Order, we considered—and rejected—a very similar argument when analyzing whether the fraud alleged in the SAC was "in connection with the purchase or sale of any security," as required by §10(b) of the Exchange Act. *See* 15 U.S.C. § 78j(b). We found that, even if Plaintiffs did not themselves invest money in Madoff, there was a sufficiently close relationship between Plaintiffs' investment in the Beacon Fund and the Beacon Fund's decision to invest in BLMIS to satisfy the "in connection with" requirement. *In re Beacon*, 745 F. Supp. 2d at 410. Although the Order did not directly address the standing issue, it presumed that because Plaintiffs purchased securities—namely the interests in the Beacon Fund—that were "in connection with" the fraud alleged in the SAC, they therefore satisfied the *Birnbaum* Rule. No arguments have been provided that lead us to reach any different conclusion now.

Ivy Defendants interpret the *Birnbaum* Rule to prohibit anyone who was not personally induced by fraud to purchase or sell a security from bringing claims under § 10(b). Ivy Defs.' Mem. Opp. Beacon Pls.' Mot. Class. Certif. ("Ivy Opp."), at 19-20. This is too restrictive a reading of the Rule however. As the Supreme Court made clear in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 79 (2006), the *Birnbaum* Rule requires only that a plaintiff who raises a §10(b) claim "seek to remedy a fraud *associated with* his or her own sale or purchase of securities." *Id.* at 79 (emphasis added). Plaintiffs therefore do not themselves have to have been the direct target of the fraud in order to bring suit. *Id.* at 85 (noting that the "requisite showing is…deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller") (internal citations omitted).

In this case, Plaintiffs have demonstrated that the class representatives and members of the proposed class purchased securities—namely, their interests in the Beacon Fund—that were

closely associated with an alleged fraud—namely, Ivy's misrepresentations regarding the Fund's Madoff investments. They do not allege that they were personally defrauded by the Ivy Defendants into making the Madoff investments but they do allege that their agents—BAMC and JPJA—were so defrauded. In pursuing this litigation, they therefore "seek to remedy a fraud associated with their sale or purchase of security." This is sufficient to confer standing. The *Birnbaum* rule is therefore no bar to class certification.

### 2.   The Timing of the Claims

Ivy Defendants also challenge the class certification motion on the ground that the securities claims against them are categorically barred by the 5-year statute of limitations imposed by 28 U.S.C. §1658(b)(2) ("the statute of repose"). Because none of the affirmative misrepresentations alleged in the SAC, or apparent in the evidence provided to the Court thus far, occurred less than five years before the first case involved in this act was filed, Ivy Defendants argue that the claims are untimely, and on that ground move to deny class certification.

This argument has no merit, given our conclusion in the October 5 Order that throughout the relevant period, Ivy was under a "continuing duty to disclose its true concerns [about Madoff] so as to render prior statements of opinion not misleading during the time period Madoff was making trades with Plaintiffs' money." *In re Beacon*, 745 F. Supp. 2d at 410. Ivy has presented no evidence indicating that it did in fact comply with its disclosure obligations during the relevant class period. This is notwithstanding what appear to have been frequent, even weekly communications with BAMC about the investments in question. *See, e.g.,* Hart Reply Decl. Exs. 65-68. Ivy's omissions render these communications materially misleading. *In re*

*Beacon*, 745 F. Supp. 2d at 409 ("There can be no doubt that Ivy's alleged omissions were material…").

These continuing misrepresentations mean that Plaintiffs' claims are not untimely, given the rule, adopted by the majority of courts in this Circuit, that the statute of repose "first runs from the date of the last alleged misrepresentation regarding related subject matter." *Plymouth County Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008). *See also In re Dynex Capital Secs. Litig.*, 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988, at *13-14 (S.D.N.Y. Feb. 10, 2006) ("In a case like this one, in which a series of fraudulent misrepresentations is alleged, th[e] 'period of repose begins when the last alleged misrepresentation was made'") (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005)). Because Ivy continued to make misrepresentations about Madoff throughout the class period, the period of repose did not begin until, at the earliest, December 11, 2008. Plaintiffs filed suit well within five years of this date.[4] Section 1658(b)(2) is therefore no bar to certification.

### 3.  Composition of the Class

Defendants argue that the Investor Class is overbroad because it includes members who purchased investments in the Beacon Fund after January 1, 2006—the date on which Ivy amended its contract with BAMC to disclaim any obligation to research, monitor or evaluate Madoff as an investment manager for the Fund. They similarly argue that the Jeanneret Investor Subclass is overbroad because it includes members who received investment advice from the Jeanneret Defendants after December 31, 2007, when the contract between Ivy and JPJA was

---

[4]  The first of the cases subsequently consolidated to form the present litigation was filed on January 27, 2009, only several months after the discovery of Madoff's fraud. *See* Complaint, *Cacoulidis v. Beacon Associates Management Corp.*, No. 09 Civ. 0777 (Jan. 27, 2009).

amended to explicitly exclude Madoff from the list of investment managers for whom Ivy provided JPJA research, monitoring and access.

Both arguments are unpersuasive, for the same reason that we rejected Ivy Defendants' statute of repose argument above. The fact that Ivy continued to possess a duty to update or correct its earlier representations about Madoff to BAMC and JPJA until the date of Madoff's arrest means that it continued to be liable towards all investors for whom JPJA and BAMC acted during this time as agents.

Under the fraud on the agent theory which we approved in the October 5 Order, "plaintiffs need only allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants." *In re Beacon,* 745 F. Supp. 2d at 408 (quoting *In re Fine Host Corp. Secs. Litig.,* 25 F.Supp.2d 61, 71–72 (D.Conn.1998)). It does not therefore matter whether the proposed class members became clients of JPJA or BAMC during a time when Ivy had an affirmative obligation to research and advise JPJA or BAMC about Madoff. What matters is that they became clients of JPJA and BAMC during a time when their agents—JPJA and/or BAMC—continued to reasonably rely upon Ivy's misrepresentations. Accordingly, we conclude that the proposed classes are not overbroad.

### 4.  Rule 23(a) prerequisites

Defendants also argue that the proposed Investor Class and Jeanneret Investor Subclass fail to satisfy the requirements for class certification set forth in Rule 23. These requirements include the four prerequisites of class certification set forth in Rule 23(a). Rule 23(a) requires plaintiffs to show: (1) "that the class is so numerous that joinder of all members is impracticable" (numerosity); (2) that "there are questions of law or fact common to the class" (commonality); (3) that "the claims or defenses of the representative parties are typical of the claims or defenses

of the class" (typicality); and (4) that "the representative parties will fairly and adequately protect the interests of the class" (adequacy). Fed. R. Civ. P. 23(a).

In addition to showing that the proposed class satisfies the four Rule 23(a) prerequisites, plaintiffs must show that the class satisfies the particular requirements of the subdivision of 23(b) under which they seek certification. In this case, Plaintiffs seek certification pursuant to 23(b)(3). They must therefore demonstrate that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance); and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority). Fed. R. Civ. P. 23(b)(3).

### a.   Numerosity

Rule 23(a)(1) calls for class certification when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Generally speaking, courts will find that the 'numerosity' requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer." *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998). However, "[d]etermination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.*

Plaintiffs claim that the Investor Class comprises at least 300 members. As evidence of this estimate, they provide a document listing 330 investors in the Beacon Fund. Hart Decl. Ex. 6. Ivy Defendants argue that the class in fact consists of only 119 members. Ivy Opp. at 48. They

reach this conclusion, however, on the basis of the overbreadth arguments that we rejected above. Their numerosity arguments based on these numbers are therefore not persuasive.

Ivy Defendants also argue that because only 75% of Beacon Fund assets were invested with Madoff, some members of the proposed class might have ended up with a residual profit rather than a loss from their investments in the Beacon Fund. and therefore should not be included in the class. Ivy Opp., at 48 n.5. We do not have to reach the merits of this argument because, even assuming *arguendo* that a quarter of Beacon Fund investors must be excluded from the class, its size would remain well above the range for which courts in this Circuit have found certification appropriate. *See, e.g., Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("Because numerosity is presumed at a level of 40 members . . . whether viewed as 700 tax-collecting jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this threshold. Numerosity is therefore satisfied.").

We reach the same conclusion with respect to the Jeanneret Investor Subclass, which although considerably smaller than the Investor Class, remains well above the forty-member threshold at which courts in this Circuit generally presume numerosity to be satisfied. Jeanneret Defs'. Mot. Opp. Class Certif. ("Jeanneret Opp."), at 17 (conceding that the Jeanneret Investor Subclass may number as many as 55 members).

Defendants argue that other considerations mitigate against the conclusion that the size of the Investor Class and Jeanneret Investor Subclass are so numerous as to make joinder impracticable. They point to the fact that the names and addresses of all Beacon Investor Class members are ascertainable from the contracts they signed when they joined the Fund, the fact that most class members live in New York state, and the significant amount of money at stake in

each member's claim, as evidence that the joinder of individual class members' claims would be not only possible but practicable.

Defendants are correct that these are all factors that in other contexts have led courts to deny class certification. Given the circumstances of this case, however—and specifically the size of the proposed class, and the fact that each one of the members of the class represents potentially hundreds or thousands of individual investors—we find that joinder would impose a significant burden on the Court and prove, ultimately, a far less efficient mechanism for resolving Plaintiffs' claims than class certification. *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.,* 269 F.R.D. 252, 258-259 (S.D.N.Y. 2010) (To satisfy numerosity, plaintiffs must show that "a consolidated action would be somehow less efficient than class certification in resolving this dispute") (internal quotes omitted).

The burden that joinder in these circumstances would pose to both the Court and the litigants is well demonstrated by the difficulties that the individual plaintiffs in the related case, *Hartman v. Ivy*, 09 Civ. 8278 (LBS), have encountered while attempting to satisfy their discovery obligations. *See, e.g.,* Endorsed Letter addressed to Magistrate Judge Andrew J. Peck from Jeffrey A. Rosenthal, Feb. 7, 2012 (Dkt. #136) (noting plaintiffs' repeated inability to comply with the discovery schedule); Hartman Pls.' Memo. Supp. Order Show Cause, Dec. 12, 2011 (noting the difficulties imposed on plaintiffs' by the obligations to provide discovery with respect to the plaintiff funds and their non-party sister funds, and by the sheer volume of discovery) at 3-5 (Dkt #377).

*Hartman* involves the joinder of only seventeen plaintiffs. Presumably the difficulties would only multiply were there fifty-five, let alone three-hundred, joined plaintiffs. We therefore conclude that, while not impossible, joinder would be difficult and inconvenient—in other

words, impracticable. *Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-245 (2d Cir. 2007) ("The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."). Accordingly, we find numerosity is satisfied with respect to both the Investor Class and the Jeanneret Investor Subclass.

### b.  Commonality

A plaintiff may meet his burden as to commonality by showing that the class members' "grievances share a common question of law or of fact." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam)). Not just any common questions will do, however. As the Supreme Court recently clarified, plaintiffs much show that the common questions are of sufficient importance to the case "that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-2551 (2011).

Plaintiffs have little difficulty satisfying this requirement. The securities claims against all three sets of defendants depend centrally upon common questions of representation and knowledge. Because JPJA and BAMC were acting as agents of all the members of the proposed classes, questions about Ivy's representations to BAMC and JPJA are necessarily common to all class members. The same is true, for the same reason, of questions about Ivy's scienter and knowledge with respect to its representations to BAMC and JPJA.

Common questions are also central to the claims against the Beacon and Jeanneret Defendants. At the heart of Plaintiffs' claims against both sets of defendants is their assertion

14

that they withheld the same material information from all of their clients or investors: namely, that neither they nor Ivy were performing due diligence on Madoff's operations any longer. "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *In re Indep. Energy Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 479-480 (S.D.N.Y. 2002); *see also In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 426 (S.D.N.Y. 1986) ("The nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication. Essentially, this is a course of conduct case, which as pled satisfies the commonality requirement of Rule 23. . . .").

Neither the Beacon nor the Jeanneret Defendants provide any evidence that their misrepresentations or omissions to different members of the class differed in any material respect. This means that crucial aspects of the claims against them will depend upon common questions relating to what they knew, when they knew it and what they told, or did not tell, Beacon Fund investors about the supervision of their investments. These are the kinds of questions that are capable of generating "common answers." *Dukes,* 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N. Y. U. L. Rev. 97, 132 (2009)). Commonality is satisfied.

### c.  Typicality

Typicality "requires that the claims of the class representatives be typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*

*by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Allegations that "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented" usually satisfy the typicality requirement "irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936–37. Typicality can be defeated, however, if the named plaintiffs are subject to "unique defenses that threaten to become the focus of the litigation." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)).

Plaintiffs propose the Plumbers & Steamfitters Local 267 Pension Fund and Plumbers & Steamfitters Local 267 Insurance Fund (collectively, "Local 267"), Plumbers Local 112 Health Fund ("Local 112"), Local 73 Retirement Fund ("Local 73"), John and Phyllis Cacoulidis (as trustees for Grand Metro Builders of N.Y. Corp. Defined Benefit Plan) and Jay Raubvogel as representatives of the Investor Class. Plaintiffs propose Local 267, Local 112, and Local 73 as representatives of the Jeanneret Investor Subclass.

All of the proposed class representatives invested in the Beacon Fund or are the trustee of an investor. Lancette Decl. ¶¶ 8-9 (for Local 267); Rounds Decl. ¶ 7 (Local 112); Carroll Decl. ¶ 7 (Local 73); Cacoulidis Decl. ¶ 6; Raubvogel Decl. ¶ 3. All had assets remaining in the Beacon Fund on December 11, 2008, when Madoff's fraud became public. Lancette Decl. ¶¶ 8-9; Rounds Decl. ¶ 7; Carroll Decl. ¶ 7; Cacoulidis Decl. ¶ 6; Raubvogel Supp. Decl. Ex. 4. All of the proposed class representatives for the Jeanneret Investor Subclass also signed Discretionary Investment Management Agreements ("DIMAs") with JPJA. Lancette Decl. ¶ 10; Rounds Decl ¶ 8; Carroll Decl. ¶ 8. The proposed class representatives' claims therefore arise from the same course of events and involve the same general facts as those of the class as a whole. They also

raise the same legal claims. This is generally all that typicality requires. *Marisol*, 126 F.3d at 376.

Defendants argue, however, that the proposed representatives are subject to unique defenses that threaten to become the focus of the litigation. Specifically, they argue that, because the class representatives testified in their depositions that they did not actually read or rely upon the Beacon Offering Memoranda ("Beacon OM") when they chose to invest in the Beacon Fund, and/or did not decide to invest in the Beacon Fund on the basis of JPJA's advice, they are not entitled to the *Affiliated Ute* presumption of reliance that, in our October 5 Order we applied to uphold Plaintiffs' claims. *In re Beacon,* 754 F. Supp. 2d at 410; *id.* at 413; *id* at 415. Absent the *Affiliated Ute* presumption, Defendants argue, the proposed class representatives are subject to unique challenges to their reliance that undermine their typicality as representatives of the class.

Defendants make two arguments to explain why the proposed class representatives cannot rely upon the *Affiliated Ute* presumption of reliance.  First, they argue that the evidence in the deposition testimony demonstrating that some of the proposed class representatives did not actually rely upon either BAMC or JPJA's representations when they chose to invest in the Beacon Fund makes the *Affiliated Ute* presumption inapplicable to their claims because *Affiliated Ute* only applies in contexts where defendants owe plaintiffs a "duty to disclose." Ivy Opp. at 44. No duty to disclose can arise, Defendants argue, from representations on which class representatives did not rely when choosing to invest.  Alternatively, Defendants argue that, even assuming that the class representatives are entitled to the *Affiliated Ute* presumption, evidence demonstrating that they did not actually rely upon JPJA or Beacon's representations when choosing to invest in the Beacon Fund rebuts the presumption as applied to their claims.

Neither argument is persuasive. With respect to the first argument, while we agree with Defendants that *Affiliated Ute* can apply only in contexts where defendants owe plaintiffs a duty to disclose,[5] we disagree that the proposed class representatives' failure to read the Beacon OM or to invest in the Beacon Fund as a result of the advice of the Jeanneret Defendants means that Defendants did not owe these plaintiffs—or their agents—a duty of this sort. It means simply that Defendants did not owe those plaintiffs a duty to disclose stemming from those representations on which Plaintiffs did not rely prior to investing. Contrary to Defendants' suggestion, the Beacon OM and the representations JPJA made to its clients when they were deciding whether to invest in the Beacon Fund are not the only sources of disclosure duties in this case.

As we concluded in our October 5 Order, the Ivy Defendants' disclosure obligations instead stem from representations they made to Plaintiffs' agents, JPJA and BAMC, regarding the legitimacy of Madoff's operations. *In re Beacon*, 745 F. Supp. 2d at 408-409. The fact that Plaintiffs did not read the Beacon OM prior to investing—or did not in fact know very much about Ivy at all—does not therefore affect these disclosure obligations, insofar as they run to Plaintiffs' agents rather than to Plaintiffs themselves.

The Jeanneret Defendants' disclosure duties stem, meanwhile, from representations they made in the Discretionary Investment Management Agreements (DIMAs) that investors signed when they became JPJA clients. Specifically, they stem from the representation that JPJA made in the DIMAs to "supervise and direct" its clients' assets in accordance with their specified investment guidelines. *See, e.g.,* Hart Decl. Ex. 11 (DIMA between JPJA and Local 267 Insurance Fund), at 1. Nothing in the text of the DIMA suggests that this promise to supervise

---

[5] *See, e.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 159 (2008) (noting that the *Affiliated Ute* presumption applies where "there is an omission of a material fact by one with a duty to disclose").

and direct extended only to those investments JPJA recommended, nor have Defendants argued as much. The fact that class representatives did not rely upon JPJA's advice when choosing to invest in the Beacon Fund does not therefore mean that they were not entitled to rely upon their promise to supervise those investments subsequently. It also does not relieve the Jeanneret Defendants of their duty to disclose to their clients when they were no longer able to perform that supervision. Evidence that some of the proposed class representatives did not read the Beacon OM or did not rely upon JPJA's advice when they chose to invest in the Beacon Fund therefore does not relieve either the Jeanneret or the Ivy Defendants of their disclosure duties towards these plaintiffs or render the *Affiliated Ute* presumption of reliance inapplicable to Plaintiffs' claims.

With respect to the Beacon Defendants, the situation is somewhat more complicated because we agree that the failure of some of the class representatives to actually read the Beacon OM prior to investing relieves the Beacon Defendants of the obligation to update or correct subsequently misleading representations made in those documents. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 629 (S.D.N.Y. 2009) (plaintiffs cannot establish reliance on the basis of statements they received only after the decision to invest); *Gabriel Capital. L.P. v. NatWest Fin. Inc.*, 177 F. Supp. 2d 169, 174 (S.D.N.Y. 2001) ("Belated reliance cannot support a federal securities claim"). If this were the only source of the Beacon Defendants' disclosure obligations to investors, Defendants would be correct that those class representatives who did not rely upon the Beacon OM when choosing to invest would not be able to invoke the *Affiliated Ute* presumption to prove their claims, and therefore would be subject to unique defenses.

In this case, however, the duty to update or correct representations in the Beacon OM is not the only disclosure duty that the Beacon Defendants possessed, although it is true that it was on this ground that we applied the *Affiliated Ute* presumption in the October 5 Order. *In re Beacon*, 745 F. Supp. 2d at 413. Because the Beacon Defendants were also fiduciaries to the Beacon Fund investors, they possessed an additional set of disclosure duties. *Chiarella v. United States*, 445 U.S. 222, 227-229 (1980) ("[A] duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them") (internal citations omitted). The Second Circuit has held that, in the context of the fiduciary relationship between a broker and a client, what the client is entitled to know as a result of the relationship of trust and confidence between them is all information "relevant to the matters entrusted to" the broker. *United States v. Szur*, 289 F.3d 200, 211-212 (2d Cir. 2002). While BAMC was not technically the broker for the Beacon Fund investors, the fact that it was empowered to make investments decisions with the Fund's assets on behalf of the Beacon Fund investors makes the relationship between BAMC and the investors in the Beacon Fund very similar to that between a broker and its clients. We find therefore that the same general disclosure obligations apply and that, as a result, BAMC had an affirmative duty to "give [its customers] information relevant to the affairs that [had] been entrusted to [it]." *Szur,* 289 F.3d at 211 (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)). The information that Plaintiffs allege BAMC failed to disclose to investors—namely, that no due diligence was henceforth to be performed on the investment manager who managed over 70% of the Fund's assets—is clearly information "relevant to the matters entrusted to" BAMC, as the entity responsible for making (under the terms of the OM) all "allocation and re-

20

allocation decisions on behalf of the" Beacon Fund. Hart Decl. Ex. 12 (2004 Beacon OM) at 9. BAMC was as a result under an affirmative duty to disclose it.

Evidence indicating that some of the proposed class representatives did not rely upon the representations in the Beacon OM when they chose to invest in the Beacon Fund does not therefore require us to reconsider our conclusion in the October 5 Order that BAMC had a duty to disclose to Beacon Fund investors information about the 2006 amendments to its contract with Ivy, although it does lead us to base that conclusion on a slightly different understanding of the nature of the disclosure obligation. Class representatives can therefore invoke the *Affiliated Ute* presumption, notwithstanding evidence demonstrating that they did not read the Beacon OM prior to investing in the Beacon Fund or did not rely upon JPJA's advice.

Nor does the evidence rebut the *Affiliated Ute* presumption as applied to the proposed class representatives' claims, as Defendants argue in the alternative. As the Second Circuit specified in *Du Pont v. Brady*, 828 F.2d 75 (2d Cir. 1987), once plaintiffs have—as in this case— successfully invoked the *Affiliated Ute* presumption, the burden shifts to defendants to rebut it by demonstrating that the plaintiffs did not in fact rely upon the omission when they made their investment decisions. *Id.* at 76. In order to do this, they must prove "by a preponderance of the evidence that disclosure of the information that defendants' omitted "would not have altered the[ir] … investment decision." *Id.* at 78.

Evidence that the proposed class representatives did not read the OM or did not rely upon JPJA when choosing to invest in the Beacon Fund does not relate, except tangentially, to the question of whether—had they been informed by the Beacon or Jeanneret Defendants that no due diligence was being performed on the investment manager who managed 70% of the Fund's assets—the class representatives would have chosen to remain in the Beacon Fund. It certainly

does not establish, by a preponderance of the evidence, that the information that neither Ivy nor the Beacon or Jeanneret Defendants were engaged in active monitoring of Madoff's management of Beacon Fund assets would have had no impact on the proposed class representatives' investment decisions.

Although the presumption remains rebuttable, we find that Defendants have provided insufficient evidence to rebut it. We therefore conclude that the proposed class representatives are not subject to unique defenses and that Plaintiffs have demonstrated, by a preponderance of the evidence, the typicality of the class representatives. Typicality is satisfied.

### d.  Adequacy

The last of the Rule 23(a) requirements is adequacy of representation. A party seeking class certification must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In order to make this showing, a party seeking certification must demonstrate two things: first, that "class counsel is experienced, qualified, and able to conduct litigation." *Velez v. Novartis Pharms. Corp.,* 244 F.R.D. 243, 268 (S.D.N.Y. 2007); second, that the class representatives' "interests are [not] antagonistic to the interest of other members of the class." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir. 2000).

Plaintiffs move to certify Interim Lead Class Counsel, Lowey Dannenberg Cohen & Hart, P.C., as class counsel for the Investor Class and Jeanneret Investor Subclass. Class counsel is experienced in securities class action litigation. Hart Decl. Ex. 1; Basar Decl. Ex. 1; Haber Decl. Ex. 1. They have prosecuted this litigation since its inception. Defendants do not contest its experience, qualifications, or ability to conduct the litigation. We therefore see no reason to doubt its adequacy.

We also see no reason to doubt the adequacy of the proposed class representatives. As we noted in our discussion of typicality above, *infra* III(A)(4)(c), Plaintiffs have demonstrated that the class representatives "possess the same interest and suffer[ed] the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-628 (U.S. 1997) (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)). They have thus demonstrated that their interests are generally aligned with those of the class.

Defendants argue that the interests of the proposed class representatives are nonetheless antagonistic to the interests of the other members of the class because many of the proposed representatives are fund trustees and are therefore under a fiduciary duty to promote the best interest of the fund they serve, rather than that of the class as a whole. This argument is unpersuasive in light of the class representatives' signed statements acknowledging their responsibilities to the class, and the lack of any obvious source of conflict between the duties the trustees share and those imposed on them as class representatives. Indeed, in many other similar cases in this District, courts have recognized trustees as adequate class representatives. *See, e.g., City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp*., docket, 11 Civ. 5026 (JSR), 2012 U.S. Dist. LEXIS 21488, at *13-15 (S.D.N.Y. Feb. 21, 2012); *Haddock v. Nationwide Fin. Servs.,* 262 F.R.D. 97, 100 (D. Conn. 2009); *Seidel v. Noah Educ. Holdings, Ltd.,* 08 Civ. 9203 (RJS), 08 Civ. 9427 (RJS), 08 Civ. 9509 (RJS), 2009 U.S. Dist. LEXIS 25949, at *9-12 (S.D.N.Y. Mar. 9, 2009). We reach the same conclusion here.

Defendants also raise specific objections to particular class representatives. They argue, for example, that the interests of Jay Raubvogel are antagonistic to those of the class as a whole because Mr. Raubvogel stands to win more money from derivative law suits currently underway in New York state court than he would recover from this litigation. Raubvogel does not however

appear to be a party to any of the derivative suits currently proceeding through state courts. Jedry Decl. Ex. B (Raubvogel Dep.) at 203:8-204:19. This makes the conflict to which Defendants point a purely speculative one. As the Second Circuit has instructed, "speculative conflict should be disregarded at the class certification stage." *In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States*, 280 F.3d 124, 145 (2d Cir. 2001).

Defendants also point to evidence suggesting that many of the class representatives did not rely, exclusively or in part, on the Beacon OM or JPJA's recommendations when choosing to invest in the Beacon Fund. For the same reasons we dismissed these objections to their typicality as class representatives, we find them unpersuasive here. *Infra* III(A)(4)(c). We thus conclude that Plaintiffs have satisfactorily established the adequacy of the proposed class representatives.

### 5.   The Rule 23(b) requirements

#### a.   Predominance

To satisfy the first Rule 23(b)(3) requirement of predominance, Plaintiffs must demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *In Re Visa Check/Mastercard Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (citation and internal quotations omitted)). To determine whether Plaintiffs have met this burden, we turn to the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184-2187 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.").

Plaintiffs bring three claims, based on Defendants' alleged violation of federal securities law: a §10(b) claim for securities fraud against all Defendants, a §20(a) control person liability

claim against Defendants Danziger, Markhoff, Jeanneret, Simon, Wohl, Geiger and Sloan; and a claim for rescission under §215 of the IAA against JPJA.

The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184-2187 (2011). To prove a violation of §20(a), Plaintiffs must demonstrate (1) "a primary violation [of the Exchange Act] by the controlled person;" (2) "control of the primary violator by the targeted defendant," and (3) that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Finally, to establish a rescission claim under § 215 of the IAA, Plaintiffs must prove that they "entered into a contract for investment advisory services with an investment advisor," *Welch v. TD Ameritrade Holding Corp.*, No 07 Civ. 6904 (RJS), 2009 U.S. Dist. LEXIS 65584, at *80 (S.D.N.Y. July 27, 2009), and that the contract violated any provision of the IAA, including § 206, which prohibits fraud or deceit. 15 U.S.C. § 80b-6.

Plaintiffs have demonstrated that these claims will predominantly rely on class-wide proof. With respect to the §10(b) claims, Plaintiffs have demonstrated that the material misrepresentations and omissions that serve as the basis of the claims are subject to common proof. This is particularly evident with respect to the claims against the Ivy Defendants, which involve misrepresentations made to Plaintiff's agents, BAMC and JPJA, and which therefore will be common to all members of the class. It is also true, however, of the claims against the Jeanneret and Beacon Defendants, insofar as these claims rely upon wrongful omissions that

appear to have been made on a class-wide basis. Indeed, as we noted *infra* III(A)(5)(a), the Jeanneret and Beacon Defendants have provided no evidence to suggest that their representations and/or omissions to different members of the class differed in material respects. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ("The key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations.") (quoting *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977)).

Plaintiffs have also demonstrated that questions of Defendants' scienter will be established using common proof—namely, the internal emails and memoranda that will indicate (among other things) whether Ivy Defendants knew facts or had access to information that contradicted its public statements; when and what the Jeanneret and Beacon Defendants knew about Ivy's ability to perform due diligence on Madoff; and what the Jeanneret and Beacon Defendants disclosed to investors in the Beacon Fund.

As we concluded above, Plaintiffs have established that they are entitled to the *Affiliated Ute* presumption of reliance with respect to the claims against all Defendants. This means that questions of reliance will not require individualized proof.

Plaintiffs have also demonstrated that liability can be determined on a class-wide basis, thus rendering questions of economic loss subject to generalized proof.  Although obviously the specific calculation of the damages of each class member will be individualized to some degree, both the methodology and many of the documents involved (Defendants's records, billing statements) will be common to the class. This is sufficient to establish predominance with respect to the § 10(b) claims. *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 305-306 (D. Conn. 2009) ("[W]here individualized damage determinations are necessary, it does not

prevent a finding that common issues predominate if liability can be determined on a class-wide basis.").

Finally, Plaintiffs can establish loss causation on a class-wide basis by demonstrating that the losses they suffered were "foreseeable," *ATSI Communs., Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 107 (2d Cir. 2007) and "within the zone of risk concealed by the misrepresentations and omissions." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005).

With respect to the §20(a) and IAA claims, common issues predominate as well. Questions of the individual control and culpability of the Ivy and Jeanneret Defendants will apply class-wide, given no evidence that any of the individual defendants occupied different roles with respect to different investors or clients. With respect to the IAA claim, whether the necessary advisory relationship exists to establish liability against JPJA is also a class-wide question, given evidence that all members of the class signed largely identical DIMAs. *Compare, e.g.,* Fagg Decl. Ex. 2 (Plumbers & Steamfitters Local 267 Insurance Fund DIMA) *with* Fagg Decl. Ex. 3 (Local 73 Health & Welfare Fund DIMA) *with* Fagg Decl. Ex. 127 (Plumbers, Pipefitters and Apprentices Local 112 Health Fund DIMA). We therefore conclude that predominance is satisfied.

### b.  Superiority

The final Rule 23(b) requirement that plaintiffs must meet is to demonstrate that class action is a "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides a list of factors that courts should consider when analyzing superiority. These include: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions; (2) "the extent and nature of any litigation concerning the controversy already begun by or

against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." *Id.*

In this case, although numerous other suits pending before this Court and others involve similar claims to those raised by the Beacon Plaintiffs, no other litigation seeks relief for the specific harms that Plaintiffs allege here. Beacon Pls.' Mem. Supp. Class Certif. ("Beacon Memo") at 51-52. This mitigates in favor of class certification. On the other hand, the fact that many of the members of the class stand to recover a substantial sum of money if successful suggests that individual class members may have an interest in individually controlling the prosecution of their case.  As the Supreme Court noted in *Amchem Products, Inc. v. Windsor*, "[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had primarily in mind the vindication of  the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.,* 521 U.S. at 616-617 (internal quotations omitted).

Given the inefficiency that we earlier concluded would be created by litigating these claims separately, we conclude that the class action provides both the fairest and the most efficient mechanism for resolving the claims in this case and that there are significant advantages to concentrating the litigation in a single forum. To force each investor to litigate separately, as this Court noted in *Cromer Fin. Ltd. v. Berger,* would "risk disparate results among those seeking redress, … would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources." 205 F.R.D. 113, 133-134 (S.D.N.Y. 2001). Furthermore, the difficulties of managing the class action do not appear to be greater—and may in fact be considerably less—than the difficulties created by potentially hundreds of individual

trials. *See In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 529 (S.D.N.Y. 1996) ("[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques.").

Accordingly, we conclude that the class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Plaintiffs' motion to certify the Investor Class and the Jeanneret Investor Subclass pursuant to Rule 23(b)(3) is granted. Interim Lead Class Counsel are hereby appointed class counsel, pursuant to Rule 23(g).

### B.    The ERISA Class and Jeanneret ERISA Subclass

Plaintiffs move for certification of the ERISA Class and Jeanneret ERISA Subclass under Rule 23(b)(1), which allows certification of a class or subclass when "prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications…or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudication."  Fed. R. Civ. P. 23(b)(1). In the alternative, they move for certification under Rule 23(b)(3).

Ivy Defendants raise several threshold objections to certification of the classes. We examine these first, before analyzing the Rule 23 requirements.

### 1.    The Fiduciary Status of the Ivy Defendants

Ivy Defendants argue that the ERISA Class cannot be certified because Plaintiffs have not proven, nor can they prove, an essential element of their claim—namely, that Ivy Defendants were fiduciaries to the plans that invested in the Beacon Fund because they provided them "investment advice for a fee or other compensation." ERISA 3(21)(A)(ii), 29 U.S.C. §

1002(21)(A)(ii).   29 C.F.R. §2510.3-21(c)(1) define what it means to provide "investment advice" to a plan.   It states in relevant part:

> A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of [ERISA] only if:
>  (i)  Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and
> (ii)  Such person either directly or indirectly. . . .
>> A.  Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
>> B.  Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

Under the regulation, investment advisors who do not possess discretionary authority over the assets of ERISA-covered plans qualify as fiduciaries only when they (1) provide advice to the plan on a regular basis, pursuant to an agreement with the plan or with a fiduciary to the plan that such advice will be (2) a primary basis for the investment of plan assets and (3) individualized to the particular needs of the plan.  29 C.F.R. §2510.3-21(c)(1)(ii)(B).

Ivy Defendants argue that Plaintiffs have not and cannot show that Ivy agreed to provide advice to BAMC about the plans represented in the proposed classes that would be individualized to the plans, as 29 C.F.R. §2510.3-21(c)(1)(ii)(B), requires. For this reason, they argue, Plaintiffs claims against them fail as a matter of law and do not merit certification. Ivy Opp. at 56 (quoting *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 228 (2d. Cir. 2008) ("[W]hen a claim cannot succeed as a matter of law, the Court should not certify a class on that issue.")).

Ivy Defendants provide several reasons why Plaintiffs' claims fail as a matter of law. First, they argue that Plaintiffs' assertion in their class certification brief that Ivy provided advice to BAMC directly, rather than to "any individual plans," represents an acknowledgment that the advice Ivy provided BAMC was not individualized but advice tailored to the Fund "as a whole." Ivy Opp. at 57 (quoting Beacon Memo at 22). Plaintiffs allegations in their brief, Ivy Defendants argue, therefore reflect a change in legal position from the allegations we sustained in the October 5 Order, when we held that Plaintiffs had made out a plausible claim that Ivy agreed to provide BAMC advice that was individualized with respect to the plans that invested in the Beacon Fund. These new allegations, they argue, are "fundamentally inconsistent with ERISA" and cannot provide a basis for relief. *Id.*

We do not agree. We do not read the language in Plaintiffs' brief as expansively as do the Ivy Defendants. Instead, we interpret Plaintiffs' allegations in their motion papers as merely a restatement of allegations they made in the SAC and that we sustained in the October 5 Order: namely, that Ivy agreed to provide advice to BAMC—*not* directly to the plans themselves—that was nonetheless individualized with respect to the plans that invested in the Beacon Fund insofar as it was based on the specific needs of the Beacon Fund *and* the plans that invested in it. *See In re Beacon,* 745 F. Supp. 2d at 425.

Ivy Defendants also argue that the interpretation of what it means to agree to provide individualized advice upon which Plaintiffs rely—and which we implicitly affirmed in the October 5 Order—reflects an erroneous and unreasonable interpretation of ERISA and its implementing regulations. They argue that advice cannot be deemed to be individualized both with respect to a pooled investment fund like the Beacon Fund *and* with respect to the individual plans that invest in it because doing so would make an investment advisor like Ivy a fiduciary to

31

both the Fund and the plans, thus creating the kind of conflict of interest that ERISA was designed to avoid. Ivy Opp. at 67 (quoting *Levy v. Lewis,* 635 F.2d 960, 968 (2d Cir. 1980) ("ERISA was designed to prevent a fiduciary from being put in a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.")). In order to qualify as a fiduciary to the individual plans that make up the Beacon Fund, they argue, Plaintiffs must instead provide evidence of an agreement to provide advice that is specifically tailored to the overall investment needs and strategies of each individual plan. The fact that Plaintiffs have not alleged an agreement of this kind, they argue, means that for this reason also their claims must fail as a matter of law.

We disagree.[6] We see no reason why recognizing an investment advisor such as Ivy to be a fiduciary to both the pooled investment fund to which it provides advice *and* the pension plans that invest in that fund would create the kind of conflict that ERISA was intended to avoid. Plans invest in pooled investment funds in order to promote certain goals which the fund managers are charged with carrying out. With respect to the assets invested in the fund, their interests are as a result necessarily aligned. This is demonstrated by the fact that, under ERISA's statutory scheme, fund managers like BAMC are also considered fiduciaries to the plans that invest in them. As such, they are obligated to promote the best interests of the plans. *See* ERISA § 404(a) (1), 29 U.S.C. § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries").

---

[6] Plaintiffs argue that this second argument is foreclosed by the law of the case doctrine, which provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991). We agree that in challenging the interpretation of individualized that this Court implicitly adopted in the October 5 Order, Ivy Defendants are challenging the law of the case. However, because the law of the case doctrine is  "discretionary and does not limit a court's power to reconsider its own decision prior to final judgment." *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996), and because in the October 5 Order we did not fully explain the reasons for the conclusion we reached, we entertain Defendants' argument here.

Ivy Defendants' argument thus seeks to establish a conflict where there can be none, absent a breach of fiduciary duty. It is moreover contradicted by 29 C.F.R. § 2510.3-101, which provides that any person who (a) "exercises authority or control respecting the management or disposition of" the assets of a pooled investment fund or "provides investment advice with respect to such assets for a fee (direct or indirect)" is a fiduciary of the plans that invest in the investment fund, as well as the fund itself. 29 C.F.R. § 2510.3-101(a)(2).

Ivy Defendants argue that 29 C.F.R. § 2510.3-101 merely expands the definition of plan assets and does not alter or amend the fiduciary duty test provided in 29 C.F.R. §2510.3-21(c)(1). We agree that nothing in 29 C.F.R. § 2510.3-101 "supersedes or broadens the fiduciary duty test in 29 CFR § 2510.3-21(c)(1)." Ivy Opp. at 61. To be a fiduciary, an advisor must still provide advice to a plan on a regular basis, "pursuant to an agreement with the plan or with a fiduciary to the plan that such advice will be a primary basis for the investment of plan assets and (3) individualized to the particular needs of the plan." 29 C.F.R. § 2510.3-21(c)(1). Nevertheless, we do interpret 29 C.F.R. § 2510.3-101(a)(2) as clarifying, if not altering or amending, what it means to provide individualized investment advice to the plan," as 29 C.F.R. § 2510.3-21(c)(1) requires.

Specifically, we interpret the regulation as making clear that advice that is individualized with respect to the needs of a pooled investment fund should also be considered individualized with respect to the plans that invest in it. This is the only interpretation of the regulation that gives effect to all the terms in both 29 C.F.R. § 2510.3-101 and 29 C.F.R. § 2510.3-21(c)(1). *See APWU v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003) ("A basic tenet of statutory construction, equally applicable to regulatory construction, is that a text should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant,

and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") (quoting *Silverman v. Eastrich Multiple Investor Fund*, 51 F.3d 28, 31 (3d Cir. 1995)). It is moreover the interpretation of the regulations that the Department of Labor ("DOL") has urged we adopt. Br. Sec. Labor Amicus Curiae Supp. Pls.' Mot. Class Certif. at 20-25. As the Supreme Court recently made clear, courts should "defer to an agency's interpretation of its regulations, even in a legal brief, unless the interpretation is plainly erroneous or inconsistent with the regulations, or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Talk Am., Inc. v. Mich. Bell Tel. Co.,* 131 S. Ct. 2254, 2260-2261 (2011) (internal quotes omitted). We find no reason to suspect that this interpretation reflects anything other than the agency's "fair and considered judgment on the matter."

We therefore conclude that, to the extent it agreed to provide regular advice to BAMC that was intended to be the primary basis for their investment decisions and that was individualized with respect to the Beacon Fund, Ivy qualified as a fiduciary under ERISA § 3(21)(A)(ii).  As we concluded in the October 5 Order, Plaintiffs have alleged not merely a possible but a plausible claim that Ivy provided advice of this sort to BAMC and that it therefore qualified as a fiduciary to the plans that invested in the Beacon Fund.  *In re Beacon*, 745 F. Supp. at 425.   Accordingly, we find that Plaintiffs' claims are not precluded as a matter of law or, for that reason, inappropriate for class certification.[7]

## 2.  Overbreadth

---

[7] Ivy Defendants also challenge the conclusion we reached in the October 5 Order that Ivy qualified as a fiduciary under ERISA §3(21)(A)(ii) and 29 C.F.R. 2510.3-21(c)(1) with respect to the advice it provided JPJA. Because none of the arguments Ivy makes assert that Plaintiffs' claims fail as a matter of law, we decline to consider them separately here. *In re IPO*, 471 F.3d at 41 ("[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement.").

Ivy Defendants argue that the ERISA Class is overbroad because it includes fiduciaries, beneficiaries and participants in plans that invested in the Beacon Fund prior to May 2000—the earliest date on which more than 25% of the equity in the Beacon Fund belonged to ERISA-covered plans, thereby triggering Ivy's fiduciary duties under 29 C.F.R. § 2510.3-101.[8] Because the assets of the plans that invested in the Beacon Fund prior to this date, Ivy Defendants argue, had already been invested with Madoff by the time that Ivy came to be a fiduciary to them, no liability attaches to the Ivy Defendants for the losses they sustained. Ivy Opp. at 83.

We do not agree. Under ERISA, fiduciaries have no liability for breaches of fiduciary duty that occur before they become fiduciaries. *See* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty . . . if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."). However, once they do possess fiduciary duties under ERISA, fiduciaries have an affirmative obligation to investigate risks that may have come into existence prior to their becoming a fiduciary—including those that result from a prior breach—and, where possible, to take remedial steps to guard against them. *See Chao v. Merino,* 452 F.3d 174, 182 (2d Cir. 2006) ("If a fiduciary was aware of a risk to the fund, he may be held liable for failing to investigate fully the means of protecting the fund from that risk…. Further, the common law of trusts . . . imposes a duty on a successor trustee to remedy the breach of a prior trustee, and imposes liability for breach of this duty 'to the extent to which a loss results from the successor trustee's failure to take such [remedial] steps.'") (quoting *Silverman v. Mutual Benefit Life Insurance Co*., 138 F.3d 98, 104 (2d Cir. 1998)); *Morrissey v. Curran,* 567 F.2d 546, 548 (2d Cir. 1977) (holding that ERISA trustees possess a responsibility

---

[8] Under 29 C.F.R. § 2510.3-101, an investment advisor to a pooled investment fund possesses fiduciary responsibilities only when a "significant" portion of the equity in the fund is composed of covered benefit plans. 29 C.F.R. § 2510.3-101(a)(2). Equity participation by benefit plan investors is deemed "significant" when "25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors." 29 C.F.R. § 2510.3-101(f)(1). This is often called the "25% rule."

to "review and liquidate… the unwise investment... made before ERISA took effect."); *Buccino v. Continental Assurance Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) (holding that, as fiduciaries, defendants were "under a continuing obligation to advise the Fund to divest itself of unlawful or imprudent investments" and their failure to do so "gave rise to a new cause of action each time the Fund was injured by its continued possession of individual policies, that is, each time it made a premium payment"). Under § 1109(b), ERISA fiduciaries are therefore not liable for irrevocable harms that occurred before they came to possess fiduciary duties, but—as the case law makes clear—they remain liable for pre-existing breaches whose effects they could, during the period they were fiduciaries to the plan, have corrected or ameliorated.

The fact that investors invested in the Beacon Fund before Ivy became an ERISA fiduciary to them does not therefore mean, as Defendants claim, that Ivy possessed no obligation towards them. It merely means that they are not responsible for any irrevocable harms that occurred prior to the triggering of their fiduciary obligations. We see no reason to conclude that the decision by the plans that invested in the Beacon Fund prior to May 2000 to invest in the Fund, and thereby in Madoff was an irrevocable act. Both the plans and BAMC had plenty of opportunity in the period between May 2000 and the discovery of Madoff's fraud in late 2008 to withdraw assets from Madoff's management, thereby ameliorating, even entirely correcting, any risk created by the decision to invest with Madoff in the first place. Ivy was therefore obligated to take what remedial steps were available to it to encourage them to divest from their unwise and imprudent investment with Madoff and BLMIS.  Accordingly, we conclude that Ivy owed fiduciary duties to the plans that invested in the Beacon Fund before the date on which more than 25% of the Fund's assets were composed of ERISA-covered plans, to (among other things) take what remedial steps were available to it to reduce the risks posed by their Madoff investments.

Ivy Defendants also argue that the class is overbroad because it includes plans who invested in the Beacon Fund after December 1, 2006—the date on which Ivy amended its contract with BAMC to exclude Madoff from its responsibilities. Plaintiffs concede that, with respect to these investors, Ivy Defendants are not liable for breach of their fiduciary duties under ERISA. Beacon Memo at 64. These are not the only claims raised by the ERISA Class, however. The Class also seeks to litigate claims against the Beacon and Jeanneret Defendants. It is uncontested that these defendants owed fiduciary duties towards members of the class based on the authority they possessed, pursuant to the DIMAs and Beacon OMs, over the disposition and management of plan assets. *In re Beacon*, 754 F. Supp. 2d at 419. These fiduciary duties continued throughout the life of the agreements—in other words, beyond December 1, 2006. The class therefore presents viable claims with respect to those investors that invested in the Beacon Fund after the date of the Ivy–BAMC Amendments. Accordingly, we conclude that the ERISA Class and Jeanneret ERISA Subclass are not overbroad.

### 3.  The Rule 23(a) Requirements

#### a.  Numerosity

Plaintiffs assert that the numbers of individuals in both the ERISA Class and the Jeanneret Investor Subclass number in the thousands, if not more. Beacon Memo at 17. Defendants argue that the size of the class should instead be calculated by the number of plans that compose it, rather than the individual members who make it up, because it was the plans, not the beneficiaries or participants, that made the relevant investment decisions. Opp. Jeanneret Defs.' Beacon Pls.' Mot. Class Certif. ("Jeanneret Opp.") at 17 n.8. Accordingly, they claim that the ERISA Class possesses only 59 members, Ivy Opp. at 81, and the Jeanneret ERISA Subclass possesses only 40 members. Jeanneret Opp. at 17.

We do not agree that the size of the class should be calculated with respect to the numbers of the plans that compose it. For one thing, plans have no standing to sue under ERISA and cannot therefore serve as proper plaintiffs in this case. *Pressroom Unions-Printers League Income Sec. Fund v. Continental Assurance Co.,* 700 F.2d 889, 893 (2d Cir. 1983). Instead, only participants, beneficiaries and fiduciaries of covered plans and the Secretary of Labor have standing to sue under ERISA. *Coan v. Kaufman,* 457 F.3d 250, 255 (2d Cir. 2006)

Trustees, of course, may sue on behalf of the beneficiaries, fiduciaries and participants of the plans they serve, *Coan,* 457 F.3d at 260-261, but we know of no case law that suggests, in a case such as this one, that it is only the trustees of the plans that may bring suit. To the contrary: the legislative history of ERISA reveals that Congress explicitly intended participants and beneficiaries of covered plans to be able to enforce their rights under the statute via the device of the class action.[9]

Ivy Defendants argue that where, as here, the trustees of some of the affected plans are involved as litigants, there is no benefit to also including in the class the plan's beneficiaries, participants and other fiduciaries. This may be true in cases where plan trustees are already parties to the litigation. Indeed, Defendants point to at least one case in which a court refused, for this reason, to recognize participants and beneficiaries of a plan as members of an ERISA class. Ivy Opp. 81 n.108 (citing *Hennessy v. Connecticut General Life Ins. Co.,* No. 84 C 10582, 1985 U.S. Dist. LEXIS 13900, at *31 (N.D. Ill. Nov. 14, 1985). We decline to extend the rule,

---

[9] Early versions of the statute in fact *required* participants and beneficiaries to institute class actions in order to enforce their rights. *See Coan,* 457 F.3d at 259-260 (noting that an early Senate version of the bill "would have required participants and beneficiaries bringing suit for breach of fiduciary duty to bring class actions and that in their final versions, "the House and Senate ERISA bills contained contrasting class-action requirements: The House bill provided that participants and beneficiaries must in most circumstances bring class actions in order to bring suit on behalf of a plan for breach of fiduciary duty, while the Senate bill provided that they may.") The final version of the bill ultimately said nothing about whether class actions by participants and beneficiaries of employee benefit plans were mandatory or permissive. *Id* at 260. Nevertheless, this legislative history makes clear that Congress contemplated, even approved, participant and beneficiary classes of the kind Plaintiffs in this case seek to certify.

38

however, to cases in which plan trustees are not already parties to the suit. To do so would be to dramatically restrict the rights of those explicitly within the zone of interests ERISA was intended to protect,[10] by making their ability to vindicate their rights under the statute dependent upon the action or inaction of their plan trustees.

We therefore conclude that the proper size of the class is calculated according to the numbers of beneficiaries, participants and fiduciaries of the employee benefit plans that invested in the Beacon Fund. Because joinder of the thousands of members of the class would obviously be impracticable, we conclude that numerosity is satisfied.

### b.   Commonality

Plaintiffs assert that common questions are central to their claims against all three sets of defendants. We agree. To succeed on any of their claims against Defendants, Plaintiffs will have to establish, at minimum, three elements: first, that the defendants were ERISA fiduciaries; second, that they were acting in their capacity as fiduciaries when they engaged in the relevant acts; and third, that they breached their fiduciary duties under ERISA. *In re Morgan Stanley Erisa Litig.*, 696 F. Supp. 2d 345, 353 (S.D.N.Y. 2009) ("To state a claim for breach of fiduciary duty under ERISA, at minimum the Complaint must allege 1) that defendant was a fiduciary who, 2) was acting within his capacity as a fiduciary, and 3) breached his fiduciary duty.").

Plaintiffs' ability to establish each of these elements will depend upon common questions of law and fact. With respect to the first element of the claim, common questions include, with respect to the Ivy Defendants: whether Ivy agreed to provide individualized advice to BAMC and JPJA, whether it provided this advice on a regular basis, and whether this advice was intended to serve as the primary basis for BAMC and JPJA's investment decisions, as required to

---

[10] *See Mullins v. Pfizer, Inc.,* 23 F.3d 663, 668 (2d Cir. 1994) (agreeing with the First Circuit that "the basic standing issue [in ERISA cases] is whether the plaintiff is within the zone of interests ERISA was intended to protect.") (internal citations omitted).

qualify as a fiduciary under 29 U.S.C. § 1002(21)(A)(ii) and 29 C.F.R. §2510.3-21(c)(1), as clarified by 29 C.F.R. § 2510.3-101. All of these questions will be answered on the basis of common proof.

With respect to the second element of the claim, common questions include: whether BAMC and JPJA were actually exercising authority over the management or disposition of plan assets when they engaged in the acts alleged in the SCAC; and whether Ivy was acting in its capacity as an investment advisor to BAMC and JPJA when it misrepresented, either by act or omission, its doubts regarding the legitimacy of Madoff's enterprises.

Finally, with respect to the third element of the claim, common questions include, with respect to the Ivy Defendants: the extent and timing of Ivy's suspicions about the legitimacy of Madoff's operations and whether Ivy's failure to investigate these suspicions further constituted a breach of its fiduciary duties of loyalty, prudence or disclosure under ERISA. With respect to the Beacon and Jeanneret Defendants, common questions include: what either BAMC or JPJA knew about Ivy's inability to conduct due diligence on Madoff and when they knew it; what either BAMC or JPJA told Beacon Fund investors about their supervision of the Madoff investments; and whether their failure to disclose Ivy's lack of due diligence constitutes a breach of their fiduciary duties of prudence, loyalty and disclosure towards the plans.

Because the resolution of these questions "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. 2541 at 2550-2551, we find that commonality is satisfied. Plaintiffs have satisfied their burden of establishing the commonality of both the ERISA Class and the Jeanneret ERISA Subclass.

### c.   Typicality

Plaintiffs propose Gregory Lancette, the Trustee of Local 267, James Rounds, the Trustee of Local 112, Patrick Carroll, the Trustee of Local 73, William F. Shannon, the Trustee of the Oswego Laborers Local 214 Pension Plan, and Donald H. Morgan, the Trustee of the IBEW 43 Welfare Fund, as class representatives for both the ERISA Class and the Jeanneret ERISA Subclass.

All of the proposed class representatives are trustees of an ERISA-covered plan that invested in the Beacon Fund. Lancette Decl. ¶¶ 1, 8-9; Rounds Decl. ¶¶ 1, 7; Carroll Decl. ¶¶ 1, 7; Morgan Decl. ¶¶ 1, 5; Shannon Decl. ¶¶ 1, 5.  All had assets remaining in the Beacon Fund on December 11, 2008, when Madoff's fraud became public. Lancette Decl. ¶¶ 8-9; Rounds Decl. ¶ 7; Carroll Decl. ¶ 7; Morgan Decl. ¶ 5; Shannon Decl. ¶ 5. All of the plans for whom the proposed class representatives served as trustees signed DIMAs with JPJA. Lancette Decl. ¶ 12; Rounds Decl. ¶ 8; Carroll Decl. ¶ 8; Morgan Decl. ¶ 6; Shannon Decl. ¶ 6.  The proposed class representatives' claims therefore arise from the same course of events as the rest of the class. They also raise the same legal claims. This is generally all that typicality requires. *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992) (Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability").

Ivy Defendants argue that evidence suggesting that JPJA was not the only, or even the primary, advisor on which Local 112, Local 267 or IBEW 43 relied when they decided to invest their assets in the Beacon Fund renders three of the five proposed class representatives—namely, Lancette, Rounds, and Morgan—subject to unique defenses that threaten to become the focus of the litigation, thereby rendering them atypical of the class. Evidence of this kind provides Defendants a unique defense against these representatives' claims, Ivy Defendants argue,

because it calls into question whether JPJA—or Ivy, in its capacity as advisor to JPJA—actually functioned as ERISA fiduciaries to these plans, by providing them "investment advice for a fee." 29 U.S.C. §1002(21)(A)(ii).

This argument is unpersuasive, in large part because it presumes that the source of JPJA's fiduciary duties towards the plans was the investment advice it provided to them. This would be true if JPJA, like Ivy, qualified as an ERISA fiduciary under the "investment advice for a fee" test set forth in ERISA §3(21)(A)(ii). But in fact, as JPJA does not contest, it qualifies as an ERISA fiduciary under the other prong of the fiduciary duty test set forth in ERISA § 3(21)(A). *See* 29 U.S.C. § 1002(21)(A) (defining an ERISA fiduciary as a person who (1) "exercises any discretionary authority or discretionary . . . respecting [the] management or disposition of [plan] assets" or (2) "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so"). *In re Beacon*, 754 F. Supp. 2d at 419. The same is true of BAMC. *Id.*

Evidence suggesting that Local 112, Local 267 or IBEW 43 relied upon other advisors when deciding to invest in the Beacon Fund is not therefore relevant to the question of JPJA's fiduciary status with respect to these plans. It certainly does not mean that Plaintiffs Lancette, Rounds or Morgan cannot prevail on their ERISA claims against JPJA. Nor does it undermine Plaintiffs' claims against Ivy Defendants. Because, as we concluded in the October 5 Order, Ivy's fiduciary obligations towards the plans stem from the advice it provided to the plans' fiduciaries, BMAC and JPJA, *In re Beacon,* 754 F. Supp. 2d at 424, the only reliance that Plaintiffs need to establish in order to succeed on their claims against the Ivy Defendants is that of their fiduciaries and agents, BAMC and JPJA.[11]

---

[11] We note that actual reliance is a prerequisite only to the ERISA failure to disclose claim. *See, e.g., Bell v. Pfizer. Inc*., 626 F.3d 66, 75 (2d Cir. 2010) ("[W]here a plaintiff asserts a breach of fiduciary claim based on a material

Defendants have pointed to no evidence showing that BAMC and/or JPJA did not in fact rely upon Ivy's investment advice and representations. We therefore conclude that typicality is satisfied.

### d.    Adequacy

Plaintiffs move to certify Interim ERISA Class Counsel, Cohen Milstein Sellers & Toll, PLLC as class counsel for the ERISA Class and Jeanneret ERISA Subclass. Class counsel have extensive class action experience. Machiz Decl. Ex. 1. Defendants do not contest their adequacy. We therefore conclude that Plaintiffs have satisfactorily demonstrated the adequacy of representation.

For the reasons provided in our discussion of typicality, *infra* III(B)(3)(c), we also find that Plainitffs have satisfactorily demonstrated that the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

### 4.  Rule 23(b)(1) Requirements

Plaintiffs seek certification of the ERISA Class and Jeanneret ERISA Subclass under Rule 23(b)(1). Rule 23(b)(1) has two prongs. Rule 23(b)(1)(A) authorizes certification in cases where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A). Alternatively, Rule 23(b)(1)(B) permits class certification in cases where the prosecution of separate actions "would create a risk of. . . adjudications with respect to individual class members, that, as a practical matter, would be dispositive of the interests of the other

---

misrepresentation or omission, the plaintiff must establish detrimental reliance."). To prove breach of the fiduciary duties of loyalty or prudence, plaintiffs only have to show that defendants were ERISA fiduciaries, that they breached their fiduciary obligations towards plaintiffs, and that the plan's losses "resulted from" the defendants' breach. *Silverman v. Mutual Benefit Life Ins. Co*., 138 F.3d 98, 104 (2d Cir. 1998).

members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). Courts generally certify classes under 23(b)(1)(A) in cases where defendants are "obliged by law to treat the members of the class alike … or where [they] must treat all alike as a matter of practical necessity." *Amchem Prods.*, 521 U.S. at 614.  Rule 23(b)(1)(B) is usually applied instead in what are often called "limited fund cases"—where "numerous persons make claims against a fund insufficient to satisfy all claims." *Amchem Prods.,* 521 U.S. at 614.

Plaintiffs argue that certification is warranted under both prongs of Rule 23(b)(1). They argue that certification is warranted under 23(b)(1)(A) because Defendants had a statutory obligation to treat all members of the class alike, and therefore individual actions would pose a risk of imposing on them inconsistent standards of conduct. They argue that certification is appropriate under Rule 23(b)(1)(B) because of the representative nature of ERISA breach of fiduciary duty suits.  ERISA's civil action provision, § 502, 29 U.S.C. § 1132, allows individual participants, beneficiaries and fiduciaries of a plan to bring suit seeking relief for breach of fiduciary duty only when they do so "in a representative capacity on behalf of the plan." *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985). The fact that, pursuant to § 502, class members are allowed to seek relief only on behalf of the plan as a whole, rather than on their own individual behalf, *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993), Plaintiffs argue, means that individual actions will necessarily dispose of the interests of the other plan beneficiaries and participants, who may or may not be party to the suit.

We do not agree that Defendants were statutorily obligated to treat all members of the class alike. The source of the Jeanneret and Beacon Defendants' fiduciary obligations towards members of the class were the DIMAs and Beacon OMs. These documents were executed

individually, on behalf of each plan, and therefore do not impose uniform legal obligations with respect to all members of the class. Therefore, as opposed to classes involving participants and beneficiaries of a single plan, multiple adjudications would not necessarily impose on Defendants inconsistent legal obligations.

However, we agree that individual actions would pose a serious risk of disposing of the interests of non-parties and that certification is therefore appropriate under 23(b)(1)(B). As this Court noted in 2001, "[a] breach of fiduciary duty claim brought by one member of a retirement plan necessarily affects the rights of the rest of the plan members to assert that claim, as the plan member seeks recovery on behalf of the plan as an entity. Accordingly, by the very nature of the relief sought, the prosecution of separate actions would risk prejudice to putative class members." *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853 (SWK), 2006 U.S. Dist. LEXIS 70474, at *12-13 (S.D.N.Y. Sept. 27, 2006). Indeed, courts have noted that the distinctive "representative capacity" aspect of ERISA participant and beneficiary suits makes litigation of this kind "a paradigmatic example of a [23](b)(1) class." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (quoting *Kolar v. Rite Aid Corp.,* No. Civ.A. 01-1229, 2003 U.S. Dist. LEXIS 3646, at *3 (E.D. Pa. March 11, 2003)). *See also Gruby v. Brady*, 838 F. Supp. 820, 828 (S.D.N.Y. 1993) ("Because a plan participant or beneficiary may bring an action to remedy breaches of fiduciary duty only in a representative capacity, such an action affects all participants and beneficiaries, albeit indirectly. Accordingly, the Court finds that class certification is proper under Rule 23(b)(1)(B).") (internal citations omitted).  This is true with respect to suits involving participants and representatives of one plan. It is equally true of suits involving participants and beneficiaries of multiple plans. *See  Shanehchian v. Macy's, Inc.,* NO: 1:07-CV-00828, 2011 U.S. Dist. LEXIS 24376, at *27-33 (S.D. Ohio Mar. 10, 2011).

Accordingly, we conclude that the ERISA Class and Jeanneret ERISA Subclass are maintainable under 23(b)(1). We therefore do not have to reach the question of whether the classes are also maintainable under 23(b)(3). Plaintiffs' motion to certify the classes pursuant to Rule 23(b)(1) is granted. Interim ERISA Class Counsel is appointed class counsel, pursuant to Rule 23(g).

### IV.   Conclusion

Plaintiffs' motion to certify the Investor Class and Jeanneret Investor Subclass pursuant to Rule 23(b)(3) is granted. Plaintiffs' motion to certify the ERISA Class and Jeanneret ERISA Subclass pursuant to Rule 23(b)(1) is also granted. Class counsel are appointed as indicated above.[12]

SO ORDERED.

Originally filed: March 14, 2012
Pages 37 and 40 amended: April 4, 2012

_____
U.S.D.J.

---

[12] The Court has considered all of the parties' other arguments and found them to be moot or without merit.

46